UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC. | ) | |
| 1090 Horsham Road | ) | |
| North Wales, PA 19454 | ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOOD AND DRUG ADMINISTRATION | ) | |
| 5600 Fishers Lane | ) | |
| Rockville, MD 20857 | ) | |
| | ) | |
| MICHAEL O. LEAVITT | ) | |
| Secretary, Health and Human Services | ) | |
| U.S. Department of Health and Human Services | ) | |
| 200 Independence Avenue SW | ) | |
| Washington, DC 20201 | ) | |
| | ) | |
| LESTER M. CRAWFORD | ) | |
| Commissioner of Food and Drugs | ) | |
| U.S. Food and Drug Administration | ) | |
| 5600 Fishers Lane | ) | |
| Rockville, MD 20857 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Teva Pharmaceuticals USA, Inc. ("Teva") brings this action for declaratory and injunctive relief to prevent the unlawful actions of the United States Food and Drug Administration and the official defendants (collectively "FDA") from depriving Teva of its statutory right to a 180-day period of exclusivity for a generic version of the pharmaceutical pravastatin sodium. Because Teva was the first generic drug company to file an abbreviated new drug application ("ANDA") for the marketing of three doses of generic pravastatin, the Hatch-Waxman Act requires the FDA to withhold approval of subsequent ANDAs for 180 days. The

FDA, however, has notified Teva that this exclusivity period expired on February 18, 2005, based on an interpretation of caselaw that is directly contrary both to the unambiguous text of the statute and the precedents of the D.C. Circuit. Teva thus seeks a declaration that the FDA's actions are contrary to law, an abuse of discretion, and arbitrary and capricious, and an injunction precluding the FDA from approving subsequent ANDAs until 180 days after Teva brings generic pravastatin to market.

### Nature of the Action

1.     Teva brings this suit based on the final agency action embodied in the June 28, 2005 letter of Gary Buehler, Director of the FDA's Office of Generic Drugs, to Teva ("FDA Letter"). That letter, which was issued without any advance notice or opportunity for Teva to be heard, provided that the FDA had decided that Teva's statutory period of generic exclusivity applicable to pravastatin sodium products expired as of February 18, 2005.

2.     The FDA Letter contravenes the plain text of the Hatch-Waxman Act, which provides that the exclusivity period for the first ANDA filer only begins to run when the first filer begins commercial marketing of the drug, or when there is a court decision "holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C. § 505(j)(5)(B)(iv) (2002). At the time of the FDA Letter, however, Teva had not begun commercial marketing of generic pravastatin and there had been no such court decision.

3.     In addition to depriving Teva of the marketing exclusivity granted by federal law, the FDA Letter threatens to undermine the incentive system around which Congress structured the Hatch-Waxman Act and which ensures that generic drug manufacturers make lower-priced drugs available to consumers and insurers as soon as possible, including prior to patent expiration. The interpretation of governing precedent embodied in the FDA Letter could permit

later-filing competitors to manipulate the judicial decision trigger in order to deprive first-filers of their exclusivity in cases where Congress clearly did not intend, and the Hatch-Waxman Act clearly does not provide, for that result.

4.     The FDA Letter contravenes both the Hatch-Waxman Act and the Administrative Procedure Act and fails to embody principles of reasoned agency decision-making. As a result, Teva seeks immediate declaratory and injunctive relief from this Court to, *inter alia,* (1) set aside the FDA Letter as contrary to law, an abuse of discretion, and arbitrary and capricious; (2) declare that the dismissal of the settlement in *Apotex Inc. v. Bristol-Myers Squibb Co.,* No. 1:04-CV-2922 (S.D.N.Y.), did not trigger the running of Teva's exclusivity period for pravastatin sodium in 10 mg, 20 mg, and 40 mg strengths; (3) enjoin the FDA from approving other generic pravastatin drug applications until 180-days after Teva brings generic pravastatin to market; and (4) at the very least, require the FDA to reconsider its analysis of the 180-day exclusivity period based on the requirements of 21 U.S.C. § 355(j)(5)(B)(iv) and sound decision-making.

## Jurisdiction and Venue

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This action arises under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 ("Hatch-Waxman Act"), *codified at, inter alia*, 21 U.S.C. § 355; the Administrative Procedure Act, 5 U.S.C. § 706(2); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## Parties

7.     Plaintiff Teva is incorporated under Delaware law with its principal place of business in North Wales, Pennsylvania. Teva is the wholly owned, indirect subsidiary of Teva

3

Pharmaceutical Industries Ltd. ("Teva Ltd."), a global pharmaceutical company organized under the laws of Israel with its principal place of business in Israel. Teva distributes the finished pharmaceutical products of Teva Ltd. in the United States and is an industry leader in the development, manufacture, and marketing of generic pharmaceutical in the United States.

8.      Defendant United States Food and Drug Administration is the agency within the United States Department of Health and Human Services charged with overseeing, *inter alia,* the human drug approval process, including pursuant to the FDCA.

9.      Defendant Michael O. Leavitt is the Secretary of Health and Human Services and the official charged by law with administering the FDCA. Secretary Leavitt is sued in his official capacity. Secretary Leavitt maintains offices at 200 Independence Avenue, S.W., Washington, D.C., 20204.

10.     Defendant Lester M. Crawford, the Commissioner of the FDA, has the delegated authority to administer the drug approval provisions of the FDCA. Commissioner Crawford is sued in his official capacity. He maintains offices at 5600 Fishers Lane, Rockville MD, 20857.

## FACTUAL ALLEGATIONS

### The Hatch-Waxman Act and 180-Day Exclusivity

11.     The approval of generic drugs is governed by the FDCA, as amended by the Hatch-Waxman Act. *See* 21 U.S.C. §§ 301 *et seq.* Although the Hatch-Waxman Act was amended as part of the Medicare Act of 2003, the amended act did not take effect until December 8, 2003, and does not apply to ANDAs filed before that date such as Teva's. *See* Pub. L. No. 108-173 § 1102(b)(1).

12.     Generic drugs contain the same active ingredients, and provide the same therapeutic value, as branded drugs. They are, however, generally sold at a lower price to

consumers, private insurers, and public insurers.  Congress enacted the Hatch-Waxman Act to increase the number of generic drugs on the market by expediting the process of bringing them there, and thereby significantly reduce the cost that the public pays for pharmaceuticals.  The Hatch-Waxman Act provides an expedited approval process within the FDA and grants generic drug companies significant incentives to encourage them to bring their products to market.  *See* "Generic Drug Entry Prior to Patent Expiration:  An FTC Study," July 2002, available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf at i ("Hatch-Waxman established a regulatory framework that sought to balance incentives for continued innovation by research-based pharmaceutical companies and opportunities for market entry by generic drug manufacturers.").

13.    In order to expedite the approval process for generic drugs, the Hatch-Waxman Act permits generic companies to obtain approval of their generic products so long as they can show them to be bioequivalent to products that the FDA has already deemed safe and effective.  Before marketing a generic drug, the manufacturer must submit an abbreviated new drug application, or ANDA, to the FDA.  21 U.S.C. § 355(j).  The ANDA establishes the bioequivalence and therapeutic value of the generic product as compared with the branded product. 21 U.S.C. § 355(j)(2)(A). So long as bioequivalence can be established, a generic drug manufacturer need not repeat the safety and efficacy studies that were conducted on the branded version of the drug and included as part of the brand manufacturer's new drug application ("NDA").  *Id.*

14.    In the ANDA, the generic manufacturer also must address, and provide a certification concerning, each patent pertaining to the drug.  The generic maker can certify, *inter alia,* that the listed patent is invalid and/or will not be infringed by the manufacture, use, or sale

of the generic drug for which the ANDA is submitted. Such a certification is known as a Paragraph IV certification. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Notice of a Paragraph IV certification must be provided to the patent holder as well. 21 U.S.C. § 355(j)(2)(B). A Paragraph IV certification signals the intent of a generic manufacturer to market its product prior to the expiration of the patents on the branded drug.

15.    The Hatch-Waxman Act, by design, encourages generic drug companies to challenge pharmaceutical patents in order to bring generic products to market faster. The first generic drug company to challenge a patent generally bears costs of research and development, legal costs to identify potentially vulnerable patents, as well as the litigation costs that can come from protracted patent infringement litigation. If this generic drug company succeeds in being the first to successfully file a Paragraph IV ANDA, however, the benefits of those investments may ultimately be shared with other generic drug companies, who can benefit from the substantial investments that the first filer has made.

16.    Therefore, in order to encourage generic drug companies to bear the costs associated with being the first filer of a Paragraph IV ANDA certification, the Hatch-Waxman Act provides that the first filer will receive the exclusive right to market the pertinent generic product for 180 days following the successful challenge. 21 U.S.C. § 355(j)(5)(B)(iv). The Act prohibits the FDA from approving the ANDAs of the subsequent filers until the 180-day exclusivity period has elapsed.

17.    The 180-day exclusivity period runs from the earlier of the date on which the first-filing generic drug company first commercially markets the generic drug or "the date of a decision of a court in an action … holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(II).

6

18.    The FDA may not approve the applications of subsequent ANDA filers until the 180-day exclusivity period expires. Once the 180 day exclusivity ends, however, other generic manufacturers may enter the product market. By successfully challenging the brand-name patent in court, the subsequent filer can start the clock on the 180-day exclusivity period.

19.    Depriving the first filer of the benefits of exclusivity undermines the incentive system that Congress carefully constructed in the Hatch-Waxman Act to ensure that generic drugs are brought to market as early as possible for the benefit of consumers.

### Pravastatin Sodium

20.    Bristol-Myers Squibb Co. ("BMS") holds the approved NDA for pravastatin sodium, No. 19-898, which is used to treat high cholesterol conditions and cardiovascular disease. BMS sells this product as Pravachol®. The FDA lists four patents in connection with Pravachol®, U.S. Patent Nos. 4,346,227 ("the '227 patent"), 5,030,447 ("the '447 patent"), 5,180,589 ("the '589 patent", and 5,622,985 ("the '985 patent").

21.    The '227 patent is a compound patent for pravastatin sodium and expires on April 20, 2006. The '447 and '589 patents claim a "reduced mass formulation" of pravastatin sodium and expire in January 2009. The '985 patent claims a method of using pravastatin sodium for a specific class of patients and expires in October 2014.

22.    On December 10, 2000, Teva filed ANDA No. 76-056 seeking approval for generic pravastatin sodium in 10 mg, 20 mg, and 40 mg doses. Teva's application included a Paragraph IV certification with respect to the '447, '589, and '985 patents. By filing a Paragraph IV ANDA, Teva certified its belief that the generic product described in the application would not infringe those patents and/or that the patents were invalid.

23.    In the same ANDA, Teva filed a Paragraph III certification with respect to the compound patent, the '227 patent.  The Paragraph III certification means that Teva does not challenge the validity of the '227 patent, and believes that the '227 patent stands in the way of marketing the generic product described in the ANDA.  Therefore, the FDA will not grant final approval to the ANDA until the expiration of the '227 patent in April 2006.

24.    Teva received a letter of tentative approval from the FDA, subject to the expiration of the '227 patent, on May 20, 2002.

25.    On information and belief, Teva was the first company to file a Paragraph IV certification for generic pravastatin sodium in 10 mg, 20 mg, and 40 mg doses.  At least seven other generic manufacturers, including Apotex Inc., filed Paragraph IV certifications for pravastatin with BMS *after* Teva.  *See* Mem. of Law in Support of Def.'s Mot. to Dismiss Plf.'s Comp., *Apotex Inc. v. Bristol-Myers Squibb Co.,* No. 1:04-CV-2922 (S.D.N.Y.) (filed May 25, 2004) ("*Apotex* Mot. to Dismiss") at 7.  According to BMS, those manufacturers similarly filed Paragraph III certifications with respect to the 227 patent.

26.    BMS "has not taken any action to preclude or delay any generic companies from entering the market with obtaining FDA approval for their generic pravastatin sodium formulations." *Apotex* Mot. to Dismiss at 8.

27.    According to the FDA, the other generic manufacturers have also received tentative approval letters from the FDA for generic pravastatin.  Therefore, they may enter the market as soon as the '227 patent expires and the 180-day exclusivity expires, as well any other pertinent patent issues are resolved.

**The *Apotex* Lawsuit**

28.     The FDA's action in this case arises from its interpretation of the legal impact of the dismissal of a sham lawsuit that Apotex (with its parent company Apotex Corp.) brought against BMS.   Despite the fact that BMS repeatedly assured Apotex that it had no present intention of bringing an infringement lawsuit based on the filing of an ANDA, Apotex filed a declaratory judgment action against BMS.   No sooner had Apotex filed this lawsuit, however, then it agreed to a stipulation with BMS in which the parties voluntarily sought ***the dismissal of the lawsuit based entirely on what BMS had said to Apotex prior to Apotex ever filing the lawsuit.***

29.     Although BMS had taken no action against any generic manufacturer based on the Paragraph IV certifications, Apotex demanded after filing its ANDA that BMS "agree in writing that Apotex's proposed generic pravastatin sodium product 'does not and will not infringe the '447, '589, and '985 patents.'"   *Apotex* Mot. to Dismiss at 8.

30.     BMS refused to make such a representation.  *Id.*  On information and belief, BMS never represented to Apotex or to any other Paragraph IV filer that its patents pertaining to pravastatin were invalid, not infringed, or unenforceable.

31.     Nonetheless, on November 10, 2003, BMS expressly informed Apotex that "BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents" referred to in the Paragraph IV certification of Apotex.  *Id.*

32.     In response to protests from Apotex about the propriety of listing the three patents with the FDA, BMS sent a letter to Apotex on December 4, 2003, in which it defended the listing of its patents, but "did not retract its ***previously expressed intention*** not to sue Apotex."  *Id.* at 8-9 (emphasis added).

33.    On February 13, 2004, BMS sent another letter "again reassur[ing] Apotex that it had no *intention* of bringing a suit for the infringement" of its patents. *Id.* at 9 (emphasis added).

34.    Apotex claimed that BMS "impliedly" accused Apotex of infringement in the previous letter, and so BMS sent a fourth letter, in which it said, "While [Apotex] may continue to disagree with BMS' interpretation of the claims of the three BMS patents, BMS nonetheless has no *intention*, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents so long as [Apotex's] previous representations about its proposed generic products remain accurate." *Id.* (emphasis added).

35.    Despite the fact that on four separate occasions, BMS clearly and unambiguously informed Apotex that it had no *intention* of filing an infringement lawsuit and that Apotex therefore had no reasonable apprehension of litigation, Apotex brought a declaratory judgment action against BMS on April 15, 2004 seeking a declaration of non-infringement, invalidity, and/or unenforceability. *See* Compl., *Apotex Inc. v. Bristol-Myers Squibb Co.,* No. 1:04-CV-2922, at 34 (S.D.N.Y.).

36.    BMS promptly moved to dismiss the Complaint because, based on its prior statements, "no actual case or controversy exists between Bristol and the plaintiffs." *Apotex* Mot. to Dismiss at 1. According to BMS, "[t]he lack of a real controversy between Apotex and Bristol could not be more plain. Apotex cannot reasonably fear being sued by Bristol, because Bristol has repeatedly affirmed in writing, in absolute terms, that it has *no* intention of suing Apotex." *Id.* at 2.

37.    BMS recognized that Apotex's "real objective is not to resolve any concerns it has about being sued, but rather to use this suit as an end run to erode another generic pharmaceutical company's marketing exclusivity as granted by the Hatch-Waxman Act." *Id.*

The district court never ruled on the merits of BMS's motion to dismiss. Rather, two months after the filing of the motion to dismiss, Apotex and BMS submitted a stipulation and requested the voluntary dismissal of the case without prejudice. The stipulation requested the dismissal of the declaratory judgment action based on the very same representations that BMS had made prior to Apotex ever filing suit.

38.     Specifically, the stipulation provided that "prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341." *Apotex* Stipulation at 3.   Furthermore, "based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement ... Apotex hereby stipulates that Apotex's Complaint ... be, and hereby is, dismissed, for lack of subject matter jurisdiction ...." *Id.*

39.     On July 23, 2004, the district court endorsed the stipulation without comment and permitted Apotex's declaratory judgment action to be dismissed. *Id.*

40.     The *Apotex* stipulation did not state that any of the pravastatin patents were invalid, not infringed, or unenforceable, and the district court in that case did not so hold, either expressly or implicitly. The stipulation likewise contained no findings as to invalidity, non-infringement, or unenforceability. To the contrary, the parties to the stipulation admitted that they ***did*** dispute the scope and validity of BMS's claims, but notwithstanding that dispute, there was no genuine controversy based on what BMS had told Apotex before Apotex had ever filed suit.

41.    Because the *Apotex* stipulation did not state that it was with prejudice, it is deemed without prejudice. *See* Fed. R. Civ. P. 41(a)(2). The dismissal of the *Apotex* case became final and no longer subject to appeal on August 22, 2004.

**The FDA Action**

42.    Ten months after the voluntary dismissal of the *Apotex* action, on June 28, 2005, the FDA mailed a letter to Teva in which it announced that the voluntary dismissal in *Apotex* had triggered the running of Teva's statutory exclusivity period for generic pravastatin in 10 mg, 20 mg, and 40 mg. The FDA never advised Teva beforehand that it was considering the impact of the *Apotex* dismissal, and Teva therefore had no opportunity to provide the FDA with its views on the matter prior to the issuance of the letter.

43.    In the June 28 letter, the FDA announced that the 180-day exclusivity period for pravastatin had begun to run with the dismissal of the *Apotex* lawsuit and therefore expired on February 18, 2005. According to the FDA, the *Apotex* stipulation and dismissal order "trigger[ed]" the running of the exclusivity period because "the decision of a court with respect to any ANDA, in which the court holds the relevant patent invalid, unenforceable or not infringed can start the 180-day period for that patent." FDA Letter at 3. The FDA Letter stated that "the *[Apotex]* dismissal is based upon BMS's representations that it has no intention to sue Apotex for infringement of these three patents arising from Apotex's generic pravastatin sodium products." According to the FDA, those representations "preclude[] a subsequent suit by BMS against Apotex for infringement." FDA Letter at 3-4.

44.    The FDA did not base its conclusion on the agency's expertise in interpreting ambiguous provisions of the Hatch-Waxman Act. To the contrary, in prior litigation before this Court, the FDA had asserted that a dismissal for lack of subject-matter jurisdiction does ***not***

serve as a judicial decision trigger under the statute. *See Teva Pharmaceuticals, USA, Inc. v. FDA,* 182 F.3d 1003, 1006-07 (D.C. Cir. 1999) ("*Teva I*").

45.    The FDA based its interpretation on the D.C. Circuit's decisions in *Teva I* and *Teva Pharmaceuticals, USA, Inc. v. FDA,* No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), a second unpublished, nonprecedential opinion issued after remand. In *Teva I,* the court reversed the denial of a preliminary injunction merely on the procedural ground that the FDA had failed to adequately explain its decision to "recognize a grant of partial summary judgment, based on the patent holder's admission of noninfringement, as a 'court decision' [as it did in an earlier case], but decline to give similar effect to a dismissal based on a finding of no reasonable apprehension of suit arising from the patent holder's admission of noninfringement" in the dismissal of another suit. 182 F.3d at 1010-11. The court found that the FDA was "mute in response to Teva's request for a complete explanation of the rejection of its interpretation." *Id.* at 1010. Therefore, "the FDA's refusal to treat the California dismissal as a trigger was arbitrary and capricious in light of the FDA's response in another case," and the Court of Appeals remanded to the agency for further proceedings. *Id.* at 1012.

46.    The case returned to the D.C. Circuit in *Teva II,* after the FDA's decision on remand. Following *Teva I,* the FDA had reiterated its earlier conclusion—that the dismissal of the ticlopidine case had not started the running of the exclusivity period—based on a claim that evaluating the legal impact of a dismissal would pose too great a burden for the agency. The D.C. Circuit again held that the FDA's decision continued to be void for "want of reasoned decision-making" because, on the facts of the case, the legal impact was plain and the agency did not explain why the administrative burden was likely to be so great. As an unpublished decision,

the opinion has no precedential value and therefore did not make any new law.  *See* D.C. Cir. R. 36(c).

47.      The FDA Letter purportedly based its conclusion on its interpretation of these two decisions by the D.C. Circuit.  According to the FDA, in *Teva I & II* "the District of Columbia Circuit ruled that a dismissal of a declaratory judgment action (DJA) can qualify as a 'decision of a court' triggering the running of 180-day exclusivity *if the dismissal estops a future action* against the ANDA holder for infringement of the patent with respect to that drug product."  FDA Letter at 3 (emphasis added).

48.      The FDA's conclusion is incorrect.  *First,* the agency has plainly misconstrued what the Court of Appeals actually held in *Teva I & II*.  The D.C. Circuit did not address what constitutes a "court decision trigger" under the Hatch-Waxman Act, much less hold that a dismissal for lack of jurisdiction should *always* be deemed a court decision trigger.  Rather, in *Teva I* the Court held that the FDA had acted arbitrarily and capriciously by failing to explain why a dismissal for lack of subject matter jurisdiction was *not* a court decision trigger in the that case where the FDA had found a grant of partial summary judgment to be a court decision in another case.  *See* 182 F.3d at 1007.

49.      The D.C. Circuit expressly recognized that "not every court action can be construed as a 'decision' with a 'holding'; for example, a dismissal for lack of personal jurisdiction is not a decision on the merits and has no preclusive effect."  *See id.* at 1008.  But the D.C. Circuit held that the FDA is obliged to provide a reasoned explanation for its conclusion. *Id.* at 1010.

50.      As in *Teva I & II*, the FDA has failed to provided a reasoned justification for its decision here.  Because *Teva I & II* were procedural decisions, the Court of Appeals did not

promulgate an authoritative interpretation of the requirements of the Hatch-Waxman Act. The FDA therefore erred by holding that those decisions required in this case a particular decision on the merits, and the decision should be vacated on that basis alone.

51.    *Second*, even if the FDA had correctly interpreted *Teva I & II*, the agency was simply wrong to conclude that in the underlying case here "the dismissal precludes a subsequent suit by BMS against Apotex for infringement of these patents." FDA Letter at 4. Federal Circuit precedent, which governs the estoppel question, *see Teva I*, 182 F.3d at 1008-09, makes it clear that for a dismissal to work an estoppel against the patent holder, the patent holder must either expressly represent that the challenged product does not infringe *or* make a clear statement to the patent holder that they will never file suit. Neither occurred in this case.

52.    Unlike this case, in *Teva I*, Syntex expressly represented that "Teva's 'formulation ... *does not infringe*' the patent," *id*. at 1008 (emphasis added), that it would "*make no claim* of patent infringement based on the sale of ticlopidine hydrochloride tablets," *id*. at 1006 (emphasis added), and that "Teva's 'formulation did not warrant bringing a patent infringement action.'" *Id*. at 1008 (emphasis added). The D.C. Circuit held that, under prevailing Federal Circuit law, a dismissal predicated on those statements would estop Syntex from filing a patent infringement lawsuit against Teva in a future case. *See id*. at 1008-09.

53.    Here, however, BMS stated only that it "had no *intention* to bring suit against Apotex." BMS did not state that Apotex's products did not infringe, nor did it promise not to sue Apotex in the future. As courts routinely recognize, a patent holder's representation about its state of mind does not bar the patent holder from changing its mind and filing a future suit. *See, e.g., C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983); *Biogen, Inc. v. Amgen, Inc.*,

913 F. Supp. 35, 39 (D. Mass. 1996); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. AMD-96-455, 1996 WL 432290 at *6 (D. Del. July 23, 1996).

54.     Moreover, by its own terms, the stipulated dismissal cannot have preclusive effect.  Rule 41(a)(2) specifically provides that "[u]nless otherwise specified in the order, a dismissal under this paragraph is without prejudice."  Fed. R. Civ. P. 41(a)(2).  One will search the parties' stipulated dismissal in vain to find any reference to the dismissal being with prejudice (or for any reference by which BMS covenants not to bring a future action).  It follows *a fortiori* that it must be without prejudice and is not sufficient to estop a future suit by BMS.  In sum, the FDA's casual finding of estoppel lacks precedential support and is both contrary to law and arbitrary and capricious.

55.     ***Third,*** the FDA erred because, wholly apart from the reasons the FDA actually provided, the clear text of the Hatch-Waxman Act does not permit the holding that Teva's exclusivity period began to run from the voluntary, stipulated dismissal of the *Apotex* lawsuit.

56.     In *Teva I*, the D.C. Circuit recognized that the dismissal of the lawsuit could potentially have been a "court decision" under the Hatch-Waxman Act, because that dismissal was the functional equivalent of a court decision, as it was "exclusively and necessarily" based on the patent holder's concession of noninfringement.  182 F.3d at 1008.  In other words, the underlying dismissal of the infringement suit at issue in *Teva I* contained an implicit "holding" that the patent was "not infringed"—the patent holder's representation of non-infringement was the basis for eliminating the case or controversy.  The district court granted the motion to dismiss on the basis that such a representation would preclude the patent holder from filing a future infringement lawsuit.

57.    By contrast, here BMS represented that it had no current *intention* of filing a lawsuit, but it steadfastly refused to concede noninfringement, invalidity, or unenforceability. Where the dismissal for lack of subject-matter jurisdiction is wholly unrelated to a finding (explicit or implicit) of non-infringement (or invalidity), there is simply no basis in the statute for construing it contain a "judicial decision … *holding* [that] the patent which is the subject of the certification to be *invalid or not infringed*."

58.    In addition, in the *Apotex* case, there simply was no "judicial decision … holding" the patent invalid or not infringed, because the court never issued an opinion at all. Rather, the court merely permitted Apotex to dismiss the case based on the stipulation. Therefore, there was no "decision … holding" anything at all, much less a holding that the patents were invalid or not infringed.

59.    The FDA's approach would effectively read the limitation requiring that the court decision contain a holding that the certified patent is invalid or not infringed completely out of the statute. A district court's approval of *any* dismissal, even one without an actual holding, would constitute a triggering "decision of a court" regardless of what it held.

60.    *Finally,* in addition to finding no support in the statute, the FDA's determination here contravenes one of the fundamental goals of the Hatch-Waxman Act, in that it invites frivolous litigation that would undermine the 180-day exclusivity period. Because Apotex's stipulated dismissal was solely based on representations BMS made prior to Apotex's initiation of a lawsuit, Apotex's course of conduct was plainly a sham brought in an attempt to trigger Teva's exclusivity rather than to expedite generic entry to the market prior to patent expiration.

61.    The FDA's decision invites generic companies to file lawsuits where they are not otherwise anticipating suit and then withdraw them *on the very same day* to start the clock on

exclusivity. By concluding that the stipulated dismissal here triggered the 180-day exclusivity period, the FDA encourages generic companies to file frivolous lawsuits which they have no intention of pursuing, solely in hopes of depriving the first filer of exclusivity and, thus, defeating the carefully crafted incentive system established through the Hatch-Waxman Act.

### FIRST CAUSE OF ACTION
#### (Violation of the FDCA and the APA)

62.     The FDA Letter stating that the period of generic exclusivity applicable to pravastatin sodium products expired as of February 18, 2005 is contrary to law, an abuse of discretion, and arbitrary and capricious; in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; and without observance of procedure required by law.

63.     The FDA Letter was not based on reasoned agency decision-making. The FDA Letter relied on an erroneous reading of two D.C. Circuit decisions. The FDA Letter also ignores basic principles of judicial economy and fairness, and threatens the carefully calibrated incentive system in the Hatch-Waxman Act that provides consumers with lower-cost generic products prior to patent expiration.

64.     The FDA Letter constitutes final agency action that is final and reviewable by a court. Teva has exhausted every available administrative avenue and has no adequate remedy at law.

65.     Neither defendants nor any other entity will suffer cognizable harm if the relief requested herein is granted, and the public interest will be served by such relief.

66.     The FDA's failure to recognize Teva's statutorily mandated exclusivity period for generic pravastatin sodium will cause substantial and irrevocable harm to the company. Teva must begin to make product and marketing decisions soon based on whether it will have the exclusive right to sell the generic product as of April 20, 2006.

67.    The FDA's unlawful conduct has caused, is causing, and will continue to cause substantial harm to Teva unless and until the FDA's actions are declared unlawful pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the FDCA, and the agency is enjoined from acting in reliance on the erroneous FDA Letter.

## PRAYER FOR RELIEF

WHEREFORE, Teva prays that this Court:

A.    Vacate the FDA Letter as contrary to law, an abuse of discretion, and arbitrary and capricious;

B.    Declare that the dismissal of the *Apotex* litigation did not trigger Teva's exclusivity period for generic pravastatin in 10 mg, 20 mg, and 40 mg doses;

C.    Enjoin the FDA from approving other generic pravastatin drug applications until 180 days after Teva brings its generic pravastatin products to market;

D.    Alternatively, direct the FDA to reconsider the 180-day exclusivity period based on the requirements of 21 U.S.C. § 355(j)(5)(B)(iv) and administrative law;

E.    Provide such further relief as the Court may deem just and proper.


Dated: July 22, 2005                              Respectfully submitted,


Of Counsel:                                       _____
Richard Egosi                                     Jay P. Lefkowitz (DC 449280)*
*Senior Vice President & General Counsel*         Pamela J. Auerbach (DC 447805)
David M. Stark                                    Steven A. Engel (DC 484789)
*Senior Director, Legal Affairs*                  John C. O'Quinn (DC 485936)
TEVA PHARMACEUTICALS USA, INC.                    KIRKLAND & ELLIS LLP
425 Privet Road                                   655 15th Street NW, Suite 1200
Horsham, PA  19044-8005                           Washington, DC  20005
(215) 293-6400                                    (202) 879-5000

                                                  *Counsel for Teva Pharmaceuticals USA, Inc.*
                                                  * *Counsel of Record*

67. The FDA's unlawful conduct has caused, is causing, and will continue to cause substantial harm to Teva unless and until the FDA's actions are declared unlawful pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and the FDCA, and the agency is enjoined from acting in reliance on the erroneous FDA Letter.

## PRAYER FOR RELIEF

WHEREFORE, Teva prays that this Court:

A. Vacate the FDA Letter as contrary to law, an abuse of discretion, and arbitrary and capricious;

B. Declare that the dismissal of the *Apotex* litigation did not trigger Teva's exclusivity period for generic pravastatin in 10 mg, 20 mg, and 40 mg doses;

C. Enjoin the FDA from approving other generic pravastatin drug applications until 180 days after Teva brings its generic pravastatin products to market;

D. Alternatively, direct the FDA to reconsider the 180-day exclusivity period based on the requirements of 21 U.S.C. § 355(j)(5)(B)(iv) and administrative law;

E. Provide such further relief as the Court may deem just and proper.


Dated: July 26, 2005                          Respectfully submitted,


Of Counsel:                                   Jay P. Lefkowitz (DC 449280)*
Richard Egosi                                 Pamela J. Auerbach (DC 447805)
*Senior Vice President & General Counsel*     Steven A. Engel (DC 484789)
David M. Stark                                John C. O'Quinn (DC 485936)
*Senior Director, Legal Affairs*              KIRKLAND & ELLIS LLP
TEVA PHARMACEUTICALS USA, INC.                655 15th Street NW, Suite 1200
425 Privet Road                               Washington, DC 20005
Horsham, PA 19044-8005                        (202) 879-5000
(215) 293-6400

                                              *Counsel for Teva Pharmaceuticals USA, Inc.*
                                              * *Counsel of Record*