# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC.<br>1090 Horsham Road<br>North Wales, PA  19454 | ) ) ) | |
| | ) | Case No. _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857 | ) ) ) ) ) | |
| MICHAEL O. LEAVITT<br>Secretary, Health and Human Services<br>U.S. Department of Health and Human Services<br>200 Independence Avenue SW<br>Washington, DC 20201 | ) ) ) ) ) ) | |
| LESTER M. CRAWFORD<br>Commissioner of Food and Drugs<br>U.S. Food and Drug Administration<br>5600 Fishers Lane<br>Rockville, MD  20857 | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

# MEMORANDUM IN SUPPORT
## OF APPLICATION FOR PRELIMINARY INJUNCTION

Of Counsel:
Richard Egosi
*Senior Vice President & General Counsel*
David M. Stark
*Senior Director, Legal Affairs*
TEVA PHARMACEUTICALS USA, INC.
425 Privet Road
Horsham, PA  19044-8005
(215) 293-6400

Jay P. Lefkowitz (DC 449280)*
Pamela J. Auerbach (DC 447805)
Steven A. Engel (DC 484789)
John C. O'Quinn (DC 485936)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC  20005
(202) 879-5000

*Counsel for Teva Pharmaceuticals USA, Inc.*

July 26, 2005

* *Counsel of Record*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 5

    1.    The Hatch-Waxman Act Encourages Generic Drug Companies To
        Bring Their Products To Market. ..................................................... 5

    2.    Teva Files The First ANDA For Generic Pravastatin Sodium. .................. 7

    3.    Apotex Files, And Then Immediately Drops, A Sham Lawsuit
        Against BMS. ............................................................................. 8

    4.    The FDA Determines That The Voluntary Dismissal Of The
        Apotex Lawsuit Constituted A Judicial Decision "Holding The
        Patent ... Invalid Or Not Infringed." ........................................... 11

ARGUMENT .................................................................................................. 12

THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO PROHIBIT
THE FDA FROM DEPRIVING TEVA OF THE EXCLUSIVITY GUARANTTED TO
THE COMPANY UNDER THE HATCH-WAXMAN ACT. .................................... 12

    A.    Teva Is Likely To Prevail On The Merits. ............................................. 14

        1.    The Agency Decision Is Entitled To No Deference. .................. 15

        2.    The FDA Letter Misinterpreted The D.C. Circuit's Decisions In
            *Teva I & II*. ......................................................................... 16

        3.    The FDA Letter Reflects An Impermissible Interpretation Of The
            Hatch-Waxman Act. ............................................................. 20

        4.    The FDA Mistakenly Concluded That The *Apotex* Dismissal
            Would Estop BMS From Enforcing Its Patent. ......................... 24

    B.    Plaintiff Will Be Irreparably Injured If The Requested Injunction Is
        Denied. ..................................................................................... 29

    C.    The Public Interest Will Be Served By The Requested Injunction ...................... 31

    D.    The Balance Of Hardships Strongly Favors Injunctive Relief. ............................ 33

1.    The FDA And The Named Officials Will Not Be Harmed By The Requested Injunction. ............................................................................33

2.    Subsequent ANDA Filers Generally Will Not Be Harmed By The Requested Injunction. ............................................................................33

CONCLUSION ............................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001) ................................................................ 16, 17

*Ampex Corp. v. Mitsubishi Elec. Corp.,*
966 F. Supp. 263 (D. Del. 1997) ............................................................... 30

*Andrx Pharms., Inc. v. Biovail Corp.,*
276 F.3d 1368 (Fed. Cir. 2002) ................................................................. 1

*Apotex Inc. v. Bristol-Myers Squibb Co.,*
No. 1:04-CV-2922 (S.D.N.Y.) ................................................................ passim

*Biacore v. Thermo Bioanalysis Corp.,*
79 F. Supp. 2d 422 (D. Del. 1999) ........................................................... 30

*Biogen, Inc. v. Amgen, Inc.,*
913 F. Supp. 35 (D. Mass. 1996) ............................................................. 29

*Boehringer Ingelheim Corp. v. Shalala,*
993 F. Supp. 1 (D.D.C. 1997) ................................................................... 33

*Bracco Diagnostics, Inc. v. Shalala,*
963 F. Supp. 20 (D.D.C. 1997) ................................................................. 33

*Bryan Ashley Intern., Inc. v. Shelby Williams Indus., Inc.,*
932 F. Supp. 290 (S.D. Fla. 1996) ........................................................... 30

*C.R. Bard, Inc. v. Schwartz,*
716 F.2d 874 (Fed. Cir. 1983) .............................................................. 4, 29, 30

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984) ................................................................................. 17

*CityFed Fin. Corp. v. OTS,*
58 F.3d 738 (D.C. Cir. 1995) ................................................................... 15

*Davenport v. Int'l Bd. of Teamsters, AFL-CIO,*
166 F.3d 356 (D.C. Cir. 1999) ................................................................. 15

*DOJ v. FLRA,*
266 F.3d 1228 (D.C. Cir. 2001) ............................................................... 17

iii

*Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.*,
  No. 03-CV-726, 2003 WL 21638254 (D.N.J. July 8, 2003)...................................8, 34, 35

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990)..................................................................................................6, 10

*Fina Research, S.A. v. Baroid Ltd.*,
  141 F.3d 1479 (Fed. Cir. 1998)........................................................................................28

*Glaxo Wellcome, Inc. v. Pharmadyne Corp.*,
  No. AMD-96-455, 1996 WL 432290 (D. Del. July 23, 1996) ........................................30

*Minnesota Mining & Mfg. Co. v. Barr Labs.*,
  289 F.3d 775 (Fed. Cir. 2002)..............................................................................8, 25, 34

*Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*,
  826 F. Supp. 112 (D. Del. 1993)......................................................................................30

*Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998)..................................................................................passim

*Mova Pharm. Corp. v. Shalala*,
  955 F. Supp. 128 (D.D.C. 1997).......................................................................15, 31, 32, 33

*Mylan Labs., Inc. v. Thompson*,
  332 F. Supp. 2d 106 (D.D.C. 2004) ................................................................................18

*Mylan Pharms., Inc. v. Thompson*,
  139 F. Supp. 2d 1 (D.D.C. 2001),
  *rev'd on other grounds*, 268 F.3d 1323 (Fed. Cir. 2001)...........................................15, 16

*Spectronics Corp. v. H.B. Fuller Co.*,
  940 F.2d 631 (Fed. Cir. 1991)...................................................................................28, 30

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
  57 F.3d 1054 (Fed. Cir. 1995).........................................................................................28

*Teva Pharms., USA, Inc. v. FDA*,
  182 F.3d 1003 (D.C. Cir. 1999) ................................................................................passim

*Teva Pharms., USA, Inc. v. FDA*,
  No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000)....................................passim

*Teva Pharms., USA, Inc. v. FDA*,
  No. 99-67, 1999 WL 1042743 (D.D.C. Aug. 19, 1999) ................................................22

*Torpharm, Inc. v. Shalala*,
  No. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997)...........................................32

*United Sweetener USA, Inc. v. Nutrasweet Co.*,
    760 F. Supp. 400 (D. Del. 1991)................................................................. 30

*Univ. of Great Falls v. N.L.R.B.*,
    278 F.3d 1335 (D.C. Cir. 2002) ............................................................... 17

**Statutes**

21 C.F.R. § 314.107(c)................................................................................. 8

21 U.S.C. § 355 ............................................................................................ 6

21 U.S.C. § 355(j) ..................................................................................... 6, 7

21 U.S.C. § 355(j)(2)(A) ............................................................................. 7

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ............................................................... 6

21 U.S.C. § 355(j)(5)(B)(iv) ................................................................. passim

21 U.S.C. § 355(j)(5)(B)(iv)(II) ............................................................. 8, 26

35 U.S.C. § 271(e) ..................................................................................... 10

35 U.S.C. § 271(e) ....................................................................................... 6

D.C. Cir. R. 34(c) ...................................................................................... 21

Fed. R. Civ. P. 41(a)(2) ................................................................... 13, 24, 31

Hatch-Waxman Act,
    Pub. L. 98-417, 98 Stat. 1585 (1984)......................................................... 6

Medicare Modernization Act,
    Pub. L. No. 108-173, ___ Stat. ___ (2003)................................................ 2

**Other Authorities**

"Generic Drug Entry Prior to Patent Expiration:  An FTC Study," (July 2002), *available at*
    http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf ................................ 6

H.R. Rep. No. 98-857 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647 ........... 6

Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") submits this memorandum in support of its application for a preliminary injunction to prevent the Food and Drug Administration ("FDA") from approving subsequent drug applications for three doses of generic pravastatin sodium until Teva's statutory exclusivity period has properly expired.  Over one year ago, Apotex Inc., another generic drug company, filed a sham lawsuit against Bristol-Myers Squibb Co. ("BMS") with no intention of prosecuting it.  Apotex voluntarily dismissed the lawsuit, in the hope that such a maneuver would trigger the running of Teva's exclusivity period.  Four weeks ago, the FDA endorsed Apotex's efforts to circumvent both the letter and the spirit of the law, ruling that based on this voluntary dismissal, Teva's 180 days of marketing exclusivity had expired.

The FDA's decision rests on a clear misreading of D.C. Circuit precedent and threatens to cause Teva several hundred million dollars in irreparable harm as it prepares to launch generic pravastatin products early next year.  Accordingly, Teva respectfully requests that the Court vacate the FDA's action and enjoin the agency from approving other generic applications until after Teva's 180-day exclusivity period expires.

## INTRODUCTION

Congress enacted the Hatch-Waxman Act of 1984 to lower the regulatory barriers facing generic drug companies and to encourage those companies to challenge the patents blocking generic entry to the market. *See, e.g., Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002).  To accomplish those goals, the statute provides that the first generic drug company to identify and challenge a brand-name patent by filing a regulatory statement with the FDA—thereby assuming the risks and costs of potential patent litigation—shall receive the exclusive right to market the generic product for a period of 180 days.  *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002).  The statute provides that this exclusivity period shall begin when the

generic company first commercially markets its product or, if earlier, if and when a court issues a decision "holding the patent which is the subject of the certification to be invalid or not infringed." *Id.*[1]

In this case, Teva filed the first application with the FDA for generic approval of three dosage strengths of pravastatin sodium, which BMS markets as Pravachol®. Apotex filed its own application for the drug more than a year later, but then tried to draw BMS into a lawsuit to trigger Teva's exclusivity for pravastatin sodium. BMS represented to Apotex on *four separate occasions* that, while it stood by its belief in the validity and enforceability of its patents, it had "no intention" of bringing an infringement lawsuit based on the FDA application.

Nonetheless, Apotex filed a sham declaratory judgment action claiming that it reasonably feared a future suit. BMS immediately moved to dismiss on the ground that, in light of its pre-suit representations, there was no case or controversy. Before the district court ruled on that motion and well before any consideration of the complaint, Apotex stipulated to a voluntary dismissal of its own lawsuit, without prejudice, based on nothing more than the pre-suit representations that Apotex supposedly had deemed inadequate before filing suit. The district court approved the parties' stipulation and dismissed the action. BMS *never* represented that Apotex's product did not infringe or that its patents were invalid or unenforceable. Therefore, this voluntary dismissal of Apotex's lawsuit cannot in any way be understood as equivalent to a

---

[1] The Medicare Modernization Act of 2003 ("MMA") amended the Hatch-Waxman Act provisions governing exclusivity. However, those amendments to the text of the MMA do not apply here because Teva's ANDA was filed prior to the enactment of the 2003 Act. *See* Pub. L. No. 108-173 § 1102(b)(1). The MMA does, however, define the term "decision of a court" in the pre-amended statute as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." *Id.* § 1102(b)(3).

"decision of a court ... *holding* the patent which is the subject of the certification to be *invalid or not infringed*." 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added).

Despite the plain language of the statute—requiring a holding that the patent is "invalid or not infringed"—the FDA ruled in a June 28, 2005 letter that the stipulated dismissal in *Apotex* did constitute a court decision triggering Teva's exclusivity. *See* June 28, 2005 Letter from Director of the FDA Office of Generic Drugs Gary Buehler to Philip Erickson ("FDA Letter") (Tab A). In support of its decision, the FDA relied exclusively on the D.C. Circuit's decision in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) (*Teva I*), and an unpublished opinion in *Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) (*Teva II*). In those cases, the Court of Appeals vacated the FDA's action on procedural grounds, "for want of reasoned decisionmaking," *id.* at *2, even while recognizing that the litigants had advanced several "permissible construction[s] of the 'court decision' requirement" in the case, *Teva I*, 182 F.3d at 1012. Despite the Court's clear recognition of multiple permissible interpretations, the FDA read those cases as adopting a particular one: namely, that the dismissal of a declaratory judgment action constitutes a court-decision trigger whenever it would bar the patent holder from filing a future infringement lawsuit. *See* FDA Letter at 3. It is, of course, axiomatic that the FDA's interpretation of a court decision—rather than a statute it is charged with administering—is entitled to no deference.

The FDA therefore held that the dismissal here was a court decision, even though the district court's summary approval of Apotex's voluntary request did not constitute a "holding" on any proposition of law, 21 U.S.C. § 355(j)(5)(B)(iv), and even though, nothing in the record said anything about whether the patent is "invalid or not infringed," *id.* The FDA not only misread what the D.C. Circuit actually held in *Teva I & II*, but the agency also misread the law of

3

estoppel. Contrary to the FDA's summary conclusion, the parties' voluntary agreement to dismiss the *Apotex* lawsuit does *not* bar BMS from seeking to enforce its patent against Apotex in the future, because BMS represented in the stipulation nothing more than that it had no present **intention** to file a lawsuit. *E.g.*, *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983). BMS made no representation about its future conduct or about the validity of its patents that Apotex could rely on to bar any future lawsuit. Therefore, even on the FDA's own terms, the dismissal of the *Apotex* lawsuit would not constitute a "court decision" under the Hatch-Waxman Act.

The FDA's misinterpretation of *Teva I & II* threatens to cost Teva hundreds of millions of dollars. If Teva enjoys its statutory right to 180 days of exclusivity, then it will be the first to bring to market a generic version of pravastatin sodium in doses of 10 mg, 20 mg, and 40 mg, products whose current sales exceed $1.7 billion. (*See* Decl. of David Marshall ("Marshall Decl.") ¶ 5 (Tab B).) It is projected that the company would sell in the first year more than two to three times the amount of the product with exclusivity than without—a difference in projected revenues of hundreds of millions of dollars. (*Id.* ¶ 6.)

Because this harm to Teva will be irreparable, and because Teva must imminently begin its preparations for a market launch—preparations that will differ substantially based on the availability of exclusivity—Teva moves for a preliminary injunction to correct the FDA's misinterpretation of the governing law. The FDA Letter rewards Apotex's gamesmanship and subverts the carefully crafted incentive scheme under the Hatch-Waxman Act. Teva thus seeks a declaration from the Court that the FDA's action is contrary to law, an abuse of discretion, and arbitrary and capricious, and an injunction prohibiting the FDA from approving the drug applications of other generic companies until Teva's 180-day period of exclusivity has expired.

## BACKGROUND

Teva Pharmaceutical Industries Ltd. ("Teva Ltd.") is a global manufacturer and distributor of brand and generic prescription pharmaceuticals headquartered in Israel. Teva is the wholly owned, indirect subsidiary of Teva Ltd., and is a leader in the development, manufacture, and marketing of generic pharmaceuticals in the United States. Teva's products are subject to the regulatory oversight of the FDA, which is the agency within the United States Department of Health and Human Services charged with overseeing, *inter alia,* the human drug approval process under the authority of the Federal, Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Drug Price Competition and Patent Term Restoration Act of 1984) (the "Hatch-Waxman Act").

### 1.    The Hatch-Waxman Act Encourages Generic Drug Companies To Bring Their Products To Market.

This case involves provisions of the Food, Drug, and Cosmetic Act ("FDCA"), regulations, and agency interpretations relating to abbreviated new drugs applications (ANDAs). The Hatch-Waxman Act, Pub. L. 98-417, 98 Stat. 1585 (1984), *codified at, inter alia,* 21 U.S.C. § 355, amended the FDCA in an effort to "make available more low cost generic drugs by establishing a generic drug approval procedure." H.R. Rep. No. 98-857 (Part I), at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647. The Hatch-Waxman Act permits the submission of ANDAs for approval of generic versions of approved drug products. *See* 21 U.S.C. § 355(j). An applicant must make a certification as to each of the patents that the innovator has listed with the FDA. A "Paragraph IV" certification asserts that the patent is invalid or will not be infringed by the generic manufacturer's drug. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). Such a certification constitutes an act of patent infringement. 35 U.S.C. §271(e); *Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 678 (1990).

The Hatch-Waxman Act provides an expedited approval process within the FDA for generic products and grants generic drug companies significant incentives to encourage them to bring their products to market. *See* "Generic Drug Entry Prior to Patent Expiration: An FTC Study," at i (July 2002), *available at* http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf ("Hatch-Waxman established a regulatory framework that sought to balance incentives for continued innovation by research-based pharmaceutical companies and opportunities for market entry by generic drug manufacturers."). To expedite the approval process, the Hatch-Waxman Act permits generic companies to obtain approval by demonstrating that its product is bioequivalent to a product that the FDA has already deemed safe and effective. Before marketing a generic drug, the manufacturer must submit an abbreviated new drug application, or ANDA, to the FDA. 21 U.S.C. § 355(j). The ANDA establishes the bioequivalence and therapeutic equivalence of the generic product as compared with the branded product. 21 U.S.C. § 355(j)(2)(A). So long as these properties can be established, a generic drug manufacturer need not repeat the safety and efficacy studies that were conducted on the branded version of the drug and included as part of the brand manufacturer's new drug application ("NDA"). *Id.*

The Hatch-Waxman Act, by design, encourages generic drug companies to challenge pharmaceutical patents promptly in order to bring generic products to market faster. The first generic drug company to challenge a patent bears research and legal costs in either designing around a patent or challenging a patent on grounds of invalidity or unenforceability. Moreover, the first filer runs the risk of substantial litigation costs, because the first filer is often the first to be sued for infringement. Thus, the Hatch-Waxman Act effectively rewards the first generic manufacturer to file a Paragraph IV certification challenging a drug patent with a 180-day period of "exclusivity" during which no other generic version of the drug will be approved. *See* 21

U.S.C. § 355(j)(5)(B)(iv); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998); *Dr. Reddy's Labs. Ltd. v. Pfizer, Inc.*, No. 03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8, 2003).

The 180-day exclusivity period runs from the earlier of the date on which the first-filing generic drug company commercially markets the generic drug or "the date of a decision of a court in an action … holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(II). The text of the statute provides that only court decisions holding the patent "invalid or not infringed" by a generic equivalent will trigger the exclusivity period, but the FDA has, by regulation, provided that the exclusivity period may also be triggered by a court decision holding the patent "unenforceable" as well. 21 C.F.R. § 314.107(c); *see also* FDA Letter at 2 & 3. Courts have ruled that any such court decision will trigger the first filer's exclusivity, even if the decision arises in litigation to which the first filer is not a party. *See Minnesota Mining & Mfg. Co. v. Barr Labs.*, 289 F.3d 775, 780 (Fed. Cir. 2002). In other words, if a subsequent ANDA filer can demonstrate invalidity or non-infringement through its own lawsuit, then the first filer's exclusivity will begin to run with the entry of a final decision from which no appeal can be taken. *See* MMA § 1102(b)(3).

### 2.     Teva Files The First ANDA For Generic Pravastatin Sodium.

On December 10, 2000, Teva filed ANDA No. 76-056, the first application for generic pravastatin sodium in 10 mg, 20 mg, and 40 mg doses. Bristol-Myers Squibb Co. ("BMS") markets pravastatin sodium as Pravachol®, a drug prescribed to treat high cholesterol and cardiovascular disease. The FDA lists four patents in connection with Pravachol®: U.S. Patent Nos. 4,346,227 ("the '227 patent"), 5,030,447 ("the '447 patent") (expires January 2009), 5,180,589 ("the '589 patent") (expires January 2009), and 5,622,985 ("the '985 patent") (expires October 2014). The '227 patent claims the compound itself and expires on April 20, 2006. The

'447 patent and the '589 patent claim formulations of the drug, and the '985 patent claims a method of use. Those three patents do not expire for several years.

Pursuant to the Hatch-Waxman Act, Teva filed a certification for each of the four Pravachol® patents with its ANDA. With respect to the '227 patent, Teva filed a Paragraph III certification, meaning that it did not intend to challenge the compound patent or to bring generic pravastatin to market before April 2006. With respect to the other three patents, however, Teva filed a Paragraph IV certification, representing that the generic product would not infringe the patents and/or that they were invalid. The FDA gave Teva tentative approval on May 20, 2002, subject to the expiration of the '227 patent. As the first Paragraph IV filer, Teva is eligible to be the exclusive marketer of generic pravastatin sodium for 180 days following final FDA approval. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

After Teva filed its application for generic pravastatin sodium, other generic drug manufacturers followed its lead. According to BMS, no fewer than seven other companies, including Apotex, have filed ANDAs for the drug. *See* Mem. of Law in Support of Def.'s Mot. to Dismiss Plf.'s Comp., *Apotex Inc. v. Bristol-Myers Squibb Co.*, No. 1:04-CV-2922 (S.D.N.Y.) (filed May 25, 2004) ("*Apotex* Mot. to Dismiss") at 7 (Tab C). According to BMS, these applications also contain Paragraph III certifications for the '227 patent and Paragraph IV certifications for the other patents. *See id.* at 6.

### 3.    Apotex Files, And Then Immediately Drops, A Sham Lawsuit Against BMS.

Because filing a Paragraph IV certification is deemed an act of patent infringement, *see* 35 U.S.C. § 271(e); *Eli Lilly*, 496 U.S. at 678, BMS was entitled to file an immediate infringement action against Teva and/or any of the later-filing generic drug companies submitting such a certification for pravastatin. The statute, however, does not require the patent

8

holder to file suit, and indeed, where, as here, an unchallenged patent would block generic competition for several years, the patent holder may have every reason *not* to litigate simply over the filing of the application years before any generic product could possibly come to market. BMS, thus, did not bring an infringement action against Teva or any of the other generic drug companies that filed ANDAs for pravastatin sodium.  *See Apotex* Mot. to Dismiss at 8.

In the fall of 2003, however, Apotex attempted to instigate a lawsuit with BMS.  Apotex, which filed its ANDA more than a year after Teva, sent BMS a letter on October 27, 2003 demanding that BMS "agree in writing that Apotex's proposed generic pravastatin sodium product 'does not and will not infringe the '447, '589, and '985 patents.'"  *Id*.  BMS expressly refused to make such a representation, but told Apotex that "BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents."  *Id*. (quoting letter of November 10, 2003).

In the correspondence between the companies, BMS made three additional representations to Apotex, asserting that while it stood by the validity of its patents, and would not concede the absence of infringement, it simply had no present intention of actually filing a lawsuit against Apotex based on the ANDA the company had filed more than two years before:

- On December 4, 2003, BMS sent a letter to Apotex in which it defended the listing of its patents, but "did not retract its *previously expressed intention* not to sue Apotex."  *Id*. at 8-9 (emphasis added).

- On February 13, 2004, BMS sent another letter "again reassur[ing] Apotex that it had *no intention* of bringing a suit for the infringement" of its patents.  *Id*. at 9 (emphasis added)

- On February 20, 2004, BMS sent a fourth letter, which stated "[w]hile [Apotex] may continue to disagree with BMS' interpretation of the claims of the three BMS patents, BMS nonetheless has *no intention*, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents so long as [Apotex's] previous representations about its proposed generic products remain accurate."  *Id*. (emphasis added).

9

BMS made clear that its then-present intention left no controversy regarding the patents, telling Apotex that its "letter attempts to manufacture a controversy when there is none." *Id.* (Blischak Decl. Exh. G). Despite the fact that on four separate occasions, BMS clearly and unambiguously informed Apotex that it had ***no intention*** of filing an infringement lawsuit and that Apotex therefore had no reasonable apprehension of litigation, Apotex brought a declaratory judgment action against BMS on April 15, 2004 seeking a declaration of non-infringement, invalidity, and/or unenforceability. *See* Compl*., Apotex Inc. v. Bristol-Myers Squibb Co.*, No. 1:04-CV-2922, at 34 (S.D.N.Y.) (filed Apr. 15, 2004) (Tab D).

BMS promptly moved to dismiss the Complaint because, based on its prior statements, "no actual case or controversy exists between [BMS] and the plaintiffs." *Apotex* Mot. to Dismiss at 1. According to BMS, "[t]he lack of a real controversy between Apotex and Bristol could not be more plain. Apotex cannot reasonably fear being sued by Bristol, because Bristol has repeatedly affirmed in writing, in absolute terms, that it has no intention of suing Apotex." BMS recognized that "[Apotex's] real objective is not to resolve any concerns it has about being sued, but rather to use this suit as an end run to erode another generic pharmaceutical company's marketing exclusivity as granted by the Hatch-Waxman Act." *Id.* at 2.

The district court never addressed the merits of BMS's motion to dismiss. Barely three months after Apotex brought its suit, the parties submitted a stipulation in which Apotex requested that the case be voluntarily dismissed. The stipulation requested the dismissal of the declaratory judgment action ***based on the very same representations that Apotex had supposedly deemed inadequate prior to filing its lawsuit.*** According to the stipulation, "prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985,

and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341." *Apotex* Stipulation at 3 (Tab E).  Furthermore, "based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement … Apotex hereby stipulates that Apotex's Complaint … be, and hereby is, dismissed, for lack of subject matter jurisdiction …." *Id.*   In other words, absolutely nothing had changed since the filing of the complaint to warrant Apotex's change of heart concerning the district court's jurisdiction over its claims.

On July 23, 2004, the district court endorsed the stipulation and ordered that Apotex's declaratory judgment action be dismissed.  *Id.*  The *Apotex* stipulation did not state that any of the pravastatin patents were invalid, not infringed, or unenforceable, and the district court in that case did not so hold.  The stipulation likewise contained no findings as to invalidity, non-infringement, or unenforceability.  To the contrary, the parties to the stipulation admitted that they **did** dispute the scope and validity of BMS's claims, but notwithstanding that dispute, there was no genuine controversy between the parties based on what BMS had told Apotex before Apotex ever filed suit—namely that it had **no intention** to file suit.  Because the Apotex stipulation did not state that it was with prejudice, it is necessarily without prejudice. *See* Fed. R. Civ. P. 41(a)(2).  The dismissal of the Apotex case became final and no longer subject to appeal on August 22, 2004.

### 4. The FDA Determines That The Voluntary Dismissal Of The Apotex Lawsuit Constituted A Judicial Decision "Holding The Patent … Invalid Or Not Infringed."

Ten months after the voluntary dismissal of the *Apotex* action, on June 28, 2005, the FDA *sua sponte* issued a letter to Teva ruling that the dismissal of the *Apotex* lawsuit had triggered the running of Teva's statutory exclusivity period for pravastatin sodium in 10 mg, 20 mg, and 40

mg doses.  *See* FDA Letter at 4.  The letter provided that the FDA deemed Teva's statutory exclusivity period to have expired four months earlier on February 18, 2005.  The FDA never advised Teva beforehand that it was considering the significance of the *Apotex* dismissal, and Teva had no opportunity to provide the FDA with its views on the matter prior to the issuance of the letter.

According to the FDA, the *Apotex* stipulation and dismissal order "trigger[ed]" the running of the 180-day exclusivity period, beginning on August 22, 2004, because "the decision of a court with respect to any ANDA, in which the court holds the relevant patent invalid, unenforceable or not infringed can start the 180-day period for that patent." *Id.* at 3.  The FDA based its conclusion on its interpretation of the *Teva I & II* decisions.  According to the FDA, in these cases, "the District of Columbia Circuit ruled that a dismissal of a declaratory judgment action (DJA) *can* qualify as a 'decision of a court' triggering the running of 180-day exclusivity *if the dismissal estops a future action* against the ANDA holder for infringement of the patent with respect to that drug product." *Id.* (emphasis supplied).  The FDA therefore considered the voluntary dismissal of the *Apotex* lawsuit, on stipulation, to be a "court decision" triggering the exclusivity period because "the *[Apotex]* dismissal is based upon BMS's representations that it has no intention to sue Apotex for infringement of these three patents arising from Apotex's generic pravastatin sodium products." *See id.* at 3-4.  According to the FDA, those representations "preclude[] a subsequent suit by BMS against Apotex for infringement." *Id.* at 4.

## ARGUMENT

### THIS COURT SHOULD ISSUE A PRELIMINARY INJUNCTION TO PROHIBIT THE FDA FROM DEPRIVING TEVA OF THE EXCLUSIVITY GUARANTTED TO THE COMPANY UNDER THE HATCH-WAXMAN ACT.

The "judicial decision" trigger of the Hatch-Waxman may sometimes pose tough questions of statutory interpretation, but the issue in this case is not one of them.  The FDA's

casual interpretation of the D.C. Circuit's precedents stands at odds with what the Court of Appeals actually held, what the statute plainly says, and what Congress clearly intended in crafting the incentive scheme embodied in the 180-day exclusivity period. In one stroke, the agency threatens to deprive Teva of an extremely valuable statutory entitlement and to open the doors of the federal courts to sham lawsuits filed for no purpose but to circumvent the Hatch-Waxman Act. Because the FDA's decision is contrary to law, an abuse of discretion, and arbitrary and capricious, and because it threatens Teva with severe and irreparable harm in the very near future, preliminary injunctive relief is warranted.

In this Circuit, the standard for a preliminary injunction is well-established. A plaintiff may demonstrate an entitlement to a preliminary injunction by showing that (1) there is a substantial likelihood of success on the merits, (2) the plaintiff would suffer irreparable injury if the requested injunction is denied; (3) an injunction will not substantially injure the opposing party or other third parties; and (4) the public interest will be furthered by the issuance of the injunction. *See Mova*, 140 F.3d at 1066. "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999). In particular, "[a]n injunction may be justified … where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997) ("Where … the likelihood of success on the merits is very high, a much smaller quantum of injury will sustain an application for a preliminary injunction."). As discussed herein, Teva can satisfy all four prongs of this standard.

13

**A.      Teva Is Likely To Prevail On The Merits.**

The likelihood of success is the critical inquiry where, as here, the issue before the Court is a wholly legal one. *See e.g.*, *Mylan Pharms., Inc. v. Thompson*, 139 F. Supp. 2d 1, 17-18 (D.D.C. 2001) ("[I]n this Circuit, the first factor—likelihood of success on the merits—is the most important one …."), *rev'd on other grounds*, 268 F.3d 1323 (Fed. Cir. 2001).  Teva can readily demonstrate a likelihood of success on the merits.

The FDA has a statutory responsibility to enforce the provisions of the Hatch-Waxman Act, including those creating the 180-day exclusivity period.  The agency here, however, has ratified Apotex's transparent attempt to circumvent the law and to deprive Teva of one of the statute's central incentive provisions.  The only explanation that the FDA gave was that this reading was compelled by the D.C. Circuit's decisions in *Teva I & II*.  As a preliminary matter, the FDA's decision is plainly not entitled to deference because it is based on the agency's interpretation of a court decision, rather than the text of a statute the agency is charged with administering.  *E.g.*, *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1085 (D.C. Cir. 2001).  In any event, the FDA's explanation fails on multiple grounds:

- The FDA has affirmatively misunderstood the holding of the D.C. Circuit's decisions, and therefore, the Court should vacate the FDA's decision on this ground alone.

- The FDA Letter reflects not only a mistaken interpretation of *Teva I & II*, but also an impermissible reading of the statute.  Because the statute itself permits only one outcome here, and that outcome is precisely the opposite of the FDA's action, the decision of the FDA should be vacated and the agency instructed to recognize Teva's exclusivity.

- Even if the FDA's interpretation of those cases were correct—and every dismissal that estopped the patentee from filing a future infringement action constituted a "decision … holding" the patent invalid or not infringed—the FDA was wrong to find an estoppel in the *Apotex* lawsuit.

### 1.    The Agency Decision Is Entitled To No Deference.

As a threshold matter, the agency's decision in this case rests on its interpretation of judicial precedent, and not the Hatch-Waxman Act. The Court therefore owes no deference to the agency decision under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). As the FDA Letter makes clear, the decision here rested on what the agency believes the D.C. Circuit held in *Teva I* and *Teva II*, and the agency purported to review the estoppel question "[i]n accordance with *Teva II*." FDA Letter at 3. Indeed, in *Teva I*, the FDA's own interpretation of the judicial-decision trigger was much narrower than the one applied in the FDA Letter:  the FDA argued that a dismissal for lack of subject-matter jurisdiction was not a "court decision," even when the dismissal was based on the patent holder's express statement of noninfringement. *See Teva I*, 182 F.3d at 1011. The FDA Letter gives absolutely no indication that it reconsidered the policy judgment underlying its initial view; rather, it simply asserts the agency's obligation to follow controlling judicial precedent.

It is well-established, however, that the Court owes no deference to an agency's interpretation of a judicial decision. *See Am. Bioscience, Inc.*, 269 F.3d at 1085 ("We, of course, owe no deference to an agency's reading of judicial orders or decisions."); *see also Univ. of Great Falls v. N.L.R.B.*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) ("We are not obligated to defer to an agency's interpretation of [court] precedent under *Chevron* or any other principle.") (citation omitted); *DOJ v. FLRA*, 266 F.3d 1228, 1230 (D.C. Cir. 2001) ("To the extent that the FLRA decision is simply an interpretation of [a judicial decision] we owe the FLRA no deference."); *Mylan Labs., Inc. v. Thompson*, 332 F. Supp. 2d 106, 117 (D.D.C.) ("[T]his Court 'owes no deference to an agency's reading of judicial orders and decisions.'") (citation omitted), *aff'd*, 389 F.3d 1272 (D.C. Cir. 2004). Therefore, the legality of the FDA's question in this case presents a

15

pure question of law unencumbered by any deference issues that would otherwise arise had the FDA based its decision on its own interpretation of the Hatch-Waxman Act.

## 2. The FDA Letter Misinterpreted The D.C. Circuit's Decisions In *Teva I & II.*

The FDA interpreted the D.C. Circuit's decisions in *Teva I & II* as articulating a rule of law under the Hatch-Waxman Act that dictated a particular result in this case. But that is a clear misunderstanding of those decisions. In both *Teva I & II*, the D.C. Circuit vacated the FDA's conduct on narrow procedural grounds—"for want of reasoned decisionmaking"—and did not hold that the Hatch-Waxman Act required one result or the other, either in that case or in future cases. Because the FDA misread these decisions, Teva can demonstrate a likelihood of establishing that at a minimum, the FDA action should be vacated based on the agency's misreading of *Teva I & II.*

Like the present case, *Teva I* concerned the FDA's assessment of whether the dismissal of a prior action constituted a "judicial decision" triggering exclusivity under the Hatch-Waxman Act. Teva had filed an ANDA seeking to market a generic version of ticlopidine and then filed a declaratory judgment action in a California federal court against the patent holder, Syntex (U.S.A.), Inc. In marked contrast to the present case, Syntex had *not* represented to Teva that it had no need to fear an infringement lawsuit. Only *after* Teva filed a declaratory action did Syntex represent to Teva that its product did not infringe and thus that Syntex would not file an infringement suit. *Teva I*, 182 F.3d at 1006. Syntex then moved to dismiss for lack of subject matter jurisdiction based on the absence of any continuing controversy. *See id.* The district court, after considering Syntex's representations, granted the motion "*based on the patent holder's admission of non-infringement.*" *Id.* at 1004 (emphasis added).

16

After the dismissal of the California action, Teva advocated before the FDA that that dismissal should be recognized as a "court decision" trigger, because the "dismissal [was] functionally equivalent to a final decision of noninfringement and unenforceability on the merits because it was based on the patent holder's express representation to Teva and the California court that Teva's formulation did not infringe the patent and that the patent holder would not sue Teva for infringement." *Id.* at 1006. The district court, after all, had only dismissed the action based on the fact that the patent holder had conceded the merits:  There was no infringement. The district court accordingly found no "case or controversy" but—in stark contrast with the dismissal here—*that holding was expressly based on Syntex's formal representation to the court, after litigation had commenced, that there was no infringement*.  The FDA, however, refused to recognize the dismissal as a court decision trigger, failing to respond to Teva's petition and declining to even meet with Teva to discuss the issue. *See id.* at 1006-07.  Accordingly, Teva brought an action under the APA in this court challenging the FDA's interpretation as contrary to law and arbitrary and capricious.

After the district court denied Teva's request for a preliminary injunction, the D.C. Circuit reversed and remanded.   The Court of Appeals recognized that Teva's argument reasonably tracked the language of the statute:  it was true that "not every court action can be construed as a 'decision' with a 'holding,'" but "the California dismissal cannot be classified as a typical dismissal for lack of subject matter jurisdiction," because "the dismissal was based exclusively and necessarily on Syntex's declaration that Teva's product would not infringe its

patent and its express disavowal of an intent to sue." *Id.* at 1008.[2]  The dismissal of the lawsuit

therefore was necessarily predicated on an implicit judicial finding of noninfringement:  although

the dismissal technically concerned subject-matter jurisdiction, there was no case or controversy

specifically because there was an admission of non-infringement.  Moreover, the representation

concerning infringement would estop Syntex from filing a future infringement lawsuit against

Teva as a matter of law.  *See id.*

Despite acknowledging these arguments, the D.C. Circuit did not rule on the ultimate

issue of what the Hatch-Waxman Act required.  To the contrary, the court expressly recognized

that "the FDA is likely correct that Teva's interpretation is not the only permissible construction

of the 'court decision' requirement."  *Id.* at 1012.  The court, however, reversed the denial of a

preliminary injunction on the procedural ground that the FDA had failed to explain adequately its

decision and remanded to the district court.  In particular, the FDA had failed to explain "why it

would recognize a grant of partial summary judgment, based on the patent holder's admission of

noninfringement, as a 'court decision' [as it did in an earlier case], but decline to give similar

effect to a dismissal based on a finding of no reasonable apprehension of suit arising from the

patent holder's admission of noninfringement" in the dismissal of Teva's suit against Syntex. *Id.*

at 1010-11.  The court found that the FDA was "mute in response to Teva's request for a

---

[2] Although the D.C. Circuit used the phrase "intent to sue," the actual representations were that "Teva's 'formulation … does not infringe' the patent," and "Teva's 'formulation did not warrant bringing a patent infringement action.'" *Teva I*, 182 F.3d at 1008.  Thus, in contrast to this case, the patentee's representation concerned its future conduct, not its present intention.  Even more critically, the patent holder specifically stated that there was no infringement, and the dismissal was predicated on that representation.  Therefore, the D.C. Circuit cannot reasonably be understood to have held that the "disavowal of an intent to sue," standing alone, may constitute a judicial decision trigger.

complete explanation of the rejection of its interpretation." *Id.* at 1010. Therefore, "the FDA's refusal to treat the California dismissal as a trigger was arbitrary and capricious in light of the FDA's response in another case." *Id.* at 1012. Plainly *Teva I* did not oblige the FDA to treat every dismissal for lack of subject-matter as a court-decision trigger, let alone of the facts of this case which are substantially different.

On appeal after remand, the D.C. Circuit reaffirmed this essentially procedural holding in the subsequent, unpublished decision in *Teva II*. As a threshold matter, as an unpublished, nonprecedential holding, *Teva II* could not modify the holding of *Teva I*. *See* D.C. Cir. R. 36(c) ("[A] panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition."). But, in any event, those decisions are entirely consistent. Following the remand in *Teva I*, the FDA expressed the view that administrative convenience would justify its decision to find a court-decision trigger based on a grant of partial summary judgment in an earlier case, but not based on the dismissal of a case on jurisdictional grounds. The D.C. Circuit, however, concluded in *Teva II* that the FDA had not explained how, under the "***unique circumstances***" of that case, the FDA would have difficulty determining that the dismissal for lack of subject matter jurisdiction was, like the dismissal in the previous case, a preclusive judgment on the enforceability of the patent. 2000 WL 1838303, at *1-*2 (quoting *Teva Pharms., USA, Inc. v. FDA*, No. 99-67, 1999 WL 1042743, at *5 (D.D.C. Aug. 19, 1999)) (emphasis added). Thus, as in *Teva I*, the D.C. Circuit held that the FDA's decision failed for "want of reasoned decisionmaking," rather than because the actual result reached conflicted with the Hatch-Waxman Act. *See id.* at *2. The Court of Appeals did not purport to impose on the FDA a binding interpretation of the "judicial decision" trigger; rather, what the FDA could not

19

do was treat similar cases differently without providing a reasoned explanation for such a distinction.

In this case, the FDA has once again failed to engage in "reasoned decisionmaking." The FDA's only explanation for its decision was that it claimed to be faithfully applying the rule articulated in *Teva I & II*, and "it is on an agency's own justifications that the validity of [the FDA action] must stand or fall." *Mova*, 140 F.3d at 1067. But that justification cannot support the FDA's decision, because the *Teva* decisions affirmatively do **not** articulate any legal rule, and indeed recognized several "plausible interpretations" of the "judicial decision" trigger. *Teva I*, 182 F.3d at 1012. Because those cases do not dictate the outcome of this case, the FDA has failed to provide an adequate explanation for its decision. As in the *Teva I & II* cases, the decision should be vacated.

### 3. The FDA Letter Reflects An Impermissible Interpretation Of The Hatch-Waxman Act.

Teva can also demonstrate a likelihood of success on the merits because the FDA's finding here that the underlying *Apotex* dismissal was a "decision of a court … *holding* the patent which is the subject of the certification to be *invalid or not infringed*," 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added), reflects an impermissible reading of the Hatch-Waxman Act. *Teva I* recognized that there were several "permissible construction[s]" of the "court decision" requirement, but the FDA's finding here that the *Apotex* dismissal was a court decision is simply not one of them. 182 F.3d at 1012. In stark contrast to the interpretation that Teva advanced in *Teva I* and advances here, the FDA's finding cannot be squared with the plain text of the statute, much less the legislative policy underlying the 180-day exclusivity period.

In *Teva I*, Teva contended that the dismissal for lack of subject matter jurisdiction at issue satisfied the court-decision trigger because the court in the underlying infringement action

necessarily "had to make a predicate finding with respect to whether Syntex would *ever* sue Teva for infringement." 182 F.3d at 1009 (emphasis added). Indeed, Syntex had expressly represented that "Teva's 'formulation ... *does not infringe*' the patent," *id*. at 1008 (emphasis added), and that "[w]e *will make no claim of patent infringement* based on the sale of ticlopidine hydrochloride tablets." Thus, the underlying dismissal of the infringement suit was necessarily predicated on an implicit "holding" that the patent was "not infringed"—the patent holder's representation of non-infringement was the basis for eliminating the case or controversy. Here, however, where the dismissal for lack of subject-matter jurisdiction is wholly unrelated to a finding (explicit or implicit) of non-infringement, there is no basis in the statute for construing it to contain a "*holding* the patent which is the subject of the certification to be *invalid or not infringed*." Thus, Teva's interpretation not only tracks the language of the statute, but it also makes practical sense insofar as it prevents other companies from manipulating the Act and frustrating congressional intent.

By contrast, the FDA's approach would read the limitation requiring that the court decision contain a holding that the certified patent is invalid or not infringed completely out of the statute and encourage precisely the gamesmanship condemned by the D.C. Circuit. *First*, the district court's approval of *any* dismissal would constitute a triggering "decision of a court" regardless of what it held. Apotex, with the consent of BMS, requested that the district court permit the withdrawal of the lawsuit based on the representations in the stipulation. The district court did not adjudicate any disputed matter under the statute, but merely permitted the parties, per Federal Rule of Civil Procedure 41(a)(2), to dismiss voluntarily the lawsuit "without prejudice." Fed. R. Civ. P. 41(a)(2). Had Congress intended for stipulated orders such as settlements or consent decrees to be court decision triggers, it could have expressly said so, as it

did with the forfeiture provisions added by the MMA. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005). But the Court provided that a judgment in an action would constitute a judicial trigger only where there was a "decision of a court ... *holding*" something about the patent. The entire lawsuit here was a non-event—a voluntary dismissal without prejudice—and the court's approval of Apotex's request for a dismissal simply cannot be understood as a "decision of a court ... holding" anything.

*Second*, and critically, the dismissal of the action here did *not* even contain an implicit holding that the patent was "not infringed" or "unenforceable." *Teva I* made clear that the patentee in the underlying action had expressly represented that the ANDA "formulation ... does not infringe" the patent. 182 F.3d at 1008. By contrast, here, there was no such representation. Despite Apotex's requests, BMS refused to concede the infringement issue, and indeed, the stipulation acknowledged continuing disagreement over the scope of BMS's patent claims. The stipulation may be based on a finding concerning BMS's present *intentions* at the time of the dismissal, but it is not based, indirectly or directly, on any finding concerning the infringement or enforceability questions.

*Third*, the district court's dismissal should not be treated as a "holding" under the statute because Apotex and BMS represented in their stipulation that the court never had jurisdiction at all over the matter. The stipulation provides that "based upon BMS's *pre-Complaint* representations," there is no subject-matter jurisdiction over the case. *Apotex* Stipulation at 3 (Tab E). This is in direct contrast to *Teva I*, where the district court made clear that it was post-

complaint statements that had mooted the controversy.[3]  The Federal Circuit has suggested that

this is a distinction that can make a difference.  *See Minnesota Mining & Manufacturing Co. v.*

*Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002) ("3M argues that the district court lacked

subject matter jurisdiction and therefore should have dismissed the action without prejudice

because, after filing the infringement action, 3M agreed that no infringement had occurred.  The

suggestion that the district court *originally* lacked subject matter jurisdiction is unfounded and

incorrect.").

When a case is dismissed because the parties believe there *never* was subject matter

jurisdiction, it should follow the "general rule" that "such a dismissal has no preclusive effect

because the court lacked authority or competence to hear and decide the case."  *Teva I*, 182 F.3d

at 1008.  If the district court *never* had subject matter jurisdiction, it had no jurisdiction to make

any "holdings" about the strength of the patent.

*Finally,* the FDA's position in this case not only runs contrary to the text of the Hatch-

Waxman Act, but it also runs counter to the congressional intent underlying the statute.   In

contrast to Teva's position in *Teva I*, which the D.C. Circuit recognized would prevent

manipulation, the FDA's position here invites generic companies to file sham lawsuits and then

---

[3] The factual record makes it clear that the district court in *Teva v. Syntex* based its order solely on Syntex's post-suit filings.  Together with its motion to dismiss, Syntex prepared for the district court a proposed dismissal order, which stated, "Plaintiff Teva USA lacked and lacks a reasonable apprehension of suit by Syntex ...."  Order Dismissing Comp. for Declaratory Judgment, *Teva Pharmaceuticals USA, Inc. v. Syntex (U.S.A.) Inc.*, No. 98-2314 (N.D. Cal.), at 2 (Tab F).  The court, however, made a single alteration to that order, striking out "lacked and," so that the final order read, "Plaintiff Teva USA lacks a reasonable apprehension."  *Id.*  The district court's affirmative decision to strike that language clearly indicates that the dismissal was predicated on the lack of jurisdiction at the time of the dismissal, not on the absence of a case or controversy prior to the filing of the complaint.

to withdraw them on the very same day solely to start the clock on a prior applicant's exclusivity. As in the case here, when the brand-name drug is protected by an earlier expiring compound patent, as well as by others that can be designed around, the second filer could trigger exclusivity by filing a declaratory action against a brand-name company that had no intention of litigating while the drug is protected by the first patent, solely to invite the stipulated dismissal that would in turn trigger the running of the exclusivity period. Where, as here, there was never a bona fide dispute, and where the case was thus resolved by a stipulated dismissal without any representations on infringement or estoppel on the merits, there is no basis under the statute or sound policy, for finding that the stipulated dismissal holds that the patent is "invalid or not infringed," 21 U.S.C. § 355(j)(5)(B)(iv)(II).

> ### 4.    The FDA Mistakenly Concluded That The Apotex Dismissal Would Estop BMS From Enforcing Its Patent.

Even if the D.C. Circuit held (or the FDA could permissibly find) that every dismissal that works an estoppel constitutes a "judicial decision" under the statute, the FDA was simply wrong to conclude that in the underlying case here "the dismissal precludes a subsequent suit by BMS against Apotex for infringement of these patents." FDA Letter at 3-4. Federal Circuit precedent, which governs the estoppel question, *see Teva I*, 182 F.3d at 1008-09, makes it clear that for a dismissal to work an estoppel against the patent holder, the patent holder must either expressly represent that the challenged product does not infringe *or* make a clear statement to the patent holder that it will not file suit. Here, however, BMS stated nothing more than that it "had no **intention** to bring suit against Apotex." *Apotex* Stipulation at 3 (Tab E) (emphasis added). As courts routinely recognize, a patent holder's representation about its state of mind does not bar the patent holder from changing its mind and filing a future suit. *See infra* pp. 26-27. It is

24

simply not enough to represent that there is no present *intention* to file a future suit.  Because there is no estoppel, the FDA Letter fails even on its own terms.

As noted above, in *Teva I*, Syntex expressly represented that "Teva's 'formulation ... *does not infringe*' the patent," 182 F.3d at 1008 (emphasis added), that "'[w]e *will make no claim* of patent infringement based on the sale of ticlopidine hydrochloride tablets,'" *id.* at 1006 (emphasis added), and Syntex's counsel stated that "Teva's 'formulation did not warrant bringing a patent infringement action.'"  *Id.* at 1008 (emphasis added).  The D.C. Circuit held that, under prevailing Federal Circuit law, a dismissal predicated on those statements would estop Syntex from filing a patent infringement lawsuit against Teva in a future case.  *See id.* at 1008-09.  In support of this reading, the D.C. Circuit relied on three Federal Circuit cases.  In each of those cases, the dismissal was predicated on the patentee's express covenant not to sue and/or the express statement of nonliability.  *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (patentee "promise[d] not to assert the patents" and promised "not to sue [adversary] in the future"); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991) (patentee filed a "Statement of Non Liability," which provides that the adversary has "no liability" and patentee "will not sue Spectronics for infringement of [the] claims"); *see also Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1482, 1483-84 (Fed. Cir. 1998) (patentee represents the adversary's disclosed product "would not infringe the '554 patent").

By contrast, in this case BMS has made no binding representation about its future conduct and steadfastly refused to concede the infringement question.  The sole representation relied on by the *Apotex* court in dismissing that action is found in the stipulated dismissal.  That representation provides only that BMS has "represented and assured Apotex that,

notwithstanding any disagreement on the scope or interpretation of the claims ... it had *no intention* to bring suit against Apotex for infringement ...." *Apotex* Stipulation at 3 (Tab E) (emphasis added).[4] BMS thus admitted in that representation that the parties may disagree over "the scope or interpretation of the claims," but nonetheless, BMS had no present "intention" to file an infringement action. Had BMS actually wished to settle the matter and foreclose a future suit, it could readily have done so by covenanting not to sue Apotex for its Hatch-Waxman application or by representing (as Syntex did in *Teva v. Syntex*) that the ANDA does not infringe. But instead, BMS carefully avoided such representations and stated only that as of July 23, 2004, it had no intention to sue, and therefore, there was no controversy between the parties.

The Federal Circuit has expressly held that this is not enough. A patentee's statement concerning its intentions (past, present, or future) does not work an estoppel that would negate the possibility of a future patent infringement lawsuit. In *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874 (Fed. Cir. 1983), the patentee moved to dismiss a declaratory judgment action brought by a disgruntled licensee based on an affidavit stating that the patentee had no intention to terminate the license and, as relevant here, stated, "I have and have had *no intention* of instituting any action against Bard for infringement" of the patent. *See id.* at 876 (emphasis added). The Federal Circuit, however, recognized that

> [a]n examination of the affidavit shows that its words were carefully chosen and did not negate the possibility of an infringement action. That affidavit said Schwartz had and has no intention of terminating the license agreement or suing

---

[4] As discussed *supra*, BMS also made four separate representations to Apotex prior to filing the lawsuit. Those representations are identical in substance to the representation found in the stipulation. Nonetheless, the district court relied only on the stipulation, not on any other filing, and the FDA only "reviewed the July 23, 2004 order dismissing Apotex's declaratory judgment action" before making its judgment here. FDA Letter at 3.

for infringement. ***Intentions, however, may change over time.*** Schwartz did not say that he would not terminate the agreement and would not bring an infringement suit. Thus, under the terms of his own affidavit Schwartz was free to terminate the agreement at a time of his choosing and institute an infringement action.

*Id.* at 881 (emphasis added). Thus, the Federal Circuit expressly held that a patentee's mere representation that it did not ***intend*** to sue a potential infringer would be insufficient to bar the patentee from filing a future lawsuit.

Numerous district courts have held similarly that the patentee's statement of its intentions would not preclude the patentee from asserting the patent in the future. *See e.g., Biogen, Inc. v. Amgen, Inc.*, 913 F. Supp. 35, 39 (D. Mass. 1996) ("Biogen's initial assurance that it '[did] not intend to assert' any additional claims of the '702 patent against Amgen was correctly perceived by Amgen as falling short of an unconditional promise to forgo future law suits."); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. AMD-96-455, 1996 WL 432290 at *6 (D. Del. July 23, 1996) ("Glaxo's statements that it has no basis for determining if Pharmadyne is in fact infringing the '431 patent, and that it has no plans to sue Pharmadyne on the '431 patent now, are to no avail. Even promises not to sue have been held insufficient to abate a declaratory plaintiff's fear.").[5]  These cases all recognize that the mere statement of the patentee's intention

_____

[5] *See also Biacore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 454 (D. Del. 1999) ("This court previously has held that the absence of a formal covenant not to sue or a willingness to accept a judgment of noninfringement creates a reasonable apprehension of suit."); *Bryan Ashley Intern., Inc. v. Shelby Williams Indus., Inc.*, 932 F. Supp. 290, 292 (S.D. Fla. 1996) ("[A]bsent the 'filing [with the Court of] a formal covenant ... not to sue [and absent] a final determination of noninfringement,' the defendant's acknowledgments do not render moot the plaintiff's declaratory judgment action."); *Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*, 826 F. Supp. 112, 114 (D. Del. 1993) ("AERT's admissions that Mobil's process, as described by Mobil, does not infringe the four AERT patents have not rendered Mobil's continuing apprehension of litigation unreasonable. AERT has not, as in *Spectronics Corp.* filed a formal covenant with the Court not to sue Mobil on the four patents."); *United Sweetener USA,*
(Continued...)

27

does not moot the controversy, because it does not prevent the patentee from filing a future infringement suit. Rather, the representation must be "unequivocal and unconditional." *Ampex Corp. v. Mitsubishi Elec. Corp.*, 966 F. Supp. 263, 273 (D. Del. 1997).

Similarly, here the district court's approval of the parties' voluntary request for dismissal would not in any fashion estop BMS from bringing a future suit. As in *C.R. Bard*, BMS "carefully chos[e]" its words to avoid actually precluding it from asserting its patent in the future. BMS had no intention to file a costly infringement action based on Apotex's filing of the ANDA, particularly where the '227 patent ensured that Apotex would not be able to bring a generic version of pravastatin until five years later. But BMS's statement of its intentions would not preclude Apotex from filing a future suit should BMS's calculus change.

In any event, by its own terms the stipulated dismissal cannot have preclusive effect. Rule 41(a)(2) specifically provides that "[u]nless otherwise specified in the order, a dismissal under this paragraph is without prejudice." Here one will search the parties' stipulated dismissal in vain to find any reference to the dismissal being with prejudice. It follows *a fortiori* that it must be without prejudice and is not sufficient, in an of itself, to estop a future suit by BMS. In sum, the FDA's casual finding of estoppel lacks precedential support and is both contrary to law and arbitrary and capricious.

---

*Inc. v. Nutrasweet Co.*, 760 F. Supp. 400, 407 (D. Del. 1991) ("Nutrasweet's promise not to sue on the '189 patent pending the outcome of the reexamination has not rendered the plaintiffs' apprehension unreasonable ... Rather than extinguishing the threat to the plaintiffs, Nutrasweet's promise merely suspends it. Because the promise not to sue is of dubious enforceability, Nutrasweet is 'free to return to its old ways' and sue whenever it wishes.").

**B.    Plaintiff Will Be Irreparably Injured If The Requested Injunction Is Denied.**

In addition to the likelihood of success, there can be little doubt but that Teva can establish the second factor of the preliminary injunction analysis, irreparable harm.  The D.C. Circuit has expressly held that the prospect that a generic drug company may lose its 180 days of exclusivity suffices to establish irreparable harm.  *See Mova* , 140 F.3d at 1066 n.6.  By filing the first Paragraph IV ANDA for generic pravastatin in 2000, Teva obtained a statutory entitlement to be the first, and exclusive, seller of generic pravastatin for 180 days.  Generic entry will likely begin with the expiration of the '227 patent on April 20, 2006, and in order to prepare for that launch, Teva will need to know well in advance of that point whether it will receive its exclusivity entitlement.  Teva thus can readily demonstrate irreparable harm from the denial of the injunction.

As the district court explained in *Mova*, "[a]ll parties recognize that the earliest generic drug manufacturer in a specific market has a distinct advantage over later entrants." *Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997).  Thus, were the FDA to improperly deny Teva exclusivity it would cause irreparable harm by denying the first filer "an officially sanctioned head start."  On appeal, the D.C. Circuit rejected the FDA's argument that "the mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact," observing that Mova would be harmed by the loss of its "officially sanctioned head start," and that this suffices to show a severe economic impact to Mova.  *Mova*, 140 F.3d at 1066 n.6 (internal quotations omitted)  As in *Mova*, Teva here can show irreparable harm based on the loss of this head start.  *See also Torpharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997) (granting injunction against FDA based on irreparable harm where the generic company improperly delayed entering the market).

Indeed, in light of the size of the product at issue here, Teva can demonstrate far greater and far more specific harm than what the district court relied on in the *Mova* opinion. In this case, the cost to Teva of losing its exclusivity is made all the greater by the size of the market for pravastatin sodium. BMS's annual sales of Pravachol® in the three doses at issue here exceed $1.7 billion a year. (*See* Marshall Decl. ¶ 5.) The question whether Teva will enjoy 180 days of exclusivity beginning in April 2006—or whether it will not—is one that will have a substantial impact on the planning and production process, and on the market position that Teva can expect after launch.

Teva provides its financial projections on the possible scenarios in the attached Declaration of its Vice President of Sales and Marketing, David Marshall, which Teva requests (by separate motion) be filed under seal. As that declaration sets out with specificity, Teva projects that if it enjoys six-months of exclusivity on pravastatin, the company will sell in the first year more than two to three times the amount of tablets of generic pravastatin than it would sell absent exclusivity, with a difference in net revenues in the hundreds of millions of dollars. (*See id.* ¶¶ 8-9.) If the FDA is permitted to approve the applications of other generic competitors in April 2006, then Teva will *forever* lose its exclusivity rights and will not likely obtain the market share that it could otherwise expect to retain post-exclusivity. (*See id.* ¶ 7.) Needless to say, even if the FDA's decision is later found unlawful, Teva will not be able to recoup any damages from the agency nor could it expect to have an action against the competitors that gained at Teva's expense.

Furthermore, preparing a newly approved pharmaceutical product for marketing and distribution is always a costly and significant undertaking. Such preparation involves, among other things, a significant investment in bioequivalence studies, manufacturing adequate

quantities of product to supply the expected market demand; printing labels for such product; preparing trade materials; and negotiating commercial contracts. These activities involve substantial commitments of time, money and planning. The amount of inventory Teva will have to stock—which amounts to hundreds of millions of pravastatin tablets—will vary greatly depending on whether the company is entitled to 180-day exclusivity. Teva will have to make these production decisions by up to six months before the launch date (*id.* ¶ 11), and therefore, absent a preliminary injunction, the FDA's decision will cause the company irreparable harm beginning in October 2005.

### C.    The Public Interest Will Be Served By The Requested Injunction

The requested injunction will serve the public interest by bringing the FDA's regulatory policy into conformity with the fundamental purpose of the Hatch-Waxman Act. As this Court has recognized in this precise context, there is a strong "public interest in faithful application of the statutes." *Mova Pharm.*, 955 F. Supp. at 131; *see also Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 3 (D.D.C. 1997) ("the public interest is served by the lawful application of statutes and requiring an agency to act lawfully"); *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 30 (D.D.C. 1997) ("there is … a strong public interest in requiring an agency to act lawfully"). Whatever transient benefit might come from the introduction of generic competition for pravastatin before the 180-day period, that benefit would be greatly outweighed by the damage that the FDA's opinion would cause to the incentive scheme that Congress established to encourage generic drug companies to challenge pharmaceutical patents.

The Hatch-Waxman Act recognizes the costs faced by the first generic drug manufacturer that invests in identifying a potentially vulnerable patent and then exposing itself to risky and expensive patent litigation. Even if the ANDA challenge is successful, and the patent is invalidated, that manufacturer will soon face competition from other generic companies that

have not run the risks of being the first filer. As the D.C. Circuit has held, the Hatch-Waxman Act thus "provide[s] a reward, in the form of an exclusivity period, to generic drug companies that are the first to file paragraph IV ANDAs" and thereby "challenge pioneer drug companies' patents." *Mova*, 140 F.3d at 1075; *see also Minn. Mining*, 289 F.3d at 778 ("[Section 355(j)(5)(B)(iv)] is designed to provide an incentive, in the form of a 180-day period of marketing exclusivity, to [the first] ANDA filer."); *Dr. Reddy's*, No. 03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8, 2003) (noting exclusivity is a "statutory benefit given as an incentive for generic companies who take the greatest risk of being the first generic entrant on the market."). If the first filer's challenge is successful, subsequent ANDA applicants can take advantage of that success without paying any portion of the cost of that success.

Congress enacted the 180-day exclusivity period to further the fundamental goal of allowing lower-cost generic drugs to reach consumers quickly, before patent expiration if possible. Absent this incentive, generic companies may be tempted to wait for another manufacturer to challenge the patents or wait for the patents to expire. The FDA Letter, however, is likely to deprive the first filer of this incentive in many future cases. The FDA has ratified Apotex's attempt to start the clock on Teva's exclusivity through a frivolous lawsuit, and the agency presumably would endorse similar gamesmanship in the future. The inevitable result will likely be to deprive generic companies of exclusivity, thereby resulting in fewer generic products coming to market, and those that do will be launched less quickly. *See Dr. Reddy's Labs.*, 2003 WL 21638254 at *7. An injunction here thus will invalidate an unlawful FDA action that, left standing, threatens to undermine the delicate balance of incentives Congress established in the Hatch-Waxman Act by permitting opportunistic competitors to trigger the exclusivity period long before the first filer can bring its products to market. *See id.*

(prematurely triggering the market exclusivity period would "nullify the statutory benefit given as an incentive [to first ANDA filers]"). If the injunction is not issued, the FDA's interpretation is likely to result in fewer generic products coming to market as soon as is practicable, which harms consumers, public insurers, and private insurers.

### D.    The Balance Of Hardships Strongly Favors Injunctive Relief.

#### 1.    The FDA And The Named Officials Will Not Be Harmed By The Requested Injunction.

The FDA is a federal agency and Secretary Leavitt and Commissioner Crawford are sued in their official capacities. The injunction that Teva requests would require the FDA and these officials to apply the Hatch-Waxman Act in a way that is consistent with, and advances, the congressionally mandated goals. Consequently, these parties cannot be injured by the court's granting of the requested order.

#### 2.    Subsequent ANDA Filers Generally Will Not Be Harmed By The Requested Injunction.

There is no dispute that Teva was the first ANDA filer for generic pravastatin sodium. Granting the requested injunction would not usurp one manufacturer's first filer status, along with the benefits of 180 days of marketing exclusivity, for the benefit of another. All this injunction would do is require the FDA to do what it already is required by law to do: trigger the 180-day exclusivity period of the first filer—Teva—only when one of the statutory Hatch-Waxman criteria have been satisfied. Because Teva is the first filer, and no other manufacturer can "become" a first filer regardless of how this motion is resolved, none of the subsequent filers will be harmed by having the requested injunction entered.

In any event, the balance of hardships tilts decidedly toward Teva rather than the subsequent ANDA filers. If Teva is denied its 180 days of exclusivity, it will limit Teva's market position compared to what it would otherwise obtain. (*See* Marshall Decl. ¶ 7.) Whereas

the costs of the denial of an injunction will be borne singularly by Teva, any costs to the subsequent applicants from the issuance of an injunction would be shared across the industry.

Finally, the generic drug industry as a whole, including subsequent filers, ultimately stand to benefit from an injunction here, because tomorrow, one of them may be a first filer that benefits from an interpretation of the statute that properly balances its rights and ensures that first filers receive the proper incentives and rewards for challenging weak drug patents and bringing lower-cost generic drugs to the market quickly.

## CONCLUSION

For the foregoing reasons, Teva respectfully requests that the Court grant its motion for a preliminary injunction.

Respectfully submitted,

Of Counsel:
Richard Egosi
*Senior Vice President & General Counsel*
David M. Stark
*Senior Director, Legal Affairs*
TEVA PHARMACEUTICALS USA, INC.
425 Privet Road
Horsham, PA  19044-8005
(215) 293-6400

Jay P. Lefkowitz (DC 449280)*
Pamela J. Auerbach (DC 447805)
Steven A. Engel (DC 484789)
John C. O'Quinn (DC 485936)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC  20005
(202) 879-5000

*Counsel for Teva Pharmaceuticals USA, Inc.*

July 26, 2005

* *Counsel of Record*

34