ECF CASE

SULLIVAN & WORCESTER LLP
Marc A. Lebowitz (ML 7381)
Matthew Giger (MG 3731)
1290 Avenue of the Americas, 29th Floor
New York, New York 10104
Tel: (212) 660-3000

RAKOCZY MOLINO MAZZOCHI LLP
William A. Rakoczy
Deanne M. Mazzochi
Matthew O. Brady
Jane J. Jaang
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6301

*Attorneys for Plaintiffs*
*Apotex Inc. and Apotex Corp.*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
APOTEX INC. and APOTEX CORP.,      :

    Plaintiffs,      :

    - against -      :      Civil Action No.

          :      **COMPLAINT**

BRISTOL-MYERS SQUIBB CO.,      :

    Defendant.      :
------------------------------------------------------x

    Plaintiffs Apotex Inc. (formerly TorPharm, Inc.) and Apotex Corp. (collectively,

"Apotex"), for their Complaint against Defendant Bristol-Myers Squibb Co. ("BMS"), hereby

allege as follows:

## NATURE OF THE ACTION

    1.    Apotex brings—and is entitled by statute to maintain—this action for declaratory

judgment of patent noninfringement under, *inter alia*, 21 U.S.C. § 355(j)(5)(C)(i) as amended by

Title XI of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.

L. No. 108-173, 117 Stat. 2066 (2003) ("the Medicare Act").

      2.        This action arises out of, *inter alia*, Apotex's (formerly TorPharm, Inc.) submission of an Abbreviated New Drug Application ("ANDA") to the United States Food and Drug Administration ("FDA") seeking approval to market a generic version of BMS's blockbuster prescription drug Pravachol®, otherwise known as pravastatin sodium.

      3.        BMS owns: (a) United States Patent No. 5,030,447 ("the '447 patent"), which claims a pharmaceutical composition containing pravastatin, certain excipients, and one or more basifying agents; (b) United States Patent No. 5,180,589 ("the '589 patent"), which claims a stabilized pravastatin composition containing pravastatin and one or more basifying agents; and (c) United States Patent No. 5,622,985 ("the '985 patent"), which claims a method for preventing or reducing the risk of a second heart attack in a mammalian species having a substantially normal serum cholesterol level by administering an HMG CoA reductase inhibitor alone, or in combination with an ACE inhibitor.

      4.        Upon submission by BMS, the '447, '589, and '985 patents were listed in FDA's "Orange Book," a compilation of approved drugs and their patents. As a consequence of such listing, BMS maintains and has affirmatively represented to the world that the '447, '589, and '985 patents claim the approved drug, Pravachol®.

      5.        By virtue of BMS's listing of the '447, '589, and '985 patents in the Orange Book, BMS represents that a claim for patent infringement could reasonably be asserted against any generic ANDA applicant, including Apotex, attempting to market a generic pravastatin sodium product. BMS, moreover, has enforced and continues vigorously to enforce its intellectual property rights.

      6.        Apotex has designed around the '447, '589, and '985 patents with its proposed

generic pravastatin sodium product and so, as required by statute, has submitted an ANDA and certified to FDA that its proposed product will not infringe the '447, '589, and '985 patents and has further notified BMS of the legal and factual bases for that certification. Apotex's ANDA filing with a certification to the '447, '589, and '985 patents constitutes an act of infringement putting Apotex at considerable risk of being sued by BMS both before and after market entry. Indeed, this regulatory submission created the necessary case or controversy and subject matter jurisdiction for BMS to sue Apotex for infringement. It likewise created the necessary case or controversy for Apotex to file and maintain an action for declaratory judgment of patent noninfringement. While BMS has not yet responded to the submission of Apotex's ANDA, BMS has also refused to inform Apotex that Apotex does not infringe the '447, '589, and '985 patents.

7.    There is an actual, substantial, and continuing justiciable case or controversy between Apotex and BMS regarding infringement of the '447, '589, and '985 patents, over which this Court can and should exercise jurisdiction and declare the rights of the parties.

8.    Apotex is also entitled by law to bring and maintain this action for declaratory judgment of patent noninfringement under the Medicare Act where, as here, BMS did not sue Apotex within 45 days of receipt of Apotex's notice of paragraph IV certification to the '447, '589, and '985 patents, and Apotex has offered BMS an Offer of Confidential Access to Apotex's ANDA for generic pravastatin sodium tablets.

9.    Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's proposed generic pravastatin sodium product does not and will not infringe the '447, '589, and '985 patents. Absent the exercise of jurisdiction by this Court and such declaratory relief, Apotex and the American public will be irreparably harmed by

the indefinite delay in the market entry and availability of lower-priced generic pravastatin sodium.

## THE PARTIES

10.    Plaintiff Apotex Inc. is a corporation organized and existing under the laws of Canada and having places of business at 150 Signet Drive, Weston, Ontario, Canada M9L 1T9, and 50 Steinway Boulevard, Etobicoke, Ontario, Canada M9W 6Y3.  Apotex Inc. develops and manufactures generic drugs, and particularly in solid oral dosage forms such as capsules and tablets, for sale and use in the United States and throughout the world.

11.    Plaintiff Apotex Corp. is a corporation incorporated and existing under the laws of the State of Delaware, having a place of business at 616 Heathrow Drive, Lincolnshire, Illinois 60069.  Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc. Following FDA approval of an ANDA, Apotex Inc. manufactures and supplies generic drug products to Apotex Corp., which then markets and sells those products to large wholesalers, warehousing chains, mail order organizations, and distributors in the United States.  Apotex Corp. also acts as Apotex Inc.'s United States agent for purposes of making regulatory submissions, including ANDAs, to FDA.

12.    On information and belief, Defendant Bristol-Myers Squibb Co. ("BMS") is a Delaware corporation with its principal place of business at 345 Park Avenue, New York, New York 10154-0037.

## JURISDICTION AND VENUE

13.    This action arises under, *inter alia*, the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the Medicare Act (21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C. § 271(e)(5)).

14.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a), because it involves substantial claims arising under the United States Patent Act, 35 U.S.C. §§ 1 *et seq.*; under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, because it is an actual controversy concerning the infringement of the patents-in-suit; and under the Medicare Act (21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C. § 271(e)(5)), because Congress has directed that district courts maintain and exercise jurisdiction in such cases.

15.     There exists a substantial and continuing actual, justiciable case or controversy between Apotex and BMS regarding infringement of the '447, '589, and '985 patents.

16.     This Court can and should declare the rights and legal relations of the parties regarding infringement of the '447, '589, and '985 patents pursuant to, *inter alia*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Medicare Act (21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C. § 271(e)(5)).

17.     Apotex has the statutory right to bring and maintain this declaratory judgment action under 21 U.S.C. § 355(j)(5)(C)(i), as amended by the Medicare Act. This Court can and should exercise its jurisdiction to render a declaratory judgment with respect to Apotex's claims pursuant to 35 U.S.C. § 271(e)(5), as amended by the Medicare Act.

18.     This Court has personal jurisdiction over BMS because it resides in this District and conducts substantial business in, and has regular and systematic contact with, this District.

19.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b).

## FACTS

### Statutory Scheme for Approval of New and Generic Drugs

20.     The approval of new and generic drugs is governed by the applicable provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.,* as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (commonly known as the "Hatch-Waxman Amendments" or "Hatch-Waxman"), and recently amended again by the Medicare Act (codified as amended in relevant part at 21 U.S.C. § 355 and 35 U.S.C. § 271).

### *New drugs and patent listing requirements*

21.     Before marketing an original new drug (*i.e.*, not a generic drug) in the United States, the FDCA, as amended by Hatch-Waxman and the Medicare Act, requires that an applicant submit, and that FDA approve, a new drug application ("NDA") under 21 U.S.C. § 355(b).  The NDA must include, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results to establish the safety and efficacy of the drug, and labeling relating to the use of the drug for which approval is requested.

22.     An NDA applicant is required, within its NDA, to submit information (*e.g.*, the patent number and expiration date) regarding each patent that claims the drug or method of using the drug that is the subject of the NDA and for which a claim of patent infringement could reasonably be asserted if a person not licensed by the patent owner engaged in the manufacture, use, or sale of the drug product.  21 U.S.C. § 355(b)(1).

23.     FDA publishes patent information submitted by an NDA-holder in the Patent and Exclusivity Information Addendum of FDA's publication, *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the "Orange Book").

24.     By filing an NDA and submitting a patent for listing in the Orange Book, the

NDA-holder/patent owner, by law, necessarily maintains that the listed patent claims the approved NDA drug and that an infringement suit could reasonably be asserted against anyone who engages in the manufacture, use, or sale of the drug, and in particular against any company that is seeking to make a generic bioequivalent of the NDA drug.

25.    In other words, by listing patent(s) in the Orange Book, the NDA-holder and/or patentee puts all prospective generic ANDA applicants on notice that a suit for infringement can and will be asserted against any ANDA applicant that attempts to seek approval for and market a generic version of the NDA drug.

26.    Such conduct by the NDA-holder/patent owner gives rise to a reasonable apprehension on the generic applicant's part that it will face an infringement suit or the threat of one if it attempts to seek approval for, or to market, a generic version of the NDA drug.

*Generic drugs and patent certification requirements*

27.    The FDCA, as amended by Hatch-Waxman and the Medicare Act, provides for an ANDA approval process that enables generic pharmaceutical manufacturers to obtain regulatory approval of lower-cost generic versions of previously approved brand-name or NDA drugs on an expedited basis, thereby benefiting the United States health-care system and American consumers. The ANDA process is a streamlined version of the full NDA procedure and results in a generic drug product that is normally marketed under the chemical name of the active drug ingredient.

28.    An applicant may invoke this procedure for expedited FDA approval of a generic version of an already approved NDA drug by submitting an ANDA to FDA under 21 U.S.C. § 355(j).

29.    Instead of repeating the comprehensive, extensive clinical studies of safety and

efficacy conducted for the previously approved NDA drug, a generic applicant submitting an ANDA is only required to establish, among other details, that its proposed generic product is bioequivalent to the already approved NDA drug (*i.e.*, has no significant difference in rate and extent of absorption) and that it has the same active ingredient, dosage form, dosage strength, route of administration, and labeling (with certain exceptions) as the approved NDA drug. 21 U.S.C. § 355(j)(2)(A).

      30.    An ANDA applicant is also required to address each patent listed in the Orange Book in connection with the approved NDA drug. In particular, Hatch-Waxman requires an ANDA applicant to submit one of four types of patent certifications for each listed patent: (I) that the NDA-holder has not submitted any patent information to FDA; (II) that the listed patent has expired; (III) that the patent will expire on a future date, and that the generic applicant will not market its product until after the expiration date (commonly referred to as a "paragraph III certification"); or (IV) that the listed patent is invalid and/or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted (commonly referred to as a "paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii)(I-IV). This last type of certification, a paragraph IV certification, signifies that the generic ANDA applicant intends to market its generic product prior to expiration of the subject patent. Such a certification constitutes an act of infringement for purposes of Hatch-Waxman and for purposes of creating a justiciable case or controversy pursuant to Article III of the United States Constitution.

      31.    When an ANDA applicant submits a paragraph IV certification for a listed patent, the generic applicant must notify the NDA-holder/patent owner that it has filed an ANDA to obtain regulatory approval of a generic version of the NDA drug, and that the ANDA contains a paragraph IV certification for a listed patent (indicating that the ANDA applicant intends to

market its generic product before expiration of the listed patent).  21 U.S.C. § 355(j)(2)(B).  This

notice must contain a detailed statement of the factual and legal bases for the ANDA applicant's

certification that the listed patent is invalid and/or will not be infringed by the manufacture, use,

or sale of the generic applicant's generic drug product.  21 U.S.C. § 355(j)(2)(B)(ii).

The submission of a paragraph IV certification has two important effects:  (a) it triggers a 180-

day exclusivity period; and (b) it constitutes an artificial act of infringement.

*180-day exclusivity*

32.     First, an applicant that is first to submit an ANDA containing a paragraph IV

certification for a listed patent is entitled to 180 days of generic marketing exclusivity during

which no other ANDA for that drug product will be approved.  21 U.S.C. § 355(j)(5)(B)(iv).

This statutory benefit is commonly known as "180-day exclusivity."

33.     The grant of 180-day exclusivity was designed to encourage generic drug makers

to incur the substantial risks and litigation costs associated with challenging an NDA-

holder/patent-owner's patents and thereby to expedite the market entry of lower-priced generic

drugs.  Congress therefore mandated, within the FDCA, that the first applicant to file an ANDA

with a paragraph IV certification is entitled to a 180-day period of generic marketing exclusivity

in which it is the only ANDA applicant allowed to market a generic version of the NDA or

brand-name drug.

34.     In particular, Section 355(j)(5)(B)(iv) of the FDCA provides that "[i]f the

application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for

a drug for which a previous application has been submitted under this section [containing] such a

certification, the application shall be made effective not earlier than one hundred and eighty days

after" the earlier of:  (a) the first commercial marketing of that ANDA applicant's proposed

drug; or (b) any court decision—whether it involves the first applicant or not—holding that the

particular patent that is the subject of the paragraph IV certification is invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv).

*Artificial act of infringement*

35.    Second, the submission of a paragraph IV certification for a listed patent constitutes an act of infringement that creates the necessary case or controversy and subject matter jurisdiction to enable an NDA-holder/patent owner to file, and a district court to resolve, an action for patent infringement—before the generic drug is actually made, used, or sold—to determine whether the generic drug, if marketed and sold in accordance with the ANDA, would infringe the relevant patent.

36.    The submission of an ANDA with a paragraph IV certification likewise creates the necessary controversy and subject matter jurisdiction for an ANDA applicant to file a declaratory judgment action against the NDA-holder/patent owner if the ANDA applicant is not sued within the applicable 45-day period, as set forth below.

37.    Upon receiving notice of a paragraph IV certification for a listed patent submitted by an ANDA applicant, the NDA-holder/patent owner may file suit for infringement of the listed patent under 35 U.S.C. § 271(e)(2)(A) within 45 days of receiving such notification. Such a suit automatically delays FDA from issuing final approval of the ANDA for up to 30 months. 21 U.S.C. § 355(j)(5)(B)(iii).

38.    If the NDA-holder/patent owner does not file suit, the ANDA applicant can file and maintain a suit for declaratory judgment against the NDA-holder/patent owner to obtain a judicial declaration with respect to the patent or patents at issue which finally resolves any disputes surrounding infringement and thus provides both the NDA-holder/patent owner and the ANDA applicant with patent certainty.

39.     Congress enacted Hatch-Waxman and the ANDA approval process in order to expedite the marketing of lower-priced generic drug products.

40.     Congress intended that the generic manufacturing and marketing of a drug should be allowed as soon as it is determined that the particular generic drug does not violate patent rights, and should not be delayed just because the NDA-holder/patent owner has not sued the generic applicant first, but rather has merely held its patents over the generic applicant like a modern-day "Sword of Damocles."

41.     Congress also intended that a generic ANDA applicant be permitted to trigger the 180-day exclusivity of another applicant by obtaining a favorable court decision in order to open up the generic market.  Otherwise, the market could be bottle-necked indefinitely by an applicant's 180-day exclusivity, and other generics could not get their products to market.

42.     In other words, Congress did not intend for NDA-holders/patent owners to be able to manipulate the market and delay generic competition by creating uncertainty as to whether it would seek to enforce its patents against generic competitors seeking to enter the market, or by creating a bottleneck in which generic applicants cannot obtain court decisions that would allow them to go to market with the first applicant.

43.     Rather, Congress contemplated and intended that ANDA applicants must obtain a favorable court decision on the patent in order to market the generic drug.  This can be accomplished by either being sued by the NDA-holder/patent owner within the 45-day period or by the generic ANDA applicant seeking a declaratory judgment of patent noninfringement and/or invalidity.

44.     An ANDA applicant is statutorily prohibited from seeking a declaratory judgment during the 45-day period in which the NDA-holder/patent owner may bring suit after receiving

notification of the ANDA and paragraph IV certification. Congress, however, clearly intended that a declaratory judgment action be available for ANDA applicants who are not sued by the NDA-holder/patent owner within the 45-day period.

45.    The acts of an NDA-holder/patent owner listing a patent in the Orange Book through the filing of an NDA and a generic manufacturer filing an ANDA together meet the case or controversy requirement so as to allow a declaratory judgment action of noninfringement and/or invalidity.

46.    But, as explained below, Congress also went a step further and explicitly mandated that an ANDA applicant is entitled to maintain a declaratory judgment action even when it is not sued.

*Congress explicitly mandated that an ANDA applicant may file and maintain a declaratory judgment action when it is not sued*

47.    On December 8, 2003, the Medicare Act was signed into law. Title XI of the Medicare Act, entitled "Access to Affordable Pharmaceuticals," amended provisions of the FDCA and, in particular, Hatch-Waxman.

48.    Under the Medicare Act, an ANDA applicant who has filed a paragraph IV certification is statutorily entitled to institute and maintain an action for declaratory judgment against an NDA-holder/patent owner if: (a) the 45-day period has passed since notice of the paragraph IV certification was received; (b) neither the patent owner nor the NDA-holder brought an action for infringement of the patent within the 45-day period; and (c) the NDA-holder/patent owner has been granted an Offer of Confidential Access to the ANDA. 21 U.S.C. § 355(j)(5)(C)(i)(I)(aa-cc), as amended.

49.    Once these three conditions are met, the Medicare Act specifically and unequivocally provides that an ANDA applicant "may, in accordance with section 2201 of title

-12-

28, United States Code, bring a civil action under such section against the owner or holder

referred to in such subclause ... for a declaratory judgment that the patent is invalid or will not

be infringed by the drug for which the applicant seeks approval...." 21 U.S.C.

§ 355(j)(5)(C)(i)(II), as amended.

50. An ANDA applicant may exercise its right to file and maintain a declaratory

judgment action under the Medicare Act regardless of whether or not the Offer of Confidential

Access to Application is accepted.

51. The new declaratory judgment provision contained in the Medicare Act, Section

1102 of the Medicare Act, 117 Stat. 2066, 2456, applies to all ANDAs pending on or after

December 8, 2003, which includes these proceedings.

52. Congress's intent in amending 21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C.

§ 271(e)(5) was to extend to ANDA applicants, like Apotex here, the right to file and maintain a

declaratory judgment action for patent noninfringement and/or invalidity against an NDA-

holder/patent owner, and grant this Court subject matter jurisdiction in such an action.

53. The purpose of this provision was two-fold. The first purpose was to allow

generic applicants to obtain much-needed patent certainty before marketing their generic

products.

54. The second purpose was to allow for triggering court decisions that would

expedite the introduction of generic drugs and clear up any bottleneck in the market created by

the first applicant's 180-day exclusivity.

BMS's Pravachol® (pravastatin sodium)

55.    BMS is the holder of approved NDA No. 19-898 for pravastatin sodium tablets, which are sold under the brand-name Pravachol®.

56.    Pravachol® (pravastatin sodium) tablets consist of pravastatin sodium, as the active ingredient or drug substance, and certain excipients, including croscarmellose sodium, lactose, magnesium oxide, magnesium stearate, microcrystalline cellulose, and povidone, as the inactive ingredients.

57.    Pravachol® (pravastatin sodium) is indicated for the treatment of individuals at increased risk for atherosclerosis-related clinical events as a function of cholesterol level, the presence or absence of coronary heart disease, and other risk factors.

58.    BMS has stated that Pravachol® is "the Company's largest selling product."

59.    BMS purports and claims to be the owner of the '447, '589, and '985 patents.

60.    BMS submitted information to FDA on at least four patents, of which the '447, '589, and '985 patents are most relevant here.  FDA also submitted information to FDA on United States Patent No. 4,346,227 ("the '227 patent"), which expires on or about October 20, 2005.  By virtue of these submissions, FDA listed the '447, '589, '985, and '227 patents in the Orange Book in connection with BMS's approved NDA No. 19-898 for Pravachol® (pravastatin sodium) tablets.

61.    The '447 patent claims a pharmaceutical composition containing pravastatin, certain excipients, and one or more basifying agents.  The '447 patent issued on July 9, 1991, and was purportedly assigned to E.R. Squibb & Sons, Inc.  On information and belief, E.R. Squibb & Sons, Inc. is now a subsidiary of BMS.  A true and correct copy of the '447 patent is attached to this Complaint as Exhibit 1.

-14-

62.     The '589 patent claims a stabilized pravastatin composition containing pravastatin and one or more basifying agents. The '589 patent issued on January 19, 1993, and was purportedly assigned to E.R. Squibb & Sons, Inc., a subsidiary of Squibb Corporation at the time. On information and belief, E.R. Squibb & Sons, Inc. is now a subsidiary of BMS. A true and correct copy of the '589 patent is attached to this Complaint as Exhibit 2.

63.     The '985 patent claims a method for preventing or reducing the risk of a second heart attack in a mammalian species having a substantially normal serum cholesterol level by administering an HMG CoA reductase inhibitor alone, or in combination with an ACE inhibitor. The '985 patent issued on April 27, 1997, and was purportedly assigned directly to BMS. A true and correct copy of the '985 patent is attached to this Complaint as Exhibit 3.

64.     By listing the '447, '589, and '985 patents in the Orange Book, BMS maintains and has affirmatively represented to the world that each of these patents claim Pravachol® (pravastatin sodium) tablets and that an infringement suit could reasonably be asserted on any or all of these patents against any generic ANDA applicant who is not licensed, including Apotex, that attempts to seek approval for, and market, a generic pravastatin sodium product.

65.     The listing of the '447, '589, and '985 patents in the Orange Book alone objectively creates the necessary case or controversy and subject matter jurisdiction for an ANDA-filer to file and maintain a declaratory judgment action if it is not sued by BMS within the requisite 45-day period.

### Apotex's ANDA for Pravastatin Sodium Tablets

66.     On December 21, 2001, TorPharm, Inc. (now, Apotex Inc., and hereinafter referred to as "Apotex") submitted an ANDA (No. 76-341) to FDA seeking approval to market a generic version of Pravachol® (pravastatin sodium) tablets in 10 mg, 20 mg, and 40 mg strengths for the treatment of individuals at increased risk for atherosclerosis-related clinical events as a function of cholesterol level, the presence or absence of coronary heart disease, and other risk factors.

67.     As part of its ANDA No. 76-341, Apotex appropriately addressed the listed patents for Pravachol® (pravastatin sodium) tablets, including the '447, '589, '985, and '227 patents.

68.     In particular, Apotex submitted paragraph IV certifications, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to the '447, '589, and '985 patents stating that such patents would not be infringed by the manufacture, use, offer for sale, sale, or importation of Apotex's generic pravastatin sodium product.   This certification signified that Apotex intends to market and commercialize its generic pravastatin sodium product prior to expiration of the '447, '589, and '985 patents.

69.     Apotex submitted a paragraph III certification to the '227 patent, signifying that Apotex would not market its pravastatin sodium product until after that patent expires on or about October 20, 2005.

70.     Apotex's ANDA No. 76-341 was substantially complete as initially submitted and was accepted for filing by FDA.

71.     On or about March 14, 2002, in accordance with 21 U.S.C. §§ 355(j)(2)(B)(i)-(ii), Apotex notified BMS of its ANDA and its paragraph IV certifications to the '447, '589, and '985

patents, together with its legal and factual bases for Apotex's paragraph IV certifications.

72.    Upon receipt of Apotex's notice of paragraph IV certification to the '447, '589, and '985 patents, BMS did not sue Apotex within the 45-day period for instituting an infringement suit under 21 U.S.C. § 271(e).

73.    Apotex received tentative approval from FDA for its ANDA No. 76-341 on September 30, 2003. This means that Apotex has satisfied all substantive requirements for approval (*i.e.*, its product is a safe, effective, and fully-substitutable generic alternative to BMS's Pravachol®), but that final FDA approval is being delayed by a 180-day exclusivity period.

74.    In connection with the filing of its ANDA, Apotex has incurred approximately $9 million in expenses to develop its pravastatin product for eventual launch into the market as well as to prepare its ANDA to FDA.

75.    Moreover, now that Apotex has received tentative approval for its pravastatin product, Apotex is poised and ready to begin immediate production of that product for launch in the United States upon expiration of the '227 patent on October 20, 2005, but before expiration of the '447, '589, and '985 patents.

76.    Apotex's submission of ANDA No. 76-341, together with the paragraph IV certifications, seeking approval to market pravastatin sodium before expiration of the '447, '589, and '985 patents constitutes an act of infringement under the Hatch-Waxman Act.

77.    Absent a declaratory judgment from this Court on the '447, '589, and '985 patents, Apotex will not be able to get its product to market upon expiration of the '227 patent in October 2005, but will be further delayed by another applicant's purported 180-day exclusivity.

**BMS Refuses to Confirm That Apotex Does not Infringe the '447, '589, and**
**'985 Patents; Refuses to Review Apotex's ANDA and Pravastatin Sodium**
**Product; and Further Asserts That the Patents-In-Suit Cover Pravastatin**
**Sodium—Which is Precisely the Product That Apotex Seeks to Make**

78.    Beginning in October 2003, Apotex sought reassurances from BMS that its

pravastatin sodium product would not infringe BMS's '447, '589, and '985 patents and that such

patents are improperly listed in the Orange Book.  In the end, Apotex has received no such

assurances, but instead a series of contradictory and inconsistent statements from BMS that have

provided Apotex with no patent certainty whatsoever.

79.    More specifically, on or about October 27, 2003, Apotex requested that BMS:  (a)

agree in writing that Apotex's ANDA product does not and will not infringe the '447, '589, and

'985 patents because those patents claim pravastatin, not the pravastatin sodium product that

Apotex intends to market; and (b) withdraw the '447, '589, and '985 patents from the Orange

Book because they do not actually claim the approved drug, pravastatin sodium, but rather only

pravastatin, making those listings improper.

80.    To date, BMS has refused all such requests, and has further refused even to

review Apotex's ANDA and pravastatin sodium product.  Instead, beginning in November 2003,

BMS issued a series of coy and contradictory, if not impliedly threatening, statements regarding

its intentions, none of which provide Apotex with any patent certainty, and which appear more

designed to confuse and delay Apotex than anything else.

81.    On or about November 10, 2003, BMS coyly stated that it "did not intend to file

suit against [Apotex] alleging infringement of [the '447, '589, and '985 patents] by the product

described in ANDA No. 76-341," so long as the representations and information in Apotex's

paragraph IV notice remain accurate.  At the same time, however, BMS refused to confirm that

Apotex's pravastatin sodium product would not infringe the '447, '589, and '985 patents, and

BMS also called Apotex's assertions about the improper listing of those patents "baseless."

82.    Notably, BMS has never seen, and indeed has refused to review, Apotex's ANDA or pravastatin sodium product, both of which are subject to change or modification during the FDA approval process, as BMS is well aware. Moreover, Apotex's "paragraph IV notice" referenced by BMS states that the '447, '589, and '985 patents claim pravastatin alone, not the approved drug pravastatin sodium and therefore Apotex's pravastatin sodium product will not infringe those patents. So, while supposedly agreeing not to sue Apotex on a product it has never seen, BMS at the same time refused to agree that that product does not infringe and also called Apotex's noninfringement theory from its paragraph IV notice "baseless."

83.    Then, on or about December 4, 2003, BMS again refused to confirm that Apotex's pravastatin sodium product does not infringe the '447, '589, and '985 patents. Instead, BMS did just the opposite and asserted that the '447, '589, and '985 patents all claim or cover pravastatin sodium—which is precisely the drug that Apotex proposes to market and that FDA has tentatively approved. In that same communication, BMS further stated that any construction of the term "pravastatin" in the '447 and '589 patents that would exclude the pravastatin sodium product Apotex seeks to market would be "incorrect" and "based on a flawed construction of the term 'pravastatin' in the claims" of those patents. BMS further stated that pravastatin sodium would "fall squarely within the subject matter claimed in claim 1" of the '985 patent.

84.    On or about February 3, 2004, Apotex—by letter and as required under 21 U.S.C. § 355(j)(5)(C)(i), as amended—extended to BMS an Offer of Confidential Access to Application to access certain information in Apotex's ANDA for pravastatin sodium tablets for the sole purpose of determining whether Apotex's product would infringe the '447, '589, and '985 patents.

85.     On or about February 13, 2004, BMS declined Apotex's offer of access to Apotex's ANDA. BMS also "reaffirmed" its earlier contradictory statement that BMS would not sue Apotex provided that the "information and representations in [Apotex's] p(IV) notice letter remain true" and Apotex does not "disavow those prior representations." At the same time, however, BMS refused to review Apotex's ANDA and product and further refused to provide any confirmation that Apotex's pravastatin sodium product does not infringe the '447, '589, and '985 patents. Rather, BMS held firm to its assertions that its patents do cover pravastatin sodium—which, again, is precisely the product Apotex proposes to market in the United States.

86.     By providing an Offer of Confidential Access to Application, and because BMS did not sue Apotex within 45 days of receipt of Apotex's notice of paragraph IV certification, Apotex is statutorily entitled to file and maintain a declaratory judgment action against BMS under 28 U.S.C. §§ 2201 and 2202, pursuant to 21 U.S.C. § 355(j)(5)(C)(i), as amended by the Medicare Act.

87.     In view of BMS's contradictory and inconsistent statements and refusal to review Apotex's ANDA to confirm that Apotex's pravastatin sodium product does not infringe, on or about February 15, 2004, Apotex again asked BMS to confirm that the '447, '589, and '985 patents do not cover or claim pravastatin sodium, any formulation containing pravastatin sodium, or any approved use of pravastatin sodium.

88.     In response, BMS again refused to provide any such reassurances to Apotex, leaving Apotex only with its assertions that the '447, '589, and '985 patents encompass and cover pravastatin sodium, which is precisely the product Apotex is seeking to market.

89.     Absent the reassurances that Apotex is seeking, Apotex has a reasonable and well-grounded fear that BMS will sue Apotex, alleging infringement of the '447, '589, and '985

-20-

patents. BMS's contradictory and cryptic communications have done nothing to alleviate that apprehension. Instead, BMS has done nothing but issue implied threats about the coverage of its patents that would include the pravastatin sodium product that Apotex is seeking to make.

90.     BMS has also bottlenecked and delayed generic competition indefinitely by not suing Apotex for infringement of the '447, '589, and '985 patents.

### BMS's Litigious Conduct and Vigorous Enforcement of its Intellectual Property Rights

91.     BMS has a long history of vigorously enforcing its patents against generic drug applicants, including Apotex, in order to keep generic drugs out of the marketplace.

92.     For example, BMS has sued ANDA-filers for alleged infringement of patents covering its drug, Taxol®. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001); *Bristol-Myers Squibb Co. v. Immunex Corp.*, 86 F. Supp. 2d 447 (D.N.J. 2000).

93.     BMS has sued ANDA-filers (including Apotex's marketing and sales affiliate, Apotex Corp.) for alleged infringement of patents covering its drug, Plavix®. *See Sanofi-Synthelabo v. Apotex Inc.*, No. 02 Civ. 2255, 2002 WL 1917871 (S.D.N.Y. Aug. 20, 2002).

94.     BMS has also filed suit against ANDA-filers for alleged infringement of patents covering its drug Monopril®. *See Bristol-Myers Squibb Co. v. Andrx Pharms., LLC*, No. 03 Civ. 2503, 2003 WL 22888804 (S.D.N.Y. Dec. 5, 2003).

95.     In fact, BMS has so aggressively defended its intellectual property, patent rights, and brand monopolies that it was the subject of an investigation by the Federal Trade Commission ("FTC"), which charged BMS with abusing and manipulating the Orange Book by improperly listing patents and asserting those patents in bad faith against generic competitors.

96.     On March 7, 2003, BMS entered into a Consent Order with FTC which prevents

BMS from improperly listing patents in the Orange Book, or otherwise violating Hatch-Waxman.

97.     BMS is one of the most litigious brand pharmaceutical companies when protecting its monopoly.

98.     BMS vigorously defends through litigation its intellectual property, including, *inter alia*, its patents rights.

### BMS's Anticompetitive Manipulation of the Statutory Scheme

99.     On information and belief, BMS has not yet sued any of the many generic ANDA applicants for pravastatin sodium. One of Apotex's competitors, Teva Pharmaceuticals ("Teva"), was purportedly the first applicant to submit an ANDA with a paragraph IV certification to a listed patent for pravastatin sodium, and claims to have 180-day exclusivity for this product.

100.     On information and belief, Teva and the other generic pravastatin sodium ANDA applicants have, like Apotex, also submitted paragraph IV certifications to the listed '447, '589, and '985 patents-in-suit here and a paragraph III certification to the '227 patent, all signifying that such applicants will not go to market until after expiration of the '227 patent on October 20, 2005, but before expiration of the '447, '589, and '985 patents.

101.     BMS has purposefully and improperly attempted to manipulate the statutory scheme and create a bottleneck in the pravastatin sodium market that will indefinitely delay the entry of generic competition by not suing any ANDA applicants on the '447, '589, and '985 patents. Without a declaratory judgment from this court, generic competition will, in fact, be delayed indefinitely after expiration of the '227 patent on October 20, 2005, based both on patent uncertainty and Teva's purported 180-day exclusivity.

102.    BMS knows that no generic ANDA applicant, including Apotex, can market its generic pravastatin sodium product in competition with BMS until at least after October 20, 2005, when the '227 patent expires.

103.    On information and belief, BMS also knows that, even after expiration of the '227 patent on October 20, 2005, most generic ANDA applicants will not attempt to commercialize and launch their generic products at risk without either favorable court decisions on the '447, '589, and '985 patents or confirmation from BMS that their products will not infringe such patents. As BMS knows, this is because of the considerable infringement risk and enormous potential damages on blockbuster drugs like Pravachol® that alone will deter most generic applicants from entering the market without a favorable court decision, thus indefinitely delaying the entry of generic competition.

104.    On information and belief, BMS also knows that, without a favorable court decision, generic competition will be delayed even further because no generic applicant can market its product in competition with BMS until at least six months after Teva first markets its pravastatin sodium product.

105.    So without a court decision on '447, '589, and '985 patents, BMS knows that it can potentially delay generic competition indefinitely through patent uncertainty and infringement exposure, as well as Teva's 180-day exclusivity.

106.    On information and belief, BMS purposefully did not sue Apotex and other generic applicants precisely so that BMS could indefinitely delay the entry of generic competition through patent uncertainty and the 180-day exclusivity period.

107.    Congress intended that generic applicants be permitted to obtain court decisions through declaratory judgment actions in order to clear up such bottlenecks in the market and make available more lower-priced generic drugs.

108.    Congress enacted the Medicare Act so that generic applicants would have the right to file and maintain declaratory judgment actions on listed patents like the '447, '589, and '985 patents here, precisely so that the generic applicant could obtain patent certainty and triggering court decisions, thus increasing the availability of lower-priced generic drugs.

109.    Absent the right to file and maintain a declaratory judgment action, Apotex would be irreparably prejudiced and harmed because it would have no way to get its competing product to market.

**There is a Substantial and Continuing Justiciable Controversy Between Apotex and BMS Regarding Infringement of the '447, '589, and '985 Patents**

110.    By preparing and filing ANDA No. 76-341, Apotex has substantially prepared to make, use, import, offer to sell, and sell pravastatin sodium tablets in the United States.

111.    FDA has tentatively approved Apotex's ANDA.

112.    By submitting its ANDA No. 76-341 to engage in the commercial manufacture, use, offer for sale, sale, or importation of generic pravastatin sodium tablets before the expiration of the '447, '589, and '985 patents, as well as filing paragraph IV certifications to the '447, '589, and '985 patents, Apotex has committed an act of infringement sufficient to create case or controversy jurisdiction under 35 U.S.C. § 271(e)(2)(A) and Article III of the Constitution.

113.    By submitting the '447, '589, and '985 patents to FDA for listing in the Orange Book, BMS has affirmatively represented to the world, and in particular Apotex, that a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. *See* 21 U.S.C. § 355(b)(1).   In other words, BMS

necessarily maintains that infringement claims on the '447, '589, and '985 patents could be reasonably asserted against Apotex.

114.    Moreover, as recently as December 4, 2003, BMS has affirmatively stated that the '447, '589, and '985 patents cover pravastatin sodium, which is precisely the product that Apotex is seeking to market in the United States.  BMS has also refused to confirm that Apotex does not infringe those patents.

115.    BMS has thus provided Apotex with a concrete indication that any effort to make, use, import, offer to sell, and sell Apotex's pravastatin sodium product would infringe the '447, '589, and '985 patents.

116.    BMS did not sue Apotex for infringement of the '447, '589, and/or '985 patents within 45 days of receiving Apotex's notice of paragraph IV certification.  In compliance with 21 U.S.C. § 355(j)(5)(C)(i), as amended, Apotex granted BMS an Offer of Confidential Access to Apotex's ANDA for generic pravastatin sodium.  As such, Apotex is statutorily entitled to institute—and this Court has constitutional authority to adjudicate—a declaratory judgment action against BMS.  35 U.S.C. § 271(e)(5), as amended.

117.    There is a continuing case or controversy between Apotex and BMS regarding infringement of the '447, '589, and '985 patents based upon, *inter alia*:

- BMS's listing of the '447, '589, and '985 patents and necessary assertions that an infringement claim could be brought against any generic pravastatin sodium applicant;

- BMS's recent affirmance that the '447, '589, and '985 patents are properly listed;

- BMS's assertions that the '447, '589, and '985 patents claim pravastatin sodium, which is the product that Apotex is seeking to make;

- BMS's entry into a settlement agreement that requires BMS to refrain from

-25-

maintaining patent listings when such listings violate applicable law;

- BMS's statements that Pravachol® is its largest selling product;

- Apotex's ANDA with paragraph IV certifications to the '447, '589, and '985 patents and act of infringement;

- Apotex's intention to market, without a license, its generic pravastatin sodium product before expiration of the '447, '589, and '985 patents;

- Apotex's tentative approval of its pravastatin sodium ANDA; and

- BMS's refusal to state that Apotex's proposed pravastatin sodium product does not and will not infringe the '447, '589, and/or '985 patents.

118. These facts alone give rise to a substantial and continuing case or controversy under Article III of the Constitution over which this Court has subject matter jurisdiction.

119. Based on these same facts, Apotex is under a reasonable apprehension that BMS will sue Apotex alleging infringement of the '447, '589, and '985 patents. Such a reasonable apprehension creates an actual case or controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

120. Apotex is also statutorily entitled to file and maintain this declaratory judgment action against BMS pursuant to the Medicare Act.

121. To avoid legal uncertainty, to protect its substantial investment, to protect its anticipated future investments in its manufacturing process for a generic pravastatin sodium product, and to open the generic pravastatin sodium market, Apotex has instituted this action and is entitled to a declaration of the rights of the parties with respect to the '447, '589, and '985 patents.

-26-

## CLAIMS FOR RELIEF

### Count I
### (Declaratory Judgment of Noninfringement of the '447 Patent)

122.    Apotex asserts and realleges all of the foregoing paragraphs as though fully set

forth herein.

123.    Apotex is entitled by statute to seek a judicial declaration of noninfringement of

the '447 patent, as BMS has not filed suit against Apotex for infringement of the '447 patent

within 45 days of receipt of Apotex's notice of paragraph IV certification.  Furthermore, Apotex

has extended to BMS confidential access to Apotex's ANDA No. 76-341 for Pravastatin Sodium

10 mg, 20 mg, and 40 mg tablets.

124.    Apotex has already committed an act of infringement by submitting its ANDA

with an accompanying paragraph IV certification.  Apotex has also received tentative approval to

market its pravastatin sodium product and has also produced an allegedly infringing pravastatin

sodium product.  Apotex also intends and is prepared to market that product before expiration of

the '447 patent.

125.    BMS has affirmatively represented that an action for patent infringement of the

'447 patent could be asserted against any generic pravastatin sodium applicant, which includes

Apotex.

126.    BMS has also engaged, and continues to engage, in conduct giving rise to a

reasonable and objective apprehension on Apotex's part that Apotex will face an infringement

suit if it commences marketing of its generic pravastatin sodium product.

127.    There is an actual, substantial, and continuing justiciable case or controversy

between Apotex and BMS regarding infringement of the '447 patent.

128.    The manufacture, sale, offer for sale, use, or importation of Apotex's proposed

pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '447 patent.

129. Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's proposed pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '447 patent.

**Count II**
**(Declaratory Judgment of Noninfringement of the '589 Patent)**

130. Apotex asserts and realleges all of the foregoing paragraphs as though fully set forth herein.

131. Apotex is entitled by statute to seek a judicial declaration of noninfringement of the '589 patent, as BMS has not filed suit against Apotex for infringement of the '589 patent within 45 days of receipt of Apotex's notice of paragraph IV certification. Furthermore, Apotex has extended to BMS confidential access to Apotex's ANDA for pravastatin sodium tablets.

132. Apotex has already committed an act of infringement by submitting its ANDA with an accompanying paragraph IV certification. Apotex has also received tentative approval of its pravastatin sodium product and has already produced an allegedly infringing pravastatin sodium product. Apotex also intends and is prepared to market that product before expiration of the '589 patent.

133. BMS has affirmatively represented that an action for patent infringement of the '589 patent could be asserted against any generic pravastatin sodium applicant, which includes Apotex.

134.   BMS has also engaged, and continues to engage, in conduct giving rise to a reasonable and objective apprehension on Apotex's part that Apotex will face an infringement suit if it commences marketing of its generic pravastatin sodium product.

135.   There is an actual, substantial, and continuing justiciable case or controversy between Apotex and BMS regarding infringement of the '589 patent.

136.   The manufacture, sale, offer for sale, use, or importation of Apotex's proposed pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '589 patent.

137.   Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's proposed pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '589 patent.

### Count III
### (Declaratory Judgment of Noninfringement of the '985 Patent)

138.   Apotex asserts and realleges all of the foregoing paragraphs as though fully set forth herein.

139.   Apotex is entitled by statute to seek a judicial declaration of noninfringement of the '985 patent, as BMS has not filed suit against Apotex for infringement of the '985 patent within 45 days of receipt of Apotex's notice of paragraph IV certification. Furthermore, Apotex has extended to BMS confidential access to Apotex's ANDA for pravastatin sodium tablets.

140.   Apotex has already committed an act of infringement by submitting its ANDA with an accompanying paragraph IV certification. Apotex has also received tentative approval to

market its pravastatin sodium tablet product and has also produced an allegedly infringing pravastatin sodium product. Apotex also intends and is prepared to market that product before expiration of the '985 patent.

141.    BMS has affirmatively represented that an action for patent infringement of the '985 patent could be asserted against any generic pravastatin sodium applicant, which includes Apotex.

142.    BMS has engaged, and continues to engage, in conduct giving rise to a reasonable and objective apprehension on Apotex's part that Apotex will face an infringement suit if it commences marketing of its generic pravastatin sodium product.

143.    There is an actual, substantial, and continuing justiciable case or controversy between Apotex and BMS regarding infringement of the '985 patent.

144.    The manufacture, sale, offer for sale, use, or importation of Apotex's proposed pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '985 patent.

145.    Apotex is entitled to a judicial declaration that the manufacture, sale, offer for sale, use, or importation of Apotex's proposed pravastatin sodium drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of the '985 patent.

**Count IV**
**(Declaratory Judgment of Invalidity of the '985 Patent Based**
**on Obviousness Under 35 U.S.C. § 103(a))**

146.    Apotex asserts and realleges all of the foregoing paragraphs as though fully set

forth herein.

*The '447 patent is prior art to the '985 patent*

147.    On information and belief, the '447 patent, owned by BMS, was filed on March

31, 1988 (as the '127 application), and issued on July 9, 1991.

148.    The '447 patent qualifies as 35 U.S.C. § 102(e) prior art, as its March 31, 1988,

filing date was prior to the earliest claimed filing date of the '985 patent.

149.    The '447 patent qualifies as 35 U.S.C. § 102(b) prior art as to the April 19, 1995,

filing date of the new matter disclosed in the '985 patent.

150.    The '447 patent discloses a pravastatin formulation having the following

composition:

| '447 Specification Disclosure | |
|---|---|
| **Ingredient** | **Parts by Weight** |
| Pravastatin | 6.7 |
| Lactose | 67 |
| Microcrystalline Cellulose | 20 |
| Croscarmellose Sodium | 2 |
| Magnesium Stearate | 1 |
| Magnesium Oxide | 3.3 |

*The '589 patent is prior art to the '985 patent*

151.    On information and belief, the '589 patent is owned by BMS, was filed on May 20, 1991, and issued on January 19, 1993.

152.    The '589 patent claims an earliest effective filing date of March 31, 1988, as the application that later became the '589 patent was originally filed as a continuation application stemming from the '127 application (that later issued as the '447 patent).

153.    The '589 patent qualifies as 35 U.S.C. § 102(e) prior art, as its March 31, 1988, filing date was prior to the earliest claimed filing date of the '985 patent.

154.    The '589 patent qualifies as 35 U.S.C. § 102(b) prior art as to the April 19, 1995, filing date of the new matter disclosed in the '985 patent.

155.    The '589 patent discloses a pravastatin formulation having the following composition:

| '589 Specification Disclosure | |
| --- | --- |
| Ingredient | Parts by Weight |
| Pravastatin | 6.7 |
| Lactose | 67 |
| Microcrystalline Cellulose | 20 |
| Croscarmellose Sodium | 2 |
| Magnesium Stearate | 1 |
| Magnesium Oxide | 3.3 |

156.    The Patent Appeals Board opinion of May 27, 1995, during prosecution of the '679 application (which is the parent patent application to the application later issuing as the '985 patent) stated on pages 4-5 that:

[BMS] do[es] not dispute the examiner's finding that [the prior art] teaches that increased (LDL)-cholesterol is the most important risk factor for a heart attack among mammals,

-32-

and that the claimed HMG CoA reductase inhibitors are used to lower cholesterol level. Appellants also do not challenge the examiner's finding that [the prior art] discloses the role of HMG CoA reductase inhibitors in lowering cholesterol in order to reduce the frequency of fatal and non-fatal coronary events. It is appellant's position that neither of the references discloses that treatment with such cholesterol lowering inhibitors prevents a second heart attack. However, while we appreciate that the references do not provide an express disclosure regarding the prevention of second heart attacks, we completely concur with the examiner that the only logical conclusion to draw is that one of ordinary skill in the art would have reasonably expected that any treatment that is effective in reducing the risk of a first heart attack would obviously prevent, or at least, reduce the risk of a second occurrence. It is difficult for us to fathom a situation where a doctor, knowing the value of administering a HMG CoA reductase inhibitor for reducing the risk of a heart attack, would not prescribe such medication to a person after he/she experiences a first heart attack, whether or not the person was taking such medication before the coronary event. In our view, to do otherwise, would require stupidity, not skill, of the practitioner. In Re Sovish, 769 F.2d 738, 226 USPQ 771 (Fed. Cir. 1985). Regarding the specifically claimed dosage, we agree with the examiner that it would have been within the skill of the artisan to determine the optimum dosage for the particular patient being treated.

157.    The Nakaya reference (*The Effect of CS-514, an Inhibitor of HMG-CoA Reductase, on Serum Lipids in Healthy Volunteers*, 61 Atherosclerosis 125-128 (1986)) qualifies as prior art under section 102(b) and teaches that one can administer HMG CoA reductase inhibitors to patients having normal serum cholesterol levels to lower serum cholesterol levels and thereby reduce the incidence of a coronary event.

158.    It would have been obvious to one of ordinary skill in the art to combine the teachings of the Nakaya article to reduce cholesterol levels in patients having normal cholesterol levels in view of the Board opinion of May 27, 1995, that expressly indicated that the state of the art prior to the earliest effective filing date of the '985 patent included that only a stupid practitioner would not use an HMG CoA reductase inhibitor to prevent second or subsequent coronary events.

159.    It would have been obvious that the preferred dosage form was the form disclosed in the '447 and/or '589 patents.

160.    The remaining dependent claims only further limit the base independent claims with the choice of HMG CoA reductase inhibitor, ACE inhibitor, or preferred compositions, which are obvious in view of the state of the art at the time.

161.    On information and belief, each of the claims of the '985 patent is invalid as being obvious under 35 U.S.C. § 103(a).

162.    There is an actual, substantial, and continuing justiciable case or controversy between Apotex and BMS regarding the validity of the '985 patent.

163.    Apotex is entitled to a judicial declaration that the '985 patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, Apotex respectfully prays for judgment in its favor and against BMS:

(a)    Declaring that the manufacture, sale, offer for sale, use, or importation of Apotex's Pravastatin Sodium 10 mg, 20 mg, and 40 mg tablet drug product that is the subject of ANDA No. 76-341 does not and will not infringe (either literally or under the doctrine of equivalents), directly or indirectly (either by inducement or contributorily), any valid or enforceable claim of United States Patent Nos. 5,030,477; 5,180,589; or 5,622,985;

(b)    Declaring that the claims of United States Patent No. 5,622,985 are invalid;

(c)    Awarding Apotex its reasonable attorneys' fees and costs of this action; and

(d)    Awarding Apotex such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

The Plaintiffs, Apotex Inc. and Apotex Corp., hereby demand a trial by jury on all issues

so triable.

Dated: April 15, 2004.
       New York, New York

                                    SULLIVAN & WORCESTER, LLP

                                    By: _____
                                         Marc A. Lebowitz (ML 7381)
                                         Matthew Giger (MG 3731)

                                    1290 Avenue of the Americas
                                    New York, New York  10104
                                    Tel: (212) 660-3000
                                    Fax: (212) 660-3001

                                    *Attorneys for Plaintiffs,*
                                    *Apotex Inc. and Apotex Corp.*

{N0021477; 1}

# Exhibit 1

# United States Patent [19]

## Joshi et al.

[11] Patent Number: 5,030,447

[45] Date of Patent: Jul. 9, 1991

[54] PHARMACEUTICAL COMPOSITIONS HAVING GOOD STABILITY

[75] Inventors: Yatindra M. Joshi, Piscataway; Pierina Chiesa, South Orange; Nemichand B. Jain, Monmouth Junction, all of N.J.

[73] Assignee: E. R. Squibb & Sons, Inc., Princeton, N.J.

[21] Appl. No.: 176,127

[22] Filed: Mar. 31, 1988

[51] Int. Cl.$^5$ ..................... A61K 31/79; A61K 9/20
[52] U.S. Cl. ........................................ 424/80; 424/83; 424/468; 424/470; 424/465; 514/510; 514/548
[58] Field of Search ................. 514/510, 548; 424/80, 424/83, 468, 470

[56] References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,865,935 | 2/1975 | Amann | 424/468 |
| 3,891,755 | 11/1975 | Mehta | 424/157 |
| 4,342,767 | 8/1982 | Albert-Schoenberg | 514/548 |
| 4,342,767 | 8/1982 | Albers-Schonberg | 514/548 |
| 4,346,227 | 8/1982 | Terahara et al. | 560/119 |
| 4,346,227 | 8/1982 | Terahara et al. | 560/119 |
| 4,609,675 | 9/1986 | Franz | 514/568 |
| 4,609,675 | 9/1986 | Franz | 514/568 |
| 4,681,759 | 7/1987 | Porubcan | 424/80 |
| 4,755,385 | 7/1988 | Etienne et al. | 424/154 |

Primary Examiner—Thurman Page
Assistant Examiner—James M. Spear
Attorney, Agent, or Firm—Burton Rodney

[57]                    ABSTRACT

A pharmaceutical compositions is provided which has excellent stability, when dispersed in water has a pH of at least about 9, and includes a medicament which is sensitive to a low pH environment such as pravastatin, one or more fillers such as lactose and/or microcrystalline cellulose, one or more binders, such as microcrystalline cellulose (dry binder) or polyvinylpyrrolidone (wet binder), one or more disintegrating agents such as croscarmellose sodium, one or more lubricants such as magnesium stearate and one or more basifying agents such as magnesium oxide.

13 Claims, No Drawings

5,030,447

1

# PHARMACEUTICAL COMPOSITIONS HAVING GOOD STABILITY

## FIELD OF THE INVENTION

The present invention relates to a pharmaceutical composition, preferably in the form of a tablet, which includes a medicament which is sensitive to a low pH environment, such as pravastatin, yet has excellent stability.

## BACKGROUND OF THE INVENTION

Pharmaceutical compositions which include a medicament which is unstable in an acidic environment will require a basic excipient to enhance storage stability.

Pravastatin, an HMG-CoA reductase inhibitor disclosed in U.S. Pat. No. 4,346,227 to Terahara et al and having the formula

is sensitive to a low pH environment and will degrade to form its lactone and various isomers.

## DESCRIPTION OF THE INVENTION

In accordance with the present invention, a pharmaceutical composition is provided which has excellent storage stability even though it includes a medicament which may degrade in a low pH environment. The pharmaceutical composition of the invention, which is preferably in the form of a tablet, includes a medicament which is sensitive to a low pH environment, such as pravastatin, one or more fillers, such as lactose and-/or microcrystalline cellulose, one or more binders, such as mirocrystalline cellulose (dry binder) or polyvinylpyrrolidone (wet binder), one or more disintegrating agents such as croscarmellose sodium, one or more lubricants such as magnesium stearate, and one or more basifying agents such as magnesium oxide to impart a pH to an aqueous dispersion of the composition of at least about 9.0.

The invention is particularly adapted to pharmaceutical compositions containing pravastatin as the medicament. Pravastatin will be present in an amount within the range of from about 1 to about 60% and preferably from about 3 to about 50% by weight of the composition.

To ensure acceptable stability, the composition of the invention will include a basifying agent which will raise the pH of an aqueous dispersion of the composition to at least 9 and preferably to a pH of at least about 9.5. The basifying agent will be present in an amount within the range of from about 1 to about 75% by weight and preferably from about 2 to about 70% by weight of the composition. Examples of basifying agents which may be included herein include but are not limited to magnesium oxide, aluminum oxide, an alkali metal hydroxide

2

such as sodium hydroxide, potassium hydroxide or lithium hydroxide or an alkaline earth metal hydroxide such as calcium hydroxide or magnesium hydroxide, with magnesium oxide being preferred.

The composition of the invention will also include one or more fillers or excipients in an amount within the range of from about 5 to about 90% by weight and preferably from about 10 to about 80% by weight such as lactose, sugar, corn starch, modified corn starch, mannitol, sorbitol, inorganic salts such as calcium carbonate and/or cellulose derivatives such as wood cellulose and microcrystalline cellulose.

One or more binders will be present in addition to or in lieu of the fillers in an amount within the range of from about 5 to about 35% and preferably from about 10 to about 30% by weight of the composition. Examples of such binders which are suitable for use herein include polyvinylpyrrolidone (molecular weight ranging from about 5000 to about 80,000 and preferably about 40,000), lactose, starches such as corn starch, modified corn starch, sugars, gum acacia and the like as well as a wax binder in finely powdered form (less than 500 microns) such as carnauba wax, paraffin, spermaceti, polyethylenes or microcrystalline wax.

Where the composition is to be in the form of a tablet, it will include one or more tablet disintegrants in an amount within the range of from about 0.5 to about 10% and preferably from about 2 to about 8% by weight of the composition such as croscarmellose sodium, crospovidone, sodium starch glycolate, corn starch or microcrystalline cellulose as well as one or more tableting lubricants in an amount within the range of from about 0.2 to about 8% and preferably from about 0.5 to about 2% by weight of the composition, such as magnesium stearate, stearic acid, palmitic acid, calcium stearate, talc, carnauba wax and the like. Other conventional ingredients which may optionally be present include preservatives, stabilizers, anti-adherents or silica flow conditioners or glidants, such as Syloid brand silicon dioxide as well as FD&C colors.

Tablets of the invention may also include a coating layer which may comprise from 0 to about 15% by weight of the tablet composition. The coating layer which is applied over the tablet core may comprise any conventional coating formulations and will include one or more film-formers or binders, such as a hydrophilic polymer like hydroxypropylmethyl cellulose and a hydrophobic polymer like ethyl cellulose, cellulose acetate, polyvinyl alcohol-maleic anhydride copolymers, β-pinene polymers, glyceryl esters of wood resins and the like and one or more plasticizers, such as triethyl citrate, diethyl phthalate, propylene glycol, glycerin, butyl phthlate, castor oil and the like. Both core tablets as well as coating formulations may contain aluminum lakes to provide color.

The film formers are applied from a solvent system containing one or more solvents including water, alcohols like methyl alcohol, ethyl alcohol or isopropyl alcohol, ketones like acetone, or ethylmethyl ketone, chlorinated hydrocarbons like methylene chloride, dichloroethane, and 1,1,1-trichloroethane.

Where a color is employed, the color will be applied together with the film former, plasticizer and solvent compositions.

A preferred tablet composition of the invention will include from about 2 to about 35% by weight pravastatin, from about 2.5 to about 70% by weight magnesium oxide, from about 10 to about 80% by weight lactose,

5,030,447

3

from about 10 to about 30% by weight microcrystalline cellulose or polyvinylpyrrolidone, from about 2 to about 8% by weight croscarmellose sodium and from about 0.5 to about 2% by weight magnesium stearate.

The pharmaceutical composition of the invention may be prepared as follows. A mixture of the medicament (pravastatin), basifying agent (preferably magnesium oxide), and a fraction (less than 50%) of the filler (such as lactose), with or without color, are mixed together and passed through a #12 to #40 mesh screen. Filler-binder (such as microcrystalline cellulose), disintegrant (such as croscarmellose sodium) and the remaining lactose are added and mixed. Lubricant (such as magnesium stearate) is added with mixing until a homogeneous mixture is obtained.

The resulting mixture may then be compressed into tablets of up to 1 gram in size.

Where desired, the tablets of the invention may be formulated by a wet granulation technique wherein medicament (pravastatin) is dissolved in warm aqueous solution of binder (polyvinylpyrrolidone). The resulting solution is used to granulate a mixture of filler (lactose hydrous), basifying agent (such as magnesium oxide), filler-binder (microcrystalline cellulose), and a portion of the disintegrant (croscarmellose sodium) The granulated mixture is passed through a #4 to #10 mesh screen and is then dried in a tray drying oven. The dried granulation is passed through a #12 to #20 mesh screen. The remainder of the disintegrant and the lubricant (such as magnesium stearate) are added and the resulting granules are compressed into a tablet.

The tablets may also be formulated by a wet granulation technique where a mixture of the medicament (pravastatin), basifying agent (preferably magnesium oxide), filler-binder (such as microcrystalline cellulose), and a fraction (less than 50%) of the filler (such as lactose) with or without color, are mixed and passed through a #12 to #40 mesh screen. A portion of the disintegrant (such as croscarmellose sodium) and the remaining lactose are added and mixed. The resulting mixture is granulated using an aqueous binder solution (such as polyvinyl pyrrolidone). The formulated wet mixture is passed thorugh a #4 to #20 mesh screen and is then dried in a tray drying oven. The dry granulation is passed through a #12 to #20 mesh screen. The remainder of the disintegrant and the lubricant (such as magnesium stearate) are added and the resulting granules are compressed into a tablet.

All mesh sizes are U.S. Standard ASTME.

The following Examples represent preferred embodiments of the present invention. All temperatures are expressed in degrees Centigrade unless otherwise indicated and all mesh sizes are U.S. Standard ASTME.

Example 1

A pravastatin formulation in the form of tablets having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 67 |
| Microcrystalline cellulose | 20 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |

4

Pravastatin, magnesium oxide and a fraction (30%) of the lactose were mixed together for 2 to 10 minutes employing a suitable mixer. The resulting mixture was passed through a #12 to #40 mesh size screen. Microcrystalline cellulose, croscarmellose sodium and the remaining lactose were added and the mixture was mixed for 2 to 10 minutes. Thereafter, magnesium stearate was added and the mixture was continued for 1 to 3 minutes.

The resulting homogeneous mixture was then compressed into tablets each containing 5 mg, 10 mg, 20 or 40 mg pravastatin.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C., or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

Example 2

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described in Example 1, except that color was incorporated into the powder mixture containing pravastatin, magnesium oxide and a fraction of the lactose.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 66.8 |
| Microcrystalline cellulose | 20 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD & C Red #3 Lake | 0.2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C., or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

Example 3

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 71 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 1 |

Pravastatin was dissolved in warm aqueous solution of polyvinylpyrrolidone. The solution was used to granulate a mixture of lactose, magnesium oxide, microcrystalline cellulose and a fraction of the croscarmellose sodium. The formulated mixture was passed through a #4 to #10 mesh screen and was then dry granulated in a tray drying oven. The dry granulation was passed through a #12 to #20 mesh screen. The remainder of

5,030,447

| 5 | 6 |

the disintegrant was added to the dry granules and mixed for 2 to 10 minutes. Thereafter, magnesium stearate was added and mixing was continued for 1 to 5 minutes. The resulting granulation was compressed into tablets.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## Example 4

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described in Example 3, except that color was incorporated into the powder mixture containing lactose, magnesium oxide, microcrystalline cellulose and a fraction of the croscarmellose sodium.

| Ingredient | Percent by Weight |
| --- | --- |
| Pravastatin | 6.7 |
| Lactose | 70.8 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD & C #3 Lake | 0.2 |
| Polyvinylpyrrolidone | 1 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## Example 5

A pravastatin formulation in the form of tablets, each containing 10 mg pravastatin, having the following composition was prepared as described in Example 3.

| Ingredient | Percent by Weight |
| --- | --- |
| Pravastatin | 6.7 |
| Lactose | 54.5 |
| Polyvinylpyrrolidone | 0.5 |
| Croscarmellose sodium | 4 |
| Magnesium stearate | 1 |
| Magnesium oxide | 33.3 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 40° C. for 18 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## Example 6

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg and 40 mg pravastatin, having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
| --- | --- |
| Pravastatin | 10 |
| Lactose | 66.7 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 2 |

Pravastatin, magnesium oxide, microcrystalline cellulose, and a fraction of the lactose were mixed for 5–10 minutes. The resulting mixture was passed through a #12 to #40 mesh screen. A portion of the croscarmellose sodium and the remaining lactose were added and mixing was continued for 5–10 minutes. The resulting mixture was granulated with an aqueous polyvinylpyrrolidone solution. The granulated wet mixture was passed through a #4 to #20 mesh screen and then dried in a tray drying oven. The dry granulation was passed through a #12–#20 mesh screen. The remainder of the croscarmellose sodium was added to the granules and mixed for 5–10 minutes. The magnesium stearate was added to the resulting granule mixture and mixing was continued for 1–5 minutes. The resulting formulation was compressed into tablets.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## Example 7

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg and 40 mg pravastatin, having the following composition was prepared as described in Example 6, except that FD&C Red #3 Lake color was mixed with pravastatin, magnesium oxide, microcrystalline cellulose and lactose.

| Ingredient | Percent by Weight |
| --- | --- |
| Pravastatin | 10 |
| Lactose | 66.5 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD & C Red #3 Lake | 0.2 |
| Polyvinylpyrrolidone | 2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## Example 8

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg and 40 mg pravastatin, having the following composition was prepared as described in Example 6, except that all of the croscarmellose sodium was mixed with dry granules prior to addition of magnesium stearate.

5,030,447

7

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose | 64.7 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 5 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 1 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

Example 9

A pravastatin formulation in the form of tablets, having the following composition was prepared as described in Example 8 except that FD&C Red #3 Lake color was mixed with pravastatin, magnesium oxide, microcrystalline cellulose and lactose.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose hydrous | 64.5 |
| Microcrystalline cellulose | 15 |
| Polyvinylpyrrolidone | 1 |
| Croscarmellose sodium | 5 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD & C #3 Lake | 0.2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 40° to 60° C. for several months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

Other basifying agents may be employed which will raise the pH of an aqueous dispersion of the composition of the invention as shown in Examples 1 to 9 to about 10. Examples of such basifying agents include NaOH, KOH, Ca(OH)₂, Mg(OH)₂ or NH₄OH.

What is claimed is:

1. A pharmaceutical composition in the form of a tablet which has enhanced stability comprising medicament which is sensitive to a low pH environment and is pravastatin, one of more fillers, one or more binders, one or more disintegrants, one of more lubricants and one or more basifying agents to impart a desired pH of at least 9 to an aqueous dispersion of said composition.

2. The pharmaceutical composition as defined in claim 1 wherein said medicament is present in an

8

amount within the range of from about 1 to about 60% by weight of the composition.

3. The pharmaceutical composition as defined in claim 1 wherein the basifying agent is present in an amount within the range of from about 1 to about 75% by weight of the composition.

4. The pharmaceutical composition as defined in claim 1 wherein the basifying agent is an alkali metal hydroxide, an alkaline earth metal hydroxide or ammonium hydroxide.

5. The pharmaceutical composition as defined in claim 5 wherein the basifying agent is MgO, Mg(OH)₂, Ca(OH)₂, NaOH, KOH, LiOH, NH₄OH, Al(OH)₃ or magaldrate.

6. The pharmaceutical composition as defined in claim 1 wherein the filler is present in an amount within the range of from about 5 to about 90% by weight.

7. The pharmaceutical composition as defined in claim 6 wherein the filler is lactose, sugar, corn starch, modified corn starch, mannitol, sorbitol, wood cellulose, microcrystalline cellulose, calcium carbonate or mixtures thereof.

8. The pharmaceutical composition as defined in claim 1 wherein the binder is present in an amount within the range of from about 5 to about 35% by weight.

9. The pharmaceutical composition as defined in claim 8 wherein the binder is microcrystalline cellulose, polyvinylpyrrolidone, lactose, corn starch, modified corn starch, sugars, gum acacia, carnauba wax, paraffin, spermaceti, polyethylenes or microcrystalline wax.

10. The pharmaceutical composition as defined in claim 1 wherein the disintegrant is present in an amount within the range of from about 0.5 to about 10% by weight.

11. The pharmaceutical composition as defined in claim 10 wherein the disintegrant is croscarmellose sodium, crospovidone, sodium starch glycolate, corn starch or microcrystalline cellulose.

12. The pharmaceutical composition as defined in claim 1 having the following formulation:

from about 3 to about 50% by weight pravastatin,

from about 2 to about 70% by weight magnesium oxide, to impart a pH of at least about 9.5,

from about 1 to about 85% by weight lactose,

from about 10 to about 30% by weight microcrystalline cellulose or polyvinylpyrrolidone,

from about 2 to about 8% by weight of croscarmellose sodium; and

from about 0.5 to about 2% by weight magnesium stearate.

13. The pharmaceutical composition as defined in claim 1 having a pH in water of at about 10.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO. :    5,030,447

DATED    :    July 9, 1991

INVENTOR(S) :    Yatindra M. Joshi et al

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 7, Claim 1, line 4 thereof, please change
"one of more fillers" to --one or more fillers--;

line 5, thereof, please change "one of more lubricants"
to --one or more lubricants--.

Signed and Sealed this

Fifth Day of January, 1993

Attest:

DOUGLAS B. COMER

Attesting Officer           Acting Commissioner of Patents and Trademarks

# Exhibit 2



US005180589A

# United States Patent [19]

## Joshi et al.

[11] Patent Number: 5,180,589

[45] Date of Patent: * Jan. 19, 1993

[54] PRAVASTATIN PHARMACEUATICAL COMPOSITIONS HAVING GOOD STABILITY

[75] Inventors: Yatindra M. Joshi, Piscataway; Pierina Chiesa, South Orange; Nemichand B. Jain, Monmouth Junction, all of N.J.

[73] Assignee: E. R. Squibb & Sons, Inc., Princeton, N.J.

[ * ] Notice: The portion of the term of this patent subsequent to Jul. 9, 2008 has been disclaimed.

[21] Appl. No.: 703,326

[22] Filed: May 20, 1991

### Related U.S. Application Data

[63] Continuation of Ser. No. 176,127, Mar. 31, 1988, Pat. No. 5,030,447.

[51] Int. Cl.⁵ ........................... A61K 9/14; A61K 9/20
[52] U.S. Cl. ................................... 424/465; 424/464; 424/489; 514/510; 514/548; 514/970; 560/119
[58] Field of Search ................. 424/80, 464, 465, 470, 424/474

[56]                    References Cited

U.S. PATENT DOCUMENTS

| 3,865,935 | 2/1975 | Amann | 424/181 |
| 3,891,755 | 6/1975 | Mehta | 424/157 |
| 3,983,140 | 9/1976 | Endo et al. | 435/72 |
| 4,342,767 | 8/1982 | Albers-Schonberg et al. | 424/250 |
| 4,346,227 | 8/1982 | Terahara et al. | 560/119 |
| 4,609,675 | 9/1986 | Franz | 514/568 |
| 4,681,759 | 7/1987 | Porubcan | 424/80 |
| 4,755,385 | 7/1988 | Etienne et al. | 424/154 |
| 5,030,447 | 7/1991 | Joshi et al. | 424/80 |

Primary Examiner—Thurman K. Page
Assistant Examiner—James M. Spear
Attorney, Agent, or Firm—Burton Rodney

[57]                    ABSTRACT

A pharmaceutical composition is provided which has excellent stability, when dispersed in water has a pH of at least about 9, and includes a medicament which is sensitive to a low pH environment such as pravastatin, one or more fillers such as lactose and/or microcrystalline cellulose, one or more binders, such as microcrystalline cellulose (dry binder) or polyvinylpyrrolidone (wet binder), one or more disintegrating agents such as croscarmellose sodium, one or more lubricants such as magnesium stearate and one or more basifying agents such as magnesium oxide.

12 Claims, No Drawings

5,180,589

1

# PRAVASTATIN PHARMACEUTICAL COMPOSITIONS HAVING GOOD STABILITY

This is a continuation of application Ser. No. 176,127, filed Mar. 31, 1988, now U.S. Pat. No. 5,030,447.

## FIELD OF THE INVENTION

The present invention relates to a pharmaceutical composition, preferably in the form of a tablet, which includes a medicament which is sensitive to a low pH environment, such as pravastatin, yet has excellent stability.

## BACKGROUND OF THE INVENTION

Pharmaceutical compositions which include a medicament which is unstable in an acidic environment will require a basic excipient to enhance storage stability.

Pravastatin, an HMG-CoA reductase inhibitor disclosed in U.S. Pat. No. 4,346,227 to Terahara et al and having the formula



is sensitive to a low pH environment and will degrade to form its lactone and various isomers.

## DESCRIPTION OF THE INVENTION

In accordance with the present invention, a pharmaceutical composition is provided which has excellent storage stability even though it includes a medicament which may degrade in a low pH environment. The pharmaceutical composition of the invention, which is preferably in the form of a tablet, includes a medicament which is sensitive to a low pH environment, such as pravastatin, one or more fillers, such as lactose and-/or microcrystalline cellulose, one or more binders, such as mirocrystalline cellulose (dry binder) or polyvinylpyrrolidone (wet binder), one or more disintegrating agents such as croscarmellose sodium, one or more lubricants such as magnesium stearate, and one or more basifying agents such as magnesium oxide to impart a pH to an aqueous dispersion of the composition of at least about 9.0.

The invention is particularly adapted to pharmaceutical compositions containing pravastatin as the medicament. Pravastatin will be present in an amount within the range of from about 1 to about 60% and preferably from about 3 to about 50% by weight of the composition.

To ensure acceptable stability, the composition of the invention will include a basifying agent which will raise the pH of an aqueous dispersion of the composition to at least 9 and preferably to a pH of at least about 9.5. The basifying agent will be present in an amount within the range of from about 1 to about 75% by weight and preferably from about 2 to about 70% by weight of the composition. Examples of basifying agents which may

2

be included herein include but are not limited to magnesium oxide, aluminum oxide, an alkali metal hydroxide such as sodium hydroxide, potassium hydroxide or lithium hydroxide or an alkaline earth metal hydroxide such as calcium hydroxide or magnesium hydroxide, with magnesium oxide being preferred.

The composition of the invention will also include one or more fillers or excipients in an amount within the range of from about 5 to about 90% by weight and preferably from about 10 to about 80% by weight such as lactose, sugar, corn starch, modified corn starch, mannitol, sorbitol, inorganic salts such as calcium carbonate and/or cellulose derivatives such as wood cellulose and microcrystalline cellulose.

One or more binders will be present in addition to or in lieu of the fillers in an amount within the range of from about 5 to about 35% and preferably from about 10 to about 30% by weight of the composition. Examples of such binders which are suitable for use herein include polyvinylpyrrolidone (molecular weight ranging from about 5000 to about 80,000 and preferably about 40,000), lactose, starches such as corn starch, modified corn starch, sugars, gum acacia and the like as well as a wax binder in finely powdered form (less than 500 microns) such as carnauba wax, paraffin, spermaceti, polyethylenes or microcrystalline wax.

Where the composition is to be in the form of a tablet, it will include one or more tablet disintegrants in an amount within the range of from about 0.5 to about 10% and preferably from about 2 to about 8% by weight of the composition such as croscarmellose sodium, crospovidone, sodium starch glycolate, corn starch or microcrystalline cellulose as well as one or more tableting lubricants in an amount within the range of from about 0.2 to about 8% and preferably from about 0.5 to about 2% by weight of the composition, such as magnesium stearate, stearic acid, palmitic acid, calcium stearate, talc, carnauba wax and the like. Other conventional ingredients which may optionally be present include preservatives, stabilizers, anti-adherents or silica flow conditioners or glidants, such as Syloid brand silicon dioxide as well as FD&C colors.

Tablets of the invention may also include a coating layer which may comprise from 0 to about 15% by weight of the tablet composition. The coating layer which is applied over the tablet core may comprise any conventional coating formulations and will include one or more film-formers or binders, such as a hydrophilic polymer like hydroxypropylmethyl cellulose and a hydrophobic polymer like ethyl cellulose, cellulose acetate, polyvinyl alcohol-maleic anhydride copolymers, β-pinene polymers, glyceryl esters of wood resins and the like and one or more plasticizers, such as triethyl citrate, diethyl phthalate, propylene glycol, glycerin, butyl phthlate, castor oil and the like. Both core tablets as well as coating formulations may contain aluminum lakes to provide color.

The film formers are applied from a solvent system containing one or more solvents including water, alcohols like methyl alcohol, ethyl alcohol or isopropyl alcohol, ketones like acetone, or ethylmethyl ketone, chlorinated hydrocarbons like methylene chloride, dichloroethane, and 1,1,1-trichloroethane.

Where a color is employed, the color will be applied together with the film former, plasticizer and solvent compositions.

5,180,589

| 3 | 4 |
|---|---|

A preferred tablet composition of the invention will include from about 2 to about 35% by weight pravastatin, from about 2.5 to about 70% by weight magnesium oxide, from about 10 to about 80% by weight lactose, from about 10 to about 30% by weight microcrystalline cellulose or polyvinylpyrrolidone, from about 2 to about 8% by weight croscarmellose sodium and from about 0.5 to about 2% by weight magnesium stearate.

The pharmaceutical composition of the invention may be prepared as follows. A mixture of the medicament (pravastatin), basifying agent (preferably magnesium oxide), and a fraction (less than 50%) of the filler (such as lactose), with or without color, are mixed together and passed through a #12 to #40 mesh screen. Filler-binder (such as microcrystalline cellulose), disintegrant (such as croscarmellose sodium) and the remaining lactose are added and mixed. Lubricant (such as magnesium stearate) is added with mixing until a homogeneous mixture is obtained.

The resulting mixture may then be compressed into tablets of up to 1 gram in size.

Where desired, the tablets of the invention may be formulated by a wet granulation technique wherein medicament (pravastatin) is dissolved in warm aqueous solution of binder (polyvinylpyrrolidone). The resulting solution is used to granulate a mixture of filler (lactose hydrous), basifying agent (such as magnesium oxide), filler-binder (microcrystalline cellulose), and a portion of the disintegrant (croscarmellose sodium). The granulated mixture is passed through a #4 to #10 mesh screen and is then dried in a tray drying oven. The dried granulation is passed through a #12 to #20 mesh screen. The remainder of the disintegrant and the lubricant (such as magnesium stearate) are added and the resulting granules are compressed into a tablet.

The tablets may also be formulated by a wet granulation technique where a mixture of the medicament (pravastatin), basifying agent (preferably magnesium oxide), filler-binder (such as microcrystalline cellulose), and a fraction (less than 50%) of the filler (such as lactose) with or without color, are mixed and passed through a #12 to #40 mesh screen. A portion of the disintegrant (such as croscarmellose sodium) and the remaining lactose are added and mixed. The resulting mixture is granulated using an aqueous binder solution (such as polyvinyl pyrrolidone). The formulated wet mixture is passed through a #4 to #20 mesh screen and is then dried in a tray drying oven. The dry granulation is passed through a #12 to #20 mesh screen. The remainder of the disintegrant and the lubricant (such as magnesium stearate) are added and the resulting granules are compressed into a tablet.

All mesh sizes are U.S. Standard ASTME.

The following Examples represent preferred embodiments of the present invention. All temperatures are expressed in degrees Centigrade unless otherwise indicated and all mesh sizes are U.S. Standard ASTME.

### EXAMPLE 1

A pravastatin formulation in the form of tablets having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 67 |
| Microcrystalline cellulose | 20 |

-continued

| Ingredient | Percent by Weight |
|---|---|
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |

Pravastatin, magnesium oxide and a fraction (30%) of the lactose were mixed together for 2 to 10 minutes employing a suitable mixer. The resulting mixture was passed through a #12 to #40 mesh-size screen. Microcrystalline cellulose, croscarmellose sodium and the remaining lactose were added and the mixture was mixed for 2 to 10 minutes. Thereafter, magnesium stearate was added and mixing was continued for 1 to 3 minutes.

The resulting homogeneous mixture was then compressed into tablets each containing 5 mg, 10 mg, 20 or 40 mg pravastatin.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C., or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

### EXAMPLE 2

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described in Example 1, except that color was incorporated into the powder mixture containing pravastatin, magnesium oxide and a fraction of the lactose.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 66.8 |
| Microcrystalline cellulose | 20 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD&C Red #3 Lake | 0.2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C., or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

### EXAMPLE 3

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 71 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 1 |

5,180,589

| 5 | 6 |

Pravastatin was dissolved in warm aqueous solution of polyvinylpyrrolidone. The solution was used to granulate a mixture of lactose, magnesium oxide, microcrystalline cellulose and a fraction of the croscarmellose sodium. The formulated mixture was passed through a #4 to #10 mesh screen and was then dry granulated in a tray drying oven. The dry granulation was passed through a #12 to #20 mesh screen. The remainder of the disintegrant was added to the dry granules and mixed for 2 to 10 minutes. Thereafter, magnesium stearate was added and mixing was continued for 1 to 5 minutes. The resulting granulation was compressed into tablets.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## EXAMPLE 4

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg or 40 mg pravastatin, having the following composition was prepared as described in Example 3, except that color was incorporated into the powder mixture containing lactose, magnesium oxide, microcrystalline cellulose and a fraction of the croscarmellose sodium

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 70.8 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD&C #3 Lake | 0.2 |
| Polyvinylpyrrolidone | 1 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## EXAMPLE 5

A pravastatin formulation in the form of tablets, each containing 10 mg pravastatin, having the following composition was prepared as described in Example 3.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 6.7 |
| Lactose | 54.5 |
| Polyvinylpyrrolidone | 0.5 |
| Croscarmellose sodium | 4 |
| Magnesium stearate | 1 |
| Magnesium oxide | 33.3 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 40° C. for 18 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## EXAMPLE 6

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg and 40 mg pravastatin, having the following composition was prepared as described below.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose | 66.7 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 2 |

Pravastatin, magnesium oxide, microcrystalline cellulose, and a fraction of the lactose were mixed for 5–10 minutes. The resulting mixture was passed through a #12 to #40 mesh screen. A portion of the croscarmellose sodium and the remaining lactose were added and mixing was continued for 5–10 minutes. The resulting mixture was granulated with an aqueous polyvinylpyrrolidone solution. The granulated wet mixture was passed through a #4 to #20 mesh screen and then dried in a tray drying oven. The dry granulation was passed through a #12–#20 mesh screen. The remainder of the croscarmellose sodium was added to the granules and mixed for 5–10 minutes. The magnesium stearate was added to the resulting granule mixture and mixing was continued for 1–5 minutes. The resulting formulation was compressed into tablets.

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

## EXAMPLE 7

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg, 20 mg and 40 mg pravastatin, having the following composition was prepared as described in Example 6, except that FD&C Red #3 Lake color was mixed with pravastatin, magnesium oxide, microcrystalline cellulose and lactose.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose | 66.5 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD&C Red #3 Lake | 0.2 |
| Polyvinylpyrrolidone | 2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

5,180,589

7

**EXAMPLE 8**

A pravastatin formulation in the form of tablets, each containing 5 mg, 10 mg. 20 mg and 40 mg pravastatin, having the following composition was prepared as described in Example 6, except that all of the croscarmellose sodium was mixed with dry granules prior to addition of magnesium stearate.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose | 64.7 |
| Microcrystalline cellulose | 15 |
| Croscarmellose sodium | 5 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| Polyvinylpyrrolidone | 1 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 60° C. or 40° C./75% relative humidity for 2 months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

**EXAMPLE 9**

A pravastatin formulation in the form of tablets, having the following composition was prepared as described in Example 8 except that FD&C Red #3 Lake color was mixed with pravastatin, magnesium oxide, microcrystalline cellulose and lactose.

| Ingredient | Percent by Weight |
|---|---|
| Pravastatin | 10 |
| Lactose hydrous | 64.5 |
| Microcrystalline cellulose | 15 |
| Polyvinylpyrrolidone | 1 |
| Croscarmellose sodium | 5 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3.3 |
| FD&C #3 Lake | 0.2 |

A dispersion of the tablets in water had a pH of about 10.

Upon subjecting the so-formed tablets to a stability study at 40 to 60° C. for several months, it was found that the tablets including the pravastatin remained substantially stable; no lactone formation was observed.

8

Other basifying agents may be employed which will raise the pH of an aqueous dispersion of the composition of the invention as shown in Examples 1 to 9 to about 10. Examples of such basifying agents include NaOH, KOH, Ca(OH)$_2$, Mg(OH)$_2$ or NH$_4$OH.

What is claimed is:

1. A stabilized pravastatin composition, which comprises pravastatin and one or more basifying agents, compatible with pravastatin, to impart a desired pH of at least 9 to an aqueous dispersion of said composition.

2. The pravastatin composition as defined in claim 1 wherein said pravastatin is present in an amount within the range of from about 1 to about 60% by weight of the composition.

3. The pravastatin composition as defined in claim 1 wherein the basifying agent is present in an amount within the range of from about 1 to about 75% by weight of the composition.

4. The pravastatin composition as defined in claim 1 wherein the basifying agent is an alkali metal hydroxide, an alkaline earth metal hydroxide or ammonium hydroxide.

5. The pravastatin composition as defined in claim 4 wherein the basifying agent is MgO, Mg(OH)$_2$, Ca(OH)$_2$, NaOH, KOH, LiOH, NH$_4$OH, Al(OH)$_3$ or magaldrate.

6. The pravastatin composition as defined in claim 1 in the form of a tablet.

7. A method of stabilizing pravastatin for storage, which comprises including with pravastatin one or more basifying agents, compatible with pravastatin, to impart a desired pH of at least 9 to an aqueous dispersion of the pravastatin.

8. The method as defined in claim 7 wherein the pravastatin is in the form of a pharmaceutical composition.

9. The method as claimed in claim 8 wherein said pravastatin is present in an amount within the range of from about 1 to about 60% by weight of the composition.

10. The method as defined in claim 8 the basifying agent is present in an amount within the range of from about 1 to about 75% by weight of the composition.

11. The method as defined in claim 8 wherein the basifying agent is an alkali metal hydroxide, an alkaline earth metal hydroxide or ammonium hydroxide.

12. The method as defined in claim 8 wherein the basifying agent is MgO, Mg(OH)$_2$, Ca(OH)$_2$, NaOH, KOH, LiOH, NH$_4$OH, Al(OH)$_3$ or magaldrate.

* * * * *

# Exhibit 3

US005622985A

# United States Patent [19]

## Olukotun et al.

[11] **Patent Number:** 5,622,985

[45] **Date of Patent:** Apr. 22, 1997

[54] **METHOD FOR PREVENTING A SECOND HEART ATTACK EMPLOYING AN HMG COA REDUCTASE INHIBITOR**

[75] Inventors: Adeove Y. Olukotun, Hopewell, N.J.; John C. Alexander, Winnetka, Ill.

[73] Assignee: **Bristol-Myers Squibb Company,** Princeton, N.J.

[21] Appl. No.: 424,984

[22] Filed: **Apr. 19, 1995**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 824,679, Jan. 23, 1992, abandoned, which is a continuation of Ser. No. 536,367, Jun. 11, 1990, abandoned.

[51] Int. Cl.⁶ .......................... A61K 31/40; A61K 31/21
[52] U.S. Cl. .................... 514/423; 514/510; 514/824
[58] Field of Search ................................ 514/423, 510, 514/824

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,346,227 | 8/1982 | Terahara et al. ........................ | 560/119 |
| 4,920,123 | 4/1990 | Beyer .................................... | 514/255 |
| 5,008,284 | 4/1991 | Grover et al. .......................... | 514/424 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0219782 | 4/1987 | European Pat. Off. . |
| 0461548A2 | 6/1991 | European Pat. Off. . |

#### OTHER PUBLICATIONS

Cecil, Textbook of Medicine, 16 Ed., pp. 239–242. (1983).

Schettler, G., "The role of diet and drugs in lowering serum cholesterol in the postmyocardial infarction patient," Cardiovasc. Drugs, Ther., 1989, 2/6 (795–799).

Glatter, T.R., "Hyperlipidemia. What is 'normal', who should be treated and how," Postgrad. Med., 1984, 76/6 (49–50).

Satler, L.F., et al., "Reduction in coronary heart disease: *Clinical and anatomical considerations,*" Clin. Cardiol., 1989, 12/8 (422–426).

Wilhelmsen, L., "Practical Guidelines for drug therapy after myocardial infarction," Drugs, 1989, 38/6 (1000–1007).

Yamamoto A., et al., "Clinical features of familial hypercholesterolemia," Arteriosclerosis, Jan.–Feb. 1989, 9 (1 Suppl.) pp. 166–174.

Goldstein, J.L., et al., "The LDL receptor defect in familial hypercholesterolemia. Implications for pathogenesis and therapy,"0 Med. Clin North Am., 1982, 66/2 (335–362).

Osborne, J.A., et al., "Anti-ischemic Actions of Lovastatin (1) in Hypercholesterolemic Rabbits," Abstract of the 61st Scientific Sessions. (1989).

Tsujita, Y. "A Potent HMG–CoA Reductase Inhibitor, Pravastatin Sodium–Tissue–Selective Inhibition of Cholesterolgenesis and Preventive Effect on Atherosclerosis in WHHL Rabbits," J. Drug Dev. 1900:3(Suppl. 1), 155–159.

Maher, V.M., et al., "Analysis of Evidence from Cholesterol–Lowering and Regression Trials," J. Drug Dev. 1990:3 (Suppl. 1) 199–203.

Lewis, B. "On lowering lipids in the post–infarction patient," Journal of Internal Medicine 1991; 29:483–488.

"A Coronary Primary Prevention Study of Scottish Men Aged 45–64 Years: Trial Design," J. Clin Epidemiol vol. 45, No. 8 pp. 849–860, 1992.

Sacks, F.M., "Desirable Serum Total Cholesterol With Low HDL Cholesterol Levels," *Circulation*, vol. 86, No. 4, Oct. 1992, pp. 1341–1344.

Sacks, F.M., et al, "Effect on coronary atherosclerosis of decrease in plasma cholesterol concentrations in normocholesterolaemic patients", *The Lancet*, vol. 344, Oct. 1994, pp. 1182–1186.

Goldman, L., et al, "Projected Cost–Effectiveness of Lovastatin for Cholesterol Reduction," Clin. Res. (36, No. 3, 337A, 1988).

Sacks, F.M. et al, "Rationale and Design of a Secondary PreventionTrial of Lowering Normal Plasma cholesterol Levels After Acute Myocardial . . . Recurrent Events Trial (CARE)" , Am. J. Card. vol. 68, Dec. 1, 1991, pp. 1436–1446.

Fuster, V., et al, "Atherosclerotic Plaque Rupture and Thrombosis," Suppl. II, Circulation, vol. 82, No. 3, Sep. 1990, II–47–II59.

Crouse, J.R., et al, "Pravastatin, Lipids and Atherosclerosis in the Carotid Arteries: Design Features of a Clinical Trial with Carotid Atheroscelosis Outcome," Controlled Clinical Trails 13:495–506 (1992).

Edelman, S., et al., "Hyperkalemia During Treatment with HMG–CoA Reductase Inhibitor," New Engl. J. of Med., vol. 320, No. 18, May 4, 1989, pp. 1219–1220.

Pitt, B., et al., "design and Recruitment in the United States of a Multicenter Quantitative Angiographic Trial of Pravastatin to Limit Atherosclerosis in the Coronary Arteries" (PLAC I), Amer. J. Card., vol. 72, Jul. 1, 1993, pp. 31–35.

"Effects of Pravastatin in Patients with Serum Total Cholesterol Levels from 5.2 to 7.8 mmol/liter (200 to 30 mg/dl) Plus Two Additional Atherosclerotic Risk Factors," Am. J. Card., Nov. 1, 1993, pp. 1031–1037.

Pearson, T.A., et al, "The Rapid Reduction in Cardiac Events with Lipid–Lowering Therapy: Mechanisms and Implications," Am. J. Card. vol. 72, Nov. 1, 1993, pp. 1072–1073.

*Primary Examiner*—Kimberly Jordan
*Attorney, Agent, or Firm*—Burton Rodney

[57] **ABSTRACT**

A method is provided for preventing or reducing the risk of a second heart attack in a patient having a substantially normal serum cholesterol level by administering an HMG CoA reductase inhibitor such as pravastatin, alone or in combination with an ACE inhibitor.

**19 Claims, No Drawings**

5,622,985

1

## METHOD FOR PREVENTING A SECOND HEART ATTACK EMPLOYING AN HMG COA REDUCTASE INHIBITOR

### REFERENCE TO OTHER APPLICATIONS

This is a continuation-in-part of application Ser. No. 824,679 filed Jan. 23, 1992 now abandoned, which is a continuation of application Ser. No. 536,367 filed Jun. 11, 1990, now abandoned.

### FIELD OF THE INVENTION

The present invention relates to a method for preventing or reducing the risk of a second heart attack in a patient having a substantially normal cholesterol level by administering an HMG CoA reductase inhibitor, such as pravastatin, alone or in combination with an ACE inhibitor.

### BACKGROUND OF THE INVENTION

It is well established that lipid disorders are important factors in the development of coronary heart disease (CHD), Scheitler, G., "The role of diet and drugs in lowering serum cholesterol in the postmyocardial infarction patient," Cardiovasc. Drugs Ther., 1989, 2/6 (795–799).

Glatter, T. R., "Hyperlipidemia. What is 'normal', who should be treated and how," Postgrad. Med., 1984, 76/6 (49–59), states that "As the coronary primary Prevention Trial has recently shown, a 1% reduction in cholesterol level produces a 2% reduction in the risk of myocardial infarction."

Goldstein, J. L., et al, "The LDL receptor defect in familial hypercholesterolemia. Implications for pathogenesis and therapy," Med. Clin. North Am., 1982, 66/2 (335–362) indicate that "familial hypercholesterolemia was the first genetic disorder recognized to cause myocardial infarction. To this day, it remains the outstanding example of a single gene mutation that causes both hypercholesterolemia and coronary atherosclerosis."

Satler, L. F., et al, "Reduction in coronary heart disease: Clinical and anatomical considerations," Clin. cardiol., 1989, 12/8 (422–426) disclose that "the higher the total plasma cholesterol and low density lipoprotein cholesterol (LDL-C), the greater the risk that coronary artery disease will develop. Recently, clinical trials including the Coronary Drug Project, the Lipid Research Clinics Coronary Primary Prevention Trial (LRC-CPPT), and the Helsinki Heart Study provided evidence that lowering cholesterol reduces the frequency of fatal and nonfatal coronary events." In addition, Satler et al disclose that other studies "demonstrated that lowering of cholesterol was associated with a decreased incidence of progression of coronary disease, as well as with the potential for reduction in the atherosclerotic plaque."

Wilhelmsen, L., "Practical guidelines for drug therapy after myocardial infarction," Drugs, 1989, 38/6 (1000–1007) discloses that it is advisable to correct blood lipid disturbances in effective management of the postinfarction patient.

Yamamoto, A. et al, "Clinical features of familial hypercholesterolemia," Arteriosclerosis, January–February 1989, 9 (1 Suppl.) p I66–74, disclose that "in addition to the low density lipoprotein (LDL) cholesterol level, higher triglyceride and lower high density lipoprotein (HDL) cholesterol levels correlate with an increased risk of ischemic heart diseases."

2

There are several different classes of compounds which have serum cholesterol lowering properties. Some of these compounds are inhibitors of the enzyme HMG CoA reductase which is essential in the production of cholesterol, such as mevastatin (disclosed in U.S. Pat. No. 3,983,140), lovastatin also referred to as mevinolin (disclosed in U.S. Pat. No. 4,231,938), pravastatin (disclosed in U.S. Pat. No. 4,346,227) and velostatin also referred to as synvinolin (disclosed in U.S. Pat. Nos. 4,448,784 and 4,450,171).

Other compounds which lower serum cholesterol may do so by an entirely different mechanism than the HMG CoA reductase inhibitors. For example, serum cholesterol may be lowered through the use of bile acid sequestrants such as cholestyramine, colestipol, DEAE-Sephadex and poly(dialylmethylamine) derivatives (such as disclosed in U.S. Pat. Nos. 4,759,923 and 4,027,009) or through the use of antihyperlipoproteinemics such as probucol and gemfibrozil which apparently lower serum "low density lipoproteins" (LDL) and/or converts LDL into high density lipoproteins (HDL).

Angiotension-converting enzyme inhibitors (ACE inhibitors) such as captopril and enalapril and known antihypertensive agents and, in addition, are known for their cardioprotective effects and for treating congestive heart failure.

European Patent Application 0219782 to Scholkens (Hoechst) discloses the treatment of atherosclerosis, thrombosis and/or peripheral vascular disease in mammals using an angiotensin converting enzyme (ACE) inhibitor or its physiologically tolerable salts. It further discloses that because ACE is predominantly localized in the luminal plasma membrane of the endothelial cell, ACE inhibitors can interfere in platelet-endothelium interaction. In addition, Scholkens discloses that ACE inhibition potentiates the action of bradykinin (a strong stimulator of prostacyclin release from endothelial cells) by inhibiting its degradation and ACE inhibitors, consequently, have an inhibitory effect on platelet aggregation.

Cecil, Textbook of Medicine, 16 Ed., pp 239 to 241, indicates at page 240 that blood pressure is an accelerator of atherosclerosis.

U.S. Pat. Nos. 4,046,889 and 4,105,776 to Ondetti et al disclose proline derivatives, including captopril, which are angiotensin converting enzyme (ACE) inhibitors useful for treating hypertension.

U.S. Pat. No. 4,337,201 to Petrillo discloses phosphinylalkanoyl substituted prolines, including fosinopril, which are ACE inhibitors useful for treating hypertension.

U.S. Pat. No. 4,374,829 discloses carboxyalkyl dipeptide derivatives, including enalapril, which are ACE inhibitors useful for treating hypertension.

U.S. Pat. No. 4,452,790 to Karanewsky et al discloses phosphonate substituted amino or imino acids and salts thereof and covers (S)-1-[6-amino-2-[[hydroxy(4-phenylbutyl)phosphinyl]-oxy]-1-oxohexyl]-L-proline (SQ 29,852, ceranapril). These compounds are ACE inhibitors useful in treating hypertension.

U.S. Pat. No. 4,316,906 to Ondetti et al discloses ether and thioether mercaptoacyl prolines which are ACE inhibitors useful in treating hypertension. This Ondetti et al patent covers zofenopril.

### DESCRIPTION OF THE INVENTION

In accordance with the present invention, a method is provided for preventing onset of or reducing risk of a second heart attack in a mammalian species having a substantially

5,622,985

3

normal serum cholesterol level, wherein a therapeutically effective amount of an HMG CoA reductase inhibitor, alone or in combination with an ACE inhibitor, is administered to a mammalian species having a substantially normal serum cholesterol level systemically, such as orally or parenterally.

In preferred embodiments where the patient to be treated in accordance with the present invention is normotensive, the angiotensin converting enzyme inhibitor, where employed, will preferably be administered in amounts below that required to cause hemodynamic effects, that is below that required to cause a reduction in blood pressure.

The combination of the HMG CoA reductase inhibitor and ACE inhibitor will be employed in a weight ratio to each other of within the range of from about 0.001:1 to about 1000:1 and preferably from about 0.05:1 to about 100:1.

The HMG CoA reductase inhibitor, alone or in combination with the ACE inhibitor will be administered as soon as possible after the initial myocardial infarction.

The term "substantially normal serum cholesterol level(s)" refers to a total cholesterol (TC) of less than 200 mg/dl, and preferably less than 190 mg/dl.

The HMG CoA reductase inhibitors suitable for use herein include, but are not limited to, mevastatin and related compounds as disclosed in U.S. Pat. No. 3,983,140, lovastatin (mevinolin) and related compounds as disclosed in U.S. Pat. No. 4,231,938, pravastatin and related compounds such as disclosed in U.S. Pat. No. 4,346,227, velostatin (synvinolin) and related compounds as disclosed in U.S. Pat. Nos. 4,448,784 and 4,450,171, with lovastatin, pravastatin or velostatin being preferred. Other HMG CoA reductase inhibitors which may be employed herein include, but are not limited to, fluindostatin (Sandoz XU-62-320), pyrazole analogs of mevalonolactone derivatives as disclosed in U.S. Pat. No. 4,613,610, indene analogs of mevalonolactone derivatives as disclosed in PCT application WO 86/03488, 6-[2-(substituted-pyrrol-1-yl)alkyl]-pyran-2-ones and derivatives thereof as disclosed in U.S. Pat. No. 4,647,576, Searle's SC-45355 (a 3-substituted pentanedioic acid derivative) dichloroacetate, imidazole analogs of mevalonolactone as disclosed in PCT application WO 86/07054, 3-carboxy-2-hydroxy-propane-phosphonic acid derivatives as disclosed in French Pat. No. 2,596,393, 2,3-di-substituted pyrrole, furan and thiophene derivatives as disclosed in European Patent Application No. 0221025, naphthyl analogs of mevalonolactone as disclosed in U.S. Pat. No. 4,686,237, octahydro-naphthalenes such as disclosed in U.S. Pat. No. 4,499,289, keto analogs of mevinolin (lovastatin) as disclosed in European Patent Application No. 0,142,146 A2, as well as other known HMG CoA reductase inhibitors.

In addition, phosphinic acid compounds useful in inhibiting HMG CoA reductase suitable for use herein are disclosed in GB 2205837 which compounds have the moiety

$$O$$
$$\|$$
$$-P-CH_2-CH-CH_2-CO-$$
$$\|\quad\quad\quad\quad\quad |$$
$$X\quad\quad\quad\quad\quad OH$$
$$|$$
$$(CH_2)_n$$
$$|$$
$$Z$$

wherein X is $-O-$ or $-NH-$, n is 1 or 2 and Z is a hydrophobic anchor.

Examples of such compounds include (S)-4-[[[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]-methoxy]methoxyphosphinyl]-3-hydroxy-butanoic acid, methyl ester or its monolithium salt,

4

(S)-4-[[[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]methoxy]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt,

(3S)-4-[[[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]methoxy]methylphosphinyl]-3-hydroxybutanoic acid, monolithium salt,

(S)-4-[[[2,4-dichloro-6-[(4-fluorophenyl)-methoxy]phenyl]methoxy]methoxyphosphinyl]-3-hydroxybutanoic acid, monolithium salt,

(3S)-4-[[[2,4-dichloro-6-[(4-fluorophenyl)-methoxy]phenyl]methoxy]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt,

(3S)-4-[[2,4-dichloro-6-[(4-fluorophenyl)-methoxy]phenyl]methoxy]methylphosphinyl]-3-hydroxybutanoic acid, or its methyl ester, and

(S)-4-[[[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl-2-yl]methyl]amino]methoxyphosphinyl]-3-hydroxybutanoic aicd, monolithium salt.

Another class of HMG CoA reductase inhibitors suitable for use herein include phosphinic acid compounds disclosed in GB 2205838, which compounds have the moiety

$$O$$
$$\|$$
$$-P-CH_2-CH-CH_2-CO-$$
$$\|\quad\quad\quad\quad\quad |$$
$$X\quad\quad\quad\quad\quad OH$$
$$|$$
$$Z$$

wherein X is $-CH_2-$, $-CH_2-CH_2-$, $-CH=CH-$, $-CH_2CH_2CH_2-$, $-C\equiv C-$ or $-CH_2O-$, where O is linked to Z, and Z is a hydrophobic anchor.

Examples of such compounds include (S)-4-[[[1-(4-fluorophenyl)-3-(1-methylethyl )-1H-indol-2-yl]ethynyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, or its sodium salt (SQ 33,600) (preferred) or its dilithium salt;

(S)-4-[[(E)-2-[4'-fluoro-3,3',5'-trimethyl[1,1'-biphenyl]-2-yl]ethenyl]hydroxyphosphinyl]-3hydroxybutanoic acid or its dilithium salt;

(S)-4-[[2-[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, methyl ester or mono- or di-alkali metal salts thereof;

(S)-4-[[[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethynyl]methoxyphosphinyl]-3-hydroxybutanoic acid or the methyl ester thereof;

(5Z)-4-[[2-[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethenyl]hydroxyphosphinyl]3-hydroxybutanoic methyl esters thereof; acid, methyl esters thereof;

(S)-4-[[2-[3-(4-fluorophenyl)-1-(1-methyl-ethyl)-1H-indol-2-yl]ethyl]methoxyphosphinyl]-3-hydroxybutanoic acid, methyl esters;

(S)-4-[[2-[[1,1'-biphenyl]-2-yl]ethyl]-methoxyphosphinyl-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethynyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(5Z)-4-[[2-[4'-fluoro-3,3',5'-trimethyl-[1,1'-biphenyl]-2-yl]ethenyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[3-(4-fluorophenyl)-1-(1-methylethyl-)-1H-indol-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[(1,1'-biphenyl)-2-yl]ethyl]-hydroxyphosphinyl]-3-butanoic acid, dilithium salt;

(S)-4-(hydroxymethylphosphinyl)-3-[[(1,1-dimethylethyl)diphenylsilyl]oxy]butanoic acid, methyl ester, or its dicyclohexylamine (1:1) salt;

5,622,985

**5**

(S)-4-[[2-[1-(4-fluorophenyl)-3-(1-methy-lethyl)-1-indol-2-yl]ethynyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or disodium salt or methyl ester thereof;

(E)-4-[[2-[3-(4-fluorophenyl)-1-(1-methyl-ethyl)-1H-indol-2-yl]ethenyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

4-[[2-[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(E)-4-[[2-[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]ethenyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[[2,4-dimethyl-6-[(4-fluorophenyl)-methoxy]phenyl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[[2,4-dimethyl-6-[(4-fluorophenyl)-methoxy]phenyl]ethynyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-[3,5-dimethyl[1,1'-biphenyl]-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-[4'-fluoro-3,5-dimethyl[1,1'-biphenyl]-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-[[1,1'-biphenyl]-2-yl]ethynyl]-hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-(5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethynyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[1-(4-fluorophenyl)-3-(1-methyl-ethyl)-1H-indol-2-yl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-[5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethynyl]hydroxy-phosphinyl]-3-hydroxy-butanoic acid, dilithium salt;

(E)-4-[[2-[5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethenyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(E)-4-[[2-[5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethenyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[5-(4-fluorophenyl)-3-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[3-(4-fluorophenyl)-5-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid,methyl ester;

(S)-4-[[2-[3-(4-fluorophenyl)-5-(1-methyl-ethyl)-1-phenyl-1H-pyrazol-4-yl]ethyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[2-[3-(4-fluorophenyl)-5-(1-methylethyl)-1-phenyl-1H-pyrazol-4-yl]ethynyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[3-(4-fluorophenyl)-5-(1-methylethyl)-1-phenyl-1H-pyrazol-4-yl]ethynyl]hydroxyphosphinyl]-3-hydrox-ybutanoic acid, dilithium salt;

(S)-4-[[[4-(4-fluorophenyl)-1-(1-methyl-ethyl)-3-phenyl-1H-pyrazol-5-yl]ethynyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[[4-(4-fluorophenyl)-1-(1-methyl-ethyl)-3-phenyl-1H-pyrazol-5-yl]ethynyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

**6**

(S)-4-[[2-[4-(4-fluorophenyl)-1-(1-methyl-ethyl)-3-phenyl-1H-pyrazol-5-yl]ethyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[4-(4-fluorophenyl)-1-(1-methyl-ethyl)-3-phenyl-1H-pyrazol-5-yl]ethyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[[1-(4-fluorophenyl)-4-(1-methyl-ethyl)-2-phenyl-1H-imidazole-5-yl]ethyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[[1-(4-fluorophenyl)-4-(1-methyl-ethyl)-2-phenyl-1H-imidazol-5-yl]ethynyl]methoxy-phosphinyl]-3-hydroxybutanoic acid, methyl ester;

(S)-4-[[2-[1-(4-fluorophenyl)-4-(1-methyl-ethyl)-2-phenyl-1H-imidazol-5-yl]ethyl]methoxy-phosphinyl]-3-hydroxybutanoc acid, methyl ester;

(S)-4-[[2-[1-(4-fluorophenyl)-4-(1-methyl-ethyl)-2-phenyl-1H-imidazol-5-yl]ethyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[[2-(cyclohexylmethyl)-4,6-dimethyl-phenyl]ethynyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

4-[[2-[2-(cyclohexylmethyl)-4,6-dimethylphenyl]ethenyl]hydroxy-phosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

4-[[2-[2-(cyclohexylmethyl)-4,6-dimethyl-phenyl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

4-[[[[4'-fluoro-3,3 ',5-trimethyl [1,1'-biphenyl]-2-yl]oxy]methyl]hydroxyphosphinyl]-3-hydroxybutanoic acid or its dilithium salt or methyl ester thereof;

4-[[[4'-fluoro-3,3',5-trimethyl [1,1'-biphenyl]-2-yl]methyl]hydroxyphosphinyl]-3-hydroxy-butanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[[1-(4-fluorophenyl)-3-methyl-2-naphthalenyl]ethynyl]hydroxyphosphinyl]-3-hydroxy-butanoic acid or its dilithium salt or methyl ester thereof;

(E)-4-[[2-[1-(4-fluorophenyl)-3-methyl-2-naphthalenyl]ethenyl]hydroxyphosphinyl]-3-hydroxy-butanoic acid or its dilithium salt or methyl ester thereof;

(S)-4-[[2-[1-(4-fluorophenyl)-3-methyl-2-naphthalenyl]ethyl]hydroxyphosphinyl]-3-hydroxy-butanoic acid or its dilithium salt or methyl ester thereof;

4-[[3-[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]propyl]methoxyphosphinyl]-3-hydroxy-butanoic acid, methyl ester;

4-[[3-[4'-fluoro-3,3',5-trimethyl[1,1'-biphenyl]-2-yl]propyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

[1S-[1α(R*),2α,4αβ,8β,8αα]]-4-[[2-[8-(2,2-dimethyl-1-oxobutoxy)decahydro-2-methyl-1-naphthalenyl]ethyl]methoxyphosphinyl]-3-hydroxy-butanoic acid, methyl ester;

[1S-[1α(R*),2α,4αβ,8β,8β]]-4-[[2-[8-(2,2-dimethyl-1-oxobutoxy)decahydro-2-methyl-1-naphthalenyl]ethyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt;

(S)-4-[[[3'-(4-fluorophenyl)spiro]cyclopentane-1,1'-[1H]indene]-2-yl]ethynyl]methoxyphosphinyl]-3-hydroxybutanoic acid, methyl ester; and

(S)-4-[[[3'-(4-fluorophenyl)spiro]cyclopentane-1,1'-[1H]indene]-2-yl]ethynyl]hydroxyphosphinyl]-3-hydroxybutanoic acid, dilithium salt.

Preferred are pravastatin or SQ 33,600.

The above-mentioned U.S. patents are incorporated herein by reference.

The angiotensin converting enzyme inhibitor which may be employed herein preferably includes those containing a mercapto (—S—) moiety such as substituted proline derivatives, such as any of those disclosed in U.S. Pat. No. 4,046,889 to Ondetti et al mentioned above, with captopril, that is, 1-[(2S)-3-mercapto-2-methylpropionyl]-L-proline,

5,622,985

**7**

being preferred, and mercaptoacyl derivatives of substituted prolines such as any of those disclosed in U.S. Pat. No. 4,316,906 with zofenopril being preferred.

Other examples of mercapto containing ACE inhibitors that may be employed herein include rentiapril (fentiapril, Santen) disclosed in Clin. Exp. Pharmacol. Physiol. 10:131 (1983); as well as pivopril, that is

$$CH_3$$
$$(CH_2)_n—CO—S—CH_2—CH—CO—N \quad \text{and YS980, that is}$$
$$CH_2$$
$$CO_2H$$

$$CH_3 \quad S.$$
$$HS—CH_2—CH—CO—N$$
$$CO_2H$$

Other examples of angiotensin converting enzyme inhibitors which may be employed herein include any of those disclosed in U.S. Pat. No. 4,374,829 mentioned above, with N-(1-ethoxycarbonyl)-3-phenylpropyl)-L-alanyl-L-proline, that is, enalapril, any of the phosphonate substituted amino or imino acids or salts disclosed in U.S. Pat. No. 4,452,790 with (S)-1-[6-amino-2-[(hydroxy-(4-phenylbutyl)-phosphinyl]oxy]-1-oxohexyl]-L-proline (SQ 29,852 or ceranapril) being preferred, phosphinylalkanoyl prolines disclosed in U.S. Pat. No. 4,168,267 mentioned above with fosinopril being preferred, any of the phosphinylalkanoyl substituted prolines disclosed in Eur. Pat. No. 4,337,201, and the phosphonamidates disclosed in U.S. Pat. No. 4,432,971 discussed above.

Other examples of ACE inhibitors that may be employed herein include Beecham's BRL 36,378 as disclosed in European patent Nos. 80822 and 60668; Chugai's MC-838 disclosed in CA. 102:72588v and Jap. J. Pharmacol. 40:373 (1986); Ciba-Geigy's CGS 14824 (3-([1-ethoxycarbonyl-3-phenyl-(1S)-propyl]-amino)-2,3,4,5-tetrahydro-2-oxo-1-(3S)-benzazepinne-1 acetic acid HCl) disclosed in U.K. Patent No. 2103614 and CGS 16,617 (3(S)-[[(1S)-5-amino-1-carboxypentyl]amino]-2,3,4,5-tetrahydro-2-oxo-1H-1-benzazepine-1-ethanoic acid) disclosed in U.S. Pat. No. 4,473,575; cetapril (alacepril, Dainippon) disclosed in Eur. Therap. Res. 39:671 (1986); 40:543 (1986); ramipril (Hoechst) disclosed in Eur. Patent No. 79-022 and Curr. Ther. Res. 40:74 (1986); Ru 44570 (Hoechst) disclosed in Arzneimittelforschung 35:1254 (1985), cilazapril (Hoffman-LaRoche) disclosed in J. Cardiovasc. Pharmacolo 9:39 (1987); R₄ 31-2201 (Hoffman-LaRoche) disclosed in FEBS Lett. 165:201 (1984); lisinopril (Merck) disclosed in Curr. Therap. Res. 37:342 (1985) and Eur. patent appl. No. 12-401, indalapril (delapril) disclosed in U.S. Pat. No. 4,385,051; indolapril (Schering) disclosed in J. Cardiovasc. Pharmacol. 5:643, 655 (1983); spirapril (Schering) disclosed in Acta. Pharmacol. Toxicol. 59 (Supp. 5):173 (1986); perindopril (Servier) disclosed in Eur. J. Clin. Pharmacol. 31:519 (1987); quinapril (Warner-Lambert) disclosed in U.S. Pat. No. 4,344,949 and CI 925 (Warner-Lambert) ([3S-[2[R(*)R(*)]]3R(*)]-2-[2-[[1-(ethoxycarbonyl)-3-phenylpropyl]amino[-1-oxopropyl]-1,2,3,4-tetrahydro-6,7-dimethoxy-3-isoquinoline-carboxylic acid HCl) disclosed in Pharmacologist 26:243, 266 (1984), WY-44221 (Wyeth) disclosed in J. Med. Chem. 26:394 (1983).

**8**

Preferred are those ACE inhibitors which are proline or substituted proline derivatives and most preferred are such ACE inhibitors which include a mercapto group.

The above-mentioned U.S. patents are incorporated herein by reference.

In carrying out the method of the present invention, the HMG CoA reductase inhibitor alone or in combination with the ACE inhibitor may be administered to mammalian species having substantially normal serum cholesterol levels, such as dogs, cats, humans, etc., and as such may be incorporated in a conventional systemic dosage form, such as a tablet, capsule, elixir or injectable. The above dosage forms will also include the necessary carrier material, excipient, lubricant, buffer, antibacterial, bulking agent (such as mannitol), anti-oxidants (ascorbic acid of sodium bisulfite) or the like. Oral dosage forms are preferred, although parenteral forms are quite satisfactory as well.

The dose administered must be carefully adjusted according to age, weight and condition of the patient, as well as the route of administration, dosage form and regimen and the desired result.

Thus, for oral administration, a satisfactory result may be obtained employing the FIMG CoA reductase inhibitor in dosages employed, for example, for pravastatin, lovastatin and simvastatin as indicated in the Physician's Desk Reference, such as in an amount within the range of from about 1 to 2000 mg, and preferably from about 4 to about 200 mg.

A preferred oral dosage form, such as tablets or capsules, will contain the HMG CoA reductase inhibitor in an amount of from about 0.5 to about 100 mg, preferably from about 5 to about 80 mg, and more preferably from about 10 to about 40 mg.

With regard to the ACE inhibitor, for oral administration, a satisfactory result may be obtained employing the ACE inhibitor in an amount within the range of from about 0.01 mg/kg to about 100 mg/kg and preferably from about 0.1 mg/kg to about 5 mg/kg.

A preferred oral dosage form, such as tablets or capsules, will contain the ACE inhibitor in an amount of from about 0.1 to about 500 mg, preferably from about 2 to about 50 mg, and more preferably from about 10 to about 25 mg.

For parenteral administration, the ACE inhibitor will be employed in an amount within the range of from about 0.005 mg/kg to about 10 mg/kg and preferably from about 0.005 mg/kg to about 2 mg/kg.

The HMG CoA reductase inhibitor and ACE inhibitor may be employed together in the same oral dosage form or in separate oral dosage forms taken at the same time.

The compositions described above may be administered in the dosage forms as described above in single or divided doses of one to four times daily. It may be advisable to start a patient on a low dose combination and work up gradually to a high dose combination.

Tablets of various sizes can be prepared, e.g., of about 2 to 2000 mg in total weight, containing one or both of the active substances in the ranges described above, with the remainder being a physiologically acceptable carrier of other materials according to accepted pharmaceutical practice. These tablets can, of course, be scored to provide for fractional doses. Gelatin capsules can be similarly formulated.

Liquid formulations can also be prepared by dissolving or suspending one or the combination of active substances in a conventional liquid vehicle acceptable for pharmaceutical administration so as to provide the desired dosage in one to four teaspoonful.

5,622,985

9

The compositions described above may be administered in the dosage forms as described above in single or divided doses of one to four times daily. It may be advisable to start a patient on a low dose combination and work up gradually to a high dose combination.

Liquid formulations can also be prepared by dissolving or suspending one or the combination of the active substances in a conventional liquid vehicle acceptable for pharmaceutical administration so as to provide the desired dosage in one to four teaspoonsful.

Such dosage forms can be administered to the patient on a regimen of one to four doses per day.

According to another modification, in order to more finely regulate the dosage schedule, the active substances may be administered separately in individual dosage units at the same time or carefully coordinated times. Since blood levels are built up and maintained by a regulated schedule of administration, the same result is achieved by the simultaneous presence of the two substances. The respective substances can be individually formulated in separate unit dosage forms in a manner similar to that described above.

Fixed combinations of HMG CoA reductase inhibitor and ACE inhibitor are more convenient and are preferred, especially in tablet or capsule form for oral administration.

In formulating the compositions, the active substances, in the amounts described above, are compounded according to accepted pharmaceutical practice with a physiologically acceptable vehicle, carrier, excipient, binder, preservative, stabilizer, flavor, etc., in the particular type of unit dosage form.

Illustrative of the adjuvants which may be incorporated in tablets are the following: a binder such as gum tragacanth, acacia, corn starch or gelatin; an excipient such as dicalcium phosphate or cellulose; a disintegrating agent such as corn starch, potato starch, alginic acid or the like; a lubricant such as stearic acid or magnesium stearate; a sweetening agent such as sucrose, aspartame, lactose or saccharin; a flavoring agent such as orange, peppermint, oil of wintergreen or cherry. When the dosage unit form is a capsule, it may contain in addition to materials of the above type a liquid carrier such as a fatty oil. Various other materials may be present as coatings or to otherwise modify the physical form of the dosage unit. For instance, tablets or capsules may be coated with shellac, sugar or both. A syrup of elixir may contain the active compound, water, alcohol or the like as the carrier, glycerol as solubilizer, sucrose as sweetening agent, methyl and propyl parabens as preservatives, a dye and a flavoring such as cherry or orange.

Some of the active substances described above form commonly known, pharmaceutically acceptable salts such as alkali metal and other common basic salts or acid addition salts, etc. References to the base substances are therefore intended to include those common salts known to be substantially equivalent to the parent compound.

The formulations as described above will be administered for a prolonged period, that is, for as long as the potential for a second heart attack remains or the symptoms continue. Sustained release forms of such formulations which may provide such amounts biweekly, weekly, monthly and the like may also be employed. A dosing period of at least one to two weeks are required to achieve minimal benefit.

The following Examples represent preferred embodiments of the invention.

10

## EXAMPLE 1

A pravastatin formulation in the form of tablets having the following composition was prepared as described below.

| Ingredient | Parts by Weight |
|---|---|
| Pravastatin | 7 |
| Lactose | 67 |
| Microcrystalline cellulose | 20 |
| Croscarmellose sodium | 2 |
| Magnesium stearate | 1 |
| Magnesium oxide | 3 |

Pravastatin, magnesium oxide and a fraction (30%) of the lactose were mixed together for 2 to 10 minutes employing a suitable mixer. The resulting mixture was passed through a #12 to #40 mesh size screen. Microcrystalline cellulose, croscarmellose sodium and the remaining lactose were added and the mixture was mixed for 2 to 10 minutes. Thereafter, magesium stearate was added and mixing was continued for 1 to 3 minutes.

The resulting homogeneous mixture was then compressed into tablets each containing 5 mg, 10 m, 20 mg or 40 mg pravastatin which may be used in preventing or reducing risk of a second heart attack, in a patient having a substantially normal serum cholesterol level.

## EXAMPLE 2

Pravastatin tablets are prepared employing conventional pharmaceutical techniques containing 20 mg pravastatin and inert ingredients employed in lovastatin tablets, namely cellulose, color, lactose, magnesium stearate and starch and butylated hydroxy-anisole as a preservative as described in the 1990 PDR.

The pravastatin tablets may be employed to prevent or reduce risk of a second heart attack in a patient having a substantially normal serum cholesterol level in accordance with the present invention.

## EXAMPLE 3

Tablets of the following compositions are prepared as described below.

| Ingredient | Weight (mg) |
|---|---|
| SQ 33,600 | 100 mg |
| Avicel | 112.5 mg |
| Lactose | 113 mg |
| Cornstarch | 17.5 mg |
| Stearic Acid | 7 mg |
| | 350 mg |

The tablets are prepared from sufficient bulk quantities by slugging the SQ 33,600, Avicel, and a portion of the stearic acid. The slugs are ground and passed through a #2 screen and then mixed with the lactose, cornstarch, and the remainder of stearic acid. The mixture is compressed into 350 mg capsule shaped tablets in a tablet press. The tablets are scored for dividing in half.

The so-formed tablets may be administered in accordance with the teachings of the present invention to prevent or reduce risk of a second heart attack in a patient having a substantially normal serum cholesterol level.

5,622,985

13

**14.** The method as defined in claim **7** wherein said angiotensin converting enzyme inhibitor is administered in single or divided doses of from about 0.1 to about 500 mg/one to four times daily.

**15.** The method as defined in claim **7** wherein the HMG CoA reductase inhibitor is pravastatin and the ACE inhibitor is captopril, fosinopril or ceranopril.

**16.** The method as defined in claim **7** wherein said angiotensin converting enzyme inhibitor is administered in single or divided doses of from about 2 to about 50 mg/one to four times daily.

14

**17.** The method as defined in claim **7** wherein the mammalian species treated is normotensive.

**18.** The method as defined in claim **17** wherein the ACE inhibitor is administered in an amount below that required to cause hemodynamic effects.

**19.** The method as defined in claim **7** wherein the HMG CoA reductase inhibitor is employed in an amount of within the range of from about 5 to about 80 mg and the ACE inhibitor is employed in an amount within the range of from about 2 to about 5 mg.

*   *   *   *   *