**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>FOOD AND DRUG ADMINISTRATION, )<br>*et al.*, )<br>Defendants, )<br><br>APOTEX INC., RANBAXY LABS. LTD., )<br>RANBAXY INC., and RANBAXY PHARMS., INC., )<br><br>Intervenors-Defendants. )<br> )<br> ) | Case No. 05-1469 (JDB) |

**APOTEX INC.'S MEMORANDUM IN OPPOSITION TO**
**TEVA'S APPLICATION FOR PRELIMINARY INJUNCTION**

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK & WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik (admitted *pro hac vice*)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6304

*Counsel for Apotex Inc.*

DATED:  August 25, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................... 1

BACKGROUND .............................................................................................. 3

I.    Statutory Background. ............................................................................. 3

II.   Factual Background. ............................................................................... 6

      A.    The Pravastatin Sodium ANDAs. ................................................... 6

      B.    Apotex's Need For Patent Certainty. .............................................. 7

      C.    Apotex's Suit For Patent Certainty And The Triggering Of
            Teva's Exclusivity Under The Rule That Teva Itself Helped
            Establish In The *Teva*/Ticlopidine Cases............................................ 10

      D.    FDA's June 28, 2005 Exclusivity Decision........................................ 11

ARGUMENT .................................................................................................. 12

I.    The *Teva*/Ticlopidine Decisions Conclusively Establish That A
      Dismissal For Lack Of Subject Matter Jurisdiction, With
      Preclusive Effect, Triggers Generic Exclusivity.......................................... 12

II.   FDA Correctly Applied The Rule Set Forth In The
      *Teva*/Ticlopidine Decisions. ................................................................... 14

III.  Teva's Attempts To Avoid Application Of The *Teva*/Ticlopidine
      Decisions Fail.......................................................................................... 15

      A.    To Trigger Exclusivity, The Dismissal Need Not Be Based
            On An Express Concession Of Non-Infringement. .......................... 16

      B.    BMS Is Estopped From Suing Apotex For Infringement Of
            The '447, '589, And '985 Patents. ................................................... 18

      C.    That BMS Made Non-Binding Statements In Pre-Suit
            Correspondence Between Counsel Is Immaterial To The
            Applicability Of The Rule Established In *Teva*/Ticlopidine. .............. 24

IV.   Even If *Teva*/Ticlopidine Did Not Establish A Binding Legal Rule, FDA's Decision Is Permissible Because It Fully Comports With Congressional Intent. ...................................................................................................26

      A.   FDA's Decision Facilitates Speedy Generic Entry By Preventing The First-Filer From Creating A Regulatory Bottleneck. ............................................................................................26

      B.   FDA's Decision Prevents Brand Companies Like BMS From Manipulating Hatch-Waxman To Their Benefit. .........................................28

      C.   Apotex's Declaratory Judgment Action Served The Legitimate Purpose Of Providing Apotex With Patent Certainty.............................................................................................................29

V.   Teva Is Judicially Estopped From Arguing That The Dismissal Order Here Is Not A Triggering Court Decision. ..............................................30

CONCLUSION...........................................................................................................32

# TABLE OF AUTHORITIES

## Federal Cases

*Amana Refrigeration, Inc. v. Quadlux, Inc.*,
  172 F.3d 852 (Fed. Cir. 1999) ................................................................. 21, 25

*Argentinas v. United States*,
  77 F.3d 1564 (Fed. Cir. 1996) ................................................................. 18

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
  846 F.2d 731 (Fed. Cir. 1988) ................................................................. 9

*C.R. Bard v. Schwartz*, 716 F.2d 874 (Fed. Cir. 1983) ................................. 22, 23

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................ 26

*Donovan v. U.S.P.S.*, 530 F. Supp. 894 (D.D.C. 1981) ................................ 31, 32

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,
  101 F. Supp. 2d 1139 (S.D. Ind. 2000) ................................................... 19, 25

*Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479 (Fed. Cir. 1998) .............. 14

*Frederiksen v. City of Lockport*,
  384 F.3d 437 (7th Cir. 2004) ................................................................. 18

*Frigard v. United States*, 862 F.2d 201 (9th Cir. 1988) ................................ 18

*Granutec, Inc. v. Shalala*,
  139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) .......................... 5

*Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999) .............. 18

*In re Barr Labs.*, 930 F.2d 72 (D.C. Cir. 1991) .......................................... 26

*In re Smith*, 285 F.3d 6 (D.C. Cir. 2002) .................................................. 31

*Lab. Corp. of Am. Holdings v. Chiron Corp.*,
  384 F.3d 1326 (Fed. Cir. 2004) ............................................................. 21

*Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*,
  289 F.3d 775 (Fed. Cir. 2002) ........................................................ 5, 24, 27

*New Hampshire v. Maine*, 532 U.S. 742 (2001) ................................... 30, 32

\*\*Cases chiefly relied
upon are indicated
with asterisks

*Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.,*
    363 F.3d 1361 (Fed. Cir. 2004) ................................................................ 20

*SmithKline Beecham Corp. v. Apotex Corp.,*
    247 F. Supp. 2d 1011 (N.D. Ill. 2003) ................................................... 4

*Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631 (Fed. Cir. 1991) ................... 14, 15

**   *Super Sack Mfg. Corp. v. Chase Packaging Corp.,*
    57 F.3d 1054 (Fed. Cir. 1995) ........................................................ passim

**   *Teva Pharms. USA, Inc. v. FDA,*
    No. 99-67(CK), 1999 WL 1042743 (D.D.C. Aug. 19, 1999)........................... passim

**   *Teva Pharms., USA, Inc. v. FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) ...................................................... passim

**   *Teva Pharms., USA, Inc. v. FDA,*
    254 F.3d 316, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000).......................... passim

*TorPharm, Inc. v. Thompson,* 260 F. Supp. 2d 69 (D.D.C. 2003)................................. 5

*Transcapital Fin. Corp. v. Director, Office of Thrift Supervision,*
    44 F.3d 1023 (D.C. Cir. 1995) ............................................................ 18

*Transwitch Corp. v. Galazar Networks, Inc.,*
    No. 03-10228-NG, 2005 WL 1540246 (D. Mass. Mar. 1, 2005) ........................... 19

*Wages v. IRS,* 915 F.2d 1230 (9th Cir. 1990) ...................................................... 19

## **Federal Statutes**

21 U.S.C. § 355(b)(1) ....................................................................................... 3

21 U.S.C. § 355(c)(2)........................................................................................ 3

21 U.S.C. § 355(j)(2)(A) ................................................................................... 4

21 U.S.C. § 355(j)(2)(A)(vii) ............................................................................. 4

21 U.S.C. § 355(j)(2)(B) ................................................................................... 4

21 U.S.C. § 355(j)(5)(B)(iv) ......................................................................... 2, 4, 5

21 U.S.C. § 355(j)(5)(B)(iv)(II) ..................................................................... 13, 15

35 U.S.C. § 271(e)(2)(A) .................................................................................. 4

35 U.S.C. § 271(e)(5) ................................................................................................... 29

5 U.S.C. § 706(2)(A) .............................................................................................. 12, 15

## Federal Regulations

21 C.F.R. § 314.107(c)(1)(ii) ......................................................................................... 5

21 C.F.R. § 314.53(e) ..................................................................................................... 3

## Federal Rules

Rule 65, FED. R. CIV. P ................................................................................................. 1

## Other Authorities

149 Cong. Rec. S15,885 (Nov. 25, 2003) ..................................................................... 29

Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173,
    § 1102(b)(3), 117 Stat. 2066 (2003) ...................................................................... 5

## INTRODUCTION

Apotex Inc. respectfully submits this memorandum in opposition to Teva's application for preliminary injunction, which this Court has consolidated with a final hearing on the merits pursuant to Rule 65, FED. R. CIV. P.  Teva challenges FDA's administrative ruling holding that the dismissal of Apotex's declaratory judgment action triggered the 180-day generic exclusivity period for pravastatin sodium tablets.  Because controlling D.C. Circuit precedent fully supports, and indeed compelled, the administrative ruling under review, this Court should deny Teva relief and enter judgment for FDA and Apotex.

## SUMMARY OF ARGUMENT

Teva's lawsuit is nothing more than a disingenuous effort to deny Apotex the benefits that flow from obtaining a court decision that allows Apotex to market its generic pravastatin products free from fear of patent infringement liability.  Teva's effort is hypocritical to say the least.  Having itself obtained these benefits in the past, and with its on-going attempt to obtain such benefits in a different court action, Teva is in no position to lodge a legitimate complaint in this Court.  Indeed, Teva itself sought and obtained the D.C. Circuit precedent that controls the outcome of this case.

In 2004, Apotex filed a declaratory judgment action against Bristol-Myers Squibb ("BMS") seeking a judicial declaration that Apotex's generic pravastatin products would not infringe BMS's patents and/or that such patents are invalid.  Teva calls this suit a "sham" and portrays it as some type of nefarious and improper plot.  Not so.  Apotex filed suit hoping to obtain a binding court order that would preclude BMS from seeking patent infringement damages once Apotex commercially launches its products.  Obtaining such a decision would not only allow Apotex to market free from fear of patent infringement liability, but also would clear an FDA regulatory barrier to prompt Agency approval of Apotex's products.  Specifically, by

virtue of having filed the first application challenging the validity or infringement of one or more of BMS's Orange Book-listed patents, Teva is eligible for a 180-day period of marketing exclusivity. *See* 21 U.S.C. § 355(j)(5)(B)(iv).[1] FDA cannot approve Apotex's application until that exclusivity expires. *See id.* A court decision that precludes BMS from suing Apotex in the future would start the 180-day exclusivity clock. *See id.*

In July 2004, Apotex obtained the binding court decision that it sought. Apotex received much needed patent certainty, as well as a decision that started the running of Teva's generic exclusivity. As binding D.C. Circuit precedent holds, this is precisely how Congress intended the exclusivity statute to work. While Teva does not like this result, it has no basis for challenging it.

Years ago, Apotex had the right to generic exclusivity on another drug, ticlopidine. Teva wanted to market its subsequently-filed product immediately so it filed a declaratory judgment action against the patentee. Like Apotex here, Teva obtained a court decision that precluded that patentee from suing for infringement damages in the future and, in the process, triggered the start of Apotex's 180-day exclusivity period. And like Teva's exclusivity period here, Apotex's exclusivity period expired before Apotex ever got to enjoy it. Apotex was no happier about that result than Teva is here. Nevertheless, Teva's own litigation against FDA and the resulting D.C. Circuit decisions make this result the law of the land.

The 180-day exclusivity period can be triggered by, *inter alia*, a court decision finding the challenged patent invalid, unenforceable, or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv). In the ticlopidine litigation, Teva convinced the D.C. Circuit that the

---

[1] The first paragraph IV ANDA for pravastatin sodium tablets was filed prior to the December 8, 2003 enactment of the 2003 Medicare Prescription Drug, Improvement, and Modernization Act ("MMA"). Accordingly, unless otherwise stated, pre-MMA provisions govern in this case.

dismissal of a declaratory judgment action, so long as it has preclusive effect, constitutes a triggering court decision. *See Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*"); *see also Teva Pharms. USA, Inc. v. FDA*, No. 99-67(CK), 1999 WL 1042743, at *5-*6 (D.D.C. Aug. 19, 1999) ("*Teva II*"); *Teva Pharms., USA, Inc. v. FDA*, 254 F.3d 316, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva III*").

In fighting for this rule of law, Teva not only triggered Apotex's exclusivity, but also established the controlling legal precedent with which Teva must now live. Teva's attempt to distinguish its circumstances from this controlling case law, while understandable, is to no avail. All of Teva's misrepresentations and misdirection do not change the D.C. Circuit's controlling decisions in the *Teva*/ticlopidine cases. And given these decisions, Teva simply cannot succeed on the merits of its case.

## BACKGROUND

### I.    Statutory Background.

A company that seeks to sell a new drug must file with FDA a New Drug Application ("NDA"). The applicant must include in its NDA, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results establishing its safety and effectiveness, and labeling describing the use for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The applicant also must submit information to FDA with respect to any patent that "claims the drug for which the application was submitted or which claims a method of using such drug . . . ." 21 U.S.C. § 355(c)(2); *see also id.* § 355(b)(1). FDA publishes all such patent information in the "Orange Book." *See* 21 C.F.R. § 314.53(e).

Before 1984, a company seeking to market a generic version of an FDA-approved drug had to complete expensive and time-consuming safety and efficacy studies on the drug, even though the NDA-holder had already established the drug's safety and efficacy through its

own studies. *See SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1018 (N.D. Ill. 2003). In 1984, Congress simplified the procedure for obtaining approval of generic drugs with the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act ("FFDCA"). These Amendments permit a generic drug company to file an Abbreviated New Drug Application ("ANDA") that relies on information from the NDA. *Id.* at 1018-19.

An ANDA applicant must establish that its generic drug product is bioequivalent to the NDA drug. *See* 21 U.S.C. § 355(j)(2)(A). The ANDA also includes a "certification" to any properly-listed Orange Book patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The statute provides four certification options, two of which are relevant here: the so-called "paragraph III certification," where the applicant certifies that it will not market until after the listed patent has expired, and the so-called "paragraph IV" certification, where the applicant seeks immediate approval because the listed patent is invalid and/or not infringed by the proposed ANDA product. *Id.* Where an ANDA applicant submits a paragraph IV certification, it must notify the patentee and NDA-holder of the factual and legal bases for that certification. *See id.* § 355(j)(2)(B).

Submitting an ANDA containing a paragraph IV certification has two important consequences. First, it constitutes a technical act of infringement, vesting the district courts with subject matter jurisdiction over a patent infringement lawsuit. *See* 35 U.S.C. § 271(e)(2)(A). Second, the first company to submit an ANDA for a drug product containing a paragraph IV certification to any listed patent is entitled to a 180-day generic exclusivity period. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Congress created this exclusivity by preventing FDA from approving competing generic products until 180 days after the earlier of two so-called "triggering" events:

(I)     the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II)    *the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed . . . .*

21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added). Thus, the 180-day exclusivity period is triggered by the earlier of: (1) the first-filer's commercial marketing ("the commercial marketing trigger"); or (2) relevant to this case, a final, unappealable court decision that the patent is invalid or not infringed ("the court decision trigger"). *Id.*[2] FDA approves all otherwise-eligible ANDAs as soon as the 180-day exclusivity period expires.

The fact is, while Congress created the 180-day exclusivity period to encourage challenges to brand-name drug patents, it never intended first-filers to delay all subsequent generic entrants indefinitely. *See Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002) ("*3M*"). Accordingly, courts have interpreted the court decision trigger broadly. *See id.* at 786 (Gajarsa, J., concurring). For instance, the court decision trigger includes *any* court decision on the patent that is the subject of the paragraph IV certification, regardless of whether the first-filer is involved in that particular litigation. *See Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410, at *8 n.2 (4th Cir. Apr. 3, 1998) (finding exclusivity triggered by a court decision involving a subsequent applicant); *see also 3M*, 289 F.3d at 780 (same); *Teva I*, 182 F.3d at 1005 n.3 (same). The court decision trigger also encompasses a broad spectrum of decisions, including decisions of patent unenforceability, despite the absence of this ground in the express language of the statute. *See Teva I*, 182 F.3d at 1009; 21 C.F.R. § 314.107(c)(1)(ii); *see also TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 72 (D.D.C. 2003).

---

[2] Under Title XI of the MMA, which in relevant part amended the FFDCA for all pending ANDAs, a triggering "court decision" is a final decision from which no appeal has been or can be taken. *See* Pub. L. No. 108-173, § 1102(b)(3), 117 Stat. 2066, 2460 (2003).

Dispositive in this case is the fact that the D.C. Circuit has expressly held that the dismissal of a declaratory judgment action brought by the ANDA applicant against the patentee triggers generic exclusivity, if the dismissal estops the patentee from subsequently asserting that the ANDA product infringes the patent-in-suit. *See Teva I*, 182 F.3d at 1008-09. Estoppel will arise from, *inter alia*, the patentee's express disavowal of any intent to sue the ANDA applicant for infringement. *See id.*; *see also Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (holding that the legal effect of a patentee's promise not to sue for infringement stated in motion papers and recorded in trial court's order is to forever estop patentee from asserting patent infringement liability against other party).

## II.     Factual Background.

### A.     The Pravastatin Sodium ANDAs.

BMS holds approved NDA No. 19-898 for 10, 20, 40, and 80 mg pravastatin sodium tablets, which it sells under the brand-name Pravachol®. FDA has approved Pravachol® for the treatment of, among other things, hyperlipidemia and the primary prevention of coronary events.

On December 21, 2001, Apotex submitted ANDA No. 76-341 seeking approval to market generic pravastatin sodium tablets in 10, 20, and 40 mg strengths. Apotex later amended its ANDA seeking approval to market the 80 mg strength as well. At the time that Apotex submitted its pravastatin sodium ANDA, FDA's Orange Book contained information on four patents: U.S. Patent Nos. 4,346,227 ("the '227 patent"), 5,030,447 ("the '447 patent"), 5,180,589 ("the '589 patent"), and 5,622,985 ("the '985 patent"). Apotex's pravastatin sodium ANDA contains paragraph IV certifications to the '447, '589, and '985 patents, and a paragraph III certification to the '227 patent. Consequently, FDA cannot approve Apotex's ANDA until April 20, 2006, when the '227 patent (and the pediatric exclusivity associated with it) expires.

Apotex provided BMS with notice of its pravastatin sodium ANDA and its paragraph IV certifications, as required under 21 U.S.C. § 355(j)(2)(B).  But in what has now become an all too familiar response, BMS, without comment or explanation, refrained from suing Apotex for infringement of the '447, '589 and '985 patents within 45 days of receiving the notice.

Teva claims to be the first generic applicant to submit paragraph IV certifications to the '447, '589, and '985 patents for the 10, 20, and 40 mg strengths of pravastatin.  As the purported first-filer, Teva was eligible for 180-day exclusivity for these products.  But any 180-day exclusivity for which Teva was eligible has expired.

### B.     Apotex's Need For Patent Certainty.

Merely because BMS refrained from suing Apotex for infringement of the listed '447, '589, and '985 patents within the 45-day Hatch-Waxman window did not mean that Apotex could launch its products without fear of infringement liability.  BMS still had the right and ability to sue Apotex when Apotex commercially launched its generic products.  Indeed, as Teva itself recognizes, patentees like BMS often have a significant incentive to delay resolution of infringement cases against subsequent filers, like Apotex.  (Ex. 1 at 10 (Teva Sertraline Br.)).  Doing so, for example, delays generic competition by preserving the first-filer's 180-day exclusivity period, which allows the patentee to "enjoy a period of six months with only one . . . generic competitor."  (*Id.*).

Patentees have, in fact, refrained from suing subsequent ANDA applicants until *after* those applicants have commercially launched their generic products.  For instance, in a case involving ANDAs for the drug quinapril, Pfizer sued Teva, the first ANDA-filer, but declined to sue any subsequent ANDA applicants.  Some of those subsequent applicants filed declaratory judgment actions seeking patent certainty.  Pfizer got those cases dismissed for lack of subject

matter jurisdiction without making any representations about its future intent to sue. And when Ranbaxy, a subsequent applicant, launched its generic product, Pfizer immediately brought a patent infringement suit. Pfizer succeeded in obtaining a preliminary injunction that forced Ranbaxy to remove its product from the market. Pfizer's conduct likely explains why other quinapril ANDA-holders have refrained from launching their generic products despite having received final FDA approval.

Given these harsh realities and the gamesmanship of brand companies, Apotex faced a quandary. If Apotex launched its pravastatin products upon receiving final approval, it risked an infringement suit by BMS. At worst, BMS could obtain significant, if not catastrophic, monetary damages – damages far exceeding Apotex's sales – and a permanent injunction against future Apotex marketing. At a minimum, BMS could obtain a preliminary injunction requiring Apotex to pull its product from the market. Apotex thus needed to know, *before launching*, whether its products infringed BMS's patents. And, as Teva has acknowledged in other litigation, "Congress has determined that generic drug companies should be able to learn, *before going to market* and risking catastrophic damages for a patentee's lost monopoly profits, whether Orange Book listed patents genuinely block their generic products." (Ex. 1 at 4-5 (Teva Sertraline Br.) (emphasis added)).

When BMS failed to initiate litigation, Apotex did not rush into court. Rather, Apotex repeatedly tried to obtain patent certainty *without* resort to litigation. While its counsel sent non-binding letters stating that BMS had no intention of suing, BMS steadfastly refused to sign a covenant not to sue. And as BMS knew, without such a binding covenant, Apotex had no enforceable guarantee that it could market its ANDA products without fear of litigation. BMS thus left Apotex with no choice but to attempt to secure a binding court order that would provide

a "perfected" preclusive effect, estopping BMS from suing Apotex upon launch.  (Ex. 2 at 27 (Teva *Teva III* D.C. Circuit Br.)).  Apotex sought such relief through the Declaratory Judgment Act, which Congress enacted precisely to prevent patentees like BMS from "brandishing a Damoclean threat with a sheathed sword."  *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988) (citation omitted).

         The fact is that when someone else holds the right to generic exclusivity, Teva has no objection to subsequent filers, like Apotex here, seeking patent certainty.  Teva did it in ticlopidine, and currently is attempting to do it again with respect to the drug sertraline.  In sertraline, Teva brought a declaratory judgment action expressly acknowledging that ANDA holders have a "*right* to seek a declaration of invalidity or non-infringement" through a Declaratory Judgment Action once the 45-day Hatch-Waxman window expires.  (Ex. 1 at 26-27 (Teva Sertraline Br.) (emphasis added)).  Indeed, according to Teva, "one of the principal goals of the Declaratory Judgment Act was to give would-be patent infringers the opportunity to challenge . . . 'scarecrow patents' . . . ."  (Ex. 3 at 2 (Teva Sertraline Reply Br.) (citation omitted)).  Teva feels so strongly about this right (or at least *its* right) to utilize the Declaratory Judgment Act when an NDA-holder fails to bring suit that it currently has a petition for a writ of *certiorari* addressing this issue pending before the U.S. Supreme Court.  *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, Appeal No. 05-48.

         Thus, Apotex's suit against BMS is a legitimate effort to take advantage of the benefits offered by the Declaratory Judgment Act – just as Teva did in *Teva*/ticlopidine and seeks to do in the sertraline case.  But even if Apotex had brought its suit against BMS for the sole purpose of triggering Teva's exclusivity (which it did not), Teva believes (at least when it is not the first-filer) that this is an "***entirely legitimate [goal] that would serve the public interest***."

(Ex. 3 at 4 (Teva Sertraline Reply Br.) (emphasis added)).    Indeed, according to Teva, *"[t]riggering the first filer's exclusivity in this fashion before the first filer can go to market is entirely consistent with the Hatch-Waxman Act and plainly benefits consumers of prescription drugs*." (*See* Ex. 1 at 21 (Teva Sertraline Br.) (emphasis added)).   Thus, Teva has absolutely no basis for labeling Apotex's suit a "sham" or otherwise challenging Apotex's motive for filing a declaratory judgment action.

### C.    Apotex's Suit For Patent Certainty And The Triggering Of Teva's Exclusivity Under The Rule That Teva Itself Helped Establish In The *Teva*/Ticlopidine Cases.

In April 2004, Apotex sued BMS in the District Court for the Southern District of New York, seeking a declaratory judgment that its ANDA product did not infringe the '447, '589, and '985 patents or that such patents were invalid.   BMS moved to dismiss Apotex's declaratory judgment action for lack of subject matter jurisdiction.   BMS argued that Apotex lacked a reasonable apprehension of suit in light of BMS's binding representation, contained in filed court papers and a sworn declaration, that it "*will **not** sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product*." (A.R. Tab 32, Ex. F at 12 (emphasis added)).   BMS's motion and supporting papers, in fact, contained other unequivocal, binding statements about Apotex's right to market free from fear of an infringement suit on the '447, '589, and '985 patents, including:

- "[BMS] has no intention, *now or in the future*, of suing Apotex for infringement of any of the '447, '589, and '985 patents." (A.R. Tab 32, Ex. C ¶ 10 (emphasis added)).

- "[I]f [Apotex's] representations [about its ANDA product] are indeed true, [BMS] will not sue Apotex on the '447, '589 or '985 patents." (*Id.*, Ex. F at 13).

While the district court did not rule on BMS's motion, instead striking it for failure to comply with pre-motion procedures, the court ultimately did dismiss Apotex's declaratory judgment action based upon BMS's binding representations that it would not sue Apotex, now or in the future.  (A.R. Tab 32, Ex. A).  The July 23, 2004 dismissal order became final and unappealable on August 22, 2004.

**D.    FDA's June 28, 2005 Exclusivity Decision.**

After obtaining patent certainty, Apotex moved forward to remove the regulatory barrier to obtaining approval in April 2006, upon expiration of the '227 patent.  On September 7, 2004, Apotex sent a letter to FDA, seeking confirmation that the dismissal of its declaratory judgment action against BMS triggered any generic exclusivity that would be awarded for pravastatin.  Apotex submitted the dismissal order, as well as the documents underlying that order, as support for its request.  (A.R. Tab 32).

On June 28, 2005, FDA responded to Apotex's letter, confirming that exclusivity for all strengths of pravastatin expired no later than February 18, 2005, having been triggered by the dismissal of Apotex's declaratory judgment action.  (A.R. Tab 36 at 2).  FDA further concluded that Apotex's pravastatin ANDA would be eligible for immediate final approval on April 20, 2006, upon expiration of the '227 patent and its corresponding pediatric exclusivity.  (*Id.* at 1).

In reaching its decision, FDA carefully and thoroughly examined BMS's unequivocal and binding representations, the statute, the dismissal order, and the D.C. Circuit's decisions in *Teva*/ticlopidine.  FDA correctly observed that the court dismissed Apotex's suit only after BMS represented that it did not intend to sue Apotex for infringement of the '447, '589, and '985 patents.  FDA further observed that the order, coupled with BMS's representations, "precludes a subsequent suit by BMS against Apotex for infringement of these

patents." (A.R. Tab 36 at 4-5). And, in light of the controlling legal authorities, FDA reached the only conclusion that it lawfully could reach: "under the rule of *Teva*, this dismissal qualifies as a court decision under [§ 355(j)(5)(B)(iv)(II)], triggering the running of 180-day exclusivity for the '447, '589, and '985 patents." (*Id.* at 4). Consequently, "any 180-day exclusivity for the '447, '589, and '985 patents was triggered as of August 22, 2004, the date the July 23 order became final, and expired as of February 18, 2005." (*Id.* at 5). Teva's attempt to challenge this decision necessarily fails.

## ARGUMENT

This Court reviews FDA's administrative rulings under the Administrative Procedure Act ("APA"). Under the APA, the FDA decision that Teva currently challenges cannot be disturbed unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Teva cannot come close to making this required showing. Judgment should be entered for FDA and Apotex.

**I.    The *Teva*/Ticlopidine Decisions Conclusively Establish That A Dismissal For Lack Of Subject Matter Jurisdiction, With Preclusive Effect, Triggers Generic Exclusivity.**

This case presents a straightforward issue that is governed by controlling D.C. Circuit precedent. Simply put, the D.C. Circuit already has decided that dismissal of a declaratory judgment action with preclusive effect, like the dismissal here, constitutes a court decision for purposes of triggering 180-day generic exclusivity. *See Teva I*, 182 F.3d at 1008-09; *Teva II*, 1999 WL 1042743, at *5-*6; *Teva III*, 2000 WL 1838303, at *1-*2. Teva attempts to escape this inevitable conclusion by arguing that the D.C. Circuit "did not hold that" dismissal of a declaratory judgment action with preclusive effect constitutes a triggering court decision. (Teva Br. at 16). Indeed, Teva goes so far as to claim that "the *Teva* decisions affirmatively do ***not*** articulate any legal rule." (*Id.* at 20). Nonsense. The *Teva*/ticlopidine decisions establish

precedent that binds both FDA and this Court here. Under that precedent, a dismissal of a declaratory judgment action for lack of subject matter jurisdiction that has preclusive effect is a triggering court decision under 21 U.S.C. § 355(j)(5)(B)(iv)(II).

Teva's current litigation position (*i.e.*, that "the *Teva* decisions affirmatively do ***not*** articulate any legal rule") is in marked contrast to the positions that it successfully put forth in the *Teva*/ticlopidine litigation. There, Teva:

- correctly recognized the D.C. Circuit in *Teva I* affirmatively "***ruled*** that the . . . dismissal was indeed a court 'decision,' and that the decision was one 'holding' the Syntex patent to be non-infringed by and/or unenforceable against Teva, because that decision has the preclusive effect of preventing Syntex from ever suing Teva for infringement of the relevant patent" (Ex. 4 at 5 (Teva *Teva II* Renewed Mot.) (emphasis added));

- correctly explained that "[t]he . . . dismissal clearly renders the patent unenforceable against Teva under the doctrine of estoppel and controlling federal caselaw. Accordingly, as this Court ***held*** in *Teva I*, the . . . dismissal constitutes a 'holding' of unenforceability of the patent for purposes of triggering [exclusivity] . . . under the FDCA." (Ex. 2 at 25 (Teva *Teva III* D.C. Circuit Br.) (internal citations omitted) (emphasis added)); and

- correctly observed that, according to the D.C. Circuit in *Teva I*, "FDA was ***obligated*** . . . to treat the . . . dismissal . . . as a 'court decision' that triggered the start of [Apotex's] 180-day 'exclusivity' period" (Ex. 5 at 2-3 (Teva *Teva II* Renewed Mot. Reply) (emphasis added)).

(*See also* Ex. 1 at 21, 40-41 (citing *Teva I* as authority) (Teva Sertraline Br.)). Given Teva's unambiguous and unequivocal prior admissions about what the D.C. Circuit "held" and "ruled" in the *Teva*/ticlopidine cases, its attempt to argue otherwise before this Court is disingenuous to say the least.

Teva's admissions aside, in *Teva I*, the D.C. Circuit did, in fact, expressly hold that the dismissal of a declaratory judgment action for lack of subject matter jurisdiction can constitute a "court decision" for purposes of triggering exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv)(II). *See Teva I*, 182 F.3d at 1008-09. The court explained in clear terms that

for purposes of the court decision trigger, "the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement." *Id.* at 1009. And because the dismissal in *Teva* was based on Syntex's disavowal of any intent to sue, that dismissal had "preclusive effect" and thus constituted a triggering court decision. *Id.* at 1008-09 (citing *Super Sack*, 57 F.3d at 1059; *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)).[3] Thus, contrary to Teva's current litigation position, the D.C. Circuit has affirmatively articulated a binding legal rule that FDA correctly, and necessarily, applied here.

## II.    FDA Correctly Applied The Rule Set Forth In the *Teva*/Ticlopidine Decisions.

FDA correctly applied the rule articulated in the *Teva*/ticlopidine decisions to exclusivity for pravastatin tablets. In doing so, FDA properly concluded that the dismissal of Apotex's declaratory judgment action, given its preclusive effect, constituted a court decision that triggered all pravastatin tablet generic exclusivity.

As both the D.C. Circuit and district court made clear in the Teva/*ticlopidine* cases, the crucial factor in determining whether a court order satisfies the court decision trigger is the estoppel effect of that court decision. *See Teva I*, 182 F.3d at 1008-11; *see also Teva II*, 1999 WL 1042743, at *5 (recognizing that the D.C. Circuit found that "the significance of a triggering court decision lies in its estoppel effect"). Here, BMS repeatedly represented that it "has no intention, *now or in the future*, of suing [Apotex] for infringement" and that it "*will not sue* Apotex for infringement of the '447, '589, and '985 patents." (A.R. Tab 32, Ex. F at 12 (emphasis added)). And the subsequent dismissal order expressly was based upon BMS's explicit disavowal of any intent to sue Apotex for infringement of the '447, '589, and '985

---

[3] On remand, the district court required FDA to treat the dismissal as a triggering court decision. *See Teva II*, 1999 WL 1042743, at *5-*6. The D.C. Circuit affirmed the district court's decision, concluding that FDA had to look at the estoppel effect of the dismissal. *See Teva III*, 2000 WL 1838303, at *1-*2.

patents. (*Id.*, Ex. A at 3). As such, that court order forever estops BMS from suing Apotex for infringement of the '447, '589, and '985 patents. *See Spectronics*, 940 F.2d at 636-38 (concluding that patentee's statement of non-liability estopped patentee from asserting infringement and declaratory judgment plaintiff, therefore "for all practical purposes has won the case pleaded in its complaint"); *Super Sack*, 57 F.3d at 1059 (patentee disavowing intent to sue was estopped from asserting patent infringement).

As required, FDA carefully and thoroughly reviewed Apotex's September 7, 2004 submission, including the supporting documents, and correctly concluded that the dismissal "[a]s a matter of black-letter patent law . . . suffice[s] to forever estop [BMS] from suing [Apotex] for patent infringement." *Teva II*, 1999 WL 1042743, at *5. Accordingly, under the rule of *Teva*/ticlopidine, the dismissal constituted a triggering court decision under 21 U.S.C. § 355(j)(5)(B)(iv)(II). FDA's determination that it triggered exclusivity for all strengths of pravastatin sodium tablets is not only permissible, but indeed, required.[4]

## III.    Teva's Attempts To Avoid Application Of The *Teva*/Ticlopidine Decisions Fail.

In order to avoid the consequences of the precedent it helped to create, Teva attempts to mischaracterize the operative holdings of the *Teva*/ticlopidine decisions and manufacture nonexistent distinctions between this case and *Teva*/ticlopidine. None of Teva's distortions succeed in removing this case from controlling D.C. Circuit precedent. And certainly none of Teva's erroneous arguments renders FDA's administrative ruling "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

[4] Apotex understands that Ranbaxy has asked FDA to reconsider its June 28, 2005 administrative ruling as it relates to exclusivity for 80 mg pravastatin tablets. Apotex does not believe that any unexpired exclusivity remains vis-à-vis the 80 mg pravastatin product given the express terms of the dismissal order in its litigation with BMS. (*See* A.R. Tab 32, Ex. A at 2). Apotex, if necessary, will submit a separate brief addressing this issue.

**A.    To Trigger Exclusivity, The Dismissal Need Not Be Based On An Express Concession Of Non-Infringement.**

Teva contends that the rule in *Teva*/ticlopidine does not apply here because, unlike in *Teva*/ticlopidine, BMS did not expressly state that Apotex's products do not infringe the relevant patents.  (Teva Br. at 21-22).  In making this argument, Teva does precisely what both it and the D.C. Circuit criticized FDA for doing in *Teva*/ticlopidine – it impermissibly puts form over substance.

In *Teva*/ticlopidine, Teva stated that the terms in the court decision trigger of § 355(j)(5)(B)(iv)(II) were imprecise and subject to broad interpretation.  (*See, e.g.*, Ex. 6 at 11-14 (Teva *Teva I* D.C. Circuit Br.)).  Teva urged the court to look at the substantive legal and functional effect of the court decision at issue, rather than adopting FDA's restrictive and overly formalistic construction.  (*Id.* at 15-17 (arguing that "FDA's restrictive interpretation of the Court Decision Trigger" was impermissible because it produced absurd results and renders other provisions of the statute superfluous); *id.* at 23-25 (arguing that the dismissal was a triggering court decision because it "has *the legal effect* of rendering the patent unenforceable against Teva" (emphasis added)); Ex. 7 at 5 ("It was inherently unreasonable for FDA to base its refusal to start Teva's 180-day clock on the form of the [dismissal], rather than on its substantive legal effect.") (Teva *Teva I* D.C. Circuit Reply Br.)).

The D.C. Circuit interpreted § 355(j)(5)(B)(iv)(II) in precisely this manner – looking to the legal effect of the dismissal (*i.e.*, its preclusive effect), rather than whether the dismissal fit into a specific pigeonhole of "noninfringement" or "invalidity."  *See Teva I*, 182 F.3d at 1008.  In so doing, the D.C. Circuit expressly stated that a court decision need *not* explicitly hold that the patent is "invalid" or "not infringed" to satisfy the court decision trigger.  *Id.* at 1008-09.  Indeed, the court rejected any argument that a triggering decision under

§ 355(j)(5)(B)(iv)(II) is limited to a decision of invalidity or non-infringement, stating that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Id.* at 1009. Instead, the court repeatedly made clear that "*the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement.*" *Id.* (emphasis added). Simply put, if the dismissal estops the patentee from asserting infringement against the ANDA applicant, it is a triggering court decision under § 355(j)(5)(B)(iv)(II). *Id.* at 1008-11; *Teva II*, 1999 WL 1042743, at *5 ("[T]he significance of a triggering court decision lies in its estoppel effect.").

Contrary to Teva's current assertions, FDA's approach in this case would not lead to "*any* dismissal . . . constitut[ing] a triggering 'decision of a court' regardless of what it held." (Teva Br. at 21). Rather, only those decisions having preclusive effect constitute a triggering court decision – just as Teva successfully advocated in the *Teva*/ticlopidine cases.

This Court should reject a rigidly formalistic and cramped manner of interpreting § 355(j)(5)(B)(iv)(II), just as the D.C. Circuit did in *Teva I* and *Teva III*. Here, BMS's judicial representations and the subsequent dismissal order estop BMS from asserting the '447, '589, and '985 patents against Apotex's ANDA products. No more is required under the *Teva*/ticlopidine cases. Teva's arguments to the contrary fail, and lack all credibility given its prior, successful arguments.[5]

---

[5]  Teva's emphasis on the word "holding" in the court decision trigger (Teva Br. at 20-21, 23), is equally flawed. And, in making this argument, Teva again attempts to rely on exactly the same sort of overly formalistic interpretation of the statute rejected in the *Teva*/ticlopidine cases.  A court decision need *not* explicitly "hold" that the patent is "invalid" or "not infringed" to satisfy the court decision trigger. *Teva I*, 182 F.3d at 1008-09.

**B.    BMS Is Estopped From Suing Apotex For Infringement Of The '447, '589, And '985 Patents.**

Teva also tries to avoid defeat by arguing that BMS is not estopped from suing Apotex in the future on the '447, '589, and '985 patents.  (*See, e.g.*, Teva Br. at 24).  Teva's arguments do not withstand even minimal scrutiny.

First, Teva argues, without supporting case law, that BMS is not estopped from asserting the '447, '589, and '985 patents in the future because the court dismissed Apotex's case "without prejudice."  It urges this Court to apply the "general rule [that dismissal for lack of subject matter jurisdiction] has no preclusive effect because the court lacked authority or competence to hear and decide the case."  (Teva Br. at 23 (internal quotations omitted)).  In making this argument, Teva, again, mistakenly puts form over substance – something that the D.C. Circuit refused to let FDA do in *Teva I* and *Teva III*.  And Teva, yet again, reverses its position – Teva successfully argued in the D.C. Circuit that its dismissal order in ticlopidine satisfied the court decision trigger even though it, too, was without prejudice.  (*See* Teva Br. Ex. F).  But, in any event, this argument, like the rest of Teva's arguments, lacks merit.

Dismissals for lack of subject matter jurisdiction almost always are without prejudice because the court lacked jurisdiction to decide the merits of the dispute.  *See Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 122 (2d Cir. 1999) (holding that "where federal subject matter jurisdiction does not exist, federal courts do not have the power to dismiss with prejudice"); *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988) ("Ordinarily, a case dismissed for lack of subject matter jurisdiction should be dismissed without prejudice . . . .").[6]

---

[6]    *See also Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) ("A suit dismissed for lack of jurisdiction cannot *also* be dismissed 'with prejudice'; that's a disposition on the merits, which only a court with jurisdiction may render."); *Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996) ("[I]n the absence of subject matter jurisdiction . . . dismissal for lack of jurisdiction is without prejudice." (citations omitted)); *Transcapital Fin. Corp. v. Director, Office of Thrift Supervision*, 44 F.3d 1023, 1026 (D.C. Cir. 1995) (dismissing

But whether a court dismisses an action with or without prejudice is immaterial to the estoppel issue presented here.  The dismissal order at issue in this case would only govern *Apotex's* right to bring a new declaratory judgment action, and not BMS's right to sue Apotex for patent infringement.[7]  Thus, whether the dismissal of Apotex's declaratory judgment action was with or without prejudice *per se* has no bearing on whether BMS can sue Apotex in the future for infringement.  What estops BMS from suing Apotex on the '447, '589, and '985 patents in the future is the preclusive effect of BMS's judicial representations – representations that form the basis of the dismissal order.  *See Transwitch Corp. v. Galazar Networks, Inc.*, No. 03-10228-NG, 2005 WL 1540246, at *7-*8 (D. Mass. Mar. 1, 2005) (holding that Rule 41(a)(2) dismissal without prejudice of declaratory judgment action in patent case based on patentee's covenant not to sue "does not bypass the estoppel" created by the covenant); *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 101 F. Supp. 2d 1139, 1145 (S.D. Ind. 2000) (concluding that the decision whether dismissal for lack of subject matter jurisdiction should be with or without prejudice was "of little significance" because "[e]stoppel forever bars [the patentee] from claiming that the defendants" infringed the specific patent claims).

Teva's argument also completely ignores the reason why the "general rule" it cites does not apply in cases like *Teva*/ticlopidine:  the dismissal order at issue estopped the patentee from later asserting infringement claims because it was based upon the patentee's disavowal of an intent to sue for infringement.  *Teva I*, 182 F.3d at 1008.  As the D.C. Circuit has

---

case for lack of subject matter jurisdiction without prejudice); *Wages v. IRS*, 915 F.2d 1230, 1234 (9th Cir. 1990) (holding that district court erred in dismissing case with prejudice where it lacked subject matter jurisdiction).

[7]  For instance, if BMS were to threaten Apotex in the future with an infringement suit, Apotex conceivably could bring a declaratory judgment action seeking a declaration that BMS is estopped from suing Apotex for infringement of the '447, '589, and '985 patents.

concluded, preclusive effect is all that is required for a dismissal to constitute a triggering court decision. *Id.* at 1008-11.

Second, by selectively quoting the administrative record, Teva argues that BMS has not made a binding representation about its future conduct. Not true. BMS expressly stated, and made binding judicial admissions, in filed court documents that "it ***will not sue*** Apotex for infringement"; that "[Apotex] has no reason, ***now or in the future***, to be apprehensive that BMS will sue it for infringement"; and that "BMS nonetheless has no intention, ***now or in the future***, of suing [Apotex] for infringement."  (A.R. Tab 32, Ex. F at 12 (emphasis added)).  The *Teva*/ticlopidine decisions directly contradict Teva's litigation suggestion that these and other BMS representations have no relevance to the estoppel question.  (Teva Br. at 26 & n.4).  Indeed, as the court in *Teva II* observed:

> all [FDA] had to do in order to determine that the patent holder would be estopped from suing Teva for patent infringement was look at *the order and [Syntex's] concessionary letter*.  As a matter of black-letter patent law, *these documents* suffice to forever estop [Syntex] from suing Teva for patent infringement. . . . [I]t is unreasonable for the FDA to refuse to make even a cursory inquiry into the basis for the . . . court's [dismissal] order.

*Teva II*, 1999 WL 1042743, at *5 (internal citations omitted) (emphasis added); *see also Teva III*, 2000 WL 1838303, at *1 (same).  Thus, the dismissal order and all of BMS's other judicial admissions and representations are equally relevant here.  BMS's unequivocal judicial representations bind the company and estop it from attempting to assert these patents against Apotex in the future.  The law does not, as Teva wrongly suggests, require BMS to give a formal covenant not to sue before estoppel attaches.  *See Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1375 (Fed. Cir. 2004) (holding that patentee's "effective[] promise[]" in oral argument not to sue was "sufficient to create an estoppel").  Thus, the

documents underlying the dismissal order, as well as the judicial representations contained therein, are without question relevant.[8]

Third, contrary to Teva's arguments in this Court, under controlling Federal Circuit case law, estoppel attaches even if BMS does not concede non-infringement.[9]  For instance, in *Super Sack*, the case relied on by the D.C. Circuit in *Teva I*, the patentee represented to the court that it would "*unconditionally agree not to sue [the declaratory judgment plaintiff] for infringement*" of its patents.  *Super Sack*, 57 F.3d at 1056.  The patentee, however, "was at great pains to emphasize that it 'has not and does not concede its claims of infringement against'" the declaratory judgment plaintiff.  *Id.* at 1057.  The Federal Circuit correctly held that the patentee was "forever estopped by its counsel's statement of nonliability . . . from asserting liability against [the plaintiff]," despite its refusal to concede non-infringement.  *Id.* at 1059.  Thus, irrespective of whether BMS conceded non-infringement, BMS's representations to the court estop it from suing Apotex in the future for infringement of the '447, '589, and '985 patents.  *See id.*; *see also Amana Refrigeration*, 172 F.3d at 855-56 (holding that patentee was estopped from suing declaratory judgment plaintiff based solely on its promise not to assert any patent claims against plaintiff).

Finally, Teva asserts that "a patent holder's representation about its state of mind does not bar the patent holder from changing its mind and filing a future suit."  (Teva Br. at 24; *id.* at 26-27).  Teva misstates the facts and the law.  On the facts, in addition to stating that it "has

---

[8]  Teva also suggests, albeit incorrectly, that FDA did not review anything but the dismissal order.  (Teva Br. at 26 n.4).  In so arguing, Teva ignores the fact that Apotex's submission contained, and FDA fully considered, not only the dismissal order, but BMS's other representations and admissions set forth in the brief and declaration upon which the order was based.  (*See* A.R. Tab 32).

[9]  The law of the Federal Circuit governs on matters of substantive patent law, including the estoppel effect of a patentee's statements or admissions.  *See Lab. Corp. of Am. Holdings v. Chiron Corp.*, 384 F.3d 1326, 1330 (Fed. Cir. 2004) (stating that Federal Circuit law applies to issues pertaining to patent law); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855-56 (Fed. Cir. 1999) (applying Federal Circuit case law on jurisdictional estoppel issues).

no intention, now or in the future, of suing [Apotex] for infringement," BMS also stated that "it will not sue Apotex" and that Apotex "has no reason, now or in the future, to be apprehensive that BMS will sue it for infringement." (A.R. Tab 32, Ex. F at 12). Thus, BMS expressed more than just an "intention" not to sue.

On the law, Teva gets it wrong as well. Even if BMS expressed no more than its present "intention" not to sue (BMS represented much more, of course), such statements estop BMS from suing Apotex in the future. In *Teva*/ticlopidine, the D.C. Circuit expressly held that "disavowal of any intent to sue" creates an estoppel. *Teva I*, 182 F.3d at 1008 (citations omitted). And the Federal Circuit requires no more than that. In *Super Sack*, for example, the Federal Circuit held that Super Sack was estopped from bringing future litigation based upon its statement that it "*agree[d] not to sue Chase for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by Chase.*" *Super Sack*, 57 F.3d 1056. Here, BMS made the exact same representation: BMS "will **not** sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product." (A.R. Tab 32, Ex. F at 12). It, too, is estopped under Federal Circuit case law.

Teva contends that *C.R. Bard v. Schwartz*, 716 F.2d 874 (Fed. Cir. 1983), holds that "[a] patentee's statement concerning its intentions (past, present, or future) does not work an estoppel that would negate the possibility of a future patent infringement lawsuit." (Teva Br. at 26). Wrong again. The court in *C.R. Bard* never held that statements about intentions (past, present, or future) do not estop a patentee from initiating future litigation. The court merely concluded that the declaratory judgment plaintiff, a patent licensee, had a reasonable apprehension of suit under the "totality of the circumstances" in that particular case. In finding a

reasonable apprehension, the court pointed to things such as: (1) the patentee sued the licensee in state court for breaching the license agreement; (2) the patentee "would only say that on the facts presently known to him he would not sue," but refused to identify the facts upon which it conditioned its decision not to sue; and (3) the patentee retained the right to sue the declaratory judgment plaintiffs' sublicensee for damages, damages for which the licensee ultimately could be liable. *C.R. Bard*, 716 F.2d at 881.

Thus, the actual holding in *C.R. Bard* has no applicability here. Unlike in *C.R. Bard*, the patentee here (BMS): (1) stated that it "will not sue" Apotex for infringement; (2) stated that it has no intention to sue "now or in the future"; (3) stated that Apotex had no reason "now or in the future" to apprehend an infringement suit; (4) did not condition its promise not to sue on some unidentified facts known just to it; (5) had not already initiated litigation against Apotex; and (6) cannot seek damages from a third party that ultimately could seek reimbursement from Apotex. Consequently, Teva's argument, even if supported by the facts (it is not), cannot carry the day under the relevant case law.[10]

---

[10]    The other cases that Teva cites are similarly infirm. (Teva Br. at 29-30 (citing *Biacore, AB v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 453-54 (D. Del. 1999) (holding that patentee's statement that "for the purposes of the trial" it would not assert certain patent claims identified in the pre-trial order was insufficient to vitiate alleged infringer's reasonable apprehension of suit); *Ampex Corp. v. Mitsubishi Elec. Corp.*, 966 F. Supp. 263, 273 (D. Del. 1997) (same for patentee's bare statement that it would forego certain infringement claims, while still pursuing others); *Bryan Ashley Int'l, Inc. v. Shelby Williams Indus., Inc.*, 932 F. Supp. 290, 292-93 (S.D. Fla. 1996) (same where copyright holder's answer acknowledged ongoing controversy over alleged copyright infringer's right to sell accused products); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. AMD-96-455, 1996 WL 432290, at *6 (D. Md. July 23, 1996) (same where patentee stated that it had no plans to sue but that it also had no basis for determining whether accused product infringed); *Biogen, Inc. v. Amgen, Inc.*, 913 F. Supp. 35, 39 (D. Mass. 1996) (observing in *dicta* that patentee's initial assurance that it did not intend to sue, without relinquishing future law suits, was insufficient by itself to vitiate reasonable apprehension of suit but holding that patent holder's later offer to stipulate that it would not sue did vitiate reasonable apprehension of suit); *Mobil Oil Corp. v. Advanced Envt'l Recycling Techs., Inc.*, 826 F. Supp. 112, 113 n.2, 114 (D. Del. 1993) (holding that patentee's admission that a specific type of process would not infringe patent but refusal to admit that that process was the alleged infringer's process did not vitiate reasonable apprehension of suit); *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400, 407 (D. Del. 1991) (same for patentee's promise not to sue on a patent in reexamination proceedings but only "pending the outcome of the reexamination")).

In sum, in attempting to avoid the controlling precedent that it helped create, Teva resorts to blatant misstatements of fact and law.  But this case presents a clear and straightforward estoppel analysis.  "As a matter of black-letter patent law" BMS is forever estopped from suing Apotex for infringement of the '447, '589, and '985 patents.  *Teva II*, 1999 WL 1042743, at *5 (citation omitted).  And that, according to binding D.C. Circuit precedent, triggers generic exclusivity.  *See Teva I*, 182 F.3d at 1008-11.

**C.    That BMS Made Non-Binding Statements In Pre-Suit Correspondence Between Counsel Is Immaterial To The Applicability Of The Rule Established In *Teva*/Ticlopidine.**

Teva also contends that the *Teva*/ticlopidine decisions do not apply because, unlike in those cases, the court hearing Apotex's claim never had subject matter jurisdiction.[11] Citing *3M*, Teva argues that "[t]he Federal Circuit has suggested that this is a distinction that can make a difference."  (Teva Br. at 23 (citation omitted)).  The Federal Circuit has made no such "suggestion."

In *3M*, the court addressed whether it should dismiss, with or without prejudice, a *patentee's infringement action*, not a declaratory judgment action.  In the passage upon which Teva relies, the Federal Circuit did nothing more than reject the patentee's argument that the district court's alleged lack of continuing subject matter jurisdiction necessarily required the dismissal to be without prejudice.  *See 3M*, 289 F.3d at 784.  And the fact of the matter is that the D.C. Circuit's *Teva*/ticlopidine rule has nothing whatsoever to do with whether jurisdiction exists at the time that the declaratory judgment claim is filed.  In the ticlopidine litigation, for example, the D.C. Circuit conducted no inquiry into the jurisdictional status of the declaratory judgment

---

[11]  According to Teva, BMS's pre-suit promise not to sue Apotex – made in non-binding correspondence between counsel – means that Apotex never had a reasonable apprehension of being sued.  Consequently, Teva argues, the court lacked subject matter jurisdiction over Apotex's declaratory judgment action when the action was filed.  From this, Teva leaps to the conclusion that the D.C. Circuit's decisions in *Teva*/ticlopidine have no relevance.  (Teva Br. at 22-23).  As explained in this section, Teva is grasping at straws.

action at the time Teva filed it, nor is any such inquiry required. *Teva I*, 182 F.3d at 1008-11. The only question presented is whether a dismissal order satisfies the court decision trigger if it estops the patentee from asserting infringement. *Id.* at 1009. In this case, it does. *Id.*[12]

Further, the estoppel cases make clear that the jurisdictional status of a declaratory judgment action at the time that the plaintiff files the complaint has no relevance whatsoever. In deciding whether a patentee is estopped from bringing a future infringement action, the court does not investigate whether it had jurisdiction at the time the declaratory judgment complaint was filed. Instead, the relevant inquiry is whether the patentee has disavowed an intent to sue the declaratory judgment plaintiff for infringement. *See, e.g.*, *Amana Refrigeration*, 172 F.3d at 855-56 (concluding that patentee's promise not to sue estopped patentee from asserting infringement and observing that court need not address whether any jurisdiction existed at the time the suit was filed); *Super Sack*, 57 F.3d at 1059 (finding that patentee was estopped from asserting patent infringement through disavowal of intent to sue, without examining whether jurisdiction existed when declaratory judgment counterclaims were filed); *Eli Lilly*, 101 F. Supp. 2d at 1142-43, 1145 (same).

Accordingly, Teva cites no legal authority to support its claim that the rule established in *Teva*/ticlopidine does not apply here because of the statements that BMS made in pre-suit correspondence between counsel. Teva's argument should be rejected.

---

[12]  Even if Teva's argument had merit (it does not), Teva has not shown that the district court in Teva's ticlopidine suit initially had subject matter jurisdiction while the district court here did not. On the contrary, Teva admittedly filed its declaratory judgment action in ticlopidine without provocation or a reasonable apprehension of suit. Here, Apotex filed suit only *after* BMS refused pre-suit to, *inter alia*, agree that Apotex's products do not infringe. In any event, such a jurisdictional inquiry is irrelevant. The relevant inquiry is not whether subject matter jurisdiction existed at the time of suit, but rather, as the D.C. Circuit held, whether the dismissal order has estoppel effect.

**IV.    Even If *Teva*/Ticlopidine Did Not Establish A Binding Legal Rule, FDA's Decision Is Permissible Because It Fully Comports With Congressional Intent.**

The D.C. Circuit has already determined that the FFDCA is ambiguous regarding whether the dismissal of a declaratory judgment action constitutes "a decision of a court . . . holding the ['447, '589, and '985] patent[s] . . . to be invalid or not infringed." *Teva I*, 182 F.3d at 1007-08 (citation omitted). Teva agrees: "[T]he question is whether Congress has directly and unambiguously excluded a 'case or controversy' dismissal of a declaratory judgment action . . . from qualifying as a 'decision of a court . . . .' The answer is that it has not." (*See* Ex. 6 at 11 (Teva *Teva I* D.C. Circuit Br.); Ex. 2 at 17-18 (same) (Teva *Teva III* D.C. Circuit Br.)). And where the statute is silent or ambiguous with respect to the specific issue at hand, the agency decision is lawful so long as it "is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

Here, FDA's administrative ruling is permissible because it is consistent with Congress' express intent when enacting Hatch-Waxman. Indeed, not only does FDA's ruling expedite market entry of less-expensive generic drug alternatives, but it prevents brand companies from manipulating the Hatch-Waxman generic exclusivity incentive. Thus, FDA's administrative ruling in this case should be upheld.

**A.    FDA's Decision Facilitates Speedy Generic Entry By Preventing The First-Filer From Creating A Regulatory Bottleneck.**

Congress' goal in enacting Hatch-Waxman was "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Teva agrees. (*See* Teva Br. at 5, 32). FDA's administrative ruling does just that – it opens the generic pravastatin market to *all* eligible ANDA filers as of April 20, 2006, which necessarily will give consumers and taxpayers access to this important medicine at greatly reduced prices.

In creating 180-day exclusivity, Congress did not intend to allow first-filers to indefinitely delay entry of all subsequent filers. As the Federal Circuit recognized, "it would be contrary to the very purpose of the Act to allow the first filer to block market entry of other generic manufacturers," adding that a subsequent filer does not "have any obligation to avoid triggering litigation that would advantage [it] by starting the 180-day exclusivity period." *3M*, 289 F.3d at 781. Indeed, as Judge Gajarsa of the Federal Circuit observed, "[b]ecause Congress has mandated a court decision in order to trigger the exclusivity period, *it is incumbent upon second ANDA filers who clearly do not infringe to obtain a court decision. This is in accordance with the congressional purpose.*" *Id.* at 789 (Gajarsa, J., concurring) (emphasis added). Teva agrees, at least when attempting to trigger exclusivity held by other companies.

In connection with its sertraline declaratory judgment suit, Teva acknowledged that bringing a declaratory judgment action with the goal of triggering the first-filer's exclusivity is "an ***entirely legitimate [goal] that would serve the public interest***." (Ex. 3 at 4 (Teva Sertraline Reply Br.) (emphasis added)). Teva, in fact, went even further, conceding that ***"[t]riggering the first filer's exclusivity in this fashion before the first filer can go to market is entirely consistent with the Hatch-Waxman Act and plainly benefits consumers of prescription drugs***." (*See* Ex. 1 at 21 (Teva Sertraline Br.) (emphasis added)). *See also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1072-73 (D.C. Cir. 1998) (acknowledging that subsequent applicants should not be punished by delayed approval due to exclusivity if they manage to "buil[d] a better mousetrap" by designing around a patent).

Thus, by opening up the market to full generic competition more quickly, FDA's decision fulfills Congress' express intent when passing Hatch-Waxman. Teva cannot credibly argue otherwise.

**B.    FDA's Decision Prevents Brand Companies Like BMS From Manipulating Hatch-Waxman To Their Benefit.**

As Teva correctly argued in *Teva*/ticlopidine, but ignores here, FDA must recognize dismissals, like the one here, as triggering court decisions. Otherwise, brand-name companies can manipulate the statute to serve their purposes, which runs contrary to Congress' goal of expediting generic drug entry. (Ex. 6 at 16, 20 (Teva *Teva I* D.C. Circuit Br.)).

The patentee, Teva previously has explained, often has an incentive "not to trigger [the exclusivity] period until after the expiration of the . . . patent so it can enjoy a period of six months with only one . . . generic competitor." (Ex. 1 at 10 (Teva Sertraline Br.)). Thus, Teva conceded, dismissals for lack of subject matter jurisdiction must be recognized as triggering court decisions or else the patentee could prevent triggering by "simply stating that it does not intend to enforce its patent against the subsequent applicant, thus preventing the courts from exercising subject matter jurisdiction to issue the very 'holding' of non-infringement that FDA's position seeks to require." (Ex. 6 at 16 (Teva *Teva I* D.C. Circuit Br.)). Such a result, Teva explained, would be "precisely contrary to the statutory intent" and "absurd[]." (*Id.* at 19, 20). Indeed, Teva emphatically argued that any other interpretation would permit patentees to manipulate the exclusivity period with anti-competitive consequences for consumers. (Ex. 2 at 7 (Teva *Teva III* D.C. Circuit Br.)).

The D.C. Circuit agreed that failing to recognize a declaratory judgment dismissal with preclusive effect as a triggering court decision "means that the patent holder could manipulate the system in order to block or delay generic competition by stating that the patent holder will not enforce its patent against the Paragraph IV challenger" – a result directly contrary to the purpose of the court decision trigger. *Teva I*, 182 F.3d at 1009; *id.* at 1011. Following the D.C. Circuit's lead, FDA also shares this concern:

> [T]he *Teva* court was concerned the FDA's interpretation of the California dismissal permitted the innovator to manipulate the starting of exclusivity . . . . If an innovator could obtain dismissal of an ANDA applicant's declaratory judgment action merely by stating that the proposed product would not infringe its patents, it could prevent the issuance of a triggering court decision, even if one or more generic companies were ready, willing, and able to manufacture.

(A.R. Tab 38 at 9 (citation omitted)).   Indeed, concerns about patentee manipulation even prompted Congress to enhance the Declaratory Judgment provisions of Hatch-Waxman in 2003, in an attempt to prevent such machinations:

> [W]hen generic applicants are blocked by a first generic applicant's 180-day exclusivity, the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the 'failure to market' provision and force the first generic to market.

149 Cong. Rec. S15,885 (Nov. 25, 2003); *see also* 35 U.S.C. § 271(e)(5), as amended ("[T]he courts of the United States *shall, to the extent consistent with the Constitution*, have subject matter jurisdiction in any action brought by such person under section 2201 of title 28 for a declaratory judgment that such patent is invalid or not infringed." (emphasis added)).

FDA's decision addresses this concern by preventing patentees, like BMS, from manipulating the triggering of exclusivity.   In this way, the Agency's decision fosters congressional intent.

### C. Apotex's Declaratory Judgment Action Served The Legitimate Purpose Of Providing Apotex With Patent Certainty.

Finally, Teva contends that FDA's decision was impermissible because Apotex's declaratory judgment action was a "sham" intended only to trigger Teva's exclusivity.   (Teva Br. at 2).   But, as previously discussed, Teva is mistaken.   That litigation provided Apotex with certainty about its right to market its pravastatin products and freedom from the threat of a patent infringement suit as soon as it exercises that right.

Teva, itself, has recognized that ANDA applicants must be permitted to bring declaratory judgment actions against patentees that refuse to sue within the 45-day period. In Teva's words, "***Congress has determined that generic drug companies should be able to learn, before going to market and risking catastrophic damages for a patentee's lost monopoly profits, whether Orange Book listed patents genuinely block their generic products***." (Ex. 1 at 4-5 (Teva Sertraline Br.) (emphasis added)). That is what Apotex hoped to, and did, accomplish here. Thus, Apotex's declaratory judgment action was not a "sham," as Teva would have this Court believe.

Moreover, even if Apotex brought its suit against BMS for the sole purpose of triggering Teva's exclusivity, Teva already has conceded that this is "an ***entirely legitimate [goal] that would serve the public interest***." (Ex. 3 at 4 (Teva Sertraline Reply Br.) (emphasis added)). As noted above, Teva even admits that "[t]riggering the first filer's exclusivity in this fashion before the first filer can go to market is entirely consistent with the Hatch-Waxman Act and plainly benefits consumers of prescription drugs." (*See* Ex. 1 at 21 (Teva Sertraline Br.)). Thus, for this reason, too, Teva's current litigation position necessarily fails.

## V.    Teva Is Judicially Estopped From Arguing That The Dismissal Order Here Is Not A Triggering Court Decision.

The Supreme Court has held that, according to the doctrine of judicial estoppel:

> where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.

*New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quotations and citation omitted). The purpose of the doctrine is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* (quotations

and citation omitted); *see also In re Smith*, 285 F.3d 6, 9 (D.C. Cir. 2002) (concluding that, under doctrine of judicial estoppel, government would be bound in later proceeding by the legal positions taken in the instant case); *Donovan v. U.S.P.S.*, 530 F. Supp. 894, 902 (D.D.C. 1981) (applying judicial estoppel to preclude prevailing party from changing position).

The *Teva*/ticlopidine cases involved the same plaintiff and defendant as this case – Teva and FDA. There, Teva asked for the precise interpretation of the court decision trigger in § 355(j)(5)(B)(iv)(II) that it seeks to avoid here. Teva urged the D.C. Circuit to hold that FDA was required to treat the dismissal of a declaratory judgment action for lack of subject matter jurisdiction with preclusive effect as a triggering court decision under § 355(j)(5)(B)(iv)(II). Teva specifically argued that "[b]ecause the parties are estopped from re-litigating the issue of whether Teva has committed any infringement, the [dismissal] . . . should be accorded full legal force and effect for purposes of the Court Decision Trigger." (Ex. 6 at 22 (Teva *Teva I* D.C. Circuit Br.)). The D.C. Circuit agreed. *See Teva I*, 182 F.3d at 1008-12.

On remand, Teva argued that the D.C. Circuit "ruled that the . . . dismissal was indeed a court 'decision,' and that the decision was one 'holding' the Syntex patent to be non-infringed by and/or unenforceable against Teva, because that decision has the preclusive effect of preventing Syntex from ever suing Teva for infringement of the patent." (Ex. 4 at 5 (Teva *Teva II* Renewed Mot.)). The district court agreed. *See Teva II*, 1999 WL 1042743, at *5 ("The significance of a triggering court decision lies in its estoppel effect.").

And when back before the D.C. Circuit, Teva argued that "the only permissible interpretation" of the court decision trigger is one that includes dismissal of a declaratory judgment action for lack of subject matter jurisdiction because, otherwise, patentees would be

able to manipulate exclusivity to block generic competition. (Ex. 2 at 7 (Teva *Teva III* D.C.

Circuit Br.)). According to Teva:

> [t]he . . . dismissal clearly renders the patent unenforceable against Teva under the doctrine of estoppel and controlling federal caselaw. Accordingly, as this Court held in *Teva I*, the . . . dismissal constitutes a 'holding' of unenforceability of the patent for purposes of triggering [exclusivity].

(*Id.* at 25 (internal citations omitted)). Again, Teva succeeded. *Teva III*, 2000 WL 1838303, at

*1.

But now, because the rule established in the *Teva*/ticlopidine decisions no longer

serves its own interests, Teva takes precisely the opposite position. The Supreme Court does not

allow this. Having succeeded in the *Teva*/ticlopidine case, Teva is estopped from changing its

position now. *See New Hampshire*, 532 U.S. at 755 (holding that state was judicially estopped

from urging one interpretation of statute and benefiting from that interpretation, then later

asserting inconsistent interpretation "to gain an additional advantage" at the expense of the same

opposing party); *Donovan*, 530 F. Supp. at 902 (applying judicial estoppel because prevailing

party "cannot and will not be permitted to play fast and loose with this Court").

## CONCLUSION

Teva once acknowledged that the D.C. Circuit established a controlling rule of

law in *Teva I*. Here, Teva argues the opposite. Teva has argued, and continues to argue, that

ANDA applicants must be allowed to obtain patent certainty by filing declaratory judgment

actions. Here, Teva calls such litigation a "sham." Teva has argued, and continues to argue, that

bringing suit for the sole purpose of triggering the 180-day generic exclusivity period is an

"entirely legitimate [goal] that would serve the public interest." Here, Teva calls Apotex's suit

an attempt "to circumvent the law and to deprive Teva of one of [Hatch-Waxman's] central

incentive provisions." (Teva Br. at 14). Teva ridiculed FDA in the *Teva*/ticlopidine cases for the

Agency's form-over-substance approach to interpreting the court decision trigger.  Here, Teva relies on that improper approach.  Thus, not only does Teva incorrectly apply the relevant facts to the controlling legal authorities, but its brief rests upon hypocritical and self-serving contentions.  Such contentions cannot prevail.

Under the D.C. Circuit's rulings in the *Teva*/ticlopidine cases, the dismissal order in the Apotex/BMS litigation triggered the start of generic exclusivity for all strengths of pravastatin tablet products because that order forever precludes BMS from asserting the '447, '589 and '985 patents against Apotex's ANDA products.  Accordingly, Teva's motion should be denied.  Judgment should be entered in favor of FDA and Apotex.

Dated:  August 25, 2005.                     Respectfully submitted,

APOTEX INC.


By:  _____/s/_____
     Arthur Y. Tsien, D.C. Bar No. 411579
     OLSSON, FRANK AND WEEDA, P.C.
     1400 16th Street, N.W., Suite 400
     Washington, D.C. 20036-2220
     (202) 789-1212
     (202) 234-3550 (facsimile)

     *Counsel for Intervenor-Defendant Apotex Inc.*


<u>Of Counsel</u>:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik (admitted *pro hac vice*)
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Intervenor-Defendant Apotex Inc.*

## CERTIFICATE OF SERVICE

I, Arthur Y. Tsien, hereby certify that I caused the foregoing Apotex Inc.'s Memorandum in Opposition to Plaintiff's Application for Preliminary Injunction to be served via e-mail and the District Court's Electronic Filing System (ECF) upon:

> Jay P. Lefkowitz
> KIRKLAND & ELLIS LLP
> 655 15th Street NW, Suite 1200
> Washington, D.C. 20005
>
> *Counsel for Plaintiff Teva Pharmaceuticals USA, Inc.*
>
> Andrew E. Clark
> Office of Consumer Litigation
> U.S. DEPARTMENT OF JUSTICE
> P.O. Box 386
> Washington, D.C. 20044
>
> *Counsel for Defendants Food and Drug Administration,*
> *Michael O. Leavitt, and Lester M. Crawford*
>
> Kate Cumming Beardsley
> BUC & BEARDSLEY
> 919 Eighteenth St., Suite 600
> Washington, D.C. 20006
>
> *Counsel for Intervenor-Defendant Ranbaxy Pharmaceuticals, Inc.*

This 25th day of August, 2005.

                                        _____/s/_____
                                        Arthur Y. Tsien, D.C. Bar No. 411579
                                        OLSSON, FRANK & WEEDA, P.C.
                                        1400 16th Street, N.W., Suite 400
                                        Washington, D.C. 20036-2220
                                        (202) 789-1212
                                        (202) 234-3550 (facsimile)