TEVA PHARMACEUTICALS USA, INC.  v. FDA, Case No. 05-1469 (JDB)

# EXHIBIT 1:

Brief of Plaintiff-Appellant Teva Pharmaceuticals USA, Inc. in *Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*, no. 04-1186 (Fed. Cir.)

("Teva Sertraline Br.")

No. 04-1186

---

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

### TEVA PHARMACEUTICALS USA, INC.,

**Plaintiff-Appellant,**
**v.**

### PFIZER, INC.,

**Defendant-Appellee.**

---

**Appeal from the United States District Court for the District of Massachusetts
In Case No. 03-CV-10167.  Judge Richard G. Stearns.**

---

### BRIEF OF PLAINTIFF-APPELLANT,
### TEVA PHARMACEUTICALS USA, INC.

Henry C. Dinger, P.C.
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Steven J. Lee
Thomas J. Meloro
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 415-7200

*Counsel for Teva Pharmaceuticals
USA, Inc., Plaintiff-Appellant*

March 22, 2004

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST...................................................................................... i

TABLE OF CONTENTS.............................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................iv

STATEMENT OF RELATED CASES .........................................................................ix

JURISDICTIONAL STATEMENT ..............................................................................1

STATEMENT OF ISSUES...........................................................................................1

INTRODUCTION ........................................................................................................2

STATEMENT OF THE CASE ......................................................................................5

STATEMENT OF FACTS ............................................................................................5

SUMMARY OF ARGUMENT......................................................................................8

ARGUMENT .............................................................................................................13

I.     STANDARD OF REVIEW...............................................................................13

II.    PATENT DISPUTES UNDER THE HATCH-WAXMAN ACT ........................13

       A.    The Hatch-Waxman Act ........................................................................13

       B.    The Hatch-Waxman Act Encourages Prompt Resolution
             Of Disputes Concerning the Application of Listed Patents
             To Generic Drugs .................................................................................15

       C.    Anomalies in the Application of the Hatch-Waxman Act ........................17

       D.    The First ANDA Filer's 180 Day "Exclusivity Period"..........................20

       E.    The Problem of "Parking" Exclusivity ..................................................22

       F.    The Medicare Amendments ...................................................................25

III.   THE DISTRICT COURT ERRED AS A MATTER OF LAW
       IN FINDING NO ACTUAL CONTROVERSY ................................................29

       A.    The "actual controversy" requirement....................................................30

B.     Teva Demonstrated an Actual Controversy
       Under the Traditional Two-Part Test......................................................33

       1.     The Listing of the '699 Patent in the Orange Book
              Gives Rise to a Reasonable Apprehension of Suit.......................34

       2.     Pfizer's Other Conduct Confirmed Teva's
              Reasonable Apprehension of Suit.................................................41

C.     Since Teva's Declaratory Judgment Action was Justiciable
       Under Article III, the Medicare Amendments establish
       Subject Matter Jurisdiction Without regard to the Satisfaction
       Of the "Reasonable Apprehension" test ...................................................45

       1.     Article III Requires Injury In Fact that is Traceable to The
              Defendant's Conduct and Redressable by the Requested
              Relief..........................................................................................46

       2.     Teva's Claim Satisfies Article III ................................................48

       3.     The "Reasonable Apprehension" Test Serves Primarily
              Prudential, Not Constitutional, Concern ......................................52

CONCLUSION                           ..........................................................................59

ADDENDA

CERTIFICATE OF COMPLIANCE..........................................................................60

CERTIFICATE OF SERVICE...................................................................................61

ii

## TABLE OF AUTHORITIES

**Federal Cases**

*Aetna Life Ins. Co. v. Haworth,*
    300 U.S. 227 (1937) .......................................................................... 30, 52

*Allergan, Inc. v. Alcon Labs., Inc.,*
    324 F.3d 1322 (Fed. Cir.) *cert denied,*
    124 S. Ct. 813 (2003) ................................................................... 12, 47, 48

*Andrx Pharm., Inc. v. Biovail Corp.,*
    276 F.3d 1368 (Fed. Cir. 2002) .............................................................. 33

*Apotex, Inc. v. Thompson,*
    347 F.3d 1335 (Fed. Cir. 2003) .................................................... 14, 16, 44

*Arrowhead Indus.Water, Inc. v. Ecolochem, Inc.,*
    846 F.2d 731 (Fed. Cir. 1988) ...............................31, 35, 39, 42, 44, 54, 56

*Bayou des Familles Dev. Corp. v. United States*
    130 F.3d 1034 (Fed. Cir. 1997) .............................................................. 53

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................... 54

*BP Chems. Ltd. v. Union Carbide Corp.,*
    4 F.3d 975 (Fed. Cir. 1993) .............................................................. 43, 55

*Conmed Corp. v. Erbe Electromedizin GMBH,*
    129 F. Supp. 2d 461 (N.D.N.Y. 2001) ...................................................... 32

*Craig v. Boren,*
    429 U.S. 190 (1976) ............................................................................... 55

*Dr. Reddy's Labs. v. Aaipharma,*
    2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002) ......................................... 32

*Dr. Reddy's Labs. v. Pfizer Inc.*,
  2003 WL 21638254 (D.N.J. July 8, 2003)................................................32

*DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.*,
  62 F.3d 1397 (Fed. Cir. 1995) ..........................................................13, 34

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990) ..................................................................13, 16, 25

*EMC Corp. v. Norand Corp.*,89 F.3d 807
  (Fed. Cir. 1996) ............................................................31, 44, 51, 57

*Fina Oil & Chem. Co. v. Ewen*,
  123 F.3d 1466 ............................................................................11, 31, 54

*First Hartford Corp. Pension Plan & Trust v.United States*,
  194 F.3d 1279 (Fed. Cir. 1999) ..............................................................53

*Glaxo Gp. Ltd. v. Apotex, Inc.*
  130 F. Supp.2d 1006 (N.D.Ill. 2001)......................................................44

*Glaxo, Inc. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997)............................9, 16, 33, 36, 38, 39, 48

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
  153 F.3d 1318,
  (Fed. Cir. 1998) ............................................................................32, 54

*Ivoclar Vivadent, Inc. v. Hasel*,
  2003 WL 21730520 (W.D.N.Y. June 30 2003) ..................................32, 42

*Kos Pharms., Inc. v. Barr Labs.*,
  242 F. Supp. 2d 311 (S.D.N.Y. 2003).................................................32, 43

*Maritrans Inc. v. United States*
  342 F.3d 1344 (Fed. Cir. 2003) ..............................................................38

*Midwest Indus., Inc.v. Karavan Trailers, Inc.*,
  175 F.3d 1356 (Fed. Cir. 1999) (en banc)..........................................32

*Minnesota Mining & Mfg. Co. v. Barr Labs.*
  289 F.3d 775 (Fed. Cir. 2002) ........................................................ 18, 21

*Mova Pharm. Corp. v. Shalala,*
140 F.3d 1060, 1072 (D.C. Cir. 1998) ................................ 24, 25, 26, 36, 57

*Mylan Pharms, Inc. v. Thomson,*
268 F.3d 1323 (Fed. Cir. 2002)........................................................... 17, 50

*Sallen v. Corinthians Licenciamentos Ltda.,*
273 F.3d 14 (1st Cir. 2001).................................................................. 32, 47

*Shell Oil Co. v. Amoco Corp.,*
  970 F.2d 885 (Fed. Cir. 1992)...................................................... 41, 56

*Smithkline Beecham Corp. v. Geneva Pharm., Inc.,*
  210 F.R.D. 547, 554 n.15 (E.D. Pa. 2002)
  *aff'd mem.,* 2003 WL 21911238 (Fed.Cir.. August 6, 2003)................... 36

*Steel Co. v. Citizens for a Better Environment,*
  523 U.S. 83 (1998) ........................................................ 12, 46, 47, 48

*Super Sack Mfg. Corp. v. Chase Packaging Corp.,*
  57 F.3d 1054, (Fed. Cir. 1995).............................................. 37, 43, 50

*Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,*
  982 F.2d 1520 (Fed. Cir. 1992).................................................. 33, 38

*Teva Pharms., USA, Inc. v. FDA,*
  182 F.3d 1003 (D.C. Cir. 1999) .................................................. 21, 41

*United States v. Genao,*
  343 F.3d 578 (2dCir. 2003) ............................................................. 58

*Vanguard Research, Inc. v. Peat,*
  304 F.3d 1249, (Fed. Cir. 2002) .................................................. 38, 39

*Warth v. Seldin,*
  422 U.S. 490 (1975).......................................................................... 55

**State Cases**

*Teva Pharms. USA, Inc. v. Abbott Labs,*
 2004 WL 226093 (N.D. Ill. Jan. 9, 2004) ............................................ 32, 42

**Federal Statutes and Legislative Materials**

21 U.S.C. §355............................................................................... 14, 27

21 U.S.C. §355(b)(1) ........................................................ 3, 6, 14, 34, 35

21 U.S.C. §355(c)(2)............................................................................ 14

21 U.S.C. §355(j)......................................................................... 6, 9, 26

21 U.S.C. §355(j)(2)(A)(ii) .................................................................. 14

21 U.S.C. §355(j)(2)(A)(iv) ................................................................. 14

21 U.S.C. §355(j)(2)(A)(vii) ......................................................... 6, 7, 15

21 U.S.C. §355(j)(2)(B) .................................................................. 15, 27

21 U.S.C. §355(j)(5)(B)(iii) ...................................................... 9, 16, 17, 36

21 U.S.C. §355(j)(5)(B)(iv) .............................................................. 20, 24

21 U.S.C. §355(j)(5)(C) ....................................................................... 46

21 U.S.C. §355(j)(5)(C)(i) ............................................................... 26, 27

21 U.S.C. §355(j)(5)(D)(i) ................................................................... 21

21 U.S.C. §355(j)(5)(D)(ii) .................................................................. 21

28 U.S.C. §1295(a)(1)........................................................................... 1

28 U.S.C. §1331.................................................................................... 1

28 U.S.C. §1338.....................................................................................1

28 U.S.C. §2201.....................................................................1,5, 26, 27

28 U.S.C. §2202.....................................................................................1

35 U.S.C. §271 ....................................................................................27

35 U.S.C. §271(e) ......................................................................4, 15, 49

35 U.S.C. §271(e)(2)....................................................2, 7, 9, 25, 33, 48

35 U.S.C. §271(e)(5)..............................................................................27

P.L. No. 108-173 ...........................................................................1, 2, 4

149 Cong. Rec. S15885 (Nov. 25, 2003)...............................................28

149 Cong. Rec. S15886 (Nov. 25, 2003)...............................................27

Medicare Prescription Drug, Improvement and
    Modernization Act
    Conference Agreement.....................................................................28

H. Rep. No. 98-857, 1984 U.S.C.C.A.N. 2647.....................................2, 5

**Other Authorities**

Engelberg, *Special Patent Provisions for Pharmaceuticals:*
   *Have They Outlived Their Usefulness?*
   39 IDEA: THE JOURNAL OF LAW AND TECHNOLOGY,
   389 (1999) ............................................................................. 17, 20, 40

C. Wright, et al. FEDERAL PRACTICE AND PROCEDURE (1998)..................... 33

*Certificate of Interest*

Counsel for the appellant certifies the following:

1.      The full name of every party represented by me is:

        Teva Pharmaceuticals USA, Inc.

2.      The name of the real party in interest (if the party named in the
        caption is not the real party in interest) represented by me is:

        Teva Pharmaceuticals USA, Inc.

3.      All parent corporations and any publicly held companies that own 10
        percent or more of the stock of the party or amicus curiae represented by
        me are:

Orvet UK Ltd.
Teva Pharmaceuticals Europe (Holland)
Teva Pharmaceutical Industries Ltd.

4.      All law firms and the partners or associates that appeared for the party
        or amicus now represented by me in the trial court or agency or are expected
        to appear in this court are:

| | |
|---|---|
| Robert J. Muldoon, Jr. | Steven J. Lee |
| Anthony L. DeProspo, Jr. | Thomas J. Meloro |
| C. Kyle Musgrove | KENYON & KENYON |
| John Bateman | One Broadway |
| SHERIN AND LODGEN LLP | New York, New York 10004 |
| 100 Summer Street | (212) 425-7200 |
| Boston, MA 02110 | |
| (617) 646-2000 | |

_____

Henry C. Dinger
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

i

i

*Statement of Related Cases*

There is no other appeal in or from the civil action from which this appeal was taken that was previously before this or any other appellate court.

There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal in any fashion other than by its precedential effect.

*Jurisdictional Statement*

The District Court had subject matter jurisdiction in this case under 28 U.S.C. §§1331, 1338(a) because the case involves substantial claims arising under the United States Patent Act, 35 U.S.C. §1 *et seq.,* under 28 U.S.C. §§2201, 2202 because it is an actual controversy concerning the validity and/or infringement of the patent-in-suit, and under P.L. No. 108-173, §1101(a)(2)(C).

Judgment in the District Court dismissing appellant's claims without prejudice was entered pursuant to the District Court's Memorandum and Order dated December 8, 2003. (A copy of the Memorandum is set forth in Addendum A.) Appellant filed a timely notice of appeal on January 5, 2004.

The jurisdiction of this Court is predicated upon 28 U.S.C. §1295(a)(1) because the appeal challenges a final decision of the United States District Court for the District of Massachusetts in a case where the jurisdiction of that court was based, in whole or in part, upon 28 U.S.C. §1338 in a case relating to patents.

*Statement of Issues*

1. Was there an "actual controversy" sufficient to support subject matter jurisdiction over the claim of Teva Pharmaceuticals, USA, Inc. ("Teva") for a declaration that appellee's pharmaceutical patent was invalid

or not infringed where: (i) appellee listed the challenged patent in the
FDA's Approved Drug Products with Therapeutic Equivalence Evaluations
with respect to a drug and Teva committed a technical act of infringing that
patent under 35 U.S.C. §271(e)(2) by submitting an Abbreviated New Drug
Application ("ANDA") to market a generic version of that drug; before the
expiration of the patent; (ii) appellee brought suit under the same patent
against another drug company seeking to market a generic version of the
same drug; (iii) appellee has consistently and aggressively enforced its
pharmaceutical patents against Teva and other generic drug companies; and
(iv) appellee refused to give any assurance that it would not sue Teva for
infringement and declined even to test samples of Teva's product?

2. Did Teva assert a claim justiciable under Article III of the
Constitution, and, if so, was the District Court required under Title XI of the
Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
P.L. No. 108-173, §§1101(a)(2)(C), 1101(d), to exercise jurisdiction over
Teva's complaint for declaratory relief?

*Introduction*

Teva challenges the District Court's dismissal of its declaratory
judgment action for lack of an "actual controversy" under the Declaratory
Judgment Act. Teva filed this action seeking a declaration that a patent

2

owned by appellee, Pfizer, Inc. ("Pfizer"),[1] was invalid and would not be infringed by Teva's generic version of Zoloft®, an enormously successful drug developed by Pfizer and approved by the FDA for the treatment of mood and anxiety disorders.

The '699 patent claims a particular crystalline form of sertraline hydrochloride, the active ingredient in Zoloft®. Pfizer listed the '699 patent in the FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* (a document generally referred to as the "Orange Book"). By listing the drug in the Orange Book, Pfizer affirmatively represented that a claim for infringing the '699 patent "could reasonably be asserted" against a company that sold a generic sertraline hydrochloride product without a license from Pfizer. 21 U.S.C. §355(b)(1).

Pfizer not only represented to the public that a seller of generic sertraline could reasonably face an infringement suit; it brought an infringement suit against the first generic company that filed an Abbreviated New Drug Application ("ANDA") for approval to sell such a generic product. That generic company, Teva's competitor IVAX Pharmaceuticals, Inc., had also notified Pfizer that the '699 was invalid and/or that IVAX's generic sertraline product would not infringe that patent. IVAX's ANDA,

---

[1]    U.S. Patent No. 5,248,699 (the "699 patent)(A56-86).

3

like Teva's, constituted an act of infringement under 35 U.S.C. §271(e), and Pfizer promptly brought suit. (Pfizer and IVAX later settled.) There is no doubt that Pfizer fully intends to enforce patent rights that may protect its lucrative Zoloft® monopoly.

Teva seeks to litigate in this case the issues raised in Pfizer's claim against IVAX: whether the '699 patent is valid and whether Teva's generic sertraline formulation infringes that patent. If Pfizer's claim presented a controversy suitable for judicial resolution, then so does Teva's. If there were any doubt on this score, Congress laid it to rest when it amended the Hatch-Waxman Act late last year to provide that an ANDA applicant such as Teva could bring a declaratory judgment action "against the owner [of a patent listed in the Orange Book] or holder [of a New Drug Application with respect to the drug associated with such listed patent] ... for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval." Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Amendments"), P.L. No. 108-173, §1101(a)(2)(C).

The prompt resolution of the type of patent dispute presented here is critical for the achievement of the purposes of the Hatch-Waxman Act. Congress has determined that generic drug companies should be able to

4

learn, before going to market and risking catastrophic damages for a

patentee's lost monopoly profits, whether Orange Book listed patents

genuinely block their generic products. Uncertainty on this score can only

serve to discourage and delay the introduction of generic drugs. Since Pfizer

has neither sued Teva nor forsworn any attempt to enforce its patent against

Teva in the future if Teva ultimately launches its generic version of Zoloft®,

this declaratory judgment action provides the only means for Teva to obtain

the certainty that Congress has deemed it appropriate to provide.

*Statement of the Case*

Teva commenced this action seeking a declaration that the '699 patent

is invalid and would not be infringed by the generic version of Zoloft® that

was the subject of an ANDA filed by Teva. (A49-89) On March 10, 2003,

Pfizer moved to dismiss the complaint for lack of subject matter jurisdiction,

contending that Teva's complaint failed to raise an "actual controversy," as

required by the Declaratory Judgment Act, 28 U.S.C. §2201(a).(A90) After

briefing and argument, the District Court allowed Pfizer's motion and

dismissed the case without prejudice. (A1-8)

*Statement of Facts*

This case arises out of the attempt of Teva, a generic drug company,

to market a generic version of Zoloft®, Pfizer's branded version of sertraline

hydrochloride, a drug approved by the FDA for the treatment of certain mood and anxiety disorders. There is a huge market for this drug, and it has steadily generated revenues for Pfizer in excess of $2 billion per year. (A399-401)

Pfizer obtained FDA approval to market its sertraline drug by filing a New Drug Application ("NDA"). In connection with that NDA, Pfizer listed in the Orange Book a number of patents as to which, in its view, a claim of infringement "could reasonably be asserted" against any generic version of that drug. 21 U.S.C. §355(b)(1). Two of the listed patents are pertinent to this case. The earlier patent,[2] which expires in June 2006, claims the compound sertraline hydrochloride. The '699 patent, which apparently expires in 2010, claims a particular crystalline polymorphic form of sertraline hydrochloride.

In July 2002, Teva submitted an Abbreviated New Drug Application ("ANDA") with the FDA under 21 U.S.C. §355(j) seeking permission to market a generic form of sertraline hydrochloride. Teva devoted several years and spent more than $1 million dollars in the preparation of this 4886 page document. (A286) In its ANDA, Teva certified, pursuant to 21 U.S.C. §355(j)(2)(A)(vii)(IV), that the '699 patent was invalid and/or would not be

infringed by the sertraline product that Teva proposed to sell.[3] Teva also

certified, pursuant to 21 U.S.C. §355(j)(2)(A)(vii)(III), that it would not

market its sertraline product before the expiration of the '518 patent four

years later in 2006.

Teva was not the only generic drug company to submit an ANDA

covering sertraline hydrochloride. The first company to file a sertraline

ANDA was IVAX Pharmaceuticals, Inc. (f/k/a Zenith Goldline

Pharmaceuticals, Inc.) ("IVAX"). IVAX also certified that it would not

market its product before the expiration of the '518 patent but that the '699

patent was invalid and/or not infringed by its generic sertraline product.

The submission of both IVAX's and Teva's ANDAs constituted acts

of patent infringement under 35 U.S.C. §271(e)(2). Pfizer commenced

infringement litigation against IVAX in January 2000. (A294-335) Pfizer

and IVAX subsequently settled their claims. Although the financial terms of

the settlement have not been disclosed, the redacted settlement documents

produced in discovery reveal that Pfizer has granted IVAX a non-exclusive,

---

[2]    U.S. Patent No. 4,356,518 (the "518 patent").

[3]    Teva based this certification in part on the ground that it proposed to
       market a polymorph of sertraline hydrochloride that it contends different
       from the form claimed in the '699 patent.

royalty-bearing license under the '699 patent to commence after the expiration of the '518 patent. (A153-154, 337-394)

Pfizer has been aggressive about enforcing its patent rights, filing dozens of lawsuits against generic drug companies, including at least three actions against Teva or companies related to Teva. (A153-154, 288-292) Although Pfizer has not yet sued Teva for infringement of the '699 patent, it has refused to provide any assurances that it will not do so.

As explained below, Pfizer's forbearance to date from asserting an infringement claim against Teva is readily explained as a matter of timing. Pfizer seeks to delay any judicial resolution of the invalidity and non-infringement claims raised by Teva and other generic companies in order to delay full generic competition and preserve IVAX's 180 day period of statutory "exclusivity" as the first ANDA filer with respect to Zoloft®. Six months of a "duopoly" with a royalty-paying IVAX in a market from which Pfizer currently derives annual revenues of more than $2 billion is plainly more attractive to Pfizer than competition from several generic drug companies.

*Summary of Argument*

By enacting the Hatch-Waxman Act, Congress sought to accelerate the introduction of generic drugs. To that end, it created an expedited

mechanism for obtaining approval for generic drugs by means of ANDAs.

21 U.S.C. §355(j). Further, Congress sought to bring about the prompt

resolution of patent disputes that arose in connection with proposed generic

drugs. The Act deems the submission of an ANDA with respect to a

particular drug to constitute an infringement of any patent listed in the

Orange Book with respect to such drug to the extent the ANDA applicant

seeks to market the drug before the listed patent's expiration. 35 U.S.C.

§271(e)(2). This statutory "act of infringement [is] sufficient to create case

or controversy jurisdiction to enable a court to resolve *any* dispute

concerning infringement and validity." *Glaxo, Inc. v. Novopharm, Ltd.,* 110

F.3d 1562, 1569 (Fed. Cir. 1997) (emphasis added).

　　Congress also encouraged owners of listed patents to commence

infringement actions promptly by directing that commencement of suit

against an ANDA applicant within 45 days after the submission of its

ANDA automatically stays FDA approval of the ANDA for 30 months

(absent earlier resolution of the lawsuit adversely to the patentee). 21 U.S.C.

§355(j)(5)(B)(iii). However, experience under the Hatch-Waxman Act has

shown that it is in the economic interest of some Orange Book patentees to

delay resolution of patent disputes, contrary to Congress' intent to permit

generic competition as soon as possible consistent with the patentee's legitimate interests.

Here, Pfizer benefits from delay in two ways. First, to the extent that Pfizer can delay litigation concerning the '699 patent until the expiration of the '518 patent, it can effectively extend the term of the latter patent. Because the profits associated with a blockbuster drug such as Zoloft® are so enormous, few generic drug companies can risk incurring ruinous liability by going to market without a judicial determination of invalidity or non-infringement. Second, a judicial holding before June 2006 that the '699 patent is invalid or non-infringed will trigger the 180-day exclusivity period extended to IVAX as the first ANDA filer to challenge the '699 patent. It is in Pfizer's economic interest not to trigger that period until after the expiration of the '518 patent so it can enjoy a period of six months with only one (royalty-paying) generic competitor.

Such delays disserve the interests of the public in the rapid introduction of generic drugs. In order to thwart efforts by patentees to extend their patent monopolies by delaying the commencement of infringement actions, generic companies have filed declaratory judgment actions to compel the prompt resolution of invalidity and non-infringement issues. Congress amended the Hatch-Waxman Act in December 2003 to

10

give explicit approval to such actions by providing that ANDA filers that are not sued by an Orange Book patentee within 45 days can file a declaratory judgment action against the patentee to resolve those issues. *Congress directed federal courts to exercise subject matter jurisdiction over such declaratory judgment actions unless such exercise would violate Article III of the Constitution.*

The District Court in this case erred as a matter of law in failing to find subject matter jurisdiction. First, the court erred in its application of the traditional test employed by this Court to determine whether a claim for a declaration of invalidity or non-infringement presents an "actual controversy." That test turns on whether (i) the "declaratory plaintiff has acted, or has made preparations to act, in a way that could constitute infringement," and (ii) "the patentee has created in the declaratory plaintiff a reasonable apprehension that the patentee will bring suit if the activity in question continues." *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1470 (Fed. Cir. 1997).

The first test is plainly satisfied because Teva's submission of its ANDA constitutes an act of infringement as a matter of law, as the District Court correctly recognized. Moreover, in the context of the Hatch-Waxman Act, Pfizer created a "reasonable apprehension" on Teva's part that it would

be sued for infringing the '699 patent. Most significantly, Pfizer listed the
'699 patent in the Orange Book and thus represented that that patent "could
reasonably be asserted" against any generic sertraline product. Additionally,
Pfizer (i) sued IVAX for infringing the same patent, (ii) has consistently and
aggressively enforced its pharmaceutical patents, and (iii) declined to give
assurances to Teva that it would not sue it for infringing the '699 patent. In
light of these circumstances and the policies of the Hatch-Waxman Act, the
"reasonable apprehension" test was satisfied.

Second, the Medicare Amendments to the Hatch-Waxman Act require
the exercise of jurisdiction over Teva's claim because those amendments
direct federal courts to exercise jurisdiction to the constitutional limit, and
Teva's claim presents a controversy that is justiciable under Article III.
Article III requires that the plaintiff claim an "injury in fact" that is
"concrete" and not "hypothetical," that is traceable to the defendant's
conduct, and that will be redressed by the requested relief. *Steel Co. v.
Citizens for a Better Environment,* 523 U.S. 83, 103-04 (1998); *see Allergan,
Inc. v. Alcon Labs., Inc.,* 324 F.3d 1322, 1331 (Fed. Cir.), *cert. denied,* 124
S. Ct. 813 (2003). Teva's claim for declaratory relief satisfies this standard.

To the extent that the "reasonable apprehension" test requires more
than this "irreducible constitutional minimum," *Steel Co.*, 523 U.S. at 102, it

serves prudential rather than constitutional requirements. Under the

Medicare Amendments, such prudential concerns cannot prevent the

exercise of subject matter jurisdiction over declaratory judgment actions

brought by ANDA applicants against Orange Book patentees.

*Argument*

I.    STANDARD OF REVIEW

The existence of an "actual controversy" sufficient to sustain federal

subject matter jurisdiction is a question of law, reviewed by this Court *de*

*novo. DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.,* 62 F.3d

1397, 1401 (Fed. Cir. 1995).

II.   PATENT DISPUTES UNDER THE HATCH-WAXMAN ACT.

A.    *The Hatch-Waxman Act*

The Hatch-Waxman Act,[4] enacted in 1984, sought to accelerate the

introduction of generic drugs. To this end, the Act allowed generic drug

manufacturers to obtain faster FDA approval for their drugs by filing an

ANDA. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 676 (1990). If the

ANDA establishes that the generic drug has the same active ingredient as a

previously approved drug and is bioequivalent to that drug, the ANDA

---

[4]    Formally, the Drug Price Competition and Patent Term Restoration Act
of 1984, Pub. L. No. 98-417, 98 Stat. 1585.

applicant can rely on the safety and effectiveness data contained in the NDA

for the original drug.  21 U.S.C. §§355(j)(2)(A)(ii), (iv).[5]

Congress recognized that uncertainty regarding the validity and

application of pharmaceutical patents would inhibit the rapid introduction of

generic drugs.    As this Court observed:

> The [Hatch-Waxman] Act . . . sought to facilitate
> the resolution of patent-related disputes over
> pharmaceutical drugs by creating a streamlined
> mechanism for identifying and resolving patent
> issues related to the proposed generic products. In
> particular, the Act required NDA applicants to
> identify any patent that claims the drug that is the
> subject of the NDA or that claims 'a method of
> using such drug and with respect to which a claim
> of patent infringement could reasonably be
> asserted' against a party who made, used, or sold
> the drug. [21 U.S.C.] §355(b)(1). The statute
> directs the FDA to list the disclosed patents, *id.*,
> which the FDA does in a publication entitled
> "Approved Drug Products With Therapeutic
> Equivalence Evaluations," more commonly known
> as the "Orange Book." In addition, the Act requires
> an NDA holder to file for listing in the Orange
> Book any such patents that issue after the NDA is
> approved. Id. §355(c)(2).

*Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1338 (Fed. Cir. 2003).

---

[5]  Congress made significant changes to 21 U.S.C. §355 in the Medicare
Amendments.  At various times in this brief Teva will refer to both pre-
amendment and post-amendment versions of §355.  The pre-amendment
version of §355 is set forth as Addendum B and the post-amendment
version as Addendum C.  Where it is important to specify one or the
other Teva will cite the pertinent section as "Old §355___" or "New
§355 ___."

14

If there are patents listed in the Orange Book regarding the drug that is the subject of an ANDA, ANDA applicants must take a substantive position with respect to each such patent. The applicant must certify with respect to each listed patent: (I) that the patentee has not filed the required patent information with the FDA, (II) that the patent has expired, (III) that the patent will expire on a specified future date, or (IV) that the patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. §355(j)(2)(A)(vii). If the applicant certifies that the patent is invalid or not infringed, it must send notice to the patentee setting forth the factual and legal bases for the certification, a so-called "Paragraph IV certification." 21 U.S.C. §355(j)(2)(B).

B.    *The Hatch-Waxman Act encourages prompt resolution of disputes concerning the application of listed patents to generic drugs.*

The Hatch-Waxman Act also amended the patent laws to specify that the filing of an ANDA for a drug with a Paragraph IV certification constitutes in itself an act of infringing the patents listed in the Orange Book with respect to that drug. 35 U.S.C. §271(e). The purpose for creating this "artificial" act of infringement was precisely to ensure the existence of a justiciable case or controversy to resolve questions concerning the effect of

15

listed patents on an ANDA. *Eli Lilly,* 496 U.S. at 678; *Apotex,* 347 F.3d at 1339. Indeed, in *Glaxo,* this Court noted that the Act "provided patentees with a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve ***any*** dispute concerning infringement and validity." 110 F.3d at 1569 (emphasis added).

Congress not only permitted, but encouraged patentees to bring infringement actions promptly after receiving a Paragraph IV certification that their patents were either invalid or not infringed by the drug covered by the ANDA. If the patentee brings its infringement action within 45 days of receiving the certification, then the FDA may not give final approval to the ANDA for a period of 30 months, unless the infringement action is earlier resolved against the patentee. 21 U.S.C. §355(j)(5)(B)(iii). The opportunity to obtain what amounts to a preliminary injunction against generic competition without the need to demonstrate a likelihood of success or a favorable balance of equities often provides a sufficient incentive to the patentee to bring suit within the 45-day period. Failure to do so permits the FDA to approve the ANDA application immediately upon satisfaction of regulatory requirements. *Id.*

During this 45-day period, the ANDA applicant may not preempt the patentee's opportunity to commence infringement litigation in its preferred

forum by filing a declaratory judgment action, and thereafter must bring any

declaratory judgment where the patentee "has its principal place of business

or a regular and established place of business." 21 U.S.C. §355(j)(5)(B)(iii).

The clear implication — made explicit in the Medicare Amendments — is

that if the patentee does not bring suit within 45 days, the ANDA applicant

can then bring a declaratory judgment action.

C.    *Anomalies in the Application of the Hatch-Waxman Act*

Congress undoubtedly anticipated that these incentives to bring suit

promptly would cause patentees to bring suit within 45 days unless they

recognized that an infringement claim against the ANDA applicant lacked

any merit. However, experience under the Act since 1984 has shown that it

is in the economic interest of some patentees to delay asserting an

infringement action that they fully intended to prosecute at a more

strategically advantageous time.

For example, patentees often list more than one patent in the Orange

Book with respect to a particular drug:[6] The commencement of an

---

[6]    By creating an automatic 30 month stay, the Act creates incentives to list
patents of questionable pertinence and validity in the Orange Book.  *See*
Engelberg, *Special Patent Provisions for Pharmaceuticals: Have They
Outlived Their Usefulness?*, 39 IDEA: THE JOURNAL OF LAW AND
TECHNOLOGY 389, 415 (1999). There is little downside risk to doing so
since the FDA does not undertake any substantive review of the
propriety of an Orange Book listing and there are few remedies available
to generic companies to challenge improper listings. *See Mylan*
(continued on next page)

infringement suit on any one of the patents within 45 days of receiving an

ANDA applicant's Paragraph IV certification will commence the 30-month

stay of FDA approval of the ANDA. By suing on only some of the listed

patents and holding others "in reserve," patentees can bring a later suit on

the "reserved" patents in the event that the ANDA applicant successfully

defends the initial infringement suit. The risk of incurring liability for

potentially catastrophic damages, particularly for a "blockbuster" drug such

as Zoloft®, will discourage many generic companies from bringing a

generic drug to market, even with FDA approval, before resolving the

applicability of such "reserved" patents. As a result, the patentee can often

delay the onset of generic competition by *not* bringing suit on a listed patent

immediately.

    This case presents another example of a situation in which the

patentee plainly intends to enforce its patents against generic competitors,

but has an incentive not to bring immediate suit against certain ANDA

---

*Pharms., Inc. v. Thompson*, 268 F.3d 1323, 1332-33 (Fed. Cir. 2002) (no private right of action to challenge improper Orange Book listing under either patent laws or Hatch-Waxman Act); *see also Minnesota Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 783 (Fed. Cir. 2002) (title 21 of U.S. Code enforceable only by United States or by proceeding against FDA under Administrative Procedures Act).

    In the Medicare Amendments, Congress created a right on the part of ANDA applicant to seek an order "delisting" an improperly listed patent by way of a counterclaim to an infringement action. §1101(b)(2)(D).

applicants. Here, there are two listed patents. There is no dispute that the
earlier patent will block generic sertraline products until it expires on June
30, 2006. Since Teva made clear in its 2002 ANDA that it did not propose
to market generic sertraline until the '518 patent expired, a 30-month stay of
FDA approval of Teva's pending ANDA provided no benefit to Pfizer.

More important, it would have been contrary to Pfizer's economic
interests to bring an immediate suit because an adverse judgment in such a
case would accelerate the commencement of full generic competition. There
are two reasons for this. First, if Pfizer can delay litigation concerning the
'699 patent until after the expiration of the '518 patent, there is a good
chance that a generic company will refrain from going to market upon that
expiration, even though the company has FDA approval, because of the risk
of catastrophic damages. To put it another way, if a generic company cannot
obtain a resolution of issues concerning the '699 patent before the expiration
of the '518 patent, the term of the latter patent, will, as a practical matter,
likely be extended by the amount of time it takes to litigate the '699 patent.

Moreover, even if some generic company were prepared to risk
ruination by going to market upon the expiration of the '518 patent without a
judicial determination of invalidity or non-infringement concerning the '699
patent, by delaying the commencement of litigation Pfizer might still prevent

such a generic company from competing at least for a period of six months. To understand why this is the case, it is necessary to review the Hatch-Waxman Act's "exclusivity" provisions.

D.    *The First ANDA Filer's 180-Day "Exclusivity" Period*

The first ANDA applicant to make a Paragraph IV certification with respect to a listed patent (the "first filer") receives a 180-day period of "exclusivity," free from competition from other generic companies. The FDA is statutorily precluded from approving any subsequently filed ANDA for the drug until this exclusivity period runs. 21 U.S.C. §355(j)(5)(B)(iv). The obvious purpose for this exclusivity is to encourage generic companies to undertake the expense of challenging the validity of listed patents and/or demonstrating an effective means for "inventing around" those patents. Without this exclusivity, subsequent ANDA filers could obtain a "free ride" from the first filer's investment in successful patent litigation. *See Engelberg, supra* note 6, at 423-24.

Under the 1984 Act, this exclusivity period was triggered either by the first filer's commercial marketing of its generic drug or by a court decision holding the patent not infringed or invalid. Old §355(j)(5)(B)(iv).[7] Such a

---

[7]    Under the Medicare Amendments to the Act, commercial marketing by the first ANDA filer is now the only event that triggers exclusivity. New §355(j)(5)(B)(iv). However, if the first filer fails to commence
*(continued on next page)*

holding triggered the commencement of the first filer's exclusivity whether

or not the decision was obtained by the first filer. *Minnesota Mining & Mfg.*

*Co. v. Barr Labs.,* 289 F.3d 775, 780 (Fed. Cir. 2002) ("*3M*"). Indeed,

exclusivity is triggered by a patentee's formal acknowledgment of non-

infringement. *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1007-12

(D.C. Cir. 1999). In other words, if the patentee sued a subsequent filer for

infringing the listed patent, a holding for the subsequent filer establishing

invalidity or non-infringement would trigger the first filer's exclusivity even

though the first filer is not in a position to take advantage of it by

commencing commercial marketing (either because it has not secured FDA

approval or for some other reason).

Triggering the first filer's exclusivity in this fashion before the first

filer can go to market is entirely consistent with the Hatch-Waxman Act and

plainly benefits consumers of prescription drugs. Where the subsequent filer

has itself made the investment in litigation necessary to establish invalidity

---

commercial marketing within 75 days of a court determination of
invalidity or non-infringement (obtained at the behest of either the first
filer or any subsequent ANDA applicant), the first filer actually forfeits
its exclusivity. New §355(j)(5)(D)(i)(I), (ii). Accordingly, under the
amendments litigation success by a subsequent filer can result in the loss
of the first filer's exclusivity altogether and not simply the earlier
triggering of exclusivity. The new forfeiture provisions which have a
different effective date from the declaratory judgment provisions, do not
apply here because Teva's ANDA was filed before the Medicare
Amendments were enacted. Medicare Amendments §1102(b).

or non-infringement, there can be no question of the subsequent filer's "free riding" on the first filer's investment. It would be "contrary to the very purpose of the Act to allow the first filer to block market entry of other generic manufacturers because the first filer is involved in protracted litigation." *3M,* 289 F.3d at 780 (citation omitted). Blocking the subsequent filer would be particularly inappropriate here since the first filer, IVAX, has not only failed to establish invalidity or non-infringement — and thereby bestow a benefit on subsequent ANDA filers — but actually abandoned its attempt to do so by settling with Pfizer.

E.    *The Problem of "Parking" Exclusivity*

In the circumstances presented here, it is in the patentee's economic interest to avoid triggering the first ANDA filer's exclusivity period before the first filer is in a position to go to market. If Pfizer can avoid triggering IVAX's exclusivity as the first filer until the expiration of the '518 patent in 2006, then it can expect to enjoy six months selling Zoloft® with only one (royalty-paying) generic competitor, a duopoly instead of full generic competition.[8] But if IVAX's exclusivity is triggered before the expiration of the '518 patent — for example, by a judgment that the '699 patent is invalid

---

[8]    Pfizer acknowledged that "an innovator company like Pfizer makes more money during the 180-day period than it does after a full generic competition with many competitors." (A505)

22

or a demonstration that a particular generic sertraline formulation does not infringe that patent — when generic competition finally occurs upon the expiration of the '518 patent, there will be no six-month duopoly. IVAX's exclusivity will have elapsed even though IVAX was unable to take advantage of it. On this scenario, when the '518 patent expires, Pfizer will face full generic competition and considerably greater downward pressure on the price of Zoloft®. By declining to sue subsequent filers, Pfizer plainly has sought to avoid the risk that one of the subsequent filers might obtain a favorable judgment and thereby trigger IVAX's exclusivity period before the expiration of the '518 patent.

This attempt to "park" IVAX's exclusivity will not work, however, if some other generic company can obtain a holding that the '699 patent is invalid or not infringed by the drug set forth in that company's ANDA. As noted above, such a holding will trigger the IVAX's exclusivity even if IVAX cannot commence commercial marketing. If Pfizer sues a subsequent ANDA filer with a Paragraph IV certification, that defendant would be able to seek such a holding. But Pfizer does not need to sue the subsequent filer immediately since the subsequent filer cannot receive FDA approval before the expiration of the '518 patent in 2006. The 30-month stay of FDA

approval was therefore worth little to Pfizer when Teva filed its ANDA in
2002.

The possibility that by *not* resolving validity or infringement issues
the patentee and first filer could thwart the subsequent filer's efforts to
trigger the first filer's exclusivity is one that the D.C. Circuit has
characterized as "strange":

> The second applicant, even though it has designed
> its product well and avoided suit, is barred from
> selling its product until the first applicant's lawsuit
> finishes (maybe years later) [or maybe never if the
> first filer settles on terms that result in no holding
> sufficient to trigger exclusivity]. The ingenious
> second applicant is thus harmed, and the public is
> deprived of the fruits of its ingenuity — a result
> seemingly at odds with Congress's apparent
> purposes, in enacting section 355(j)(5)(B)(iv), of
> rewarding innovation and bringing generic drugs
> to market quickly. Indeed, the first applicant could
> even collude with the original patent-holder to
> prolong their litigation [or settle it on terms that
> have the same effect], and thereby keep the second
> applicant's drug off the market indefinitely.

*Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1072 (D.C. Cir. 1998)

(bracketed material added).

The D.C. Circuit identified an "elegant and textually persuasive" way
to address this anomalous result:  the subsequent ANDA filer should bring a
declaratory judgment action against the patentee seeking a declaration of
invalidity or non-infringement. *Id.* at 1072-73.  This is not a perfect

24

solution, as the court explained, because the first filer might still get an unearned exclusivity period, but at least a successful declaratory judgment would prevent any "parking" of exclusivity. *Id.* at 1073.

Moreover, a declaratory judgment action by an ANDA applicant also would prevent the effective extension of the term of the '518 patent by permitting a resolution of the issues concerning the '699 patent before the '518 patent expires. The legislative history of the original Hatch-Waxman Act made it clear that Congress sought to permit generic competition *immediately* upon the expiration of a blocking patent and that there be no indirect extensions of patent terms. H. Rep. No. 98-857, Pt. I, at 46, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2679. *See Eli Lilly*, 496 U.S. at 676 (purpose for creating act of infringement in 35 U.S.C. §271(e)(2) to "eliminat[e] the *de facto* extension at the end of the patent term in the case of drugs, and to enable new drugs to be marketed more cheaply and quickly.")

F. *The Medicare Amendments.*

The *Mova* court recognized the value of declaratory judgments as a means by which to avoid delaying full generic competition. That court also recognized a potential obstacle to that "elegant" solution: the likelihood that patentees would challenge the subject matter jurisdiction of federal district

courts over such declaratory judgment actions, as Pfizer has done here. *Mova*, 140 F.3d at 1073.

As explained below, the circumstances here comfortably established subject matter jurisdiction over Teva's declaratory judgment action under well-recognized principles of subject matter jurisdiction. The District Court's contrary conclusion rested on its misunderstanding of the standards adopted by this Court for determining whether an "actual controversy" exists under the Declaratory Judgment Act. 28 U.S.C. §2201.

However, in enacting the Medicare Amendments, Congress sought to avoid unproductive jurisdictional wrangling in cases such as this by expressly authorizing generic drug companies to bring declaratory judgment actions. Title XI of the Medicare Amendments amended the Hatch-Waxman Act by adding to 21 U.S.C. §355(j) a provision that specifically permits an ANDA applicant to "bring a civil action" under 28 U.S.C. §2201 "against the owner [of a patent listed in the Orange Book] or holder [of an NDA with respect to the drug associated with such listed patent] ... for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval." New §355(j)(5)(C)(i)(II). This right to seek a declaration of invalidity or non-infringement was made subject to the ANDA applicant's having served on the owner or holder a paragraph IV

26

notification in proper form and the failure of the owner or holder to bring an infringement action within 45 days.[9]

Congress specified that it intended to make such declaratory judgment actions available immediately. Medicare Amendments §1101(c)(1) provides that the amendment applies to "proceedings under [21 U.S.C. §355] pending on or after the date of … enactment," i.e., December 8, 2003. Congress understood that to mean pending either in the district court or on appeal. 149 Cong. Rec. S15886 (Nov. 25, 2003) (remarks of Sen. Kennedy).

Congress directed federal courts to entertain declaratory judgment actions by ANDA applicants unless it would violate Article III of the Constitution to do so. Section 1101(d) of the Medicare Amendments[10] amended 35 U.S.C. §271 by providing that district courts "shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under [28 U.S.C. §2201] for a declaration" of invalidity or non-infringement.

---

[9]   Congress amended the form of the Paragraph IV certification, New §355(j)(2)(B), but provided that those amendments would only apply to Paragraph IV certifications submitted "on or after August 18, 2003." Medicare Amendments §1101(c)(2). Thus, the reference in New §355(j)(5)(C)(i)(I)(cc) to notice under "paragraph (2)(B)," must be understood as a reference to notice that complied with Old §355(j)(2)(B) for any certifications filed before Aug. 18, 2003. Teva filed the ANDA involved in this case in 2002. (A286)

[10]   Codified at 35 U.S.C. §271(e)(5).

27

Moreover, Congress made it abundantly clear that it enacted these provisions because it sought to have "courts . . . find jurisdiction . . . to prevent . . . improper effort[s] to delay infringement litigation between generic drug manufacturers and pioneer drug companies."  Medicare Amendments Conf. Agreement at 386.[11]  The legislative history for the Medicare Amendments specifically referred to circumstances like those presented in this case as the reason for these amendments.  In responding to a question posed on the Senate floor, Senator Kennedy identified a number of situations in which Congress expected district courts to entertain declaratory judgment actions, including:

> [W]hen generic applicants are blocked by a first generic applicant's 180-day exclusivity, the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the "failure to market" provision and force the first generic to market.

149 Cong. Rec. S15885 (November 25, 2003).  Indeed, Senator Kennedy expressed Congress' expectation that "in almost all situations where a generic applicant has challenged a patent and not been sued for patent infringement, a claim by the generic applicant seeking declaratory judgment on the patent will give rise to a justiciable 'case or controversy' under the

---

[11]  This Conference Committee Agreement is available online at http://waysandmeans.house.gov/media/pdf/hr1/hr1jtexplstate.pdf.

Constitution." *Id.* The only circumstance in which Congress understood there to be no such case or controversy was "the rare circumstance in which the patent owner and brand drug company have given the generic applicant a covenant not to sue, or otherwise formally acknowledge that the generic applicant's drug does not infringe." *Id.*

III.   THE DISTRICT COURT ERRED AS A MATTER OF LAW IN FINDING NO
       ACTUAL CONTROVERSY.

The District Court erred as a matter of law in concluding that Teva did not allege an "actual controversy" in its complaint. First, the District Court misapplied this Court's traditional test for determining subject matter jurisdiction in declaratory judgment actions by failing to recognize that Teva had reasonable objective grounds to fear that Pfizer would bring an action for infringement of the '699 patent. Second, whether or not Pfizer's conduct gave rise to such a "reasonable apprehension of suit," Teva's declaratory judgment action presented a controversy justiciable under Article III. Under the Medicare Amendments to the Hatch-Waxman Act, the justiciability of Teva's claim for declaratory relief obliged the District Court to exercise jurisdiction over it.

   A.   *The "actual controversy" requirement.*

The Declaratory Judgment Act's requirement of an "actual controversy" derives from Article III's limitation of the jurisdiction of the

federal courts to "case[s] and controvers[ies]." In this context, the Supreme

Court has articulated what this limitation is intended to achieve:

> A 'controversy' in this sense must be one that is
> appropriate for judicial determination. A
> justiciable controversy is thus distinguished from a
> difference or dispute of a hypothetical or abstract
> character; from one that is academic or moot. The
> controversy must be definite and concrete,
> touching the legal relations of parties having
> adverse legal interests. It must be a real and
> substantial controversy admitting of specific relief
> through a decree of a conclusive character, as
> distinguished from an opinion advising what the
> law would be upon a hypothetical state of facts.
> Where there is such a concrete case admitting of
> an immediate and definitive determination of the
> legal rights of the parties in an adversary
> proceeding upon the facts alleged, the judicial
> function may be appropriately exercised although
> the adjudication of the rights of the litigants may
> not require the award of process or the payment of
> damages. And as it is not essential to the exercise
> of the judicial power that an injunction be sought,
> allegations that irreparable injury is threatened are
> not required.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41 (1937)

(citations omitted).

This Court has formulated a two-part test to serve as a

"useful" means for determining the existence of an actual

controversy in the "classic patent declaratory judgment suit" in

which the plaintiff sues a patentee for a declaration of invalidity

and/or non-infringement:

> In the classic patent declaratory judgment suit, *i.e.*,
> where the declaratory plaintiff is laboring under
> the threat of litigation for alleged infringement of a
> patent, the "actual controversy" requirement means
> that there is jurisdiction over the action if: (1) the
> declaratory plaintiff has acted, or has made
> preparations to act, in a way that could constitute
> infringement, and (2) the patentee has created in
> the declaratory plaintiff a reasonable apprehension
> that the patentee will bring suit if the activity in
> question continues.

*Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1470 (Fed. Cir. 1997). This

test "is designed to police the sometimes subtle line between cases in which

the parties have adverse interests and cases in which those adverse interests

have ripened into a dispute that may properly be deemed a controversy."

*EMC Corp. v. Norand Corp.,* 89 F.3d 807, 811 (Fed. Cir. 1996).

However, as this Court has cautioned, "there is no specific, all-

purpose test" for identifying actual controversies. *Arrowhead Indus. Water,*

*Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735 (Fed. Cir. 1988). This Court has

specifically acknowledged that "[s]atisfaction of th[e] traditional two-part

test is not ... a prerequisite to jurisdiction in every possible patent

declaratory judgment action." *Fina Oil,* 123 F.3d at 1470. That test is

merely one way to assure that the "disagreement ... is real and immediate."

31

*Id.; cf. Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1327 (Fed. Cir. 1998) ("reasonable apprehension" prong of traditional test "contributes to policing the boundary" between Article III controversies and "a difference or dispute of a hypothetical or abstract character") (citation omitted), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.,* 175 F.3d 1356 (Fed. Cir. 1999) (*en banc*); *Sallen v. Corinthians Licenciamentos Ltda.,* 273 F.3d 14, 25 (1st Cir. 2001) (showing "a reasonable apprehension of suit … is not the only way to establish the existence of a case for purposes of Article III").

This Court has never applied this test for "classic patent infringement litigation" in a case brought by an ANDA applicant seeking a declaration that a patent listed in the Orange Book with respect to the drug that is the subject of its ANDA is invalid and/or not infringed.  With the exception of the case below, most district courts to have considered the question in such a context have found an actual controversy.[12]

---

[12]    *See Teva Pharms. USA, Inc. v. Abbott Labs.,* No. 03 C 5455, 2004 WL 226093, at *3-*10 (N.D. Ill. Jan. 9, 2004); *Ivoclar Vivadent, Inc. v. Hasel,* No. 02-CV-0316E(F), 2003 WL 21730520, at *6 (W.D.N.Y. June 30, 2003); *Kos Pharms., Inc. v. Barr Labs.,* 242 F. Supp. 2d 311, 315-17 (S.D.N.Y. 2003); *Dr. Reddy's Labs. v. Aaipharma,* No. 01 Civ. 10102 (LAP), 2002 WL 31059289 (S.D.N.Y. Sept. 13, 2002); *Conmed Corp. v. Erbe Electromedizin GMBH,* 129 F. Supp. 2d 461, 466 (N.D.N.Y. 2001). The only cases in this context to find no actual controversy of which Teva is aware have been the decision below and *Dr. Reddy's Labs. v. Pfizer Inc.,* No. Civ. A. 03-CV-726 (JAP), 2003 WL 21638254 (D.N.J. July 8, 2003), a case on which the District Court in this case relied.

B.    *Teva demonstrated an actual controversy under the traditional two-part test.*

Application of the traditional test for an "actual controversy" in this context turns on whether (i) Teva has infringed, or taken concrete steps toward infringing, the '699 patent, and (ii) Pfizer has taken actions that give rise to a reasonable apprehension that Pfizer will sue Teva for infringing the '699 patent.  There is no question that the first part of the test has been satisfied.  As 35 U.S.C. §271(e)(2) provides, and as the court below recognized, the filing of Teva's ANDA constituted an act of infringement sufficient to trigger a justiciable case or controversy.  *Glaxo,* 110 F.3d at 1569; *see also Andrx Pharm., Inc. v. Biovail Corp.,* 276 F.3d 1368, 1371 (Fed. Cir. 2002).  "There is little difficulty in finding an actual controversy if all the acts that are alleged to create liability already have occurred."  10B C. Wright, *et al.,* FEDERAL PRACTICE AND PROCEDURE §2757, at 475 (1998). Cases in which jurisdiction was denied because the threatened act of infringement was years away, *e.g., Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1526-27 (Fed. Cir. 1992), are plainly distinguishable because infringement has already occurred in this case, as the District Court correctly ruled.[13]

---

[13]    Moreover, Teva spent more than $1,000,000 over the course of several years to prepare its nearly 5000 page ANDA.  Even if the submission of

*(continued on next page)*

The "reasonable apprehension" prong of the test was satisfied as well, and the District Court erred as a matter of law in failing to recognize this. In the context of the Hatch-Waxman Act's regulatory scheme, Teva faced a plainly reasonable apprehension that Pfizer would enforce the '699 patent against any maker of generic sertraline hydrochloride products, including Teva, before such maker went to market with a generic sertraline product.

           1.      The listing of the '699 patent in the Orange Book gives rise to a reasonable apprehension of suit.

The first and most important basis for finding a reasonable apprehension of suit is Pfizer's listing of the '699 patent in the Orange Book. That listing constituted an affirmative representation to the FDA and to the public that a claim of infringing that patent "could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use or sale" of *any* generic sertraline drug. 21 U.S.C. §355(b)(1). As Judge Gajarsa of this Court noted in his *3M* concurrence, listing a drug in the Orange Book "meets" the "reasonable apprehension" prong of the Court's traditional test. 289 F.3d at 791 (Gajarsa, J., concurring) (citing *Cordis Corp. v. Medtronic,*

---

the ANDA were not in itself an act of infringement, the investment of time and resources to prepare the ANDA plainly constitute a meaningful concrete step towards making, using or selling a generic drug that, according to Pfizer's listing of the '699 patent in the Orange Book, could reasonably be viewed as an infringement of that patent. *See DuPont Merck Pharm. Co. v. Bristol-Myers Squibb Co.,* 62 F.3d 1397, 1401 (Fed. Cir. 1995).

*Inc.,* 835 F.2d 859, 862 (Fed. Cir. 1987)).[14] Judge Gajarsa noted the similarity between the language of §355(b)(1) and the traditional formulation of the "reasonable apprehension" test and observed that that similarity was "not coincidental." *Id.*

Judge Gajarsa's analysis is consistent with the purposes of both the "reasonable apprehension" test and the Hatch-Waxman Act. This Court has explained that the "reasonable apprehension" test serves to "protect[] quiescent patent owners against unwarranted litigation." *Arrowhead,* 846 F.2d at 736. Pfizer is not a defendant that "has done nothing but obtain a patent." *Id.* Pfizer has informed the world that the '699 patent likely precludes anyone from marketing a generic sertraline product until it expires.

Moreover, when it enacted the Hatch-Waxman Act, Congress anticipated that when an ANDA applicant challenges the patentee's Orange Book listing by serving a Paragraph IV certification, the issues of validity and/or infringement are joined in a sufficiently concrete manner to permit the judicial resolution of those issues *at the behest of either party.* The Act contemplates that either party can initiate litigation to resolve them. The

---

[14]    The other two judges on the *3M* panel did not reject or even discuss Judge Gajarsa's statement, but rather decided the particular case on other
*(continued on next page)*

35

patentee gets the first shot at forum selection, but, by precluding the ANDA applicant from commencing a declaratory judgment action only for 45 days, and by specifying the proper venue for a declaratory judgment thereafter, 21 U.S.C. §355(j)(5)(B)(iii), Congress made it abundantly clear that if the patentee declines to bring an infringement action within that period, the ANDA applicant is free thereafter to seek a declaration of invalidity and/or non-infringement.

In the Medicare Amendments, Congress made this clear implication explicit by expressly authorizing ANDA applicants to bring declaratory judgment actions after the passage of 45 days without an infringement suit by the patentee. Congress' goal has been to enable a court to "promptly resolve any dispute concerning infringement and validity" that would otherwise delay the introduction of generic drugs. *Glaxo,* 110 F.3d at 1569. As the D.C. Circuit commented in *Mova,* declaratory judgments brought by ANDA applicants serve to prevent collusion by patentees and first ANDA filers from undermining the goal of permitting the introduction of generic drugs as quickly as possible. 140 F.3d at 1072; *see also Smithkline Beecham*

---

grounds. Nothing in *3M* or in any other decision of this Court calls into question the analysis in Judge Gajarsa's concurrence.

*Corp. v. Geneva Pharm., Inc.,* 210 F.R.D. 547, 554 n.15 (E.D. Pa. 2002), *aff'd mem.,* 2003 WL 21911238 (Fed. Cir. Aug 6, 2003).

The District Court rejected this argument for two reasons, neither of which can withstand careful analysis. First, the District Court ruled that the rationale of Judge Gajarsa's concurrence in effect proves too much. According to the District Court "[a] blanket inference [that a listing in the Orange Book creates a reasonable apprehension of suit] would cover every patent holder who listed a patent, thereby eliminating the second prong of the test. A patent holder may have reasons to sue for infringement, and all things depending, reasons not to sue." (A7) The District Court missed the point.

Initially, a ruling that listing a patent in the Orange Book gives rise to a reasonable apprehension of suit applies only to cases under the Hatch-Waxman Act where Congress has created a detailed mechanism for resolving patent disputes concerning listed patents very promptly. Such a ruling would have no effect on cases outside the Hatch-Waxman context. Moreover, patentees can bring genuinely unnecessary litigation to an end at once by a formal acknowledgment of non-infringement or a covenant not to sue. *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058-60 (Fed. Cir. 1995).

In addition, the fact that a patentee such as Pfizer has "reasons not to sue" *immediately upon the filing of an ANDA* does not mean that the ANDA applicant does not have a reasonable basis to fear an infringement suit when those reasons disappear, as they are likely to do in this case as the expiration of the '518 patent approaches. Judge Stearns as a practical matter read into the traditional test a requirement that the patentee's actions give rise to a reasonable apprehension of *imminent* suit.[15] The cases do not support this gloss on the test. *See, e.g., Vanguard Research, Inc. v. Peat,* 304 F.3d 1249, 1255 (Fed. Cir. 2002) ("a plaintiff must show more than the nervous mind of a possible infringer, but does not have to show that the patentee is poised on the courthouse steps") (citation omitted).

Rather, the cases reflect a concern for the imminence of the *infringement. See, e.g., Glaxo,* 110 F.3d at 1571; *Telectronics,* 982 F.2d at 1527. Where the declaratory judgment plaintiff has not committed itself to a particular course of infringement, considerations of ripeness may warrant judicial forbearance from resolving what might still be an abstract or inchoate dispute. *See Maritrans Inc. v. United States,* 342 F.3d 1344, 1359 (Fed. Cir. 2003). However, in the Hatch-Waxman context, the ANDA applicant commits an actual act of infringement by submitting the ANDA

---

[15]    Pfizer urged this argument to the District Court. (A496-497)

with a Paragraph IV certification, a document that sets forth with great precision precisely what product the applicant proposes to sell upon obtaining FDA approval.[16] There is nothing inchoate about the resulting patent dispute, and in *Glaxo,* this Court has recognized the justiciability of disputes concerning whether the drug described in the ANDA will infringe. *See* 110 F.3d at 1568-70.

Making the "reasonable apprehension" test turn on the imminence of an infringement suit makes that test far too manipulable by the patentee. So long as the patentee faces no imminent risk of competition, the patentee can afford to wait. If waiting under such circumstances is enough to preclude a declaratory judgment action, then the law will have handed back to patentees the "sheathed sword" by which to "brandish a Damoclean threat," *Arrowhead,* 846 F.2d at 735, and thus undermined one of the reasons for enacting the Declaratory Judgment Act, *id.* As this Court has observed, "a patentee's present intentions do not control whether a case or controversy exists." *Vanguard Research,* 304 F.3d at 1255. Making the test turn on the imminence of suit would also undermine the goals of the Hatch-Waxman Act to resolve patent disputes promptly once the issues are joined by the

---

[16]   Moreover, Teva served on Pfizer a detailed analysis explaining the basis for its contention that its sertraline product does not infringe the '699 patent. (A110-119)

listing of a patent in the Orange Book and the serving of a Paragraph IV certification with respect to the patent.

The District Court's second reason turned on what it perceived to be a countervailing purpose of the Hatch-Waxman Act: to extend to the first ANDA filer that submits a Paragraph IV certification a period of 180 days of exclusivity. Since Teva's success in its declaratory judgment action could trigger IVAX's exclusivity period before IVAX could market its generic sertraline product, Judge Stearns considered it proper to deny Teva the opportunity for such success.

In so ruling, the District Court misunderstood the purpose of exclusivity. The point is not to reward an ANDA applicant for being the first to file an ANDA or even for being the first to submit a Paragraph IV certification. It is, rather, to reward the first filer's investment of resources needed to invalidate (or to establish a successful strategy to avoid infringing) a listed patent, an investment that benefits not only the first filer that litigates these issues, but all other generic companies as well. Exclusivity prevents "free riding" by other generic companies on the first filer's investment. Engelberg, *supra* note 6, at 423-24. It is for this reason that courts have uniformly permitted subsequent filers who successfully establish invalidity or non-infringement to trigger the first filer's exclusivity whether or not the

first filer can take advantage of it.  *3M*, 289 F.3d at 780; *Teva Pharms.*, 182

F.3d at 1007-12.  Where the subsequent filer has not engaged in "free

riding" but has itself undertaken the investment in litigation and succeeded,

there is no unfairness to the first filer if a rival's success triggers its

exclusivity.[17]

>    2.    Pfizer's other conduct confirmed Teva's reasonable
>          apprehension of suit.

Although Pfizer's listing of the '699 patent in the Orange Book is a

sufficient basis for finding a "reasonable apprehension of suit," Pfizer

engaged in additional conduct that buttresses the existence of such a

reasonable apprehension.  First, Pfizer brought an infringement suit against

IVAX claiming that IVAX's ANDA for sertraline hydrochloride infringed

the '699 patent.  Thus, Pfizer obviously contends that the '699 patent is valid

and infringed by generic sertraline products.  Any suggestion that Pfizer's

"forbearance" from suing Teva signals an acquiescence in Teva's

contentions of invalidity and non-infringement is unfounded.  Courts have

recognized that the patentee's commencement of infringement litigation on

the same patent against other parties supports a finding of "reasonable

apprehension."  *See, e.g., Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888

---

[17]    Indeed, in the Medicare Amendments a first ANDA filer's failure to
market within 75 days of a final determination of invalidity or non-
>                                                    *(continued on next page)*

41

(Fed. Cir. 1992) ("[r]elated litigation may be evidence of a reasonable apprehension"); *Arrowhead,* 846 F.2d at 737 (finding reasonable apprehension where suit against third party "evidenced not only an intent but a willingness and capacity to employ litigation in pursuit of its patent rights"); *Teva Pharm. USA, Inc. v. Abbott Labs,* No. 03 C 5455, 2004 WL 226093, at *5-*6 (N.D. Ill. Jan. 9, 2004) (patentee had filed patent litigation against applicant's affiliate in Canada); *Ivoclar Vivadent, Inc. v. Hasel,* No. 02-CV-0316E(F), 2003 WL 21730520, at *6 (W.D.N.Y. June 30, 2003) (patentee sued two other alleged infringers).

The reasonableness of Teva's apprehension of suit is further confirmed by Teva's own experience with Pfizer and that of the generic industry as a whole. Pfizer is aggressive about enforcing its pharmaceutical patents. Pfizer has sued Teva at least three times to block the marketing of Teva's generic drugs. Since 1998, Pfizer has initiated many patent litigation suits against generic drug companies. It would be naïve to construe Pfizer's forbearance as anything other than lying in wait for a more opportune moment to sue when the '518 patent has expired or is about to expire.

Moreover, Pfizer has refused either to acknowledge that Teva's product would not infringe the '699 patent or to extend to Teva a covenant

---

ingringement results in outright forfeiture of exclusivity.

not to sue. Indeed, Pfizer refused even to test Teva's products, despite having the opportunity to do so, in order to reach an informed position whether Teva's products infringed. (A462-478) While not dispositive, "a patentee's refusal to give assurances that it will not sue to enforce its patent is relevant to the determination." *BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 980 (Fed. Cir. 1993): *see also Kos Pharms., Inc. v. Barr Labs.* 242 F. Supp. 2d 311, 317 (S.D.N.Y. 2003).

The District Court gave no weight to this fact because, in the court's view, "there is nothing in the [Food, Drug and Cosmetic Act] that requires Pfizer to respond one way or another to Teva's request for a covenant not to sue." 2003 WL 22888848 at *4. But this observation misses the point. Teva never argued that Pfizer had such an obligation. The issue before the District Court, rather, was whether to infer from Pfizer's forbearance from suing Teva that Pfizer has no intention ever to sue Teva. If Pfizer had given the requested covenant not to sue, the question of jurisdiction would have been resolved and dismissal would have been proper on mootness grounds. *See Super Sack,* 57 F.3d 1058-60. While it may be true that Pfizer is not obliged to test any of Teva's products or to give any assurances concerning future litigation, Pfizer cannot have it both ways. Pfizer cannot argue Teva lacks any reasonable apprehension of suit while it insists on remaining coy

43

concerning its own intentions notwithstanding the listing of the '699 patent

in the Orange Book. *See Glaxo Group. Ltd. v. Apotex, Inc.,* 130 F. Supp.2d

1006, 1009 (N.D. Ill. 2001) ("defendant cannot defeat jurisdiction simply by

refusing to put in writing what is otherwise obvious.")

Allowing Pfizer to have it both ways in this regard is inconsistent with

the regulatory scheme enacted by Congress. Congress has directed courts to

resolve patent issues promptly. Since the patentee has stated publicly, by

listing the '699 patent in the Orange Book, that any generic version of

Zoloft® could reasonably be found to infringe, only a judicial determination

or the patentee's formal acknowledgment of an ANDA applicant's non-

infringement can resolve promptly the dispute that the submission of an

ANDA with a Paragraph IV certification creates. Since Pfizer refuses the

latter, only the former remains. The District Court's ruling eliminates both

and thereby thwarts the congressional purpose.

In the end, the argument that Teva faces no "reasonable apprehension

of suit" rests on nothing more than the facts that Pfizer has neither sued Teva

nor delivered to Teva a formal threat of suit. This Court has repeatedly ruled

that those facts alone do not preclude the existence of a reasonable

apprehension of suit. *See, e.g., EMC,* 89 F.3d at 811; *Arrowhead,* 846 F.2d

at 736. While the test requires more than the mere existence of a patent in

44

the hands of an otherwise "quiescent" patentee, much more than that has

been shown in this case. Here, Pfizer, a company that has been aggressive in

protecting its patent rights against Teva and other generic companies, has

formally announced to the world that generic sertraline could reasonably be

found to infringe the '699 patent. It has sued one generic company already,

and refuses to give any assurances that it will not sue any others. It has a

manifest economic interest in refusing to sue any other generic companies

immediately because it hopes to extend the practical life of the '518 patent

and at least to enjoy a six-month duopoly with IVAX, interests that

undermine any suggestion that its forbearance reflects any lack of

confidence in its infringement claims. The District Court erred as a matter

of law in failing to recognize Teva's "reasonable apprehension of suit."

    C.   *Since Teva's declaratory judgment action is justiciable under*
         *Article III, the Medicare Amendments establish subject matter*
         *jurisdiction without regard to the satisfaction of the "reasonable*
         *apprehension" test.*

As noted above, in its recent amendments to the Hatch-Waxman Act,

Congress not only made explicit that ANDA applicants such as Teva had the

right to seek a declaration of invalidity and/or non-infringement if not sued

by the patentee within 45 days of its Paragraph IV certification, but also

directed the federal courts to exercise jurisdiction over such declaratory

judgment actions unless the exercise of jurisdiction runs afoul of Article III.

New §355(j)(5)(C); Medicare Amendments §1101(d). This legislation,
which was signed into law on December 8, 2003 (the date on which Judge
Stearns rendered the decision challenged in this appeal), was made
applicable to cases pending (in the district court or on appeal), on the date of
enactment. *See* pp. 27 *supra.*

The question presented, therefore, in the event that this Court rules
that the "reasonable apprehension" test was not satisfied in this case, is
whether satisfaction of that test is constitutionally mandated in this case. In
other words, is Teva's claim for declaratory relief a justiciable controversy
under Article III?

> 1.    Article III requires injury in fact that is traceable to the
>       defendant's conduct and redressable by the requested
>       relief.

The crux of the "justiciability" question is whether the dispute is "of
the sort traditionally amenable, to and resolved by, the judicial process."
*Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 102 (1998)
(citing *Muskrat v. United States.,* 219 U.S. 346, 356-57 (1911)). The
Constitution requires, as an "irreducible constitutional minimum," that the
plaintiff have standing in the sense of claiming an "injury in fact" that is
"concrete" and not "conjectural," that is fairly traceable to the defendant's

conduct, and that will be redressed by the requested relief. *Id.* at 102-03.
*Accord, Sallen*, 273 F.3d at 25.

This Court acknowledged the pertinence of this irreducible minimum
in *Allergan, Inc. v. Alcon Labs., Inc.*, 324 F.3d 1322, 1331 (Fed. Cir. 2003)
(*per curiam*), *cert. denied*, 124 S. Ct. 813 (2003). In *Allergan*, a patentee
brought suit against a generic drug company for a declaration that the latter's
marketing of a drug that was the subject of a pending ANDA would induce
infringement of a listed patent by third parties. *Id.* at 1328.[18]  The Court
cited the standing requirements referenced in *Steel Co.*, which were plainly
met in *Allergan*, and found Article III jurisdiction over the claim for
declaratory relief even though the actual harm from the contributory
infringement had not occurred and would not occur until after the FDA
approved the defendant's ANDA. *Id.* at 1331-32. While it recognized that
the prospect of actual harm was, to a degree, "speculative," *such*
*indeterminacy was inherent in the Congressional determination to make the*
*submission of an ANDA itself an act of infringement. Id.* The mere fact that
litigation concerning validity or infringement concerned harms that were not

---

[18]  The plaintiff claimed that FDA approval of the ANDA for an unpatented
use would lead physicians to prescribe it for uses covered by plaintiff's
patent. *Id.* This was obviously an injury in fact attributable to the
defendant's pursuit of FDA approval to market its generic product. The
*(continued on next page)*

imminent and might not occur for years did not preclude Article III

jurisdiction. *Id.* The Court stressed the language from *Glaxo* that 35 U.S.C.

§271(e)(2) "provided patentees with a defined act of infringement sufficient

to create case or controversy jurisdiction to enable a court to promptly

resolve any dispute concerning infringement and validity." *Id.* at 1332

(quoting *Glaxo,* 110 F.3d at 1569).

2. Teva's claim satisfies Article III.

*Allergan* and *Glaxo* put to rest any question that the resolution of the

dispute concerning infringement or validity raised by a Paragraph IV

certification is not justiciable. If such a dispute is "of the sort traditionally

amenable to, and resolved by, the judicial process" when initiated by the

patentee, *Steel Co.*, 523 U.S. at 102, then it is equally amenable to judicial

resolution when brought by the ANDA applicant since both sides satisfy

Article III's standing requirements, and the issues presented are exactly the

same regardless of which party initiates the suit.

Here, Teva alleges injury in fact. It has sought FDA permission to

market its generic sertraline product immediately upon the expiration of the

'518 patent. The '699 patent stands as an obstacle to such marketing. Teva

---

relief sought would have prevented such alleged inducement of
infringement. *Id.* at 1332.

faces potentially catastrophic liability if it commences marketing at that point. It is an injury that is attributable to Pfizer's ability to assert a claim against Teva for infringing the '699 patent, a claim that Pfizer has already stated would be reasonable for it to assert by listing the '699 patent in the Orange Book and that Pfizer previously asserted against IVAX. The declaration sought by Teva that the '699 patent is invalid and/or not infringed by Teva's sertraline product would obviously redress that injury.

Moreover, Teva faces an injury in fact if it is unable to trigger IVAX's exclusivity. In *3M*, this Court recognized that disputes concerning the triggering of a first ANDA filer's exclusivity give rise to justiciable controversies. 289 F.3d at 780. In that case, the patentee recognized, after commencing litigation against an ANDA applicant under 35 U.S.C. §271(e), that the drug described in the ANDA would not infringe the patent. *Id.* at 779. The patentee argued that the case should be dismissed without prejudice because its recognition of non-infringement caused the district court to lose subject matter jurisdiction. *Id.* at 780. This Court rejected this contention because a justiciable controversy remained concerning the effect of the form of dismissal on the exclusivity of the first generic company to file an ANDA with respect to the pertinent drug. *Id.* at 780-81.

In addition, "it is 'the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action.'" *Mylan,* 268 F.3d at 1330 (quoting *Collin County, Tex. v. HAVEN,* 915 F.2d 167, 171 (5th Cir. 1990)). Plainly, Pfizer faces injury in fact from Teva's prospective infringement of the '699 patent and its inevitable infringement counterclaim would present a traditionally justiciable controversy.

The only circumstance that would undermine the existence of an Article III controversy would be Pfizer's formal acknowledgment that the sertraline product described in Teva's ANDA will not, in fact, infringe the '699 patent, notwithstanding the representation inherent in Pfizer's listing the patent that any generic version of Zoloft® could reasonably be found to infringe that patent.[19] Were Pfizer to make this acknowledgement, then Teva would not face injury in fact since Pfizer's acknowledgment would estop it from asserting an infringement claim in the future. *Super Sack,* 57 F.3d at 1058-59. Accordingly, Pfizer can bring Teva's declaratory judgment action to an immediate halt by formally acknowledging non-infringement. This would "divest" the court of subject matter jurisdiction. *Id.*

---

[19] In theory, Pfizer might also acknowledge that the '699 patent was invalid. Since Pfizer has already brought one suit on that patent, presumably it will not make this acknowledgment in practice.

But Pfizer made no such acknowledgment although it had every opportunity to do so. Teva offered Pfizer samples of its products. Pfizer plainly could have sought to stay proceedings below for a reasonable period if it needed more time to undertake an infringement analysis. It is clear that Pfizer is unwilling to forego the opportunity to sue Teva at a more opportune moment, i.e., when it has enjoyed the full term of the '518 patent and a six-month duopoly with IVAX immediately thereafter. Pfizer's present diffidence is perfectly understandable, but it does not undermine the existence of Article III jurisdiction.[20]

---

[20]    As this Court pointed out in *EMC,* 89 F.3d at 811-12:

> The test for finding a "controversy" for jurisdictional purposes is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling. The need to look to substance rather than form is especially important in this area, because in many instances (as in this case) the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction. In the end, the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with one another.

Finally, it is worth considering this case in light of the Supreme Court's characterization of what constitutes an "actual controversy" in *Aetna Life*. The dispute between Teva and Pfizer whether the '699 patent is invalid or not infringed is not "hypothetical or abstract." It concerns the validity of a specific patent and its application to the specific pharmaceutical formulation set forth in Teva's ANDA. It "touches the legal relations of parties having adverse legal interests." By law, Teva has committed an act of infringement and seeks permission to sell its generic sertraline product without Pfizer's permission before the expiration of the '699 patent. Teva seeks "specific relief of a conclusive character," i.e. a legally binding determination that the '699 patent is invalid and/or not infringed and that Teva can go to market immediately upon the expiration of the '518 patent. Teva has asserted a "concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged." *See Aetna Life*, 300 U.S. at 241. Teva's complaint for declaratory relief states a justiciable controversy under Article III.

>    3.    The "reasonable apprehension" test serves primarily
>           prudential, not constitutional, concerns.

If this, or any other, case is "justiciable" under Article III even though, *ex hypothesi,* the patentee has not taken sufficient concrete steps to give rise to a "reasonable apprehension" of suit, how should this Court's

traditional two-part test for determining the existence of an "actual

controversy" in patent declaratory judgment actions be understood? The

answer is that it is a prudential rule, adopted by this Court to guide district

courts in applying the admittedly vague language of the Declaratory

Judgment Act.

The jurisprudence of federal subject matter jurisdiction is replete with

examples of such prudential doctrines that result in federal courts' declining

jurisdiction in cases where there is no Article III obstacle to the exercise of

jurisdiction. For example, the Supreme Court has made it clear that the

requirement that the plaintiff seek to redress an injury in fact is required by

Article III. However, there are many additional standing doctrines that are

not constitutionally required but are regularly invoked to restrict the exercise

of federal court jurisdiction. *See, e.g., First Hartford Corp. Pension Plan &*

*Trust v. United States,* 194 F.3d 1279, 1290 (Fed. Cir. 1999) (shareholder

derivative suit standing requirement of Fed. R. Civ. P. 23.1 is "prudential"

standing limitation, not a "constitutional" limitation). Similarly, as this

Court has recognized, the "ripeness" doctrine "is a blend of prudential and

constitutional concepts." *Bayou des Familles Dev. Corp. v. United States,*

130 F.3d 1034, 1037 (Fed. Cir. 1997). The doctrine of exhaustion of

administrative remedies is a prudential ripeness doctrine, not a constitutional

limitation on jurisdiction, reflecting the reluctance of courts as a policy matter to intrude in a controversy when the action of an administrative agency might obviate the need for the court to do so. *Id.* The principal difference between constitutional and prudential limits on subject matter jurisdiction is that Congress can "negate" the latter as it sees fit in exercising its power to define the jurisdiction of the federal courts within the limits of Article III. *See Bennett v. Spear,* 520 U.S. 154, 162 (1997).

Neither this Court nor the Supreme Court has ruled that the "reasonable apprehension" test in itself is a constitutional requirement. This Court has used the language of policy and prudence, rather than constitutional "irreducibility," to describe the test. *See, e.g., Arrowhead,* 846 F.2d at 736 (traditional test is a "test often useful in evaluating complaints for declaratory judgments in patent cases"); *see also Fina Oil,* 123 F.3d at 1470 ("[s]atisfaction of th[e] traditional two part test is not ... a prerequisite to jurisdiction in every possible patent declaratory judgment action"; it is merely a means to assure "that the declaratory plaintiff has enough interest in the subject matter of the suit and that the disagreement between the parties is real and immediate"); *Hunter Douglas,* 153 F.3d at 1327 (test "contributes to policing the boundary between a constitutional controversy . . . and 'a

difference or dispute of a hypothetical or abstract character'") (citation omitted).

The *BP Chemicals* case makes clear that the "reasonable apprehension" test serves prudential policies as well as constitutional requirements. In that case, a non-manufacturing company in the business of licensing its technology to others brought a declaratory judgment action against a patentee seeking a declaration that its licensees would not infringe the defendant's patent by practicing the licensed technology. 4 F.3d at 976. The plaintiff, as a non-manufacturer, faced no threat of an infringement action itself. In explaining its affirmance of the district court's dismissal for want of an "actual controversy," the Court stressed that plaintiffs "must assert their own legal rights and interests." *Id.* at 981 (citing *Warth v. Seldin,* 422 U.S. 490, 499 (1975)). As the Supreme Court made clear in *Warth,* the principle that requires courts ordinarily not to entertain claims made to enforce the rights of third parties is a prudential, not a constitutional rule, from which the Court departs where circumstances warrant, 422 U.S. at 509; *see also, e.g., Craig v. Boren,* 429 U.S. 190, 193-94 (1976) (beer vendor has standing to assert equal protection rights of college-aged men denied the right to purchase beer when their female peers are permitted to do so).

Moreover, this Court has identified a principal purpose of the "reasonable apprehension" test to carry out what it perceives to be the *statutory* policy of the Declaratory Judgment Act, "not to drag a non-threatening patentee into court." *Shell Oil,* 970 F.2d at 889; *see Arrowhead,* 846 F.2d at 736 (reasonable apprehension is rule that "protects quiescent patent owners against unwarranted litigation."). Even if one grants that this is one of the policies served by the Declaratory Judgment Act, there is no plausible argument that protecting purely passive patentees from defending their patents is required by Article III. There is no question that Congress could require even "non-threatening" patentees to defend their patents if it expressly authorized would-be infringers that have taken concrete steps toward infringement (and thus face Article III injury in fact) to challenge those patents, and could do so without directing the courts to decide abstract, hypothetical disputes contrary to Article III.

In fact, that is exactly what Congress has done in the Medicare Amendments to the Hatch-Waxman Act. Congress made explicit what was surely implicit in the Hatch-Waxman Act as enacted in 1984, i.e., that ANDA applicants not sued within 45 days of submitting a Paragraph IV certification could commence an action seeking a declaration of invalidity or non-infringement with respect to a patent listed in the Orange Book.

Congress made this explicit precisely to avoid the anomalies described in *Mova* and *3M,* and to permit ANDA applicants to avoid potentially catastrophic liability by resolving patent issues before going to market. Congress made this decision applicable to all pending cases, including this one.

Congress has directed the federal courts to exercise jurisdiction over such declaratory judgment actions to the limits of Article III. Medicare Amendments §§1101(a)(2)(C), 1101(d). Accordingly, the "reasonable apprehension of suit" test can no longer be invoked simply to protect "quiescent" patentees. Nor can it be invoked in furtherance of any merely prudential jurisdictional rule.[21] It can only be invoked when it is necessary

---

[21]   Moreover, even though the Declaratory Judgment Act in general permits courts to exercise discretion not to hear such cases, despite the existence of an "actual controversy," *EMC,* 89 F.3d at 813, the congressional mandate to entertain such suits to the constitutional limit has eliminated such discretion in cases brought by ANDA applicants to declare listed patents invalid or not infringed.

Judge Stearns did not purport to decide this case as a matter of discretion. He ruled that he lacked power to proceed in the absence of proof of a "reasonable apprehension of suit," and concluded, erroneously, that such proof was absent. (A8)  However, the district court in the *Dr. Reddy* case, on which Judge Stearns relied, did purport to exercise discretion not to entertain Dr. Reddy's declaratory judgment action against Pfizer regarding the same patent. *See* 2003 WL 21638254, at *8.  Under the Medicare Amendments, such discretion is no longer available and is not available as an alternative ground for affirmance in this case.  In any event, since the District Court did not purport to exercise discretion in dismissing the case, even if this Court concluded that district courts retain discretion under the Declaratory Judgment Act in Hatch-Waxman cases, and further concluded that exercising such discretion to protect the ability of Pfizer and IVAX to "park" the latter's exclusivity would not be an abuse of discretion *per se,*

*(continued on next page)*

to prevent the assertion of jurisdiction in a dispute that falls below the "irreducible minimum" of Article III.

Since Teva's claim plainly does not fall below this minimum, it is immaterial as a matter of law whether Pfizer's actions have given rise to a reasonable apprehension of suit. The District Court erred in dismissing Teva's complaint. The judgment of dismissal must be vacated and the case remanded for proceedings on the merits of Teva's claim for declaratory relief.

---

the proper response would not be to affirm, but rather to remand for the District Court to exercise its discretion in the first instance. *See United States v. Genao*, 343 F.3d 578, 586-87 (2d Cir. 2003).

*Conclusion*

For the foregoing reasons, the dismissal of Teva's declaratory

judgment complaint should be vacated and the case remanded to the District

Court for resolution of Teva's claims for declaratory relief on their merits.

Respectfully submitted,

_____

Henry C. Dinger, P.C.
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

Steven J. Lee
Thomas J. Meloro
KENYON & KENYON
One Broadway
New York, New York 10004
(212) 415-7200

Counsel for Teva Pharmaceuticals
USA, Inc.

March 22, 2004

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of F.R.A.P. 32(a)(7)(C).  This brief contains 13,161 words as calculated by the "Word Count" feature of Microsoft Word XP, the word processing program used to create it.

_____
Henry C. Dinger

March 22, 2004

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of March, 2004, two copies of Brief of Plaintiff-Appellant, Teva Pharmaceuticals USA, Inc. was served by hand upon:

Timothy C. Blank                         Robert J. Muldoon, Jr.
DECHERT, LLP                             SHERIN AND LODGEN LLP
200 Clarendon Street                     100 Summer Street, Suite 2800
27th Floor                               Boston, MA 02110-2109
Boston, MA 02116                         (617) 646-2000
(617) 728-7100

and by Federal Express upon:

Dimitrios T. Drivas                      Thomas J. Meloro
WHITE & CASE, LLP                        KENYON & KENYON
1155 Avenue of the Americas              One Broadway
New York, NY 10036-2787                  New York, NY 10004
(212) 819-8396                           (212) 425-7200


                                 _____
                                     Henry C. Dinger, P.C.

61