TEVA PHARMACEUTICALS USA, INC. v. FDA, Case No. 05-1469 (JDB)

# EXHIBIT 6:

Brief of Appellant Teva Pharmaceuticals USA, Inc. in *Teva Pharmaceuticals USA, Inc. v. FDA*, no. 99-5022 (D.C. Cir.)

("Teva *Teva I* D.C. Circuit Br.")

ORAL ARGUMENT UNSCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

# No. 99-5022

TEVA PHARMACEUTICALS USA, INC.,
                                    Plaintiff/Appellant

v.

UNITED STATES FOOD AND DRUG ADMINISTRATION,
                                                    et al.,
                                    Defendant/Appellees.

APPEAL FROM DENIAL OF PRELIMINARY INJUNCTIVE
RELIEF BY THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

BRIEF OF APPELLANT
TEVA PHARMACEUTICALS USA, INC.

James N. Czaban
Geoffrey M. Levitt
David M. Malone (Counsel of Record)

VENABLE, BAETJER, HOWARD & CIVILETTI, LLP
1201 New York Avenue, NW
Suite 1000
Washington, D.C.  20005-3917
202/962-4800

ATTORNEYS FOR APPELLANT
TEVA PHARMACEUTICALS USA, INC.

## Rule 28(a)(1) Certificate

### Parties

Appellant Teva Pharmaceuticals USA, Inc. appeared as plaintiff in this matter before the United States District Court for the District of Columbia. Appellant-intervenor Purepac Pharmaceutical Co. was granted leave to intervene as a plaintiff in the district court after the Notice of Appeal was filed. Appellees United States Food and Drug Administration and Donna E. Shalala, in her official capacity as Secretary of the Department of Health and Human Services, appeared as defendants. Appellee-intervenors Hoffman-La Roche, Inc./Syntex (USA) Inc. and TorPharm, a Division of Apotex, Inc. appeared as defendant-intervenors.

### Rulings Under Review

This is an appeal of the January 21, 1999 order of Judge Colleen Kollar-Kotelly of the United States District Court for the District of Columbia denying Teva's Application for a Temporary Restraining Order and Motion for a Preliminary Injunction. The order is unreported and is included in the Joint Appendix ("JA") at page 146.

### Related Cases

There are no related cases.

I hereby certify this 1st day of February, 1999 that the foregoing is a complete and accurate statement regarding the parties, rulings, and related cases.

_____
David M. Malone

i

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Counsel of record for Teva hereby certify that, to the best of our knowledge and belief, the attached list (on next page) shows all subsidiaries or affiliates of Teva Pharmaceutical Industries, Ltd., the corporate parent company of Teva, that have any outstanding securities in the hands of the public. We further state that, insofar as relevant to the litigation before this Court, Teva is engaged in the manufacture, marketing, sale and distribution of generic pharmaceutical products.

These representations are made in order that judges of this Court may determine the need for recusal.

David M. Malone
February 1, 1999

ii

# TEVA PHARMACEUTICAL INDUSTRIES, LTD.
## SUBSIDIARY AND ASSOCIATED COMPANIES*
### AT DECEMBER 31, 1998

| Name of Company | Activity |
| --- | --- |
| **Subsidiaries:** | |
| Teva Pharmaceuticals USA, Inc. | Production, importation to the United States and marketing of pharmaceutical products |
| Abic Ltd. and its wholly-owned subsidiaries (99.3%) | Production and marketing of pharmaceutical and veterinary products |
| Salomon, Levin and Elstein Ltd. | Marketing and distribution of the Company's pharmaceutical products and imported pharmaceuticals |
| Assia Chemical Industries Ltd. | Production of active pharmaceutical ingredients for the pharmaceutical industry |
| Teva Tech Ltd. | Production of active pharmaceutical ingredients for the pharmaceutical industry |
| Plantex Ltd. | Production of raw materials for the pharmaceutical industry |
| Teva Pharmaceuticals Europe BV and its wholly-owned subsidiaries | Marketing of pharmaceutical, chemical and veterinary products |
| Biogal Pharmaceutical Works Ltd., Hungary (97%) | Production and marketing of active pharmaceutical ingredients and pharmaceutical products |
| Pharmachemie BV | Production and marketing of pharmaceutical products |
| APS/Berk Ltd., U.K. | Manufacture and distribution of pharmaceutical products |
| Prosintex Industrie Chimiche Italiane S.r.l., Italy | Production and marketing of active pharmaceutical ingredients for the pharmaceutical industry |
| Teva Medical Ltd. | Manufacture of medical products and equipment for hospital use |
| Teva Medical Trading Ltd. | Importation and marketing in Israel of Travenol-Baxter products |
| Gry-Pharma GmbH, Germany (93.3%) | Marketing of pharmaceutical products |
| Biological Laboratories Teva Ltd. | Production and distribution of veterinary drug products |
| Teva Holdings Ltd. | Financing |

**Associated Companies:**

| | |
| --- | --- |
| Prographarm Laboratories, France (34%) | Production of pharmaceutical products |
| Portman Pharmaceuticals Inc., U.S. (30%) | Research and Development |

* 100% owned and controlled except as where otherwise noted.

**The above list does not include subsidiaries engaged in the distribution of pharmaceutical, chemical and veterinary products in North and South America, Europe and Africa or inactive subsidiaries.**

# TABLE OF CONTENTS

**Page**

RULE 28(a)(1) CERTIFICATE ................................................................ i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT................................ii

TABLE OF CONTENTS................................................................ iv

TABLE OF AUTHORITIES ................................................................ vii

GLOSSARY ................................................................................ x

CERTIFICATE OF SERVICE AND COMPLIANCE WITH CIRCUIT RULE 28........ xii

INTRODUCTION ..........................................................................2

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ............................................................................2

ISSUE PRESENTED ON APPEAL................................................3

STATUTES AND REGULATIONS ................................................4

STANDARD OF REVIEW ..............................................................4

STATEMENT OF THE CASE.........................................................4

    Factual Background ................................................................4

    The Proceedings Below ..........................................................7

SUMMARY OF ARGUMENT ........................................................9

ARGUMENT ..............................................................................10

    I.    THE DISMISSAL OF TEVA'S HATCH-WAXMAN
        DECLARATORY JUDGMENT ACTION MUST BE
        TREATED AS A "COURT DECISION TRIGGER" FOR
        PURPOSES OF STARTING TEVA'S 180-DAY WAITING
        PERIOD FOR EFFECTIVE APPROVAL OF ITS
        TICLOPIDINE ANDA ..........................................................10

        A.    The "Court Decision Trigger" Provision Of The
            Statute Does Not Directly Address Whether The
            Dismissal Of Teva's Declaratory Judgment Action
            Against Roche On Case Or Controversy Grounds

Triggered the 180-Day Delay Period Applicable To
The Effective Approval Date Of Teva's Ticlopidine
ANDA ..................................................................................................10

B.   FDA's Refusal To Treat The Dismissal Of Teva's
Hatch-Waxman Declaratory Judgment Action As a
Court  Decision Trigger Is Based On An
Unreasonable and Impermissible Statutory
Interpretation ......................................................................................14

1.   FDA's Interpretation of the Court Decision
Trigger is Unreasonable Because It Renders
the Hatch-Waxman Declaratory Judgment
Action Mechanism Effectively Inoperative ......................15

2.   FDA's Interpretation Allows Holders of
Invalid, Unenforceable, Or Non-Infringed
Patents to Thwart The Statutory Mechanisms
Congress Created to Expedite Generic
Market Entry ....................................................................18

C.   It is Reasonable And Necessary to Interpret The
Dismissal of Teva's Declaratory Judgment Action
As Triggering the Start of the 180-Day Delay
Period Applicable to Effective Approval of Teva's
Ticlopidine ANDA ..............................................................................20

1.   Recognizing the Dismissal of Teva's
Declaratory Judgment Action As Triggering
the Start of the 180-Day Delay Period Is
Consistent with the Structure and Purpose of
the 1984 Amendments ......................................................20

2.   The California Court's Case Or Controversy
Dismissal Is Equivalent To A Judgment Of
Unenforceability ..............................................................23

3.   The FDA Itself Has Recognized An
Analogous Court Action As Triggering the
Start of the 180-Day Delay Period ..................................25

II.   EQUITABLE CONSIDERATIONS WARRANT THE
ISSUANCE OF A PRELIMINARY INJUNCTION ................................27

A.   Teva Will Be Irreparably Harmed Without the
Requested Preliminary Injunction ................................................27

B.     The Balance of Harms Weighs In Favor Of Teva's
       Request For Preliminary Injunctive Relief .....................................29

C.     The Public Interest Strongly Supports Granting The
       Requested Injunction .....................................................................31

III.   NOTICE-AND-COMMENT RULEMAKING IS NOT
       REQUIRED TO ESTABLISH THE EFFECTIVE DATE OF
       TEVA'S TICLOPIDINE ANDA ...............................................................32

CONCLUSION.............................................................................................................32

## TABLE OF AUTHORITIES

**Cases**

Abbott Laboratories v. Young, 920 F.2d 984, 988 (D.C. Cir. 1990),
cert. denied, 502 U.S. 819 (1991). ...................................................................................24

Asiana Airlines v. FAA, 134 F.3d 393, 398 (D.C. Cir. 1998). .....................................24-25

Bracco Diagnostics, Inc. v. Shalala, 963 F. Supp. 20 (D.D.C. 1997). .................24, 37-38

C.F. Communications Corp. v. FCC, 128 F.3d 735, 739 (D.C. Cir. 1997). .....................24

* Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467
U.S. 837, 842-43 (1984). ..............................................................................22, 24, 29

Cold Metal Process Co. v. E.W. Bliss Co., 21 F. Supp. 509 (D. Del.
1937). ...................................................................................................................31

Eli Lilly v. Medtronic, 496 U.S. 661 (1990). ...............................................................30

Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1483-1484 (Fed. Cir.
1998). ...................................................................................................................34

Granutec, Inc. v. Shalala,139 F.3d 889 (table),1998 WL 153410 (4th Cir.
April 3, 1998). ......................................................................................22-23, 26, 35-37

Merck v. Danbury, 694 F. Supp. 1 (D.Del. 1988), aff'd 873 F.2d 1418
(Fed. Cir. 1989). ...............................................................................................33-34

Mova Pharmaceutical Corp. v. Shalala, 955 F. Supp. 128 (D.D.C. 1997),
aff'd 140 F.3d 1060 (D.C. Cir. 1998). .............................................................20, 37-38, 42

* Mova Pharmaceutical Corp. v. Shalala, 140 F.3d
1060 (D.C. Cir. 1998). ..................................................................11-13, 22-23, 26-28, 32

Purepac Pharmaceutical Co. v. Friedman, No. 98-5334, -- F.3d --, 1998
WL 898347 (D.C. Cir. Dec. 29, 1998). ..........................................................................12

Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636 (Fed. Cir. 1991). .....................34

Super Sack Manufacturing Corp. v. Chase Packaging Corp., 57 F.3d
1054, 1059 (Fed. Cir. 1995), cert. denied, 516 U.S. 1093 (1996). ............................32, 34

*Authorities upon which we chiefly rely are marked with asterisks.

United States v. Thompson, 251 U.S. 407, 412 (1920). ...................................................12

United States v. Ron Pair Enterprises, 489 U.S. 235 (1989). .......................................21, 24

**Statutes and Regulations**

5 U.S.C. § 551 et seq. ....................................................................................................11

21 U.S.C. § 355(j). ........................................................................................................13

21 U.S.C. § 355(j)(2)(A)(vii)(IV). .................................................................................14

*21 U.S.C. § 355(j)(5)(B). .............................................................................................16

* 21 U.S.C. § 355(j)(5)(B)(iii). ........................................................................14-15, 27-30

21 U.S.C. § 355(j)(5)(B)(iii)(II). ...............................................................................27, 29

* 21 U.S.C. § 355(j)(5)(B)(iv). ...................................................................................27, 28, 33

21 U.S.C. § 355(j)(5)(B)(iv)(I). ...............................................................11, 12, 16, 17, 20

28 U.S.C. § 1331. ..........................................................................................................12

28 U.S.C. § 1391(e). ......................................................................................................12

28 U.S.C. § 2201. .......................................................................................................12, 15

28 U.S.C. § 2202. ..........................................................................................................15

35 U.S.C. § 271(e)(1). ....................................................................................................15

35 U.S.C. § 271(e)(2). .................................................................................................14, 15, 30

35 U.S.C. § 281-285 .......................................................................................................15

21 C.F.R. § 314.94(a)(12)(i)(A)(4). ...............................................................................33

21 C.F.R. § 314.107(a)(12)(i)(4). ...................................................................................23

21 C.F.R. § 314.107(c). ..................................................................................................20

21 C.F.R. § 314.107(e)(1). ..............................................................................................34

21 C.F.R. § 314.107(e)(2)(i). ..........................................................................................34

59 Fed. Reg. 50,338, 50,339 (Final Rule, October 3, 1994)............................................23

### Other Authorities

Black's Law Dictionary 407 (6th ed. 1990)........................................................................21

H.R. Rep. No. 857, 98th Cong., 2d Sess., pt. II at 15 (1984) reprinted in
1984 U.S.C. C.A.N. 2686, 2699. ...................................................................................26

Advisory Committee's Notes to Federal Rules of Civil Procedure, Rule
16 (1983)...........................................................................................................................25

# GLOSSARY

## ANDA

Abbreviated New Drug Application.

## Commercial Marketing Trigger

A statutory provision pursuant to which a Paragraph IV ANDA applicant's 180-Day Delay Period starts on the date that a previous Paragraph IV ANDA applicant first commercially markets its version of the drug at issue. See 21 U.S.C. § 355(j)(5)(B)(iv)(I).

## Court Decision Trigger

A statutory provision pursuant to which a Paragraph IV ANDA applicant's 180-Day Delay Period starts on the date of a qualifying court decision. FDA's interpretation of this provision is the underlying issue in this appeal. See 21 U.S.C. § 355(j)(5)(B)(iv)(II).

## FDA

The United States Food and Drug Administration.

## FFDCA

Federal Food, Drug, and Cosmetic Act.

## Hatch-Waxman Amendments

The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984). This Act established the current system for review and approval of generic drug applications, including the patent challenge system involved in this case.

## Hatch-Waxman Declaratory Judgment Action

A declaratory judgment action brought by a Paragraph IV ANDA applicant against the holder of a Listed Patent, seeking judicial resolution of the claims of patent non-infringement, invalidity, or unenforceability made in the applicant's Paragraph IV Certification. See 21 U.S.C. § 355(j)(5)(B)(iii).

x

**Listed Patent**

A patent covering an FDA-approved drug substance or an approved method of using a drug, which is listed in FDA's publication <u>Approved Drug Products With Therapeutic Equivalence Evaluations</u>, also known as the "Orange Book." <u>See</u> 21 U.S.C. § 355(b)(1).

**Paragraph IV ANDA**

An ANDA that seeks FDA approval to market a drug prior to the expiration date of a listed patent covering the drug. <u>See</u> 21 U.S.C. §§ 355(j)(2)(A)(vii)(IV) and 355(j)(2)(B)(ii). Paragraph IV ANDAs, by definition, must contain a Paragraph IV Certification. The filing of a Paragraph IV ANDA is an act of patent infringement that establishes subject matter jurisdiction for federal courts to hear and decide a Paragraph IV Infringement Action or a Hatch-Waxman Declaratory Judgment Action. <u>See</u> 35 U.S.C. § 271(e)(2).

**Paragraph IV Certification**

A certification submitted to FDA as part of an ANDA, stating that a listed patent covering the drug is invalid, unenforceable, or will not be infringed by the future commercial marketing of the generic version for which the ANDA was submitted. <u>See</u> 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

**Paragraph IV Infringement Action**

A special type of patent infringement lawsuit which may only be brought by a holder of a Listed Patent within 45 days of its receipt of a Paragraph IV ANDA applicant's Paragraph IV Notification. <u>See</u> 21 U.S.C. § 355(j)(5)(B)(iii).

**Paragraph IV Notification**

A detailed explanation of the factual and legal bases supporting the claims made in a Paragraph IV Certification. A Paragraph IV Notification must be provided to the holder of the listed patent, and the holder of the approved full New Drug Application for the drug for which the ANDA was submitted. <u>See</u> 21 U.S.C. § 355(j)(2)(B).

**180-Day Delay Period, or "Generic Exclusivity Period"**

The delay period to be imposed upon the effective date of all Paragraph IV ANDAs for which there exists a previously filed Paragraph IV ANDA for the same drug. <u>See</u> 21 U.S.C. § 355(j)(5)(B)(iv). (Because this period may be started (or "triggered"), and may even expire, before the previous applicant has begun marketing, the common term "generic exclusivity period" is a misnomer.)

## CERTIFICATE OF SERVICE AND COMPLIANCE WITH CIRCUIT RULE 28

I HEREBY CERTIFY that on this first day of February, 1999, this BRIEF OF APPELLANT TEVA PHARMACEUTICALS USA, INC. was served by hand-delivery on the following persons:

Frank E. Hunger
Eugene Thirolf
Andrew E. Clark
Drake Cutini
Department of Justice
Office of Consumer Litigation
National Place Building
1331 Pennsylvania Avenue, N.W.
Room 950 N
Washington, D.C.  20004
Counsel for Federal Defendants

Margaret Jane Porter
Anne Miller
United States Food and Drug Administration
5600 Fishers Lane
Room 671
Rockville, MD 20857

Eugene M. Pfeifer
James D. Miller
King & Spalding
1730 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Counsel for Appellee TorPharm, a Division of Apotex, Inc.

Donald Beers
David Korn
Nancy Lapidus
Arnold & Porter
555 12th Street, N.W.
Washington, D.C.  20004
Counsel for Appellee Hoffman-La Roche Inc.

Robert A. Dormer
James R. Phelps
Hyman, Phelps & McNamara, P.C.
700 Thirteenth Street, N.W.
Washington, D.C.  20005
Counsel for Appellant Purepac Pharmaceutical Co.

I FURTHER CERTIFY that this Brief does not exceed 12,500 words, as provided by Circuit Rule 28(d).

David M. Malone

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

TEVA PHARMACEUTICALS USA, INC.,                )
                                               )
    Plaintiff/Appellant, and                   )
                                               )
PUREPAC PHARMACEUTICAL CO.,                    )
                                               )
    Intervenor/Plaintiff/Appellant             )
                                               )
              v.            )      No. 99-5022
                                               )
THE UNITED STATES FOOD                         )
AND DRUG ADMINISTRATION, and                   )
                                               )
DONNA E. SHALALA,                              )
Secretary of Health and Human Services,        )
                                               )
    Defendants/Appellees,                      )
                                               )
                                               )
                                               )
TORPHARM, A DIVISION OF                        )
APOTEX, INC., and                              )
                                               )
HOFFMAN-LA ROCHE, INC./ SYNTEX                 )
(U.S.A.) INC.,                                 )
                                               )
    Intervenors/Defendants/Appellees           )

## BRIEF OF APPELLANT
## TEVA PHARMACEUTICALS USA, INC.

## INTRODUCTION

This appeal presents a narrowly focused question of statutory construction arising from the misinterpretation by the Food and Drug Administration ("FDA") of a provision of the Federal Food, Drug, and Cosmetic Act. The provision at issue, 21 U.S.C. § 355(j)(5)(B)(iv)(II) (the "Court Decision Trigger") establishes the start of the statutory 180-Day Delay Period applicable to effective approval of certain Abbreviated New Drug Applications ("ANDAs"). In this action, Teva seeks a preliminary injunction ordering FDA to apply the Court Decision Trigger so as to allow Teva to receive final approval of its already tentatively approved ANDA for the drug ticlopidine hydrochloride ("ticlopidine") on February 10, 1999. The statutory interpretation advanced by Teva as the basis for this request was discussed favorably by this court in Mova Pharmaceuticals Inc. v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998), and was acknowledged by both FDA and the district court in this case to be a reasonable interpretation. In contrast, as shown infra, FDA's interpretation, under which the agency refuses to apply the Court Decision Trigger to permit effective final approval of Teva's ticlopidine ANDA on February 10, is unreasonable because it deprives the courts of their proper role in the statutory scheme at issue, produces demonstrably absurd results that could not have been intended by Congress, and renders the broader statutory scheme effectively null and void. Accordingly, the lower court erred in denying Teva's requested preliminary injunction.

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This action arises under the Administrative Procedure Act, 5 U.S.C. § 551 et seq., and the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 201 et seq. ("FFDCA").

2

Jurisdiction was proper in the district court pursuant to 28 U.S.C. §§ 1331 and 2201, and venue was proper under 28 U.S.C. § 1391(e). The order of the district court denying Teva's motion for a preliminary injunction was entered January 21, 1999, and notice of this appeal was timely filed on January 25, 1999.

## ISSUE PRESENTED ON APPEAL

Under the FFDCA, FDA must impose a 180-Day Delay Period on the effective approval date of an ANDA which challenges the validity or enforceability of a "listed" drug patent, or which claims that the patent will not be infringed by the generic version of the drug for which ANDA approval is sought (i.e., a "Paragraph IV ANDA"), if there is a previously filed ANDA for the same drug that also includes such a patent challenge. (The 180-Day Delay Period has been the subject of two recent cases before this court, Mova, 140 F.3d 1060 and Purepac Pharmaceutical Co. v. Friedman, No. 98-5334, -- F.3d --, 1998 WL 898347 (D.C. Cir. Dec. 29, 1998), although the specific legal questions presented by the instant case were not at issue in those cases.) Under limited circumstances, a Paragraph IV ANDA applicant who has not been sued by the patent holder may seek to trigger the start of its 180-Day Delay Period by bringing a declaratory judgment action seeking judicial resolution of its claim of invalidity, unenforceability, or non-infringement. It is not disputed that a fully litigated judgment in favor of the ANDA applicant in such an action would satisfy the "Court Decision Trigger" of 21 U.S.C. § 355(j)(5)(B)(iv)(II). Teva brought such an action against the ticlopidine patent holder, Syntex (U.S.A.) Inc. In response, Syntex expressly represented to the court that Teva's ticlopidine product does not infringe Syntex's patent, and that Syntex would not sue Teva for patent infringement. On that basis, the court found that Teva did not have a

3

reasonable apprehension of being sued for patent infringement, and dismissed the

declaratory judgment action on "case or controversy" grounds. FDA, however, refused

to trigger Teva's 180-Day Delay Period as of the date of that dismissal.

This issue presented by this appeal is:

> Whether the district court erred in denying a preliminary injunction ordering the
> FDA to treat the dismissal of Teva's Hatch-Waxman Declaratory Judgment
> Action as sufficient to activate the Court Decision Trigger, where that denial
> allows the patent holder unilaterally to frustrate the intended operation of the
> statute and artificially extend its monopoly by announcing its intention not to
> enforce its patent.

## STATUTES AND REGULATIONS

The statutes and regulations upon which Teva chiefly relies are included in the

addendum attached hereto.

## STANDARD OF REVIEW

This appeal presents a question of statutory interpretation under the FFDCA and

is reviewed de novo by the Court of Appeals. Mova, 140 F.3d at 1066.

## STATEMENT OF THE CASE

### Factual Background

Teva manufactures and distributes generic prescription drugs subject to the

regulatory oversight of FDA pursuant to the FFDCA. See Joint Appendix ("JA") 169.

On June 20, 1997, Teva filed an ANDA pursuant to 21 U.S.C. § 355(j) seeking FDA

approval to market a generic version of ticlopidine, a widely used drug that is prescribed

4

to minimize the risk of thrombotic strokes. Teva's ANDA was a special type known as a "Paragraph IV ANDA" which allows applicants to seek approval to market the drug prior to the expiration date of any patents that may be "listed" for the original approved version of the drug. 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The only listed patent for ticlopidine is U.S. Patent No. 4,591,592 (the " '592 patent"), a formulation patent held by Syntex (U.S.A.) Inc. ("Syntex"). Syntex's version of ticlopidine is marketed by Hoffman-La Roche ("Roche") under the brand name Ticlid®.[1]

Teva's ANDA included a Paragraph IV Certification stating that its formulation of ticlopidine would not infringe the '592 patent. As required, Teva provided Syntex with a Paragraph IV Notification disclosing the filing of its ANDA and the bases upon which Teva had concluded that its version of ticlopidine would not infringe the Syntex patent. Teva's Paragraph IV Notification began a 45-day window during which Syntex could object to Teva's proposed pre-patent-expiration marketing of ticlopidine by filing a special type of patent infringement action pursuant to 21 U.S.C. § 355(j)(5)(B)(iii) and 35 U.S.C. § 271(e)(2). Filing such an action would have automatically delayed the effective approval date of Teva's ANDA for up to 30 months, i.e. until the end of 1999. However, after evaluating Teva's Paragraph IV Notification of non-infringement and analyzing samples of Teva's ticlopidine product (provided voluntarily by Teva at Syntex's request), Syntex did not file such an action. See JA 172; 21 U.S.C. § 355(j)(5)(B)(iii).

On June 8, 1998, Teva brought a declaratory judgment action against Syntex in the U.S. District Court for the Northern District of California pursuant to 21 U.S.C.

---

[1]    Although Roche was not a party to Teva's declaratory judgment action, Roche and Syntex are under common ownership and control, and have jointly intervened in the instant action as defendants. Accordingly, the two will be referred to interchangeably herein, consistent with context.

§ 355(j)(5)(B)(iii), 35 U.S.C. §§ 271, 281-285, and 28 U.S.C. §§ 2201 and 2202, seeking

to resolve any dispute concerning the claims of non-infringement made in Teva's

Paragraph IV Notification. See JA 182. After Teva filed its declaratory judgment action,

Syntex conceded in writing that Teva's ticlopidine product does not infringe Syntex's

ticlopidine patent, and represented that Syntex would not bring any action to enforce the

patent against Teva's marketing of the drug. See JA 193. Syntex's acknowledgement of

non-infringement and non-enforcement stated: "Based on the information that [Teva]

provided us, we are of the opinion that the formulation used in [Teva's] ticlopidine

hydrochloride tablets does not infringe U.S. Patent 4,591,592. We will make no claim of

patent infringement based on the sale of ticlopidine hydrochloride tablets having the

formulation that [Teva] disclosed to us." See JA 193.

In light of this development, Teva promptly sought to resolve the declaratory

judgment action by proposing entry of a one-page consent judgment that would simply

incorporate Syntex's admission that "the manufacture, use or sale of the ticlopidine

hydrochloride tablets for which Teva USA submitted an Abbreviated New Drug

Application to the U.S. Food and Drug Administration in 1997 will not infringe U.S.

Patent 4,591,592." See JA 194. Syntex rejected this reasonable proposal, see JA 200,

and instead insisted on filing a motion to dismiss the action on the same grounds upon

which Teva's proposed consent judgment was based - namely, that all parties were in

agreement that Teva's product does not infringe Syntex's ticlopidine patent and that the

patent is unenforceable against Teva. See JA 201.

After considering all the evidence presented by Teva and Syntex regarding Teva's

claim of non-infringement, the court heard oral argument on August 14, 1998, and

6

dismissed the action the same day. The basis for the dismissal was that in view of Syntex's concession of non-infringement, Teva lacked a reasonable apprehension that Syntex could bring an infringement action to enforce the '592 patent, and the court was thus deprived of "case or controversy" jurisdiction. See JA 242.

On October 29, 1998, FDA approved Teva's ticlopidine ANDA, having determined that Teva's ticlopidine product is safe and effective and meets all applicable substantive standards for marketing. However, FDA made this approval "tentative" - meaning that it has postponed the date on which Teva may begin to market its product - on the ground that Teva cannot market its product until 180 days after the previous Paragraph IV ticlopidine ANDA applicant, Intervenor/Defendant/Appellee TorPharm, a Division of Apotex, Inc. ("TorPharm"), first markets its product, or 180 days after "the date of a court decision described under section 505(j)(5)(B)(iv), whichever is earlier." See JA 244. (The Paragraph IV ANDA of Intervenor/Appellant Purepac Pharmaceutical Co. was also issued a tentative approval by FDA on July 15, 1998, subject to the same conditions as Teva's tentative approval.)

Following the dismissal of its declaratory judgment action, and again upon receipt of the tentative approval of its ANDA, Teva notified FDA of the Order of dismissal and of Teva's position that such Order constitutes a "court decision" for purposes of 21 U.S.C. § 355(j)(5)(b)(iv)(II), thus starting Teva's 180-Day Delay Period. FDA, however, never responded to Teva's repeated requests to recognize the start of that period.

**The Proceedings Below**

Teva filed this action on January 11, 1999 seeking a temporary restraining order and a preliminary injunction directing the FDA to convert its existing tentative approval

7

of Teva's ticlopidine ANDA into an effective final approval so that Teva may market its ticlopidine product as of February 10. The district court set an expedited briefing schedule, and, on January 21, entered its Memorandum Opinion and Order denying the requested relief. The district court (1) recognized that Teva's interpretation of the statute is reasonable, JA 158, and (2) acknowledged that FDA's interpretation of 21 U.S.C. § 355(j)(5)(B)(iv)(II) would allow patent holders to "artificially extend" their non-patent based monopoly by "manipulating the Court Decision Trigger" as Roche has done here. JA 159. Nevertheless, the court concluded that FDA's interpretation was permissible and was entitled to judicial deference, and suggested that notice-and-comment rulemaking would be required for FDA to change that interpretation. JA 158, 160.

## SUMMARY OF ARGUMENT

Contrary to the lower court's conclusion, FDA's refusal to treat the dismissal of Teva's declaratory judgment action as a triggering event is not a reasonable construction of the law, and is thus impermissible under Chevron. In contrast, this Court in Mova, as well as both the district court and FDA in this case, have acknowledged that treating the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action as a Court Decision Trigger would be reasonable and permissible, and consistent with Congressional intent. In this case, the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action serves the same statutory purpose as, and is functionally equivalent to, a final decision of non-infringement and unenforceability on the merits because it was based upon the patent holder's express representation to Teva and to the court (1) that Teva's ticlopidine formulation does not infringe the patent, and (2) that Syntex would not sue Teva for patent infringement. Because Teva's reasonable statutory construction is the only possible alternative to the FDA's impermissible construction under the circumstances of this case, further FDA rulemaking is not required in order to recognize the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action as a "court decision" trigger. In addition, Teva satisfies the equitable requirements for issuance of a preliminary injunction. This court should therefore reverse the district court's denial of the requested preliminary injunction and order FDA to make Teva's ticlopidine ANDA effective as of February 10, 1999.

### ARGUMENT

I.  **THE DISMISSAL OF TEVA'S HATCH-WAXMAN DECLARATORY JUDGMENT ACTION IS A "COURT DECISION TRIGGER" FOR PURPOSES OF STARTING THE 180-DAY DELAY PERIOD ON EFFECTIVE APPROVAL OF TEVA'S TICLOPIDINE ANDA**

   A.  **The Statute Does Not Directly Address Whether The Dismissal Of Teva's Declaratory Judgment Action Against Roche On Case Or Controversy Grounds Triggered The 180-Day Delay Period Applicable To The Effective Approval Date Of Teva's Ticlopidine ANDA**

In determining the validity of FDA's position that the August 14, 1998 case or controversy dismissal of Teva's declaratory judgment action did not constitute a "court decision" triggering the 180-Day Delay Period applicable to effective approval of Teva's ticlopidine ANDA, the threshold question is whether "Congress has directly spoken to the precise question at issue," Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. If, however, the Congressional intent is not unambiguously expressed in the statute, the analysis must move on to the second part of the Chevron test, i.e., whether the agency's interpretation is permissible.

The lower court based its denial of the requested injunction at least partially on its view that the statutory provision at issue - the Court Decision Trigger - is "unambiguous" in excluding Teva's interpretation. JA 157. This view is, however, wrong. The Court Decision Trigger is, along with the Commercial Marketing Trigger, one of two alternative statutory triggers that determine the beginning of the 180-Day Delay Period applicable to the effective approval date of a paragraph IV ANDA which,

10

like Teva's ticlopidine ANDA, is not the first paragraph IV ANDA for the same drug.[2]

Together, these two trigger provisions operate to begin the 180-Day Delay Period on the

earlier of:

> (I) the date [FDA] receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
>
> **(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed . . . .**

21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added).

Applying the Chevron part 1 analysis in the context of this case, the question is

whether Congress has directly and unambiguously excluded a "case or controversy"

dismissal of a declaratory judgment action concerning infringement of the patent at issue

- a type of action that FDA, the court below, and this Court have all agreed is "an action

described in clause (iii)," see JA 93, 156; Mova, 140 F.3d at 1073 - from qualifying as a

"decision of a court . . . holding the patent which is the subject of the certification to be

invalid or not infringed." The answer is that it has not.

As an initial matter, the terms "decision" and "holding" as used in the Court

Decision Trigger provision - terms that appear to have been central to the rejection of

Teva's position by the court below, see JA 157 - are neither defined in the statute nor

inherently so precise in their legal meaning as to exclude the outcome obtained in Teva's

---

[2]       The statute does not actually refer to a "first" ANDA or to "subsequent" ANDAs, but rather applies the 180-Day Delay Period to a Paragraph IV ANDA that is "for a drug for which a previous [paragraph IV] application has been submitted . . . ." 21 U.S.C. § 355(j)(5)(B)(iv). FDA, however, has consistently interpreted this provision so as to award the potential benefits of the 180-Day Delay Period only to the first Paragraph IV Applicant, see 21 C.F.R. § 314.107(c). Inasmuch as this particular issue is not in dispute in this case either factually or legally, this brief will adopt FDA's usage on the matter for the sake of convenience.

11

declaratory judgment action. For instance, Black's Law Dictionary refers to the term "decision" as a "popular rather than technical or legal word; a comprehensive term having no fixed, legal meaning," and notes that "though sometimes limited to the sense of judgment, the term . . . may also include various rulings, as well as orders . . . ." Black's Law Dictionary 407 (6th ed. 1990).[3] Black's also defines "decision" as a "determination arrived at after consideration of facts, and, in legal context, law," id. This definition directly applies to the court's Order dismissing Teva's declaratory judgment action, which was based on consideration of the fact that Syntex had conclusively stated that Teva's ticlopidine does not infringe the patent and that it would not sue Teva for infringement.

"Holding" is a similarly imprecise term that Black's defines as the "legal principle to be drawn from the opinion (decision) of the court." Id. at 731. Again, this term clearly covers the Teva v. Syntex declaratory judgment outcome. As the court below acknowledged, the "legal principle" established by that outcome is that Roche/Syntex cannot sue Teva for infringement of the ticlopidine patent - in other words, that the Roche/Syntex ticlopidine patent is now unenforceable against Teva as a matter of law. See JA 158-159.

Not only are the relevant statutory terms themselves lacking in the kind of precision contemplated by the Chevron part 1 test, but FDA, the court below, the Court of Appeals for the Fourth Circuit, and this Court have all acknowledged that the Court

---

[3]    Indeed, the Supreme Court, in an analogous setting concerning whether the granting of a motion to quash an indictment fulfilled the applicable statutory requirement of a "decision or judgment sustaining a special plea in bar" in order to permit the government to take a direct writ of error to the Supreme Court, stated: "As it is settled that this question is to be determined, not by form but by substance, it follows that the fact that the ruling took the form of granting a motion to quash is negligible." United States v. Thompson, 251 U.S. 407, 412 (1920) (citations omitted).

Decision Trigger is sufficiently ambiguous to allow the interpretation advanced here by Teva. FDA, in its brief below, conceded that Teva's interpretation "may be a permissible construction of the statute." JA 98. Similarly, the district court, though at one point erroneously calling the statute "unambiguous," recognized that Teva's interpretation could be adopted by FDA in rulemaking under the FFDCA or by the Federal Circuit (as a matter of patent law) in a case, see JA 158. By definition, if an interpretation of a statute could be adopted by an agency in a rulemaking or by a court in a holding, that interpretation cannot be unambiguously precluded by the terms of the statute itself. See Chevron, 467 U.S. at 842-843.

Likewise, the Fourth Circuit, in Granutec, Inc. v. Shalala, 139 F.3d 899 (Table), 1998 WL 153410 (4th Cir. 1998) (unpublished opinion),[4] faced a similar question of interpretation of the statutory Court Decision Trigger: namely, whether a court decision in a patent infringement case involving an ANDA applicant other than the first Paragraph IV applicant could effectuate the trigger. The court stated: "FDA's reading of 'the date of a decision of a court' simply interprets ambiguous statutory terminology. Despite the corporate litigants' arguments and protests to the contrary, this statutory language possesses no clear, definite meaning." Granutec, 1998 WL 153410 at * * 8 (emphasis added). Although the specific issue in dispute here was not before the Granutec court, that court's characterization of the same statutory provision at issue in this case fully applies here.

Finally, this Court's Mova opinion implicitly, but indisputably, refuted the proposition that the Court Decision Trigger is sufficiently clear on its face to preclude the

---

[4]    As noted by this Court in Mova, the rules of the Fourth Circuit disfavor, but do not prohibit, citation to unpublished opinions. Mova, 140 F.3d at 1069 n.9.

13

interpretation advanced by Teva here.  In <u>Mova</u>, the Court stated that FDA could

"provide by regulation that a court decision ruling that an ANDA applicant cannot

reasonably anticipate suit by a patent-holder is equivalent, for purposes of section

355(j)(5)(B)(iv), to a ruling that the patent is invalid or not infringed."  <u>Mova</u>, 140 F.3d at

1073 n.18.  The court went on: "If the patent-holder declines even to create enough

adversity to support a declaratory judgment action, it might well be fair to deem the

patent-holder to have conceded non-infringement, at least for purposes of the statutory

scheme," <u>id</u>.  These statements clearly contemplate the possibility of alternative

interpretations that could allow the Court Decision Trigger to be activated by a "case or

controversy" dismissal of a declaratory judgment action based on a patent holder's

concession of non-infringement - again, a view that is fundamentally incompatible with

the conclusion that Congress has "directly spoken to the precise question at issue."

        In sum, contrary to the district court's conclusion, the Court Decision Trigger

provision of the statute does not unambiguously exclude Teva's interpretation under

<u>Chevron</u> part 1.  As will be shown <u>infra</u>, however, FDA's current interpretation of that

provision does not survive <u>Chevron</u> part 2, for that interpretation is unreasonable and

impermissible as applied to the facts of this case.

> **B.     FDA's Refusal To Treat The Dismissal Of Teva's Hatch-Waxman
> Declaratory Judgment Action As A Court Decision Trigger Is Based
> On An Unreasonable And Impermissible Statutory Interpretation**

        As demonstrated above, Congress did not conclusively address whether the Court

Decision Trigger excludes a case or controversy dismissal of a Hatch-Waxman

Declaratory Judgment Action on the basis of the patent holder's concession of non-

infringement. Accordingly, FDA's refusal to trigger the start of Teva's 180-Day Delay Period on the date of the dismissal of its Hatch-Waxman Declaratory Judgment Action can only survive review if it is a reasonable application of the statute and does not produce results that are absurd, or that Congress would not have sanctioned.[5]  See Chevron, 467 U.S. at 845; see also Abbott Laboratories v. Young, 920 F.2d 984, 988 (D.C. Cir. 1990), cert. denied, 502 U.S. 819 (1991) ("The 'reasonableness' of an agency's construction depends on the construction's 'fit' with the statutory language as well as its conformity to statutory purposes."). As demonstrated below, FDA's interpretation is unreasonable.

      1.    **FDA's Interpretation Is Unreasonable Because It Renders The Hatch-Waxman Declaratory Judgment Action Mechanism Effectively Inoperative**

"A cardinal principle of interpretation requires [the courts] to construe a statute so that no provision is rendered inoperative, or superfluous, void or insignificant." Asiana Airlines v. FAA, 134 F.3d 393, 398 (D.C. Cir. 1998), quoting C.F. Communications Corp. v. FCC, 128 F.3d 735, 739 (D.C. Cir. 1997) (internal quotation marks omitted). The FDA's restrictive interpretation of the Court Decision Trigger violates that cardinal rule of construction, and is thus impermissible, because it would produce the absurd result of making it virtually impossible for any subsequent Paragraph IV ANDA applicant to use the statutory declaratory judgment mechanism for the purposes contemplated by the statute.

---

[5]    Even if one were to accept the argument that the literal words of the Court Decision Trigger exclude such a dismissal from the types of court decisions that may act as triggers of 180-Day Delay Periods, that would not end the inquiry here, because as this Court recognized in Mova, the literal interpretation may not stand if it "will produce a result demonstrably at odds with the intentions" of Congress. Mova, 140 F.3d at 1068 (quoting United States v. Ron Pair Enterprises, 489 U.S. 235 (1989)).

As illustrated by this case. under FDA's interpretation. subsequent ANDA applicants' ability to utilize this crucial statutory mechanism could be routinely defeated by a patent holder simply stating that it does not intend to enforce its patent against the subsequent applicant, thus preventing the courts from exercising subject matter jurisdiction to issue the very "holding" of non-infringement that FDA's position seeks to require.  FDA's interpretation would thus deprive the courts of their proper role with respect to the Court Decision Trigger, and would render the broader statutory provisions and legislative purposes of 21 U.S.C. § 355(j)(5)(B) "inoperative, superfluous, void, [and] insignificant." Asiana Airlines, 134 F.3d at 398.[6]  Indeed, if FDA's current interpretation prevails, it is hard to imagine that any future Hatch-Waxman Declaratory Judgment Actions will ever be brought, since patent holders will have gained the absolute power to prevent such cases from satisfying the Court Decision Trigger.

Thus, FDA's interpretation would defeat the underlying purposes of the Hatch-Waxman Declaratory Judgment Action. Those purposes are not difficult to discern. This mechanism is an integral part of the Act's "flexible schedule of ANDA approval effectiveness dates" for Paragraph IV ANDAs.  See H.R. Rep. No. 857, 98th Cong., 2d Sess., pt. II at 15 (1984) reprinted in 1984 U.S.C.C.A.N. 2686, 2699.  It is available only to those Paragraph IV ANDA applicants who are not sued for patent infringement within

---

[6]    Moreover, FDA's position contravenes the important policy goal of facilitating early settlement of lawsuits. See Advisory Committee's Notes to F.R.C.P. 16 (1983) ("Since [settlement] obviously eases crowded dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible.").

45 days of submitting their Paragraph IV Notification. 21 U.S.C. § 355(j)(5)(B)(iii).[7] Although first Paragraph IV ANDA applicants may theoretically use the Hatch-Waxman Declaratory Judgment Action if they are not sued, there is little reason for them to do so because the statute specifically makes such applicants' ANDAs eligible for immediately effective approval upon the closing of the 45-day lawsuit window (subject to the normal substantive review by the agency).  Id.  Thus, this statutory mechanism is of practical import only to subsequent Paragraph IV ANDA applicants - whose ANDA effective dates are subject to the 180-Day Delay Period - particularly (but not exclusively) in those situations where the 180-Day Delay Period cannot be started by the Commercial Marketing Trigger or where the 180-Day Delay Period may eventually begin, but only after an excessive amount of time has passed.  More generally, the Hatch-Waxman Declaratory Judgment Action plays a critical statutory role as a safeguard against the otherwise intransigent types of anti-competitive outcomes discussed in both Mova, 140 F.3d at 1067, 1072-74, and Granutec, 1998 WL 153140 at * * 9 (Addendum Item 5).

There are several situations in which the full applicability of the Hatch-Waxman Declaratory Judgment Action as a Court Decision Trigger, as requested by Teva herein, is crucial.  For example, if the first Paragraph IV ANDA applicant has lost a Paragraph IV Infringement Action, it is prohibited from beginning commercial marketing before the patent expires, 21 U.S.C. § 355(j)(5)(B)(iii)(II).  Or, as is increasingly occurring, a first Paragraph IV ANDA applicant may settle with the patent holder by agreeing never to

---

[7]    Although the statute on its face does not preclude an ANDA applicant who has been sued in a Paragraph IV Infringement Action from also bringing a Hatch-Waxman Declaratory Judgment Action, the two types of cases necessarily involve the same legal and factual issues under the patent, so that a declaratory judgment action filed while a Paragraph IV Infringement Action is pending presumably would either be dismissed or consolidated with the infringement action.  Thus, the district court's supposition that "every ANDA applicant would wait 45 days and then sue the patent holder, nullifying the Commercial Marketing Trigger," JA 158, misses the point entirely.

market its version of the drug. See Mova, 140 F.3d at 1072 n.14. Each of these scenarios prevents both the Commercial Marketing Trigger and the Court Decision Trigger (in a Paragraph IV Infringement Action against the first applicant) from operating. In addition, there are several scenarios in which a subsequent applicant, such as Teva here, may not want to wait for the previous applicant to trigger the start of the 180-Day Delay Period. For example, as in this case, the first applicant's ANDA may encounter prolonged difficulties in obtaining FDA approval. Or, a subsequent applicant may have done a much better job at producing a non-infringing product than the first applicant, so that the subsequent applicant is not sued, while the first applicant is subject to the 30-month approval stay, 21 U.S.C. § 355(j)(5)(B)(iii), and thus cannot market for the foreseeable future. As this court noted in Mova, the Hatch-Waxman Declaratory Judgment Action "provides a particularly appropriate solution in cases in which the second applicant has done a better job of designing around the pioneer drug manufacturer's patent than the first did." 140 F.3d at 1073. FDA's interpretation would nullify that solution.

2.    **FDA's Interpretation Allows Holders Of Invalid, Unenforceable, Or Non-Infringed Patents To Thwart The Statutory Mechanisms Congress Created To Expedite Generic Market Entry**

The statute clearly contemplates that the Hatch-Waxman Declaratory Judgment Action will operate for the benefit of subsequent Paragraph IV ANDA applicants. Congress intended such applicants to be able to trigger the start of the 180-Day Delay Period if they can show that the patent holder is unable to enforce its patent rights against the applicant. 21 U.S.C. § 355(j)(5)(B)(iii)-(iv); Mova 140 F.3d at 1073 (noting that a

18

subsequent ANDA applicant "can bring its own declaratory judgment action against the patent holder, and, if the [subsequent] applicant prevails, the Court Decision Trigger will be satisfied and it will be allowed to market its product"). By allowing patent holders unilaterally to defeat ANDA applicants' ability to use this statutory procedure, FDA's interpretation turns the Court Decision Trigger into a tool benefiting patent holders against ANDA applicants, precisely contrary to the statutory intent.

It is even more obvious that Congress could not have endorsed FDA's current approach when one considers that this approach not only transfers the benefits of the Court Decision Trigger in declaratory judgment actions from ANDA applicants (the intended beneficiary class) to patent holders, but allows that benefit to go nearly exclusively to holders of invalid, unenforceable, or non-infringed patents - the very types of patents the entire Paragraph IV ANDA scheme is designed to defeat. Those patent holders who have a legitimate basis to refute the ANDA applicant's claim of invalidity, unenforceability, or non-infringement will invariably file a Paragraph IV Infringement Action within 45 days - precluding a separate Hatch-Waxman Declaratory Judgment Action - because the mere filing of such an infringement action imposes an <u>automatic</u> 30-month statutory injunction against FDA approval of the ANDA, <u>see</u> 21 U.S.C. § 355(j)(5)(B)(iii), and because a victory ensures that the patent holder will not face competition from the generic applicant for the life of the patent. 21 U.S.C. § 355(j)(5)(B)(iii)(II). Thus, for Paragraph IV ANDAs where there is at least a colorable basis to bring a Paragraph IV Infringement Action, the Declaratory Judgment Action Trigger typically will not come into play. It will be a key factor, however, when ANDA applicants identify and challenge highly vulnerable patents, such as happened with

19

ticlopidine. But, if FDA's interpretation stands, it will enable holders of such patents to effectively postpone generic competition, perhaps even for the life of the patent. And, most absurdly of all, such a patent holder <u>could effectively extend its patent by expressly acknowledging that the patent would not be infringed and will not be enforced</u>!

The district court itself acknowledged the absurdity of FDA's interpretation, but failed to properly apply that conclusion under <u>Chevron</u>. As the court noted, FDA's interpretation "gives the patent holder the ability to <u>artificially</u> extend its period of market exclusivity by <u>manipulating</u> the Court Decision Trigger, by choosing not to sue the ANDA applicant and then stipulating that it will not sue any ANDA applicant that brings a declaratory judgment action." Mem. Op. at 12 (emphasis added), JA 159. Whatever the district court may have believed to be the Congressional intent, its (quite accurate) description of the effects of FDA's interpretation are inconsistent with the conclusion that FDA's interpretation is reasonable. <u>See</u> <u>Chevron</u>, 467 U.S. at 845.

> ### C. It Is Reasonable And Necessary To Interpret The Dismissal of Teva's Declaratory Judgment Action As Triggering The Start Of The 180-Day Delay Period Applicable To Effective Approval Of Teva's ANDA
>
> #### 1. Recognizing The Dismissal Of Teva's Declaratory Judgment Action As Triggering The Start Of The 180-Day Delay Period Is Consistent With The Structure And Purpose Of The 1984 Amendments

A key component of the Hatch-Waxman Amendments is the deliberate Congressional decision to ensure that the federal courts would exercise jurisdiction to decide the substantive patent issues involved in Paragraph IV challenges. Congress's intent was to ensure that the courts would not refuse to decide cases arising out of Paragraph IV challenges on "case or controversy" grounds because the issue for decision

in such cases is whether the proposed future sale of the drug would infringe the patent.[8] Thus, Congress acted to allow the courts to decide such cases on the merits where such decisions are necessary to allow FDA to determine when a Paragraph IV ANDA approval may be made effective.  See Eli Lilly v. Medtronic, 496 U.S. at 678 (the legislative intent "is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend").  Congress accomplished this by designating the filing of a Paragraph IV ANDA as an act of infringement, 35 U.S.C. § 271(e)(2), and by establishing the Paragraph IV Infringement Action and the Hatch-Waxman Declaratory Judgment Action as court actions by which a Paragraph IV challenger's claims of patent invalidity, unenforceability, and/or non-infringement can be adjudicated before any actual commercial manufacture or sales of the generic product occur.  21 U.S.C § 355(j)(5)(B)(iii).

Fulfillment of this legislative purpose requires FDA to recognize the dismissal of a Hatch-Waxman Declaratory Judgment Action on case or controversy grounds as triggering the start of the 180-Day Delay Period when there has been a definitive statement by the patent holder of non-infringement and/or unenforceability. The facts of this case illustrate perfectly why this is so.  Syntex's express concession that it would not sue Teva for infringement and that Teva's generic product does not infringe Syntex's patent was essential to the California federal court's judgment that it lacked jurisdiction over Teva's declaratory judgment action.  Specifically, based upon Roche's express concessions, the court found that Teva had no reasonable apprehension of suit by Roche.

---

[8]    The Hatch-Waxman Amendments specifically exempted the manufacture and use of a patented drug from the traditional definition of infringement, 35 U.S.C. § 271(a), so long as such activities were conducted in connection with the submission of a marketing application to FDA.  See 35 U.S.C. § 271(e)(1); Eli Lilly v. Medtronic, 496 U.S. 661 (1990).

This factual finding, based on the evidence presented, was a necessary prerequisite to the court's decision that it had no jurisdiction. Roche cannot return to court and attempt to sue Teva for infringement; nor could Teva bring another declaratory judgment action against Roche, again seeking a decision of non-infringement on this same patent. See Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995); Cold Metal Process Co. v. E.W. Bliss Co., 21 F.Supp. 509 (D. Del. 1937) (dismissal of a declaratory judgment brought by alleged patent infringer against patentee for lack of case or controversy was res judicata in infringer's subsequent suit seeking to enjoin prosecution of patent infringement). Because the parties are estopped from re-litigating the issue of whether Teva has committed any infringement, the California federal court's judgment is a final, valid, and enforceable court decision, and should be accorded full legal force and effect for purposes of the Court Decision Trigger.

Failure to follow this approach will leave the system subject to manipulation, and outright nullification, at the whim of patent holders. The absurdity of this situation is underscored by the fact that case or controversy dismissals of Hatch-Waxman Declaratory Judgment Actions are much more likely to come into play in precisely those circumstances where the patent owner has the weakest grounds for enforcing its patent. As this Court noted in Mova, the patent owner is the party that controls whether a Paragraph IV challenger has a sufficient apprehension of being sued -- and hence whether the court will find a case or controversy to exist. Indeed, as Syntex argued in its motion to dismiss Teva's Hatch-Waxman Declaratory Judgment Action, a patent owner can render any declaratory judgment action moot simply by having its attorney state that the company will not enforce its patent against the Paragraph IV challenger. See JA 203

22

("counsel's statements of non-liability [even after the Complaint is filed] 'removes [sic]

from the field any controversy sufficiently actual to confer jurisdiction over [a] case.'")

(quoting <u>Super Sack Manufacturing Corp. v. Chase Packaging Corp.</u>, 57 F.3d 1054, 1059

(Fed. Cir. 1995), <u>cert.</u> <u>denied,</u> 516 U.S. 1093 (1996)) (brackets added by Syntex).

Thus, unless the statute is interpreted so that 180-Day Delay Periods are triggered

by a case or controversy dismissal of a Hatch-Waxman Declaratory Judgment Action

based on a patent holder's concession of non-infringement, an owner of an invalid,

unenforceable, or non-infringed patent would be free to block generic competition by

simply declaring, in response to a Hatch-Waxman Declaratory Judgment Action, its

intention not to enforce its patent. Such an outcome would clearly be inconsistent with

the legislative intent.

### 2. The California Court's Case Or Controversy Dismissal Is Equivalent To A Judgment Of Unenforceability

Treating the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action as

triggering the 180-Day Delay Period under 21 U.S.C.§ 355(j)(5)(B)(iv) is further

supported by the fact that such a dismissal, in the circumstances of this case, has the legal

effect of rendering the patent unenforceable against Teva. Both the Federal Circuit and

FDA have concluded that the Court Decision Trigger necessarily incorporates a finding

of unenforceability to the same extent as a finding of invalidity or non-infringement. <u>See</u>

<u>Merck v. Danbury</u>, 694 F.Supp. 1 (D.Del. 1988), <u>aff'd</u> 873 F.2d 1418 (Fed. Cir. 1989);

21 C.F.R. § 314.107(a)(12)(i)(*4*); 59 Fed. Reg. 50,338, 50,339 (Final Rule, October 3,

1994) (finding that to preclude applicants challenging patents as unenforceable from

filing certifications under paragraph IV would be contrary to Congress' obvious intent in

23

allowing patent challenges under section 505 of the act and would lead to absurd results).[9]

The California district court's decision dismissing Teva's Hatch-Waxman Declaratory Judgment Action based on Syntex's post-complaint admission of non-infringement means that there is no longer any "case or controversy" as to the infringement or enforceability issues.[10] That dismissal must therefore constitute a "holding" of unenforceability of the patent under the FFDCA for purposes of triggering the 180-Day Delay Period applicable to the effective date of Teva's ANDA. See 21 U.S.C. § 355(j)(5)(B (iv); 21 C.F.R. § 314.94(a)(12)(i)(A)(4). Moreover, under analogous circumstances involving a "case or controversy" dismissal, the Federal Circuit observed as a matter of patent law that: "'Having requested a declaration of non-infringement of the . . . patent claims, [the declaratory judgment plaintiff] for all practical purposes has won the case pleaded in its complaint.'" Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1483-1484 (Fed. Cir. 1998) (quoting Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636 (Fed. Cir. 1991)).

The dismissal of Teva's declaratory judgment action based on Syntex's admission of non-infringement also renders the patent unenforceable against Teva under the doctrine of estoppel and controlling federal caselaw. Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995) (a party, such as Syntex here, is

---

[9]     It is significant, and appropriate, that FDA implemented the unenforceability provisions on its own initiative, without providing an opportunity for public comment, based on the Federal Circuit decision in Merck v. Danbury.

[10]     Of course, it would also be possible for a patent holder to try to avoid a declaratory judgment action altogether by a pre-emptive concession of non-infringement prior to initiation of any litigation. Although such a scenario might raise additional issues under the Court Decision Trigger, it is not presented by this case, and so will not be discussed further herein.

"forever estopped by its counsel's statement of nonliability. . . from asserting liability . . ."). This fact also requires FDA to deem Teva's 180-Day Delay Period to have started on August 14, 1998, because, as noted <u>supra</u>, both the Federal Circuit and FDA have concluded that unenforceability of a listed patent is an appropriate basis for approval of Paragraph IV ANDAs under the Hatch-Waxman patent challenge system. See <u>Merck v. Danbury</u>, 694 F. Supp. 1.[11]

### 3.    The FDA Itself Has Recognized An Analogous Court Decision As Triggering The Start Of The 180-Day Delay Period

Although the FDA in this litigation states that it "has not adopted" Teva's interpretation of the Court Decision Trigger, JA 98, the agency has already in fact accepted, and acted upon, the underlying principle behind Teva's interpretation. Specifically, with respect to the effective approval dates of ANDAs for the drug ranitidine hydrochloride ("ranitidine"), FDA triggered the start of the applicable 180-Day Delay Period as of the date of a court's termination of a patent infringement action based on the patent holder's concession of non-infringement. <u>Granutec</u>, 1998 WL 153410. FDA's action is best described in the agency's own brief in that case:

> On October 7, 1996, the district court for the District of Connecticut granted summary judgment for Boehringer [the generic ANDA filer] on the basis of Glaxo's [the patent holder's] "<u>express concession that Defendants' product does not infringe these patents</u>." Glaxo did not appeal that order, and its appeal time expired on March 3, 1997. . . . Thus, under [the] <u>Mova</u> [district court decision] and under FDA's current interpretation of 21 U.S.C. 355 (j)([5])(B)(iv) and 21 C.F.R. 314.107(e)(2)(i) in light of <u>Mova</u>, the 180-Day Period of exclusivity for

---

[11]    There is no need nor basis to apply 21 C.F.R. § 314.107(e)(2)(i) to deem the delay clock to have started on the date Teva's time to appeal the dismissal lapsed, because, pursuant to 21 C.F.R. § 314.107(e)(1) this final decision is one from which no appeal can be taken by the patent holder, Syntex. Moreover, because Teva did not oppose the dismissal, Teva could not have appealed.

Genpharm [the first ANDA filer] began to run on March 3, 1997 . . . , and expired on August 29, 1997.

FDA's Brief at 12, Granutec v. Shalala, 139 F.3d 889 (Table), 1998 WL 153410 (Nos. 97-1873 and 97-1874) (Addendum Item 4); see also Glaxo v. Boehringer Ingelheim, No. 3: 95-CV-01342 (D. Conn. Oct. 7, 1996) (Order granting defendant's summary judgment motion based on Glaxo's express concession of non-infringement) (Addendum Item 3).

These facts closely parallel the current circumstances. Like the patent holder in the ranitidine situation (Glaxo), here Roche, once litigation over infringement of the patent had begun, decided not to litigate the matter to a final judgment of unenforceability, invalidity, or non-infringement after full trial. Instead, like Glaxo, Roche expressly conceded that the generic product at issue did not infringe the patent. And, as in the ranitidine situation, the court in Teva v. Syntex terminated the case expressly because of the patent holder's concession of non-infringement. Moreover, the substantive legal result in these two cases is precisely the same: the patent holder cannot enforce the patent against the generic applicant, and the generic applicant is free to market the product -- subject, of course, to the FDA approval process.

The motions argument before the court in Teva v. Syntex makes clear that Roche wanted to avoid any ruling that could be cited as a triggering "court decision." But such procedural machinations do not govern whether the provisions of the Hatch-Waxman Amendments are satisfied. In the ranitidine situation as described in Granutec, the patent holder sued the ANDA filer, and then admitted non-infringement, leading to summary judgment. In the current case, the ANDA filer sued the patent holder, and the patent

holder then admitted non-infringement, leading to dismissal. In the ranitidine situation,
FDA recognized the court action as activating the Court Decision Trigger. Here,
unaccountably, it does not. But the fact that the current matter involves dismissal of a
declaratory judgment proceeding on case or controversy grounds, while the ranitidine
matter involved a decision on a motion for summary judgment, is a distinction without a
difference. There is no material difference, in the context of the FFDCA, between a
judgment dismissing a declaratory action because the patent holder has expressly
conceded non-infringement and a judgment dismissing a non-declaratory action because
the patent holder has expressly conceded non-infringement.

      The lower court acknowledged that Teva is now protected from suit by Roche, but
suggested that such protection is all Teva is entitled to from its declaratory judgment
action. JA 159. That analysis is incomplete. In the context of the Hatch-Waxman
Amendments, the legal consequence of dismissing Teva's declaratory judgment action is
precisely the consequence envisioned by the Court Decision Trigger: it demonstrates that
the patent holder has had its opportunity to protect and enforce its patent, and provides a
date certain on which the 180-Day Delay Period begins to run. This principle was the
foundation for FDA's eminently correct stance in the ranitidine situation - a stance
upheld by the Fourth Circuit in the Granutec case. It should likewise underlie this
Court's interpretation here.

## II.    EQUITABLE CONSIDERATIONS WARRANT THE ISSUANCE OF A PRELIMINARY INJUNCTION

### A.    Teva Will Be Irreparably Harmed Without The Requested Preliminary Injunction

The district court below rejected Teva's assertion that the company will be irreparably harmed unless FDA is ordered to set February 10, 1999 as the effective date of Teva's already approved ticlopidine ANDA, despite that court's acknowledgement that "similar factual allegations" to those made by Teva had been found to constitute irreparable injury in other cases. JA 162. Those other cases included Mova Pharmaceutical Corp. v. Shalala, which found irreparable injury where "one pharmaceutical company gets an 'officially sanctioned head start in the market' and another pharmaceutical company is 'left behind'," 955 F.Supp. 130, (D.D.C. 1997), aff'd 140 F.3d 1060 (D.C. Cir.1998), and Bracco Diagnostics, Inc. v. Shalala, 963 F.Supp. 20 (D.D.C. 1997), which found a "significant economic advantage to receiving first approval and being the first company to enter the market, an advantage that can never be fully recouped through money damages or by playing 'catch-up'."

The lower court, however, refused to apply the irreparable harm standard used in those two cases to Teva's situation here, notwithstanding its clear factual applicability, on the ground that a stricter standard was required because Teva had not shown a likelihood of success on the merits. Instead, the court applied what it characterized as the "general rule" that "economic loss does not constitute irreparable harm unless it is so substantial that it threatens the movant's very existence," JA 162, and accordingly rejected Teva's claim of irreparable harm on the ground that Teva had not shown "that its overall

28

operations will be irreparably harmed if its entry into the ticlopidine market is delayed." JA 163.

As shown above, contrary to the district court's view, Teva has a very high likelihood of success on the merits. Therefore, the relevant standard of irreparable injury is precisely that applied in the <u>Mova</u> and <u>Bracco</u> cases, under which Teva's situation clearly supports a finding of irreparable injury if the company's approved ticlopidine product is kept off the market after February 10. Every day that Teva is denied its legal right to market its approved ticlopidine product on and after February 10 works substantial hardship upon Teva in terms of direct financial loss, disruption of ability to properly plan and prepare for market entry, and competitive disadvantage, <u>see</u> JA 169-181. If TorPharm receives approval in the interim - as may well occur - and is permitted any period of <u>de facto</u> market exclusivity after February 10, the hardship to Teva in terms of competitive disadvantage will be compounded. Moreover, the damage that would be suffered by Teva in that situation cannot be recompensed. Should Teva's legal position later be vindicated in court, there would be no way Teva could recover any of the damages the company would have already suffered either from the FDA, from any of the other private parties to this action, or from any other source. Accordingly, the irreparable injury requirement for preliminary injunctive relief is unquestionably met here.

29

**B.     The Balance Of Harms Weighs In Favor Of Teva's Request For Preliminary Injunctive Relief**

It is self-evident that granting Teva's requested preliminary injunction will not harm the FDA. Moreover, FDA has not identified any potential harm to its interests that would result from entry of the requested preliminary injunction.

Nor would Roche or Syntex suffer any legally cognizable injury from Teva's requested relief. Having definitively conceded that Teva's ticlopidine product does not infringe its patent, and having irrevocably waived its legal ability to sue Teva for infringement, Roche and Syntex have no protectable interest in when Teva's ticlopidine product enters the market. Rather, by its involvement in this case, Roche simply seeks once again to fish in the troubled waters of the post-Mova application of the 180-day generic delay provision in order to artificially prolong its market monopoly through the sheer good luck (from Roche's perspective) of the delay in FDA approval of TorPharm's ANDA. As Teva noted in its brief below, however, Roche cannot be heard to claim a protected interest in serendipity.

The balance-of-harms situation with respect to TorPharm, though slightly more complicated, still clearly weighs in favor of the requested injunction. Most importantly, issuance of the requested injunction will not delay the approval or the market entry of TorPharm's ticlopidine product, which will remain a matter entirely within the control of FDA and TorPharm. On the other hand, if the requested injunction does not issue, Teva's approved ticlopidine product will be blocked from the market altogether for six months after the (as yet undetermined) date when TorPharm begins to market its ticlopidine product. It is true that issuance of the injunction would mean that TorPharm would have

30

to share the ticlopidine market with Teva, and possibly Purepac, after February 10. But this is far less onerous than the harm to Teva if the injunction is denied.

From TorPharm's perspective, issuance of the requested injunction would result only in having to share the ticlopidine market with other generic companies. From Teva's perspective, however, failure to issue the injunction would result in being barred from the ticlopidine market altogether for at least six months, despite Teva's ticlopidine product having been determined by FDA to be safe and effective in October 1998. For this reason, the district court's statement that issuance of the requested injunctive relief would cause TorPharm to "lose precisely the market advantages that Teva describes in its affidavits," JA 163, is wrong. [12]

### C.    The Public Interest Strongly Supports Granting The Requested Injunction

The district court's statement that the public's interest in this litigation is "difficult to discern," JA 163, is baffling. The district court based this statement on its view that although the public has a clear interest in the "ready availability of safe, effective, and affordable prescription drugs," the public also benefits from the research and development efforts of pioneer drug companies, "efforts which are rewarded and encouraged by patent law and the FFDCA's corresponding protection for patent holders." Id. Unfortunately, the district court overlooked the fact that in this case, Teva's generic product is being kept off the market not by Roche's patent - which Roche has admitted Teva's product does not infringe - nor by any "protection for patent holders" under the

---

[12]    By the same token, the District Court's statement that this case "arises out of a race between competing pharmaceutical companies to be the first to market a generic version" of ticlopidine, JA 148, is incorrect. Teva is not seeking to be first on the market, but only to be allowed to enter the market as of the date it is legally entitled to do so, February 10. If that outcome results in Teva (and/or Purepac) being de

31

FFDCA - for which Roche does not qualify - but by the misapplication of a statutory provision intended to sort out the sequencing of market entry as between generic companies. In other words, any public interest that may have once existed in protecting Roche's patent rights here vanished forever on August 14, 1998, the day Teva effectively won its declaratory judgment action by obtaining an order of dismissal on the basis of Roche's express concession of non-infringement. The only public interest that remains is the interest in timely market entry of safe, effective lower cost generic alternatives to Roche's branded ticlopidine - an interest that weighs decisively in Teva's favor.[13]

### III.    NOTICE-AND-COMMENT RULEMAKING IS NOT REQUIRED TO ESTABLISH THE EFFECTIVE DATE OF TEVA'S TICLOPIDINE ANDA

In the wake of Mova, FDA has stated that it will "regulate directly from the statute," JA 251, and will decide 180-Day Delay Period issues on a "case by case basis" "by reference directly to the statute" until such time as it promulgates revised final regulations using notice and comment rulemaking. JA 95. As demonstrated above, however, the result of FDA's post-Mova literalism in this case cannot stand because it produces absurd, unintended results. Teva has conclusively demonstrated that it is reasonable to treat the dismissal of Teva's declaratory judgment action as activating the Court Decision Trigger, and that it is unreasonable not to do so. Although this Court acknowledged in Mova that FDA could reasonably promulgate regulations to treat such a

---

facto first on the market, it will be solely because of the delay in FDA approval of TorPharm's ANDA, not because of anything Teva is asking this Court to do.

[13]    In this light, Roche's argument that there is "no compelling public interest in expediting the approval of Teva's ANDA" because Roche "can supply the market for the drug," JA 125, is nothing short of offensive. If the public's only interest were in having a drug available, regardless of price, Congress need not have bothered enacting the Hatch-Waxman Amendments at all.

dismissal as a Court Decision Trigger, see Mova, 140 F.3d at 1073 n.18, at that time there was no concrete dispute as to that issue because none of the parties had engaged in a declaratory judgment action. In this case, all pertinent facts necessary for the proper application of the statute to Teva's ANDA have already been established and are uncontested. There would be no further purpose to be served by FDA re-addressing this specific dispute through rulemaking. The matter is now squarely before this court, and should be finally and expeditiously decided by entry of an order that FDA make Teva's ticlopidine ANDA effective as of February 10, 1999.

## CONCLUSION

For the reasons stated herein, Teva respectfully urges the court to reverse the district court's denial of a preliminary injunction, and to remand to the district court with instructions to promptly order FDA to make Teva's tentatively-approved ticlopidine ANDA effective as of February 10, 1999.

Respectfully submitted,

James N. Czaban (D.C. Bar #459211)
Geoffrey M. Levitt (D.C. Bar #358633)
David M. Malone (D.C. Bar #125047) (Counsel of Record)

Venable, Baetjer, Howard & Civiletti LLP
1201 New York Avenue, NW
Suite 1000
Washington, D.C. 20005-3917
202/962-4800 (phone)
202/962-8300 (fax)

Attorneys for Teva Pharmaceuticals USA, Inc.

33

# ADDENDUM: STATUTES & UNPUBLISHED
# LEGAL MATERIALS

1.  21 U.S.C.A. § 355.

2.  35 U.S.C.A. § 271.

3.  Glaxo, Inc. v. Boehringer Ingelheim Corporation, C 95-01342 (D. Conn. October 9, 1996) (Memorandum Decision).

4.  Brief for the Federal Appellees, Granutec, Inc. v. Shalala, 139 F.3d 889 (Table), 1998 WL 153410 (4th Cir. April 3, 1998) (C 97-1873, C 97-1874).

5.  Granutec, Inc. v. Shalala, 139 F.3d 889 (Table), 1998 WL 153410 (4th Cir. April 3, 1998).

21 USCA s 355                                                                    Page 1
21 U.S.C.A. § 355

UNITED STATES CODE ANNOTATED
TITLE 21. FOOD AND DRUGS
CHAPTER 9--FEDERAL FOOD, DRUG, AND COSMETIC ACT
SUBCHAPTER V--DRUGS AND DEVICES
PART A--DRUGS AND DEVICES

Copr. © West 1998.  No Claim to Orig. U.S. Govt. Works

Current through P.L. 105-220, approved 8-7-1998

§ 355. New drugs

(a) Necessity of effective approval of application

 No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval
of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.

(b) Filing application;  contents

 (1) Any person may file with the Secretary an application with respect to any drug subject to the provisions of
subsection (a) of this section.  Such person shall submit to the Secretary as a part of the application (A) full
reports of investigations which have been made to show whether or not such drug is safe for use and whether such
drug is effective in use;  (B) a full list of the articles used as components of such drug;  (C) a full statement of the
composition of such drug;  (D) a full description of the methods used in, and the facilities and controls used for,
the manufacture, processing, and packing of such drug;  (E) such samples of such drug and of the articles used as
components thereof as the Secretary may require;  and (F) specimens of the labeling proposed to be used for such
drug.  The applicant shall file with the application the patent number and the expiration date of any patent which
claims the drug for which the applicant submitted the application or which claims a method of using such drug and
with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the
owner engaged in the manufacture, use, or sale of the drug.  If an application is filed under this subsection for a
drug and a patent which claims such drug or a method of using such drug is issued after the filing date but before
approval of the application, the applicant shall amend the application to include the information required by the
preceding sentence.  Upon approval of the application, the Secretary shall publish information submitted under
the two preceding sentences.  The Secretary shall, in consultation with the Director of the National Institutes of
Health and with representatives of the drug manufacturing industry, review and develop guidance, as appropriate,
on the inclusion of women and minorities in clinical trials required by clause (A).

 (2) An application submitted under paragraph (1) for a drug for which the investigations described in clause (A)
of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for
the applicant and for which the applicant has not obtained a right of reference or use from the person by or for
whom the investigations were conducted shall also include--

 (A) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent
which claims the drug for which such investigations were conducted or which claims a use for such drug for
which the applicant is seeking approval under this subsection and for which information is required to be filed
under paragraph (1) or subsection (c) of this section--

 (i) that such patent information has not been filed,

 (ii) that such patent has expired,

 (iii) of the date on which such patent will expire, or

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

21 USCA s 355                                                                                       Page 2

  (iv) that such patent is invalid or will not be infringed by the manufacture use, or sale of the new drug for which the application is submitted;  and

  (B) if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

  (3)(A) An applicant who makes a certification described in paragraph (2)(A)(iv) shall include in the application a statement that the applicant will give the notice required by subparagraph (B) to--

  (i) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

  (ii) the holder of the approved application under subsection (b) of this section for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

  (B) The notice referred to in subparagraph (A) shall state that an application has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of the drug before the expiration of the patent referred to in the certification.  Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

  (C) If an application is amended to include a certification described in paragraph (2)(A)(iv), the notice required by subparagraph (B) shall be given when the amended application is submitted.

  (4)(A) The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1) or under section 262 of Title 42, which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

  (B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection or section 262 of Title 42 if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of clinical trials intended to form the primary basis of an effectiveness claim.  The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of the clinical trials.  Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant upon request.

  (C) Any agreement regarding the parameters of the design and size of clinical trials of a new drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary.  Such agreement shall not be changed after the testing begins, except--

  (i) with the written agreement of the sponsor or applicant;  or

  (ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

  (D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance division personnel unless such field or compliance division personnel demonstrate to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection or section 262 of Title 42 (including all scientific and medical matters, chemistry, manufacturing, and controls).

(c) Period for approval of application; period for, notice, and expedition of hearing; period for issuance of order

(1) Within one hundred and eighty days after the filing of an application under subsection (b) of this section, or such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall either--

(A) Approve the application if he then finds that none of the grounds for denying approval specified in subsection (d) of this section applies, or

(B) Give the applicant notice of an opportunity for a hearing before the Secretary under subsection (d) of this section on the question whether such application is approvable. If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree. Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(2) If the patent information described in subsection (b) of this section could not be filed with the submission of an application under subsection (b) of this section because the application was filed before the patent information was required under subsection (b) of this section or a patent was issued after the application was approved under such subsection, the holder of an approved application shall file with the Secretary the patent number and the expiration date of any patent which claims the drug for which the application was submitted or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug. If the holder of an approved application could not file patent information under subsection (b) of this section because it was not required at the time the application was approved, the holder shall file such information under this subsection not later than thirty days after September 24, 1984, and if the holder of an approved application could not file patent information under subsection (b) of this section because no patent had been issued when an application was filed or approved, the holder shall file such information under this subsection not later than thirty days after the date the patent involved is issued. Upon the submission of patent information under this subsection, the Secretary shall publish it.

(3) The approval of an application filed under subsection (b) of this section which contains a certification required by paragraph (2) of such subsection shall be made effective on the last applicable date determined under the following:

(A) If the applicant only made a certification described in clause (i) or (ii) of subsection (b)(2)(A) of this section or in both such clauses, the approval may be made effective immediately.

(B) If the applicant made a certification described in clause (iii) of subsection (b)(2)(A) of this section, the approval may be made effective on the date certified under clause (iii).

(C) If the applicant made a certification described in clause (iv) of subsection (b)(2)(A) of this section, the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (3)(B) is received. If such an action is brought before the expiration of such days, the approval may be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (3)(B) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

  (i) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval may be made effective on the date of the court decision,

  (ii) if before the expiration of such period the court decides that such patent has been infringed, the approval may be made effective on such date as the court orders under section 271(e)(4)(A) of Title 35, or

  (iii) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision.

  In such an action, each of the parties shall reasonably cooperate in expediting the action. Until the expiration of forty-five days from the date  the notice made under paragraph (3)(B) is received, no action may be brought under section 2201 of Title 28 for a declaratory judgment with respect to the patent. Any action brought under such section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

  (D)(i) If an application (other than an abbreviated new drug application) submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of another application for a drug for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted effective before the expiration of ten years from the date of the approval of the application previously approved under subsection (b) of this section.

  (ii) If an application submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active  ingredient) of which has been approved in any other application under subsection (b) of this section, is approved after September 24, 1984, no application which refers to the drug for which the subsection (b) application was submitted and for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted may be submitted under subsection (b) of this section before the expiration of five years from the date of the approval of the application under subsection (b) of this section, except that such an application may be submitted under subsection (b) of this section after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in clause (iv) of subsection (b)(2)(A) of this section. The approval of such an application shall be made effective in accordance with this paragraph except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (C) shall be extended by such amount of time (if any) which is required for seven and one-half years to have  elapsed from the date of approval of the subsection (b) application.

  (iii) If an application submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b) of this section, is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under subsection (b) of this section for the conditions of approval of such drug in the approved subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) of this section if the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

(iv) If a supplement to an application approved under subsection (b) of this section is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under subsection (b) of this section for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) of this section if the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and if the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted.

(v) If an application (or supplement to an application) submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection and for which the investigations described in clause (A) of subsection (b)(1) of this section and relied upon by the applicant for approval of the application were not conducted by or for the applicant and for which the applicant has not obtained a right of reference or use from the person by or for whom the investigations were conducted and which refers to the drug for which the subsection (b) application was submitted effective before the expiration of two years from September 24, 1984.

(4) A drug manufactured in a pilot or other small facility may be used to demonstrate the safety and effectiveness of the drug and to obtain approval for the drug prior to manufacture of the drug in a larger facility, unless the Secretary makes a determination that a full scale production facility is necessary to ensure the safety or effectiveness of the drug.

(d) Grounds for refusing application;  approval of application;  "substantial evidence" defined

If the Secretary finds, after due notice to the applicant in accordance with subsection (c) of this section and giving him an opportunity for a hearing, in accordance with said subsection, that (1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (b) of this section, do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof;  (2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions;  (3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity;  (4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions;  or (5) evaluated on the basis of the information submitted to him as part of the application and any other information before him with respect to such drug, there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof;  or (6) the application failed to contain the patent information prescribed by subsection (b) of this section;  or (7) based on a fair evaluation of all material facts, such labeling is false or misleading in any particular;  he shall issue an order refusing to approve the application.  If, after such notice and opportunity for hearing, the Secretary finds that clauses (1) through (6) do not apply, he shall issue an order approving the application. As used in this subsection and subsection (e) of this section, the term "substantial evidence" means evidence consisting of adequate and well- controlled investigations, including clinical

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. If the Secretary determines, based on relevant science, that data from one adequate and well- controlled clinical investigation and confirmatory evidence (obtained prior to or after such investigation) are sufficient to establish effectiveness, the Secretary may consider such data and evidence to constitute substantial evidence for purposes of the preceding sentence.

(e) Withdrawal of approval;  grounds;  immediate suspension upon finding imminent hazard to public health

 The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application with respect to any drug under this section if the Secretary finds (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the application was approved;  (2) that new evidence of clinical experience, not contained in such application or not available to the Secretary until after such application was approved, or tests by new methods, or tests by methods not deemed reasonably applicable when such application was approved, evaluated together with the evidence available to the Secretary when the application was approved, shows that such drug is not shown to be safe for use under the conditions of use upon the basis of which the application was approved;  or (3) on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof;  or (4) the patent information prescribed by subsection (c) of this section was not filed within thirty days after the receipt of written notice from the Secretary specifying the failure to file such information;  or (5) that the at the application contains any untrue statement of a material fact:  Provided, That if the Secretary (or in his absence the officer acting as Secretary) finds that there is an imminent hazard to the public health, he may suspend the approval of such application immediately, and give the applicant prompt notice of his action and afford the applicant the opportunity for an expedited hearing under this subsection;  but the authority conferred by this proviso to suspend the approval of an application shall not be delegated.  The Secretary may also, after due notice and opportunity for hearing to the applicant, withdraw the approval of an application submitted under subsection (b) or (j) of this section with respect to any drug under this section if the Secretary finds (1) that the applicant has failed to establish a system for maintaining required records, or has repeatedly or deliberately failed to maintain such records or to make required reports, in accordance with a regulation or order under subsection (k) of this section or to comply with the notice requirements of section 360(k)(2) of this title, or the applicant has refused to permit access to, or copying or verification of, such records as required by paragraph (2) of such subsection;  or (2) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to assure and preserve its identity, strength, quality, and purity and were not made adequate within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of;  or (3) that on the basis of new information before him, evaluated together with the evidence before him when the application was approved, the labeling of such drug, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary specifying the matter complained of.  Any order under this subsection shall state the findings upon which it is based.

(f) Revocation of order refusing, withdrawing or suspending approval of application

 Whenever the Secretary finds that the facts so require, he shall revoke any previous order under subsection (d) or (e) of this section refusing, withdrawing, or suspending approval of an application and shall approve such application or reinstate such approval, as may be appropriate.

(g) Service of orders

 Orders of the Secretary issued under this section shall be served (1) in person by any officer or employee of the Department designated by the Secretary or (2) by mailing the order by registered mail or by certified mail

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

addressed to the applicant or respondent at his last-known address in the records of the Secretary.

(h) Appeal from order

 An appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of an application under this section. Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein such applicant resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a written petition praying that the order of the Secretary be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Secretary, or any officer designated by him for that purpose, and thereupon the Secretary shall certify and file in the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have exclusive jurisdiction to affirm or set aside such order, except that until the filing of the record the Secretary may modify or set aside his order. No objection to the order of the Secretary shall be considered by the court unless such objection shall have been urged before the Secretary or unless there were reasonable grounds for failure so to do. The finding of the Secretary as to the facts, if supported by substantial evidence, shall be conclusive. If any person shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceeding before the Secretary, the court may order such additional evidence to be taken before the Secretary and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Secretary may modify his findings as to the facts by reason of the additional evidence so taken, and he shall file with the court such modified findings which, if supported by substantial evidence, shall be conclusive, and his recommendation, if any, for the setting aside of the original order. The judgment of the court affirming or setting aside any such order of the Secretary shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28. The commencement of proceedings under this subsection shall not, unless specifically ordered by the court to the contrary, operate as a stay of the Secretary's order.

(i) Exemptions of drugs for research; discretionary and mandatory conditions; direct reports to Secretary

 (1) The Secretary shall promulgate regulations for exempting from the operation of the foregoing subsections of this section drugs intended solely for investigational use by experts qualified by scientific training and experience to investigate the safety and effectiveness of drugs. Such regulations may, within the discretion of the Secretary, among other conditions relating to the protection of the public health, provide for conditioning such exemption upon--

 (A) the submission to the Secretary, before any clinical testing of a new drug is undertaken, of reports, by the manufacturer or the sponsor of the investigation of such drug, of preclinical tests (including tests on animals) of such drug adequate to justify the proposed clinical testing;

 (B) the manufacturer or the sponsor of the investigation of a new drug proposed to be distributed to investigators for clinical testing obtaining a signed agreement from each of such investigators that patients to whom the drug is administered will be under his personal supervision, or under the supervision of investigators responsible to him, and that he will not supply such drug to any other investigator, or to clinics, for administration to human beings; and

 (C) the establishment and maintenance of such records, and the making of such reports to the Secretary, by the manufacturer or the sponsor of the investigation of such drug, of data (including but not limited to analytical reports by investigators) obtained as the result of such investigational use of such drug, as the Secretary finds will enable him to evaluate the safety and effectiveness of such drug in the event of the filing of an application pursuant to subsection (b) of this section.

 (2) Subject to paragraph (3), a clinical investigation of a new drug may begin 30 days after the Secretary has received from the manufacturer or sponsor of the investigation a submission containing such information about the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

drug and the clinical investigation, including--

(A) information on design of the investigation and adequate reports of basic information, certified by the applicant to be accurate reports, necessary to assess the safety of the drug for use in clinical investigation;  and

(B) adequate information on the chemistry and manufacturing of the drug, controls available for the drug, and primary data tabulations from animal or human studies.

(3)(A) At any time, the Secretary may prohibit the sponsor of an investigation from conducting the investigation (referred to in this paragraph as a "clinical hold") if the Secretary makes a determination described in subparagraph (B).  The Secretary shall specify the basis for the clinical hold, including the specific information available to the Secretary   which served as the basis for such clinical hold, and confirm such determination in writing.

(B) For purposes of subparagraph (A), a determination described in this subparagraph with respect to a clinical hold is that--

(i) the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation, taking into account the qualifications of the clinical investigators, information about the drug, the design of the clinical investigation, the condition for which the drug is to be investigated, and the health status of the subjects involved;  or

(ii) the clinical hold should be issued for such other reasons as the Secretary may by regulation establish (including reasons established by regulation before November 21, 1997).

(C) Any written request to the Secretary from the sponsor of an investigation that a clinical hold be removed shall receive a decision, in writing and specifying the reasons therefor, within 30 days after receipt of such request.  Any such request shall include sufficient information to support the removal of such clinical hold.

(4) Regulations under paragraph (1) shall provide that such exemption shall be conditioned upon the manufacturer, or the sponsor of the investigation,   requiring that experts using such drugs for investigational purposes certify to such manufacturer or sponsor that they will inform any human beings to whom such drugs, or any controls used in connection therewith, are being administered, or their representatives, that such drugs are being used for investigational purposes and will obtain the consent of such human beings or their representatives, except where it is not feasible or it is contrary to the best interests of such human beings.  Nothing in this subsection shall be construed to require any clinical investigator to submit directly to the Secretary reports on the investigational use of drugs.

(j) Abbreviated new drug applications

(1) Any person may file with the Secretary an abbreviated application for the approval of a new drug.

(2)(A) An abbreviated application for a new drug shall contain--

(i) information to show that the conditions of use prescribed, recommended, or suggested in the labeling proposed for the new drug have been previously approved for a drug listed under paragraph (7) (hereinafter in this subsection referred to as a "listed drug");

(ii)(I) if the listed drug referred to in clause (i) has only one active  ingredient, information to show that the active ingredient of the new drug is the same as that of the listed drug;

(II) if the listed drug referred to in clause (i) has more than one active ingredient, information to show that the active ingredients of the new drug are the same as those of the listed drug, or

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(III) if the listed drug referred to in clause (i) has more than one active ingredient and if one of the active ingredients of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the other active ingredients of the new drug are the same as the active ingredients of the listed drug, information to show that the different active ingredient is an active ingredient of a listed drug or of a drug which does not meet the requirements of section 321(p) of this title, and such other information respecting the different active ingredient with respect to which the petition was filed as the Secretary may require;

(iii) information to show that the route of administration, the dosage form, and the strength of the new drug are the same as those of the listed drug referred to in clause (i) or, if the route of administration, the dosage form, or the strength of the new drug is different and the application is filed pursuant to the approval of a petition filed under subparagraph (C), such information respecting the route of administration, dosage form, or strength with respect to which the petition was filed as the Secretary may require;

(iv) information to show that the new drug is bioequivalent to the listed drug referred to in clause (i), except that if the application is filed pursuant to the approval of a petition filed under subparagraph (C), information to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in clause (i) and the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in clause (i);

(v) information to show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug referred to in clause (i) except for changes required because of differences approved under a petition filed under subparagraph (C) or because the new drug and the listed drug are produced or distributed by different manufacturers;

(vi) the items specified in clauses (B) through (F) of subsection (b)(1) of this section;

(vii) a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the listed drug referred to in clause (i) or which claims a use for such listed drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under subsection (b) or (c) of this section--

(I) that such patent information has not been filed,

(II) that such patent has expired,

(III) of the date on which such patent will expire, or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and

(viii) if with respect to the listed drug referred to in clause (i) information was filed under subsection (b) or (c) of this section for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

The Secretary may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii).

(B)(i) An applicant who makes a certification described in subparagraph (A)(vii)(IV) shall include in the application a statement that the applicant will give the notice required by clause (ii) to--

(I) each owner of the patent which is the subject of the certification or the representative of such owner designated to receive such notice, and

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(II) the holder of the approved application under subsection (b) of this section for the drug which is claimed by the patent or a use of which is claimed by the patent or the representative of such holder designated to receive such notice.

(ii) The notice referred to in clause (i) shall state that an application, which contains data from bioavailability or bioequivalence studies, has been submitted under this subsection for the drug with respect to which the certification is made to obtain approval to engage in the commercial manufacture, use, or sale of such drug before the expiration of the patent referred to in the certification. Such notice shall include a detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed.

(iii) If an application is amended to include a certification described in subparagraph (A)(vii)(IV), the notice required by clause (ii) shall be given when the amended application is submitted.

(C) If a person wants to submit an abbreviated application for a new drug which has a different active ingredient or whose route of administration, dosage form, or strength differ from that of a listed drug, such person shall submit a petition to the Secretary seeking permission to file such an application. The Secretary shall approve or disapprove a petition submitted under this subparagraph within ninety days of the date the petition is submitted. The Secretary shall approve such a petition unless the Secretary finds--

(i) that investigations must be conducted to show the safety and effectiveness of the drug or of any of its active ingredients, the route of administration, the dosage form, or strength which differ from the listed drug;  or

(ii) that any drug with a different active ingredient may not be adequately evaluated for approval as safe and effective on the basis of the information required to be submitted in an abbreviated application.

(3)(A) The Secretary shall issue guidance for the individuals who review applications submitted under paragraph (1), which shall relate to promptness in conducting the review, technical excellence, lack of bias and conflict of interest, and knowledge of regulatory and scientific standards, and which shall apply equally to all individuals who review such applications.

(B) The Secretary shall meet with a sponsor of an investigation or an applicant for approval for a drug under this subsection if the sponsor or applicant makes a reasonable written request for a meeting for the purpose of reaching agreement on the design and size of bioavailability and  bioequivalence studies needed for approval of such application.  The sponsor or applicant shall provide information necessary for discussion and agreement on the design and size of such studies.  Minutes of any such meeting shall be prepared by the Secretary and made available to the sponsor or applicant.

(C) Any agreement regarding the parameters of design and size of bioavailability and bioequivalence studies of a drug under this paragraph that is reached between the Secretary and a sponsor or applicant shall be reduced to writing and made part of the administrative record by the Secretary.  Such agreement shall not be changed after the testing begins, except--

(i) with the written agreement of the sponsor or applicant;  or

(ii) pursuant to a decision, made in accordance with subparagraph (D) by the director of the reviewing division, that a substantial scientific issue essential to determining the safety or effectiveness of the drug has been identified after the testing has begun.

(D) A decision under subparagraph (C)(ii) by the director shall be in writing and the Secretary shall provide to the sponsor or applicant an opportunity for a meeting at which the director and the sponsor or applicant will be present and at which the director will document the scientific issue involved.

(E) The written decisions of the reviewing division shall be binding upon, and may not directly or indirectly be changed by, the field or compliance  office personnel unless such field or compliance office personnel demonstrate

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

to the reviewing division why such decision should be modified.

(F) No action by the reviewing division may be delayed because of the unavailability of information from or action by field personnel unless the reviewing division determines that a delay is necessary to assure the marketing of a safe and effective drug.

(G) For purposes of this paragraph, the reviewing division is the division responsible for the review of an application for approval of a drug under this subsection (including scientific matters, chemistry, manufacturing, and controls).

(4) Subject to paragraph (5), the Secretary shall approve an application for a drug unless the Secretary finds--

(A) the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity;

(B) information submitted with the application is insufficient to show that each of the proposed conditions of use have been previously approved for the listed drug referred to in the application;

(C)(i) if the listed drug has only one active ingredient, information submitted with the application is insufficient to show that the active ingredient is the same as that of the listed drug;

(ii) if the listed drug has more than one active ingredient, information submitted with the application is insufficient to show that the active ingredients are the same as the active ingredients of the listed drug, or

(iii) if the listed drug has more than one active ingredient and if the application is for a drug which has an active ingredient different from the listed drug, information submitted with the application is insufficient to show--

(I) that the other active ingredients are the same as the active ingredients of the listed drug, or

(II) that the different active ingredient is an active ingredient of a listed drug or a drug which does not meet the requirements of section 321(p) of this title,

or no petition to file an application for the drug with the different ingredient was approved under paragraph (2)(C);

(D)(i) if the application is for a drug whose route of administration, dosage form, or strength of the drug is the same as the route of administration, dosage form, or strength of the listed drug referred to in the application, information submitted in the application is insufficient to show that the route of administration, dosage form, or strength is the same as that of the listed drug, or

(ii) if the application is for a drug whose route of administration, dosage form, or strength of the drug is different from that of the listed drug referred to in the application, no petition to file an application for the drug with the different route of administration, dosage form, or strength was approved under paragraph (2)(C);

(E) if the application was filed pursuant to the approval of a petition under paragraph (2)(C), the application did not contain the information required by the Secretary respecting the active ingredient, route of administration, dosage form, or strength which is not the same;

(F) information submitted in the application is insufficient to show that the drug is bioequivalent to the listed drug referred to in the application or, if the application was filed pursuant to a petition approved under paragraph (2)(C), information submitted in the application is insufficient to show that the active ingredients of the new drug are of the same pharmacological or therapeutic class as those of the listed drug referred to in paragraph (2)(A)(i) and that the new drug can be expected to have the same therapeutic effect as the listed drug when administered to patients for a condition of use referred to in such paragraph;

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

(G) information submitted in the application is insufficient to show that the labeling proposed for the drug is the same as the labeling approved for the listed drug referred to in the application except for changes required because of differences approved under a petition filed under paragraph (2)(C) or because the drug and the listed drug are produced or distributed by different manufacturers;

(H) information submitted in the application or any other information available to the Secretary shows that (i) the inactive ingredients of the drug are unsafe for use under the conditions prescribed, recommended, or suggested in the labeling proposed for the drug, or (ii) the composition of the drug is unsafe under such conditions because of the type or quantity of inactive ingredients included or the manner in which the inactive ingredients are included;

(I) the approval under subsection (c) of this section of the listed drug referred to in the application under this subsection has been withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section, the Secretary has published a notice of opportunity for hearing to withdraw approval of the listed drug under subsection (c) of this section for grounds described in the first sentence of subsection (e) of this section, the approval under this subsection of the listed drug referred to in the application under this subsection has been withdrawn or suspended under paragraph (6), or the Secretary has determined that the listed drug has been withdrawn from sale for safety or effectiveness reasons;

(J) the application does not meet any other requirement of paragraph (2)(A); or

(K) the application contains an untrue statement of material fact.

(5)(A) Within one hundred and eighty days of the initial receipt of an application under paragraph (2) or within such additional period as may be agreed upon by the Secretary and the applicant, the Secretary shall approve or disapprove the application.

(B) The approval of an application submitted under paragraph (2) shall be made effective on the last applicable date determined under the following:

(i) If the applicant only made a certification described in subclause (I) or (II) of paragraph (2)(A)(vii) or in both such subclauses, the approval may be made effective immediately.

(ii) If the applicant made a certification described in subclause (III) of paragraph (2)(A)(vii), the approval may be made effective on the date certified under subclause (III).

(iii) If the applicant made a certification described in subclause (IV) of paragraph (2)(A)(vii), the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received. If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, except that--

(I) if before the expiration of such period the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of the court decision,

(II) if before the expiration of such period the court decides that such patent has been infringed, the approval shall be made effective on such date as the court orders under section 271(e)(4)(A) of Title 35 or

(III) if before the expiration of such period the court grants a preliminary injunction prohibiting the applicant from engaging in the commercial manufacture or sale of the drug until the court decides the issues of patent validity and infringement and if the court decides that such patent is invalid or not infringed, the approval shall be made effective on the date of such court decision.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

In such an action, each of the parties shall reasonably cooperate in expediting the action.  Until the expiration of forty-five days from the date the notice made under paragraph (2)(B)(i) is received, no action may be brought under section 2201 of Title 28 for a declaratory judgment with respect to the patent.  Any action brought under section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

(iv) If the application contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection continuing such a certification, the application shall be made effective not earlier than one hundred and eighty days after--

(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II) the date of a decision of a court in an action described in clause  (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

(C) If the Secretary decides to disapprove an application, the Secretary shall give the applicant notice of an opportunity for a hearing before the Secretary on the question of whether such application is approvable.  If the applicant elects to accept the opportunity for hearing by written request within thirty days after such notice, such hearing shall commence not more than ninety days after the expiration of such thirty days unless the Secretary and the applicant otherwise agree.  Any such hearing shall thereafter be conducted on an expedited basis and the Secretary's order thereon shall be issued within ninety days after the date fixed by the Secretary for filing final briefs.

(D)(i) If an application (other than an abbreviated new drug application) submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted effective before the expiration of ten years from the date of the approval of the application under subsection (b) of this section.

(ii) If an application submitted under subsection (b) of this section for a drug, no active ingredient (including any ester or salt of the active ingredient) of which has been approved in any other application under subsection (b) of this section, is approved after September 24, 1984, no application may be submitted under this subsection which refers to the drug for which the subsection (b) application was submitted before the expiration of five years from the date of the approval of the application under subsection (b) of this section, except that such an application may be submitted under this subsection after the expiration of four years from the date of the approval of the subsection (b) application if it contains a certification of patent invalidity or noninfringement described in subclause (IV) of paragraph (2)(A)(vii).  The approval of such an application shall be made effective in accordance with subparagraph (B) except that, if an action for patent infringement is commenced during the one-year period beginning forty-eight months after the date of the approval of the subsection (b) application, the thirty-month period referred to in subparagraph (B)(iii) shall be extended by such amount of time (if any) which is required for seven and one-half years to have elapsed from the date of approval of the subsection (b) application.

(iii) If an application submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application approved under subsection (b) of this section, is approved after September 24, 1984, and if such application contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant, the Secretary may not make the approval of an application submitted under this subsection for the conditions of approval of such drug in the subsection (b) application effective before the expiration of three years from the date of the approval of the application under subsection (b) of this section

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

for such drug.

(iv) If a supplement to an application approved under subsection (b) of this section is approved after September 24, 1984, and the supplement contains reports of new clinical investigations (other than bioavailability studies) essential to the approval of the supplement and conducted or sponsored by the person submitting the supplement, the Secretary may not make the approval of an application submitted under this subsection for a change approved in the supplement effective before the expiration of three years from the date of the approval of the supplement under subsection (b) of this section.

(v) If an application (or supplement to an application) submitted under subsection (b) of this section for a drug, which includes an active ingredient (including any ester or salt of the active ingredient) that has been approved in another application under subsection (b) of this section, was approved during the period beginning January 1, 1982, and ending on September 24, 1984, the Secretary may not make the approval of an application submitted under this subsection which refers to the drug for which the subsection (b) application was submitted or which refers to a change approved in a supplement to the subsection (b) application effective before the expiration of two years from September 24, 1984.

(6) If a drug approved under this subsection refers in its approved application to a drug the approval of which was withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section or was withdrawn or suspended under this paragraph or which, as determined by the Secretary, has been withdrawn from sale for safety or effectiveness reasons, the approval of the drug under this subsection shall be withdrawn or suspended--

(A) for the same period as the withdrawal or suspension under subsection (e) of this section or this paragraph, or

(B) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

(7)(A)(i) Within sixty days of September 24, 1984, the Secretary shall publish and make available to the public--

(I) a list in alphabetical order of the official and proprietary name of each drug which has been approved for safety and effectiveness under subsection (c) of this section before September 24, 1984;

(II) the date of approval if the drug is approved after 1981 and the number of the application which was approved; and

(III) whether in vitro or in vivo bioequivalence studies, or both such studies, are required for applications filed under this subsection which will refer to the drug published.

(ii) Every thirty days after the publication of the first list under clause (i) the Secretary shall revise the list to include each drug which has been approved for safety and effectiveness under subsection (c) of this section or approved under this subsection during the thirty-day period.

(iii) When patent information submitted under subsection (b) or (c) of this section respecting a drug included on the list is to be published by the Secretary, the Secretary shall, in revisions made under clause (ii), include such information for such drug.

(B) A drug approved for safety and effectiveness under subsection (c) of this section or approved under this subsection shall, for purposes of this subsection, be considered to have been published under subparagraph (A) on the date of its approval or September 24, 1984, whichever is later.

(C) If the approval of a drug was withdrawn or suspended for grounds described in the first sentence of subsection (e) of this section or was withdrawn or suspended under paragraph (6) or if the Secretary determines

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

that a drug has been withdrawn from sale for safety or effectiveness reasons, it may not be published in the list under subparagraph (A) or, if the withdrawal or suspension occurred after its publication in such list, it shall be immediately removed from such list--

  (i) for the same period as the withdrawal or suspension under subsection (e) of this section or paragraph (6), or

  (ii) if the listed drug has been withdrawn from sale, for the period of withdrawal from sale or, if earlier, the period ending on the date the Secretary determines that the withdrawal from sale is not for safety or effectiveness reasons.

A notice of the removal shall be published in the Federal Register.

  (8) For purposes of this subsection:

  (A) The term "bioavailability" means the rate and extent to which the active ingredient or therapeutic ingredient is absorbed from a drug and becomes available at the site of drug action.

  (B) A drug shall be considered to be bioequivalent to a listed drug if--

  (i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or

  (ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

  (9) The Secretary shall, with respect to each application submitted under this subsection, maintain a record of--

  (A) the name of the applicant,

  (B) the name of the drug covered by the application,

  (C) the name of each person to whom the review of the chemistry of the application was assigned and the date of such assignment, and

  (D) the name of each person to whom the bioequivalence review for such application was assigned and the date of such assignment.

The information the Secretary is required to maintain under this paragraph with respect to an application submitted under this subsection shall be made available to the public after the approval of such application.

  (k) Records and reports; required information; regulations and orders; access to records

  (1) In the case of any drug for which an approval of an application filed under subsection (b) or (j) of this section is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, of data relating to clinical experience and other data or information, received or otherwise obtained by such applicant with respect to such drug, as the Secretary may by general regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination, whether there is or may be ground for invoking subsection (e) of this section. Regulations and orders issued under this subsection and under subsection (i) of this section shall have due regard for the professional ethics of the medical profession and the interests of patients and shall

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

provide, where the Secretary deems it to be appropriate, for the examination, upon request, by the persons to whom such regulations or orders are applicable, of similar information received or otherwise obtained by the Secretary.

 (2) Every person required under this section to maintain records, and every person in charge or custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

(l) Public disclosure of safety and effectiveness data

 Safety and effectiveness data and information which has been submitted in an application under subsection (b) of this section for a drug and which has not previously been disclosed to the public shall be made available to the public, upon request, unless extraordinary circumstances are shown--

 (1) if no work is being or will be undertaken to have the application approved,

 (2) if the Secretary has determined that the application is not approvable  and all legal appeals have been exhausted,

 (3) if approval of the application under subsection (c) of this section is withdrawn and all legal appeals have been exhausted,

 (4) if the Secretary has determined that such drug is not a new drug, or

 (5) upon the effective date of the approval of the first application under subsection (j) of this section which refers to such drug or upon the date upon which the approval of an application under subsection (j) of this section which refers to such drug could be made effective if such an application had been submitted.

(m) "Patent" defined

 For purposes of this section, the term "patent" means a patent issued by the Patent and Trademark Office of the Department of Commerce.

(n) Scientific advisory panels

 (1) For the purpose of providing expert scientific advice and recommendations to the Secretary regarding a clinical investigation of a drug or the approval for marketing of a drug under section 355 of this title or section 262 of Title 42, the Secretary shall establish panels of experts or use panels of experts established before November 21, 1997, or both.

 (2) The Secretary may delegate the appointment and oversight authority granted under section 394 of this title to a director of a center or successor entity within the Food and Drug Administration.

 (3) The Secretary shall make appointments to each panel established under paragraph (1) so that each panel shall consist of--

 (A) members who are qualified by training and experience to evaluate the safety and effectiveness of the drugs to be referred to the panel and who, to the extent feasible, possess skill and experience in the development, manufacture, or utilization of such drugs;

 (B) members with diverse expertise in such fields as clinical and administrative medicine, pharmacy, pharmacology, pharmacoeconomics, biological and physical sciences, and other related professions;

 (C) a representative of consumer interests, and a representative of interests of the drug manufacturing industry

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

not directly affected by the matter to be brought before the panel; and

(D) two or more members who are specialists or have other expertise in the particular disease or condition for which the drug under review is proposed to be indicated.

Scientific, trade, and consumer organizations shall be afforded an opportunity to nominate individuals for appointment to the panels. No individual who is in the regular full-time employ of the United States and engaged in the administration of this chapter may be a voting member of any panel. The Secretary shall designate one of the members of each panel to serve as chairman thereof.

(4) Each member of a panel shall publicly disclose all conflicts of interest that member may have with the work to be undertaken by the panel. No member of a panel may vote on any matter where the member or the immediate family of such member could gain financially from the advice given to the Secretary. The Secretary may grant a waiver of any conflict of interest requirement upon public disclosure of such conflict of interest if such waiver is necessary to afford the panel essential expertise, except that the Secretary may not grant a waiver for a member of a panel when the member's own scientific work is involved.

(5) The Secretary shall, as appropriate, provide education and training to each new panel member before such member participates in a panel's activities, including education regarding requirements under this Act and related regulations of the Secretary, and the administrative processes and procedures related to panel meetings.

(6) Panel members (other than officers or employees of the United States), while attending meetings or conferences of a panel or otherwise engaged in its business, shall be entitled to receive compensation for each day so engaged, including traveltime, at rates to be fixed by the Secretary, but not to exceed the daily equivalent of the rate in effect for positions classified above grade GS-15 of the General Schedule. While serving away from their homes or regular places of business, panel members may be allowed travel expenses (including per diem in lieu of subsistence) as authorized by section 5703 of Title 5, for persons in the Government service employed intermittently.

(7) The Secretary shall ensure that scientific advisory panels meet regularly and at appropriate intervals so that any matter to be reviewed by such a panel can be presented to the panel not more than 60 days after the matter is ready for such review. Meetings of the panel may be held using electronic communication to convene the meetings.

(8) Within 90 days after a scientific advisory panel makes recommendations on any matter under its review, the Food and Drug Administration official responsible for the matter shall review the conclusions and recommendations of the panel, and notify the affected persons of the final decision on the matter, or of the reasons that no such decision has been reached. Each such final decision shall be documented including the rationale for the decision.

CREDIT(S)

1972 Main Volume

(June 25, 1938, c. 675, § 505, 52 Stat. 1052; 1940 Reorg.Plan No. IV, § 12, eff. June 30, 1940, 5 F.R. 2422, 54 Stat. 1237; June 25, 1948, c. 646, § 32(b), 62 Stat. 991; May 24, 1949, c. 139, § 127, 63 Stat. 107; 1953 Reorg.Plan No. 1, § 5, eff. Apr. 11, 1953, 18 F.R. 2053, 67 Stat. 631; June 11, 1960, Pub.L. 86-507, § 1(18), 74 Stat. 201; Oct. 10, 1962, Pub.L. 87-781, Title I, §§ 102(b)-(d), 103(a), (b), 104(a)-(d)(2), 76 Stat. 781-783, 784, 785.)

1998 Electronic Update

(As amended Aug. 16, 1972, Pub.L. 92-387, § 4(d), 86 Stat. 562; Sept. 24, 1984, Pub.L. 98-417, Title I, §§

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

21 USCA s 355              **Page 18**

101, 102(a)-(b)(5), 103, 104, 98 Stat. 1585, 1592, 1593, 1597; May 13, 1992, Pub.L. 102-282, § 5, 106 Stat. 161; Aug. 13, 1993, Pub.L. 103-80, § 3(n), 107 Stat. 777; Nov. 21, 1997, Pub.L. 105-115, Title I, §§ 115(a), (b), 117, 119, 120, 124(a), 111 Stat. 2313, 2315, 2316, 2318, 2324.)

35 USCA s 271                                                                    Page 77
35 U.S.C.A. § 271

UNITED STATES CODE ANNOTATED
TITLE 35. PATENTS
PART III--PATENTS AND PROTECTION OF PATENT RIGHTS
CHAPTER 28--INFRINGEMENT OF PATENTS

Copr. © West 1998. No Claim to Orig. U.S. Govt. Works

Current through P.L. 105-220, approved 8-7-1998

§ 271. Infringement of patent

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

(e)(1) It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention (other than a new animal drug or veterinary biological product (as those terms are used in the Federal Food, Drug, and Cosmetic Act and the Act of March 4, 1913) which is primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques) solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

(2) It shall be an act of infringement to submit--

(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, or

(B) an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151-158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques and which is claimed in a patent or the use of which is claimed in a patent,

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug or veterinary biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent.

(3) In any action for patent infringement brought under this section, no injunctive or other relief may be granted which would prohibit the making, using, offering to sell, or selling within the United States or importing into the United States of a patented invention under paragraph (1).

(4) For an act of infringement described in paragraph (2)--

(A) the court shall order the effective date of any approval of the drug or veterinary biological product involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed,

(B) injunctive relief may be granted against an infringer to prevent the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product, and

(C) damages or other monetary relief may be awarded against an infringer only if there has been commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States of an approved drug or veterinary biological product.

The remedies prescribed by subparagraphs (A), (B), and (C) are the only remedies which may be granted by a court for an act of infringement described in paragraph (2), except that a court may award attorney fees under section 285.

(f)(1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

(g) Whoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer, if the importation, offer to sell, sale, or use of the product occurs during the term of such process patent. In an action for infringement of a process patent, no remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product. A product which is made by a patented process will, for purposes of this title, not be considered to be so made after--

(1) it is materially changed by subsequent processes; or

(2) it becomes a trivial and nonessential component of another product.

(h) As used in this section, the term "whoever" includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

same extent as any nongovernmental entity.

 (i) As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is that in which the sale will occur before the expiration of the term of the patent.

CREDIT(S)

1984 Main Volume

(July 19, 1952, c. 950, 66 Stat. 811.)

1998 Electronic Update

(As amended Sept. 24, 1984, Pub.L. 98-417, Title II, § 202, 98 Stat. 1603; Nov. 8, 1984, Pub.L. 98-622, Title I, § 101, 98 Stat. 3383; Aug. 23, 1988, Pub.L. 100-418, Title IX,    § 9003, 102 Stat. 1564; Nov. 16, 1988, Pub.L. 100- 670, Title II, § 201(i), 102 Stat. 3988; Nov. 19, 1988, Pub.L. 100-703, Title II,  § 201, 102 Stat. 4676; Oct. 28, 1992, Pub.L. 102-560,  § 2(a)(1), 106 Stat. 4230; Dec. 8, 1994, Pub.L. 103-465, Title V,    § 533(a), 108 Stat. 4988.)

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------X

GLAXO, INC., GLAXO GROUP LIMITED,        :
and ALLEN AND HANBURYS LIMITED,
                                         :
            Plaintiffs
                                         :
            -against-                            No. 3: 95-CV-01342(GLG)
                                         :
BOEHRINGER INGELHEIM CORPORATION,                Memorandum Decision
and BOEHRINGER INGELHEIM                  :
CHEMICALS, INC.,
                                         :
            Defendants.
                                         :
-------------------------------------X

        Defendants have moved for partial summary judgment (doc. #

135)   as   to   Plaintiffs'   claim   that   Defendants'   ranitidine

hydrochloride product infringes Plaintiffs' patents nos. 4,521,431

(the '431 patent) and 4,672,133 (the '133 patent).   Based on

Plaintiffs' express concession that Defendants' product does not

infringe these patents, Defendants' Motion for Partial Summary

Judgment on this claim is GRANTED.


                            SO ORDERED.


Dated:    October 7 , 1996.
          Bridgeport, Connecticut.


                                    GERARD L. GOETTEL
                                    U.S.D.J.

**andrews**
# Pharmaceutical

November 1997

# GRANUTEC-GOVERNMENT BRIEF

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

Nos. 97-1873 & 97-1874

GRANUTEC, INC.,

Plaintiff-Appellee,

v.

DONNA E. SHALALA, Secretary of
Health and Human Services, et al.,

Defendants-Appellees,

and

GENPHARM INC. and GENEVA PHARMACEUTICALS INC.,

Intervenors-Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

BRIEF FOR THE FEDERAL APPELLEES

## STATEMENT OF THE ISSUE

Whether the district court correctly ruled that the regulation
of the Food and Drug Administration (FDA) at issue here is valid
and that, as a result, the FDA should have approved Granutec's
abbreviated new drug application (ANDA) for marketing on July 10,
1997.

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

Pertinent provisions of the Drug Price Competition and Patent
Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, 21
U.S.C. 355(j) (the Hatch-Waxman Amendments), which amended the
Federal Food, Drug, and Cosmetic Act (FDC Act), 21 U.S.C. 301 et
seq., and pertinent provisions of FDA's regulations are attached as
a statutory and regulatory addendum to this brief.

## STATEMENT OF JURISDICTION

The district court's jurisdiction was invoked inter alia
pursuant to 28 U.S.C. 1331. JA 12 ¶2.[1] The district court entered
final judgment on July 3, 1997. JA 536. Genpharm Inc. and Geneva
Pharmaceuticals Inc. filed notices of appeal on July 3, 1997 (JA
538, 544), and obtained a stay of the district court's order on
July 9, 1997. This Court's appellate jurisdiction to review the

1/ Geneva Pharmaceuticals Inc. argues that, pursuant to 21 U.S.C.
355(h), the district court lacked jurisdiction and that
jurisdiction to review FDA's actions lies solely with the courts of
appeals. Geneva Br. at 14-15. Section 355(h) states that "[a]n
appeals may be taken by the applicant from an order of the Secretary
refusing or withdrawing approval of an application under this
section. Such appeal shall be taken by filing in the United States
court of appeals * * *." 21 U.S.C. 355(h) (emphasis added). Even
if Geneva is correct that FDA's tentative approval of Granutec's
ANDA (see JA 30) is tantamount to a refusal, Geneva's
jurisdictional argument has no effect in this case. This case is
now before this Court which, even under Geneva's theory, has
jurisdiction to review the issues presented in this appeal. See 28
U.S.C. 1631.

2

Copyright © 1997 Andrews Publications.   All rights reserved.   Reproduction prohibited.

B1

final decision of the district court is invoked pursuant to 28 U.S.C. 1291.

## STATEMENT OF THE CASE

### 1. Nature of the Case.

This case concerns the entry into the market of ranitidine hydrochloride, a generic form of the popular drug Zantac. Pursuant to the Hatch-Waxman Amendments, FDA promulgated a regulation that addresses the situation before the Court -- i.e., when a generic drug is entitled to 180 days of market exclusivity. Under FDA's regulation, only the first ANDA applicant that (1) challenges a patent, (2) is sued for patent infringement, and (3) successfully defends that suit is entitled to the 180 days of market exclusivity. In Nova Pharmaceutical Corp. v. Shalala, 955 F. Supp. 128 (D.D.C. 1997), the district court ruled that FDA's regulation was contrary to law and that the 180-day period of market exclusivity must go to the first ANDA applicant that challenges a patent without regard to whether that applicant is sued for patent infringement or whether that applicant succeeds in any patent infringement suit. FDA decided on an interim basis to acquiesce in the Nova decision until a reversal of that decision could be obtained. As a result, FDA did not apply its regulation to ranitidine approvals. Granutec, Inc. filed suit and sought a preliminary injunction directing FDA to follow its regulation, which would have allowed Granutec to market its generic form of ranitidine on July 10, 1997. Genpharm, Inc. and Geneva Pharmaceuticals, Inc., intervened in the action, urging the district court not to order FDA to follow the FDA regulation.

3

These two intervenors posited two different interpretations of the Hatch-Waxman Amendments. Each interpretation diverged from FDA's regulation, and also diverged in significant ways from FDA's position in temporary acquiescence to the Nova decision. Each interpretation accorded market exclusivity to the proponent of the proposal. The district court rejected the intervenors' claims and ordered FDA to follow its regulation. Geneva and Genpharm then appealed.

### 2. Statutory and Regulatory Background.

At issue in this case are provisions of the FDC Act and its implementing regulations that apply to the approval of new and generic drug applications. These provisions were added to the FDC Act through the Hatch-Waxman Amendments of 1984. Title I of the Hatch-Waxman Amendments was intended "to make available more low cost generic drugs by establishing a generic drug approval procedure for pioneer drugs first approved after 1962." H.R. Rep. No. 857 (Part I), 98th Cong., 2d Sess. at 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2647. Until the Hatch-Waxman Amendments, manufacturers of generic drugs first approved after 1962 generally were required to duplicate the time-consuming and expensive safety and effectiveness studies already performed on the pioneer drugs. The Hatch-Waxman Amendments permit these generic drug manufacturers to rely on FDA's prior determinations of the safety and efficacy of the pioneer drug. H.R. Rep. No. 857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984), reprinted in 1984 U.S.C.C.A.N. at 2647-48.

Title II of the Hatch-Waxman Amendments was intended to provide a new incentive for increased expenditures for research and development of pioneer drug products by "restoration of some of the

4

B2

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

andrews
# Pharmaceutical

November 1997

time lost on patent life while the product is awaiting pre-market approval." H.R. Rep. No. 857 (Part II), 98th Cong., 2d Sess. at 15 (1984), reprinted in 1984 U.S.C.C.A.N. at 2648.

a. *New Drug Applications (NDAs).*

Pharmaceutical companies seeking to market pioneer, or innovator, drugs must first obtain FDA approval through the filing of a New Drug Application (NDA). 21 U.S.C. 355(a), (b). An NDA applicant, also referred to as a sponsor, is required to submit to FDA data demonstrating the safety and effectiveness of the drug. In addition, the NDA applicant must submit information on any patent which claims the drug or a method of using such drug for which a claim of patent infringement could reasonably be asserted against an unauthorized party. 21 U.S.C. 355(b)(1), (c)(2). The patent information must include the patent number and date of expiration. Id. FDA is required to publish this information, and does so in a publication entitled "Approved Drug Products With Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book"). See 21 C.F.R. 314.53(e).

b. *Abbreviated New Drug Applications (ANDAs).*

A manufacturer who wishes to market a generic version of a pioneer or innovator drug may submit an ANDA to FDA. 21 U.S.C. 355(a), (j). Under the ANDA procedure, 21 U.S.C. 355(j), ANDA applicants may rely upon FDA findings of safety and effectiveness for the pioneer drug product. 21 U.S.C. 355(j)(2). The statute requires that an ANDA contain, among other data and information, a certification with respect to each patent that claims the drug or the method of the drug's use for which the ANDA applicant is seeking approval and for which patent information is required to be

5

filed. 21 U.S.C. 355(j)(2)(A)(vii). This certification must state one of the following (id.):

(I)   that the required patent information relating to such patent has not been filed;

(II)  that such patent has expired;

(III) that the patent will expire on a particular date; or

(IV)  that such patent is invalid or will not be infringed by the drug for which approval is being sought.

If a certification is made under paragraph I or II indicating that patent information pertaining to the drug or its use has not been filed with FDA or the patent has expired, approval of the ANDA may be made effective immediately. 21 U.S.C. 355(j)(4)(B)(ii). A certification under paragraph III indicates that the ANDA applicant does not intend to market the drug until after the expiration date of the applicable patent, and approval of the ANDA may be made effective on such expiration date. 21 U.S.C. 355(j)(4)(B)(ii).

A certification under paragraph IV -- the paragraph at issue in this case -- requires that the ANDA applicant give notice of the filing of the ANDA to the patent owner and the NDA holder for the listed drug, which notice must include a detailed statement of the factual and legal basis for the ANDA applicant's opinion that the patent is not valid or will not be infringed by marketing of the generic drug at issue. 21 U.S.C. 355(j)(2)(B). FDA may approve an ANDA with a paragraph IV certification, and the approval may become effective immediately, despite the unexpired patent, unless an action for infringement of the patent is brought against the

6

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

subject of the certification to be invalid or not infringed.

whichever is earlier.

FDA has implemented this statutory provision in 21 C.F.R. 314.107(c)(1), which provides as follows:

(1) If an abbreviated new drug application contains a certification that a relevant patent is invalid, unenforceable, or will not be infringed and the application is for a generic copy of the same listed drug for which one or more substantially complete abbreviated new drug applications were previously submitted containing a certification that the same patent was invalid, unenforceable, or would not be infringed and the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice submitted under § 314.95, approval of the subsequent abbreviated new drug application will be made effective no sooner than 180 days from whichever of the following dates is earlier:

(i) The date the applicant submitting the first application first commences commercial marketing of its drug product; or

(ii) The date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed.

(emphasis added). In short, the regulation provides that, in order to receive the 180-day period of exclusivity, the first paragraph IV ANDA applicant (1) must be sued and (2) must then successfully defend the patent infringement suit.

d. *The Nova Decision.*

In *Nova Pharmaceuticals v. Kessler,* 955 F. Supp. 128 (D.D.C.

8

---

ANDA applicant within 45 days of the date the patent owner and NDA holder receive notice of the paragraph IV certification. 21 U.S.C. 355(j)(4)(B)(iii); 21 C.F.R. 314.107(f)(2). If a patent infringement action is brought, approval of the ANDA will not become effective until at least 30 months from the date that the patent owner and NDA holder received notice, unless a final decision is reached sooner in the patent case or the court otherwise orders a longer or shorter period. 21 U.S.C. 355(j)(4)(B)(iii). As an incentive to reward companies for being the first to challenge patents, Hatch-Waxman provides in certain circumstances a 180-day period of market exclusivity to an ANDA applicant who made a paragraph IV certification as against other, later-filed paragraph IV applicants for the same generic drug. 21 U.S.C. 355(j)(4)(B)(iv). It is eligibility for that period of market exclusivity that is at issue here. This section provides:

(iv) If the (ANDA) contains a (Paragraph IV) certification and is for a drug for which a previous application has been submitted under this subsection continuing [sic; containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after --

(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the

7

B4    Copyright © 1997 Andrews Publications.    All rights reserved.    Reproduction prohibited.

andrews
# Pharmaceutical

1997, both Mova and Mylan Pharmaceuticals had filed ANDAs and paragraph IV certifications for a glyburide product used to treat diabetes. However, the innovator company, Upjohn, sued only Mova, not Mylan. Mova had filed the first paragraph IV ANDA, and at the time of the Mova decision, its lawsuit with Upjohn was pending. Under FDA's applicable regulation (reprinted above), FDA approved Mylan's ANDA because Mova was not at that point entitled to the 180-day period of exclusivity: (1) Mova had not yet "successfully defended" its patent litigation; and (2) Mylan had not been sued.

The Mova court, however, ruled that, in order to qualify for the 180-day period of exclusivity, the statute does not require that the first paragraph IV ANDA applicant "successfully defend" the patent litigation or even that it be sued. In the court's view, the simple fact that Mova had filed the first ANDA with a paragraph IV certification in and of itself entitled Mova to the 180 days of exclusivity. 955 F. Supp. at 130. Consequently, that court granted Mova's request for preliminary injunctive relief and ordered FDA to suspend its approval of Mylan's glyburide product until 180 days after Mova began marketing the product or Mova won its patent litigation. 955 F. Supp. at 132.

FDA did not appeal this interlocutory decision and, instead, filed an opposition to Mova's motion for summary judgment and asked

9

the district court to uphold the validity of FDA's regulation. FDA expected the Mova court to issue a final ruling quickly. Mylan, however, did appeal, and the appeal is presently pending. Mova Pharmaceuticals v. Kessler and Mylan Pharmaceuticals, D.C. Cir. No. 97-5082. The preliminary injunction in Mova has not been stayed, and the court has not yet acted on the summary judgment motion.

In the interim, as a matter of agency policy nationwide, FDA decided to acquiesce temporarily -- pending an appellate decision overturning the district court decision or a favorable ruling on summary judgment -- in the Mova preliminary injunction in order to promote administrative uniformity and to avoid forum shopping problems that would lead disappointed ANDA applicants back to the United States District Court for the District of Columbia where the Mova decision was rendered. JA 31, 146, 223, 273-274.

3. The Generic Drug Applications At Issue.

The NDA holder for Zantac is the Glaxo Wellcome Company. JA 339. Zantac is the trade name for ranitidine hydrochloride. Glaxo has listed in the "Orange Book" two patents for Zantac that are relevant to this litigation: U.S. Patent No. 4,128,658 ("the '658 patent"), with an expiration date of July 25, 1997; and U.S. patent No. 4,521,431 ("the '431 patent"), with an expiration date of June 4, 2002. See, e.g., JA 17 ¶22. No ANDA applicant successfully

10

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

**andrews**
# Pharmaceutical

November 1997

challenged the '658 patent before it expired July 25, 1997, but some of the applicants involved in this litigation successfully challenged the '431 patent, obtaining court rulings that the applicants' generic ranitidine hydrochloride product does not infringe the '431 patent. See, e.g., Genpharm Br. at 13-14.

a. *Genpharm.* On February 15, 1991, Genpharm filed the first paragraph IV ANDA for ranitidine. JA 341. Glaxo sued Genpharm for patent infringement. Subsequently, Genpharm agreed to a "final Judgment on Consent" in favor of Glaxo on October 23, 1995, with respect to both the '431 and '658 patents. JA 45. In May, 1996, Genpharm amended its ANDA, making a paragraph IV certification with respect to the '431 patent. JA 342-343. Glaxo sued Genpharm for patent infringement for a third time. JA 343 ¶14.

b. *Geneva.* Geneva submitted its paragraph IV ANDA three years after Genpharm, in February, 1994. Geneva Br. at 8. Geneva also filed a paragraph IV certification with respect to the '431 patent. Glaxo brought patent infringement litigation against Geneva, and that litigation continues.

c. *Granutec.* Granutec also submitted an ANDA with a paragraph IV certification. Glaxo sued Granutec, and Granutec prevailed in a decision that was affirmed by the Federal Circuit on April 4, 1997. *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562 (Fed.

11

Cir. 1997).

d. *Boehringer.* Boehringer Ingelheim Corporation also submitted a paragraph IV ANDA for ranitidine and was sued by Glaxo. On October 7, 1996, the district court for the District of Connecticut granted summary judgment for Boehringer on the basis of Glaxo's "express concession that Defendants' product does not infringe these patents." JA 238. Glaxo did not appeal that order, and its appeal time expired on March 3, 1997. JA 239, 240.

In sum, the critical facts are: (1) Genpharm was the first applicant to file an ANDA for ranitidine containing a paragraph IV certification; (2) Genpharm has not begun to market its ranitidine product; and (3) the first judgment holding the Glaxo patent invalid and not enforceable became final when Glaxo's right to appeal the decision in the *Boehringer* case expired on March 3, 1997. Thus, under *Mova* and under FDA's current interpretation of 21 U.S.C. 355(j)(4)(B)(iv) and 21 C.F.R. 314.107(e)(2)(i) in light of *Mova*, the 180-day period of exclusivity for Genpharm began to run on March 3, 1997 (when Glaxo's right to appeal the *Boehringer* decision lapsed), and expired on August 29, 1997.

4. **This Suit.**

a. On June 17, 1997, FDA informed Granutec by letter that it would not approve Granutec's ANDA until the expiration of

12

B6

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

andrews
# Pharmaceutical

November 1997

Genpharm's 180-day exclusivity period on August 29, 1997. JA 30. FDA stated that, under its interim decision to acquiesce in the Mova decision, Genpharm Inc. was entitled to the 180-day period of exclusivity. JA 31-32. FDA further stated that a licensing agreement between Granutec and Glaxo did not alter this result. JA 32 (citing 59 Fed. Reg. 50338, 50346, 50353 (Oct. 3, 1994)).

b. On June 17, 1997, Granutec filed the instant suit, seeking injunctive relief requiring FDA to follow its regulations. JA 11. Under those regulations, Granutec asserted, no generic would have qualified for the 180-day exclusivity period. JA 20 ¶37. As a result, and based on its licensing agreement with Glaxo, which permitted Granutec to market its generic version of ranitidine on July 10, 1997 (JA 19 ¶35), Granutec sought an injunction requiring FDA to approve its ANDA for marketing as of July 10, 1997. JA 23, 25.

Genpharm Inc. and Geneva Pharmaceuticals moved to intervene in the action (JA 141, 214, 435), and the district court granted intervention at the hearing on Genpharm's motion for preliminary injunction (JA 241, 244-245). The intervenors opposed Granutec's motion.

Although FDA agreed with Granutec that its regulation was valid and that, under FDA's regulation, Granutec would be able to

13

begin marketing as of July 10, 1997, FDA informed the district court that, because of the preliminary injunction ruling in Mova, FDA had decided to acquiesce on an interim basis in the Mova ruling until a reversal of that decision could be obtained. See, e.g., JA 31, 269-275.

On July 3, 1997, the district court granted Granutec's motion for preliminary injunction (JA 532) and entered final judgment (JA 536). The court determined that, under FDA's regulation, no generic was entitled to market exclusivity, opening the way for Granutec to begin marketing on July 10, 1997, pursuant to its agreement with Glaxo. JA 534-535. In addition, "since the only issue before the Court is one of law and since the Court has an adequate basis to make a final ruling on the issue of law" (JA 534), the court entered a permanent injunction for Granutec, denied Geneva's motion for a preliminary injunction, and dismissed both Geneva's and Genpharm's cross-claims against FDA (JA 534-535).

c. Genpharm and Geneva appealed. JA 538, 544. On July 9, 1997, this Court granted Genpharm's and Geneva's motions for stay of the district court's judgment pending appeal. On July 15, 1997, following this Court's stay of the district court judgment, FDA notified certain applicants with ANDAs for ranitidine hydrochloride that, because of this Court's stay, the determination stated in the

14

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

andrews

# Pharmaceutical

November 1997

June 17, 1997, letter would apply: Genpharm is entitled to 180 days of market exclusivity, which expires on August 29, 1997. See, e.g., Geneva Br., Addendum at A-26.

On July 31, 1997, FDA notified Granutec that, inasmuch as "Genpharm, Inc. has waived as to Granutec, Inc., the exclusivity to which Genpharm, Inc. is entitled, * * * that * * * waiver permits FDA to approve your [ANDA] application" for marketing on August 1, 1997. Geneva Br., Addendum at A-28.

## SUMMARY OF ARGUMENT

1. Introduction. In this appeal, Genpharm and Geneva have challenged the district court's decision upholding the validity of FDA's market exclusivity regulation. In the district court, FDA had argued that, while it believed its regulation was valid (see, e.g., JA 274 -- "we believe that [Mova] is contrary to our regulations"), it had decided on an interim basis to acquiesce in the decision of Mova Pharmaceutical Corp. v. Shalala, 955 F. Supp. 128 (D.D.C. 1997), until a reversal of that decision could be obtained. In Mova, the district court granted a preliminary injunction to a generic drug manufacturer, ruling that FDA's market exclusivity regulation was invalid to the extent that, under the regulation, a generic manufacturer who was the first to file a paragraph IV ANDA was not entitled to the 180-day period of market

15

exclusivity unless (1) the manufacturer was sued for patent infringement and (2) successfully defended that patent infringement suit. The Mova district court, in contrast, ruled that the regulation was inconsistent with the statute because the statute required the first paragraph IV ANDA applicant to be granted 180 days of market exclusivity whether or not it was sued for patent infringement and, if sued, whether or not it successfully defended that suit. However, because Genpharm and Geneva have appealed the district court's decision in this case, in which the court ruled that FDA's regulation was valid, FDA now takes the position in this appeal that its regulation is valid and should be upheld on appeal.

1. FDA's interpretation of the statute can be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Where Congress has not directly addressed an issue or has addressed it ambiguously, a court may not impose its own construction on the statute but, rather, must determine whether the agency's position is based on a permissible interpretation of the statute.

2. FDA's regulation is a reasonable interpretation of the market exclusivity provision in the Hatch-Waxman Amendments. It represents a careful response to the fact that neither the Hatch-Waxman Amendments nor the legislative history specifically address

16

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

**andrews**

# Pharmaceutical

November 1997

the precise question at issue here. Although the statute provides a 180-day period of market exclusivity to the first generic drug applicant to challenge a patent by way of a paragraph IV ANDA, the statute does not specifically address whether the generic manufacturer is entitled to that period of exclusivity if it is not sued for patent infringement or, as here, if it is sued for patent infringement but loses that suit. Indeed, that the statute does not specifically address the situation presented in this case -- or does so ambiguously -- is buttressed by the fact that the several generic manufacturers participating in this litigation have each offered a distinctly different interpretation of the market exclusivity provision.

Given that the statute does not address the precise question at issue, FDA carefully considered alternative interpretations. FDA proposed during a complete notice-and-comment rulemaking. FDA rejected the alternatives based on its balancing of these alternatives against the overarching goals of the Hatch-Waxman legislation -- to provide notice to interested parties of the existence of NDA holders' patent claims and to ensure the prompt and orderly entry of generic drugs onto the market. FDA ultimately determined that the interpretation embodied in its regulation best served these goals.

17

## ARGUMENT

### FDA'S REGULATION EMBODYING THE "SUCCESSFUL DEFENSE" REQUIREMENT IS CONSISTENT WITH THE HATCH-WAXMAN AMENDMENTS AND, THEREFORE, SHOULD BE UPHELD.

Standard of Review. This Court reviews de novo the issue of whether FDA's regulation, as an interpretation of the Hatch-Waxman Amendments, is rational and not arbitrary and capricious. See, e.g., Shafer v. Preston Mem. Hosp. Corp., 107 F.3d 274, 277 (4th Cir. 1997); Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984, 986 (4th Cir. 1996); Bristol-Myers Squibb Co. v. Shalala, 91 F.3d 1493, 1499-1500 (D.C. Cir. 1996). The threshold determination is whether Congress has directly addressed the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-843 (1984). See also Cabell, supra, 101 F.3d at 986. However, "[w]here the statute is silent or ambiguous with respect to the question, a reasonable agency interpretation warrants deference." Ibid. See also Chevron, supra, 467 U.S. at 843 ("if, however, ... Congress has not directly addressed the precise question at issue," the court must determine "whether the agency's answer is based on a permissible interpretation of the statute.") (emphasis added). In

18

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

andrews
Pharmaceutical

November 1997

the latter situation, i.e., Chevron "step 2" cases, FDA's interpretation of the Hatch-Waxman Act must be upheld if it is reasonable, and can be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law • • •." 5 U.S.C. 706(2)(A). The Court cannot substitute its judgment for FDA's just because another interpretation is also reasonable. See, e.g., Young v. Community Nutrition Institute, 476 U.S. 974, 981 (1986). See also Cabell, 101 F.3d at 986; and Bristol-Myers Squibb Co. v. Shalala, supra, 91 F.3d at 1499-1500 (upholding FDA's regulatory construction of the "same labeling" requirement in the Hatch-Waxman Act).

A.    The Hatch-Waxman Act Does Not Address The Precise Question At Issue.

At issue in this case is the generic drug marketing exclusivity provision of the Hatch-Waxman Amendments, 21 U.S.C. 355(j)(4)(B)(iv). See pp. 8-9, supra, for text of provision. That provision plainly does not address the "precise question at issue" (Chevron, 467 U.S. at 843), which is how to apply the 180-day exclusivity provision when the first filer of an ANDA with a paragraph IV certification is sued but loses that litigation. Or,

2/ The statute also does not address, for example, how to implement the 180-day exclusivity provision when the first filer of an ANDA with a paragraph IV certification is not sued for patent infringement.

19

at the very least, it addresses the issue ambiguously. Thus, contrary to the district court decision in Mova, supra, 955 F. Supp. 128, there is unquestionably a statutory gap to be filled.

Indeed, proof that such a gap exists is provided by the fact that Genpharm, Geneva, Boehringer, and Granutec have all offered different interpretations of the provision at issue. Each claims that its interpretation is supported by the language of the statute which, in turn, demonstrates that the statute either does not address the precise question at issue or does so ambiguously.

B.    FDA's Regulation Is A Reasonable Interpretation Of The Hatch-Waxman Amendments; Therefore, It Should Be Upheld.

1.    FDA's interpretation (which Granutec supports) is embodied in 21 C.F.R. 314.107(c)(1). See p. 9, supra, for the text. As stated earlier (supra, p. 9), the regulation would not grant an award of 180 days of exclusivity to any generic in this case because Genpharm was the first paragraph IV filer but did not "successfully defend" the patent suit brought by Glaxo against it. The "successful defense" requirement should be upheld because it has been FDA's longstanding and consistent interpretation. see, e.g., Smiley v. Citibank (South Dakota) N.A., 116 S. Ct. 1730, 1733

20

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

**andrews**
# Pharmaceutical

November 1997

(1996), and because it necessarily "reconcil[es] conflicting policies." Chevron, supra, 467 U.S. at 844 (internal quotation marks and citation omitted), as demonstrated by the numerous opposing positions espoused by the generics in this case.

2.    FDA's interpretation was first explained in detail to the pharmaceutical industry in a July 29, 1988 guidance letter. JA 134. The letter inter alia states that "FDA believes that Congress intended this provision [21 U.S.C. 355(j)(4)(B)(iv)] to reward the first generic applicant to successfully litigate the scope or validity of a patent on a listed drug." JA 134.

As initially proposed in 1989, FDA's regulation provided that the 180-day exclusivity would only go to a paragraph IV applicant if that applicant had in fact been sued for patent infringement. 54 Fed. Reg. 28872, 28894-95 (July 10, 1989). The reason for this interpretation was to avoid rewarding an applicant with 180-day exclusivity if the applicant had not in fact devoted time and "resources to litigate the scope or validity of a patent a 180-day period free from generic competition." 54 Fed. Reg. 28894-95. This proposed interpretation was also intended to prevent such applicants from delaying competition by filing a paragraph IV certification and then, if not sued, simply deferring the first "marketing" of the product until it suited them. Id. at 28894-95.

21

FDA received voluminous comments on all aspects of this proposed rule and addressed them at length, accepting some and rejecting others. 59 Fed. Reg. 50338 (Oct. 3, 1994). In the final rule, FDA modified the regulation to clarify that, in order to receive 180-day exclusivity, the first applicant who submits the paragraph IV certification also had to have successfully defended a timely patent infringement suit. 21 C.F.R. 314.107(c)(1). One comment to the proposed rule had stated that granting 180-day exclusivity to an applicant who had merely been sued for patent infringement "created an incentive for frivolous claims of patent invalidity or noninfringement because it would give ANDA applicants exclusivity even if the applicant was unsuccessful in defending against the patent owner's lawsuit." 59 Fed. Reg. 50338, 50353 (Oct. 3, 1994) (comment 76). FDA agreed with this comment and clarified 21 C.F.R. 314.107(c)(1) by adding that a first-filed paragraph IV applicant also had to "successfully defend a suit brought within 45 days." Id. at 50353. This was consistent with the 1988 industry letter (JA 134), and thus clarified what FDA intended all along.

3.    There is no legislative history explaining the scope of the 180-day exclusivity period. As a result, FDA's regulation focused on a balancing of the two overarching goals of the Hatch-

22

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

Waxman legislation -- (1) to provide notice to interested parties of the existence of NDA holders' patent claims and (2) to ensure the orderly entry of generic drugs onto the market, see H.R. Rep. No. 857 (Part I), 98th Cong., 2d Sess. at 14 (1984), reprinted in 1984 U.S.C.C.A.N. at 2647 (goal is to create competition to high cost innovator drugs by encouraging the orderly and prompt entry of low-cost generic products onto the market) -- against the effect alternative interpretations of the statute (offered by both pioneer and generic drug manufacturers) would have upon these goals. See 59 Fed. Reg. 50338 (Oct. 3, 1994). How the 180-day exclusivity provision is interpreted can have a profound effect on the entry into the market of generic drug products. The facts in this case and in Mova, as well as in a number of hypothetical yet distinctly possible situations, demonstrate the extent of this effect.

a. In this case, FDA decided to acquiesce in Mova until it could obtain a reversal of that decision. See pp. 9-11, supra. As a result, FDA granted exclusivity to Genpharm. However, had FDA applied its regulations to the ranitidine ANDA approvals, Granutec's ANDA would have been approved on July 10, 1997, pursuant to Granutec's license from Glaxo, because, as we explained above (at pp. 8-9), under FDA's regulation no generic was entitled to the 180-day period of exclusivity. Furthermore, once the '658 patent

23

expired on July 25, 1997, FDA could have approved all other ANDAs that had met the substantive approval and patent requirements, including those of Geneva and Boehringer.

b. In contrast, Mova requires FDA to grant the 180-day exclusivity period to Genpharm. The beginning of the 180-day period would be triggered, according to Genpharm (Genpharm Br. at 33-37), by either Genpharm's "first commercial marketing" of ranitidine or a victory by Genpharm in its patent litigation. According to Genpharm, therefore, there would be no generic competition to Zantac until either the 30-month stay barring approval of Genpharm's application expires in January, 1999, and Genpharm begins to market, or until Genpharm wins its patent litigation. And, if neither event were to occur, FDA would not be able to approve any ANDA for ranitidine until June 4, 2002 (almost five years from now), when the '431 patent expires.

Given the other ANDA applicants who have successfully challenged the patent and are otherwise ready for approval (see, e.g., JA 239), the foregoing outcome is plainly inconsistent with the statutory intent of bringing generic drugs to market promptly. As a result, although it has temporarily acquiesced in Mova's ruling that the first filed paragraph IV ANDA is entitled to the statutory 180-day exclusivity period, FDA has endeavored to

24

B12

**andrews**
# Pharmaceutical

November 1997

minimize the delay in entry of generic drugs to market and has, in the wake of Mova, interpreted the statute to permit approval of a subsequent ANDA 180 days after any applicant achieves success in patent litigation with the innovator. See 21 U.S.C. 355(j)(4)(B)(iv)(II) ("the date of a decision of a court") (emphasis added). See also 21 C.F.R. 314.107(e) (defining finality of court decisions). Thus, under this interpretation, although Mova required FDA to award the 180-day exclusivity period to Genpharm, the 180-day period began to run upon Boehringer's successful defense of its patent litigation, not with Genpharm's successful defense of its patent litigation as Genpharm contends (Genpharm Br. at 33-37). This result is more consistent with the congressional objective of creating generic competition to high cost innovator drugs than Genpharm's approach.

c. Mova itself provided another example of the effect of different interpretations. See pp. 9-11, supra. The district court decided that Mova was entitled to exclusivity simply and solely because it was the first to file an ANDA with a paragraph IV certification, 955 F. Supp. at 130-131, and then directed FDA to suspend approval of Mylan's ANDA until 180 days after Mova wins its patent suit or first markets its drug. Seven months have passed since the decision, and Mova has not won its patent litigation. As

25

a result, Mylan has not obtained approval for its ANDA. Moreover, should Mova ultimately fail in its patent litigation, the Mova decision dictates that there will be no ANDA approved until the patent at issue expires in 2007, notwithstanding Mylan's ANDA. This result could not possibly be what Congress intended.

d. There are other equally unacceptable situations that could result from interpreting the statute as not requiring success in patent litigation as a predicate to exclusivity. For example, if the first paragraph IV applicant was not sued for patent infringement or lost that suit, the 180-day exclusivity period would always begin with the date of first commercial marketing. 21 U.S.C. 355(j)(4)(B)(iv). However, because exclusivity does not begin with FDA approval of the application, an applicant who was not sued for patent infringement or lost that suit could obtain approval for an ANDA and then indefinitely delay the beginning of marketing. That delay, in turn, would indefinitely delay generic competition in general. This could occur because, although the ANDA applicant has obtained approval, it is unable to bring the product to market. This could also occur because in certain circumstances it would be in the ANDA applicant's financial interest not to market the drug.

This last possibility is very real. Many generic drug

26

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

companies are "captive" -- wholly or partly owned by innovator companies. For example, Genpharm's corporate parent is Merck, and Geneva is owned by Novartis, which was formed by a merger of Sandoz and Ciba-Geigy. *See* Genpharm's Disclosure Statement (Genpharm Br. at i-ii). If the first ANDA applicant with a paragraph IV certification is a "captive" generic, its parent might elect not to sue. Thus, the "captive" paragraph IV ANDA could obtain approval, but not begin commercial marketing until the patent expires, in order not to undermine the market position enjoyed by the parent innovator company. Even for a generic that is not a "captive," a financial incentive may be provided by the innovator company to delay marketing of the generic product, which would, in turn, delay the start of the 180-day countdown to the approval of other generic competitors. Such a strategy could delay marketing of a generic drug for years, depending on the expiration date of the patent at issue.

4. As we have stated throughout, under FDA's regulation, no ranitidine applicant would be entitled to exclusivity because no applicant fulfilled all of the criteria for exclusivity. Thus, Granutec's ANDA would have been finally approvable as of July 10, 1997, pursuant to its licensing agreement with Glaxo; the Boehringer ANDA would have been finally approvable on July 25,

27

1997, the date Glaxo's patent expired; and, since at least 30 months had passed since institution of patent litigation, Geneva would have been finally approvable on July 25, 1997. Genpharm would not have been approvable on July 25, 1997, even if it had met the technical approval criteria, because it had not yet prevailed in its current round of litigation with Glaxo, and because 30 months had not passed since institution of that litigation.

e. Genpharm argues that it is entitled to immediate approval of its application despite the fact that it has not prevailed in its current patent litigation, and despite the fact that 30 months have not passed since institution of that litigation. Genpharm Br. at 33-37. Genpharm contends that Glaxo should be accorded only a single tolling period, and that Glaxo already used up that benefit in its first round of litigation with Genpharm — which Glaxo won. Id. at 36. Under Genpharm's reasoning, then, Genpharm, which has already lost in patent litigation once, should be permitted to go to market immediately, and Glaxo should be afforded no further opportunity to vindicate its patent rights before Genpharm goes to market. Thus, Genpharm would reward the infringer with immediate approval, despite pending patent litigation. This is irrational. Genpharm's contention that it may yet satisfy the "successful defense" requirement in FDA's regulation, and should therefore

28

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

receive exclusivity if it prevails in its third round of patent litigation with Glaxo, is meritless. Genpharm Br. at 30. Under the regulation, to receive exclusivity, the first applicant must prevail in a *specific* law suit: *i.e.*, a suit for patent infringement brought "within 45 days of receipt of notice submitted under § 314.95." 21 C.F.R. 314.107(c)(1). Genpharm did not prevail in that specific suit for patent infringement, and accordingly, it may not receive market exclusivity.

b. Genpharm argues that the "successful defense" requirement renders the "first commercial marketing" provision in 21 U.S.C. 355(j)(4)(B)(iv)(I) a nullity. Genpharm Br. at 25-26. This is wrong. It might well happen that an ANDA applicant that is confident it will ultimately prevail in patent litigation would choose to go to market after the 30-month stay of FDA approval expires, 21 U.S.C. 355(j)(4)(B)(iii) (see p. 8, supra), but before the patent litigation (including an appeal) is resolved. In other words, depending upon its own financial and legal acumen, the applicant may choose to go to market before its exclusivity vests with the winning of the lawsuit. If the applicant wins the lawsuit, market exclusivity would have begun to run on the date the applicant began marketing.

c. Geneva agrees that Genpharm has not met the requirements

29

for exclusivity, but maintains that Geneva, instead, is entitled to exclusivity. Geneva Br. at 15-26. Geneva argues (1) that, since the first applicant has not met the requirements for exclusivity, Geneva, as second applicant, should be accorded market exclusivity; and (2) that, since its application was the first application to propose to market Form 1 ranitidine, a particular chemical form of ranitidine, it should be accorded market exclusivity with respect to that chemical form of ranitidine.

Geneva's claim is deficient on its face, since Geneva failed at least two of the critical tests: Geneva was not "the applicant submitting the *first* [paragraph IV] application." 21 C.F.R. 312.107(c)(1), (2); and Geneva did not "successfully defend[]" against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice submitted under § 314.95." Indeed, Geneva is still in litigation with the patent holder.

Moreover, Geneva's claim rests on the premise that, "Mova [is] clearly correct." Geneva Br. at 22. Mova, however, is clearly to the contrary, ruling specifically that it was the "first filing of an ANDA * * * under paragraph IV * * * that required FDA to withhold approval from subsequent paragraph IV filers." 955 F. Supp. at 130. Under Mova, no entity but Genpharm may claim exclusivity. For this same reason, Mova does not support Geneva's

30

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

November 1997

**andrews**

# Pharmaceutical

contention (Geneva Br. at 15-19) that eligibility for exclusivity should shift from one applicant to another as prior applicants are unsuccessful in patent litigation. Moreover, in this regard, the statute is clear that only the first paragraph IV applicant is eligible for exclusivity. *See* 21 U.S.C. 355(j)(4)(B)(iv)(II) (articulating the 180-day market exclusivity as a limitation of FDA's approval of a paragraph IV ANDA where a "previous [paragraph IV] application has been submitted").

Nevertheless, Geneva contends that, in the preamble to the final regulations at issue here, FDA abandoned this established interpretation and embraced a theory of shifting eligibility for exclusivity. Geneva quotes the preamble, "if an ANDA applicant made a paragraph IV certification and later withdraws that certification, the agency will not regard the withdrawn paragraph IV certification as precluding the agency from granting 180-day exclusivity to a subsequent ANDA applicant." Geneva Br. at 18, quoting 59 Fed. Reg. 50338, 50348 (October 3, 1994). This quotation, however, omits a key phrase that qualifies the quoted language by referring to earlier language in the preamble. Thus, the complete quotation is this: "However, *as stated earlier*, if an ANDA applicant made a paragraph IV certification and later withdraws that certification * * *." Id. The "earlier" statement

31

referred to is this:

> FDA also notes that, if an ANDA applicant with a pending application voluntarily makes a patent certification for an untimely filed patent, the ANDA applicant may withdraw the patent certification for the untimely filed patent. The agency, on its own initiative, has amended § 314.94(a)(12)(viii) to make this clear. Additionally, if the patent certification for the untimely filed patent was a the patent certification (claiming that the patent is invalid or would not be infringed), the agency would not consider the withdrawn paragraph IV certification to preclude FDA from granting 180-day exclusivity to another ANDA applicant.

Id. Thus, FDA's concern for the second certifier was limited to an unusual factual situation: where the first certification was unnecessary because the first certifier had not been required to certify to an untimely filed patent not included in the "Orange Book" at the time the ANDA was submitted. In that situation, applicants filing after the patent was listed in the "Orange Book" would be required to certify to the patent, and FDA would determine whether the first filer among those later filers met the criteria for market exclusivity. This case does not present those facts.

In contrast, that part of the preamble that directly speaks to the exclusivity provision at issue here makes unequivocally clear that, in promulgating the final regulation in 1994, FDA adhered to the position it has held consistently since 1988: "[p]roposed § 314.107(c)(1)(i) would provide 180-day exclusivity to the *first*

32

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

**andrews**
# Pharmaceutical

November 1997

ANDA applicant to submit a complete ANDA with a paragraph IV patent certification * * *." Id. at 50353 (Comment 76) (emphasis supplied). See also id. Comment 77 ("first ANDA applicant"); Comment 78 (same); and id. at 50354 (Comments 79, 81) (referring to the "first applicant" and the "first application"). In short, there is no merit to Geneva's contention that FDA has shifted positions on the "first ANDA applicant" requirement. So, even if Genpharm "los[t] its place in the 'review queue'" (Geneva Br. at 21) when it amended its application to include Form 1 instead of Form 2 ranitidine, as Geneva contends, Geneva would not be the "first applicant" and its ANDA would not be the "first application." Hence, Geneva is not entitled to exclusivity.

d. Geneva argues that FDA should distinguish between ANDAs for ranitidine hydrochloride Form 1 and ranitidine hydrochloride Form 2, and award Geneva exclusivity as the applicant submitting the first ANDA for a Form 1 ranitidine hydrochloride. Geneva Br. at 16-19. Geneva notes that when it submitted its ANDA for Form 1, the only ANDAs previously filed related to Form II ranitidine.[3]

Geneva's argument misconstrues the exclusivity provisions and

33

3/ Glaxo submitted two patents for its ranitidine hydrochloride product that are relevant to this litigation. Patent '658 covers Form 1 ranitidine, and patent '431 covers Form 2 ranitidine. JA 367 ¶29.

the generic drug approval process established in the FDCA. Under the exclusivity provision, FDA may not approve an ANDA for 180 days:

[i]f the [ANDA] contains a [paragraph IV] certification and is for a drug for which a previous application has been submitted under this subsection continuing [sic] such a certification.

21 U.S.C. 355(j)(4)(B)(iv) (emphasis added). Therefore, the relevant inquiry is twofold: 1) was the Geneva ANDA one for a drug for which a previous application has been submitted, and 2) did the previous application contain a paragraph IV certification? As set out below, the answer to the first question is yes; the previous application was the Genpharm application. Since it is undisputed that the Genpharm ANDA contained a paragraph IV certification, the answer to the second question is also yes.

In order to accept Geneva's argument that there has been no "previous application," the Court must conclude that ranitidine in the Form 1 chemical crystal is not the same "drug" as ranitidine in the Form 2 chemical crystal. All ANDAs must include in the application a reference to a listed drug approved by the agency. 21 U.S.C. 355(j)(2)(A). When an applicant submits an ANDA, it must include information to show that the active ingredient of the generic drug is the same as the active ingredient of the approved

34

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

innovator drug. 21 U.S.C. 355(j)(2)(A)(ii)(I). In reviewing the ANDA for approval, FDA must determine whether the generic drug product contains the same active ingredient as the innovator product. 21 U.S.C. 355(j)(3)(C)(i).

The applicants involved in this litigation all used as their reference listed drug the Glaxo ranitidine hydrochloride product approved under NDA 18-703, which contains Form 2 ranitidine hydrochloride as the active ingredient. See, e.g., JA 368 ¶32. The current Genpharm, Geneva, and Granutec ANDAs are for drug products that contain Form 1 ranitidine hydrochloride. See, e.g., JA 369 ¶39, 370 ¶43, 426-428 ¶¶61-64. In those ANDAs, Genpharm, Geneva, and Granutec have each established that the active ingredient in its product is the same as that in the Glaxo product. Therefore, FDA has determined that in this case the form of the crystal does not change the active ingredient.

Finally, if Geneva's position were correct, then the Form 1 "drug" Geneva seeks to market would not be the same "drug" as Zantac, which contains a Form 2 crystal. Thus, under Geneva's own reasoning, Geneva's ANDA could not be approved as a generic form of Zantac. But Geneva's position is wrong: although the crystalline forms may be different for purposes of patent protection, they are the same "drug" for purposes of generic drug approval.

35

e. Boehringer argues that more than one applicant can obtain market exclusivity and that as each successive paragraph IV applicant files, it is entitled to market exclusivity over later ANDA applicants. Boehringer Amicus Br. at 13-23. Boehringer's argument must fail: if nothing else, the statute anticipates that only the first paragraph IV applicant is entitled to market exclusivity. Mova agrees with this proposition. The difference between FDA's regulation and Mova is that FDA interprets the statute to require the first applicant to be sued for patent infringement and to have successfully defended that suit.

f. Genpharm also argues that its period of exclusivity should expire on January 27, 1998. Genpharm Br. at 33-37. Genpharm bases this argument on its decision to waive its exclusivity to permit Granutec to begin marketing Granutec's generic version of ranitidine on August 1, 1997. See Geneva Br., Addendum at A-28. Genpharm thus calculates that the 180-day period commencing on August 1, 1997, expires on January 27, 1998.

This argument is a tortured reading of the statute. The Hatch-Waxman Amendments provide that the exclusivity period begins to run from *the earlier of* two events:

(1) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application.

36

B.18

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

(II) the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed.)

21 U.S.C. 355(j)(4)(B)(iv)(emphasis supplied).

As discussed throughout, the second-described event above occurred on March 3, 1997. Thus, the Court does not have to reach the date of "first commercial marketing" because the first commercial marketing did not occur until *after* March 3, 1997.

In any event, as to the first described event, involving "marketing of the drug under the previous application," Genpharm now argues (Genpharm Br. at 33-38) that: its agreement to allow Granutec to market ranitidine starting on August 1, 1997, is the "first commercial marketing"; Granutec stands in Genpharm's shoes; and accordingly, the 180-day period of exclusivity starts on August 1, 1997. The fatal flaw in this argument, however, is that Granutec's marketing pursuant to its agreement with Genpharm is not marketing *under the previous application*," and it is the "previous application" that is accorded market exclusivity under the statute (subsection (I), above). Here, the "previous application" is Genpharm's. In entering into its commercial waiver agreement, Granutec did not abandon its own ANDA, which provided information to FDA concerning, for example, the composition, manufacture, and specification of the drug substance and the drug product, including

37

master production records and inactive ingredients. *See* 21 C.F.R. 314.94(a)(9), 314.50(d)(1). This information is unique to Granutec and to the drug produced by Granutec. Granutec is now marketing ranitidine pursuant to FDA's approval of Granutec's ANDA, Number 74-488 (JA 30). Granutec is not marketing pursuant to Genpharm's ANDA, Number 74-023 (JA 145).[4]

4/ Since filing its initial brief in this appeal, Genpharm has resolved its third suit with Glaxo, obtained approval of its ANDA, and may begin marketing. However, as stated in this brief, Genpharm's exclusivity began to run as of March 3, 1997, and not with its commercial marketing.

38

Copyright © 1997 Andrews Publications. All rights reserved. Reproduction prohibited.

CONCLUSION

For the foregoing reasons, FDA's regulation should be declared valid.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

ERIC H. HOLDER, JR.
JANICE McKENZIE COLE
United States Attorney

DOUGLAS N. LETTER
202/514-3602
HOWARD S. SCHER
202/514-4814
Attorneys, Appellate Staff
Civil Division, Room 3617
Department of Justice
Washington, D.C. 20530-0001

OF COUNSEL:

MARGARET JANE PORTER
Chief Counsel

ELIZABETH H. DICKINSON
CATHERINE M. COOK
Office of the Chief Counsel
U.S. Food and Drug
Administration
5600 Fishers Lane
Rockville, MD 20857

SEPTEMBER 1997

39

Copyright © 1997 Andrews Publications.  All rights reserved.  Reproduction prohibited.

139 F.3d 889 (Table)
46 U.S.P.Q.2d 1398
Unpublished Disposition
(Cite as: 139 F.3d 889, 1998 WL 153410 (4th Cir.(N.C.)))

Page 5

NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.

(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)

GRANUTEC, INCORPORATED, Plaintiff-Appellee,

v.

DONNA E. SHALALA, Secretary of Health and Human Services; Michael Friedman, M.D.; Food & Drug Administration, Defendants, and
GENPHARM, INCORPORATED, Intervenor-Appellant.
BOEHRINGER INGELHEIM CORPORATION, Amicus Curiae.
GRANUTEC, INCORPORATED, Plaintiff-Appellee,

v.

DONNA E. SHALALA, Secretary of Health and Human Services; Michael Friedman, M.D.; Food & Drug Administration, Defendants-appellees, and
GENEVA PHARMACEUTICALS, INCORPORATED, Intervenor-Appellant.
BOEHRINGER INGELHEIM CORPORATION, Amicus Curiae.

Nos. 97-1873, 97-1874.

United States Court of Appeals, Fourth Circuit.

Argued October 1, 1997.

Decided April 3, 1998.

Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. Terrence W. Boyle, Chief District Judge. (CA-97-485-5-BO).

Richard Melvyn Cooper, WILLIAMS & CONNOLLY, Washington, D.C., for Appellant Genpharm.

Joel E. Hoffman, SUTHERLAND, ASBILL & BRENNAN, L.L.P., Washington, D.C., for Appellant Geneva.

Howard Stanley Scher, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Robert Fritz Green, LEYDIG, VOIT & MAYER, LTD., Chicago, Illinois, for Appellees.

George A. Borden, Dan S. Sokolov, WILLIAMS & CONNOLLY, Washington, D.C.; Robert W. Spearman, Catharine B. Arrowood, Robert H. Tiller, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Raleigh, North Carolina, Edgar H. Haug, Barry S. White, James K. Stronski, FROMMER, LAWRENCE & HAUG, L.L.P., New York, New York, for Appellant Genpharm.

Hamilton P. Fox, III, Timothy J. Cooney, Kristen J. Indermark, Melina Zacharopoulos, SUTHERLAND, ASBILL & BRENNAN, L.L.P., Washington, D.C.; Steven J. Lee, Frederick H. Rein, Reem F. Jishi, KENYON & KENYON, New York, New York; Noel Allen, ALLEN & PINNIX, P.A., Raleigh, North Carolina, for Appellant Geneva.

Frank W. Hunger, Assistant Attorney General, Janice McKenzie Cole, United States Attorney, Douglas N. Letter, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Margaret Jane Porter, Chief Counsel, Elizabeth H. Dickinson, Catherine M. Cook, Office of the Chief Counsel, FOOD & DRUG ADMINISTRATION, Rockville, Maryland, for Federal Appellees.

John F. Fleder, David F. Weeda, Arthur Y. Tsien, OLSSON, FRANK & WEEDA, P.C., Washington, D.C.; John R. Wallace, WALLACE, CREECH & SARDA, L.L.P., Raleigh, North Carolina, for Appellee Granutec.

Barbara S. Wahl, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington, D.C.; Martin B. Pavane, Michael C. Stuart, COHEN, PONTANI, LIEBERMAN & PAVANE, New York, New York, for Amicus Curiae.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Before RUSSELL [FN*] and MOTZ, Circuit
Judges, and PHILLIPS, Senior Circuit Judge.

    FN* Judge Russell heard oral argument in this case
    but died prior to the time the opinion was filed.
    The opinion is filed by a quorum of the panel. 28
    U.S.C.A. § 46(d) (West 1993).

OPINION

PER CURIAM.

**1 This appeal concerns the Food and Drug
Administration's enforcement of certain provisions
of 21 U.S.C.A. § 355, part of the 1984 revision to
the Food, Drug, and Cosmetic Act known
collectively as the "Hatch-Waxman Amendments."
See Drug Price Competition and Patent Term
Restoration Act of 1984, Pub.L. No. 98-417, 98
Stat. 1585 (1984). The district court determined that
the Food and Drug Administration (FDA)
incorrectly declined to apply the terms of a
regulation, promulgated pursuant to the Hatch-
Waxman Amendments, that the District Court for
the District of Columbia had all but held invalid in
Mova Pharmaceutical Corp. v. Shalala, 955 F.Supp.
128 (D.D.C.1997).

At the time of the district court's decision in the
present case, FDA had decided:

    to acquiesce temporarily--pending an appellate
    decision overturning the district court decision or a
    favorable ruling on summary judgement--in the
    Mova preliminary injunction in order to promote
    administrative uniformity and to avoid forum
    shopping problems that would lead ... applicants
    back to the United States District Court for the
    District of Columbia where the Mova decision was
    rendered.

Brief of FDA at 11. Genpharm, Inc., and Geneva
Pharmaceuticals, Inc., intervened in opposition to
Granutec's motion for an injunction, with each
cross-claiming that it was entitled to the 180-day
exclusive marketing period Granutec sought to
enjoin.

For the reasons set forth within, we conclude that
the regulation Granutec seeks to enforce is invalid.
Further, we hold that, as the first applicant under
the statute, Genpharm was entitled to a 180-day
exclusivity period measured from March 3, 1997,
until August 29, 1997. We therefore reverse the
judgment of the district court.

I.
A.

The provision of the Hatch-Waxman Amendments
relevant to this appeal concerns the availability of a
180-day market exclusivity period to the first
company that seeks, under certain circumstances, to
market a generic form of a patented drug approved
by the FDA. Under the Food, Drug, and Cosmetic
Act generally, pioneer drug manufacturers must
obtain FDA approval for any new drug by filing a
New Drug Application (NDA), which requires the
submission of specific data concerning the safety and
effectiveness of the drug, as well as any information
on applicable patents. All drug patent information is
published by the FDA.

One of the primary innovations of the Hatch-
Waxman Amendments is an additional provision that
allows companies subsequently seeking to produce
and market a generic form of a pioneer drug to
avoid filing a full NDA. Instead, these companies
may file only an Abbreviated New Drug Application
(ANDA), in which they may rely on the findings of
safety and effectiveness included in the original
NDA. The only important new information that
must be included in the ANDA regards the generic
company's position vis-a-vis the original patent, and
the company must make one of four certifications: I)
that no patent for the pioneer drug has been filed; II)
that the patent for the pioneer drug has expired; III)
that the patent for the pioneer drug will expire on a
particular date; or IV) that the patent for the pioneer
drug is invalid or will not be infringed upon by the
proposed generic. See 21 U.S.C.A.                  §
355(j)(2)(A)(vii) (West Supp.1997). The last of
these, commonly referred to as a "Paragraph IV"
certification, is the certification at issue in this
appeal.

**2 If a generic company chooses Paragraph IV
certification, it must notify both the patent owner
and the NDA holder of the ANDA application. That
notification must include the basis for why the
proposed generic does not infringe upon the patent,
or why that patent is invalid. See 21 U.S.C.A.        §
355(j)(2)(B) (West Supp.1997). After such notice,
an action for patent infringement must be brought
within 45 days, and if no such action is brought,
FDA may approve the ANDA. If an infringement
action is brought, FDA cannot approve the ANDA

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

139 F.3d 889 (Table)                                                    Page 7
(Cite as: 139 F.3d 889, 1998 WL 153410, **2 (4th Cir.(N.C.)))

for 30 months, unless the matter is adjudicated in the ANDA applicant's favor or the court hearing the suit orders a shorter or longer waiting period. See 21 U.S.C.A. § 355(j)(4)(B)(iii) (West Supp.1997).

In addition, and here we reach the statutory provision contested in this appeal, the Hatch-Waxman Amendments also provide an incentive for companies to challenge patents and develop alternative forms of patented drugs by offering a 180-day period of market exclusivity to those who successfully make their Paragraph IV certifications. The relevant provision states:

> (iv) If the application [ANDA] contains a certification described in [Paragraph IV] ... and is for a drug for which a previous application has been submitted under this subsection continuing [sic: usually read as "containing"] such a certification, the application shall be made effective not earlier than one hundred and eighty days after--
> (I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,
> whichever is earlier.

21 U.S.C.A. § 355(j)(4)(B)(iv) (West Supp.1997). Thus, the statute grants a 180-day period of exclusive marketing rights to the first generic manufacturer to file an ANDA containing a Paragraph IV certification, measuring from the date it decides to begin marketing after the 30-month stay has expired (presumably assuming the risk of liability for patent infringement) or from the date of a favorable patent infringement decision, whichever is earlier.

Further, pursuant to 21 U.S.C.A. § 371(a), FDA may promulgate regulations for the enforcement of the Food, Drug, and Cosmetic Act as a whole, and has done so with regard to the 180-day market exclusivity provision. See 21 U.S.C.A. § 371(a) (West 1972). That regulation, found at 21 C.F.R. § 314.107(c)(1), states that:

> (1) If an abbreviated new drug application contains a certification that a relevant patent is invalid, unenforceable, or will not be infringed and the application is for a generic copy of the same listed

drug for which one or more substantially complete abbreviated new drug applications were previously submitted containing a certification that the same patent was invalid, unenforceable, or would not be infringed and the applicant submitting the first application has successfully defended against a suit for patent infringement brought within 45 days of the patent owner's receipt of notice submitted under § 314.95, approval of the subsequent abbreviated new drug application will be made effective no sooner than 180 days from whichever of the following dates is earlier:
> **3 (i) The date the applicant submitting the first application first commences commercial marketing of its drug product; or
> (ii) The date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed.

21 C.F.R. § 314.107(c)(1) (1997) (emphasis added). This provision, therefore, not only restates the statutory requirements for the 180-day exclusivity period, but additionally requires that "the applicant submitting the first application has successfully defended against a suit for patent infringement." Id.

                        B.

The regulation's addition to the requirements for the 180-day exclusivity period is commonly known as the "successful defense" requirement, and has been enforced since the regulation's adoption in 1994. Earlier, in 1989, an unwritten FDA interpretation of the statute requiring that the Paragraph IV applicant be sued in order to be eligible for the exclusivity period was challenged as unreasonable in Inwood Laboratories, Inc. v. Young, 723 F.Supp. 1523 (D.D.C.1989), appeal dismissed, 43 F.3d 712 (D.C.Cir.1989). There, a district court granted a motion for a preliminary injunction against FDA on the ground that, because 21 U.S.C. § 355(j)(4)(B)(iv) was clear on its face, a court should not "permit[ ] the FDA to read into [the statute] a requirement of a lawsuit which is simply not there." Id. at 1526.

Nevertheless, FDA promulgated a regulation containing an even more demanding interpretation of the statute--i.e., the "successful defense" requirement--in 1994. That regulation was itself challenged in an injunction context last year in Mova, where the District Court for the District of

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Columbia, while not declaring the regulation invalid, stated that the likelihood was "very high" that a challenge to the "successful defense" portion of the regulation as an impermissible addition to the relevant statute would succeed. Mova, 955 F.Supp. at 131. In so doing, the district court declared:

The language of the statute may be complex, and even cumbersome, but it is plain and unambiguous. It does not include a "successful defense" requirement, and indeed it does not even require the institution of patent litigation. It was Mova's first filing of an ANDA for micronized glyburide [the drug there in question] under paragraph IV, and not Upjohn's infringement suit, that required FDA to withhold approval from subsequent paragraph IV filers.... The operation of the statute on the facts of this case may appear to FDA to be unwise, and may appear ... to be an invitation for abuse, but their remedy lies with Congress, not this Court.

Id. at 130-31 (citing Inwood, 723 F.Supp. at 1526). Thus, Mova strongly implied that the regulation in question was not a permissible "interpretation" of the 180-day exclusivity provision in the statute.

### C.

**4 In the present case, Granutec successfully persuaded the district court to enjoin FDA from granting the 180-day marketing exclusivity period to its competitor, Genpharm, for the production of a generic form of Zantac, a medication for the treatment of ulcers and one of the largest-selling prescription drugs in the world. Granutec's argument in this regard was that, contrary to Mova, FDA erred in not applying the "successful defense" requirement. Granutec maintained that FDA's failure to follow its own regulation, which compelled the result that no ANDA applicant in this matter was entitled to 180-day exclusivity, was arbitrary and capricious. As stated above, FDA had adopted a position acquiescing in the Mova decision and its implications for the validity of the "successful defense" requirement. In granting the injunction, however, the district court cited the regulatory "successful defense" requirement, without further explanation.

Granutec's claim against Genpharm resulted from a series of efforts by various pharmaceutical companies to use the Paragraph IV certification to gain FDA approval for a generic form of Zantac. The original patents for the two operative forms of

ranitidine hydrochloride (ranitidine), the active ingredient in Zantac, belonged to GlaxoWellcome, Inc. (Glaxo), the pioneer manufacturer of Zantac. The two forms of ranitidine, Forms 1 and 2, are considered equivalent by FDA, but are covered by different patents: Patent No. 4,521,431 (the 431 patent) covers Form 2 ranitidine, and will expire on June 4, 2002, and Patent No. 4,128,658 (the 658 patent) covers Form 1, and expired on July 25, 1997. See Brief of FDA at 11, 34 & n.3.

The first company to challenge either patent was Genpharm, which, in February 1991, filed an ANDA for a generic ranitidine product, and included a Paragraph IV certification as to the 431 patent for Form 2 ranitidine. Later, Genpharm amended that application to include a Paragraph IV certification as to the 658 patent as well. Glaxo filed an infringement suit within the 45-day statutory period, and prevailed in October 1995. See Glaxo, Inc. v. Genpharm Pharmaceuticals, Inc., C.A. Nos. K-92-1831 and K-93-4228 (D.Md. Oct. 23, 1995). In 1996, Genpharm filed a Paragraph IV certification under its ANDA alleging non-infringement of the 431 patent for Form 1 ranitidine, and again Glaxo sued. That case remained pending when this appeal was filed.

In January 1994, Geneva filed an ANDA for generic ranitidine, which included a Paragraph IV certification as to the 431 patent for a Form 1 product. Glaxo sued Geneva, and that case also remained pending as of the time this appeal was filed.

In April 1994, Granutec filed an ANDA for generic ranitidine, which also included a Paragraph IV certification as to the 431 patent for a Form 1 product. Glaxo sued, and Granutec prevailed in July 1996; Glaxo appealed that decision and lost on appeal when the Federal Circuit affirmed on April 4, 1997. See Glaxo, Inc. v. Novopharm, Ltd., 931 F.Supp. 1280 (E.D.N.C.1996), aff'd, 110 F.3d 1562 (Fed.Cir.1997). In the wake of this decision, Glaxo and Granutec entered into a licensing agreement regarding the 658 patent, which provided that, in exchange for a substantial monetary payment, Glaxo would allow Granutec to begin marketing generic Zantac on July 10, 1997, fifteen days before the scheduled expiration of the 658 patent.

**5 This case was instituted when Granutec, having

entered into the 15-day licensing agreement with Glaxo for its generic version of Zantac, sought FDA approval of its ANDA effective July 10, 1997. FDA responded that it could not approve Granutec's ANDA effective as of July 10, 1997. Pursuant to its decision to acquiesce in Mova and that decision's implications for the "successful defense" requirement, FDA concluded that Genpharm was entitled to the 180-day marketing exclusivity period because Genpharm filed the first ANDA with a Paragraph IV certification for Zantac. FDA measured Genpharm's exclusivity period from March 3, 1997, the date that Glaxo's right to appeal expired in Glaxo, Inc. v. Boehringer Ingelheim Corp., 954 F.Supp. 469 (D.Conn.1996), judgment entered by 962 F.Supp. 295 (D.Conn.1997), aff'd, No. 97-1283, 1997 WL 355339 (Fed.Cir. June 4, 1997), a wholly unrelated suit in which a district court determined that Boehringer Ingelheim's generic version of Form 1 ranitidine did not infringe upon Glaxo's 431 patent.

This judgment, FDA claimed, satisfied the requirement of 21 U.S.C.A. § 355(j)(4)(B)(iv) that, before the 180-day period of exclusivity can begin, there must be "a decision of a court in an action ... holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C.A. § 355(j)(4)(B)(iv)(II) (emphasis added). As FDA had decided to "acquiesce" in the Mova decision, it did not apply the additional "successful defense" requirement found in 21 C.F.R. § 314.107(c)(1).

On June 17, 1987, Granutec filed this action, seeking declaratory and injunctive relief against FDA, in the District Court for the Eastern District of North Carolina. Granutec alleged that no company was entitled to a 180-day exclusivity period and sought approval of its ANDA effective July 10, consistent with the terms of its license from Glaxo. Genpharm and Geneva intervened and cross-claimed, and, on July 3, 1997, the district court dismissed the two cross-claims and, sua sponte, granted a permanent injunction against FDA.

This appeal followed. Although FDA was the party against whom the district court enforced the permanent injunction, on appeal the agency has realigned itself. FDA now asserts that the district court's injunction was proper and should be upheld.

On July 9, 1997, we entered a stay of the district court's injunction pending appeal. We also ordered Genpharm and Geneva each to post a five million dollar supersedeas bond to protect Granutec's stake in the event we ultimately affirmed the district court's order. Granutec thereafter executed an agreement with Genpharm wherein Genpharm waived any entitlement to exclusivity in favor of Granutec, but preserved Granutec's right to challenge Genpharm's claim to exclusivity. In the wake of this agreement, FDA approved Granutec's ANDA effective August 1, 1997, and Granutec has been marketing its generic version of Zantac since that date.

**6 On August 6, 1997, the District Court for the District of New Jersey dismissed with prejudice Glaxo's infringement claim against Geneva. See Glaxo, Inc. v. Geneva Pharmaceuticals, Inc., C.A. Nos. 94-1921 and 94-4589 (D.N.J. Aug. 6, 1997). FDA thereafter approved Geneva's ANDA as of August 29, 1997. On August 15, 1997, Genpharm prevailed over Glaxo in its infringement suit. See GlaxoWellcome, Inc. v. Genpharm, Inc., No. 96-CIV-6719 (S.D.N.Y. Aug. 15, 1997). FDA approved Genpharm's ANDA effective August 22, 1997, and Genpharm has marketed its generic since that date.

II.

This case turns on a fundamental problem of administrative law: an agency's authority to interpret the statutes it is required to enforce.

A.

Genpharm and Geneva allege that the district court incorrectly required FDA to adhere to the "successful defense" requirement--a requirement that both companies claim is invalid because it directly conflicts with the plain language of the statutory provision regarding the 180-day market exclusivity period. In support of this allegation, Genpharm and Geneva cite Mova, and other cases holding that regulations, like the one here, that add to rather than elucidate a statutory requirement go beyond an agency's authority to interpret legislative grants of power. We agree with their argument.

As Judge Robertson stated in Mova when he examined the validity of the "successful defense" requirement, the language of 21 U.S.C.A.        §

355(j)(4)(B)(iv) is "plain and unambiguous. It does not include a 'successful defense' requirement, and indeed it does not even require the institution of patent litigation." Mova, 955 F.Supp. at 130. In light of this plain and unambiguous language, FDA's interpretive authority with regard to the statutory provision is limited to the extent that Congress has already spoken directly to the issue addressed by the regulation. See Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Here, that issue involves the exact requirements a generic manufacturer must satisfy to qualify for the 180-day market exclusivity period. By expressly including certain requirements in the statute to the exclusion of all others, Congress presumably intended that the statutory requirements would comprise the full measure of eligibility. As we held in Cabell Huntington Hospital, Inc. v. Shalala, 101 F.3d 984, 990-91 (4th Cir.1996), an agency cannot issue regulations that alter the statute's requirements for benefits the agency administers. All that Congress required for the 180-day exclusivity period is: (1) the filing of the first ANDA that includes a Paragraph IV certification; and (2) either (a) the first commercial marketing of the drug (after no infringement suit has been filed within 45 days or no resolution to such a suit has been reached after the expiration of the 30-month stay), or (b) a decision that the patent in question is either invalid or not infringed. See 21 U.S.C.A. § 355(j)(4)(B)(iv).

**7 Demanding a "successful defense" neither interprets the statute nor fills a gap left by statutory silence. Rather, the "successful defense" requirement adds a requirement not contemplated in the statute, and, as Genpharm notes, renders superfluous 21 U.S.C.A.    §   355(j)(4)(B)(iv)(I), which allows the 180-day period to begin at the time FDA receives notice of marketing of the drug, regardless of the outcome of any infringement suit. See Foxglenn Investors L.P. v. Cisneros, 35 F.3d 947, 950-51 (4th Cir.1994) (declaring invalid a regulatory interpretation that rendered a section of the applicable statute superfluous).

Both Granutec and FDA argue that the regulation in question merely elucidates rather than adds to the requirements for the 180-day exclusivity period. Further, Granutec painstakingly attempts to demonstrate that the regulation does not render 21

U.S.C. § 355(j)(4)(B)(iv)(I) superfluous. Granutec and FDA cite legislative history in support of their argument that the regulation is consistent with the statute. However, both are mistaken. Chevron clearly states that the determination of a regulation's validity under its enabling statute involves a two-stage process. Analysis of legislative history and policy goals occurs at the second stage, and is reached only if Congress, through the relevant statute, has not spoken directly to the issue in question. See Chevron, 467 U.S. at 842-43. If Congress has so spoken, "that is the end of the matter," id. at 842; a court simply does not undertake to assess the reasonableness of the agency's interpretation of the statute if Congress has spoken.

Our examination of the regulation's relation to the statute never reaches the second stage in this case. Congress has plainly laid out the requirements for the 180-day exclusivity period in the statute (albeit in tortured language), and, thus, our inquiry into Congressional intent must end there. Having found the exclusivity requirements embodied in the statutory language of 21 U.S.C.A. § 355(j)(4)(B)(iv) clear and conclusive, we are bound to hold invalid any attempt to alter the terms of that statute.

The "successful defense" requirement in 21 C.F.R. § 314.107(c)(1) amounts to such an alteration because it adds a requirement to 21 U.S.C.A.      § 355(j)(4)(B)(iv) that Congress never contemplated. Further, the idea that any 180-day exclusivity period must be premised on the successful defense of an infringement suit results in the evisceration of 21 U.S.C.A. §   355(j)(4)(B)(iv)(I), which clearly contemplates an exclusivity period beginning—whether or not an infringement suit has come to resolution—on the date of first commercial marketing by the first ANDA filer.

Thus, we hold the "successful defense" requirement contained in 21 C.F.R.   § 314.107(c)(1) to be an invalid addition to the statutory requirements for exclusivity. Genpharm, as the first ANDA filer, was therefore entitled to a period of exclusivity under the statute. [FN1]

FN1. We reject Geneva's argument that Genpharm lost its place in line as the first ANDA applicant, and thus the only ANDA applicant, eligible for exclusivity. FDA maintains that, although

Genpharm did not make the Paragraph IV certification relevant to these proceedings until 1996. Genpharm qualifies as the first ANDA-applicant for purposes of the exclusivity because the certification relates back to the date of its ANDA application. This interpretation does not clearly conflict with either the regulations or the statute, and thus we find no reason to substitute a contrary judgment on this matter for that of FDA. See Chevron, 467 U.S. at 843-45; Pauley v. Beth Energy Mines, Inc., 501 U.S. 680, 696-98, 705-06, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991); Mullins Coal Co. v. Director, OWCP, 484 U.S. 135, 159, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987); Lisa Lee Mines v. Director, OWCP, 86 F.3d 1358, 1360-63 & n. 8 (4th Cir.1996).

### B.

**8 Having concluded that the "successful defense" requirement imposed by 21 C.F.R. § 314.107(c)(1) is invalid, we turn now to determine how to measure Genpharm's period of exclusivity. This determination depends upon the interpretation given to the phrase "the date of a decision of a court" holding the patent invalid or not infringed, as used in 21 U.S.C.A. § 355(j)(4)(B)(iv)(II). The litigants (and amicus Boehringer Ingelheim Corp.) espouse multiple interpretations of the phrase, and, accordingly, suggest just as many different dates from which to measure exclusivity.

FDA has adopted alternative positions regarding how to interpret this provision, depending upon our decision with regard to the validity of the "successful defense" requirement. If we upheld the "successful defense" requirement found in 21 C.F.R. § 314.107(c)(1), FDA argued that, pursuant to the language of that regulation, we should conclude "a court" means " the court" that rendered the "successful defense" decision for the first ANDA applicant. Thus, no litigant would be entitled to exclusivity because the only litigant ever possibly entitled was Genpharm, and Genpharm had not successfully defended when Granutec sought approval of its ANDA effective July 10.

However, in the event that we found the "successful defense" requirement invalid, as we have, FDA adheres to the argument consistent with its original position in this suit, reflecting its acquiescence in Mova. That is, the "successful defense" requirement being invalid, FDA argues that "a court" means " any court." By this reasoning, Genpharm's

exclusivity began running at the date of a decision by the first court to hold the 431 patent not infringed, whether or not that decision involved Genpharm (the first ANDA applicant).

FDA then combines this reasoning with the terms of 21 C.F.R. § 314.107(e). "[F]or purposes of establishing the effective date of approval," that section defines "a decision of a court" in terms of a "final judgment from which no appeal can be or has been taken." Section 314.107(e) goes on to state that "the date of final decision" shall be, in the case of no appeal by the patent holder, "the date on which the right to appeal lapses," and, in the case of an appeal, "the date of the first decision or order by a higher court" affirming the district court's non-infringement decision. 21 C.F.R. § 314.107(e) (1997). Thus, FDA concludes that Genpharm's period of exclusivity ran from March 3, 1997--the date that Glaxo's right of appeal lapsed in the Boehringer Ingelheim suit [FN2]--and expired 180 days later on August 29, 1997.

> FN2. Genpharm contends that Glaxo did appeal the district court's order, and thus March 3, 1997, is an improper date to measure from even under FDA's analysis. We disagree. By order dated October 7, 1996, the district court in the Boehringer suit granted partial summary judgment to Boehringer on the basis of Glaxo's express concession that Boehringer's generic did not infringe the 431 patent. Thereafter, on November 18, 1996, the court entered partial summary judgment in Boehringer's favor on Glaxo's claim that Boehringer infringed Glaxo's patents by filing its ANDA. On January 30, 1997, the court entered final judgment with regard to both of these orders. See Glaxo, Inc. v. Boehringer Ingelheim Corp., 962 F.Supp. 295 (D.Conn.1997). Glaxo appealed that judgment and lost, see 1997 WL 355339 (Fed.Cir. June 4, 1997); however, it appealed only with regard to the November 18 order, not the October 7 order that the district court entered on the basis of Glaxo's express concession of non-infringement. See id. at n. 1; see also Memorandum of Genpharm, Inc., in Support of its Mot. for an Inj. Pending Appeal, at Tab 4 (Aug. 18, 1997) (copy of letter from attorney for Glaxo to attorney for Boehringer Ingelheim declaring that "Glaxo is not appealing the Court's October 7, 1996 decision").

Although FDA's "successful defense" regulation was an invalid attempt to impose an additional requirement in derogation of the statutory scheme,

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

FDA's reading of "the date of a decision of a court" simply interprets ambiguous statutory terminology. Despite the corporate litigants' arguments and protests to the contrary, this statutory language possesses no clear, definite meaning. For the purpose of measuring exclusivity under this statutory scheme, "the date of a decision" may mean the date of a district court decision, but it may also mean--without, contrary to Granutec's suggestion, doing harm to ordinary principles of finality and res judicata--the date appeal rights lapse or the date a higher court renders its first decision, as FDA's regulation contemplates. Similarly, " a court" may mean "the court," but it may just as well mean "any court." A fair reading of this statutory language does not clearly dictate a particular interpretation.

**9 Each version bears certain problems in relation to the statutory scheme. At first blush, FDA's preferred interpretation (if the "successful defense" requirement is invalid) achieves a seemingly anomalous result in that a first applicant (here, Genpharm) receives an entitlement to exclusivity during a period when, presuming the imposition of a 30-month stay under 21 U.S.C.A. § 355(j)(4)(B)(iii), that applicant may not be able to take advantage of its exclusive rights until the 30-month period ends or it receives a favorable noninfringement judgment. However, this interpretation seeks to thwart any attempt by pioneer drug manufacturers to capture the generic market, and to some degree achieves that goal. Furthermore, although FDA's interpretation subjects first applicants to the vagaries of timing and speed attributable to different courts, it does not strip exclusivity of all value. As Genpharm and Granutec have demonstrated, the ability to waive exclusivity in favor of another generic manufacturer can be quite lucrative.

By contrast, Genpharm and Geneva contend that "a court" must mean "the court," and thus each maintains that the period of exclusivity cannot begin to run until the generic manufacturer entitled to exclusivity begins marketing or wins a patent infringement suit brought against it by the pioneer manufacturer. This interpretation preserves exclusivity for the first applicant until it prevails in litigation, or at least until it begins marketing while assuming the risk of losing the litigation. However, it clears the way for generic capture.

Such a result would be antithetical to the very purpose of the exclusivity incentive and the entire ANDA regime. As the legislative history of the Hatch-Waxman amendments indicates, the ANDA scheme purports to "make available more low cost generic drugs." H.R.Rep. No. 98-857, pt. 1, 98th Cong., 2d Sess., at 14 (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647. A situation where no generic can come to market because the pioneer has imposed a stranglehold by gaining entitlement to an exclusive marketing period for its captured generic, yet never exercises that right, could not have been contemplated by Congress. [FN3]

FN3. We recognize that even under FDA's interpretation a pioneer could place a stranglehold on the generic market, although we think it is less likely. For example, a pioneer in control of a captured generic could file the first ANDA with a Paragraph IV certification. As long as the pioneer prevents its captured generic from going to market and at the same time does not file an infringement suit against any generic manufacturer (captured or non-captured), the captured generic's exclusivity period would never begin to run, and no generic could begin to sell pursuant to a Paragraph IV certification. The "successful defense" requirement would solve this problem, were it valid. But this problem, like many others, arises from the manner in which Congress drafted the exclusivity mechanism, and, as such, the remedy lies with Congress.

Given the complicated and sensitive nature of the statutory drug approval mechanism, we choose to defer to the interpretation posited by the agency charged by Congress with administering the statutory scheme. FDA's interpretation of the statutory language and its own regulations is a permissible, reasonable interpretation of a complicated legislative framework that reflects a considered balance of competing statutory goals. We recognize that positions adopted by an agency solely for litigation do not deserve the deference of this Court. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). However, we are not faced with such a situation here. FDA did not adopt its current position in anticipation of this litigation, but in response to the Mova decision, which suggested the probable invalidity of the "successful defense" requirement. It made its position known to all ANDA applicants seeking

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

139 F.3d 889 (Table)
(Cite as: 139 F.3d 889, 1998 WL 153410, **9 (4th Cir.(N.C.)))

Page 13

approval in the wake of Mova, seeking to avoid any forum shopping that might result. Indeed, it was FDA's adherence to its post-Mova position that precipitated this lawsuit by Granutec. In such a situation, the concerns that caution against deference to an agency's litigation position do not exist because the position reflects the thoughtful judgment of the agency, not just the posture of litigation counsel. See National Wildlife Fed'n v. Browner, 127 F.3d 1126, 1129 (D.C.Cir.1997) (citing Auer v. Robbins, 519 U.S. 452, ----, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997)); Herman v. NationsBank Trust Co., 126 F.3d 1354, 1363 (11th Cir.1997); Appalachian States LowLevel Radioactive Waste Comm'n v. Pena, 126 F.3d 193, 198-99 (3rd Cir.1997); Monongahela Power Co. v. Reilly, 980 F.2d 272, 279 & n. 7 (4th Cir.1993).

### C.

**10 Both Genpharm and Geneva also assert jurisdictional and procedural grounds for reversal of the district court--namely, that the district court lacked subject matter jurisdiction over this case and failed to give the intervenors the proper notice and hearing before dismissing the cross-claims and granting, sua sponte, a permanent injunction.

We would have jurisdiction if the district court lacked it, and thus all appellants have received the remedy they seek--a full hearing and decision on the merits in the Court of Appeals. In addition, if we held that the district court failed to provide proper notice and hearing to the parties, the remedy would be to remand to the district court for largely the same proceedings that we have conducted.

For these reasons, we reject these allegations of procedural shortcomings on the part of the district court.

### III.

In sum, then, we hold that the "successful defense" requirement imposed by 21 C.F.R. § 314.107(c)(1) is invalid. Further, we hold that, under the interpretation of the statutory scheme adopted by the FDA in contemplation of such a decision, Genpharm was entitled to a period of exclusivity that ran from March 3, 1997, until August 29, 1997. Because Genpharm waived its exclusivity with regard to Granutec, and FDA approved Geneva's ANDA as of August 29, 1997, no party has violated Genpharm's period of exclusivity. Granutec was never entitled to begin marketing on July 25, 1997, so its agreement with Glaxo to begin marketing on July 10, 1997, was based on an erroneous premise. The supersedeas bonds shall be returned, along with accrued interest, to Genpharm and Geneva.

We understand this opinion will not satisfy any party to this suit. In cases involving complicated regulatory schemes such as this, we seek to give full effect to the plain language of a statute while simultaneously deferring to reasonable interpretations offered by the relevant federal agency. The complex legislative scheme and the awkwardly drafted statute at issue here do not lend themselves to simple solutions, particularly when further complicated by secondary licensing arrangements, a stay pending appeal, and multi-million dollar bonds. In accordance with this opinion, the judgment of the district court is hereby

REVERSED.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works