# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-1469 (JDB) |
| ) | |
| FOOD AND DRUG ADMINISTRATION, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Of Counsel:

PAULA M. STANNARD
Acting General Counsel

SHELDON T. BRADSHAW
Chief Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

WENDY S. VICENTE
Associate Chief Counsel

U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD  20857
(301) 827-7138

PETER D. KEISLER
Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

ANDREW E. CLARK
Attorney
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, D.C.  20044
Tel:  (202) 307-0067
Fax:  (202) 514-8742
andrew.clark@usdoj.gov

Dated:  August 25, 2005

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATUTORY AND REGULATORY FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.      New Drug Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.     Abbreviated New Drug Applications . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         A.     Patent Certifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         B.     180-Day Period of Market Exclusivity . . . . . . . . . . . . . . . . . . . . . . . 7

         C.     Court Decision Trigger . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

              1.     The *Teva* Decisions:  California Patent
                     Infringement Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

              2.     *Teva I* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

              3.     *Teva II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

              4.     Administrative Precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS . . . . . . . . . . . . . 15

    I.      Pravastatin NDA and ANDAs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    II.     Patent Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    III.    FDA's June 28, 2005 Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    I.      Teva Is Not Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . 19

**Page(s)**

A.    FDA's Administrative Decisions Are Entitled to Deference  . . . . . . . . . 19

B.    FDA Properly Applied Applicable Precedent In Its
      Determination That Exclusivity Was Triggered  . . . . . . . . . . . . . . . . . . . 22

      1.    Under *Teva I* and *II*, Exclusivity Is Triggered When the Dismissal
            of a Declaratory Judgment Action Has Preclusive Effect  . . . . . . 22

      2.    The *Apotex v. Bristol* Dismissal Order Has Preclusive Effect  . . 24

C.    The *Teva* Decisions Properly Informed FDA's Exclusivity
      Determination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      1.    FDA's Construction of the Statute Carefully Applies Relevant
            Case Law and is Entitled to Deference  . . . . . . . . . . . . . . . . . . . . 26

      2.    *Teva* Sets Forth the Governing Legal Standard for Application
            of the Court Decision Trigger  . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.    FDA Reasonably Determined That the Dismissal Order at Issue in
      This Case Had Preclusive Effect  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      1.    A Concession of Noninfringement is Not Necessary for the
            Dismissal to Have Preclusive Effect  . . . . . . . . . . . . . . . . . . . . . . 30

      2.    A Pre- or Post-Suit Representation Can Have Preclusive
            Effect  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      3.    Bristol's Assurances Preclude Bristol from Suing Apotex  . . . . . 33

      4.    Teva's Legal Position in This Case is Inconsistent With Its
            Position in the Prior *Teva* Litigation  . . . . . . . . . . . . . . . . . . . . . 36

E.    Teva Has Not Shown That FDA's Decision Conflicts with
      Congressional Intent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II.    Teva Has Not Shown That It Will Suffer Irreparable Harm Without
       an Injunction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.   FDA and the Public Will Be Harmed if Teva's Request for Relief
       Is Granted  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

Abbott Labs. v. ALRA Labs., Inc., Civil Action No. 92 C 5806
    (N.D. Ill. Dec. 23, 1992) ................................................ 14

American Bioscience, Inc. v. Thompson,
    269 F.3d 1077 (D.C. Cir. 2001) ................................................ 20

Amoco Production Co. v. Village of Gambell,
    480 U.S. 531 (1987) ................................................ 18

Apotex, Inc. v. Bristol-Myers Squibb Co., No. 04-2922 (S.D.N.Y.) ............................... 3, 24, 34

Auer v. Robbins,
    519 U.S. 452 (1997) ................................................ 20

Autera v. Robinson,
    419 F.2d 1197 (D.C. Cir. 1969) ................................................ 26

Barnhart v. Walton,
    535 U.S. 212 (2002) ................................................ 19, 21

Biocore v. Thermo Bioanalysis Corp.,
    79 F. Supp. 2d 422 (D. Del. 1999) ................................................ 35

Biogen, Inc. v. Amgen, Inc.,
    913 F. Supp. 35 (D. Mass. 1996) ................................................ 31, 35

Boehringer Ingelheim Corp. v. Shalala,
    993 F. Supp. 1 (D.D.C. 1997) ................................................ 18

Boivin v. US Airways, Inc.,
    297 F. Supp. 2d 110 (D.D.C. 2003) ................................................ 40

Bristol-Myers Squibb Co. v. Shalala,
    923 F. Supp. 212 (D.D.C. 1996) ................................................ 18, 19, 20, 40

Bryan Ashley Int'l, Inc. v. Shelby Williams Indus.,
    932 F. Supp. 290 (S.D. Fla. 1996) ................................................ 35

iii

**Page(s)**

C.R. Bard, Inc. v. Schwartz,
    716 F.2d 874 (Fed. Cir. 1983) ...................................................................... 34

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) .................................................................................... 18

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ............................................................... 19, 20, 21, 26

Christiansen v. Harris County,
    529 U.S. 576 (2000) .................................................................................... 21

Citizens to Preserve Overton Park, Inc. v. Volpe,
    401 U.S. 402 (1971) .................................................................................... 19

Consumer Electronics Ass'n v. FCC,
    347 F.3d 291 (D.C. Cir. 2003) .................................................................... 19

Experience Works, Inc. v. Chao,
    267 F. Supp. 2d 93 (D.D.C. 2003) ......................................................... 40, 41

Fed. Express Corp. v. Mineta,
    373 F.3d 112 (D.C. Cir. 2004) .................................................................... 25

Fina Research, S.A. v. Baroid Ltd.,
    141 F.3d 1479 (Fed. Cir. 1998) .................................................................. 23

Glaxo Group Ltd. v. Dr. Reddy's Labs.,
    325 F. Supp. 2d 502 (D.N.J. 2004) ............................................................ 37

Glaxo Wellcome, Inc. v. Pharmadyne Corp.,
    No. 96-455, 1996 WL 432290 (D. Md. July 23, 1996) ................................ 35

Gulf Oil Corp.v. Dep't Of Energy,
    514 F. Supp. 1019 (D.D.C. 1981) ......................................................... 40, 41

Kaktovik v. Watt,
    689 F.2d 222 (D.C. Cir. 1982) .................................................................... 26

Micks at Pa. Ave., Inc. v. BOD, Inc.,
    389 F.3d 1284 (D.C. Cir. 2004) .................................................................. 25

iv

**Page(s)**

Minnesota Mining & Manufacturing Co. v. Barr Labs., Inc.,
    289 F.3d 775 (Fed. Cir. 2002) ........................................................................... 33

Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.,
    826 F. Supp. 112 (D. Del. 1993) ....................................................................... 35

Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.,
    No. 95-1333, 1996 U.S. App. LEXIS 14274 (Fed. Cir. Jun. 13, 1996) ....................... 35

Mova Pharm. Corp. v. Shalala,
    140 F.3d 1060 (D.C. Cir. 1998) ................................................................... passim

Mylan Labs., Inc. v. Thompson,
    389 F.3d 1272 (D.C. Cir. 2004) ............................................................. 20, 21, 26

Mylan Pharm., Inc. v. Henney,
    94 F. Supp. 2d 36 (D.D.C. 2000), *vacated as moot sub nom. Pharmachemie*
    *B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002) ..................................... 7

Mylan Pharm., Inc. v. Shalala,
    81 F. Supp. 2d 30 (D.D.C. 2000) ................................................................. passim

Mylan Pharms., Inc. v. Thompson,
    207 F. Supp. 2d 476 (N.D. W. Va. 2001) ........................................................ 40

Mylan v. Thompson,
    139 F. Supp. 2d 1 (D.D.C.), *rev'd other grounds*, 268 F.3d 1323
    (Fed. Cir. 2001) ............................................................................ 18, 40, 41

National Pharm. Alliance v. Henney,
    47 F. Supp. 2d 37 (D.D.C. 1999) .................................................................. 40

Purepac Pharm. Co. v. Thompson,
    354 F.3d 877 (D.C. Cir. 2004) ..................................................................... 20

Serono Labs., Inc. v. Shalala,
    158 F.3d 1313 (D.C. Cir. 1998) ............................................................... 20, 43

Skidmore v. Swift & Co.,
    323 U.S. 134 (1944) .................................................................................. 20

Sociedad Anomia Vina Santa Rita v. Dep't of Treasury,
    193 F. Supp. 2d 6 (D.D.C. 2001) .................................................................. 41

**Page(s)**

Spectronics Corp. v. H.B. Fuller Co.,
    940 F.2d 631 (Fed. Cir. 1991) ..................................................................... 23

Super Sack Mfg. Corp. v. Chase Packaging Corp.,
    57 F.3d 1054 (Fed. Cir. 1995) ..................................................................... 23

Teva Pharms., USA, Inc. v. Syntex (USA) Inc.,
    No. 98-02314 (dismissal order Aug. 7, 1998) ........................................... 9, 10

Teva Pharms., USA, Inc. v. FDA,
    182 F.3d 1003 (D.C. Cir. 1999)(*Teva I*) ................................................. passim

Teva Pharms., USA, Inc. V. FDA, No. 99-5287, 2000 U.S. App. LEXIS 38667
    (D.C. Cir. Nov. 15, 2000) (*Teva II*) ........................................................ passim

Teva Pharms., USA, Inc. v. FDA,
    No. 99-67, 1999 U.S. Dist. LEXIS 14575 ( D.D.C. Aug. 19, 1999) ................. 11, 12, 28

Teva Pharms., USA, Inc. v. Pfizer Inc. , 69 USPQ2d 1791,
    2003 U.S. Dist. LEXIS 21940 (D. Mass. 2003) ........................................... 39

Teva Pharms. USA, Inc. v. Pfizer, Inc.,
    395 F.3d 1324 (Fed. Cir. 2005) ..................................................................... 39

Thomas Jefferson Univ. v. Shalala,
    512 U.S. 504 (1994) ..................................................................................... 20

Tri-Bio Labs., Inc. v. United States,
    836 F.2d 135 (3d Cir. 1987) ......................................................................... 5

United States Air Tour Ass'n v. FAA,
    298 F.3d 997 (D.C. Cir. 2002) ..................................................................... 20

United States v. Mead Corp.,
    533 U.S. 218 (2001) ..................................................................................... 20

United Sweetener USA, Inc. v. Nutrasweet Co.,
    760 F. Supp. 400 (D. Del. 1991) ................................................................. 35

Varicon Int'l v. Office of Personnel Mgmt.,
    934 F. Supp. 440 (D.D.C. 1996) ................................................................. 40

**Page(s)**

Wisconsin Gas Co. v. FERC,
   758 F.2d 669 (D.C. Cir. 1985) ......................................................... 40, 41

Wyoming Outdoor Council v. U.S. Forest Service,
   165 F.3d 43 (D.C. Cir. 1999) ........................................................... 20

## FEDERAL STATUTES

5 U.S.C. § 706(2) ............................................................................... 19

21 U.S.C. § 355(a) ............................................................................ passim

21 U.S.C. § 355(b) ............................................................................ 4

21 U.S.C. § 355(b)(1) ....................................................................... 4

21 U.S.C. § 355(c)(1) ........................................................................ 8

21 U.S.C. § 355(c)(2) ........................................................................ 4, 8

21 U.S.C. § 355(d) ............................................................................ 20

21 U.S.C. § 355(j) ............................................................................. 4

21 U.S.C. § 355(j)(2)(A) .................................................................... 5

21 U.S.C. § 355(j)(2)(A)(vii) ............................................................ passim

21 U.S.C. § 355(j)(2)(A)(viii) ........................................................... 15

21 U.S.C. § 355(j)(2)(B) .................................................................... 6

21 U.S.C. § 355(j)(4) ......................................................................... 20

21 U.S.C. § 355(j)(5) ......................................................................... 20

21 U.S.C. § 355(j)(5)(B) .................................................................... 6, 16

21 U.S.C. § 355(j)(5)(B)(iv) .............................................................. passim

21 U.S.C. § 355(j)(7) ......................................................................... 5

21 U.S.C. § 355a ............................................................................................... 16

35 U.S.C. § 156 .................................................................................................. 4

35 U.S.C. § 271 .................................................................................................. 4

35 U.S.C. § 271(e)(2)(A) ............................................................................... 6, 13

35 U.S.C. § 271(e)(5)(2005) ............................................................................ 16

35 U.S.C. § 282 .................................................................................................. 4

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No.
108-173, 117 Stat. 2066 (Dec. 8, 2003) ............................................................ 4, 5, 8

## FEDERAL REGULATIONS

21 C.F.R. § 314.3(b) ......................................................................................... 5

21 C.F.R. § 314.53(e) ......................................................................................... 4

21 C.F.R. § 314.105(d) ...................................................................................... 16

21 C.F.R. § 314.107(c) ...................................................................................... 26

21 C.F.R. § 314.107(c)(1)(ii) ....................................................................... 6, 8, 22

21 C.F.R. § 314.107(f)(2) .................................................................................... 6

21 C.F.R. § 314.430 ...................................................................................... 17, 18

Fed. R. Civ. P. 65(a)(2) ..................................................................................... 18

## OTHER AUTHORITIES

H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984),
    *reprinted in* 1984 U.S.C.C.A.N. 2647-48. ................................................. 5

The American Heritage College Dictionary (3d ed. 2000) ...................................... 24

**INTRODUCTION**

Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva"), a manufacturer of generic drugs, asks this Court to compel the Food and Drug Administration ("FDA" or "Agency") to award Teva a 180-day period of generic drug marketing exclusivity for a blockbuster drug, contrary to FDA's determination that any exclusivity period for that drug has already expired. Teva, in a dramatic reversal of its previous position in *Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*"), a case in which it ultimately prevailed against FDA, now asserts that a dismissal of a declaratory judgment action in a patent infringement action does not constitute a "court decision trigger" of exclusivity, even where that case is dismissed upon a stated assurance that there is "no intention to bring suit." Teva, however, cannot escape from applicable precedent – that Teva itself wrought – which holds that such a dismissal constitutes a "court decision trigger" under the statutory exclusivity provision. *Id.* at 1009; *see also Teva Pharm., USA, Inc. V. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 at 6 (D.C. Cir. Nov. 15, 2000) ("*Teva II*").

This case illustrates the complexities and administrative burdens inherent in implementing the approach adopted in the *Teva* cases. Although FDA argued unsuccessfully against the standard adopted by the court in *Teva*, FDA has since tried to apply the *Teva* rule in a clear and bright-line manner that allows both the agency and industry to predict with certainty whether the dismissal of a declaratory judgment action will satisfy the court decision trigger. The agency strives to provide the industry with certainty and predictability so that it can make business planning decisions. A bright-line rule also preserves administrative and judicial resources by minimizing the time required for consideration and review of the underlying question. Nevertheless, FDA's decisions continue to be challenged by generic applicants who

argue about the meaning of the *Teva* standard and whether certain factual circumstances meet that standard. Thus, although FDA firmly believes it has correctly applied *Teva* to the facts of this case, and that its decision should therefore be upheld, its foremost interest lies in the establishment or clarification of a bright-line rule to guide the agency and industry alike.

## BACKGROUND

Bristol-Myers Squibb Company ("Bristol") markets pravastatin sodium tablets ("pravastatin") under the brand name Pravachol, which has been approved for the treatment of primary and secondary prevention of coronary events and hyperlipidemia. Pravachol is a brand-name, "pioneer," or "innovator" drug, in contrast to a "generic" drug. A pioneer drug is marketed under a new drug application ("NDA"). Bristol holds the NDA for pravastatin for four different strengths of that product: 10 mg, 20 mg, 40 mg, and 80 mg.

Generic drug applicants must file an abbreviated new drug application ("ANDA") to obtain approval of a generic version of a pioneer drug product. As part of its ANDA, a generic drug manufacturer may challenge the patents identified by the innovator as claiming the approved drug. Generally speaking, the first ANDA applicant to submit a patent challenge is eligible for 180 days of generic marketing exclusivity without competition from other ANDA applicants who subsequently challenge those patents. Under the applicable governing statute, the exclusivity period will begin to run with the earlier of the first commercial marketing of the drug ("commercial marketing trigger") or "the date of a decision of a court in an action . . . holding the patent which is the subject of the certification to be invalid or not infringed" ("court decision trigger"). 21 U.S.C. § 355(j)(5)(B)(iv)(I), (II).

Teva asserts that it was the first ANDA applicant to challenge two patents listed for Bristol's 10 mg, 20 mg, and 40 mg pravastatin products. As such, Teva contends that it is

2

eligible for a 180-day period of generic marketing exclusivity for those products.  For the

moment, however, Teva and all other ANDA applicants are barred from marketing pravastatin

until April 20, 2006, when another of Bristol's Pravachol patents is due to expire.  Thus, FDA

has not yet granted final approval to any pravastatin ANDA.

       In the meantime, another ANDA applicant for pravastatin, Intervenor-Defendant Apotex

Inc., filed a declaratory judgment suit against Bristol, seeking a determination that its product

would not infringe several of the listed patents for Pravachol.  On July 23, 2004, the district court

dismissed Apotex's action pursuant to a stipulated dismissal order that expressly incorporated

Bristol's stated intention not to sue Apotex for infringement.  *Apotex, Inc. v. Bristol-Myers

Squibb Co.*, No. 04-2922 (S.D.N.Y.) (AR Tab 32, at tab A).  That judgment became final and

unappealable on August 22, 2004.

       In response to an inquiry from Apotex, FDA determined in a letter decision dated June

28, 2005, that the July 23, 2004 stipulated order dismissing Apotex's declaratory judgment action

constituted a court decision that triggered the commencement of any generic exclusivity period

for pravastatin.  AR Tab 36, at 2.  As FDA explained in that letter, "the dismissal precludes a

subsequent suit by [Bristol] against Apotex for infringement of these patents, and constitutes a

decision of a court."  *Id.* at 4-5.  Thus, any exclusivity for which Teva might have been eligible

was triggered when that dismissal order became final and unappealable on August 22, 2004, and

expired 180 days later, on February 18, 2005.  *Id*. at 2.

       In this lawsuit, Teva challenges FDA's determination that exclusivity for pravastatin has

been triggered and expired and seeks an order enjoining FDA from approving other ANDAs for

that drug.  As explained below, however, FDA reasonably concluded that the stipulated dismissal

order in *Apotex v. Bristol* triggered exclusivity for pravastatin, pursuant to the governing statute

and applicable precedent.  *See Teva I*, 182 F.3d at 1008.  Nor has Teva, which has the largest

share of the generic drug market in North America and is among the largest generic drug

manufacturers in the world, established that it will suffer irreparable harm without the relief that

it seeks.  For these and other reasons explained in greater detail below, Teva is not entitled to

injunctive relief.

## STATUTORY AND REGULATORY FRAMEWORK

I.    New Drug Applications

Under the FDCA, pharmaceutical companies seeking to market "pioneer" or "innovator"

drugs must first obtain FDA approval by filing an NDA containing extensive scientific data

demonstrating the safety and effectiveness of the drug.  21 U.S.C. § 355(a), (b).  An NDA

applicant must also submit information on any patent that claims the drug, or a method of using

the drug, and for which a claim of patent infringement could reasonably be asserted against an

unauthorized party.  21 U.S.C. § 355(b)(1), (c)(2).  FDA must publish the patent information it

receives, and does so, in "Approved Drug Products with Therapeutic Equivalence Evaluations"

(the "Orange Book").  *Id*.; *see also* 21 C.F.R. § 314.53(e).

II.   Abbreviated New Drug Applications

The Drug Price Competition and Patent Term Restoration Act of 1984 (known as the

"Hatch-Waxman Amendments"), codified at 21 U.S.C. §§ 355 and 35 U.S.C. §§ 156, 271, and

282, permits the submission of ANDAs for approval of generic versions of approved drug

products.  21 U.S.C. § 355(j).[1]  ANDA applicants do not have to submit clinical data to

---

[1] Congress amended 21 U.S.C. § 355(j) in late 2003.  *See* The Access to Affordable
Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization
Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA").  Pursuant to the
effective dates of those amendments, they do not apply to the exclusivity determinations for the
ANDAs in this case because the earliest ANDA containing a paragraph IV certification was

demonstrate the safety and efficacy of the product, as in an NDA.  Rather, an ANDA relies on

FDA's previous findings that the product approved under the NDA is safe and effective.  The

FDCA sets forth in detail the information an ANDA must contain.  *See* 21 U.S.C. § 355(j)(2)(A).

The Hatch-Waxman Amendments were intended to balance encouraging innovation in

drug development with accelerating the availability of lower cost alternatives to innovator drugs.

*See* H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984), *reprinted in* 1984

U.S.C.C.A.N. 2647-48.  *See also, e.g., Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135, 139 (3d

Cir. 1987).  The timing of approval of ANDAs depends, in part, on patent protections for the

pioneer drug.

A.    Patent Certifications

Among other things, an ANDA must contain one of four specified certifications for each

patent that "claims the listed drug" or "a use for such listed drug for which the applicant is

seeking approval."  21 U.S.C. § 355(j)(2)(A)(vii).  The "listed drug" is an approved new drug

product.  21 U.S.C. § 355(j)(7); 21 C.F.R. § 314.3(b).

This certification must state one of the following:

(I)   that the required patent information relating
to such patent has not been filed;
(II)  that such patent has expired;
(III) that such patent will expire on a particular date; or
(IV)  that such patent is invalid or will not be infringed by the drug for which
approval is being sought.

*See* 21 U.S.C. § 355(j)(2)(A)(vii).[2]  If an ANDA applicant wishes to challenge the validity of a

submitted before the December 8, 2003, enactment date of the MMA.  *See id.* § 1102(b)(1).
Except where otherwise noted, this memorandum refers to the pre-MMA version of the statute.

[2] If a certification is made under paragraph I or II indicating that patent information pertaining to
the drug or its use has not been filed with FDA or the patent has expired, the ANDA may be
approved immediately if all other requirements for approval have been met.  21 U.S.C.

patent, to claim that the patent would not be infringed by the product proposed in the ANDA, or to assert that the patent is unenforceable, the applicant must submit a paragraph IV certification to FDA.  The applicant must also provide notice of its paragraph IV certification to the NDA holder and the patent owner explaining the factual and legal basis for the applicant's opinion that the patent is invalid, not infringed, or unenforceable.  21 U.S.C. § 355(j)(2)(B); 21 C.F.R. § 314.107(c)(1)(ii).[3]

The filing of a paragraph IV certification is an act of infringement.  35 U.S.C. § 271(e)(2)(A).  This enables the NDA holder and patent owner to sue the ANDA applicant before the product is marketed.  If such a suit is brought within 45 days of the date notice of the certification was received by the patent owner or NDA holder, FDA must stay approval of the ANDA for 30 months from the date of notice, unless a final court decision is reached earlier in the patent case or the court otherwise orders a longer or shorter period.  21 U.S.C. § 355(j)(5)(B)(iii).  If no action is brought within the requisite 45-day period, FDA may approve an ANDA with a paragraph IV certification effective immediately, provided that there are no applicable exclusivity periods and that other conditions for approval have been met.  21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).

─────────────────

§ 355(j)(5)(B)(i).  A certification under paragraph III indicates that the ANDA applicant does not intend to market the drug until after the applicable patent has expired, and approval of the ANDA may be made effective on the expiration date.  21 U.S.C. § 355(j)(5)(B)(ii).

[3] Although the statute does not expressly include unenforceability as one of the grounds for a paragraph IV certification or a triggering court decision, FDA has construed the statute to include unenforceability because a patent that is held unenforceable cannot be asserted against an ANDA applicant and should not serve as a basis for delaying generic drug market entry.  21 C.F.R. § 314.107(c)(1)(ii); *see Teva I*, 182 F.3d at 1009 (recognizing and approving unenforceability as the basis for a paragraph IV certification).

B.    180-Day Period of Market Exclusivity

Submitting a paragraph IV certification may enable an ANDA applicant to market its product during the patent term.  However, such a certification also exposes the ANDA applicant to some risk of patent infringement litigation.  The statute provides an additional incentive and reward to the first generic drug manufacturer to expose itself to this risk by delaying approval of subsequent ANDAs containing later paragraph IV challenges to the patent until the expiration of 180 days after a triggering event – either the first ANDA applicant's commercial marketing of the drug or an applicable court decision.  21 U.S.C. § 355(j)(5)(B)(iv).  *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998); *Mylan Pharm., Inc. v. Henney*, 94 F. Supp. 2d 36, 40 (D.D.C. 2000) ("*Mylan (tamoxifen)*"), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C. Cir. 2002).

The statutory provision "on its face appears to provide an advantage to the first party who files a paragraph IV ANDA (henceforth, the 'first applicant'), by granting him a 180-day period in which to market his generic drug without competition from other ANDA applicants."  *Mova*, 140 F.3d at 1064.  During that time, the first ANDA applicant can market its product, and approvals of other ANDAs for the same product are held in abeyance.

C.    Court Decision Trigger

The statutory provision governing the court decision trigger of 180-day exclusivity provides:

> If the application [submitted under 21 U.S.C. § 355(j)(2)] contains a certification described in subclause (IV) of paragraph (2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after-
>
> (I) the date the Secretary receives notice from the applicant under the

> previous application of the first commercial marketing of the drug under
> the previous application, or
>
> (II) *the date of a decision of a court in an action described in clause (iii)*
> *holding the patent which is the subject of the certification to be invalid or*
> *not infringed,*

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added).  *See also* 21 C.F.R. §§ 314.107(c)(1) & (2).

Under this provision, as noted, either of two events can trigger the start of the exclusivity period:

(1) the commercial marketing of the drug product as set forth in subparagraph (I) (the

"commercial marketing trigger"); or (2) an applicable court decision as set forth in subparagraph

(II) (the "court decision trigger"), the provision at issue in this case.[4]

In its two *Teva* decisions, the D.C. Circuit interpreted the court decision trigger broadly,

holding that exclusivity can be triggered by a court decision in an action that does not involve the

ANDA eligible for exclusivity.  *Teva I*, 182 F.3d at 1005 n.3.  In that case, Teva, a subsequent

ANDA applicant, obtained a "court decision" that triggered Apotex's exclusivity for the drug

ticlopidine – just as Apotex, in this case, has obtained a court decision that triggered Teva's

putative exclusivity for pravastatin.  *Id.; see also Teva II*, 2000 U.S. App. LEXIS 38,667, at *6.

The *Teva* decisions are central to FDA's interpretation and application of the court decision

trigger in this case, and thus warrant a careful examination.

---

[4] Under the MMA, the applicable "decision of a court" in this case is a final judgment from
which no appeal can be or has been taken.  *See* MMA § 1102(b)(3) (defining "decision of a
court" for drugs for which a paragraph IV certification was filed before enactment of the MMA
and for which there has been no triggering court decision as of the date of enactment on
December 8, 2003).

1.    The *Teva* Decisions:  California Patent Infringement Litigation

The *Teva* case was precipitated by the dismissal of a declaratory judgment action in a patent case in the Northern District of California.  Apotex (then TorPharm) was eligible for exclusivity for generic ticlopidine tablets, which blocked approval of Teva's ANDA.  *Teva I*, 182 F.3d at 1004 n.2.  Teva sought to trigger Apotex's exclusivity under the court decision trigger before Apotex was ready to market its drug product.  Accordingly, Teva sued the NDA holder, Syntex, for a declaratory judgment that it did not infringe Syntex's patent.  *Id.* at 1006.  On the same day that Teva filed its complaint, Syntex sent Teva a letter, stating that "[w]e will make no claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the formulation you have disclosed to us."  *Id.*

Teva prepared a joint motion for entry of a consent judgment that would have held Syntex's patent not infringed, but Syntex declined that approach, presumably out of concern that such a judgment would constitute a triggering court decision that would have opened the door to imminent generic competition.  *Id.*  Instead, Syntex moved to dismiss the case for lack of subject matter jurisdiction based on Teva's lack of reasonable apprehension of suit.  *Id.*  The district court granted Syntex's motion in modified form, finding that Teva "lacks a reasonable apprehension of suit by Syntex for infringement of the patent" and that there was accordingly no justiciable case or controversy.  *Id.; see also Teva Pharm. USA, Inc. v. Syntex (USA) Inc.*, No. 98-02314 (dismissal order Aug. 14, 1998) ("Ca. Dismissal") (attached hereto as Ex. A).  The court crossed out the words "lacked and" before "lacks" in Syntex's proposed order because it expressly declined to decide, as Syntex had requested, that there had never been a reasonable apprehension of suit.  *Id.* at 24.

The court similarly rejected Teva's request to enter a finding of noninfringement, having

decided to dismiss solely on the ground that there was no present case or controversy. *Id.* at 23.

The court explained its view as follows:

> I don't have the power to do either one [grant Teva's or Syntex's requests]. Once there is
> a decision here that there is no case [or] controversy, you're out the door. My file is taken
> away from me. Even if I could, even if I have the power, I'm not going to get embroiled
> into this kind of thing without knowing the facts.
>
> I mean, how can I say that there never was reasonable apprehension to sue, unless I walk
> through a very lengthy hearing on all the track records between you? I can't do that, and
> particularly can't do it where you agree that I have no Article III jurisdiction; and the
> same way with what Teva wants that this letter constitutes an admission and a waiver,
> and that's going to have the impact of whether Torpharm does or does not have this
> priority under the Act. I'm not going to do that without a very extensive hearing, and I'm
> not going to have any.

*Id.* at 23-24. Thus, the court declined to find that Syntex's letter "constitutes an admission and a

waiver," or otherwise make any finding that Teva had requested in an effort to trigger Apotex's

exclusivity. Rather, upon determining that there was no present case or controversy, the court

sent the parties "out the door" without evaluating whether there had ever been a reasonable

apprehension of suit, or entering a finding of an admission of noninfringement.

        2.     *Teva I*

Following dismissal of the California patent case, Teva petitioned FDA for a

determination that the court's decision triggered Apotex's exclusivity, notwithstanding the

court's failure to enter an order with a finding of noninfringement. *Teva I*, 182 F.3d at 1006.

FDA concluded that there had been no court decision trigger, and Teva brought suit in this Court

challenging the agency's determination. Teva sought a declaratory judgment that the California

order had triggered Apotex's exclusivity and that Teva was entitled to final approval of its

ANDA 180 days following dismissal of the California case. *Id.* at 1006-07. The district court

(Kollar-Kotelly, J.) dismissed Teva's case, agreeing with FDA that the California decision was

not a holding on the merits and did not qualify as a triggering court decision under the plain language of the statute.

On appeal, the D.C. Circuit reversed and remanded. The court held that a dismissal of a declaratory judgment action for lack of subject matter jurisdiction could constitute an effective "holding" that the patent was not invalid or infringed for purposes of the court decision trigger, 21 U.S.C. § 355(j)(5)(B)(iv)(II). *Teva I*, 182 F.3d at 1008. The court noted that "the significance of a court's 'decision' or 'holding' often lies in its preclusive effect," *id.* at 1008, and found an apparent inconsistency between FDA's treatment of unenforceability as a basis for a paragraph IV certification and its determination that the order in this case did not constitute a court decision trigger. *Id.* at 1009. In the court's view, a dismissal order that precluded or estopped a patentee from suing an ANDA applicant was essentially a "holding" that the patent was unenforceable with respect to that applicant, and thus constituted a triggering court decision. *Id.* After setting forth its analysis at length, the court remanded the case so that FDA could explain why it did not recognize the stipulated dismissal in *Teva I* as a court decision trigger. *Id.* at 1010.

    3.    *Teva II*

On remand, FDA explained that it would be a tremendous administrative burden to examine the pleadings, transcripts, and exhibits from the underlying patent litigation to determine whether the dismissal order in that case had preclusive effect. *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *16, 17 (Aug. 19, 1999). In a declaration, FDA described the process by which the agency determines whether a particular court decision will trigger exclusivity under the statute. *Id.* First, the ANDA applicant asserting that there has been such a trigger submits a copy of the order to FDA. Staff from the agency's Office of Generic Drugs ("OGD") then work together with FDA lawyers to determine whether the patent at issue

has been found invalid, unenforceable, or not infringed. *Id.* at *17. It was not part of FDA's practice at the time for agency staff to review pleadings, transcripts, or exhibits from the underlying patent litigation due to the burden such review would impose upon the agency's limited resources. FDA also maintained that "OGD lacks the expertise to make accurate determinations about the legal effect, such as estoppel, of representations relating to patents that are not embodied in a court decision." *Id.* Consistent with these practices and concerns, and because FDA felt that Teva's interpretation would be contrary to industry expectations, FDA determined to continue to view the California dismissal as a non-triggering court decision. *Id.* at *18.

>This time, however, Judge Kollar-Kotelly rejected FDA's position. The court explained:

>[T]his is not a case where a great deal of sophisticated legal analysis is required. As the Court of Appeals found, all OGD had to do in order to determine that the patent holder would be estopped from suing Teva for patent infringement was look at the order and Roche's [Syntex's] concessionary letter. As a matter of black-letter patent law, these documents suffice to forever stop Roche from suing Teva for patent infringement. *In light of the Court of Appeals' finding that the significance of a triggering court decision lies in its estoppel effect, it is unreasonable for the FDA to refuse to make even a cursory inquiry into the basis for the California court's order.*

*Id.* at *19 (emphasis added) (citations omitted).

The D.C. Circuit affirmed the district court's decision in an unpublished decision and largely adopted its findings. *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. Chief Judge Edwards dissented in part, noting that, on remand, FDA had "pressed a new point that we had not previously considered: In assessing the statutory 'court decision' requirement, the agency would not look beyond the face of a court order, because to do so would be unduly burdensome to the agency." *Id.* at *9 (Edwards, C.J., dissenting in part). "In short," Judge Edwards stated, "the agency obviously and sensibly sought to avoid the burden of adjudicating the underlying reasons

for a dismissal." *Id.* at *10.

4.    Administrative Precedent

Since issuance of the D.C. Circuit's *Teva II* decision, FDA has adhered to the court's ruling and has consistently employed the analysis set forth by the court when called upon to determine whether an exclusivity period has been triggered by a decision of a court. In 2003, for example, Allergan argued to the agency that there had been no triggering court decision stemming from a district court's finding of noninfringement for lack of evidence that doctors would prescribe or use the drug brimonidine for off-label uses in an infringing manner. AR Tab 38, at 5. FDA disagreed, concluding that the decisions in that case had preclusive effect because the court had rejected Allergan's claims of inducing infringement under 35 U.S.C. § 271(e)(2), and had thus triggered exclusivity. *Id.* at 8.

In its decision letter, FDA analyzed the *Teva* decisions in detail, noting that "the preclusive effect of the California dismissal was a crucial factor in the court's decision that the California dismissal was a 'court decision' that triggered exclusivity." *Id.* at 9. FDA stated:

> The narrow inquiry in *Teva* was whether a dismissal, which appeared to have no preclusive effect because the court lacked authority to hear the case, actually involved a predicate – and preclusive – finding of fact. The *Teva* court's analysis focused on Syntex's disavowal of intent to sue Teva. The court determined that such disavowal estopped Syntex from suing Teva for infringement, and thus the dismissal had the effect of a judgment of non-infringement. 182 F.2d at 1009. Because of the unusual posture of that case, the critical factor for the court was whether the dismissal had preclusive effect.

*Id.* at 10. FDA observed moreover that the *Teva* court had been concerned that, without such an interpretation of the court decision trigger, the innovator could manipulate and delay the starting of exclusivity, "even if one or more generic companies were ready, willing, and able to manufacture." *Id.* at 9.

13

FDA reached a different outcome in an exclusivity trigger decision involving the drug flecainide acetate.  In that case, the court had granted summary judgment to generic manufacturer Barr Labs, based on a finding that Barr's product did not infringe 3M's patents, and denied 3M's motion to dismiss based on Barr's failure to comply with the notice requirements of the Act.  AR Tab 37, at 2.  3M appealed only on the second ground.  Barr therefore argued to FDA that, based upon the *Teva* decisions, the district court's decision had triggered exclusivity because the parties agreed that Barr did not infringe the patent.  FDA disagreed, stating:

> FDA is well aware of the *Teva* decisions, and the obligation they impose upon FDA to review these questions of triggering court decisions on a case-by-case basis.  The agency has done so with respect to these Flecainide Acetate ANDAs. It is the agency's view that what controls in this matter is that the district court decision finding non-infringement was appealed.  Although Barr makes a plausible argument that the outcome of the appeal might not have any practical effect on whether or not the patent is infringed, <u>in fact the outcome of the appeal could have an effect on whether the exclusivity is triggered</u>.

*Id.* at 4 (emphasis in original).

The touchstone of FDA's decision was whether, following the appeal, there would be a decision with preclusive effect:  "If 3M succeeds in the appeal and the Federal Circuit directs the district court to dismiss 3M's case based on Barr's failure to comply with the notice requirement, there will be no decision with preclusive effect."  *Id.* at 4 (citing *Abbott Labs. v. ALRA Labs, Inc.*, Civil Action No. 92 C 5806 (N.D. Ill. Dec. 23, 1992)).  Thus, because there was a distinct possibility that the decision would be without any preclusive effect following the appeal, FDA determined that, in this instance, the court decision at issue had not triggered the start of the exclusivity period.

## FACTUAL BACKGROUND AND ADMINISTRATIVE PROCEEDINGS

I.      Pravastatin NDA and ANDAs

Bristol is the holder of an approved NDA 19-898 for pravastatin sodium tablets, which it markets under the brand-name Pravachol.  FDA approved Bristol's pravastatin NDA for 10 mg and 20 mg tablets in 1991, 40 mg tablets in 1993, and 80 mg tablets in 2001.[5]  Bristol listed four relevant patents in the Orange Book with respect to its drug: U.S. Patent Nos. 4,346,227 ("the '227 patent"); 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent").

On December 20, 2000, Teva submitted an ANDA for generic versions of 10 mg, 20 mg, and 40 mg pravastatin.[6]  Its ANDA contained paragraph IV certifications to the '447, '589, and '985 patents and a paragraph III certification to the '227 patent, thus indicating that Teva would not market the drug until that patent has expired.[7]  FDA tentatively approved Teva's application on May 15, 2002, and it will not be eligible for final approval and marketing until on or about April 20, 2006, when the '227 patent and an additional six-month period of pediatric exclusivity

---

[5] *See* Electronic Orange Book, *available at* http://www.accessdata.fda.gov/scripts/cder/ob/docs/obdetail.cfm?Appl_No=019898&TABLE1=OB_Rx.

[6] Teva did not submit an ANDA for the 80 mg product, and that product is not part of this lawsuit.  In response to a request from Ranbaxy Pharmaceuticals, Inc., FDA is reconsidering its initial determination that the court decision trigger applied to the 80 mg product.  *See* Letter from Ranbaxy (Aug. 23, 2005) (attached hereto as Ex. B) (asserting that the court decision at issue did not encompass the 80 mg product); Letter from FDA to Ranbaxy (Aug. 24, 2005) (attached hereto as Ex. C).  By contrast, Teva never sought formal administrative reconsideration of FDA's decision with respect to the 10, 20, and 40 mg products at issue in this case, electing instead to bring its claims directly to this Court.

[7] Teva later withdrew its paragraph IV certification for the '985 patent and substituted a so-called "section (viii) statement" indicating that Teva did not seek approval for the method of use claimed in that patent.  *See* 21 U.S.C. § 355(j)(2)(A)(viii).  The '985 patent is not relevant to the exclusivity issues in this case.

15

have expired.[8]  Several other applicants have submitted ANDAs for pravastatin, all of which

likewise contain paragraph III certifications to the '227 patent, and thus are similarly precluded

from marketing the drug until at least April 20, 2006.

II.    Patent Litigation

        Bristol did not sue any of the pravastatin ANDA applicants for infringement of the listed

patents within 45 days of receiving notice of their paragraph IV certifications.  In such

circumstances, after 45 days have expired, the FDCA permits an ANDA applicant to bring a

declaratory judgment action against the NDA holder seeking a declaratory judgment of

noninfringement.  *See* 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(5)(2005).  Apotex

brought a declaratory judgment action with respect to pravastatin on April 15, 2004, and, on July

23, 2004, the district court dismissed the action pursuant to a stipulated order of dismissal.  That

order provided in relevant part:

> WHEREAS, prior to Apotex's filing of the Complaint herein, BMS [Bristol] repeatedly
> represented and assured Apotex that, notwithstanding any disagreement on the scope or
> interpretation of the claims of the '447, '985, and '589 patents, it had no intention to
> bring suit against Apotex for infringement of the '447, '985, and '589 patents with
> respect to Apotex's generic pravastatin sodium products that are the subject of ANDA
> No. 76-341.
>
> NOW THEREFORE, based upon BMS's pre-Complaint representations that it has no
> intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the
> manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin
> sodium products that are the subject of ANDA No. 76-341, Apotex hereby stipulates that
> Apotex's Complaint seeking a declaratory judgment of noninfringement of the '447,
> '985, and '589 patents be, and hereby is, dismissed, for lack of subject matter jurisdiction,

---

[8] FDA grants "tentative approval" to an ANDA when all scientific and procedural conditions for
approval have been met, but the application cannot be fully approved because approval is
blocked by a 30-month stay, some form of marketing exclusivity, or some other barrier to
approval arising from patent infringement litigation.  *See* 21 C.F.R. § 314.105(d).  Among other
exclusivities, an NDA holder can receive six months of pediatric exclusivity beyond patent
expiration if, as Bristol did here, it satisfactorily completes requested studies concerning the
effects of its drug in the pediatric population.  21 U.S.C. § 355a.

with each party to bear its own costs.

III.    FDA's June 28, 2005 Decision

In response to a then-confidential inquiry from Apotex following the dismissal of this declaratory judgment action, FDA determined that the court's dismissal qualified as a court decision under 21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered any exclusivity that attached to the '447, '985, and '589 patents.  AR Tab 36, at 2.[9]  Because the July 23, 2004 order became final and unappealable on August 22, 2004, any 180-day exclusivity that may have arisen from those patents expired on February 18, 2005.  *Id.*

In its decision, published to all ANDA applicants for pravastatin 10, 20, 40 and 80 mg, FDA set out in full the relevant statutory language and summarized the applicable regulation.  *Id.* at 2-3.  FDA discussed the construction of the statute in the *Teva* cases, noting the *Teva I* court's ruling "that a dismissal of a declaratory judgment action (DJA) can qualify as a 'decision of a court' triggering the running of 180-day exclusivity if the dismissal estops a future action against the ANDA holder for infringement of the patent with respect to that drug product."  *Id.* at 3-4.  FDA reviewed the dismissal order between Bristol and Apotex, and found that the dismissal was "based on BMS's representations that it has no intention to sue Apotex for infringement of these three patents arising from Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-431.  Accordingly, the dismissal precludes a subsequent suit by BMS against Apotex for infringement of these patents, and constitutes a decision of a court."  *Id.* at 4-5.  Thus, FDA concluded that any exclusivity for the '447, '589, and '985 patents had been triggered and

---

[9] FDA treats submissions to unapproved ANDAs as confidential unless the applicant grants permission for disclosure.  21 C.F.R. § 314.430.

expired as of February 18, 2005.  *Id.*

## ARGUMENT

To obtain a preliminary injunction, a party must demonstrate that:  (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest.[10]  *See Boehringer Ingelheim Corp. v. Shalala,* 993 F. Supp. 1, 1 (D.D.C. 1997); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  The Court must balance the four factors in deciding whether to grant the injunctive relief.    *Id.*

The injunctive relief Teva seeks is "an extraordinary form of judicial relief" and is not to be granted lightly.  *Mylan v. Thompson*, 139 F. Supp. 2d 1, 17 (D.D.C.) ("*Mylan (buspirone)*"), *rev'd other grounds*, 268 F.3d 1323 (Fed. Cir. 2001); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996).

---

[10]   This Court has agreed to consolidate Teva's motion for a preliminary injunction with its request for a permanent injunction on the merits pursuant to Fed. R. Civ. P. 65(a)(2).  *See* Doc. No. 10 (Aug. 9, 2005 order).  The standard for entry of a permanent injunction is the same as that for a preliminary injunction, except that a plaintiff must actually prevail on the merits rather than simply demonstrate a likelihood of success.  *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 47 (D.D.C. 2000). Thus, the same considerations govern the court's determination of Teva's request for a permanent injunction on the merits.  Moreover, the federal defendants have filed an administrative record in this case, and there are no known factual disputes or disagreements as to the contents of the record.  Courts have held that it is appropriate to enter summary judgment for the non-moving party in such circumstances if the court's determination of the legal issues establishes that the defendant is so entitled.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (noting that courts may grant summary judgment *sua sponte*).

I.     **Teva Is Not Likely to Succeed on the Merits**

    A.     **FDA's Administrative Decisions Are Entitled to Deference**

FDA's administrative decisions are subject to review by the Court under the Administrative Procedure Act ("APA"), and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Indeed, "[t]here is a presumption in favor of the validity of the administrative action." *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 216 (D.D.C. 1996). The reviewing court must consider whether the agency's decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment. *Overton Park*, 401 U.S. at 416. However, "under this narrow scope of review, '[t]he court is not empowered to substitute its judgment for that of the agency.'" *Bristol-Myers*, 923 F. Supp. at 216 (quoting *Overton Park*, 401 U.S. at 416).

When a court is reviewing an agency's construction of a statutory provision, the first step is to determine "whether Congress has spoken to 'the precise question at issue.'" *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984)) ("*Chevron* step one") (internal citation omitted). To the extent there exists any ambiguity in the statutory provisions at issue and their relationship to other relevant portions of the Act, the Court should defer to FDA's interpretation of its own statute. *See Chevron*, 467 U.S. at 843-44 & n.11 (in case of ambiguity, court must uphold agency's interpretation if construction is permissible under the statute; court need not conclude that agency construction was only one it permissibly could have adopted or even reading court would have reached) ("*Chevron* step two"); *see also Barnhart v. Walton*, 535

U.S. 212, 218 (2002); *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).[11]

 *Chevron* deference applies where "Congress delegated authority to the agency generally to make rules carrying the force of law." *Id.* at 226-27. Congress has authorized and directed FDA to decide not only what drugs may lawfully enter the marketplace through the NDA and ANDA approval process, but also when they may enter the market. The statute is replete with references to findings and determinations that must be made by the agency in the drug approval process. *See, e.g.,* 21 U.S.C. §§ 355(d), 355(j)(4), 355(j)(5). Such determinations necessarily require interpretation of a statutory scheme that is undeniably "complex." *See, e.g., Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1079 (D.C. Cir. 2001); *Mova*, 140 F.3d at 1062. The D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the FDCA, as well as the agency's own implementing regulations. *See, e.g., Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1281 (D.C. Cir. 2004); *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).[12]

---

[11] Under *Mead*, an agency's interpretation of its own statute is entitled to different degrees of judicial deference depending on the circumstances. FDA is, at a minimum, entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944), under which courts give "considerable and in some cases decisive weight" to statutory interpretations "made in pursuance of official duty, [and] based upon more specialized experience and broader investigations and information" than a court is likely to have, provided that the administrative decision is carefully and thoughtfully made.

[12] Furthermore, when, as here, a court is evaluating an agency's interpretation of its own regulations, the agency is entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002) (courts "defer to an agency's reading of its own regulation, unless that reading is 'plainly erroneous or inconsistent with the regulation'") (internal citations omitted); *Wyoming Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 52 (D.C. Cir. 1999) (agency's construction of own regulation is controlling unless plainly erroneous or inconsistent with regulation); *Bristol-Myers*, 923 F. Supp. at 216.

*Chevron* deference extends to administrative determinations that are not embodied in rulemaking or formal adjudication. As the Supreme Court made clear in *Barnhart*:

> [T]he fact that the Agency previously reached its interpretation through means less formal than "notice and comment" rulemaking . . . does not automatically deprive that interpretation of the judicial deference otherwise its due. If this Court's opinion in [*Christiansen v. Harris County*, 529 U.S. 576 (2000))] suggested an absolute rule to the contrary, our later opinion in [*Mead*] denied the suggestion. Indeed, *Mead* pointed to instances in which the Court has applied *Chevron* deference to agency interpretations that did not emerge out of notice-and-comment rulemaking.

535 U.S. at 221-22 (citations omitted).

In *Mylan v. Thompson*, 389 F.3d at 1279-80, for example, the D.C. Circuit extended *Chevron* deference to an FDA drug approval determination involving generic drug exclusivity issues. In *Mylan*, as here, FDA made its determination in a decisional letter. The court explained that deference was appropriate because of "the complexity of the statutory regime . . . the [presence of] FDA's expertise or the careful craft of the scheme it devised to reconcile the various statutory provisions . . . and [the fact that] FDA's decision made no great legal leap but relied in large part on its previous determination of the same or similar issues and on its own regulations." *Id.* at 1280.

Although FDA in this case did not devise the rule articulated by the court in the *Teva* cases and initially did not agree with it, the agency has conformed its practice to the interpretation of the statute set forth by the D.C. Circuit. FDA has applied that interpretation consistently post-*Teva* when called upon to decide whether a particular court decision triggered the start of exclusivity under the statute. *See, e.g.,* AR Tabs 37-38. Apotex and other members of the regulated industry have relied on the standard set forth in *Teva* and the agency's application of that standard.

    **B.**    **FDA Properly Applied Applicable Precedent In Its Determination That Exclusivity Was Triggered**

        **1.**    **Under *Teva I* and *II*, Exclusivity Is Triggered When the Dismissal of a Declaratory Judgment Action Has Preclusive Effect**

FDA reasonably determined in its June 28, 2005 letter that any exclusivity that may have attached for pravastatin has already been triggered and expired.  AR Tab 36.  FDA reached this conclusion by applying the statute as construed in the D.C. Circuit's *Teva* decisions.  As noted above, the statute effectively awards a 180-day period of generic marketing exclusivity to the first ANDA applicant to submit a paragraph IV certification challenging an innovator's patent.  It does so by requiring FDA to delay approval of subsequent ANDAs for 180 days following either the first commercial marketing of the drug by the first paragraph IV filer or "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or infringed" – whichever is earlier.  21 U.S.C. § 355(j)(5)(B)(iv)(II).[13]

Before *Teva*, FDA interpreted the term "holding" to mean that only a court decision on the merits of invalidity, infringement, or unenforceability would trigger the start of exclusivity.  That interpretation, however, was struck down in *Teva*, in which the D.C. Circuit held that an explicit "holding" on the merits was not required to trigger exclusivity.  Taking an expansive view of the terms "decision" and "holding," the court noted that "the significance of a court's 'decision' or 'holding' often lies in its preclusive effect."  *Teva I*, 182 F.3d at 1008.

The court observed moreover that a "holding" of invalidity or noninfringement was not required, because a "holding" of unenforceability would also suffice.  *Id.* at 1009.  And, if a "holding" of unenforceability would trigger exclusivity, then so too would a dismissal order that

---

[13] As noted, FDA has by regulation construed "invalid or not infringed" to include "unenforceable."  21 C.F.R. § 314.107(c)(1)(ii).

estopped a patentee from suing for infringement. *Id.* Any difference between unenforceability (which precludes the patentee from asserting the patent against anyone) and estoppel (which precludes the patentee from asserting the patent only against the party as to whom it is estopped) was, in the court's view, "a distinction without difference for purposes of the 'court-decision' requirement." *Id.* at 1010. Because Syntex was estopped from suing Teva for patent infringement as a result of the California dismissal in that case, that dismissal order was essentially a "holding" that the patent was unenforceable with respect to Teva and thus qualified as a triggering court decision. *Id.*

The *Teva* court also made clear that the proper inquiry for determining whether a patentee is estopped from suing for infringement is whether the dismissal order in a declaratory judgment action has "preclusive effect." *Teva I*, 182 F.3d at 1008. To resolve that issue, the court looked to the law of the Federal Circuit, which "has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's *disavowal of any intent to sue* for infringement has preclusive effect." *Teva I*, 182 F.3d at 1008 (citing *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991); and *Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998)) (emphasis added). Finally, the court, in *Teva II*, directed FDA to look beyond the face of the court order if necessary to determine whether dismissal of the declaratory judgment action had preclusive effect. *Teva II*, 2000 U.S. App. LEXIS at *5 (noting with approval the district court's statement that "[a]ll [FDA officials] had to do in order to determine that the patent holder would be estopped from suing Teva for patent infringement was look at the order and Roche's concessionary letter. As a matter of black-letter patent law, these documents suffice to forever estop Roche from suing Teva for patent

infringement.").

### 2.    The *Apotex v. Bristol* Dismissal Order Has Preclusive Effect

In this case, FDA followed the D.C. Circuit's directive to look at the face of the dismissal order and other relevant documents if necessary to determine whether the dismissal order has preclusive effect.  According to the standard articulated by *Teva I*, the dismissal order alone supports FDA's conclusion that the stipulated dismissal between Bristol and Apotex is preclusive.  Bristol's commitment is present on the face of the order:  "BMS repeatedly represented and assured Apotex that . . . it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341."  AR Tab 32 (tab A) at 3.  Bristol's *"assur[ance]"* that it had no *"intention"* to sue Apotex precisely tracks the *Teva* court's description of Federal Circuit law governing preclusion.  *Teva I*, 182 F.3d at 1008 ("the patent holder's *disavowal of any intent to sue* for infringement has preclusive effect") (emphasis added).  "Assure" means to "1.  To state positively, as to remove doubt.  2.  To cause to feel sure.  3.  To give confidence to; reassure.  4. To make certain; ensure."  The American Heritage College Dictionary at 84 (3d ed. 2000).  FDA therefore properly considered Bristol's repeated assurances that it had no intention of suing Apotex as strong evidence that the stipulated dismissal of Apotex's declaratory judgment action had preclusive effect.

In addition to the face of the order itself, FDA reviewed the documents submitted by Apotex in connection with its request that FDA treat the dismissal order as a triggering court decision under section 355(j)(5)(B)(iv)(II).  AR Tab 32.  Apotex's submission included a declaration by Bristol's patent counsel, Matthew P. Blischak, who summarized the assurances Bristol had made to Apotex which formed the basis of Apotex's agreement to dismiss the suit.

AR Tab 32 (tab C); *see also* July 23, 2004 dismissal order, AR Tab 32 (tab A) (incorporating

Bristol's pre-complaint representations as a ground for dismissal). Bristol's statements further

support FDA's determination that the dismissal order had preclusive effect. Indeed, according to

Blischak's declaration, Bristol told Apotex in writing that it had "no intention, now or in the

future, of suing TorPharm for infringement of any of the three BMS patents so long as

TorPharm's previous representations about its proposed generic products remain accurate." AR

Tab 32 (tab C) ¶ 17 (quoting from a letter sent by Bristol to Apotex's counsel on February 20,

2004).[14]

Thus, Bristol did not casually tell Apotex that it did not think it would sue Apotex or

otherwise make an equivocal representation about its "state of mind." Rather, Bristol gave

*assurance* that it did not intend to sue Apotex, "now or in the future." Bristol also predicated its

assurance on a condition: Bristol's stated intention would not change as long as Apotex's

representations about its generic product remained accurate. These assurances estop Bristol from

suing Apotex in the absence of a change in that condition. *See Teva I*, 182 F.3d at 1008 (citing

Federal Circuit cases); *see also Micks at Pa. Ave., Inc. v. BOD, Inc.*, 389 F.3d 1284, 1289 (D.C.

Cir. 2004) ("Under the doctrine of equitable estoppel, 'a party with full knowledge of the facts,

which accepts the benefits of a transaction, contract, statute, regulation, or order may not

subsequently take an inconsistent position to avoid the corresponding obligations or effects.'")

---

[14] Although FDA did not expressly refer to documents other than the order in its decision letter, a remand for FDA to address those specific documents would serve no purpose. FDA's decision is supportable based on the face of the order alone, which summarizes Bristol's statements. The actual statements themselves lend further support to FDA's decision. *See Fed. Express Corp. v. Mineta*, 373 F.3d 112, 118 (D.C. Cir. 2004) (declining to remand the case when the agency's response was incomplete, stating "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

(quoting *First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1016 (D.C. Cir. 2000)); *Autera v. Robinson*, 419 F.2d 1197, 1201 n.17 (D.C. Cir. 1969) ("a valid settlement agreement, once reached, cannot be repudiated by the parties"); *Kaktovik v. Watt*, 689 F.2d 222, 230 n.65 (D.C. Cir. 1982) (same).  FDA therefore reasonably construed Bristol's stated assurances as binding, and sufficient to confer preclusive effect on the stipulated dismissal of Apotex's lawsuit.  *See* AR Tab 36, at 2-3.  As such, the dismissal order constitutes a triggering court decision under the statute.  *See Teva I*, 182 F.3d at 1008.

### C.    The *Teva* Decisions Properly Informed FDA's Exclusivity Determination

#### 1.    FDA's Construction of the Statute Carefully Applies Relevant Case Law and is Entitled to Deference

Teva contends as a threshold matter that FDA's decision is "plainly not entitled to deference because it is based on the agency's interpretation of a court decision, rather than the text of a statute the agency is charged with administering."  Pl. Mem. at 14.  This argument is baseless.  From the face of FDA's June 28, 2005 letter, it is apparent that the agency is applying and interpreting section 355(j)(5)(B)(iv) of the statute as well as its implementing regulation, 21 C.F.R. § 314.107(c).  AR Tab 36, at 2-4.  The fact that FDA's application of the statute and its regulation is informed by judicial precedent, as it often is, does not make that decision any less worthy of deference.  Teva's argument suggests that an administrative agency is only entitled to deference if it construes a statute without regard to judicial precedent – a suggestion that flies in the face of basic principles of statutory construction.  While it is unquestionably the province of the court to say what the law is, FDA's construction of its own statute is owed no less deference merely because the agency quite properly took account of applicable judicial precedent in the course of doing so.  S*ee Mylan*, 389 F.2d at 1280 (granting *Chevron* deference to FDA decision

letter construing applicable statutory provisions and regulation in light of relevant judicial

precedent).

Moreover, FDA did not read *Teva* as automatically dictating the result in this case.

Rather, FDA carefully considered the specific facts of the case and the particular terms of the

dismissal order between Bristol and Apotex before concluding that the order had preclusive

effect.  AR Tab 36, at 4-5.  Nor is FDA's decision absolute; FDA did not conclude that a district

court's approval of *any* dismissal would constitute a triggering court decision as Teva suggests.

Pl. Mem. at 21.  To the contrary, as noted above, FDA has made clear that it will treat the

dismissal of a declaratory judgment action as a triggering court decision only when it is evident

from the order and surrounding circumstances that the dismissal would have preclusive effect.

*See* AR Tab 36, at 3-5; *supra* section II.C.4.

## 2. *Teva* Sets Forth the Governing Legal Standard for Application of the Court Decision Trigger

Teva attempts to minimize the significance of the D.C. Circuit's interpretation of the

court decision trigger in *Teva I*, contending that the court did not actually rule on the ultimate

issue, but instead remanded the case for FDA to reconcile its position with that taken in an earlier

case.  Pl. Mem. 18-20.  Teva's argument that the *Teva* decisions "do *not* articulate any legal

rule," however, rings hollow.  Pl. Mem. at 20 (emphasis in original).  In *Teva I*, the court

thoroughly analyzed the court decision trigger and set a clear standard for what types of

dismissals would qualify as triggering court decisions under the statute:  those with preclusive or

estoppel effect.  "Although the dismissal was not a judgment on the merits after consideration of

evidence presented by the parties, there was no need for such a procedure here because the

dismissal sufficed to estop Syntex from suing Teva for patent infringement."  *Teva I*, 182 F.3d at

27

1009.  The court's opinion is replete with references to that standard: *see, e.g., id.* at 1009 ("the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement"); *id.* at 1008 ("From the perspective of the California court, then, Syntex's declaration and conduct eliminated the need for a declaratory judgment because Syntex would be estopped from challenging Teva's marketing of its generic drug on the ground of patent infringement.").

Teva's position also directly contradicts what it previously told Judge Kollar-Kotelly on remand about the import of the *Teva I* decision: "The Court ruled that the California dismissal was indeed a court 'decision,' and that the decision was one 'holding' the Syntex patent to be non-infringed by and/or unenforceable against Teva, because that decision has the preclusive effect of preventing Syntex from ever suing Teva for infringement of the relevant patent." Teva's Renewed Application for TRO and Mot. for PI at 5 (filed July 28, 1999) (attached hereto as Ex. D).  Indeed, Teva strenuously argued that the procedural "remand" of the case did not alter the substance of the court's ruling that the California dismissal had preclusive effect and was thus a court decision trigger.  "Although the Court of Appeals' opinion remanded the case to this Court 'to consider anew the request for injunctive relief,' Circuit Op. at 17, for all practical purposes the Court of Appeals' decision leaves no room for doubt that [there has been a court decision trigger]." *Id.* at 3.

Moreover, both the district court on remand and the D.C. Circuit on appeal in *Teva II* treated the standard set forth in *Teva I* as authoritative and applied that standard.  *Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 U.S. Dist. LEXIS 14,575 at *19 (Aug. 19, 1999) ("In light of the Court of Appeals' finding that the significance of a triggering court decision lies in its estoppel effect, it is unreasonable for the FDA to refuse to make even a cursory inquiry into the

basis for the California court's order."); *Teva II*, 2000 U.S. App. LEXIS 38,667, at *6. FDA has

consistently applied that standard, post *Teva*, and ANDA applicants have relied on the *Teva*

standard in determining whether to bring declaratory judgment actions and on what terms they

would accept dismissal of such actions. *See* AR Tabs 36-38. Notwithstanding what Teva

characterizes as the "essentially procedural holding" of *Teva I*, there is no question that the *Teva*

decisions are governing law in this circuit with respect to the proper interpretation of the court

decision trigger.

Teva also argues that "*Teva I* did not oblige the FDA to treat every dismissal for lack of

subject-matter jurisdiction as a court-decision trigger, let alone the facts of this case which are

substantially different." Pl. Mem. at 19. To be sure, exclusivity will not necessarily be triggered

anytime a declaratory judgment action is dismissed for lack of jurisdiction, as FDA has made

clear. In this case, however, as in *Teva I*, Bristol made representations and assurances to Apotex

that have preclusive effect and that served as the predicate for the dismissal of Apotex's

declaratory judgment action. Although Bristol's representations were not identical to Syntex's

representations in *Teva I*, the analysis of *Teva I* properly informed FDA's decision in this case.

Where, as here, the dismissal of a declaratory judgment action has preclusive effect, *Teva* clearly

directs FDA to treat the order of dismissal as a court decision that triggers the start of exclusivity

under the statute.

### D.    FDA Reasonably Determined That the Dismissal Order at Issue in This Case Had Preclusive Effect

Teva argues in the alternative that, even if the *Teva* decisions established that a dismissal

order with preclusive effect constitutes a triggering court decision, the dismissal order in this case

does not have preclusive effect. Pl. Mem. at 24.

29

1.    **A Concession of Noninfringement is Not Necessary for the Dismissal to Have Preclusive Effect**

Teva first contends that the California dismissal order at issue in *Teva I* was found to have preclusive effect only because the NDA holder (Syntex) conceded that there was no patent infringement by the ANDA applicant (Teva).  Pl. Mem. at 17.  Contrary to Teva's claim, however, the *Teva* court did not predicate its conclusion on Syntex's concession of non-infringement but instead made clear that a mere "*disavowal of any intent to sue* for infringement has preclusive effect" and would therefore estop any subsequent attempt by the innovator to enforce its patent against that ANDA applicant.  *Teva I*, 182 F.3d at 1008 (emphasis added).  The court took note of the fact that FDA's regulations include "unenforceability" as a basis for a paragraph IV certification, and that a court decision holding a patent unenforceable would therefore suffice to trigger exclusivity under the statute.  *Id.* at 1009.  While recognizing that "unenforceability" in the strictest sense prevents the patent holder from enforcing the patent against any entity, the court found no meaningful distinction for purposes of the court decision trigger between broad unenforceability and such basic estoppel as arose between the patentee (Syntex) and the ANDA applicant (Teva) in that declaratory judgment litigation.  *Id.*  at 1009-10.  Because Syntex was precluded from enforcing its patent against Teva, the *Teva* court viewed the effect of the declaratory judgment dismissal in that case as tantamount to a triggering court decision of unenforceability.

Teva argues that "the D.C. Circuit cannot reasonably be understood to have held that the 'disavowal of an intent to sue,' standing alone, may constitute a judicial decision trigger" because Syntex had also stated that there was no infringement, and had made representations concerning its future conduct.  Pl. Mem. at 18 n.2.  In support, Teva cites the court's statement that the

California dismissal "was based exclusively and necessarily on Syntex's declaration that Teva's product would not infringe its patent and its express disavowal of an intent to sue." Pl. Mem. at 17-18 (citing *Teva I*, 182 F.3d at 1008). Nevertheless, a closer reading of the court's opinion demonstrates that only a disavowal of an intent to sue – and not the additional declaration of noninfringement – was necessary to its conclusion that the dismissal order had preclusive effect. *See Teva I*, 182 F.3d at 1008. Indeed, the court specifically characterized Federal Circuit caselaw as holding "that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *Id.* The *Teva* court thus made quite clear that a dismissal with preclusive effect may constitute a triggering court decision under the statute irrespective of whether or not it is accompanied by an explicit admission of non-infringement. Other decisions support that approach. *See, e.g., Biogen, Inc. v. Amgen, Inc.*, 913 F. Supp. 35, 39 (D. Mass. 1996) (accepting as binding a stipulation not to sue over protest that such a stipulation must also include a concession of noninfringement).

Teva's claim that FDA's approach "would read the limitation requiring that a court decision contain a holding that the certified patent is invalid or not infringed completely out of the statute" is thus without merit. Pl. Mem. at 21. When a patentee is estopped by its assurances from suing a particular ANDA for infringement, as Bristol is in this case, that patent is effectively unenforceable with respect to that ANDA, and, under *Teva I*, the court decision trigger applies.

### 2.    A Pre- or Post-Suit Representation Can Have Preclusive Effect

Teva also argues that the "*holding [in the California patent infringement action] was expressly based on Syntex's formal representation to the court, after litigation had commenced,*

31

*that there was no infringement.*"  *Id.* (emphasis in original).  That argument is both inaccurate

and insignificant.  The concessionary letter at issue in *Teva* was sent by Syntex on the same day

that Teva filed its declaratory judgment lawsuit.  *Teva I*, 182 F.3d at 1006.  The district court

observed that the papers had crossed in the mail, stating, "[a]s of now there is, and as of the

moment of filing, I guess, because of the crossing in the mails, there was no case [or]

controversy."  Ex. A at 23.  The court expressly declined to consider whether Teva had ever had

a reasonable apprehension of suit, and thus whether there had ever been a case or controversy.

*Id.* ("Syntex wants me to go further and find that there never was a reasonable apprehension [of]

suit . . .  I'm not going to do [that].").  The controlling question was whether there was a *present*

case or controversy.

Teva argues that the court's act of crossing out "lacked and" before "lacks" in Syntex's

proposed dismissal order establishes that the court determined that Teva had once had a

reasonable apprehension of suit, and that the dismissal order was thus based solely on Syntex's

post-suit filings.  Pl. Mem. at 23 n.3.  The court's actual statements concerning the changed

language, however, belie that assertion.  The court simply denied Syntex's request to enter a

finding that Teva had never had a reasonable apprehension of suit, noting that such a

determination would require an extensive hearing that the court thought unnecessary because

there was no present case or controversy.  Ex. A.  Because there was no Article III jurisdiction,

the court told the parties, "you're out the door" without reaching a determination one way or the

other as to whether Teva had ever had a reasonable apprehension of suit.  *Id.* at 23.

Nor was it of any significance to the D.C. Circuit whether Teva had ever had a reasonable

apprehension of suit.  Rather, the court's finding that Teva presently had no reasonable

apprehension of suit (based on Syntex's letter) sufficed to estop Syntex from suing Teva.  *Teva I*,

182 F.3d at 1008. What mattered to the D.C. Circuit was the preclusive effect of the court's dismissal of the case. *Id.* at 1009 ("Although the dismissal was not a judgment on the merits after consideration of evidence presented by the parties, there was no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement.").[15] So too in this case, Bristol's representations estop Bristol from suing Apotex for infringement, without regard to whether those representations were made before or after the complaint was filed.

### 3.    Bristol's Assurances Preclude Bristol from Suing Apotex

Teva characterizes Bristol's assurances in this case as expressing no more than an intention not to sue Apotex, and argues that such a statement, under "governing" Federal Circuit precedent, does not estop Bristol from changing its mind and suing Apotex. Pl. Mem. at 24. The *Teva* court noted, however, that Federal Circuit law on patentee estoppel "supported" its conclusion that "a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *Teva I*, 182 F.3d at 1008. It is the holding of the D.C. Circuit in *Teva I* that best informs the determination in this case. Bristol's assurances to Apotex that it had no intention to sue "now or in the future" clearly meet the standard for preclusive effect articulated in *Teva I*.

In any event, Teva mischaracterizes Bristol's statements in this case, asserting that "BMS has made no binding representation about its future conduct." Pl. Mem. at 25. In fact, Bristol

---

[15] Teva also asserts that it matters in the Federal Circuit whether the court ever had jurisdiction, citing *Minnesota Mining & Manufacturing Co. v. Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002). Pl. Mem. at 23. In that case, however, whether the court had original subject matter jurisdiction was irrelevant in view of the court's determination that the parties' disagreement about the form of the dismissal order (with or without prejudice, out of concern that a dismissal with prejudice would be a court decision trigger) "create[d] subject matter jurisdiction." *Id.* at 780 (citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989)).

gave Apotex an express assurance that it had no intention to sue Apotex "now or in the future"
upon the stated condition that Apotex's representations concerning its ANDA remained accurate.
*See* BMS Declaration, AR Tab 32 (tab C) at ¶¶ 10, 15, 17. Bristol even repeated its assurances
on four separate occasions. Bristol's representations thus went much further than those at issue
in *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 876 (Fed. Cir. 1983), a case in which the patentee
merely stated that "I have and have had no intention of instituting any action against Bard for
infringement." In *Bard*, the patentee left the door to its future conduct open; Bristol did not. The
Federal Circuit decided that the patentee's prior representation concerning its intent to sue did
not negate the plaintiff's reasonable apprehension of suit after an examination of "the totality of
the circumstances." *Id.* at 880. Those circumstances included the fact that Bard, the patent
licensee, had ceased royalty payments under a patent license agreement, and the patentee had
previously filed a suit in state court for recovery of royalty payments. *Id.* at 881. Bard
additionally feared suit based on its potential liability for damages for infringement by an
assignee. *Id.* at 882. Moreover, the patentee's attorney "would only say that on the facts
presently known to him he would not sue." Because it was unclear what facts were "presently
known" to the patentee and his attorney, the court concluded that, under all the circumstances,
Bard had a reasonable apprehension of suit notwithstanding the patentee's stated intent not to
bring suit. *Id*.

Thus, although the Federal Circuit found a present intention not to sue insufficient to
estop a future lawsuit in Bard, the facts of that case are clearly distinguishable from the *Apotex-
Bristol* dismissal order at issue here, where Bristol's representations covered future conduct, and
where Bristol's decision not to sue was based on Apotex's representations concerning its ANDA
– facts known to both Apotex and Bristol.

Nor do the district court cases cited by Teva support its assertion that Bristol's assurances to Apotex lack estoppel effect. In *Biogen, Inc. v. Amgen, Inc.*, 913 F. Supp. 35, 39 (D. Mass. 1996), for instance, the court did not consider the patentee's initial statements concerning its present intention not to sue to necessarily be binding, but later statements concerning its future conduct were held to be binding. *Id.* Similarly, in *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. 96-455, 1996 WL 432290 (D. Md. July 23, 1996), Glaxo's statements that it had no plans to sue "now" did not abate the declaratory plaintiff's fear, in view of other indications of the patentee's litigious behavior. *Id.* at *6.[16]

---

[16] Teva also relies upon *Biocore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 454 (D. Del. 1999), in which the court stated that a failure to stipulate to noninfringement created a reasonable apprehension of suit, given the patentee's current infringement litigation for other claims of that same patent. *Id.* In this case, by contrast, Bristol made an affirmative assurance that it had no intention to sue *in the future*, and had not sued any other ANDA applicant for infringement. Similarly, the statements held not to render the case moot in *Bryan Ashley Int'l, Inc. v. Shelby Williams Indus.*, 932 F. Supp. 290 (S.D. Fla. 1996), encompassed only present, not future conduct. *Id.* at 292. In *Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*, 826 F. Supp. 112, 114 (D. Del. 1993), the court held that "a non-binding qualified admission of noninfringement at this late stage in the proceedings does not render Mobil's apprehension unreasonable" in view of the patentee's other litigious statements and conduct. "While Mobil perhaps no longer faces the threat of patent infringement at this instant, Mobil still faces a threat of *future* patent infringement suit based on AERT's four patents." *Id.* (emphasis added). The court in that case was thus primarily concerned about potential future liability, which Bristol foreclosed in this case with its assurances to Apotex. Moreover, the Federal Circuit reversed the district court's jurisdictional decision in *Mobil* as to two of the patents for which the patentee had not filed counterclaims for infringement. *Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*, No. 95-1333, 1996 U.S. App. LEXIS 14274 (Fed. Cir. Jun. 13, 1996) (unpublished opinion). In *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400 (D. Del. 1991), also cited by Teva, the court held that a promise not to sue pending resolution of a patent reexamination proceeding did not extinguish the plaintiff's reasonable apprehension of suit. The temporary suspension of the threat in that case is in sharp contrast to Bristol's repeated assurances in this case that it had no intention to sue at any time in the future based on Apotex's representations about its ANDA.

35

4.    **Teva's Legal Position in This Case is Inconsistent With Its Position in the Prior *Teva* Litigation**

In stark contrast to its position in this case, Teva argued to this Court and the D.C. Circuit in *Teva I* that a declaratory judgment dismissal based upon a stated intention not to enforce a patent was sufficient to activate the court decision trigger. Teva defined the issue on appeal in *Teva I* as follows:

> Whether the district court erred in denying a preliminary injunction ordering the FDA to treat the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action as sufficient to activate the Court Decision Trigger, where that denial allows the patent holder unilaterally to frustrate the intended operation of the statute and artificially extend its monopoly by *announcing its intention not to enforce* its patent.

*See* Brief of Teva Pharmaceuticals USA, Inc., No. 99-5022 (D.C. Cir. Feb. 1, 1999), at 4 (attached hereto as Ex. F) (emphasis added). Teva further stated in its appeal brief:

> As illustrated by this case, under FDA's interpretation, subsequent ANDA applicants' ability to utilize this crucial statutory mechanism could be routinely defeated by a patent holder *simply stating that it does not intend to enforce its patent against the subsequent applicant*, thus preventing the courts from exercising subject matter jurisdiction to issue the very 'holding' of non-infringement that FDA's position seeks to require. FDA's interpretation would thus deprive the courts of their proper role with respect to the Court Decision Trigger, and would render the broader statutory provisions and legislative purposes of 21 U.S.C. § 355(j)(5)(B) "inoperative, superfluous, void, [and] insignificant." *Asiana Airlines*, 134 F.3d at 398.

*Id.* at 16 (emphasis added).

Teva's argument that the statutory purpose would be frustrated if FDA did not treat a stated intention not to sue as a court decision trigger is in stark contrast to its policy argument in this case. After having prevailed in the original *Teva* litigation, Teva now seeks to reverse course because, for this drug product, the opposite outcome will be more to its financial benefit. Teva's complete about-face on this issue exposes its arguments in this case as wholly opportunistic and

36

strips them of all credibility.  Teva should not be heard to argue that a declaratory judgment dismissal based upon a stated intention not to enforce a patent was sufficient to activate the court decision trigger in *Teva I and II*, when the result benefitted Teva, but does not activate the court decision trigger here, where the result would assertedly cause it harm.

### E.    Teva Has Not Shown That FDA's Decision Conflicts with Congressional Intent

Teva argues that FDA's decision will "encourage precisely the gamesmanship condemned by the D.C. Circuit," and that Teva's interpretation "makes practical sense insofar as it prevents other companies from manipulating the Act and frustrating congressional intent."  Pl. Mem. at 21.  Apotex's conduct in this case, however, is exactly the sort of action encouraged by the D.C. Circuit's broad interpretation of the court decision trigger in *Teva* and espoused by Teva itself in the prior litigation.  *Teva I*, 182 F. 3d at 1008-1009; *see* Teva's Motion for Preliminary Injunction in *Teva Pharmaceuticals USA, Inc. v. FDA*, No. 97-67 (Jan. 11, 1999) (attached hereto as Ex. G).  Indeed, one court has observed in similar circumstances that "there is nothing inherently insidious about a second ANDA filer using a declaratory judgment action to trigger the first ANDA filer's 180-day exclusivity period," *Glaxo Group Ltd. v. Dr. Reddy's Labs.*, 325 F. Supp. 2d 502, 506 n.1 (D.N.J. 2004) – just as Teva itself used a declaratory judgment action to trigger Apotex's exclusivity in the prior *Teva* litigation.

Teva further asserts that, "[h]ad Congress intended for stipulated orders such as settlements or consent decrees to be court decision triggers, it could have expressly said so, as it did with the forfeiture provisions added by the MMA."  Pl. Mem. at 21-22 (citing 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(BB) (2005)).  The fact that Congress did not expressly provide for these stipulated orders does not render FDA's interpretation of the statute unreasonable or

impermissible in light of controlling precedent in the circuit. The D.C. Circuit – at Teva's own behest – has interpreted the court decision trigger to broadly include dismissal orders such as a dismissal for a lack of subject matter jurisdiction, even though Congress did not specifically draft the statute to cover such situations. *Teva I*, 182 F.3d at 1008. If, as in *Teva*, the dismissal of a declaratory judgment action for lack of subject matter jurisdiction can serve as the basis for a court decision trigger even where the dismissal order says nothing on its face about the patentee's intentions, then it is certainly reasonable to conclude, as FDA did here, that a stipulated dismissal order containing Bristol's assurances that it had no intention to sue Apotex for infringement *on the face of the order* would also constitute a triggering court decision.

Nor are Teva's "practical" policy arguments well-taken in view of Teva's opposite position in the previous litigation, in which Teva argued that, "where the patent holder has 'declined to create enough adversity to support a declaratory judgment action,' the clear legislative intent of Hatch-Waxman can only be fulfilled by interpreting the statute so that generic 'exclusivity' periods are triggered by a case or controversy dismissal of a Hatch-Waxman Declaratory Judgment Action." *See* Ex. G (Teva P.I. Br.) at 20 (citing *Mova*, 140 F.3d at 1073 n.18). If, as Teva previously contended, exclusivity is triggered when a declaratory judgment action is dismissed for lack of subject matter jurisdiction because the patent holder has not made statements sufficiently threatening to create a reasonable apprehension of suit, then it most certainly should be triggered by a stipulated dismissal predicated on the patentee's explicit assurance that it does not threaten litigation.

Indeed, Teva's reasoning in the prior litigation wholly undermines its charges of "frivolous" litigation here. Pl. Mem. at 32. In a previous brief on this subject, Teva warned that if case-or-controversy dismissals did not constitute triggering court decisions, "owners of invalid,

38

unenforceable, or noninfringed patents could block generic competition by manipulating the very statutory provisions that were designed to allow generic competitors to defeat the patent in the first place – a truly absurd outcome." Ex. G (Teva P.I. Br.) at 20-21.[17]  Teva has put forth a similar argument to the Supreme Court in its petition for certiorari in *Teva v. Pfizer*, urging the position that a subsequent ANDA applicant should be able to bring a declaratory judgment action against the patentee even if it does not have an imminent reasonable apprehension of suit.  See *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, No. 05-48 (petition for certiorari filed July 5, 2005) (attached hereto as Ex. E) at 4-5 ("The Federal Circuit's ruling eviscerates the 2003 amendments by precluding generic companies from pursuing declaratory judgment actions in precisely the situations where Congress ought to make them available, *i.e.,* where a pharmaceutical patentee can effectively extend the life of its patent by delaying suit for patent infringement.").[18]

Here, however, Teva seeks to bring about precisely the outcome that it previously labeled "absurd."  By characterizing Bristol's statements to Apotex as non-preclusive and the dismissal of Apotex's declaratory judgment action as non-triggering, it is now Teva itself that seeks to delay generic competition and thwart what it once called the "clear legislative intent" of the Hatch-Waxman Amendments.  Ex. G (Teva P.I. Br.) at 20.

---

[17] Post-*Teva*, FDA too has observed that the *Teva* court was concerned that an innovator could manipulate and delay the starting of exclusivity, "even if one or more generic companies were ready, willing, and able to manufacture."  AR Tab 38, at 9.

[18] Teva seeks Supreme Court review of the Federal Circuit's decision in *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1330 (Fed. Cir. 2005).  In that case, Teva (much like Apotex in this case) filed a declaratory judgment action to try to obtain a court decision trigger of another ANDA's exclusivity.  Pfizer filed a motion to dismiss based on Teva's lack of a reasonable apprehension of suit, and the district court granted that motion.  Pfizer, however, unlike Bristol in this case, never provided assurance that it would not sue.  *Id.* at 1333; *see also Teva Pharms. USA, Inc. v. Pfizer Inc.*, 69 USPQ2d 1791, 2003 U.S. Dist. LEXIS 21940, at *13 (D. Mass. 2003).  Nor did Pfizer stipulate to dismissal of the case based on such assurances.

**II.    Teva Has Not Shown That It Will Suffer Irreparable Harm Without an Injunction**

Teva has failed to demonstrate that it will suffer irreparable harm absent injunctive relief or that the balance of hardships tips in its favor.  Courts insist that only *irreparable* harm justifies the issuance of a preliminary injunction.  Indeed, "[t]he *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff." *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).  Because Teva's likelihood of success is slim, Teva "would have to make a very substantial showing of severe irreparable injury" to prevail on its motion.  *Nat'l Pharm. Alliance v. Henney,* 47 F. Supp. 2d 37, 41 (D.D.C. 1999).  Irreparable injury is a "very high standard."  *See Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996); *Bristol-Myers,* 923 F. Supp at 220 .  The injury alleged must be certain, great, actual, and imminent, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan (buspirone)*, 139 F. Supp. 2d at 27 (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

It is well settled that mere economic loss in and of itself does not constitute irreparable harm.  *Wisconsin Gas*, 758 F.2d at 674; *Mylan Pharms., Inc. v. Thompson*, 207 F. Supp. 2d 476, 485 (N.D. W. Va. 2001); *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000)("*Mylan (terazosin)*"); *Bristol-Myers*, 923 F. Supp. at 220.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are inadequate.  *Wisconsin Gas*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is so great as to "cause extreme hardship to the business, or even threaten destruction of

40

the business." *Gulf Oil*, 514 F. Supp. at 1025; *see also Wisconsin Gas*, 758 F.2d at 674

(recoverable monetary loss may constitute irreparable harm only where it "threatens the very

existence of the movant's business"); *Experience Works, Inc.*, 267 F. Supp. 2d at 96 ($21.1

million reduction in funding is serious financial blow, but one frequently faced by other similar

entities, and not an economic loss that threatens survival of the business); *Sociedad Anomia Vina

Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone

cannot constitute irreparable injury unless it threatens the very existence of the movant's

business").

Teva asserts that generic entry for pravastatin sodium will likely begin with the expiration

of the '227 patent on April 20, 2006, and that Teva will be harmed if, as a result of FDA's

decision, it is subject to competition from other ANDAs on that date.  Teva claims that it will be

deprived of early-entry and related competitive advantages, market share, and "hundreds of

millions of dollars" in net revenues.  Pl. Mem. at 30-31.  All of Teva's alleged injuries, however,

are based on speculation and are various forms of economic loss that do not meet the high

standards set forth above.

Allegations of lost sales and a lost opportunity to gain certain market advantages are a far

cry from the required demonstration of a "serious" and "irretrievable" loss that "would

significantly damage its business above and beyond a simple diminution in profits."  *Mylan

(buspirone)*, 139 F. Supp. 2d at 27; *Mylan (terazosin)*, 81 F. Supp. 2d at 42.  Teva has failed to

demonstrate that obtaining a smaller market position than it had anticipated would result in

economic injury "sufficiently large in proportion to [its] operations that the loss of the amount of

money involved would also cause extreme hardship to [its] business, or even threaten destruction

of [its] business." *Gulf Oil*, 514 F. Supp. at 1025.

41

In support of its claim of irreparable harm, Teva relies on *Mova*, in which the district court granted a preliminary injunction to Mova both because it would have been harmed by the loss of its exclusivity and because "Mova's small size put it at a particular disadvantage." *Mova*, 140 F.3d at 1066 n.6. The D.C. Circuit affirmed, noting that both of those factors sufficed to show a "severe economic impact to Mova." *Id.* *Mova* did not hold, as Teva argues, that the loss of exclusivity *alone* "suffices" to show irreparable harm. Moreover, Teva is a much larger company in 2005 than Mova was in 1999. Even if Teva's sales of pravastatin are lower than expected, any potential shortfall will comprise but a small percentage of Teva's total revenues, which, for the most recent quarter, totaled $1.227 billion dollars.[19] Teva is in fact the largest generic pharmaceutical manufacturer in North America, and is poised to become the largest in the world following its recent acquisition of Ivax Pharmaceuticals, Inc.[20] Teva is well aware of the uncertainties associated with generic exclusivity and accounts for that risk to its investors by noting that, "[a]lthough the FDA's interpretation [of exclusivity] may benefit some of the products in our pipeline, it may adversely affect others."[21] Because Teva has not shown that it will suffer an irretrievable loss that would significantly damage its business, its allegations fall well short of the showing necessary to support a finding of irreparable injury.

---

[19] *See* Teva Reports Second Quarter 2005 Results, *available at* http://www.tevapharm.com/pr/2005/pr_538.asp (stating Teva's gross sales for the three months ending June 30, 2005).

[20] *See The History of Teva*, *available at* http://www.tevapharm.com/about/history.asp; Generic drug maker Teva to acquire Ivax, AP, *available at* http://www.msnbc.msn.com/id/8698552/ (July 25, 2005).

[21] *See* Form 20-F at 10 (for fiscal year ending Dec. 31, 2004), *available at* http://www.tevapharm.com/financial/.

**III.     FDA and the Public Will Be Harmed if Teva's Request for Relief Is Granted**

Teva has also failed to show that any harm it will suffer in the absence of injunctive relief outweighs the potential harm to FDA, or that granting Teva's relief will serve the public interest – the third and fourth requirements for a preliminary injunction.  Although FDA has no commercial stake in the outcome of this litigation, FDA is the government agency charged with implementing the statutory scheme governing exclusivity and the approval of generic drugs.  As such, FDA's interest coincides with the public interest.  *Serono*, 158 F.3d at 1326 (determining that the public interest is "inextricably linked" to Congress's purpose in passing the Hatch-Waxman Amendments); *Mylan (terazosin)*, 81 F. Supp. 2d at 44-45.

FDA must ensure that generic drug entry occurs in accordance with the statutory scheme that Congress enacted.  FDA strives to apply the FDCA in the manner that the courts have interpreted it, so that members of the regulated industry can make informed business decisions – including, as relevant here, whether to proceed with declaratory judgment actions and whether to agree to a particular form of dismissal order.  Apotex and others have relied on FDA's acquiescence in the *Teva* decisions, as well as the D.C. Circuit's articulation of the court decision trigger provision in those cases.  In this case, for the reasons stated above, FDA has concluded that, as interpreted by the D.C. Circuit, the statute limits exclusivity by affording subsequent ANDA applicants such as Apotex the opportunity to trigger exclusivity by means of a declaratory judgment action, thus potentially opening the door to broader generic competition at an earlier time.  Apotex has done so with respect to pravastatin in this case.  The public interest therefore weighs against Teva's claim for injunctive relief.

## CONCLUSION

For the foregoing reasons, Teva's motions for a preliminary injunction should be denied,

and judgment entered for the federal defendants.

Respectfully submitted,

Of Counsel:

PAULA M. STANNARD                    PETER D. KEISLER
Acting General Counsel               Assistant Attorney General

SHELDON T. BRADSHAW                  EUGENE M. THIROLF
Chief Counsel, Food and Drug Division  Director
                                     Office of Consumer Litigation

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

                                     _____/s/_____
WENDY S. VICENTE                     ANDREW E. CLARK
Associate Chief Counsel              Attorney
                                     Office of Consumer Litigation
U.S. Dept. of Health & Human Services  U.S. Department of Justice
Office of the General Counsel        P.O. Box 386
5600 Fishers Lane                    Washington, D.C.  20044
Rockville, MD  20857                 Tel:  (202) 307-0067
(301) 827-7138                       Fax:  (202) 514-8742

Dated:   August 25, 2005

44

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a copy of the foregoing Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction to be served via the District Court's electronic filing (ECF) system upon:

Jay P. Lefkowitz
Steven A. Engel
KIRKLAND & ELLIS
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
*Counsel for Plaintiff Teva Pharmaceuticals USA, Inc.*

Arthur Y. Tsien
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C.  20036-2220
*Counsel for Intervenor-Defendant Apotex Inc.*

William A. Rakoczy
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
*Counsel for Intervenor-Defendant Apotex Inc.*

Kate C. Beardsley
Carmen M. Shepard
BUC & BEARDSLEY
919 Eighteenth Street, NW, Suite 600
Washington, DC 20006
*Counsel for Intervenor-Defendant Ranbaxy Laboratories Limited et al.*

this 25th day of August, 2005.

_____/s/_____
Andrew E. Clark