# EXHIBIT E

No. 05-46

IN THE

# Supreme Court of the United States

TEVA PHARMACEUTICALS USA, INC.,

*Petitioner,*

v.

PFIZER, INC.,

*Respondent.*

ON PETITION FOR A WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

## PETITION FOR A WRIT OF CERTIORARI

WILLIAM F. SHEEHAN
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
(202) 346-4000

THOMAS L. CREEL, P.C.
MARK I. KOFSKY
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800

HENRY C. DINGER, P.C.
*Counsel of Record*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

# QUESTIONS PRESENTED

Federal law requires pharmaceutical companies to list, for every new drug, all patents that "could reasonably be asserted" against a generic version of the drug. To promote the prompt resolution of disputes concerning such patents — and thereby accelerate the introduction of generic drugs — Congress in 2003 specifically authorized generic drug companies to bring an action for a declaratory judgment that a listed patent was invalid or not infringed, 21 U.S.C. § 355(j)(5)(C)(i)(II), and directed federal courts to exercise subject matter jurisdiction over such actions "to the extent consistent with the Constitution," 35 U.S.C. § 271(e)(5). The questions presented are:

1. Whether the court below erred in holding, contrary to the rulings of other circuit courts and to this Court's decision in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937), that a generic company can establish jurisdiction under Article III in declaratory judgment actions *only* by proving that it faces "a reasonable apprehension of imminent litigation" for patent infringement.

2. Whether the court below erred in holding that Congress intended to require such a reasonable apprehension of imminent litigation as a condition to the exercise of jurisdiction in declaratory judgment actions under 21 U.S.C. § 355(j)(5)(C)(i)(II) and 35 U.S.C. § 271(e)(5), even though that requirement is contrary to the plain meaning of these statutes and would preclude such actions in precisely the circumstances in which Congress intended to authorize them, *i.e.*, when, by delaying the commencement of infringement litigation, the patentee can effectively extend the term of pharmaceutical patents and delay competition from generic drugs.

ii

## LIST OF PARTIES

All parties in the proceedings below are listed in the caption to this petition.

## RULE 29.6 CORPORATE DISCLOSURE STATEMENT

The parent corporations of petitioner, Teva Pharmaceuticals USA, Inc., are: Orvet UK Ltd, Teva Pharmaceuticals Europe, and Teva Pharmaceutical Industries Ltd. Teva Pharmaceutical Industries Ltd. is a publicly held company that owns 10% or more of the petitioner's stock.

iii

## TABLE OF CONTENTS

QUESTIONS PRESENTED .................................................... i

LIST OF PARTIES ............................................................ ii

RULE 29.6 CORPORATE DISCLOSURE STATEMENT ................................................................. ii

TABLE OF CONTENTS .................................................... iii

TABLE OF AUTHORITIES ............................................... vi

OPINIONS BELOW ........................................................... 1

JURISDICTION ................................................................. 1

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ........................................... 1

INTRODUCTION .............................................................. 3

STATEMENT OF THE CASE ............................................ 5

Teva's Abbreviated New Drug Application ............. 5

Pfizer's Infringement Claim Against IVAX ............ 7

The District Court Decision ...................................... 8

The Federal Circuit Panel Decision .......................... 9

Denial of Rehearing and Rehearing En Banc ........ 11

iv

REASONS FOR GRANTING THE PETITION ............ 12

I.  The Decision Below Gravely Undermines
    Congressional Efforts to Reduce the Cost of
    Prescription Drugs. .................................... 14

II. The Decision Below Purports to Resolve an Important
    Federal Question in a Manner that Conflicts with the
    Decisions of this Court and those of other Federal
    Circuit Courts. ........................................ 20

III. The Decision Below will Impose an Unjustified
    and Unprecedented Limitation on Subject Matter
    Jurisdiction in Patent Cases throughout the Country
    that Congress will be Unable to Remedy. ............. 25

CONCLUSION ............................................... 26

**APPENDICES**

Appendix A — Opinion of the United States Court of
Appeals for the Federal Circuit Filed January 21, 2005 ..... 1a
    Dissenting Opinion of Judge Mayer ..................... 27a

Appendix B — Opinion of the United States District
Court for the District of Massachusetts Granting
Defendant's Motion to Dismiss Filed
December 8, 2003 ......................................... 37a

Appendix C — Opinion of the United States Court of
Appeals for the Federal Circuit Denying Petition
for Panel Rehearing and Rehearing En Banc Filed
April 4, 2005 ............................................ 48a
    Dissenting Opinion of Judge Gajarsa ................... 50a
    Dissenting Opinion of Judge Dyk ...................... 60a

v

Appendix D — 21 U.S.C. § 355(j)(5)(C) .................... 67a

Appendix E — 149 Cong. Rec. S15884-86
(Nov. 25, 2003) ......................................... 71a

Appendix F — H.R. Conf. Rep. No. 108-391,
at 836 (2003) ........................................... 82a

vi

## TABLE OF AUTHORITIES

**Cases**

*Aetna Life Ins. Co. v. Haworth,*
300 U.S. 227 (1937) ............................................ i, 11, 21, 22

*Asarco, Inc. v. Kadish,*
490 U.S. 605 (1989) ............................................ 22

*Ass'n of Data Processing Serv. Orgs. v. Camp,*
397 U.S. 150 (1970) ............................................ 23

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................ 21

*BP Chems., Ltd. v. Union Carbide Corp.,*
4 F.3d 975 (Fed. Cir. 1993) ............................................ 17

*Bresnick v. United States Vitamin Corp.,*
139 F.2d 239 (2d Cir. 1943) ............................................ 20

*Calderon v. Ashmus,*
523 U.S. 740 (1998) ............................................ 11

*Cardinal Chemical Co. v. Morton Int'l, Inc.,*
508 U.S. 83 (1993) ............................................ 13, 20

*Clair v. Kastar,*
148 F.2d 644 (2d Cir. 1945) ............................................ 20

*Dewey & Alma Chem. Co. v. American Anode, Inc.,*
137 F.2d 68 (3d Cir. 1943) ............................................ 25

vii

*Eli Lilly & Co. v. Medtronic, Inc.,*
496 U.S. 661 (1990) ............................................ 3, 6, 8, 14-16

*Gen-Probe, Inc. v. Vysis, Inc.,*
359 F.3d 1376 (Fed. Cir. 2004) ............................................ 17

*Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
896 F.2d 1542 (9th Cir. 1989) ............................................ 25

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................ 21

*Maryland Cas. Co. v. Pacific Coal & Oil Co.,*
312 U.S. 270 ............................................ 13, 22, 23

*Merck KGAA v. Integra Lifesciences I, Ltd.,*
545 U.S. ___, 125 S. Ct. 2372 (2005) ............................................ 15

*Minnesota Mining & Mfg. Co. v. Barr Labs.,*
289 F.3d 775 (Fed. Cir. 2002) ............................................ 7, 17

*Mova Pharm. Corp. v. Shalala,*
140 F.3d 1060 (D.C. Cir. 1998) ............................................ 17, 18

*Salten v. Corinthians Licenciamentos Lida.,*
273 F.3d 14 (1st Cir. 2001) ............................................ 24

*Sankyo Corp. v. Nakamura Trading Corp.,*
2005 U.S. App. LEXIS 4339, at *9-*11
(6th Cir. Mar. 15, 2005) ............................................ 24

*Societe de Conditionnement en Aluminium v.
Hunter Engineering Co.,*
655 F.2d 938 (9th Cir. 1981) ............................................ 24, 25

viii

*Starter Corp. v. Converse, Inc.*,
84 F.3d 592 (2d Cir. 1996) ............................ 25

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998) ...................................... 11

*Teva Pharmaceuticals USA, Inc. v. Pfizer, Inc.*,
2003 U.S. Dist. LEXIS 21940
(D. Mass. Dec. 8, 2003), *aff'd*,
395 F.3d 1324 (Fed. Cir.), *reh'g denied*,
405 F.3d 990 (Fed. Cir. 2005) ......................... 1

*Warth v. Seldin*,
422 U.S. 490 (1975) .................................... 21

**U.S. Constitution and Statutes**

21 U.S.C. § 355(b)(1) ................................ 5, 15
21 U.S.C. § 355(j)(2)(A) ................................. 6
21 U.S.C. § 355(j)(5)(B) ............................. 6, 7, 15
21 U.S.C. § 355(j)(5)(C) ........................... i, 2, 9, 18
28 U.S.C. § 1254(1) ..................................... 1
28 U.S.C. § 1295(a) .................................... 26
28 U.S.C. § 1331 ........................................ 8
28 U.S.C. § 1338(a) ..................................... 8
28 U.S.C. § 2201 .................................... 2, 3, 8

ix

35 U.S.C. § 271(e)(1) ................................... 15
35 U.S.C. § 271(e)(2) .............................. 4, 6, 15
35 U.S.C. § 271(e)(5) ........................ i, 2, 9, 18, 21
U.S. Constitution, Art. III, section 2, clause 1 ........ 1

**Other Authorities**

149 Cong. Rec. S15885 (Nov. 25, 2003) ................. 17

Centers for Medicare & Medicaid Services,
National Health Expenditures Aggregate Amounts
and Average Annual Percent Change, by Type of
Expenditure: Selected Calendar Years 1980-2003 ....... 14

Federal Trade Commission, *Generic Drug Entry
Prior to Patent Expiration: An FTC Study* (2002) ....... 14

H.R. Conf. Rep. No. 108-391 (2003) .................... 18

Letter from Douglas Holtz-Eakin, Director Congressional
Budget Office to Hon. William M. Thomas, Chairman,
House Committee on Ways and Means (Nov. 20, 2003) .... 19

1

## OPINIONS BELOW

The decision of the United States Court of Appeals for the Federal Circuit (App. 1a-36a) for which review by this Court is sought is reported at 395 F.3d 1324 (Fed. Cir. 2005). The order denying rehearing and rehearing en banc from that decision, together with the opinions dissenting from the denial of rehearing (App. 48a-66a), is reported at 405 F.3d 990 (Fed. Cir. 2005). The decision of the United States District Court for the District of Massachusetts reviewed by the Federal Circuit (App. 37a-47a) is set forth at 2003 U.S. Dist. LEXIS 21940 (D. Mass. Dec. 8, 2003).

## JURISDICTION

The judgment of the Federal Circuit was entered on January 21, 2005. App 1a. A timely petition for rehearing and rehearing en banc was denied on April 4, 2005. App. 48a-50a. This Court has jurisdiction to review the judgment of the Federal Circuit under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

U.S. Constitution, Art. III, section 2, clause 1 provides in pertinent part:

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority.

2

Section 505(j)(5)(C)(i)(I) of the Federal Food, Drug, and Cosmetic Act, as added by the Medicare, Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1101(a)(2)(C), 117 Stat. 2451 (2003), 21 U.S.C.A. § 355(j)(5)(C)(i)(II) (West Supp. 2005), reads in part.[1]

**(C) Civil Action to obtain patent certainty**

* * *

If the conditions described in items (aa), (bb), and as applicable, (cc) of subclause (I) have been met, the [abbreviated new drug] applicant referred to in such subclause may, in accordance with [28 U.S.C. § 2201], bring a civil action against the owner or holder referred to in such subclause (but not against any owner or holder that has brought such a civil action against the applicant, unless that civil action was dismissed without prejudice) for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the applicant seeks approval ....

35 U.S.C.A. § 271(e)(5) (West Supp. 2005) (as added by Pub. L. No. 108-173, § 1101(d), 117 Stat. 2457 (2003)) provides:

---

[1]   The full text of 21 U.S.C. § 355(j)(5)(C) is set forth at App. 67a-70a.

3

Where a person has filed an application described in paragraph (2) that includes a certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and neither the owner of the patent that is the subject of the certification nor the holder of the approved application under subsection (b) of such section for the drug that is claimed by the patent or a use of which is claimed by the patent brought an action for infringement of such patent before the expiration of 45 days after the date on which the notice given under subsection (b)(3) or (j)(2)(B) of such section was received, the courts of the United States shall, to the extent consistent with the Constitution, have subject matter jurisdiction in any action brought by such person under [28 U.S.C. § 2201] for a declaratory judgment that such patent is invalid or not infringed.

## INTRODUCTION

In 1984, Congress enacted the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetics Act[2] in order to accelerate the introduction of generic drugs in order to moderate the ever-increasing cost of prescription medication in the United States. *See Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 670-74 (1990). A critical means for achieving this goal was to encourage the prompt resolution of disputes concerning the application of pharmaceutical patents to

---

[2]   Formally, the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585.

proposed generic drug products *before* the launch of such drugs to eliminate patent uncertainty and to relieve generic companies of the need to risk potentially ruinous liability to determine whether their products infringe. To that end, Congress made the submission of an Abbreviated New Drug Application (an "ANDA") seeking regulatory approval to market a generic drug before the expiration of any such patent an "act of infringement" sufficient to support an immediate patent infringement lawsuit. 35 U.S.C. § 271(e)(2).

By 2003, Congress recognized that some pharmaceutical patentees refrained from bringing infringement lawsuits under § 271(e)(2) specifically to avoid resolving patent uncertainty and thereby to delay competition from generic drug companies. The ability of generic drug companies to forestall such delay by bringing declaratory judgment actions was in doubt because in non-ANDA cases the Federal Circuit had ruled that a plaintiff could seek a declaration of invalidity or non-infringement only by proving that it faced a reasonable apprehension of being sued for infringement. It was not at all clear that a generic company could make such a showing against a patentee that pursued a strategy of avoiding litigation. In response, Congress amended 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) specifically to direct district courts to hear declaratory judgment actions by generic drug companies "to the extent consistent with the Constitution."

However, in this case the Federal Circuit ruled *as a matter of constitutional law* that jurisdiction to hear such actions exists *only* where the generic company can prove that it faces imminent suit for patent infringement. This Court has never adopted such a rule, which is inconsistent with this

4

Court's Article III jurisprudence, and several other circuits have rejected it.

The Federal Circuit's ruling eviscerates the 2003 amendments by precluding generic companies from pursuing declaratory judgment actions in precisely the situations where Congress sought to make them available, *i.e.*, where a pharmaceutical patentee can effectively extend the life of its patent by *delaying* suit for patent infringement. Moreover, by grounding its ruling in the Constitution, the Federal Circuit effectively has tied Congress' hands. Only this Court's review can remedy this untenable situation.

## STATEMENT OF THE CASE

*Teva's Abbreviated New Drug Application*

Petitioner, Teva Pharmaceuticals USA, Inc. ("Teva"), develops and sells generic drugs. In July 2002, Teva submitted an Abbreviated New Drug Application ("ANDA") to the FDA seeking approval to sell a generic version of the antidepressant sertraline. Respondent, Pfizer, Inc. ("Pfizer") sells sertraline under the trade name Zoloft®. Zoloft is a very successful drug, generating annual sales revenue in the billions of dollars. App. 8a.

As required by the Hatch-Waxman Amendments, Pfizer had identified patents that could reasonably be asserted against a generic sertraline product. *See* 21 U.S.C. § 355(b)(1). Two of those patents are pertinent here: U.S. Patent No. 4,356,518 (the "compound patent") claims sertraline itself and expires in June 2006; U.S. Patent No. 5,248,699 (the "polymorph patent") claims a particular crystalline form or "polymorph" of sertraline, and expires in 2010. Pfizer listed these patents in the FDA's *Approved*

5

*Drug Products with Therapeutic Equivalence Evaluations*, a publication generally referred to as the "Orange Book."[3]

When Teva filed its ANDA for sertraline in 2002, it certified (i) that it would not market its generic sertraline product until the expiration of the compound patent, and (ii) that the polymorph patent was invalid and/or would not be infringed by Teva's generic sertraline product. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III) and (IV). The first certification guaranteed that the FDA would not approve Teva's ANDA before the expiration of the compound patent four years later. 21 U.S.C. § 355(j)(5)(B)(ii). The second certification constituted an act of infringement of the polymorph patent sufficient to support federal subject matter jurisdiction over a patent infringement action against the ANDA applicant. 35 U.S.C. § 271(e)(2); *see Eli Lilly*, 496 U.S. at 678.

If Pfizer had sued Teva for infringing the polymorph patent within 45 days after receiving the second certification, the FDA would have been precluded from approving Teva's ANDA until the court had ruled the patent invalid or not infringed or 30 months had elapsed, whichever occurred first. 21 U.S.C. § 355(j)(5)(B)(iii). Of course, since the FDA in any event would not approve Teva's ANDA until the expiration of the composition patent more than 30 months after the filing of Teva's ANDA, this automatic stay of FDA approval would have provided nothing of value to Pfizer.

[3] The contents of the Orange Book are available online at http://www.fda.gov/cder/ob/default.htm.

*Pfizer's Infringement Claim Against IVAX*

Pfizer did not sue Teva within 45 days. Its forbearance, however, did not reflect indifference to competition to its blockbuster drug. Pfizer had earlier brought suit for infringing the polymorph patent against another generic drug company, IVAX Pharmaceuticals, Inc. ("IVAX"), that had filed an ANDA to market generic sertraline. That case settled[4] and the interplay between that settlement and federal pharmaceutical law explains Pfizer's decision not to bring an immediate infringement action against Teva.

Since IVAX was the first generic company to file an ANDA for approval of a generic sertraline product challenging the polymorph patent, it had an expectation of a lucrative 180 day "exclusivity" period during which no other generic sertraline product could be approved by the FDA. 21 U.S.C. § 355(j)(5)(B)(iv). However, like Teva, IVAX did not challenge the compound patent in its ANDA, and therefore was not in a position to enjoy its six months of "exclusivity" until the expiration of the compound patent in 2006. If any other generic company obtained a court decision that the polymorph patent was invalid or not infringed, the 180 day exclusivity period would commence, whether or not IVAX was able to launch its generic sertraline product. *See Minnesota Mining & Mfg. Co. v. Barr Labs.*, 289 F.3d 775, 780 (Fed. Cir. 2002). If such a court decision occurred more than 180 days before the expiration of the compound patent, IVAX would effectively lose its

[4] Under the terms of the settlement, IVAX entered into a non-exclusive royalty-bearing license of the polymorph patent to commence upon the expiration of the composition patent. App. 9a.

exclusivity. In that situation, when the compound patent expired, Pfizer would face price competition, not only from IVAX (for which it would receive royalty payments), but also from other generic companies. It was, therefore, in Pfizer's interest to avoid, if possible, any litigation with another generic drug company that might have the effect of triggering IVAX's exclusivity before the expiration of the compound patent.

## The District Court Decision

Teva sued Pfizer in January 2003 for a declaration that the polymorph patent was invalid and not infringed.[5] Teva sought to be in a position to launch its generic sertraline product immediately upon the expiration of the compound patent. However, avoiding the delay attributable to IVAX's exclusivity was not Teva's only concern. Teva faced exposure to significant infringement liability even if it delayed launching its product until after the compound patent expired *and* IVAX's exclusivity period had run. Teva sought to obtain patent certainty before launching, just as Congress had sought to encourage when it enacted the Hatch-Waxman Amendments in 1984. *See Eli Lilly*, 496 U.S. at 676.

Hoping to avoid any resolution of the patent issues (and thereby avoid any risk of triggering IVAX's exclusivity), Pfizer moved to dismiss Teva's action for want of subject matter jurisdiction, claiming that there was no "actual controversy." The district court granted the motion, ruling that Teva had not established that it faced a "reasonable apprehension ... that it will face an infringement

---

[5]  The bases for federal jurisdiction was 28 U.S.C. §§ 1331, 1338(a), 2201.

8

suit," as the court found to be required by Federal Circuit precedent. App. 43a-46a.

## The Federal Circuit Panel Decision

On appeal to the Federal Circuit, Teva argued that legislation enacted in 2003 required the district court to hear Teva's declaratory judgment action. Title XI of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "Medicare Amendments")[6] specifically authorized Teva to bring a "civil action to obtain patent certainty" against "the owner [of a patent listed in the Orange Book] or holder [of a New Drug Application for the drug associated with such listed patent] ... for a declaratory judgment that the patent is invalid or will not be infringed by the drug for which the [ANDA] applicant seeks approval ...." 21 U.S.C. § 355(j)(5)(C)(i)(II). Congress further provided that district courts "shall, to the extent consistent with the Constitution, have subject matter jurisdiction" in any such action. 35 U.S.C. § 271(e)(5). Teva argued that these amendments established subject matter jurisdiction so long as the underlying patent dispute was justiciable under Article III and that its dispute with Pfizer was plainly justiciable under this Court's "case or controversy" jurisprudence.

A number of *amici curiae* also urged the Federal Circuit to reverse the dismissal of Teva's claim for declaratory relief. The Federal Trade Commission emphasized the "vital role" that declaratory judgment actions by generic companies play in bringing generic drugs quickly to market. The Commission argued that Teva had raised an "actual controversy" because the resolution of the patent

---

[6]  Pub. L. No. 108-173 (2003).

9

10

dispute between Teva and Pfizer affected the timing of FDA approval of Teva's ANDA and Teva therefore faced a redressable injury that potential infringers not subject to the pharmaceutical regulatory process do not face. Brief for *Amicus Curiae* Federal Trade Commission Supporting Appellant and Urging Reversal. AARP emphasized the importance of declaratory judgment actions in bringing generic drugs to market quickly to ameliorate the burdens of prescription drug costs on older Americans and on giving effect to Congress' direction that jurisdiction over such actions be exercised to the limits of Article III. Brief of AARP as *Amicus Curiae* in Support of Appellant.[7]

The Federal Circuit panel, in a 2-1 decision, rejected Teva's arguments and affirmed the dismissal. It ruled that Article III itself *requires* that a declaratory judgment plaintiff prove that the defendant's acts triggered a reasonable apprehension that the defendant will sue the plaintiff for patent infringement. App. 18a-21a. Moreover, the panel recast this "reasonable apprehension" test to require proof that the reasonably apprehended infringement suit be "imminent." App. 16a-17a.

The holding that the "reasonable apprehension of imminent suit" test is a constitutional rather than a prudential limitation on jurisdiction logically should have ended the matter. Nevertheless, the panel went on to rule that in enacting the Medicare Amendments, Congress intended to preserve that test as a jurisdictional limitation on declaratory

---

[7] The Generic Pharmaceutical Association, a trade association of generic drug companies, also submitted an amicus brief in support of Teva's position.

11

judgment suits brought by ANDA applicants pursuant to those amendments. App. 21a-24a.

Judge Mayer dissented. He concluded that Article III does not require the "reasonable apprehension" test because the decisions of this Court, beginning with *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937), establish that a "case or controversy" under Article III exists whenever the plaintiff has suffered injury in fact for which it seeks "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts," App. 31a (quoting *Calderon v. Ashmus*, 523 U.S. 740, 746 (1998) (quoting *Aetna*, 300 U.S. at 241)), and that Teva had presented such a case. Judge Mayer also concluded that Pfizer's act of listing the polymorph patent in the Orange Book, an act that represented to the world that that patent "likely precluded" a generic sertraline product, was sufficient to give rise to a reasonable apprehension of infringement litigation. App. 32a.

*Denial of Rehearing and Rehearing En Banc*

Teva petitioned for rehearing and rehearing en banc. Despite amicus submissions by the Federal Trade Commission and others urging rehearing, the Court denied the petition on April 4, 2005, with three judges dissenting. App. 48a-50a.

Judge Mayer did not supplement his panel dissent. The two other dissenters, Judges Gajarsa and Dyk, each filed dissenting opinions in which the other joined. Judge Gajarsa observed that this Court's decisions establish that Article III requires only a redressable injury in fact, traceable to defendant's conduct, e.g., *Steel Co. v. Citizens for a Better*

12

*Environment*, 523 U.S., 83, 103-04 (1998), and that this constitutional "minimum" was satisfied here. App. 51a-57a.

Judge Dyk wrote that the Article III decisions of this Court "provided no support" for the Federal Circuit's view that only a "reasonable apprehension of imminent suit" can establish an actual controversy, and noted the inconsistency of the approach taken by the panel majority with rulings of other circuits. App. 60a-63a. He concluded that the Medicare Amendments were plain on their face in requiring district courts to hear declaratory judgment actions by ANDA applicants if Article III's minimum "case or controversy" standards were satisfied. App. 64a.

REASONS FOR GRANTING THE PETITION

The Federal Circuit's ruling gravely undermines recent congressional efforts to accelerate the introduction of generic drugs and thereby ameliorate the staggering cost of prescription drugs in the United States. Both Congress and this Court have recognized that the prompt resolution of disputes involving the application of pharmaceutical patents to generic drugs is critical to the achievement of this goal. Congress amended the law in 2003 to authorize declaratory judgment actions by generic drug companies and thereby ensure that such companies would have the same opportunity to obtain prompt "patent certainty" that Congress gave pharmaceutical patentees in 1984.

The decision below effectively nullified those amendments. The court below not only denied declaratory relief in precisely the situations in which Congress sought to make such relief available, but also prevented Congress from ever providing such relief by grounding its ruling in the Constitution itself. It is difficult to imagine a more complete

13

frustration of congressional purpose in an area of vital importance to the nation's health care system. Accordingly, this case presents a "matter of special importance to the entire Nation," *Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 89 (1993).

The Federal Circuit reached its decision by finding Article III requirements that this Court has never imposed and that go well beyond what this Court has repeatedly identified as the essential characteristics of a justiciable "case or controversy." There is no question but that there would be jurisdiction to resolve the dispute between Teva and Pfizer in an infringement action brought by Pfizer, and this Court has emphasized that the identity of the party that initiates litigation to resolve a justiciable controversy is "immaterial" to the Article III question. *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). The Federal Circuit's decision also conflicts with decisions from other circuits and denies access to declaratory relief in situations in which both the Medicare Amendments and the Declaratory Judgment Act were intended to apply.

If the decision below is allowed to stand, no district court in the country will entertain declaratory judgment actions as Congress provided in the Medicare Amendments. Appeals from dismissals of declaratory judgment actions in patent cases are heard exclusively by the Federal Circuit, and every district court is bound by Federal Circuit precedent in such cases. Hence, only review by this Court can correct the misreading of its precedents and the frustration of national health care policy caused by the decision below.

14

## I. The Decision Below Gravely Undermines Congressional Efforts to Reduce the Cost of Prescription Drugs.

The price of prescription drugs has grown dramatically in recent years, creating enormous burdens for patients (particularly the elderly), for employers who provide prescription drug benefits for their employees, and for the taxpayers who fund Medicare, Medicaid and other public health care programs. National expenditures for prescription drugs have risen from $12 billion in 1980 to $40 billion in 1990 to more than $170 billion in 2003.[8]

Generic drugs play a critical role in moderating this explosive growth in the cost of prescription drugs. A study cited by the Federal Trade Commission in 2002 reported that average drug prices declined 20% within two years of generic drug entry into the market and that the savings increase with the number of generic competitors.[9]

This Court has recognized that the Hatch-Waxman Amendments sought to accelerate the introduction of generic drugs. *Eli Lilly*, 496 U.S. at 670. Generic entry was often delayed because pharmaceutical patents prevented generic drug companies from even commencing their development efforts until those patents expired. This delay, coupled with a

---

[8] Centers for Medicare & Medicaid Services, National Health Expenditures Aggregate Amounts and Average Annual Percent Change, by Type of Expenditure: Selected Calendar Years 1980-2003 (available at http://www.cms.hhs.gov/statistics/nhe/historical/t2.asp.)

[9] Federal Trade Commission, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* 9 (2002) (available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf.)

15

lengthy process of regulatory review, resulted in a *de facto* extension of the terms of pharmaceutical patents. *See id.*

The Hatch-Waxman Amendments addressed this problem in several ways. First, they required innovator companies to list in the Orange Book any patents that "could reasonably be asserted" against generic versions of the drugs to which they pertain. 21 U.S.C. § 355(b)(1) Second, they provided that the activities of companies to develop generic versions of patented products for purposes of seeking FDA approval would not constitute patent infringement. 35 U.S.C. § 271(e)(1). *See Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. ___, 125 S. Ct. 2372 (2005). Third, the Hatch-Waxman Amendments encouraged the resolution of patent disputes *before* generic companies launched their products (at risk of potentially ruinous liability) by (i) making the submission of an ANDA that seeks FDA approval before the expiration of an Orange Book patent (because the patent is invalid or not infringed) an act of infringement of such patent sufficient to support infringement litigation, and (ii) automatically delaying FDA approval of the generic drug by 30 months if the patentee commenced an infringement action within 45 days of receiving notice of this certification. 21 U.S.C. § 355(j)(5)(B)(iii); 35 U.S.C. § 271(e)(2).[10] This Court

---

[10] The number of drugs as to which generic companies seek FDA approval before patent expiration is large and increasing. The FDA reports that since 1984 approximately 300 drugs have been the subject of ANDAs certifying that a patent said to cover the drug is invalid or not infringed, including more than 30 since March 2004. *See* http://www.fda.gov/cder/ogd/ppiv.htm. Since it is common for more than one generic drug company to file an ANDA with respect to a particular drug, these figures significantly understate the actual number of ANDAs filed containing such certifications.

recognized that without the ability to resolve infringement disputes promptly, the legislative scheme "will not work." *Eli Lilly*, 496 U.S. at 678.

By 2003, Congress recognized that the incentive of an automatic 30 month stay of FDA approval of a generic drug was often insufficient to prompt patentees to commence immediate infringement litigation against ANDA applicants that challenged their patents. As one supporter of the Medicare declaratory judgment provisions of the Amendments explained during the congressional debate over them:

> For example, the brand drug company might have several patents listed in the Food and Drug Administration's Orange Book with respect to a particular drug. It could be in the company's interest to bring suit within 45 days on one patent and to hold the others in reserve. The suit on one patent would automatically stay approval of the generic application until the lawsuit is resolved or the 30 months elapses. Holding the other patents in reserve would introduce uncertainty that could discourage generic companies from devoting resources to bring the generic drug to market and that would give the brand drug company a second opportunity to delay generic competition by suing the generic company for infringement of the reserved patents after the resolution of the initial infringement suit.
>
> ..... Or when generic applicants are blocked by a first generic applicant's 180-day exclusivity,

16

the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the "failure to market" provision and force the first generic to market.

149 Cong. Rec. S15885 (Nov. 25, 2003) (remarks of Sen. Kennedy) (App. 77a).[11] As lower courts had recognized, these delays could be avoided if generic companies could sue for a declaration of invalidity or non-infringement after the patentee failed to bring an infringement action within 45 days. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1073 (D.C. Cir. 1998); *Minnesota Mining*, 289 F.3d at 789-92 (Gajarsa, J., concurring).

The availability of this solution, however, was unclear in light of the Federal Circuit test for determining when a suit for a declaration of patent invalidity or non-infringement presented an "actual controversy." That test required "both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Gen-Probe, Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1380 (Fed. Cir. 2004) (quoting *BP Chems., Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993)). Since filing an ANDA certifying that an Orange Book patent is invalid or not infringed constitutes infringement as a matter of law, it was the "reasonable apprehension of suit" requirement that raised questions whether a declaratory

17

[11] The complete colloquy is set forth at App. 71a-81a.

18

judgment remedy would be available. *See Mova*, 140 F.3d at 1073.

In enacting Title XI of the Medicare Amendments — entitled "Access to Affordable Pharmaceuticals" — Congress sought to resolve this uncertainty by (i) expressly granting generic companies the right to seek a declaration of invalidity or non-infringement when the patentee does not bring suit within 45 days of receiving the generic company's certification, 21 U.S.C. § 355(j)(5)(C)(i)(II), and (ii) directing district courts to exercise jurisdiction over such declaratory judgment actions "to the extent consistent with the Constitution." 35 U.S.C. § 271(e)(5).

Congress plainly anticipated that this legislation would expand the ability of generic companies to bring declaratory judgment actions. ANDA applicants that could demonstrate a reasonable apprehension of suit could have brought declaratory judgment actions under existing Federal Circuit law without any further legislative authorization. Congress does not amend laws simply to preserve the legal status quo.[12] On the contrary, Congress expected that as a result of expanding declaratory judgment jurisdiction, patients would get quicker "access to affordable

---

[12] Contrary to the Federal Circuit's conclusion, the Conference Committee Report does not reflect the intent of the conferees to apply the reasonable apprehension test whether or not the Constitution requires it. The report refers, consistent with the statutory language, to applying that test "to the extent required by Article III." *See* H.R. Conf. Rep. No. 108-391, at 836 (2003) (App. 82a–83a). Nor does the Report reflect any conclusion by Congress that that test is constitutionally required.

19

pharmaceuticals" and dramatic cost savings would be achieved.[13]

The Federal Circuit decision completely frustrates that congressional purpose. The court not only ruled that the Constitution *always* required satisfaction of the "reasonable apprehension" test, but also reformulated the test to require a reasonable apprehension of *imminent* infringement litigation. As noted above, Congress provided that ANDA applicants could bring declaratory judgment actions specifically to address situations in which the owners of Orange Book patents had a financial incentive to *delay* the commencement of infringement litigation. Thus, by imposing an "imminence" requirement, the Federal Circuit guaranteed that there would be no declaratory judgment remedy in precisely this situation in which Congress intended to make such a remedy available.

The "imminence" requirement also undermines one of the principal goals of the Declaratory Judgment Act itself: to provide a remedy for a potential defendant that is unable to obtain a binding determination whether its product infringes a patent. The paradigm of this type of case involves what this Court, quoting Learned Hand, called a "scarecrow" patent, *i.e.*, a weak patent on which the patentee does not

---

[13] According to estimates prepared for Congress by the Congressional Budget Office, enactment of Title XI of the Medicare Amendments would result in cost savings of $600 million through FY 2013 and (along with Title I of the Medicare Amendments) in $7.2 billion in increased revenues. Letter from Douglas Holtz-Eakin, Director Congressional Budget Office to Hon. William M. Thomas, Chairman, House Committee on Ways and Means (Nov. 20, 2003) (available at http://cbo.gov/ftpdocs/48xx/doc4808/11-20-Medicare_Letter.pdf).

bring suit but that scares off the potential infringer and its customers. *See Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95-96 (1993) (citing *Bresnik v. United States Vitamin Corp.*, 139 F.2d 239, 242 (2d Cir. 1943) (L. Hand, J.)). In *Cardinal*, this Court noted that "[m]erely the desire to avoid the threat of a 'scarecrow' patent ... may ... be sufficient to establish jurisdiction under the Declaratory Judgment Act." *Id.* at 96.[14]

By definition, the victim of a "scarecrow" patent faces no likelihood of imminent infringement litigation. Yet the Federal Circuit's decision in this case would deny declaratory relief to the victims of such patents on constitutional grounds.

It is difficult to imagine a more complete undermining of important federal legislation than that brought about by the Federal Circuit's decision in this case. This Court should grant review to determine whether Article III genuinely requires such a result.

II.  **The Decision Below Purports to Resolve an Important Federal Question in a Manner that Conflicts with the Decisions of this Court and those of other Federal Circuit Courts.**

The Medicare Amendments provide that district courts should exercise jurisdiction over declaratory judgment

20

[14]  Moreover, as Judge Hand said in another patent case, "[i]f a manufacturer fears that he will be charged to infringe, he can always inquire of the patentee, and if the answer is unsatisfactory, he can bring an action for a declaratory judgment. *The time has now passed when a patentee may sit by and refuse to show his hand.*" *Clair v. Kastar*, 148 F.2d 644, 646 (2d Cir. 1945) (emphasis added).

actions brought by generic drug companies in the circumstances presented here unless it is unconstitutional to do so. 35 U.S.C. § 271(e)(5). This Court has recognized Congress' authority to preclude the application of any merely prudential limitation on the subject matter jurisdiction of federal courts. *E.g.*, *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

This Court has ruled repeatedly that Article III's "irreducible constitutional minimum" is that the plaintiff "demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *E.g.*, *Bennett*, 520 U.S. at 162 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In no case discussing this constitutional minimum has this Court required a "reasonable apprehension of imminent litigation."

In particular, the Court imposed no such requirement in *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937), which upheld the constitutionality of the Declaratory Judgment Act against Article III challenge and established the framework for analyzing the applicability of Article III to declaratory judgment actions. In the words of Chief Justice Hughes, to fall within the "judicial Power" of Article III, the declaratory plaintiff's claim "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of

21

22

facts." *Id.* at 241.[15] The insurance company plaintiff in *Aetna* sought a declaration of non-coverage and there is no hint in the Court's opinion that the insurer faced any threat of imminent litigation. The harm that the insurer invoked to justify declaratory relief was the prejudice to its ability to prove non-coverage through the death or disappearance of witnesses. *Id.* at 239.[16] *See also Asarco, Inc. v. Kadish*, 490 U.S. 605, 619 (1989) (articulating requirement for "case or controversy" in terms of the adversity of the parties and the existence of valuable legal rights that will be affected "to a specific and substantial degree by the decision of the question of law").

The Federal Circuit never attempted to ground its reasonable apprehension requirement in the Article III decisions of this Court. Rather, it read its own prior decisions as setting forth constitutional requirements, even though the Article III question was not squarely presented in any of those cases. This case is the first patent case reviewed by the Federal Circuit where Congress has directed the exercise of subject matter jurisdiction to the constitutional

[15] This standard is clearly satisfied here. Teva seeks a judicial determination whether the specific pharmaceutical product described in its ANDA will infringe Pfizer's patent and whether the patent itself is valid. It has committed a statutory act of infringing that patent. There is nothing hypothetical about Teva's claim.

[16] In *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270 (1941), this Court extended the *Aetna* holding to permit an insurer to sue the party injured by its insured for a declaration of non-coverage. Although the injured party would have had the right to sue the insurer after obtaining a judgment against the insured, the injured party had not obtained such a judgment when the insurer brought its declaratory judgment action. Plainly, the insurer faced no *imminent* risk of coverage litigation.

23

limit. Accordingly, prior Federal Circuit precedent should not have precluded consideration of general principles of justiciability under Article III.

Teva plainly satisfied the "irreducible constitutional minimum" of injury, traceability and redressability, as the dissenting judges all recognized. Unless Teva can obtain a judicial determination whether its generic version of *Zoloft* infringes Pfizer's patent, it cannot trigger IVAX's exclusivity and thereby avoid delaying the launch of its generic product until at least six months after the composition patent expires. Nor can it avoid the risk of ruinous liability if it launches before such a determination. Those injuries are traceable to Pfizer's listing the polymorph patent in the Orange Book and they will be redressed by litigating the validity and infringement of that patent.[17]

Moreover, a concrete dispute exists between Teva and Pfizer because Teva has already committed a statutory act of infringement that gives rise to a dispute that is unquestionably justiciable at Pfizer's behest. "It is immaterial that frequently, in the declaratory judgment suit, the positions of the parties is the same in either case." *Maryland Cas.*, 312 U.S. at 273. Since an infringement suit brought by Pfizer within 45 days of Teva's certification with respect to the polymorph patent would have been justiciable, Teva's

[17] The Federal Circuit minimized this injury as a mere "competitive disadvantage." App. 26a. But a "competitive disadvantage" is precisely what the victims of "scarecrow" patents suffer, and this Court indicated in *Cardinal Chem.* that such harm may support a declaratory judgment action. Competitive injury is certainly "injury in fact" for Article III purposes. *See Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151-52 (1970).

declaratory judgment action presenting the identical issues in a case involving the identical parties is justiciable as well. That Pfizer was not about to sue Teva does not affect this conclusion.

The "reasonable apprehension of imminent litigation" requirement is not only foreign to this Court's Article III jurisprudence; it also conflicts with the Article III decisions of other circuits. In *Sallen v. Corinthians Licenciamentos Ltda*, 273 F.3d 14 (1st Cir. 2001), the First Circuit expressly rejected the proposition that Article III requires a party seeking a declaration of his right to use the defendant's trademark in its internet domain name to demonstrate a reasonable likelihood that it will be sued for trademark infringement. The court noted that where an actual concrete controversy exists between the parties, it was unnecessary to prove that the defendant was reasonably likely to commence an infringement action. *Id.* at 25-26.

Similarly, in a recent unpublished decision, the Sixth Circuit also rejected the proposition that a reasonable apprehension of suit is categorically required to satisfy Article III. *Sankyo Corp. v. Nakamura Trading Corp.*, 2005 U.S. App. LEXIS 4339, at *9,*11 (6th Cir. Mar. 15, 2005). The court relied instead on the principles of justiciability set forth in the *Aetna Life* decision and the three-part test of injury, traceability and redressability.

Other circuits have formulated the "actual controversy" requirement for declaratory judgments in terms of whether the plaintiff faces a reasonable apprehension of future liability, not of imminent litigation. Indeed, that was the approach taken in patent decisions by other circuits before the establishment of the Federal Circuit. For example, in *Societe de Conditionnement en Aluminium v. Hunter*

24

*Engineering Co.*, 655 F.2d 938 (9th Cir. 1981), the patentee specifically disclaimed any threat of infringement litigation, although, like Pfizer, it "refused to forbear from any future threats or litigation concerning" its patents. *Id.* at 941. Nonetheless, the court found an actual controversy sufficient to sustain a suit for a declaration of invalidity. Emphasizing that the constitutional standard was established by *Aetna's* requirement of a "real and substantial controversy admitting of specific relief through a decree of a conclusive character," the court of appeals rejected any requirement of a threat of litigation. The critical fact was that the plaintiff had actually commenced arguably infringing activity as to which the patent presented a "Damoclean threat." *Id.* at 945.[18]

Because the Federal Circuit has departed from this Court's settled Article III principles and has announced a jurisdictional rule that conflicts with the decisions of other circuits, this Court should grant review.

III. The Decision Below will Impose an Unjustified and Unprecedented Limitation on Subject Matter Jurisdiction in Patent Cases throughout the Country that Congress will be Unable to Remedy.

The untenable situation created by the Federal Circuit's decision can only be remedied by this Court. The

---

[18] See also *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996)(per curiam)(trademark case; "reasonable apprehension of liability"); *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555-56 (9th Cir. 1989)(copyright case; "reasonable apprehension ... of liability"); *Dewey & Alma Chem. Co. v. American Anode, Inc.*, 137 F.2d 68, 71 (3d Cir. 1943)(patent case; public notice by the patentee that certain practices constitute patent infringement supports declaratory judgment action).

25

26

Federal Circuit has exclusive jurisdiction over appeals in patent cases. 28 U.S.C. § 1295(a). Future litigants may seek en banc review from the Federal Circuit, but the refusal of that court to grant such review in this case, notwithstanding the cogency of the dissenting opinions and the urgings of the Federal Trade Commission, AARP and others as *amici curiae* in this case, lead one to infer that a majority of the Federal Circuit is committed to support the views of the panel in this case.

Moreover, by grounding its decision in the Constitution itself, the Federal Circuit has effectively prevented Congress from ever creating a declaratory judgment remedy in the circumstances presented here. Although the Federal Circuit inferred — incorrectly — that Congress intended to preserve the "reasonable apprehension" test, in the end Congress' intent does not matter if, as the Federal Circuit held, the test is constitutionally required. For this reason as well, the Court should grant review.

## CONCLUSION

The Federal Circuit has grafted onto Article III a limitation on the subject matter jurisdiction of federal courts in declaratory judgment actions that this Court has never articulated and that other circuit courts have rejected outright.

27

For the reasons set forth herein, this Court should grant the petition for certiorari.

Respectfully submitted,

July 5, 2005

WILLIAM F. SHEEHAN
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
(202) 346-4000

HENRY C. DINGER, P.C.
  *Counsel of Record*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

THOMAS L. CREEL, P.C.
MARK I. KOFFSKY
GOODWIN PROCTER LLP
599 Lexington Avenue
New York, NY 10022
(212) 813-8800