# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC, )<br><br>Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES FOOD )<br>AND DRUG ADMINISTRATION, and )<br>DONNA E. SHALALA, Secretary of Health )<br>and Human Services, )<br><br>Defendants. ) | Civil Action No. |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF TEVA'S MOTION FOR A PRELIMINARY INJUNCTION

James N. Czaban (D.C. Bar #459211)
Geoffrey M. Levitt (D.C. Bar #936336)
David M. Malone (D.C. Bar #125047)
(Counsel of Record)

Venable, Baetjer, Howard & Civiletti LLP
1201 New York Avenue, NW
Suite 1000
Washington, D.C. 20005-3917
202/962-4800
Attorneys for Teva Pharmaceuticals, USA, Inc.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS .....................................................................................2

ARGUMENT..........................................................................................................5

I.     THE STATUTORY BACKGROUND....................................................................6

     A.     The Paragraph IV ANDA .............................................................7

     B.     The Paragraph IV Infringement Action and The Hatch
           Waxman Declaratory Judgment Action........................................8

     C.     The 180-Day "Generic Exclusivity" Period .................................9

     D.     Establishing The Effective Date of Approval of
           Paragraph IV ANDAs..................................................................10

II.    THE DECLARATORY JUDGMENT ACTION TRIGGER IS
     NECESSARY TO GIVE FULL FORCE AND EFFECT TO THE
     STATUTORY PARAGRAPH IV CHALLENGE SYSTEM................................15

     A.     The Declaratory Judgment Action Trigger is Mandated
           By The Express Provisions Of The 1984 Amendments ............16

     B.     The Declaratory Judgment Action Trigger Has Been
           Endorsed by the D.C. Circuit in Mova ......................................17

     C.     Dismissal of a Hatch-Waxman Declaratory Judgment
           Action on "Case or Controversy" Grounds Must Also
           Be Treated as a Court-Decision Trigger Under 21
           U.S.C. § 355(j)(5)(B (IV) (II) ....................................................18

     D.     A Case or Controversy Dismissal is Equivalent To a
           Judgment of Unenforceability, and Should Trigger the
           Start Of a Paragraph IV Applicant's 180-Day Delayed
           Effectiveness Period....................................................................23

     E.     The Statutory Bases For The Declaratory Judgment
           Action Trigger Have Been Evaluated and Endorsed by
           FDA and Two Courts of Appeals ...............................................25

           1.     Teva's Citizen Petition.....................................................25

           2.     The Granutec Decision ....................................................27

i

3.  The Mova Decision and FDA's Regulatory
Response ..........................................................................................28

F.  The Declaratory Judgment Action Trigger is Necessary
to Effectuate the Overriding Legislative Intent To
Expedite Approval And Marketing Of Affordable
Generic Versions of Non-Patentable Drugs................................................28

III.  THE INJUNCTIVE RELIEF REQUESTED HEREIN IS
NECESSARY AND APPROPRIATE AT THIS TIME, AND THE
COURT SHOULD NOT WAIT FOR FDA TO BEGIN NOTICE
AND COMMENT RULEMAKING........................................................................33

IV.  THE REQUESTED INJUNCTION IS WARANTED IN THIS
CASE ..............................................................................................................35

A.  Teva Has Demonstrated A Strong Likelihood Of
Success........................................................................................................35

B.  Teva Will Be Irreparably Injured If The Requested
Injunction Is Not Granted ..........................................................................36

C.  Neither FDA Nor Any Other Interested Party Will
Suffer Any Cognizable Harm If The Requested
Injunction Is Granted .................................................................................38

1.  FDA Will Not Be Harmed By The
Requested Injunction ....................................................................38

2.  Neither TorPharm Specifically, Nor "First"
Paragraph IV Filers Generally, Will Suffer
Cognizable Harm By The Requested
Injunction ......................................................................................38

3.  Patent Owners Will Not Be Prejudiced in
Any Way By Implementation of the
Declaratory Judgment Action Trigger ...........................................39

D.  The Public Will Be Served By The Requested
Injunction ...................................................................................................40

CONCLUSION............................................................................................................41

## TABLE OF AUTHORITIES

### Cases

Barr Lab., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)................................................................. 41

Boehringer Ingelheim Corp. v. Shalala, 993 F.Supp. 1, 6 (D.D.C. 1997) ........................ 41

* Eli Lilly & Co. v. Medtronic, 496 U.S. 661, 678 (1990).................................................... 9

Eli Lilly v. Medtronic ................................................................................................... 19, 22

Eli Lilly v. Medtronic, 496 U.S. ....................................................................................... 19

Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1483-1484 (Fed. Cir. 1998)............ 25

Granutec v. Shalala, 139 F.3d 889, 1998 WL 153410 (4th Cir. April 3, 1998) ................ 28

Merck v. Danbury ................................................................................................ 23, 24, 25

* Merck v. Danbury Pharmacal, Inc., 694 F.Supp. 1 (D. Del. 1988), aff'd, 873 F.2d 1418

(Fed. Cir. 1989)........................................................................................................... 24

Merck v. Danbury, 694 F.Supp. 1 (D.Del. 1988), aff'd 873 F.2d 1418 (Fed. Cir. 1989). 23

Mova Pharm. Corp. v. Shalala, 955 F. Supp. 128, 131 (D. D.C. 1997) ........................... 31

* Mova Pharmaceuticals v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998)............ 6,15,17,33,36

Purepac v. Friedman ........................................................................................................ 35

Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636 (Fed. Cir. 1991) ...................... 25

Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995)25

### Statutes and Regulations

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ....................................................................................... 8
21 U.S.C. § 355(j)(2)(B).................................................................................................... 8
21 U.S.C. § 355(j)(5)(B)............................................................................................ passim
* 21 U.S.C. § 355(j)(5)(B)(iii).................................................................................... passim
21 U.S.C. § 355(j)(5)(B)(iii)(II)....................................................................................... 13
21 U.S.C. § 355(j)(5)(B)(iv) ..................................................................................... passim
21 U.S.C. § 355(j)(5)(b)(v)................................................................................................ 5
28 U.S.C. § 2201............................................................................................................... 3
35 U.S.C. § 271(e)(2)....................................................................................................... 19
35 U.S.C. §§ 271(a), 281, 283 -285 ................................................................................. 12
35 U.S.C. §§ 271(e)(2)....................................................................................................... 9
21 C.F.R. § 314.107(a)(12)(i)(4) ..................................................................................... 23

21 C.F.R. § 314.107(c)(1)………………………………………………………6, 14, 27

**Other Authorities**

H.R. Rep. No. 98-857, Part II, 10, (Aug. 1, 1984) <u>reprinted</u> at 1984 U.S. Code. Cong.
    Admin. News 2686, 2694 ........................................................................... 12
H.R. Rep. No. 98-857, Part II, 15 (August 1, 1994) <u>reprinted</u> at 1984 U.S. Code. Cong.
    Adm. News 2686, 2699 (Aug. 1, 1984)....................................................... 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| THE UNITED STATES FOOD | ) | |
| AND DRUG ADMINISTRATION, and | ) | |
| DONNA E. SHALALA, Secretary of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF TEVA'S MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Teva Pharmaceuticals USA, Inc. ("Teva") seeks to begin commercial marketing

of its approved generic drug ticlopidine HCl ("ticlopidine") on February 10, 1999, the

date on which the existing "tentative" approval of Teva's ticlopidine product should be

made effective under the Federal Food, Drug, and Cosmetic Act ("FFDCA" or the

"Act"). The U.S. Food and Drug Administration ("FDA"), however, has failed to

implement explicit provisions of the FFDCA, as amended by the Drug Price Competition

and Patent Term Restoration Act of 1984 (the "1984 Amendments"), that establish

February 10, 1999 as the date on which Teva should be allowed to bring its generic

ticlopidine to market, and has unlawfully refused to set that date, as the date on which the

public may begin to receive the substantial cost savings associated with generic ticlopidine. As a result, the American public is in jeopardy of being unlawfully denied access to affordable generic versions of this life-saving drug. Therefore, in light of the facts and arguments set forth herein and supported by the accompanying Declaration of Carole Ben-Maimon, M.D., Teva respectfully asks this court to apply the statutory provisions that FDA has overlooked and, in light of the undisputed facts involved herein, order FDA to make its existing approval of Teva's ticlopidine product effective no later than February 10, 1999.

## STATEMENT OF FACTS

Teva is a manufacturer and distributor of prescription pharmaceuticals, including less expensive generic versions of brand name drugs. As such, Teva's business operations are subject to regulatory oversight by FDA pursuant to the FFDCA. See Exh. A (Declaration of Carole Ben-Maimon, M.D.) ("Ben-Maimon Decl.").

On June 20, 1997, Teva filed a special type of Abbreviated New Drug Application ("ANDA") pursuant to 21 U.S.C. § 355(j) seeking FDA approval to market ticlopidine prior to the expiration date of the formulation patent (U.S. Patent No. 4,591,592 (the " '592 patent")) held by Syntex (U.S.A.) Inc. ("Syntex") covering the version of ticlopidine marketed by Hoffman-La Roche ("Roche") under the brand name Ticlid®. (ANDAs seeking approval to market a generic drug before relevant patents expire are often referred to as "Paragraph IV ANDAs," the term that will be used hereinafter.) As required by the 1984 Amendments, Teva notified Syntex of the filing of its ANDA and of the bases upon which Teva had concluded that its version of ticlopidine would not infringe the Syntex patent (a so-called "Paragraph IV Notification"). Syntex

then had 45 days after the receipt of that notification in which to object to Teva's proposed pre-patent expiration marketing of ticlopidine by filing a special type of patent infringement action under the 1984 Amendments. After receiving and reviewing samples of Teva's ticlopidine, Syntex did not file such an action, even though such filing automatically would have delayed the effective approval date of Teva's ANDA for up to 30 months pursuant to the 1984 Amendments. See Exh. A at ¶ 4 (Ben-Maimon Decl.); 21 U.S.C. § 355(j)(5)(B)(iii).

Subsequently, on June 8, 1998, Teva brought a declaratory judgment action against Syntex pursuant to 21 U.S.C. § 355(j)(5)(B)(iii) and 28 U.S.C. § 2201, seeking a judicial adjudication of the claims made in its Paragraph IV Notification. See Exh. B (Teva's Declaratory Judgment Complaint). After Teva filed its declaratory judgment action, Syntex confirmed what Teva had asserted in its Paragraph IV Notification, and in its declaratory judgment complaint, by admitting that Teva's ticlopidine product in fact does not infringe Syntex's ticlopidine patent, and further representing that Syntex would not bring any action to enforce the patent against Teva's marketing of the drug. See Exh. C. (Letter dated June 8, 1998 from John P. Parise, Corporate Counsel for Roche/Syntex, to William A. Fletcher, President and CEO of Teva Pharmaceuticals USA.) Syntex's acknowledgement of non-infringement and non-enforcement stated:

> Based on the information that [Teva] provided us, we are of the opinion that the formulation used in [Teva's] ticlopidine hydrochloride tablets does not infringe U.S. Patent 4,591,592. We will make no claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the formulation that [Teva] disclosed to us.

See Exh. C.

In light of this development, Teva promptly sought to cooperatively expedite the resolution of the action by proposing to enter into a consent judgment that would simply incorporate what Syntex had admitted to in its June 8th notification of non-infringement to Teva – specifically, that "the manufacture, use or sale of the ticlopidine hydrochloride tablets for which Teva USA submitted an Abbreviated New Drug Application to the U.S. Food and Drug Administration in 1997 will not infringe U.S. Patent 4,591,592." See Exh. D. (Letter from Teva's counsel to Syntex's counsel. Syntex rejected this reasonable proposal, see Exh. D. (Letter from Syntex's counsel, and instead insisted on filing a motion to dismiss the action on the same grounds upon which Teva's proposed consent judgment was based – namely that all parties were in complete agreement that Teva's product does not infringe Syntex's ticlopidine patent and that the patent is unenforceable against Teva. See Exh. E. (Syntex's Motion to Dismiss with Supporting Memorandum and accompanying Exhibits.) After a hearing, on August 14, 1998, the court dismissed the action because, in view of Syntex's post-complaint representations, including the Parise letter and Syntex's own motion to dismiss, Teva no longer had a reasonable apprehension that Syntex could bring an infringement action to enforce the '592 patent, and the court was thus deprived of "case or controversy" jurisdiction as to the infringement or enforceability issues. See Exh. F. (Final Order of Dismissal in Teva v. Syntex).

On October 29, 1998, FDA approved Teva's ticlopidine ANDA, indicating that Teva's ticlopidine product met all applicable substantive standards for marketing. However, FDA made this approval "tentative" pursuant to 21 U.S.C.§ 355(j)(5)(B)(iv) – meaning that it has postponed the date on which Teva may begin to commercialize its

product -- on the grounds that Teva must wait until 180 days after the previous Paragraph IV ticlopidine ANDA applicant, believed to be TorPharm, a Division of Apotex, Inc. ("TorPharm"), first markets its product, or 180 days after "the date of a court decision described under section 505(j)(5)(B)(iv), whichever is earlier." See Exh. G. (Letter from FDA to Teva granting tentative approval for ticlopidine.) This statutory 180-day delay period applied to the effective date of subsequent Paragraph IV ANDAs was created by the 1984 Amendments to encourage generic applicants to file Paragraph IV ANDAs.

Immediately following the dismissal of its declaratory judgement action, and again after tentative approval of its ANDA, Teva notified FDA of the Court's ruling and of Teva's position that the ruling constitutes a decision of non-infringement and unenforceability of the '592 patent under 21 U.S.C. § 355(j)(5)(b)(iv), thus triggering the start of the 180-day delay clock against the effective date of Teva's ANDA. FDA, however, has not responded to Teva's repeated requests to recognize the start of that 180-day period, and has refused to meet with Teva to discuss this issue. See Exh. A at ¶ 9. As a result of FDA's failure to implement the explicit statutory provisions that govern the effective date of Teva's ticlopidine ANDA following the final court decision in its declaratory judgment action, Teva is being indefinitely denied the ability to sell, and the public the right to be prescribed, generic versions of the life-saving drug ticlopidine. Id. at ¶¶ 10-14.

## ARGUMENT

In the wake of the D.C. Circuit's invalidation of FDA's "successful defense" regulation (found at, 21 C.F.R. § 314.107(c)(1)), in Mova Pharmaceuticals v. Shalala,

140 F.3d 1060 (D.C. Cir. 1998), there is now a significant and unintended procedural loophole in FDA's regulatory scheme governing the 180-day delay period applicable to the effective approval dates of Paragraph IV ANDAs which are not the first Paragraph IV ANDA filed for a particular drug. Although FDA has indicated that it is working to close that loophole through a rulemaking procedure, Teva will be substantially and irreparably harmed unless this court orders FDA to give full force and effect to the statutory provisions as described hereinbelow, so as to effectuate Teva's right to begin marketing ticlopidine on February 10, 1999.

## I    THE STATUTORY BACKGROUND

The 1984 Amendments implemented a carefully balanced legislative compromise between the various segments of the pharmaceutical industry by which Congress sought to reduce the cost of health care by removing regulatory obstacles to the marketing of generic versions of drugs, while enhancing patent protection for drug innovators. This law established the ANDA as an expedited method to obtain FDA approval of generic versions of approved drugs, without requiring generic manufacturers to incur the delay and expense of conducting redundant clinical trials on their versions of drugs whose safety and efficacy had already been established. In return, the law provided patent holders a regulatory method to extend the patent term of drugs for which there was undue FDA delay in approving the original new drug application ("NDA").

To ensure that patent holders would not abuse the ANDA approval scheme by improperly claiming patent protection for their drugs, Congress created a complex but logical system to encourage competitive challenges to weak patents, and to spur efforts to

create non-infringing equivalents to patented drugs.[1]     As described below, this so-called

"Paragraph IV patent challenge" system includes three key elements:

- an administrative process for ANDA applicants to initiate patent challenges;

- special legal mechanisms to ensure that the federal courts can decide whether proposed future sales of generic versions of a drug would infringe the relevant patent(s), including a 30-month stay on effective approval of an ANDA if the patent holder sues the generic applicant within 45 days after the generic applicant challenges the patent; and

- an incentive to mount early patent challenges, consisting of the potential for up to 180 days' delay in  the effective approval date of Paragraph IV ANDAs filed after the first Paragraph IV ANDA (the so-called 180-day "generic exclusivity" period).[2]

See 21 U.S.C. § 355(j).

### A.    The Paragraph IV ANDA

The patent challenge process begins when a generic drug applicant files a

Paragraph IV ANDA containing a certification that the patent covering the drug in

question is invalid, unenforceable, or will not be infringed by the proposed future

manufacture, use, or sale of the generic drug for which the application is submitted.[3]  See

---

[1]     See 21 U.S.C. §§ 355(j)(2)(A)(vii)(IV), 355(j)(2)(B), 355(j)(5)(B)(iii)–(iv).

[2]     As discussed infra, the statute nowhere uses the term "exclusivity" but rather operates only to apply a 180-day delay to the effective date of subsequent Paragraph IV ANDAs, which may or may not result in a de facto period of exclusive marketing by the first Paragraph IV ANDA applicant.  Whether a first challenger can take advantage of this delay period depends upon a host of factors, including the quality of the first applicant's ANDA submission, and its ability to resolve any outstanding patent infringement issues more expeditiously than subsequent applicants. It is clear, therefore, that the statute only confers the potential benefit of, but not the right to, as much as 180 days of generic "exclusivity" for first Paragraph IV ANDA filers.

[3]     If there is more than one relevant patent, the generic applicant must file appropriate certifications to each relevant patent.

21 U.S.C. § 355(j)(2)(A)(vii)(IV).[4]  The applicant must also send a Paragraph IV

Notification to the patent holder (and to the holder of the approved NDA for the drug),

informing these parties of its Paragraph IV certification, and explaining in detail the legal

and factual bases for the claimed invalidity, unenforceability, or non-infringement, 21

U.S.C. § 355(j)(2)(B).

### B.    The Paragraph IV Infringement Action and The Hatch-Waxman Declaratory Judgment Action

Within 45 days of receiving a Paragraph IV Notification, the patent holder must

decide whether it can, and wants to, bring a specialized type of patent infringement action

(the "Paragraph IV Infringement Action") seeking to disprove the claims made in the

Paragraph IV Notification, 21 U.S.C. § 355(j)(5)(B)(iii).  If the patent owner does not

bring a Paragraph IV Infringement Action within 45 days, the Paragraph IV ANDA

applicant may then bring a declaratory judgment action against the patent owner seeking

judicial resolution of the claims raised in its Paragraph IV Notification (the "Hatch-

Waxman Declaratory Judgment Action").  Id.

The purpose of the Paragraph IV Infringement Action and the Hatch-Waxman

Declaratory Judgment Action is to resolve potential patent disputes arising out of a

Paragraph IV Notification prior to actual marketing of the proposed generic version of

the drug.  However, because federal courts do not generally exercise jurisdiction to

decide conjectural disputes such as whether proposed future sales of a generic drug

---

[4]        In response to the Federal Circuit decision in  Merck & Co. Inc. v. Danbury Pharmacal, Inc., 694
F.Supp. 1 (D.Del. 1988), aff'd 873 F.2d 1418 (Fed. Cir. 1989), FDA specified that
unenforceability, as well as invalidity and non-infringement, may be claimed as a basis for a
Paragraph IV challenge.  See 21 C.F.R. § 314.94(a)(12)(i)(A)(4).  The unenforceability issue is
further discussed infra.

would infringe a patent, Congress had to create special jurisdictional mechanisms for the courts to hear and determine the question of future infringement in the context of Paragraph IV ANDAs. Thus, Congress designated the submission of a Paragraph IV ANDA as an act of infringement, albeit a "highly artificial act of infringement," Eli Lilly & Co. v. Medtronic, 496 U.S. 661, 678 (1990), and limited the remedies for such acts of "infringement." See 35 U.S.C. §§ 271(e)(2) and (e)(4).

Although the "act" of infringement that gives rise to a Paragraph IV Infringement Action is simply the filing of a Paragraph IV ANDA, the issue actually litigated in such an action, or in a Hatch-Waxman Declaratory Judgment Action, is whether the assertions in the ANDA applicant's Paragraph IV Notification are correct – i.e., whether the patent is invalid, unenforceable, or would not be infringed by the proposed future sales of the particular generic version of the drug. See Eli Lilly, 496 U.S. at 678.

## C.    The 180-Day "Generic Exclusivity" Period

The Paragraph IV patent challenge system is designed to encourage direct challenges to weak patents, as well as efforts to promote the development and timely marketing of therapeutically equivalent drug products that do not infringe otherwise valid patents. Thus, a firm that successfully invalidates a patent (or creates a non-infringing alternative product) effectuates an important statutory goal by forcing open a previously closed market for lower-priced generic equivalents to a brand name drug. However, patent litigation is expensive and the outcome uncertain, and a successful Paragraph IV challenger may open the market not only for itself but also for other generic competitors,[5]

---

[5]    Where a patent has been found invalid, any company can obtain FDA approval to sell the drug at issue upon proof that its product is therapeutically equivalent to the innovator drug. However, if a

thereby diluting the potential economic rewards for its foresight and hard work. In addition, a Paragraph IV applicant runs the risk of incurring a 30-month stay on effective approval of its ANDA if the patent owner brings suit. 21 U.S.C. § 355(j)(5)(B)(iii).

Thus, Congress provided that where multiple Paragraph IV ANDAs have been filed for the same drug, the effective date of approval of all Paragraph IV ANDAs other than the first one must be delayed by 180 days, counting from the earliest of several statutorily defined trigger dates. 21 U.S.C. § 355(j)(5)(B)(iv). The resulting potential head start for the first Paragraph IV ANDA filer against other generic competitors (commonly but imprecisely referred to as the "generic exclusivity" period) is an important statutory incentive for companies to pursue Paragraph IV challenges. However, as reflected by the plain language of the statute, which does not include the word "exclusivity" in any of the pertinent provisions, Congress did not intend to block market entry by other generic competitors indefinitely, even in situations where the first applicant had not yet begun marketing its product, nor did it intend to provide first Paragraph IV applicants with a vested ownership interest in a 180-day exclusive marketing period.

### D.    Establishing The Effective Date of Approval of Paragraph IV ANDAs ___ __ ___ ___ ___ ___ ___

The effective date of approval of a Paragraph IV ANDA is determined under 21 U.S.C. § 355(j)(5)(B), and can be affected by the patent owner's response (if any) to the Paragraph IV Notification, the status of any ensuing litigation, and whether any previous

---

particular company's generic version of a drug has been found not to infringe the patent by reason of its technical characteristics, it is possible that other generic companies may not be able to compete if the non-infringing version of the drug is itself protected by patent or is otherwise unavailable to competitors.

Paragraph IV ANDA was filed for the drug.  The relevant portions of 21 U.S.C. §

355(j)(5)(B) provide as follows:

> *(B) The approval of an [ANDA] shall be made effective on the last applicable date determined under the following:*
>
> (i)      * * *
> (ii)     * * *
>
> (iii)    *If the applicant made a [paragraph IV] certification . . . the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided under paragraph (2)(B)(i) is received.  If such an action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of the notice provided under paragraph (2)(B)(i) or such shorter or longer period as the court may order because either party to the action failed to reasonably cooperate in expediting the action, . . . --*
>
> (I)      * * *
> (II)     * * *
> (III)    * * *
>
> *In such an action, each of the parties shall reasonably cooperate in expediting the action.  Until the expiration of forty-five days from the date the notice made under paragraph (2)(B)(i) is received, no action may be brought under section 2201 of title 28 for a declaratory judgment with respect to the patent.  Any action brought under section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.*
>
> (iv)    *If the application contains a [Paragraph IV]... certification and is for a drug for which a previous application has been submitted under this subsection continuing such a certification, the application shall be made effective not earlier than one hundred and eighty days after –*
>
> (I)      *the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or*
>
> (II)     *the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier.*

21 U.S.C. § 355(j)(5)(B).

These provisions govern the timing of effective approval of Paragraph IV ANDAs as follows. First, if no Paragraph IV Infringement Action is brought by the patent holder against a Paragraph IV ANDA applicant within 45 days of the receipt of the applicant's Paragraph IV Notification, approval of that applicant's ANDA must be made effective immediately upon satisfactory completion of FDA's substantive review of the ANDA, without regard to the patent, subject to any applicable 180-day delay period, as discussed infra.[6]  21 U.S.C. § 355(j)(5)(B)(iii).

If a Paragraph IV Infringement Action is brought within 45 days, FDA may "tentatively" approve the ANDA at any time, but the effective date of that approval is automatically stayed for 30 months to allow the courts time to decide the substantive issues (i.e., patent invalidity, unenforceability, non-infringement) raised in the applicant's Paragraph IV Notification.  21 U.S.C. § 355(j)(5)(B)(iii).  However, if the 30 months expire before a judicial resolution of the Paragraph IV Infringement Action, FDA must

---

[6]    Hatch-Waxman does not, however, prohibit a patent owner who has not sued a Paragraph IV challenger within the 45-day period from later bringing a traditional patent infringement suit against the challenger, based on post-approval sale of the drug, for damages, injunctive relief, and attorney's fees.  See 35 U.S.C. §§ 271(a), 281, 283 -285.  Indeed, the legislative history shows that the Paragraph IV procedures were specifically crafted with this possibility in mind.  See H.R. Rep. No. 857, 98th Cong., 2d Sess. 10, reprinted at 1984 U.S.C.C.A.N. 2686, 2694, (attached as Exh. H).

Thus, even though FDA may make approval of an ANDA effective immediately if the patent owner does not bring an action within 45 days, an applicant who actually markets its competing product without any prior judicial review of the patent runs a potentially enormous legal and financial risk.  As discussed in more detail below, an ANDA applicant therefore has strong incentives to bring a declaratory judgment action challenging the patent, so that it may seek to eliminate any potential patent infringement claims before actual marketing begins.

make the ANDA approval effective immediately, notwithstanding the ongoing litigation, subject to any applicable 180-day delay period.[7]  Id.

If a Paragraph IV applicant prevails in a Paragraph IV Infringement Action, its ANDA approval must be made effective on the date of the court's decision (again, subject to any applicable 180-day delay period) 21 U.S.C. § 355(j)(5)(B)(iii)(I).  If the patent owner prevails, the court must order FDA to make the applicant's ANDA approval effective no earlier than the patent expiration date.  21 U.S.C. § 355(j)(5)(B)(iii)(II).

For ANDAs that were not the first Paragraph IV ANDA to be filed for a particular drug, the 180-day delay provisions of section 355(j)(5)(B)(iv) must be applied in order to determine the effective date of approval.  That clause mandates that the effective date of such subsequent Paragraph IV ANDAs be delayed for 180 days, but, consistent with the Congressional intent to provide a "flexible schedule of ANDA approval effectiveness dates,"[8] the statute provides multiple pathways by which Paragraph IV ANDA applicants can trigger the start of the 180-day period.

Specifically, section 355(j)(5)(B) provides two scenarios under which a 180-day delay period may be triggered by the first applicant, and two scenarios in which a subsequent applicant may trigger the start of that 180-day period.[9]  The crux of this case lies in the fact that FDA has implemented only three of those four trigger points and, in

---

[7]     The court may, however, shorten or lengthen the 30 month period, thus expediting or further delaying final effective approval, if one of the parties fails to reasonably cooperate in expediting the action. 21 U.S.C. § 355(j)(5)(B)(iii). And, the court may also issue a preliminary injunction prohibiting the commercial manufacturing or sale of the generic product until such time as the patent issues are resolved. 21 U.S.C. § 355(j)(5)(B)(iii)(III).

[8]     See H.R. Rep. No. 857, 98th Cong., 2d Sess. 15, reprinted at 1984 U.S.C.C.A.N. 2686, 2699.

[9]     Thus, as noted supra, the statute, on its face, clearly does not guarantee the first applicant any period of "exclusivity," although first applicants who submit high quality ANDAs that can be

the wake of Mova, the non-implementation of the fourth statutory trigger now threatens

the viability of the entire Paragraph IV ANDA system. The three triggers FDA has

implemented are as follows:

- The date of the first applicant's first commercial marketing of the drug (the "Commercial Marketing Trigger"), 21 U.S.C. § 355(j)(5)(B)(iv)(I); 21 C.F.R. § 314.107(c)(1)(i);

- The date of a court decision, in a Paragraph IV Infringement Action against the first applicant, that the patent is invalid, unenforceable, or will not be infringed by that applicant's drug (the "Successful First Challenger Trigger"), 21 U.S.C. § 355(j)(5)(B)(iv)(II); 21 C.F.R. § 314.107(c)(1)(ii); and

- The date of a decision of a court, in a Paragraph IV Infringement Action against any subsequent Paragraph IV ANDA applicant, that the patent is invalid, unenforceable, or not infringed (the "Successful Subsequent Challenger Trigger"). 21 U.S.C. § 355(j)(5)(B)(iv)(II); *Guidance for Industry: 180-Day Generic Drug Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act,* Center for Drug Evaluation and Research, Procedural Guidance 5, June 1998 (hereinafter "Generic Exclusivity Guidance") (attached as Exh. J).[10]

The fourth trigger found in 21 U.S.C. § 355(j)(5)(B) – which FDA has thus far

failed to implement – must operate to start the 180-day effective date delay period, as

applied to a subsequent Paragraph IV ANDA, on:

- The date of a court decision, in a Hatch-Waxman Declaratory Judgment Action brought by any Paragraph IV applicant, that the patent is invalid, unenforceable, or will not be infringed by that applicant's version of the drug, or dismissing the action on "case or controversy" grounds (the "Declaratory Judgment Action Trigger"). 21 U.S.C. § 355(j)(5)(B)(iii),(iv).

---

approved without undue delay should usually be able to enjoy 180 days (or more) of actual exclusivity within the generic market.

[10]  The successful subsequent challenger trigger was first adopted on an adjudicatory basis by FDA in June 1997 in connection with the drug ranitidine, and the agency's action was upheld by the Fourth Circuit Court of Appeals in Granutec v. Shalala, 139 F.3d 889, 1998 WL 153410 (4th Cir. April 3, 1998) (unpublished opinion) (attached as Exh. I), and then re-affirmed in the Generic Exclusivity Guidance, in which FDA announced how it would amend its regulation to conform to the courts of appeals decisions in Mova and Granutec. FDA codified the amendments described in the Generic Exclusivity Guidance in an "interim final rule" on November 5, 1998, 63 Fed. Reg. 59,710-59,712 (attached as Exh. K).

As shown herein, FDA has throughout the 14-year life of the 1984 Amendments neglected to implement the Declaratory Judgment Action Trigger. That neglect has now led to administrative paralysis on the issue of the effective date of the approval of the ANDA for Teva's non-infringing ticlopidine product, and the necessity for this court to order FDA to establish February 10, 1999, as the effective date of Teva's ticlopidine ANDA.

## II.    THE DECLARATORY JUDGMENT ACTION TRIGGER IS NECESSARY TO GIVE FULL FORCE AND EFFECT TO THE STATUTORY PARAGRAPH IV CHALLENGE SYSTEM

FDA's non-implementation of the Declaratory Judgment Action Trigger is arbitrary and capricious and should be enjoined by this court. Application of the Declaratory Judgment Action Trigger as requested herein is consistent with the statute, has been expressly endorsed by the D.C. Circuit in Mova v. Shalala, and is necessary in order to effectuate the clear legislative purposes of the Paragraph IV challenge provisions and avoid absurd and unintended results.[11]

---

[11]    The D.C. Circuit's recent decision in Purepac Pharm. Co. v. Friedman, No. 98-5334, 1998 WL 898347 (D.C. Cir. Dec. 29, 1998) (attached as Exh. L), is in no way inconsistent with the relief requested herein. In that case, the Court upheld FDA's decision, in response to the Court's earlier Mova ruling, not to require that the first applicant even be sued by the patent owner under Hatch-Waxman in order to impose the 180-day delay period on subsequent ANDAs (as opposed to the invalidated prior requirement that the applicant must have been sued and have successfully defended such a lawsuit, in order to give rise to the delay period). The Court based its decision on the conclusion that FDA's post-Mova interpretation, as reflected in a Guidance Document and an interim final rule, was rational and consistent with the plain language of the statute. In contrast, the instant case concerns a completely distinct statutory issue as to which FDA has not issued any interpretative guidance or regulation.

**A.    The Declaratory Judgment Action Trigger is Mandated
By The Express Provisions Of The 1984 Amendments**

As noted supra, under the statute, an applicable 180-day delay period may begin

on "the date of a decision of a court **in an action described in clause (iii)** holding the

patent which is the subject of the certification to be invalid or not infringed . . . ." 21

U.S.C. § 355(j)(5)(B)(iv)(II) (emphasis added).  Importantly, "clause (iii)" describes two

types of actions – the Paragraph IV Infringement Action, and the Hatch-Waxman

Declaratory Judgment Action:

> (iii)    If the applicant made a [paragraph IV] certification . . . the approval shall
> be made effective immediately unless **an action is brought for infringement** of a
> patent which is the subject of the certification before the expiration of forty-five
> days from the date the notice provided under paragraph (2)(B)(i) is received [the
> Paragraph IV Infringement Action].  If such an **action** is brought before the
> expiration of such days, the approval shall be made effective upon the expiration
> of the thirty-month period beginning on the date of the receipt of the notice
> provided under paragraph (2)(B)(i) or such shorter or longer period as the court
> may order because either party to the action failed to reasonably cooperate in
> expediting the action, . . . --
>
> (I)      * * *
> (II)     * * *
> (III)    * * *
>
> In such an action, each of the parties shall reasonably cooperate in expediting the
> action.  Until the expiration of forty-five days from the date the notice made under
> paragraph (2)(B)(i) is received, no **action** may be brought under section 2201 of
> title 28 **for a declaratory judgment** with respect to the patent [the Hatch-
> Waxman Declaratory Judgment Action].  Any action **brought under section
> 2201** shall be brought in the judicial district where the defendant has its principal
> place of business or a regular and established place of business.

21 U.S.C. §355(j)(5)(B)(iii) (emphasis added).

Thus, under the unambiguous statutory terms, the running of an applicable 180-day delay period can be triggered by a subsequent Paragraph IV applicant on the earliest of the following:

- The date of a court decision, in a patent infringement action brought against the subsequent Paragraph IV applicant by the patent owner, that the patent is invalid, unenforceable, or will not be infringed by the subsequent applicant's version of the drug – i.e., the "Successful Subsequent Challenger Trigger;" or

- The date of a court decision, in a declaratory judgment action brought by the subsequent Paragraph IV applicant against the patent owner, that the patent is invalid, unenforceable, or will not be infringed by the subsequent applicant's version of the drug – i.e., the Declaratory Judgment Action Trigger.

21 U.S.C. § 355(j)(5)(B)(iv)(II).

## B. The Declaratory Judgment Action Trigger Has Been Endorsed by the D.C. Circuit in Mova

FDA's non-implementation of the Declaratory Judgment Action Trigger is all the more puzzling in light of the fact that the D.C. Circuit has already explicitly acknowledged the existence of this trigger. In the appeal of Mova v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998), Teva filed a brief amicus curiae, showing that implementation of the Declaratory Judgment Action Trigger is mandated by the statute, and explaining how its implementation would resolve the procedural problems that have arisen as a result of that court's subsequent invalidation of FDA's so-called "successful defense" regulation. After extensive discussion of the Declaratory Judgment Action Trigger at oral argument, and after considering a thorough amicus brief filed by another generic drug company opposing adoption of that trigger, the court concluded that the statutory interpretation supporting the trigger is "elegant and textually persuasive." Mova, 140 F.3d at 1073.

Moreover, the court observed that this trigger "provides a particularly appropriate

solution in cases in which the second applicant has done a better job of designing around

the pioneer drug manufacturer's patent than the first did: in such cases, the second

applicant should find it (relatively) easy to win a declaratory judgment action against the

patent-holder." Id.

> **C.     Dismissal of a Hatch-Waxman Declaratory Judgment Action
> on "Case or Controversy" Grounds Must Also Be Treated as a
> Court-Decision Trigger Under 21 U.S.C. § 355(j)(5)(B (IV) (II)**

As noted above, there is a clear statutory mandate that subsequent Paragraph IV

applicants should be able to bring a Hatch – Waxman Declaratory Judgment Action to

trigger the start of the delay period blocking effective approval of their ANDAs.

However, where a patent owner declines to bring a Paragraph IV Infringement Action,

and, in response to a Hatch-Waxman Declaratory Judgment Action, states its definitive

view that the Paragraph IV applicant's product does not infringe the patent, the court will

most likely refuse to rule on the merits, and instead will dismiss the action on "case or

controversy" grounds. Indeed, that is exactly what occurred in connection with Teva's

ANDA for ticlopidine.

In such a case, despite the fact that the matter was not actually litigated, the

court's dismissal of the action -- based on the patent owner's conclusive

acknowledgement of non-infringement-- is for legal and practical purposes a "decision"

of the court holding the patent not to be infringed. As such, it should trigger the 180-day

delay period under 21 U.S.C. § 355(j)(5)(B)(iv)(II). Such an interpretation is consistent

with the intent of the 1984 Amendments, the structure and substance of the overall

statutory scheme, and FDA's implementation of other related elements of that scheme which have been upheld by the courts. In addition, FDA's failure to implement this interpretation has produced, and will continue to produce, absurd results which render the relevant statutory provisions effectively null and void with respect to the very class of applicants for which they are primarily intended to be used.

A key component of the 1984 Amendments is the deliberate Congressional decision to ensure that the federal courts would exercise jurisdiction to decide the substantive patent issues involved in Paragraph IV challenges. Congress's concern was to ensure that the courts would not refuse to decide cases arising out of Paragraph IV challenges on "case or controversy" grounds because the issue for decision in such cases is whether the proposed future sale of the drug would infringe the patent.[12] Thus, Congress acted to allow the courts to decide such cases on the merits where such decisions are necessary to allow FDA to determine when a Paragraph IV ANDA approval may be made effective. See Eli Lilly v. Medtronic, 496 U.S. at 678 (the legislative intent "is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend."). Congress accomplished this by designating the filing of a Paragraph IV ANDA as an act of infringement, 35 U.S.C. § 271(e)(2), and by establishing the Paragraph IV Infringement Action and the Hatch-Waxman Declaratory Judgment Action as special types of court actions by which a Paragraph IV challenger's claims of patent invalidity, unenforceability, and/or non-infringement can be adjudicated long before any

---

[12]    The 1984 Amendments specifically exempted the manufacture and use of a patented drug from the traditional definition of infringement, 35 U.S.C. § 271(a), so long as such activities were conducted in connection with the submission of a marketing application to FDA. See 35 U.S.C. § 271(e)(1); Eli Lilly v. Medtronic, 496 U.S. 661 (1990). Thus, the only issue in a Paragraph IV Infringement Action is whether future commercial sales would infringe the patent.

actual commercial manufacture or sales of the generic product will occur. 21 U.S.C. §
355(j)(5)(B)(iii).

Fulfillment of the legislative purpose behind the Paragraph IV ANDA system
requires FDA to recognize the dismissal of a Hatch-Waxman Declaratory Judgment
Action on case or controversy grounds, especially when there has been a definitive
statement by the patent-holder of non-infringement and/or unenforceability, as triggering
the start of the 180-day period under 21 U.S.C. § 355(j)(5)(B)(iv)(II). Otherwise, the
system will be subject to manipulation in absurd and unintended ways. First, as a general
principle, case or controversy dismissals of Hatch-Waxman Declaratory Judgment
Actions are much more likely to come into play in those circumstances where the patent
owner has the weakest grounds for enforcing its patent. After all, the patent owner is the
party that controls whether a Paragraph IV challenger has a sufficient apprehension of
being sued -- and hence whether the court would find a case or controversy to exist.[13]
Thus, where the patent holder has "declined to create enough adversity to support a
declaratory judgment action," the clear legislative intent of Hatch-Waxman can only be
fulfilled by interpreting the statute so that generic "exclusivity" periods are triggered by a
case or controversy dismissal of a Hatch-Waxman Declaratory Judgment Action. See
Mova, 140 F.3d at 1073 (n. 18). Otherwise, owners of invalid, unenforceable, or non-
infringed patents could block generic competition by manipulating the very statutory

---

[13]    Indeed, as Syntex argued in its motion to dismiss Teva's Hatch-Waxman Declaratory Judgment
Action, a patent owner can render any declaratory judgment action moot simply by having its
attorney state that the company will not enforce its patent against the Paragraph IV challenger.
See Exh. E. (Syntex Memorandum in Support of Motion to Dismiss) at 7-8 ("counsel's statements
of non-liability [even after the Complaint is filed] 'removes from the field any controversy
sufficiently actual to confer jurisdiction over [a] case.'") quoting Super Sack Manufacturing Corp.
v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995), cert. denied 516 U.S. 1093 (1996)
(brackets added by Syntex).

provisions that were designed to allow generic competitors to defeat the patent in the first place – a truly absurd outcome. Yet that is precisely the nature of the potential loophole exposed following the Mova court's invalidation of the successful defense regulation, a potential loophole that can and should be closed immediately by this court's implementation of the Declaratory Judgment Action Trigger as requested herein with respect to Teva's ticlopidine ANDA.

The absurdity of not treating a case or controversy dismissal as a court decision trigger is even clearer in the specific context of the ticlopidine situation, in which multiple Paragraph IV ANDAs were filed, but the patent owner has declined to pursue a Paragraph IV Infringement Action against any challenger.[14]  Nevertheless, if the first Paragraph IV challenger (such as TorPharm in this instance) fails to secure substantive FDA approval, or decides -- perhaps in collusion with the patent owner -- to delay, or forgo entirely, its right to commercialize the drug, the only way for subsequent challengers' ANDAs to become effective is to satisfy the court decision trigger of 21 U.S.C. § 355(j)(5)(B)(iv)(II) through a Hatch-Waxman Declaratory Judgment Action, as Teva has done with ticlopidine.

In this case, however, because Syntex had admitted in writing that it has no legitimate basis to dispute Teva's claim of non-infringement, it moved to dismiss Teva's declaratory judgment action on case or controversy grounds, hoping to avoid a definitive court "holding" in Teva's favor, and thus to prevent Teva from satisfying the statutory

---

[14]    Syntex did initially file a Paragraph IV Infringement Action against one ticlopidine Paragraph IV applicant, Eon Labs Manufacturing, Inc., but that case was quickly withdrawn. The relevance (if any) of the resolution of that case to the instant action may be that the 180-day ticlopidine delay period should have been started even earlier than the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action, but that issue is not before the court, and need not be decided herein.

court decision trigger. FDA's failure to treat this dismissal as a triggering court decision under 21 U.S.C. § 355(j)(5)(B)(iv)(II) allows the indefinite blockage of legitimate generic market entry by patent holders who thwart the "judicial adjudication upon which the ANDA and paper NDA schemes depend," Eli Lilly v. Medtronic 496 U.S. at 678, by avoiding judicial confirmation of a Paragraph IV applicant's claim of non-infringement, invalidity, or unenforceability through a dismissal on case or controversy grounds. That result is emphatically contrary to the intent of the Act. Indeed, as the D.C. Circuit in Mova noted with respect to this precise scenario:

> After all, the purpose of the scheme set up by section 355(j)(5)(B) is to allow the patent-holder an opportunity to defend its patent. **If the patent-holder declines even to create enough adversity to support a declaratory judgment action, it might well be fair to deem the patent-holder to have conceded noninfringement, at least for purposes of the statutory scheme.** Certainly, there would be no danger in such a case that the patent-holder's failure to enforce its patent is attributable to a mistake.

140 F.3d at 1073-1074 (n. 18) (emphasis added). Thus, interpreting 21 U.S.C. § 355(j)(5)(B)(iv)(II) to allow such a dismissal to fulfill the court decision trigger is necessary and appropriate to effectuate the express statutory provisions and avoid clearly absurd results.

Indeed, any interpretation that does not treat a case or controversy dismissal as a court decision trigger necessarily imputes to Congress the intent to allow holders of invalid and non-infringed patents to thwart the very statutory mechanisms Congress created to allow ADNA applicants to avoid market blockage by such patent holders.

D.    **A Case or Controversy Dismissal is Equivalent To a Judgment of Unenforceability, and Should Trigger the Start Of a Paragraph IV Applicant's 180-Day Delayed Effectiveness Period**

Treating a case or controversy dismissal of a Hatch-Waxman Declaratory

Judgment Action as a court decision trigger under 21 U.S.C.§ 355(j)(5)(B)(iv) is

independently supported by the fact that such a dismissal, the circumstances of this case,

is the functional equivalent of a finding that the patent is unenforceable against the

Paragraph IV challenger, a type of finding that both the Federal Circuit and FDA have

concluded is a valid basis for a Paragraph IV challenge. See Merck v. Danbury, 694

F.Supp. 1 (D.Del. 1988), aff'd 873 F.2d 1418 (Fed. Cir. 1989); 21 C.F.R. §

314.107(a)(12)(i)(4).  Indeed, it is significant and appropriate that FDA implemented the

unenforceability provisions on its own initiative, without providing an opportunity for

public comment, based on the Federal Circuit decision in Danbury.  As stated in the

preamble to FDA's final regulations:

> The agency, on its own initiative, has also amended § 314.50(i)(1)(i)(A)(4) and § 314.94(a)(12)(i)(A)(4) (21 CFR 314.94(a)(12)(i)(A)(4)) to include a reference to unenforceable patents. As proposed, these provisions would have required applicants to certify that a patent is invalid or will not be infringed by the manufacture, use, or sale of the drug product that is the subject of the application. The agency has revised these certification statements to clarify how an applicant challenging a patent as unenforceable should word its paragraph IV certification. Although the agency realizes that courts have, in patent cases, distinguished invalid patents from unenforceable patents, the only court addressing the issue of unenforceable patents in the context of the provisions of section 505 of the act interpreted the phrase "invalid or not infringed" to include an unenforceable patent. (See Merck v. Danbury Pharmacal, Inc., 694 F.Supp. 1 (D. Del. 1988), aff'd, 873 F.2d 1418 (Fed. Cir. 1989) (applying section 505(j)(4)(B)(iii) of the act).) The agency agrees with the court's construction of the act. The alternative interpretation, precluding applicants challenging patents as unenforceable from filing certifications under paragraph IV, would be contrary to Congress' obvious intent in allowing patent challenges under section 505 of the act and would lead to absurd results. Subsequent to the Merck decision [but before the promulgation of

any regulation], the agency has accepted paragraph IV certifications from applicants challenging patents as unenforceable.

59 Fed. Reg. 50,338, 50,339 (Final Rule, October 3, 1994).

With respect to ticlopidine, the California court's dismissal of Teva's Hatch-Waxman Declaratory Judgment Action based on Syntex's post-complaint admission of Teva's non-infringement means that there is no longer any "case or controversy" as to the infringement or enforceability issues because Syntex now acknowledges non-infringement. This decision thus must constitute a "holding" of non-infringement and/or unenforceability of the patent under the FFDCA for purposes of triggering the 180-day delay being applied to Teva's ANDA. See 21 U.S.C. § 355(j)(5)(B)(iv); and and 21 C.F.R. § 314.94(a)(12)(i)(A)(4). Moreover, under analogous circumstances involving a "case or controversy" dismissal, the Federal Circuit observed as a matter of patent law that: "'Having requested a declaration of non-infringement of the . . . patent claims, [the declaratory judgment plaintiff] for all practical purposes has won the case pleaded in its complaint.'" Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1483-1484 (Fed. Cir. 1998), (quoting Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 636 (Fed. Cir. 1991)).[15]

Moreover, the dismissal of this case based on Syntex's admission of non-infringement independently renders the patent unenforceable against Teva under the doctrine of estoppel and controlling federal caselaw. See Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995) (a party, such as Syntex here, is "forever estopped by its counsel's statement of nonliability. . . from asserting

---

[15] This case does not seek, nor does it require, that the court engage in any conclusive interpretation of the patent laws; it merely seeks to require FDA to appropriately apply the FFDCA, specifically 21 U.S.C.§ 355 (j)(5)(B).

liability . . ."). This fact also requires the agency to deem Teva's 180-day delay period to have started on August 14, 1998, because, as noted <u>supra</u>, both the Federal Circuit and FDA have concluded that unenforceability of a listed patent is an appropriate basis for approval of Paragraph IV ANDAs under the Hatch-Waxman patent challenge system. <u>See Merck v. Danbury</u>, <u>supra</u>. Thus, the 180-day delay clock currently blocking Teva's ticlopidine ANDA must be deemed to have started on August 14, 1998, and to expire on February 10, 1999.[16]

### E.    The Statutory Bases For The Declaratory Judgment Action Trigger Have Been Evaluated and Endorsed by FDA and Two Courts of Appeals

Court-ordered implementation of the Declaratory Judgment Action Trigger with respect to Teva's ticlopidine ANDA does not require any new-sprung statutory analysis or interpretation, and does not require notice-and-comment rulemaking, because the FDA and two U.S. Courts of Appeals have already reviewed and accepted the basic interpretative premises underlying the relief requested in this case.

#### 1.    Teva's Citizen Petition

The agency first adopted the "successful subsequent challenger trigger" on June 17, 1997, in apparent response to a citizen petition submitted on behalf of Teva, Docket # 97P-0080/CP1 (February 27, 1997) (hereinafter "Initial Petition"), (see Exh. N), requesting that FDA implement the statutory mandate that a first Paragraph IV applicant's 180-day "exclusivity" period can be triggered by the decision of a court in an

---

[16]    There is no need nor basis to apply 21 C.F.R. § 314.107(e)(2)(i) to deem the delay clock to have started on the date Teva's time to appeal the dismissal lapsed, because pursuant to 21 C.F.R. § 314.107(e)(1) this final decision is one from which no appeal can be taken by the patent holder, Syntex. Moreover, because Teva did not oppose the dismissal, Teva could not have appealed.

action other than one in which that first applicant is a party. The Initial Petition argued

that under the plain language of the statute, 21 U.S.C. § 355(j)(5)(B)(iii), the running of a

previous applicant's "exclusivity" period may be started by an appropriate decision of a

court in either: (1) a Paragraph IV Infringement Action against a subsequent applicant, or

(2) a Hatch-Waxman Declaratory Judgment Action brought by a subsequent Paragraph

IV applicant against the patent owner.

In applying this statutory analysis to the multiple pending ANDAs for generic

ranitidine, FDA concluded that --

> the 180 day exclusivity period [is triggered] with a decision of _any_ court in
> a patent infringement action related to a paragraph IV certification finding
> the patent invalid or not infringed whether or not it is the court hearing a
> patent infringement action resulting from the first paragraph IV
> certification.

FDA letter to Genpharm, Inc., June 17, 1997 at 2. (emphasis in original) ("FDA
Ranitidine Letter") (attached as Exh. O).

Accordingly, FDA granted, without notice-and-comment rulemaking, 180 days of

"exclusivity" to the first Paragraph IV ANDA challenger, Genpharm (which had not yet

successfully defended against a patent infringement action), but based the starting date of

that 180-day period on the date of "[t]he _first_ decision of a court in an action resulting

from a paragraph IV certification to a patent listed for ranitidine . . . ." FDA Ranitidine

Letter at 3 (emphasis added). In that instance, the first such court decision was the

decision of a Connecticut federal court that the ranitidine product of a subsequent

Paragraph IV applicant, Boehringer Ingelheim, would not infringe the applicable

ranitidine patent.[17] Id.

---

[17]    Pursuant to 21 C.F.R. § 314.107(e), FDA interpreted the date of the court decision to be the date
that the patentee's right to appeal the district court's ruling expired.

## 2.    The Granutec Decision

FDA's ranitidine exclusivity decision was immediately challenged in court by

Granutec Pharmaceuticals, which argued that pursuant to the existing "successful

defense" regulation, then contained in 21 C.F.R. § 314.107(c)(1), FDA should not have

granted Genpharm exclusivity because Genpharm had not yet successfully defended

against a Hatch-Waxman infringement action.[18]  Genpharm intervened to challenge

FDA's adoption of the Successful Subsequent Challenger Trigger.  On April 3, 1998, the

Court of Appeals for the Fourth Circuit ruled that the "successful defense" regulation was

invalid, and upheld FDA's exclusivity determination, based on the Successful Subsequent

Challenger Trigger.  Granutec v. Shalala, 139 F.3d 889, 1998 WL 153410 (4th Cir. April

3, 1998) (unpublished opinion).

Thus, in affirming FDA's adoption of the Successful Subsequent Challenger

Trigger, the Granutec court supported the basic statutory analysis presented here -- that

Hatch-Waxman includes "involuntary" triggers by which subsequent Paragraph IV

challengers can start the running of a previous challenger's 180-day exclusivity period.

As the court observed, a contrary interpretation, by which only a court decision involving

a first paragraph IV challenger could trigger the exclusivity period, would be "antithetical

to the very purpose of the exclusivity incentive and the entire ANDA regime."  Granutec,

1998 WL 153410 at **9.[19]

---

[18]    The now-revoked "successful defense" regulation, contained in 21 C.F.R. § 314.107(c)(1), required that in order to be eligible for an "exclusivity" period, the first Paragraph IV ANDA applicant must first win in defense of a Paragraph IV Infringement Action.  Unless and until such a successful defense became final, FDA would be free to grant effective approval to a subsequent Paragraph IV applicant who was not sued in a separate Paragraph IV Infringement Action.

[19]    Moreover, the Fourth Circuit's decision indicates that the agency's adoption of the Successful Subsequent Challenger Trigger is entitled to substantial deference, notwithstanding the absence of

### 3.    The Mova Decision and FDA's Regulatory Response

As discussed supra, shortly after the Granutec decision, the D.C. Circuit in Mova also ruled that the successful defense regulation was invalid as contrary to the express provisions of the statute.[20]  In response to these court decisions, FDA issued its Generic Exclusivity Guidance.  That Guidance re-affirmed the agency's adoption of the "successful subsequent challenger" interpretation, as first applied to ranitidine and upheld by the Fourth Circuit in Granutec, but did not refer to the Declaratory Judgment Action Trigger.

### F.    The Declaratory Judgment Action Trigger is Necessary to Effectuate the Overriding Legislative Intent To Expedite Approval And Marketing Of Affordable Generic Versions of Non-Patentable Drugs

In the wake of Mova and Granutec, FDA's failure to implement the Declaratory Judgment Action Trigger results in anomalous situations in which patent owners and first Paragraph IV ANDA filers are able to manipulate the Paragraph IV system to block legitimate generic competition by other Paragraph IV challengers.  Immediate court-ordered implementation of the Declaratory Judgment Action Trigger will effectuate the important Congressional policy choices underlying the 1984 Amendments by effectively eliminating significant procedural obstacles to an equitable and efficient Paragraph IV patent challenge system.

---

notice-and-comment rulemaking.  As the Court concluded, the Successful Subsequent Challenger Trigger "reflects the thoughtful judgment of the agency," Granutec, 1998 WL 153410 at ** 9.

[20]    As noted supra, on November 5, 1998, FDA formally revoked the successful defense regulation in response to the Mova and Granutec decisions.  63 Fed. Reg. 59,710.

The current situation with respect to Teva's ticlopidine ANDA illustrates this point perfectly. FDA has determined Teva's ticlopidine product to be safe, effective, and therapeutically equivalent to the branded drug Ticlid®, and on that basis has issued a tentative approval of Teva's ANDA. Unless the Declaratory Judgment Action Trigger is implemented, however, the 180-day delay period on effective approval of Teva's ANDA cannot and will not begin until TorPharm first commercially markets its ticlopidine product, which of course cannot occur unless and until TorPharm's ticlopidine ANDA is approved, and TorPharm makes the business decision to actually market the product. This situation creates the very real possibility that there will be no generic ticlopidine product on the market at all for an indefinite period that could even last until the expiration of the relevant patent in 2003 – despite the fact that there are (thus far) two independent, non-infringing generic ticlopidine products that are approved and ready to come to market now, but for the improper blockage imposed by FDA. This could happen for a number of reasons.

First, it is unknown when (or whether) TorPharm's ticlopidine ANDA will be approved by FDA. The TorPharm ANDA, it should be noted, was submitted many months prior to Teva's and Purepac's now-approved ticlopidine ANDAs, yet still has not succeeded in obtaining FDA approval. Until its ANDA is approved, TorPharm obviously cannot begin marketing its ticlopidine product, and thus cannot fulfill the Commercial Marketing Trigger. Without the Declaratory Judgment Action Trigger, the generic market for ticlopidine thus may be indefinitely held hostage to the apparent substantive weaknesses that have prevented TorPharm's ANDA from receiving FDA approval.[21]

---

[21]    This situation, in fact, exemplifies the disturbing potential that without the fail-safe mechanism of the Declaratory Judgment Action Trigger, less careful (or less scrupulous) generic applicants may,

Even if TorPharm does receive approval in the reasonably near future, there is nothing to prevent TorPharm – either prior or subsequent to that approval – from striking a deal with the patent owner to refrain indefinitely from marketing its generic version of ticlopidine in exchange for payment. This "generic capture" scenario has in fact already come to pass with respect to more than one generic drug.[22]

These kinds of delays in the availability of generic versions of ticlopidine obviously impose tremendous additional unnecessary costs upon patients, taxpayers, and private health care payors, directly contradicting the fundamental purposes of the 1984 Amendments. It is abundantly clear from the entire history and structure of the 1984 Amendments that their goal was to expedite and broaden the availability of generic drugs in order to lower health care costs, consistent with appropriate protections for patent owners' legitimate rights. It would utterly defy logic to assume that Congress intended the 180-day period provisions to be applied in ways that would defeat the underlying purpose of the 1984 Amendments as a whole. Rather, the only sensible understanding of this provision is that it was intended as a limited mechanism to spark additional diligence, speed, and aggressiveness on the part of generic applicants in clearing patent hurdles -- again, consistent with the broad underlying goal of expediting market access to generic drugs.

---

in order to obtain "first filer" status, rush to put together weaker or sloppier ANDAs that could then clog the approval pipeline, and, in so doing, indefinitely prevent subsequent, more meritorious generic products from coming to market.

[22]    For instance, in the case of the breast cancer drug tamoxifen, two separate manufacturers' generic versions of the drug are being kept off the market indefinitely by virtue of a deal between the first paragraph IV ANDA filer and the NDA holder/patent owner under which the first paragraph IV filer is not pursuing final approval of its ANDA, thereby preventing the 180-day delay clock from starting altogether. See FDA Docket No. 98P-0493/PSA1. Although the legal issues in that case are somewhat different, it clearly illustrates that "generic capture" is more than just a theoretical possibility.

Several courts, as well as FDA, have expressed serious concern about this issue. Indeed, FDA's main argument in support of the now-invalidated "successful defense" requirement in the Mova case was that without such a requirement, the way would be open to manipulation of the 180-day delay provision so as to delay or block generic market access. Both the District Court and the Circuit Court in Mova, while disagreeing with the "successful defense" interpretation, recognized the force of this underlying policy argument. As the District Court commented in response to this argument: "The operation of the statute on the facts of this case may appear to FDA to be unwise, and may appear to Mylan to be an invitation for abuse, but their remedy lies with Congress, not this Court." Mova Pharm. Corp. v. Shalala, 955 F. Supp. 128, 131 (D. D.C. 1997), aff'd 140 F.3d 1060 (D.C. Cir. 1998). And, as noted supra, the Circuit Court also recognized the potential policy dilemma posed by the removal of the successful defense requirement, but recommended a number of other solutions, including the very Declaratory Judgment Action Trigger advocated by Teva herein. Indeed, by providing a built-in fail-safe mechanism whereby a subsequent Paragraph IV applicant can unilaterally break the market stranglehold that could result from a first filer's willful or inadvertent failure to bring its product to market in a timely fashion, the Declaratory Judgment Action Trigger neatly solves the apparent problem that led the Mova District Court, in effect, to throw up its hands and suggest approaching Congress for relief.

As the above discussion shows, the serious potential problem of "generic capture" is resolved by the implementation of the Declaratory Judgment Action Trigger as requested herein. This provides significant support for such implementation in terms of Congressional intent and sound public policy. It is important to recognize, however, that

even if TorPharm obtained ANDA approval today and began marketing tomorrow, it would not change the fact that the correct legal interpretation of the statute requires implementation of the Declaratory Judgment Action Trigger. In other words, the fact that the Declaratory Judgment Action Trigger can avoid "generic capture" is strong independent support for the conclusion that Congress meant it to be implemented, but the actual presence of "generic capture" in any specific situation is not a prerequisite to the implementation of this trigger. Moreover, even if TorPharm began to market its ticlopidine product tomorrow, unless the Declaratory Judgment Action Trigger is implemented, FDA would still not allow Teva's product on the market for another six months, in violation of the law and to the great commercial detriment of Teva.[23]

In sum, contrary to the implicit assumption of the parties and the District Court in Mova, but as recognized by the Mova Circuit Court, Congress has already provided a solution to the "generic capture" problem, in the form of the Declaratory Judgment Action Trigger. And in light of the well-established maxim of statutory interpretation that a law must be interpreted so as to avoid absurd results plainly at odds with the intentions of its drafters, see Mova v. Shalala, 140 F. Supp. at 1068, and cases cited therein, good law and good logic – as well as sound public policy – plainly dictate that the Declaratory Judgment Action Trigger be applied here. This application, moreover, must include the "case or controversy" dismissal interpretation discussed above, so as not to be rendered practically null and void by patent owners' maneuvering to avoid litigating a Hatch-Waxman Declaratory Judgment Action, as occurred in this case.

---

[23]    The same is true, of course, with respect to Purepac's ticlopidine product.

### III.    THE INJUNCTIVE RELIEF REQUESTED HEREIN IS NECESSARY AND APPROPRIATE AT THIS TIME, AND THE COURT SHOULD NOT WAIT FOR FDA TO BEGIN NOTICE AND COMMENT RULEMAKING

It is Teva's understanding that FDA's failure to implement the Declaratory Judgment Action Trigger may derive, in part, from the agency's longstanding position that it lacks expertise in matters of patent law and its belief that such expertise is necessary to make a decision relating to the legal effect of the dismissal of Teva's Hatch-Waxman Declaratory Judgment Action. Although it is true that a key purpose of the Paragraph IV Infringement Action and the Hatch-Waxman Declaratory Judgment Action is to free FDA from having to decide patent disputes, and to allow the courts to make those decisions, see 54 Fed. Reg. 28,872, 28,909 (July 10, 1989) ("[T]he 1984 Amendments are plainly structured to allow any patent disputes to be litigated in federal court") (emphasis added), see also Eli Lilly, 496 U.S. at 678, in this situation FDA can no longer rely on the courts to render a patent determination in the form of a formal holding on the merits. That is because Teva's effort to obtain a judicial adjudication on the substance of its Paragraph IV Notification has ended in a dismissal, foreclosing the possibility of any further court action on the patent issues in Teva's ANDA.

Nevertheless, this case does not require FDA, or this court, to decide, as a matter of patent law, whether the dismissal of Teva's declaratory judgment action constitutes a binding judgment of non-infringement or unenforceability -- although it is clear that it does, see Fina Research, supra. Rather, this case presents the narrower question of whether the agency must treat such dismissals as a court decision trigger for purposes of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(j)(5)(B)(iv). As demonstrated herein, and as suggested by the D.C. Circuit in Mova, the answer is clearly that it must.

However, the agency's reluctance to decide what it perceives to be a patent law issue further demonstrates the necessity, and utility, of this court issuing the injunctive relief requested herein. The FDA will thereby be relieved of the burden of reconciling its hands-off policy in patent law matters with the perceived patent-related issues presented by the Declaratory Judgment Action Trigger. Moreover, FDA must address the Declaratory Judgment Action Trigger one way or another in the rulemaking it is preparing, and its decision will most likely be the subject of subsequent litigation in this court. Teva, however, faces the immediate threat of irreparable harm if the issue of its right to begin marketing ticlopidine on February 10, 1999 is not resolved expeditiously by this court in this action. Thus, it is necessary and appropriate for this court to order FDA to implement the Declaratory Judgment Action Trigger as requested herein.

It is clear that FDA could, if it chose, implement the Declaratory Judgment Action Trigger by way of an adjudicatory determination of the starting date of the 180-day ticlopidine delay period, as the agency did with respect to ranitidine, which procedure was upheld by the Fourth Circuit in Granutec, see section II.E supra. Alternatively, FDA could have issued a Guidance for Industry and/or an interim regulation announcing its implementation of the Declaratory Judgment Action Trigger, as it did with respect to revoking the "successful defense" regulation, which procedure was recently upheld by the D.C. Circuit in Purepac v. Friedman. Because the agency could have taken action to implement the Declaratory Judgment Action Trigger without full notice and comment rulemaking, there should be no barrier to this court deciding the underlying statutory issues involved and ordering FDA to immediately implement the Declaratory Judgment Action Trigger with respect to Teva's ticlopidine ANDA in accordance with that



statutory analysis. As discussed below, such an order is warranted because Teva satisfies the four-prong test required to support a preliminary injunction.

## IV.    THE REQUESTED INJUNCTION IS WARANTED IN THIS CASE

As demonstrated by the foregoing, Teva is likely to succeed on the merits of this case. In addition, as discussed below, Teva will be irreparably harmed if the court does not enter the requested injunction. Moreover, issuance of the injunction will not cause any cognizable harm to FDA or any other interested party, but will directly and significantly further the public interest in the faithful application of the laws and in the greater availability of generic versions of ticlopidine.

In this Circuit, a litigant is entitled to a preliminary injunction if it demonstrates:

1) a substantial likelihood of success on the merits,

2) that it would suffer irreparable injury if the injunction is not granted,

3) that an injunction would not substantially injure other interested parties, and

4) that the public interest would be furthered by the injunction.

Mova v. Shalala, 140 F.3d at 1066. And, although the court must balance the parties' showings in each of those areas, id., Teva has in this case demonstrated that each of the factors weighs most heavily in favor of the requested injunction.

## A.    Teva Has Demonstrated A Strong Likelihood Of Success

The substantive arguments set forth hereinabove demonstrate that Teva has a strong likelihood of success on the merits, and is therefore entitled to the injunction requested.

### B.    Teva Will Be Irreparably Injured If The Requested Injunction Is Not Granted

Teva filed its Paragraph IV ANDA for ticlopidine over 18 months ago, in June 1997, and received tentative approval in October 1998. In the interim, the D.C. Circuit decided Mova, thus significantly clouding the issue of how FDA would implement the statutory 180-day delay period. In order to avoid precisely the market blocking effect now seen as a result of the Mova decision, Teva filed its Hatch-Waxman Declaratory Judgment Action in June 1998, expending a considerable amount of money and time in order to comply to the best of its ability with the express statutory provisions that permit such actions to be brought in order to trigger the start of any applicable 180-day effective approval delay. As discussed above, after that case was dismissed due to the lack of any dispute over Teva's non-infringement of the patent at issue, Teva notified FDA of the court decision and made numerous unfulfilled requests to meet with the agency regarding its willingness to implement the statutory Declaratory Judgment Action Trigger provisions. Teva has thus made an extraordinary investment of time and resources in pursuing effective approval of its ticlopidine ANDA, all of which will be lost unless this court orders FDA to do what it is obligated to do – faithfully implement the laws, and in particular, the statutory Declaratory Judgment Action Trigger.

As described in the accompanying declaration of Carole Ben-Maimon, M.D., Teva will also be irreparably harmed by any further delay in obtaining the requested

relief. Preparing a newly approved pharmaceutical product for marketing and distribution is a costly and significant undertaking. Such preparation involves, among other things, manufacturing of adequate quantities of product to supply the expected market demand; printing labels for such product; preparing trade materials; and negotiating commercial contracts. These activities involve substantial commitments of time, money and planning.

Uncertainty about the date of market entry severely disrupts this preparation process. Because pharmaceutical products such as ticlopidine must bear specific expiration dates that are dated from the date of manufacture, if Teva manufactures product now in anticipation of a February 10 market entry, but such entry is delayed significantly beyond that date, that product's viable shelf life will be curtailed, reducing its commercial saleability. On the other hand, if Teva does not manufacture product now, it will not have sufficient product to supply market demand at the time of its market entry, due to long manufacturing lead times. This would result in permanent loss of market share to competitors in the generic ticlopidine market.

In addition, the uncertainty as to the date of market entry significantly interferes with Teva's ability to enter into effective commercial discussions with potential customers, including drug wholesalers, pharmacy chains, hospitals, and others. As a result, Teva will not be able to enter into sales contracts with these potential customers in enough time to begin timely shipments on the date of market entry.

As a result, unless this court grants the relief requested herein, Teva will suffer significant and irreparable financial harm in terms of both direct lost sales and lost opportunity to acquire market share in the ticlopidine market.

**C.    Neither FDA Nor Any Other Interested Party Will Suffer Any Cognizable Harm If The Requested Injunction Is Granted**

**1.    FDA Will Not Be Harmed By The Requested Injunction**

Defendants FDA and Shalala (in her official capacity as Secretary of HHS) are a federal government agency and a cabinet-level Secretary respectively. The relief requested herein is simply an order that FDA and Shalala promptly and properly apply the statutory laws which govern the effective date of Teva's ticlopidine ANDA. As such they are incapable of being injured as a result of the court's granting of the requested order.

**2.    Neither TorPharm Specifically, Nor "First" Paragraph IV Filers Generally, Will Suffer Cognizable Harm By The Requested Injunction**

The order requested herein seeks nothing more than the faithful application of the statutory provisions governing the effective approval dates of subsequent Paragraph IV ANDAs. The order will not in any way diminish the rights of "first" Paragraph IV ANDA applicants, because as discussed above, the statute does not guarantee a 180-day period of generic "exclusivity" to the first filer, but rather, simply operates to delay by 180 days the effective date of subsequent Paragraph IV ANDAs, starting on the earliest relevant triggering event. Those first Paragraph IV applicants whose ANDAs are of high enough quality to avoid undue delays in FDA approval will almost always be able to enjoy a full 180 days of actual "exclusivity," but where, as here, the first applicant's ANDA is so problematic that its approval is delayed 6 months (or longer) beyond the

approval date of a subsequently filed ANDA, the applicant may well be unable to enjoy any period of exclusivity.

Such a result is fully consistent with the relevant statutory provisions (which nowhere use the term "exclusivity"), the FDA policy upheld in Granutec (which provided a shortened "exclusivity" period to the first Paragraph IV ANDA filer for ranitidine), and the clear legislative history showing that Congress sought to ensure that applicants who filed incomplete or "sham" ANDAs would not be allowed to initiate the Paragraph IV challenge process, and in turn, obviously, would not be able to benefit from the 180-day delay provisions.[24] Thus in this case, it is TorPharm's inability to obtain timely approval of its ANDA (for whatever reason) that may cause it not to be able to enjoy any actual "exclusivity" period, and because such a result is clearly consistent with the law, TorPharm should not be heard to argue that it will suffer any cognizable injury at all from entry of the injunction against FDA.

### 3.    Patent Owners Will Not Be Prejudiced in Any Way By Implementation of the Declaratory Judgment Action Trigger

The requested injunction ordering FDA to implement the Declaratory Judgment Action Trigger as requested herein will in no way harm the legally cognizable interests of patent owners or NDA holders such as Syntex and Roche, because this trigger can only come into play after a patent owner has been given at least two clear opportunities to enforce whatever rights it may have in the patent at issue – the right to bring a Paragraph IV Infringement Action, and the option to litigate the merits of a Hatch-Waxman

---

[24]    See H.R. Rep. No. 857, Part II, 98th Cong., 2d Sess. 24-25 (1984), reprinted at 1984 U.S.C.C.A.N. 2686, 2699 ("The Committee does not intend that applicants be permitted to circumvent this [Paragraph IV] notice requirement by filing sham ANDA's or ANDA's which are substantially incomplete.").

Declaratory Judgment Action.  Facilitating the use of the Declaratory Judgment Action

Trigger, in fact, will protect patent owners' interests by giving them additional notice,

after a Paragraph IV notification, that their patent is being challenged.  If they have the

legal ability and desire to enforce the patent, they may do so in defense of the declaratory

judgment action.  After the patent owner has waived two such opportunities, however, the

only fair conclusion is that the patent owner cannot or does not wish to enforce the

patent.[25]

### D.    The Public Will Be Served By The Requested Injunction

The relief requested herein will serve the public interest by accelerating the public

availability of generic versions of ticlopidine, at substantially lower prices than currently

prevail under Roche's de facto monopoly.  Moreover, because the relief requested herein

is necessary to bring FDA's regulatory policy into conformity with the express provisions

of the FDCA, the public interest will also thereby be served.

The public interest is clearly served by expediting the market entry of generic

ticlopidine by allowing Teva (and other sponsors of tentatively-approved ticlopidine

ANDAs) to begin marketing immediately upon the expiration of the applicable 180-day

regulatory delay period, which in this case is February 10, 1999.  See Boehringer

Ingelheim Corp. v. Shalala, 993 F. Supp. 1, 6 (D.D.C. 1997) (discussing the "public

interest in receiving generic competition to brand-name drugs as soon as is possible").

---

[25]    For example, Rule 11 of the Federal Rules of Civil Procedure may legally preclude some patent
owners from defending a declaratory judgment action on the merits, because such a defense might
require the patent owner to aver that the generic version of the drug would infringe the patent,
when in fact the patent owner may have already openly confessed non-infringement.

The D.C. Circuit has also recognized that the expeditious introduction of generic drugs

into the market is a matter of public health:

> Barr's interest, we may assume, is entirely commercial. But it makes
> money getting useful drugs into the hands of sick people . . . . [F]or
> poorer people – the users for whom access to generic drugs is most
> important – a pecuniary saving on drugs may have important health
> benefits. The difference between sinking, say, 3% and 20% of one's
> income into pharmaceuticals spells a large difference in the range of
> economically accessible food and shelter.

In re Barr Lab., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991).

Equally, there is a substantial public interest in requiring the agency to comply

with the governing statute and its own regulations. "[T]he public interest is served by the

lawful application of statutes and requiring an agency to act lawfully and within its

obligations under the APA." Boehringer Ingelheim, 993 F. Supp. at 3. See also Bracco

Diagnostics, 963 F. Supp. at 30 ("Requiring [FDA] to act lawfully is . . . very much in the

public interest."). As demonstrated herein, the regulatory loophole that exists without

FDA's implementation of the Declaratory Judgment Action Trigger violates both the

language and purpose of the FDCA, and threatens to render the Paragraph IV ANDA

process a practical nullity. Such a result must be prevented at the earliest possible

opportunity by the issuance of the injunction requested herein.


## CONCLUSION

The injunction requested herein is necessary in order to properly implement the

Hatch-Waxman Declaratory Judgment Action Trigger, and thus give full force and effect

to the statutory provisions of the FFDCA. Denial of the injunction will cause immediate,

concrete, ongoing, and irreparable harm to Teva and other generic drug companies who

are currently being denied important statutory rights under the 1984 Amendments, and to

the public, which is unlawfully being denied the important cost savings that would result

from early marketing of a generic version of this critical drug.

For the reasons set forth herein, this court should grant the requested injunction

and order FDA to establish February 10, 1999 as the effective date of Teva's ticlopidine

ANDA.


Respectfully submitted,

**TEVA PHARMACEUTICALS USA, INC.**


James N. Czaban (D.C. Bar #459211)
Geoffrey M. Levitt (D.C. Bar #936336)
David M. Malone (D.C. Bar #125047)
(Counsel of Record)

Venable, Baetjer, Howard & Civiletti LLP
1201 New York Avenue, NW
Suite 1000
Washington, D.C. 20005-3917
202/962-4800
Attorneys for Teva Pharmaceuticals, USA, Inc.

42