# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| | ) | Case No. 05-1469 (JDB) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| APOTEX INC., | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |
| | ) | |
| _____ | ) | |

## TEVA PHARMACEUTICALS USA, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS APPLICATION FOR INJUNCTIVE AND DECLARATORY RELIEF

Of Counsel:
Richard Egosi
*Senior Vice President & General Counsel*
David M. Stark
*Senior Director, Legal Affairs*
TEVA PHARMACEUTICALS USA, INC.
425 Privet Road
Horsham, PA  19044-8005
(215) 293-6400

Jay P. Lefkowitz (DC 449280)*
Pamela J. Auerbach (DC 447805)
Steven A. Engel (DC 484789)
Michael D. Shumsky
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC  20005
(202) 879-5000

*Counsel for Teva Pharmaceuticals USA, Inc.*

September 7, 2005

* *Counsel of Record*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................ii

INTRODUCTION ...........................................................................................................1

ARGUMENT.................................................................................................................2

THIS COURT SHOULD ENJOIN FDA FROM DEPRIVING TEVA OF THE
EXCLUSIVITY PERIOD UNDER THE HATCH-WAXMAN ACT. ........................................2

    A.    Teva Is Entitled To Judgment On The Merits. .........................................2

        1.    FDA's Decision Is Not Entitled To Deference. ...........................3

        2.    FDA's Decision Misinterpreted *Teva I* And *Teva II*. ..............6

        3.    FDA Mistakenly Concluded That The *Apotex* Dismissal Would
            Estop BMS From Enforcing Its Patent. .....................................9

        4.    FDA's Decision Impermissibly Interpreted The Hatch-Waxman
            Act...........................................................................................14

    B.    Teva Will Be Irreparably Injured If The Requested Injunction Is Denied. ...........17

    C.    The Balance Of Hardships and Public Interest Strongly Favor Entry Of An
        Injunction In This Case..........................................................................20

CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan, Inc. v. Shalala*,
No. 94-1223, 6 Food & Drug Rep. 389 (D.D.C. Nov. 10, 1994) ....................................19

*Am. Biosci., Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) ...........................................................................1, 4, 5

*Boehringer Ingelheim Corp. v. Shalala*,
993 F. Supp. 1 (D.D.C. 1997) ......................................................................................20

*Bracco Diagnostics, Inc. v. Shalala*,
963 F. Supp. 20 (D.D.C. 1997) ..............................................................................19, 20

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
339 F. Supp. 2d 52 (D.D.C. 2004) ...............................................................................18

*Bristol-Myers Squibb Co. v. Shalala*,
923 F. Supp. 212 (D.D.C. 1996) ..................................................................................20

*C.R. Bard, Inc. v. Schwartz*,
716 F.2d 874 (Fed. Cir. 1983) ...............................................................................10, 12

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ...............................................................................................3, 4

*CityFed Fin. Corp. v. OTS*,
58 F.3d 738 (D.C. Cir. 1995) ......................................................................................17

*CSX Transp. v. Williams*,
406 F.3d 667 (D.C. Cir. 2005) ....................................................................................18

*Dart Drug Corp. v. Schering Corp.*,
320 F.2d 745 (D.C. Cir. 1963) ....................................................................................13

*Davenport v. Int'l Bd. of Teamsters, AFL-CIO*,
166 F.3d 356 (D.C. Cir. 1999) ....................................................................................17

*DOJ v. FLRA*,
266 F.3d 1228 (D.C. Cir. 2001) ....................................................................................4

*Donovan v. U.S.P.S.*,
530 F. Supp. 894 (D.D.C. 1981) ....................................................................................8

*Dr. Reddy's Labs. v. Pfizer, Inc.*,
No. 03-CV-726, 2003 WL 21638254 (D.N.J. July 8, 2003) ...........................................18

*Entergy Ark., Inc. v. Nebraska*,
    210 F.3d 887 (8th Cir. 2000) ...................................................................18

*Experience Works, Inc. v. Chao*,
    267 F. Supp. 2d 93 (D.D.C. 2003) ...........................................................18

*Folio v. City of Clarksburg*,
    134 F.3d 1211 (4th Cir. 1998) ..............................................................3, 16

*Gulf Oil Corp. v. Dep't of Energy*,
    514 F. Supp. 1019 (D.D.C. 1981) .............................................................19

*Halderman v. Pennhurst State Sch. and Hosp.*,
    901 F.2d 311 (3d Cir. 1990) .....................................................................13

*In re Smith*,
    285 F.3d 6 (D.C. Cir. 2002) .......................................................................8

*Iowa Utils. Bd. v. FCC*,
    109 F.3d 418 (8th Cir. 1996) ...................................................................20

*Minnesota Mining & Mfg. Co. v. Barr Labs., Inc.*,
    289 F.3d 775 (Fed. Cir. 2002) .................................................................21

*Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*,
    826 F. Supp. 112 (D. Del. 1993) ..............................................................12

*Montrose Med. Group Participating Sav. Plan v. Bulger*,
    243 F.3d 773 (3d Cir. 2001) .......................................................................3

*Mova Pharm. Corp. v. Shalala*,
    140 F.3d 1060 (D.C. Cir. 1998) ...........................................................21, 22

*Mylan Laboratories, Inc. v. Thompson*,
    389 F.3d 1272 (D.C. Cir. 2004) .................................................................6

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) .............................................................20

*Mylan Pharms., Inc. v. Thompson*,
    139 F. Supp. 2d 1 (D.D.C. 2001) .............................................................20

*Nat'l Wildlife Fed'n v. Burford*,
    835 F.2d 305 (D.C. Cir. 1987) .................................................................21

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...................................................................................8

*Piper v. Chris-Craft Indus., Inc.*,
    430 U.S. 1 (1977) ....................................................................................................4

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ..................................................................................................4

*Sociedad Anonima Vina Santa Rita v. U.S. Dept. of Treasury*,
    193 F. Supp. 2d 6 (D.D.C. 2001) ..........................................................................18

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*,
    57 F.3d 1054 (Fed. Cir. 1995) ...............................................................................13

*Teva Pharms. USA, Inc. v. FDA (Teva I)*,
    182 F.3d 1003 (D.C. Cir. 1999) .............................................2, 3, 6, 7, 8, 9, 10, 11, 15, 16

*Teva Pharms. USA, Inc. v. FDA*, No. 99-67,
    1999 WL 1042743 (D.D.C. Aug. 19, 1999) .........................................................6, 7

*Teva Pharms., USA, Inc. v. FDA (Teva II)*,
    No. 99-5342, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000)..................5, 6, 7, 8, 9, 15, 16

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ...............................................................................12

*United Sweetener USA, Inc. v. Nutrasweet Co.*,
    760 F. Supp. 400 (D. Del. 1991) ............................................................................12

*Univ. of Great Falls v. N.L.R.B.*,
    278 F.3d 1335 (D.C. Cir. 2002) .............................................................................4

*W. Va. Ass'n of Comm. Health Ctrs., Inc. v. Heckler*,
    734 F.2d 1570 (D.C. Cir. 1984) .............................................................................2

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) .................................................................................13

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) ...............................................................................18

**Statutes**

21 U.S.C. § 355(j)(5)(B)(iv) .......................................................................................1, 14

21 U.S.C. § 355(j)(5)(B)(iv)(II)...................................................................................7

64 Fed. Reg. 42,873 (1999) .........................................................................................8

Fed. R. Civ. P. 65(a)(2)................................................................................................2

**Other Authorities**

FDA Center For Drug Evaluation & Research,
     *Guidance for Industry: Court Decisions, ANDA Approvals, and 180-Day Exclusivity
     Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act*
     (Mar. 2000), http://www.fda.gov/cder/guidance/3659fnl.pdf ...........................................14

## INTRODUCTION

The Food and Drug Administration ("FDA") cannot and does not deny that its decision has no tether to the words of the Hatch-Waxman Act:  the district court's unreasoned approval of Apotex's request to dismiss its own lawsuit in no way constitutes a "decision … holding" anything about the pravastatin patents, let alone that the patents are "invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv).   Nor does FDA deny that if the agency is correct, Teva's exclusivity period began to run more than a year before any generic product could have come to market and without any of the blocking patents having been cleared.  As in the D.C. Circuit's *Teva* cases, FDA does not articulate a coherent justification for reaching this absurd result. Instead—and without irony—FDA defends its action by simultaneously claiming that the *Teva* cases compelled its action here and that its interpretation of those cases warrants deference.

Nothing could be further from the truth.  Courts do not defer to agencies when agencies interpret court decisions.  *E.g.*, *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1085 (D.C. Cir. 2001).  Moreover, the agency's decision here not only misunderstands what the D.C. Circuit ***did*** in the *Teva* cases, but misapprehends what the D.C. Circuit ***said*** in those cases.  Ultimately, FDA's decision upsets the incentive-laden scheme Congress created to encourage generic entry into the pharmaceutical market and threatens to cost Teva hundreds of millions of dollars in irrecoverable lost revenues.  For the reasons articulated in Teva's opening brief and further set forth below, judgment should be entered for Teva.

**ARGUMENT**

**THIS COURT SHOULD ENJOIN FDA FROM DEPRIVING TEVA OF THE EXCLUSIVITY PERIOD UNDER THE HATCH-WAXMAN ACT.**

A.      **Teva Is Entitled To Judgment On The Merits.[1]**

As Teva explained in its opening brief, the D.C. Circuit's *Teva* decisions did not hold that dismissals for lack of subject-matter jurisdiction generally act as a court-decision trigger for Hatch-Waxman's statutory exclusivity period, let alone announce a rule that requires such a result on the very different facts of this case. *See* Teva Br. 16-20; 24-28. For everything else FDA has to say about the *Teva* cases, it concedes both of these points: "To be sure, exclusivity will not necessarily be triggered anytime a declaratory judgment action is dismissed for lack of jurisdiction … [and] Bristol's representations were not identical to Syntex's representations in *Teva I*." FDA Br. at 29. Those points, if nothing else, control the outcome here, because the D.C. Circuit's decision in *Teva I* —even if not purely procedural (although it was, *see* Teva Br. at 16-20)—was predicated on Syntex's **binding** representation that it would **never** sue Teva because "Teva's 'formulation … **does not infringe** the patent.'" *Teva Pharms. USA, Inc. v. FDA (Teva I)*, 182 F.3d 1003, 1008 (D.C. Cir. 1999) (quoting letter from Syntex to Teva) (emphasis supplied). BMS's representations here, by comparison, reflect only a **conditional** and **present**

---

[1] Although Teva initially moved for entry of a preliminary injunction, this Court has since consolidated that motion with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). *See* 8/9/05 Order. Accordingly, Teva must show actual success on the merits, along with the other factors traditionally encompassed within the preliminary injunction standard, in order to obtain a permanent injunction. *See W. Va. Ass'n of Comm. Health Ctrs., Inc. v. Heckler*, 734 F.2d 1570, 1578 (D.C. Cir. 1984).

intention not to sue Apotex.[2]  BMS never conceded the question of infringement or guaranteed Apotex that it would not bring suit in the future.  Thus, even if the *Teva* decisions do compel a particular construction of Hatch-Waxman's court-decision trigger, FDA erred in its application of those decisions.

### 1.    FDA's Decision Is Not Entitled To Deference.

Notwithstanding its perfunctory protests to the contrary, FDA's decision is not entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  As Teva's opening brief explained, as a matter of black-letter law, courts do not defer to an agency's application of judicial precedents or judge-made doctrines like estoppel.  *E.g.*, *Am.*

---

[2] Those points also dispose of Apotex's suggestion that Teva is "Judicially Estopped From Arguing That The Dismissal Order Here Is Not A Triggering Court Decision."  Apotex Br. 30; *see also* FDA Br at 28-29; 36-37.  Whatever position Teva took in the cases FDA purports to have applied here, nothing **Teva said there** bears on the legal question here: whether **FDA** properly interpreted and applied the resulting decisions **under the materially different facts in this case**.

Moreover, Teva cannot be held to legal arguments that the D.C. Circuit did not actually adopt in *Teva I* and *Teva II*.  Judicial estoppel applies only when a court actually adopts the position taken by a litigant, and, even then, only when the party takes inconsistent positions on factual—as opposed to legal—matters.  *E.g.*, *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 782 (3d Cir. 2001) (explaining that where "a party's initial position was never accepted by a court … it is difficult to see how a later change manifests an intent to play fast and loose"); *see also Folio v. City of Clarksburg*, 134 F.3d 1211, 1217-18 (4th Cir. 1998) ("In order for judicial estoppel to apply, (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) **the position must be one of fact instead of law**; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently.") (emphasis added).  The question here is **not** what Teva argued in past briefs, but what the Court of Appeals actually **held**.

Finally, the charges of inconsistency leveled against Teva are especially galling because both Apotex and FDA have **blatantly reversed their own positions** on the issues in this case, as discussed below, *see infra* pp. 14–16.

*Biosci.*, 269 F.3d at 1085 ("We, of course, owe no deference to an agency's reading of judicial

orders or decisions."); *see also Univ. of Great Falls v. N.L.R.B.*, 278 F.3d 1335, 1341 (D.C. Cir.

2002) ("We are not obligated to defer to an agency's interpretation of [judicial] precedent under

*Chevron* or any other principle.") (citation omitted); *DOJ v. FLRA*, 266 F.3d 1228, 1230 (D.C.

Cir. 2001) ("To the extent that the FLRA decision is simply an interpretation of [a judicial

decision] we owe [it] no deference.").  Indeed, this has been the settled rule for more than sixty

years.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 89-90 (1943) ("Since the Commission professed

to decide the case before it according to settled judicial doctrines, its action must be judged by

the standards which ... would be enforced by a court...."); *see also Piper v. Chris-Craft Indus.,*

*Inc.*, 430 U.S. 1, 42 n.27 (1977) ("[T]he agency['s] ... presumed 'expertise' in the securities-law

field is of limited value when the narrow legal issue is one peculiarly reserved for judicial

resolution, namely whether a cause of action should be implied by judicial interpretation....").

       This rule makes sense.  Deference to administrative decisionmaking stems from the

recognition that Congress often entrusts the "accommodation of conflicting policies ... to the

agency's care," and the firm belief that courts must respect politically accountable agency

decisionmaking where "a full understanding of ... the given situation ... depend[s] upon more

than ordinary knowledge."  *Chevron*, 467 U.S. 844-45.  But when an agency seeks to interpret

and apply judicial precedent, there are no "manifestly competing interests" for it to reconcile,

and its administrators possess no "great expertise" relative to federal judges.  *Id.* at 865.  In light

of the established bases for deference, and their absence here, it is unsurprising that FDA

***completely avoids*** discussing any of the authorities Teva cited for the rule that courts do not

defer to agency interpretations of judicial decisions:  its response brief cites just one of those

cases, and only for the singularly underwhelming proposition that the Federal Food, Drug and

Cosmetic Act ("FDCA") is a "'complex'" statute.  FDA Br. 20 (quoting *Am. Biosci.*, 269 F.3d at 1079).[3]

   These cases, however, preclude any deference to FDA here.  FDA's brief makes clear that its entire decision rested on its interpretation of the *Teva* decisions, not on the agency's interpretation of ambiguous statutory text.  Indeed, FDA's brief admits that fact nearly a dozen times.  FDA Br. 1 ("FDA has … tried to apply ***the Teva rule*** in a clear and bright-line manner.") (emphasis added);  *id.* 2 ("FDA firmly believes ***it has correctly applied Teva to the facts of this case***.") (emphasis added);  *id.* 21 ("***FDA in this case did not devise the rule articulated by the court in the* Teva *cases*** and initially did not agree with it, [but] has conformed its practice to the interpretation of the statute ***set forth by the D.C. Circuit***.") (emphasis added);  *id.* 13 ("Since issuance of the D.C. Circuit's *Teva II* decision, ***FDA has adhered to the court's ruling and consistently employed the analysis set forth by the court*** when called upon to determine whether an exclusivity period has been triggered by a decision of a court.") (emphasis added);  *id.* 8 ("***The Teva decisions are central*** to FDA's interpretation and application of the court decision trigger ***in this case***.") (emphasis added);  *id.* 22 ("***FDA reached [its] conclusion by applying the statute as construed in the D.C. Circuit's* Teva *decisions***.") (emphasis added);  *id.* ("FDA Properly ***Applied Applicable Precedent*** In Its Determination That Exclusivity Was Triggered.") (emphasis added);  *id.* 24 ("***In this case, FDA followed the D.C. Circuit's directive***.") (emphasis added);  *id.* 29 ("Where, as here, the dismissal of a declaratory judgment action has a preclusive effect, ***Teva***

_____

[3] Apotex, also, does not address these cases.  Instead, it relies on generic statements from cases in which courts have deferred to an agency's construction of ambiguous statutes.   Apotex Br. at 26.  These cases cannot have any application here, in light of FDA's statements about the nature of its decisionmaking below.

*clearly directs FDA to treat the order of dismissal as a court decision that triggers the start of exclusivity* under the statute.") (emphasis added); *id.* 31 ("When a patentee is estopped by its assurances from suing, … *under* **Teva I***, the court decision trigger applies*.") (emphasis added). Given FDA's explicit and oft-repeated statements concerning the basis for its decision, the agency's claim that its bare citations to the underlying statute warrant deference rings particularly hollow. *See* FDA Br. at 26.[4]

### 2.    FDA's Decision Misinterpreted *Teva I* And *Teva II*.

According to FDA, the D.C. Circuit's *Teva* cases established a binding interpretation of the Hatch-Waxman Act that required FDA to reach the result it did in this case. For all its discussion of the *Teva* cases, FDA Br. at 7-12, 22-24, 27-29, however, FDA barely acknowledges what the D.C. Circuit actually did in *Teva I*: **vacate** FDA's decision "for want of reasoned decisionmaking" and ***decline to hold*** that the Hatch-Waxman Act's court decision trigger provision required a particular result, either there or in future cases. *See Teva Pharms. USA, Inc. v. FDA*, No. 99-67, 1999 WL 1042743 at \*2. Indeed, *Teva I* is replete with language making clear that the D.C. Circuit was ***not*** engaged in an authoritative construction of the statute, but rather was concerned that FDA had not sufficiently justified its case-by-case application of the statute. *Teva I*, 182 F.3d at 1007 (D.C. Cir. 1999) ("[T]he FDA has offered no particular interpretation of that provision, relying instead on its authority to interpret the provision narrowly

---

[4] FDA's citation of *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004), is unavailing. In that case, FDA "was required to fill [a] statutory gap" and relied on an ***uncontested*** interpretation of a distinguishable judicial decision as support for its approach. *See id.* at 1284. Quite in contrast here, *Mylan Laboratories* did not involve a dispute over whether FDA properly distinguished and applied a prior judicial precedent, but one over whether it reasonably opted to analogize from that precedent in making policy. *Id.*

until it promulgates a new rule.  ***Without regard to how the FDA should address the issue in its***

***next rulemaking***, it is clear that the FDA, consistent with its statement that it would 'regulate

directly from the statute' on a 'case-by-case basis,' cannot avoid the merits of Teva's contention

that the California dismissal satisfies the 'court decision' requirement.") (citations omitted;

emphasis added); *id*. at 1009 ("This is the result that ***appears to be*** the purpose of the triggering

'court decision' provision…. For these reasons, the California dismissal ***would appear to meet***

the requirements of a 'court decision' under [21 U.S.C.] § 355(j)(5)(B)(iv)(II).  On remand, of

course, the ***FDA will have the opportunity to explain why it fails to meet them.***") (emphasis

added); *see also id*. at 1012 (recognizing several "plausible interpretations" of the "judicial

decision" trigger).

      Unable to take issue with this interpretation, FDA and Apotex seize on isolated

statements Teva made prior to *Teva II*, and suggest that the district court's opinion on remand

accordingly interpreted *Teva I* as having established that the court-decision trigger depends on

the preclusive effect of a patent-holder's promise to not sue.  *E.g.*, FDA Br. at 13 (quoting

remand opinion); Apotex Br. at 30-32.  But no matter what Teva or the district court believed

after *Teva I*, *Teva II* removed any doubt.  On remand from *Teva I*, FDA argued that

administrative convenience justified its decision to find a court-decision trigger based on a grant

of summary judgment, but not on the dismissal of a case on jurisdictional grounds.  The D.C.

Circuit, however, responded in *Teva II* by holding that FDA had not suitably explained how the

agency would be inconvenienced by having to conduct such an inquiry.  *Teva Pharms., USA,*

*Inc. v. FDA (Teva II)*, No. 99-5342, 2000 WL 1838303 at **1-2 (D.C. Cir. Nov. 15, 2000)

(quoting *Teva Pharms., USA, Inc. v. FDA*, 1999 WL 1042743 at *5) (emphasis added).  The

D.C. Circuit made clear that it had not imposed on FDA a binding interpretation of the "judicial

7

decision" trigger; indeed, the court warned that it did not intend to foreclose future statutory interpretation by the agency, cautioning that "[n]othing in this order … should be taken to express any view whatsoever on the FDA's current rulemaking proposal to establish an ANDA 'triggering period.' This rulemaking proposal is not before the court and it is not within the compass of this Judgment." *Id*. at *2 (citing 180–Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed. Reg. 42,873 (1999) (proposed Aug. 6, 1999)). Crucially, that proposed rulemaking rejected the interpretation of the statute that FDA now claims that the D.C. Circuit advanced:

> [T]he agency considered whether dismissal for lack of jurisdiction on the grounds that no 'case or controversy' exists because, for example, a party has no reasonable apprehension of a patent infringement action, could be considered a triggering court decision. The agency has rejected this interpretation of the statute.

*Id*. at 42,881. If *Teva II* had adopted a controlling interpretation of the statute, as FDA now claims, the Court of Appeals' express reservation of the rulemaking question and FDA's subsequent proposal would make no sense at all.

Given that the *Teva* cases explicitly declined to bind the agency to a fixed interpretation, defendants' judicial estoppel arguments necessarily fail. As noted above, that doctrine comes into play only when a court adopts the position advocated by a litigant, *supra* at p. 3 n.2; none of Apotex's cases is in tension with that principle. *See New Hampshire v. Maine*, 532 U.S. 742 (2001); *In re Smith*, 285 F.3d 6, 9 (D.C. Cir. 2002); *Donovan v. U.S.P.S.*, 530 F. Supp. 894 (D.D.C. 1981). *Teva I* and *Teva II* are clear in what they say (and do not say): there are a variety of "plausible interpretations" of the court-decision trigger, one of which "appears" to have been met, subject to FDA offering a reasoned basis for construing the statute otherwise, and without prejudice to FDA's right to take a contrary view. The only logical reading of these statements is

8

that *Teva I* and *II* did not set forth a definitive reading of the court-decision trigger and therefore do not obligate FDA to treat every dismissal for lack of subject-matter jurisdiction as triggering statutory exclusivity—much less hold that any such rule would apply on the facts of this case.

### 3.    FDA Mistakenly Concluded That The *Apotex* Dismissal Would Estop BMS From Enforcing Its Patent.

Despite FDA's claim that the *Teva* cases required the agency's decision here, FDA concedes in the very same breath that "exclusivity will not necessarily be triggered anytime a declaratory judgment action is dismissed for lack of jurisdiction … [and] Bristol's representations were not identical to Syntex's representations in *Teva I*." FDA Br. at 29. These concessions cannot be overstated: even based on FDA's misreading of *Teva I & II*, the agency admits that those cases do not compel the outcome that would flow from applying that mistaken interpretation of D.C. Circuit precedent. In fact, BMS's representations—which FDA concedes are "not identical" to those in *Teva I*—would not estop BMS from enforcing its patent against potential generic entrants. FDA thus has misapplied the law of estoppel.[5]

FDA argues that BMS's "commitment" to refrain from suit "is present on the face of the order" that accepts Apotex's voluntary dismissal, since the underlying stipulation stated that "'BMS repeatedly represented and assured Apotex that … it had no **intention** to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.'" FDA Br. 24 (quoting Apotex Stipulation at 3 (Tab D)) (emphasis supplied). That representation, however,

---

[5] To reiterate, FDA is not entitled to deference when it seeks to interpret and apply judicial doctrines like estoppel, as its putative application of the *Teva* cases required it do here. *See supra* Section A.1.

does not have *any* preclusive effect on BMS's right and ability to *eventually* bring suit against Apotex or any other generic producer of pravastatin sodium. It merely suggests that, at the time the stipulated dismissal was entered, BMS had no *current* plan to bring a lawsuit against Apotex—not that it *never would*. This crucial distinction between present and future intentions is precisely what the Federal Circuit recognized in *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983) (emphasis added):

> That affidavit said Schwartz had and has no intention of terminating the license agreement or suing for infringement. ***Intentions, however, may change over time***. Schwartz did not say that he would not terminate the agreement and would not bring an infringement suit. Thus, under the terms of his own affidavit Schwartz was free to terminate the agreement at a time of his choosing and institute an infringement action.

Though both FDA and Apotex attempt to distinguish *C.R. Bard* as having rested on the totality of the circumstances which included other (somewhat vague) factors, that claim is beside the point. In *C.R. Bard*, the declarant's affidavit was put forward in an effort to negate the declaratory plaintiff's fear of future suit on the ground that it would estop the declarant from instituting a future action. Given that it reflected only the declarant's present intent, the court squarely held that it was insufficient, on its own terms, to do so. *Id*. Defendants in this case put forward BMS's statements for precisely the same reason: to show that BMS is estopped from bringing suit. The representations in *C.R. Bard* were not sufficient to estop the declarant; therefore, the virtually identical representations of present intent here are not sufficient to trigger estoppel.

That simple fact demonstrates the fallacy of FDA's reliance on the *Teva* cases, because BMS's representations here—like the representations in *C.R. Bard*, but unlike the representations in *Teva*—do not actually foreclose the prospect of future suit. In *Teva I*, Syntex was precluded from *ever* suing Teva or any other generic entrant following the dismissal of that suit because

Syntex had asserted—in papers it submitted to the court in support of its motion to dismiss the underlying lawsuit, *Teva I*, 182 F.3d at 1009—that "Teva's 'formulation … does not infringe the patent.'" *Id*. at 1008 (quoting Syntex letter to Teva); *see also id*. at 1004 ("The California court dismissed the complaint for lack of subject-matter jurisdiction after finding, ***based on the patent holder's admission of non-infringement***, that Teva lacked a reasonable apprehension of suit by the patent holder.") (emphasis added); *id*. at 1008-09 ("[The court's] finding … that Teva 'lacks a reasonable apprehension of suit by Syntex for infringement of its patent' … could only have been ***based on*** the patent holder's declaration of counsel … that Teva's 'formulation … does not infringe' the patent … and its June 8th letter to Teva [stating] … that Teva's 'formulation did not warrant bringing a patent infringement action.'").  To arrive at its conclusion that BMS's "assurance that it had no intention to sue Apotex precisely tracks the *Teva* court's description of Federal Circuit law governing preclusion," FDA Br. at 24, FDA simply ignores that the D.C. Circuit singled out as the critical basis for that assurance: that Syntex made a judicial representation that there was no infringement and therefore no basis for any future suit.  The BMS representation that FDA singles out in this case differs from the decisive one in the *Teva* decisions, and the agency's failure to recognize the distinction between preclusive judicial admissions and non-binding assertions of present intention was error.

In an effort to shore up the shaky grounds for its action in this case, FDA now seeks refuge in a series of pre-suit BMS representations—representations to which the agency did not refer in its decision.  *See* FDA Br. 24-26 (discussing BMS's extrajudicial representations to Apotex); *see also* Apotex Br. 14-15, 19-20 (same).  B*ut see* Apotex Br. at 24 & n.11 (twice referring to such promises as having occurred in the course of "***non-binding*** correspondence

between counsel").  To the extent that the agency may properly rely on those statements to defend its decision, they do not support FDA's decision in this case.[6]

In those communications, BMS stated it "ha[d] 'no *intention*, now or in the future, of suing TorPham for infringement … so long as TorPham's previous representations about its proposed generic products remain accurate.'"  AR Tab 32 (tab C) ¶ 17 (quoting Decl. of Matthew P. Blischak).  There are at least two problems with FDA's reliance on those representations.  *First*, those statements reveal nothing beyond BMS's then-*present* intention not to sue Apotex.  BMS stated that it did not have a *present* intention to sue Apotex "now" and did not have a *present* intention to sue Apotex "in the future."  As *C.R. Bard* recognized, however, "[i]ntentions … may change over time," 716 F.2d at 881, and BMS's statements *expressly* left open the possibility that BMS could and would bring a suit against Apotex if conditions, or its intentions, changed in the future.  Those qualified statements, which were clearly intended to avoid a lawsuit with Apotex while preserving BMS's future litigation options, stand in marked contrast to the express judicial admission of non-infringement at issue in the *Teva* cases— admissions which foreclosed *any* possibility of a future lawsuit.[7]

---

[6] *E.g.*, *Troy Corp. v. Browner*, 120 F.3d 277, 293 (D.C. Cir. 1997) ("The EPA asserts that it also relied on a third study in which mice were exposed to DMP.  The proposed rule does not refer to the mouse study [and] [i]f the agency in fact relied on the mouse study its reliance is well hidden in the record.  We hold that the EPA's reliance on tests that were largely undocumented violates the agency's Guidelines and evidences arbitrary and capricious agency action").

[7] The qualified nature of BMS's representations here forecloses FDA's attempt to distinguish the holdings of *Mobil Oil Corp. v. Advanced Envtl. Recycling Tech., Inc.*, 826 F. Supp. 112 (D. Del. 1993) (holding that a "non-binding *qualified* admission of noninfringement" did not obviate the prospective entrant's reasonable fear of suit), and *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400 (D. Del. 1991) (holding that a conditional promise not to sue did not extinguish plaintiff's reasonable apprehension of suit).  In turn, these qualified representations clearly distinguish the circumstances here from *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57

(Continued…)

*Second*, and likewise in contrast to the representations at issue in the *Teva* cases, none of the pre-suit statements that FDA and Apotex now trumpet was referenced in the stipulation ordering dismissal here. This fact is crucial because, in contrast with adjudicated dismissals, the bases for judicial action in a stipulated dismissal are set forth *within* the stipulation itself. As the D.C. Circuit long ago explained in a related context:

> Consent decrees, as their name implies, are the result of an agreement, sometimes precedently expressed in formal stipulation, and sometimes solely in the decree itself. ***They are to be read within their four corners,*** and especially so because they represent the agreement of the parties, and not the independent examination of the subject-matter by the court. ***They are binding only to the extent to which they go.*** Neither court nor party can write in them what is not there, and thus change what was agreed upon between the parties.

*Dart Drug Corp. v. Schering Corp.*, 320 F.2d 745 (D.C. Cir. 1963) (quotation omitted; alteration in original); *see also Halderman v. Pennhurst State Sch. and Hosp.*, 901 F.2d 311, 318 n.9 (3d Cir. 1990) ("[A] Stipulation of Dismissal that is 'so ordered' by the district court is the functional equivalent, and has the same effect as, a consent order or consent decree."); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) ("A consent decree is essentially a settlement agreement subject to continued judicial policing.").

FDA and Apotex essentially ask this Court now to read new justifications not only into FDA's decision, *supra* at 9, but into the stipulated dismissal as well. The specific BMS pre-suit representations relied on by the defendants, however, were not part of the stipulation submitted to the district court, and therefore, did not constitute the sort of preclusive, binding judicial

---

F.3d 1054, 1056 (Fed. Cir. 1995) (emphasis added), in which the patentee represented that it would "***unconditionally*** agree not to sue … for infringement."

representations that were crucial in the *Teva* cases.  Because FDA misapplied its own misinterpretation of the *Teva* decisions, this Court should enter judgment for Teva.

### 4.    FDA's Decision Impermissibly Interpreted The Hatch-Waxman Act.

FDA decided that Apotex's stipulated dismissal triggered Teva's exclusivity based on the agency's misinterpretation of the *Teva* cases.  With that error exposed, FDA founders in explaining how to square its decision with the text of the statute.  Indeed, FDA offers only a half-hearted explanation of how the dismissal of a declaratory judgment action for lack of subject-matter jurisdiction on grounds wholly divorced from a finding of non-infringement possibly can be understood as a "***holding*** [that] the patent which is the subject of the certification [is] ***invalid or not infringed***," 21 U.S.C. § 355(j)(5)(B)(iv) (emphasis added).  Teva Br. 20-24; *see also id*. at 21-22 (observing that Hatch-Waxman does not identify stipulated dismissals as court decision triggers, the way it has with forfeiture provisions under the Medicare Modernization Act).

Rather than confront the text of the statute and its surrounding statutory scheme, FDA and Apotex instead focus on the purported inconsistencies between Teva's position here and in the prior *Teva* cases.  FDA Br. 38-39; Apotex Br. 27-28.  That claim does not advance the ball: Not only is Teva's position consistent through these cases, but as FDA acknowledges, the agency is guilty of the same charges of hypocrisy it levels against Teva.  *See* FDA Br. 1 ("FDA argued unsuccessfully ***against*** the standard adopted by the court in *Teva*….) (emphasis added); *id*. at 21 ("FDA in this case did not devise the rule articulated by the court in the *Teva* cases and ***initially did not agree with it***….) (emphasis added);  *see also* FDA Center For Drug Evaluation & Research, *Guidance for Industry: Court Decisions, ANDA Approvals, and 180-Day Exclusivity Under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act* at 2 (Mar. 2000),  http://www.fda.gov/cder/guidance/3659fnl.pdf ("[F]or the 180-day exclusivity to have

14

real meaning … the court decision triggering the exclusivity must be the one that finally resolves the patent infringement litigation related to the ANDA.").

Apotex's Janus-faced representations are even more galling than FDA's, because Apotex repeatedly argued in the *Teva* cases that a dismissal for lack of subject-matter jurisdiction could ***never*** be a judicial-decision trigger under the Hatch-Waxman Act.   *E.g.*, Apotex Br., *Teva Pharms. USA, Inc. v. FDA (Teva II)*, Nos. 99-5287 & 99-5342 (Tab A), at 10-11 ("A decision dismissing a declaratory judgment action because of the absence of a live controversy without addressing the validity of the patent ***does not satisfy the terms of the statute***.  The court decision addresses jurisdiction, not the patent's validity, and ***certainly does not*** 'hol[d] the patent … to be invalid of not infringed.'") (emphasis added; alteration in original); *id.* at 13 ("A subject matter dismissal … ***certainly does not*** constitute a 'holding' that the patent is 'invalid or not infringed.' Accordingly, the unambiguous terms of the statute dictate that the California Order does not satisfy the court decision trigger.") (emphasis added); *see also* Apotex Br., *Teva Pharms. USA, Inc. v. FDA* (*Teva I*), Nos. 99-5022 & 99-5027 (Tab B), at 13 ("Congress also specifically triggered the 180-day period with a court decision holding a patent invalid or not infringed, ***not*** simply any court decision resolving a case involving a patent.") (emphasis added);  *id.* at 15 ("The question is whether there is a decision of the court holding 'the patent … not infringed.' ***There is no such decision here***.") (emphasis added); *id.* at 15 n.8 ("The statute clearly ***requires a court to rule on the merits of infringement***.") (emphasis added);  *id.* ("Torpharm and Roche submit that ***the statute is clear and excludes all such court actions not including a holding of invalidity or non-infringement***."); *id.* at 14 ("Dismissal of a declaratory judgment action on jurisdictional grounds also ***does not result in a judicial decision*** finding the patent not infringed

or invalid.") (emphasis added; unattributed internal quotation omitted).[8]  These inconsistencies preclude Apotex's hypocritical attempt to assert "judicial estoppel" against Teva here.  *E.g.*, *Folio v. City of Clarksburg*, 134 F.3d 1211, 1218 n.3 (4th Cir. 1998) ("We note ironically that appellants maintained inconsistent positions in [the prior proceedings], essentially making the reverse arguments of the City….  Thus, appellants ask us to prohibit the City from doing precisely what they do so freely.  We decline.").  If any litigant has been seeking to have things both ways, it is Apotex.

Indeed, Teva argues here, as it did in *Teva I*, nothing more than that the Hatch-Waxman Act means what it says:  A judicial decision must either explicitly or implicitly say something about validity or infringement in order to trigger the 180-day exclusivity period.  In *Teva I & II*, Teva argued that a dismissal on jurisdictional grounds that is predicated on the patent holder's concession of non-infringement (and consequent promise of no future suit) should be deemed the functional equivalent of an implicit "holding" that the patent is "not infringed."  By contrast, where as here, the declaratory-judgment plaintiff requests a dismissal without any clear promise from the patent holder about the patent itself, the district court's judgment does not constitute a holding of anything at all about infringement or invalidity.

Despite FDA and Apotex's efforts to avoid the force of Teva's policy arguments by questioning Teva's consistency, the Court need not wade through past briefs to decide which of

---

[8] Apotex's alternative argument—that stipulated dismissals should be treated as "holdings" because Congress intended to speedily opening the market to generic competition, Apotex Br. at 26-27—overlooks what Congress actually *did* in the statute, *i.e.*, provide a 180-day period prior to the onset of generic competition in order to provide an incentive for market entry.  And its other policy-based claims overlook the systemic consequences of the rule it would adopt, which (by curtailing the Hatch-Waxman incentives) would drive generic manufacturers from the market and thereby reduce consumer savings.  *See generally* GPhA Br.; *see also infra* Section C.

the parties presents the most consistent and coherent picture of the policies underlying the Hatch-Waxman Act. The Generic Pharmaceutical Association ("GPhA") has offered the Court the generic industry's view of the impact of FDA's decision on the Hatch-Waxman landscape. GPhA, which represents both first filers and subsequent filers, GPhA Br. 1, commits itself to identifying and advancing the interests of the generic pharmaceutical industry as a whole. Its proposed filing both explains the importance of interpreting the statute according to its obvious meaning, and weighs the competing policy interests implicated by the parties' differing statutory interpretations. GPhA squarely endorses Teva's interpretation of the statute and its underlying legislative intent, emphasizing that FDA's decision in this case not only conflicts with the statute's text, but "would unsettle the incentive system of the Hatch-Waxman Act." *Id.* at 3-4.

### B.    Teva Will Be Irreparably Injured If The Requested Injunction Is Denied.

Teva has established that it will be irreparably harmed by FDA's decision to deprive it of the exclusivity period guaranteed by Hatch-Waxman.[9] But for its conclusory assertion that Teva's asserted injuries "are based on speculation," FDA Br. 41, FDA cannot and does not deny that, given the size of the market for pravastatin sodium, Teva's first-filer status for three pravastatin dosages is worth hundreds of millions of dollars. Marshall Decl. ¶¶ 7-9. FDA's failure to meaningfully contest the extent of Teva's anticipated financial loss is unsurprising: After all, the Hatch-Waxman exclusivity period is designed to provide a substantial financial

---

[9] It bears reemphasizing, in light of Teva's demonstration of success on the merits of its claim, that "[a]n injunction may be justified … where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995). In other words, the injunction "factors interrelate on a sliding scale and must be balanced against each other," *Davenport v. Int'l Bd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360-61 (D.C. Cir. 1999), with primacy going to the merits.

reward to "generic companies who take the greatest risk of being the first generic entrant on the market." *Dr. Reddy's Labs. v. Pfizer, Inc.*, No. 03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8, 2003).

Nor does FDA contest the fact that Teva's losses would be irrecoverable. Sovereign immunity bars Teva from recovering monetary damages from the agency. *E.g.*, *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) ("While it is well-established that the possibility that adequate compensatory or other corrective relief will be available at a later date weighs heavily against a claim of irreparable harm, it is of no avail in this case where the plaintiff will be unable to sue to recover any monetary damages against either Freddie Mac or OFHEO.") (internal quotation, citation, and alteration omitted); *see also Entergy Ark., Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000) ("The importance of preliminary injunctive relief is heightened in this case by the likely unavailability of money damages should the [plaintiff] prevail on the merits of its claims. Relief in the form of money damages could well be barred by [defendant's] sovereign immunity."); *cf. CSX Transp. v. Williams*, 406 F.3d 667, 674 n.7 (D.C. Cir. 2005) (accepting that irreparable injury exists where a plaintiff cannot recoup the $2-3 million cost of complying with a challenged regulation due to sovereign immunity, but finding rule inapplicable because D.C. does not enjoy sovereign immunity from damage suits).[10]

_____

[10] For this reason, FDA's chief cases—like *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and those cases which rely upon it, *e.g.*, *Sociedad Anonima Vina Santa Rita v. U.S. Dept. of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001); *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003)—are wholly inapposite. The rule announced in those addresses recoverable, not irrecoverable, economic losses. *Wisconsin Gas*, 758 F.2d at 674 ("[P]etitioners have premised their motions for stay upon unsubstantiated and speculative allegations of ***recoverable*** economic injury.") (emphasis added).

Indeed, even if Teva's potential monetary losses were recoverable from FDA, the "significant economic advantage to receiving first approval and being the first company to enter the market … can never be fully recouped through money damages or by 'playing catch-up.'" *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (citing *Allergan, Inc. v. Shalala*, No. 94-1223, 6 Food & Drug Rep. 389, 391 (D.D.C. Nov. 10, 1994), for the proposition that "'if a manufacturer of a product drops out of the market, its competitors are likely to gain sales, probably in some measure in proportion to their market share,' and that this sufficiently demonstrates irreparable harm").

FDA argues that "irrecoverable economic loss does not rise to the level of irreparable harm unless the financial injury is so great as to 'cause extreme hardship to the business, or even threaten destruction of the business.'" FDA Br. 40-41 (quoting *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981)). That is not what *Gulf Oil* held. Rather, *Gulf Oil* stated that "the injury must be more than simply irretrievable; it must also be **serious** in terms of its effect on the plaintiff." *Id.* at 1026. The prospective and irredeemable loss of hundreds of millions of dollars, coupled with the loss of what Teva already has invested in bioequivalence studies; manufacturing adequate quantities of product to supply the expected market demand during the exclusivity period; printing labels for such product; packaging such product; preparing trade materials; negotiating commercial contracts; and the disruption that FDA's decision has wrought on Teva's planning cycle, *see* Teva Br. 30-31, is nothing if not serious. Indeed, what is at stake for Teva here dwarfs the $75,000 at stake in *Gulf Oil*. *Gulf Oil*, 514 F. Supp. at 1024.[11]

---

[11] FDA's citations to the *Mylan* cases, FDA Br. at 41, are likewise unavailing. As this Court has noted, Mylan "all but conceded that its estimated lost revenues … will not cause serious damage to the company," because its alleged loss in sales was a mere three million dollars – less than

(Continued…)

Unrecoverable economic loss on this order of magnitude plainly constitutes the kind of irreparable harm sufficient to sustain entry of a permanent injunction. *E.g.*, *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss ... does qualify as irreparable harm.").

### C.    The Balance Of Hardships and Public Interest Strongly Favor Entry Of An Injunction In This Case.

FDA barely engages Teva's contention that subsequent ANDA filers, consumers, and insurers all stand to benefit from the requested injunction and the rule of law underpinning it. *See* Teva Br. 31-34. Indeed, FDA does not even attempt to respond to Teva's argument that all subsequent ANDA filers will benefit from the requested injunction. *See* Teva Br. 33-34. And with good reason: As GPhA's proposed *amicus* brief makes clear, FDA credibly could not do so. Ultimately, *every* generic manufacturer stands to gain from a faithful interpretation of the Hatch-Waxman Act—one that rewards first filers who challenge weak drug patents and thereby limits the market power of brand-name pharmaceutical companies. *See* GPhA Br. 4-6, 10-11; *see also Boehringer Ingelheim Corp. v. Shalala*, 993 F. Supp. 1, 3 (D.D.C. 1997) ("[T]he public interest is served by … requiring an agenc[y] to act lawfully."); *Bracco Diagnostics, Inc. v.*

---

one-half of one percent of total annual sales. *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) (citing *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996), for the proposition that "a loss of less than one percent of total sales is not irreparable harm"). In this case, Teva has alleged that it stands to lose some 100 times that much in sales or (proportionally to Teva's size) 10 times what was at stake in *Mylan*. And while Judge Urbina's decision in *Mylan Pharms., Inc. v. Thompson*, 139 F. Supp. 2d 1, 27-28 (D.D.C. 2001), is distinguishable for the simple reason that Mylan made no effort to argue that its losses would be "irretrievable," *id.* at 27, Teva respectfully submits that Judge Urbina erred in concluding that such a profound diminution in anticipated revenues and profits is somehow not "significant."

*Shalala*, 963 F. Supp. 20, 30 (D.D.C. 1997) ("[T]here is … a strong public interest in requiring an agency to act lawfully.").[12]

In turn, the public only stands to benefit from that regime.  By ensuring that generic producers are able to take advantage of Hatch-Waxman's chief reward, Teva's interpretation of the Act not only would preserve the incentive scheme Congress established, but it also would encourage the prompt production and distribution of inexpensive, high-quality drugs to consumers. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("The purpose of [Hatch-Waxman] is to provide a reward, in the form of an exclusivity period, to generic drug companies that are the first to … challenge pioneer drug companies' patents."); *see also Minnesota Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 778 (Fed. Cir. 2002) ("This provision is designed to provide an incentive, in the form of a 180-day period of marketing exclusivity, to [the first] ANDA filer.").

Blinded by myopic self-interest, Apotex argues that FDA's decision serves these goals here because it "open[s] up the market to full generic competition [on pravastatin] more quickly."  Apotex Br. 27.  But Apotex's view ignores the  systemic consequences of such a decision.  As GPhA's proposed brief explains, depriving generic manufacturers of their key incentive will "inevitabl[y]" lead "generic manufacturers that would have filed early ANDAs [to] sit on the sidelines until another generic manufacturer challenges the brand patents and opens the

---

[12] To that end, it goes without saying that FDA will not be harmed by entry of an injunction:  Its chief interest, too, lies in faithfully applying the law.  *See Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 327 (D.C. Cir. 1987) ("FLPMA created a scheme whereby BLM's management of public lands would be subject to specified procedures that mandate consideration of numerous factors. Thus, if BLM is violating those procedures, its revocations and terminations may not represent the proper balance of competing uses of public land. ").

gateway for generic entry.   As the ANDA filings drop off, *the rate at which generic pharmaceuticals come to market will also slow, harming the generic market, consumers, and insurers*."  GPhA Br. 11 (emphasis added).

To its credit, FDA really does not dispute the policy implications of its decision in this case.  Although it argues that its decision will help industry "make informed business decisions [about] whether to proceed with declaratory judgment actions [or] agree to a particular form of dismissal order," FDA Br. 43, *any* decision by FDA—regardless of whom it benefits—would help manufacturers "make informed decisions" about how FDA will address their actions.  The problem here, of course, is that FDA's decision does not establish a useful and clear rule for industry to follow.   Instead, FDA makes exclusivity turn on the metaphysic vagaries of preclusion doctrine, rather than on a simple inquiry into whether the underlying litigation resulted in a finding or admission of invalidity or non-infringement.  As this case demonstrates in spades, FDA's decision fosters uncertainty, breeds litigation, and threatens to seriously delay the production and marketing of generic drugs.

With no other argument available, FDA falls back on a cringe-inducing *ipse dixit*: that because "FDA is the government agency charged with implementing the statutory scheme governing exclusivity and the approval of generic drugs…, [it]s interest coincides with the public interest."  FDA Br. 43 (emphasis added).  That undoubtedly is true, but whether the agency's "interest coincides" with the public's bears no relation to whether its decision actually *advances* the public interest and should be permitted to stand.  *See Mova*, 140 F.3d at 1066.  Even the best-intentioned government efforts sometimes go astray, and FDA cannot really believe that its public-minded motives are sufficient to insulate its actions from judicial scrutiny.

In this case, FDA has failed to provide a single, rational explanation of how its decision actually furthers the public interest—much less how its decision to pronounce Teva's period of statutory exclusivity dead on arrival furthers congressional intent. The public interest factor of the balancing test for injunctive relief weighs decidedly in favor of granting Teva its requested injunction.

## CONCLUSION

For the foregoing reasons, Teva respectfully requests that the Court grant its motion for declaratory and injunctive relief.

Respectfully submitted,

____/s/_____

Of Counsel:                                 Jay P. Lefkowitz (DC 449280)*
Richard Egosi                               Pamela J. Auerbach (DC 447805)
*Senior Vice President & General Counsel*   Steven A. Engel (DC 484789)
David M. Stark                              Michael D. Shumsky
*Senior Director, Legal Affairs*            KIRKLAND & ELLIS LLP
TEVA PHARMACEUTICALS USA, INC.              655 15th Street NW, Suite 1200
425 Privet Road                             Washington, DC  20005
Horsham, PA  19044-8005                     (202) 879-5000
(215) 293-6400

                                            *Counsel for Teva Pharmaceuticals USA, Inc.*

September 7, 2005                            * *Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Teva Pharmaceuticals USA, Inc.'s Reply Memorandum in Support of Its Application for Injunctive and Declaratory Relief to be served via the District Court's Electronic Filing System (ECF) upon:

> Andrew Clark
> Office of Consumer Litigation
> U.S. DEPARTMENT OF JUSTICE
> P.O. Box 386
> Washington, D.C.  20044
>
> *Counsel for Defendants Food and Drug Administration,*
> *Michael O. Leavitt, and Lester M. Crawford*
>
> Arthur Y. Tsien
> OLSSON, FRANK AND WEEDA, P.C.
> 1400 16th Street, N.W., Suite 400
> Washington, D.C.  20036-2220
>
> *Counsel for Intervenor-Defendant Apotex Inc.*
>
> William A. Rakoczy
> Christine J. Siwik
> RAKOCZY MOLINO MAZZOCHI SIWIK LLP
> 6 West Hubbard Street, Suite 500
> Chicago, IL  60610
>
> *Counsel for Intervenor-Defendant Apotex Inc.*
>
> Theodore Case Whitehouse
> WILLKIE FARR & GALLAGHER LLP
> 1875 K Street, N.W.
> Washington, D.C.  20006-1238
>
> *Counsel for Amicus-Movant The Generic Pharmaceutical Association*

This 7th day of September 2005.

                                      _____/s/_____
                                        Steven A. Engel (DC 484789)
                                        KIRKLAND & ELLIS LLP
                                        655 15th Street NW, Suite 1200
                                        Washington, DC  20005
                                        (202) 879-5000