EXHIBIT 1

No. 05-48

IN THE

# Supreme Court of the United States

————————

Teva Pharmaceuticals USA, Inc.,

*Petitioner*,

v.

Pfizer, Inc.

————————

On Petition for a Writ of Certiorari
to the United States Court of Appeals
for the Federal Circuit

————————

**BRIEF *AMICUS CURIAE* OF THE GENERIC
PHARMACEUTICAL ASSOCIATION IN SUPPORT
OF PETITIONER**

————————

Thomas C. Goldstein
(Counsel of Record)
Amy Howe
Kevin K. Russell
GOLDSTEIN & HOWE, P.C.
4607 Asbury Pl., NW
Washington, DC 20016
(202) 237-7543

September 7, 2005

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................. i

TABLE OF AUTHORITIES....................................................... ii

INTEREST OF *AMICUS CURIAE*............................................ 1

STATEMENT OF THE CASE.................................................. 1

I.    Background to the Statutory Scheme ................................. 1

II.   The Instant Litigation And The Lower Court Rulings ........ 4

REASONS FOR GRANTING THE WRIT.............................. 7

I.    The Decision Below Is Contrary To This Court's Precedents Defining The "Case Or Controversy" Required By Article III Of The U.S. Constitution And Conflicts With The Precedent Of Other Circuits................. 9

II.   The Question Presented Is Vitally Important To Pharmaceutical Competition............................................. 16

CONCLUSION.................................................................... 20

ii

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Insurance Co.* v. *Haworth*, 300 U.S. 227 (1937) .... 11

*Apotex* v. *Pfizer*, 125 Fed. Appx. 987 (CAFC Apr. 11, 2005), *vacating and remanding as moot Torpharm, Inc.* v. *Pfizer*, No. 03-CV-990, 2004 U.S. Dist. LEXIS 11,930 (D. Del. June 28, 2004)............................................. 19

*Apotex* v. *Pfizer*, No. 04-CV-02539 (S.D.N.Y. Apr. 1, 2004), appeal pending, No. 05-1199 (CAFC) ...................... 18

*Arrowhead Industrial Water* v. *Ecolochem*, 846 F.2d 731 (CAFC 1988) ................................................................ 10, 15

*Bio-Technology Gen. Corp.* v. *Duramed Pharms., Inc.*, 174 F. Supp.2d 229 (D.N.J. 2001), rev'd, 323 F.3d 1356 (CAFC 2003) ................................................................ 17

*BP Chems.* v. *Union Carbide Corp.*, 4 F.3d 975 (CAFC 1993) .............................................................................. 3, 15

*Cardinal Chemical Co.* v. *Morton International*, 508 U.S. 83 (1993)............................................................................ 10

*Chesebrough-Pond's, Inc.* v. *Faberge, Inc.*, 666 F.2d 393 (CA9 1982)............................................................................ 12

*Dr. Reddy's Laboratories* v. *Pfizer*, No. 03-726, 2003 U.S. Dist. LEXIS 24,351 (D.N.J. July 8, 2003)........................... 18

*Eli Lilly & Co.* v. *Medtronic*, 496 U.S. 661, reh'g denied, 497 U.S. 1047 (1990)............................................................ 16

*EMC Corp.* v. *Norand Corp.*, 89 F.3d 807 (CAFC 1996)........ 14

*Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002), *vacating and remanding* 234 F.3d 558 (CAFC 2000) ................................................................ 8

*Geneva Pharm.* v. *GlaxoSmithKline*, 213 F. Supp. 2d 597 (E.D. Va. 2002), aff'd, 349 F.3d 1373 (CAFC 2003)........... 17

*Holmes Group* v. *Vornado Air Cir. Sys.*, 535 U.S. 826 (2002), *vacating and remanding* 13 Fed. Appx. 961 (CAFC 2001) ................................................................ 8, 11

iii

*Janssen Pharm. N.V.* v. *Eon Labs*, 374 F. Supp. 2d 263 (E.D.N.Y. 2004), aff'd, 134 Fed. Appx. 425 (CAFC 2005) .................................................................. 17

*Maryland Cas. Co.* v. *Pacific Coal & Oil Co.*, 312 U.S. 270 (1941)............................................................. 6

*Merck KGaA* v. *Integra Lifesciences I*, 125 S. Ct. 2372 (2005), *vacating and remanding* 331 F.3d 860 (CAFC 2003) .................................................................... 8

*Mutual Pharm. Co.* v. *Pfizer*, No. 03-CV-1116, 2004 U.S. Dist. LEXIS 4846 (D.D.C. Mar. 24, 2004)......................... 19

*Mylan* v. *Merck & Co.*, No. 05-cv-1416 (SHR) (M.D. Pa.) ..... 19

*Purdue Pharma L.P.* v. *Endo Pharmaceuticals*, 410 F.3d 690 (CAFC 2005) ................................................ 17

*Raines* v. *Byrd*, 521 U.S. 811 (1997) ........................................ 15

*Sallen* v. *Corinthians*, 273 F.3d 14 (CA1 2001)....................... 13

*Sherwood Medical Indus., Inc.* v. *Deknatel, Inc.*, 512 F.2d 724 (CA8 1975) ................................................... 12

*Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83 (1988) ...... 9

*United Christian Scientists* v. *Christian Science Bd. of Directors, First Church of Christ, Scientist*, 829 F.2d 1152 (CADC 1987)............................................... 12

### Statutes

21 U.S.C. 355(b)(1) ............................................................ 2, 13

21 U.S.C. 355(c)(2)............................................................. 2, 13

21 U.S.C. 355(j)(2)(A)............................................................. 1

21 U.S.C. 355(j)(5)(B)(iii)................................................... 2, 5

21 U.S.C. 355(j)(5)(B)(iv) ..................................................... 2

21 U.S.C. 355(j)(5)(C)............................................................ 3

35 U.S.C. 271(e)(2)............................................................. 2, 13

35 U.S.C. 271(e)(5)......................................................... 4, 9, 15

iv

## Other Authorities

AARP, Prescription Drug Costs And The Role Of Generic Drugs (Oct. 1, 2002), available at http://assets.aarp.org/rgcenter/health/rx_generic.pdf............ 20

Conf. Rep. No. 108-391 (2003) ................................................... 3

Dep't of Health and Hum. Servs. Task Force on Drug Importation, REPORT ON PRESCRIPTION DRUG IMPORTATION (Dec. 2004), available at http://www.hhs.gov/importtaskforce/Report1220.pdf (visited Sept. 7, 2005) ........................................................ 20

*Generics Key To Cost Control*, UPI, May 19, 2005 ................ 20

*Generics: FDA Announces Measures To Improve Generic Drug Access*, DRUG WEEK, Mar. 26, 2004 .......................... 20

Nat'l Inst. For Health Care Management, *A Primer: Generic Drugs, Patents, and the Pharmaceutical Marketplace* (June 2002), available at http://www.nihcm.org/GenericsPrimer.pdf ......................... 20

Steven Findlay, *Easy Way To Cut Costs Of Drugs: Generics*, USA TODAY, May 13, 2004, at 23A ................... 20

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Generic Pharmaceutical Association ("GPhA") represents over 120 companies that manufacture more than ninety percent of all affordable prescriptions dispensed in the United States each year, accounting for more than one billion prescriptions annually. GPhA accordingly has a significant interest in the proper construction of the so-called Hatch-Waxman scheme, which Congress enacted to speed the marketing of generic drugs while protecting the legitimate patent rights of brand-name drug companies.

## STATEMENT OF THE CASE

### I. Background to the Statutory Scheme

In the 1984 Hatch-Waxman Amendments to the federal patent and drug laws, Congress sought to ameliorate two substantial obstacles to the efforts of generic pharmaceutical manufacturers to compete against brand manufacturers. First, Congress created a streamlined process for FDA approval of generic drug products through which generic manufacturers may submit an Abbreviated New Drug Application (ANDA) demonstrating the bioequivalence of the so-called "pioneer" product and its generic equivalent. 21 U.S.C. 355(j)(2)(A).

Second, Congress adopted a scheme to expedite the litigation of patent disputes. Generic manufacturers, which seek to compete with a brand product already in the marketplace, often face the prospect of a patent infringement suit by the brand company. Such a suit, if successful, could result in debilitating liability if the generic drug were marketed but later found to infringe the patent. Thus, as Congress well knew, in cases of genuine doubt, generic manufacturers may decline to

---

[1] Pursuant to S. Ct. R. 37.6, *amicus* states that no counsel to a party authored this brief in whole or in part and that no person other than *amicus curiae* and its members made a financial contribution towards the preparation and submission of the brief. Letters reflecting the consent of the parties have been lodged with the Court.

2

launch their less-expensive products, even if the brand company's patent claims would ultimately have been rejected.

Congress accordingly created a statutory mechanism to permit early resolution of potential patent infringement claims against a new generic drug prior to its marketing. Under Hatch-Waxman, brand manufacturers must identify any patent for which "a claim of patent infringement could reasonably be asserted" against the maker of a generic equivalent. 21 U.S.C. 355(b)(1), (c)(2). FDA publishes that patent information in its "Orange Book." In turn, a generic manufacturer's submission of an ANDA challenging the validity, enforceability, or infringement of an Orange Book-listed patent constitutes a statutory act of patent infringement, vesting the federal courts with subject matter jurisdiction over an infringement suit. 35 U.S.C. 271(e)(2).

Congress contemplated that these provisions would resolve patent disputes soon after the ANDA is filed. To encourage generic companies to avail themselves of these new statutory provisions, Congress amended the statutory scheme in other ways as well. For example, Congress created an incentive for brand companies to bring a patent infringement claim promptly after learning of the ANDA filing. If a brand company initiates patent litigation within forty-five days of receiving notice of an ANDA applicant's challenge to its patent, FDA must defer approval of the generic product for thirty months. 21 U.S.C. 355(j)(5)(B)(iii).

Congress also encouraged generic drug development by providing that the owner of the first ANDA containing a challenge to a listed patent receives a 180-day period of marketing exclusivity against other generic competitors. 21 U.S.C. 355(j)(5)(B)(iv). Specifically, the FDA must defer approval of later-filed applications until 180 days after the earlier of two specified dates. *Ibid.* Particularly relevant here, a later generic applicant can trigger the start of this 180-day period by obtaining a judgment declaring the listed patent invalid, unenforceable, or not infringed. *Ibid.*

3

The Hatch-Waxman provisions were only a partial success, however. Through various tactics, brand manufacturers could use the exclusivity period granted to first ANDA filers to block later generic competitors out of the marketplace for years. Despite the thirty-month stay that would result if a brand company initiated suit within the forty-five-day Hatch-Waxman window, brand companies often had a substantial incentive to refrain from instituting litigation before the generic drug was brought to market. A judicial determination could backfire by producing a finding of non-infringement that would trigger the start of the 180-day exclusivity period, thereby allowing more generic companies to enter the market sooner. Moreover, declining to institute patent litigation could leave in place a cloud of patent uncertainty that delayed generic market entry longer than a patent suit itself.

District courts have often ruled that declaratory judgment actions must be dismissed for failure to satisfy the Federal Circuit's "reasonable apprehension" test. Even though Congress clearly contemplated that generic manufacturers would be permitted to resolve patent claims through a declaratory judgment suit against the patentee, the Federal Circuit, which has exclusive jurisdiction over patent appeals, has held that a declaratory judgment suit was impermissible unless the plaintiff itself faced a reasonable apprehension of suit from the patentee. *E.g.*, *BP Chems.* v. *Union Carbide Corp.*, 4 F.3d 975, 978 (1993). That rule rested on that court's "pragmatic" concern that merely obtaining a patent should not subject the patentee to litigation. *Ibid.*

In response to these continuing impediments, Congress enacted further legislation in 2003 "to prevent an improper effort to delay infringement litigation between generic drug manufacturers and pioneer drug companies." Conf. Rep. No. 108-391, at 836 (2003). As amended, the legislation provides that, if the brand manufacturer does not bring suit within the forty-five-day Hatch-Waxman period, the generic competitor may itself institute a declaratory judgment action. 21 U.S.C. 355(j)(5)(C). Recognizing its power to remove the Federal

4

Circuit's prudential standing barrier, Congress further provided that the district courts would have jurisdiction over such a suit to the fullest "extent consistent with the Constitution." 35 U.S.C. 271(e)(5).

## II.  The Instant Litigation And The Lower Court Rulings

1.  This case arises from petitioner Teva's intention to market a generic equivalent to respondent Pfizer's antidepressant Zoloft® (the trade name for the drug sertraline).  As is relevant here, Pfizer listed in the Orange Book two patents that it claimed could reasonably be asserted against a competitor to Zoloft®.  According to Pfizer, one expires in 2006; the other (known as the "'699 patent") expires in 2010.

In 2002, Teva filed an ANDA for a generic equivalent to Zoloft®.  The ANDA stated that Teva intended to begin marketing as soon as Pfizer's first patent expired in 2006.  Teva maintained that the '699 patent either would not be infringed or was invalid.

Teva's ANDA submission constituted a statutory act of infringement of the '699 patent.  Pfizer did not, however, sue Teva.  Pfizer knew that its refusal to bring suit would impede and delay competition from Teva in two ways.  First, it would leave a cloud of patent uncertainty, threatening Teva with the prospect of massive patent liability if it brought its drug to market before the '699 patent expired in 2010.

Second, by avoiding a resolution of the patent dispute, Pfizer prevented FDA from approving Teva's product until at least 180 days *after* Pfizer's first patent expired in 2006.  This distinct, categorical approval prohibition arose from a side agreement between Pfizer and another generic manufacturer, Ivax, which had filed the first ANDA for sertraline and thus had a right to generic exclusivity for its sertraline product.  Pfizer had sued Ivax for patent infringement in response to the latter's ANDA, but then settled in exchange for a share of the revenues from Ivax's sales.  Teva could avoid or limit this additional 180-day delay, however, if it secured a court judgment that Pfizer's '699 patent was either invalid or not in-

5

fringed prior to the expiration of Pfizer's first patent.  See 21 U.S.C. 355(j)(5)(B)(iii).

2.  To remove the cloud of patent uncertainty over its product, and to avoid the delay in FDA approval occasioned by the Ivax application and agreement with Pfizer, Teva brought this declaratory judgment action against Pfizer.  The district court, however, deemed itself bound to hold that Teva's claim was not ripe because Teva itself faced no imminent suit from Pfizer.  Pet. App. 37a-47a.  The district court notably did not dispute that Pfizer was refusing to sue precisely to limit generic competition.  Instead, it concluded that this fact ironically deprived Teva of standing, for "Pfizer's self-interest in" deferring the resolution of the patent dispute only "makes the prospects of [it bringing] a lawsuit against Teva (or anyone else) even more remote."  *Id.* 46a.

3.  Teva appealed, supported by the Federal Trade Commission as *amicus curiae*.[2]  The FTC emphasized the "important role" this case would play "in furthering competitive pharmaceutical markets and in lowering health care cost[s]."  FTC Panel Br. 3.  "The issue has important ramifications for the operation of Hatch-Waxman because such a declaratory judgment" may be "the *only* means by which a generic drug maker may be able to" bring a competing product to market.  *Ibid.* (emphasis added).  The FTC explained:  "If the district court's decision is upheld, it will enable first generic applicants and brand-name drug manufacturers to delay substantially entry by other generic firms, and indeed by *any* generic firm (including one that has done a better job of designing around the patent), into the marketplace for a drug."  *Id.* 3-4 (emphasis in original).

A divided panel of the Federal Circuit nonetheless affirmed.  Pet. App. 1a-36a.  The panel majority acknowledged this Court's prior holding that the existence of an "actual con-

---

2   The FTC's brief (FTC Panel Br.) is available at http://www.ftc.gov/ogc/briefs/teva_v_pfizer.pdf.

6

troversy" sufficient to bring a declaratory judgment action depends on "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Pet. App. 12a (quoting *Maryland Cas. Co.* v. *Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

Teva's brief demonstrated that there is indeed a concrete controversy between it and Pfizer. For example, by listing its patents in the Orange Book, Pfizer had declared that Zoloft® was protected by the '699 patent, whereas Teva contends that the '699 patent did not preclude its market entry. Pfizer had moreover previously invoked that very patent to sue Ivax when it sought to introduce a generic equivalent for Zoloft®. Notwithstanding that Teva's ability to bring its product to market was directly precluded by Pfizer's conduct, Pfizer had refused Teva's request for a covenant not to sue.

Despite these undisputed facts, the Federal Circuit concluded that its so-called "reasonable apprehension" test is a constitutional threshold for bringing a declaratory judgment action. Pet. App. 20a. The court held that a declaratory judgment action is justiciable only if there is "an explicit threat or other action by the patentee which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit." *Id.* 13a. Indeed, the plaintiff must "demonstrate that it has a reasonable apprehension of *imminent* suit." *Id.* 16a.

The panel majority concluded that Teva could not meet this rigorous standard because the very point of Teva's claim is that Pfizer seeks to *avoid* a court adjudication of the dispute: "Significantly, Teva virtually concedes that Pfizer will not bring immediate suit for infringement of the '699 patent. According to Teva, Pfizer does not wish to expose the patent to the possibility of a noninfringment or invalidity determination * * *." Pet. App. 16a. The majority found it irrelevant that Teva was injured by this state of affairs:

7

The fact that Teva is disadvantaged from a business standpoint * * * and the fact that Pfizer's decision not to sue Teva creates an impediment to Teva's removing that disadvantage are matters separate and distinct from whether an Article III controversy exists between Teva and Pfizer. The injury about which Teva complains is the product of the Hatch-Waxman scheme and the fact that Pfizer has acted in a manner permitted under that scheme. *It is not the product of a threat of suit by Pfizer. That is the problem that Teva faces in seeking to establish district court jurisdiction.*

*Id.* 26a (emphasis added). It continued:

[I]n order to rule in Teva's favor, we would have to hold that the Article III requirement of an actual controversy is satisfied, not because Teva is under an imminent threat of suit by Pfizer, but because the combined circumstances of the Hatch-Waxman scheme and Pfizer's lawful conduct under that scheme have created a situation in which Teva finds itself at a competitive disadvantage * * *. Those circumstances do not amount to an actual controversy between Teva and Pfizer, however.

*Ibid.*

4. Teva petitioned for rehearing en banc, again supported by the FTC as *amicus curiae*.[3] The petition was denied over the dissenting votes of three judges who issued two dissenting opinions. See Pet. App. 48a.

### REASONS FOR GRANTING THE WRIT

The petition for certiorari should be granted for several reasons. The court of appeals' decision is flatly contrary to this Court's precedents identifying the "case or controversy"

---

[3] The FTC's brief (FTC En Banc Br.) is available at http://www.ftc.gov/ogc/briefs/050208teva.pdf.

8

required to invoke the jurisdiction of the federal courts. The ruling below moreover conflicts with decisions of other circuits that faithfully apply this Court's decisions. The question is also of indisputable importance. This Court has in the past granted certiorari to review important rulings of the Federal Circuit on questions of patent law, and it should do so here.[4]

This case also is an ideal vehicle to resolve the question presented. Teva's claim against Pfizer presents two distinct injuries that, in *amicus*'s submission, give rise to an Article III case or controversy. Teva is both (a) precluded from securing FDA approval, and (b) deterred from entering the market as a consequence of the prospect of patent liability. By granting the petition, the Court can efficiently address in one case whether either or both injuries are sufficient to trigger the jurisdiction of the federal courts.

Finally, it is important to recognize that the number of opportunities for this Court to resolve the question presented will diminish rapidly if certiorari is denied. The Federal Circuit's ruling precludes generic drug manufacturers from instituting litigation in the circumstances presented in this case. If this Court were to deny certiorari in this case, other similarly situated generic manufacturers would be hard-pressed to incur the costs of instituting new suits, appeal to the Federal Circuit, and petition for certiorari based merely on the prospect that in a later case the Court would reverse course and grant review.

Certiorari accordingly should be granted. At the least, the Court should invite the Solicitor General to file a brief expressing the views of the United States.

---

[4] For recent examples, see, *e.g.*, *Merck KGaA* v. *Integra Lifesciences I*, 125 S. Ct. 2372 (2005), *vacating and remanding* 331 F.3d 860 (2003); *Holmes Group* v. *Vornado Air Cir. Sys.*, 535 U.S. 826 (2002), *vacating and remanding* 13 Fed. Appx. 961 (2001); *Festo Corp.* v. *Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002), *vacating and remanding* 234 F.3d 558 (2000).

9

**I.    The Decision Below Is Contrary To This Court's Precedents Defining The "Case Or Controversy" Required By Article III Of The U.S. Constitution And Conflicts With The Precedent Of Other Circuits.**

Congress has granted the federal courts jurisdiction to decide declaratory judgment suits brought by generic drug manufacturers against brand manufacturers to resolve patent claims to the fullest "extent consistent with the Constitution." 35 U.S.C. 271(e)(5).  The Federal Circuit held that the Constitution prohibits such a suit unless the generic manufacturer "has a reasonable apprehension of [an] *imminent* suit" by the brand manufacturer.  Pet. App. 16a (emphasis in original).

That ruling cannot be reconciled with this Court's precedents.  "The irreducible constitutional minimum of standing,'" this Court has held, "contains three requirements":

> First and foremost, there must be alleged (and ultimately proved) an "injury in fact" – a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be causation – a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.  And third, there must be redressability – a likelihood that the requested relief will redress the alleged injury.

*Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 103 (1988) (citations omitted).

The court of appeals held that Teva failed to meet the first standing requirement because the only injury it was willing to recognize – a suit by Pfizer – was insufficiently "imminent." That holding is clearly wrong.  This Court's precedents require that the *injury* be "imminent," as opposed to "conjectural" or "hypothetical."  There is no requirement that *litigation* filed by the other side must be imminent.  Put another way, Article III provides for jurisdiction not merely when there is a "case" but also when there is a "controversy."  That requirement is satisfied in these circumstances.

10

The Federal Circuit's contrary holding is flatly at odds with this Court's decision in *Cardinal Chemical Co.* v. *Morton International*, 508 U.S. 83 (1993), addressing the circumstances in which Article III permits a declaratory judgment action with respect to a patent infringement claim. Recognizing that "a party seeking a declaratory judgment has the burden of establishing the existence of an actual controversy," this Court explained that "[i]n patent litigation, a party may satisfy that burden, and seek a declaratory judgment, even if the patentee has not filed an infringement action." *Id.* at 95. In support, it quoted with approval Judge Markey's recognition in *Arrowhead Industrial Water* v. *Ecolochem*, 846 F.2d 731, 734-35 (CAFC 1988), that cases such as this present

> the sad and saddening scenario that led to enactment of the Declaratory Judgment Act * * * . In the patent version of that scenario, a patent owner engages in a *danse macabre*, brandishing a Damoclean threat with a sheathed sword. * * * Before the Act, competitors victimized by that tactic were rendered helpless and immobile so long as the *patent owner refused to grasp the nettle and sue*. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests. *The sole requirement for jurisdiction under the Act is that the conflict be real and immediate, i.e., that there be a true, actual "controversy" required by the Act.*

*Cardinal Chem.*, 508 U.S. at 95-96 (emphasis added). Accord 10B Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 2751 (3d ed. 1988).

As this case demonstrates, the Federal Circuit refuses to heed *Cardinal Chemical*. Instead, it insists that a declaratory judgment plaintiff have not only a real and immediate contro-

11

versy with the defendant, but also the prospect of an imminent suit.

Outside the patent context, this Court's seminal ruling "upholding the [declaratory judgment] statute" involved, as Judge Dyk explained in his opinion dissenting from the denial of rehearing en banc, a situation precisely analogous to the one here – "one in which there was no imminent risk of suit because the potential plaintiff declined to sue." Pet. App. 61a. In *Aetna Life Insurance Co.* v. *Haworth*, 300 U.S. 227 (1937), the plaintiff insurance company sought a declaration of its obligations to the policyholders. Not only had the policyholders "not instituted any action wherein the plaintiff would have an opportunity to prove the absence of the alleged disability," *id.* at 239, but Aetna sued for the very reason that there was no present prospect of the parties' rights being adjudicated. This Court nonetheless found a sufficient controversy because the case involved a "definite and concrete dispute" relating to the parties' "legal rights and obligations." *Id.* at 242. "Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages." *Id.* at 240-41.

Prior to the transfer of exclusive jurisdiction of such questions to the Federal Circuit, the regional circuits faithfully applied this Court's precedents in analogous circumstances.[5] The Eighth and District of Columbia Circuits con-

_____

[5] This Court's practice of reviewing Federal Circuit decisions when "other courts have held or assumed" the contrary, *Pfaff* v. *Wells Electronics*, 525 U.S. 55, 60 (1998), recognizes that conflicts between the Federal Circuit's decisions and those of other circuits on "patent issues" are "useful in identifying questions that merit this Court's attention," *Holmes Group* v. *Vornado Air Circulation Sys.*, 535 U.S. 826, 839 (2002) (Stevens, J., concurring).

12

sidered not whether the plaintiff has a reasonable apprehension of an imminent suit, but instead whether the plaintiff had a reasonable apprehension that it will face either an infringement suit or *the threat of one*.  See, *e.g.*, *United Christian Scientists* v. *Christian Science Bd. of Directors, First Church of Christ, Scientist*, 829 F.2d 1152, 1158 (CADC 1987); *Sherwood Medical Indus., Inc.* v. *Deknatel, Inc.*, 512 F.2d 724, 727-28 (CA8 1975).  That standard is met here, as Teva unquestionably faced a reasonable threat of suit given that Pfizer listed the '699 patent in the Orange Book, refused to provide Teva with a covenant not to sue, and sued Ivax for patent infringement.[6]

Two other circuits similarly applied a less stringent standard than the Federal Circuit's.  The Ninth Circuit enquires whether "the plaintiff has a real and reasonable apprehension that he will be subject to liability" – a fact-based determination that looks at "[t]he acts of the defendant * * * in view of their likely impact on competition and the risks imposed upon the plaintiff, to determine if the threat perceived by the plaintiff [is] real and reasonable."  *Chesebrough-Pond's, Inc.* v. *Faberge, Inc.*, 666 F.2d 393, 396 (1982).  And while the First Circuit – which considered the question in the context of a dispute over which it had jurisdiction under World Trade Organization procedures – expressly holds that the "reasonable

---

[6] In reviewing the totality of the circumstances to determine whether such a reasonable apprehension exists, the Eighth and District of Columbia Circuits have accorded weight to the fact that the patentee has previously brought infringement actions, just as Pfizer previously sued Ivax.  See *Sherwood Medical*, 512 F.2d at 728 (although past infringement action, standing alone, not dispositive, patentee's entire course of conduct, including past action, gave rise to "reasonable apprehension"); *United Christian Scientists*, 829 F.2d at 1159 n.25 (noting that "prior record of infringement charges against the declaratory plaintiff or others similarly situated" is one of the factors "which courts have regularly recognized as buttressing a reasonable apprehension of impending litigation").

13

apprehension of suit" standard "is not the only way" to estab-
lish Article III jurisdiction unless "the only controversy sur-
rounds a potential, future lawsuit," it holds that, even in the
absence of such a potential suit, the facts of a particular case
may demonstrate that such a controversy exists. See *Sallen* v.
*Corinthians*, 273 F.3d 14, 25 (2001).

2. It cannot be seriously argued that Teva's declaratory
judgment complaint fails to state an Article III case or contro-
versy under this Court's precedents and the standard articu-
lated by other circuits. There is a concrete legal controversy
between Teva and Pfizer with respect to whether Teva's
product infringes on Pfizer's patent. Pfizer's listing of the
'699 patent in the Orange Book constituted a representation
by it that "a claim of patent infringement could reasonably be
asserted" against a generic equivalent on the basis of the pat-
ent. 21 U.S.C. 355(b)(1), (c)(2). Teva has alleged its inten-
tion to market a drug that, according to the Orange Book list-
ing, Pfizer believes will violate its patent. Under the federal
patent laws, Teva's filing of an ANDA challenging the valid-
ity or infringement of that patent constitutes a statutory act of
patent infringement as matter of law. 35 U.S.C. 271(e)(2).
Pfizer has further refused Teva's request that it acknowledge
that Teva's product is non-infringing. In these circumstances,
only a suit by Teva can resolve the controversy.

Nor is there any serious dispute that the current state of
affairs greatly harms Teva. Even the Federal Circuit did not
doubt in the *slightest* that Teva had suffered an "injury." Pet.
App. 26a. Instead, it deemed the fact that "Teva is injured
from a business standpoint" and "finds itself at a competitive
disadvantage" (*ibid.*) irrelevant as a matter of law.

The legal dispute that Teva seeks to resolve has at least
two definite, adverse consequences for Teva that would be
remedied by a judgment in its favor – and, indeed, can *only* be
remedied by such a judgment. First, Teva is deterred by the
prospect of devastating infringement liability from entering
the marketplace. Manufacturers in Teva's position frequently

14

have massive investments tied up in the development of their generic equivalents by the time they submit an ANDA. As Judge Mayer recognized in his dissent, ANDA applicants such as Teva "suffer a real and defined harm when uncertainty exists as to their rights to manufacture and sell a generic product free from infringement allegations." Pet. App. 35a. "[D]eclaratory judgment actions serve an important role because the [FTC's] Generic Drug Study showed that *no* generic applicant entered the market prior to a district court decision addressing the patents that, at the time of its application, were listed in the Orange Book." FTC Panel Br. 8 n.9 (emphasis added).

Second, even if Teva wanted to market its drug before adjudicating Pfizer's patent claim, the FDA *cannot* approve Teva's generic equivalent for at least 180 days after the expiration of Pfizer's first patent, unless Teva secures an earlier favorable patent judgment. See *supra* at 2. Thus, "[t]he controversy is real and immediate, and is between adverse parties, because Pfizer's conduct creates a bottleneck that just as surely delays Teva from receiving FDA approval to market a product as if Pfizer had won a preliminary injunction in an infringement suit against Teva." FTC En Banc Br. 9. "Absent such a decision, Teva (and every other ANDA applicant) instead must wait for its approval until Ivax has marketed its product for 180 days, which will not occur until December 2006, at the earliest. Thus, the only way that Teva can advance the date of the approval of its product is through this litigation. Absent this action, Teva suffers an injury-in-fact from the lost opportunity to bring its product to market during the 180 days." FTC Panel Br. 21-22.

3. The Federal Circuit's holding that Teva nonetheless fails to state a justiciable controversy because it does not face an "imminent suit" from Pfizer (Pet. App. 16a) is insupportable. The "pragmatic" concern (*EMC Corp.* v. *Norand Corp.*, 89 F.3d 807, 811-12 (CAFC 1996)) that gave rise to the Federal Circuit's reasonable apprehension test is completely missing here. That requirement was adopted to "protect[]

15

quiescent patent owners against unwarranted litigation" when they have "done nothing but obtain a patent." *Arrowhead Indus. Water* v. *Ecolochem, Inc.*, 846 F.2d 731, 736 (CAFC 1988). The prudential standing rule thereby seeks "to determine whether the need for judicial attention is real and immediate." *BP Chems.*, 4 F.3d at 978. The rule is "but a pragmatic attempt to give operational guidance against which patentees can structure their conduct, and control their litigation costs, in a fact-specific area of the law." Pet. App. 51a (Gajarsa, J., dissenting). But in this context, "exercising jurisdiction over this action does not force a lawsuit on a 'quiescent' patent-owner." FDA Panel Br. 13. To the contrary, as Judge Mayer recognized in his dissent, "[b]y listing its patent [in the Orange Book], Pfizer has informed the world that the '699 patent precludes anyone from marketing a generic sertraline hydrochloride product until it expires." Pet. App. 32a. Both the district court (*id.* 46a) and the court of appeals (*id.* 16a) recognized that Pfizer – like other brand manufacturers in its position – declined to file suit not because of ambivalence about its patent rights, but instead to prevent generic competition. Any doubt is resolved by the facts that Pfizer sued Ivax on an indistinguishable claim and refused to grant Teva a covenant not to sue.

Thus, the Federal Circuit's odd rule that litigation must be imminent before it may be brought "is ill-suited to evaluate an action brought by a subsequent ANDA applicant when that applicant *requires* a court decision so that it can get FDA approval to bring its product to market." FDA Panel Br. 12. The prudential interest in limiting the litigation burdens on patent holders is simply overborne in this circumstance.

In any event, even if it otherwise applied, the Federal Circuit's prudential standing rule did not survive Congress's enactment of a specific directive that the federal courts shall exercise jurisdiction over suits such as Teva to the fullest extent consistent with the Constitution. See 35 U.S.C. 271(e)(5); *Raines* v. *Byrd*, 521 U.S. 811, 820 n.3 (1997) (Congress may eliminate prudential standing rules by statute).

16

## II. The Question Presented Is Vitally Important To Pharmaceutical Competition.

The petition for certiorari should also be granted because it presents a question of fundamental importance to competition in the pharmaceutical industry and, accordingly, to the American public that relies so heavily on lower-priced generic drugs to combat the skyrocketing costs of healthcare.

1. Because the Federal Circuit has exclusive jurisdiction over patent disputes, the ruling below governs every attempt in the nation by generic pharmaceutical companies to resolve patent disputes with brand manufacturers. The decision below provides a roadmap for brand manufacturers to preclude litigation of all such disputes. "No incumbent will ever make the threat [of litigation], if it can simply ride out the term in the listed patent." Pet. App. 57a (Gajarsa, J., dissenting).

As this Court has previously recognized Congress enacted the statutory provisions of the Hatch-Waxman scheme at issue here "to enable new drugs to be marketed more cheaply and quickly." *Eli Lilly & Co.* v. *Medtronic*, 496 U.S. 661, 676 (1990). "Quite obviously, the purpose of [these provisions] is to enable the judicial adjudication upon which the ANDA and paper NDA schemes depend." *Id.* at 678. And just as "[t]he scheme will not work, of course, if the holder of the patent pertaining to the pioneer drug is disabled from establishing in court that there has been an act of infringement" (*ibid.*), so too it "will not work" if the patent holder can prevent generic manufacturers from establishing in court that there has been no patent infringement.

The FTC concurs that "[d]eclaratory judgment actions by ANDA applicants concerning listed patents play a vital role in the Hatch-Waxman regime" (FDA Panel Br. 12), helping to "further[] competitive pharmaceutical markets and [lower] health care costs" (FTC En Banc Br. 2). Indeed, it concludes, "even a modest delay in the entry of subsequent ANDA applicants may impose substantial costs on consumers because

17

competition among generic manufacturers has a strong impact on the price of a drug." FTC Panel Br. 8.

In the course of preparing this brief, *amicus* GPhA surveyed its membership to determine the significance of the question presented. The responses confirm that the Federal Circuit's decision fundamentally affects competition throughout the pharmaceutical industry. The survey conclusively established two facts: (i) the FTC and the dissenting judges below are correct in their conclusion that these circumstances present a concrete controversy; and (ii) the number of drugs affected by the ruling is large and constantly growing.

GPhA's members report that they regularly defer launching a product until they can litigate the question of patent infringement to at least a district court judgment.[7] By not bringing suit, brand companies perpetuate paralyzing uncertainty that allows them to continue selling their branded drugs

---

[7] To cite just a few examples,

● Endo Pharmaceuticals launched its equivalent to Oxycontin® only after a favorable Federal Circuit ruling. *Purdue Pharma L.P.* v. *Endo Pharmaceuticals*, 410 F.3d 690 (2005).

● Eon Labs launched its equivalent to Sporanox® (produced by Johnson & Johnson affiliate Janssen) only after a favorable district court judgment. *Janssen Pharm. N.V.* v. *Eon Labs*, 374 F. Supp. 2d 263 (E.D.N.Y. 2004), aff'd, 134 Fed. Appx. 425 (CAFC 2005).

● Geneva launched its equivalent to Augmentin® only after a favorable district court judgment; other manufacturers then followed suit. *Geneva Pharm.* v. *GlaxoSmithKline*, 213 F. Supp. 2d 597 (E.D. Va. 2002), aff'd, 349 F.3d 1373 (CAFC 2003).

● Barr Labs launched its equivalent to Mircette® only after a favorable district court judgment. *Bio-Technology Gen. Corp.* v. *Duramed Pharms., Inc.*, 174 F. Supp. 2d 229, 232 (D.N.J. 2001), rev'd, 323 F.3d 1356 (CAFC 2003).

● Conversely Eon Labs has been precluded from litigating with respect to its generic equivalent to Pfizer's Accupril® and has not entered the market despite having final approval.

18

at monopoly prices.  The decision below is particularly perni-
cious because it is the drugs that the public most frequently
uses – and hence that give rise to the greatest possible in-
fringement liability – that will suffer reduced competition.
Infringement damages for blockbuster drugs such as Zoloft®
(which generates revenues for Pfizer well in excess of $2 bil-
lion annually) would ruin most generic companies.

GPhA's members also report that the ruling below would
have a sweeping effect.  Generic manufacturers regularly seek
to market generic equivalents and represent in their ANDAs
that the patents listed in connection with the innovator drug
are either invalid or will not be infringed.  The most recent
data published by the FDA indicates that generic manufactur-
ers have filed such ANDA certifications for 314 drugs.  See
http://www.fda.gov/cder/ogd/ppiv.htm (last visited Sept. 7,
2005).  More than seventy were submitted in the last two-and-
a-half years alone.  *Ibid.*  Many of those drugs are likely to
present patent issues that ought to be resolved promptly but,
under the Federal Circuit's ruling, cannot.

These examples illustrate the sweep of the ruling below:

● The ruling below does not merely affect Teva even
with respect to Zoloft®.  Two other manufacturers filed AN-
DAs seeking to market generic Zoloft® products and brought
similar declaratory judgment actions.  Both were dismissed
on the same ground as the Federal Circuit's ruling here.  *Dr.
Reddy's Labs.* v. *Pfizer*, No. 03-726, 2003 U.S. Dist. LEXIS
24,351 (D.N.J. July 8, 2003) (order); *Apotex* v. *Pfizer*, No. 04-
CV-02539 (S.D.N.Y. Apr. 1, 2004) (order), appeal pending,
No. 05-1199 (CAFC).

● The ruling below affects numerous drugs other than
Zoloft®.  For example, there are the attempts to litigate the
patent validity/non-infringement of generic equivalents to
Pfizer's Accupril® (which generates nearly $600 million in
annual U.S. sales).  Various generic manufacturers have filed
ANDAs for Accupril®.  When Pfizer failed to file suit, two of
those manufacturers sought a declaratory judgment.  Their

19

cases were dismissed, on the same rationale as the ruling be-
low. *Mutual Pharm. Co.* v. *Pfizer*, No. 03-CV-1116, 2004
U.S. Dist. LEXIS 4846 (D.D.C. Mar. 24, 2004); *Apotex* v.
*Pfizer*, No. 03-CV-990-SLR, 2004 U.S. Dist. LEXIS 11,930
(D. Del. June 28, 2004).

● Teva and Mylan Laboratories have filed ANDAs with
respect to Merck & Co.'s Proscar®.  Merck did not file suit
against either.  Mylan has a pending declaratory judgment
action against Merck.  *Mylan* v. *Merck & Co.*, No. 05-cv-
1416 (SHR) (M.D. Pa.).

● Teva has a pending declaratory judgment with respect
to SmithKline Beecham's Famvir®.

2.  By substantially impeding generic competition, the
Federal Circuit's ruling will directly injure consumers and the
public health.  Because generic drugs are generally sold for a
fraction of the prices of their brand counterparts, the substitu-
tion of generic drugs for brand drugs results in billions of dol-
lars in savings each year.[8]  A one-percent increase in the sub-
stitution of generic drugs for brand drugs could result in a
savings of up to $2 billion per year, while the widespread sub-
stitution of generic drugs for brand drugs whenever possible
could save U.S. consumers as much as $17 billion per year.
Dep't of Health and Hum. Servs. Task Force on Drug Impor-
tation, REPORT ON PRESCRIPTION DRUG IMPORTATION 68
(Dec. 2004), available at http://www.hhs.gov/importtaskforce/
Report1220.pdf (visited Sept. 7, 2005); Steven Findlay, *Easy*

---

[8] See FDA, FDA White Paper:  New FDA Initiative on Im-
proving Access to Generic Drugs (June 12, 2003), available at
http://www.fda.gov/oc/initiatives/generics/whitepaper.html (visited
Sept. 7, 2005) (average price of a brand drug is $72, compared with
$17 for its generic counterpart); Statement of the FTC on *Competi-
tion in the Pharmaceutical Marketplace:  Antitrust Implications of
Patent Settlements*, Before the Comm. on the Judiciary of the U.S.
Senate    (May    24,    2001),    available    at    http://www.ftc.gov/
os/2001/05/pharmstmy.htm (estimating that consumers saved $8 to
$10 billion in 1994 by substituting generics for brand drugs).

20

*Way To Cut Costs Of Drugs:  Generics*, USA TODAY, May 13, 2004, at 23A.

Access to generic pharmaceuticals is thus "perhaps the single most important route to lower personal and national drug costs during the next decade." Findlay, *supra*.  Indeed, the cost savings created by generic pharmaceuticals translates directly into improved public health and, thus, lives saved. As the FDA Commissioner has explained, generic drugs "are an increasingly important way to provide the American people with safe, effective and affordable medical treatment." *Generics:  FDA Announces Measures To Improve Generic Drug Access*, DRUG WEEK, Mar. 26, 2004, at 231.  See also Nat'l Inst. For Health Care Management, *A Primer:  Generic Drugs, Patents, and the Pharmaceutical Marketplace* 19 (June 2002), available at http://www.nihcm.org/GenericsPrimer.pdf (positing that "[t]he advent of [the generic equivalent of the anti-depressant Prozac]" may help rectify the "persistent under-diagnosis and under-treatment of depression in the U.S.").

The high costs of prescription are a significant – and in some cases, insuperable – barrier to proper treatment for many Americans, particularly the elderly.  See *Generics Key To Cost Control*, UPI, May 19, 2005 (quoting Dr. Jan Berger, chief clinical officer of Caremark Rx Inc.: "the No. 1 reason why patients do not take their medicine is because it is too expensive"); AARP, Prescription Drug Costs And The Role Of Generic Drugs 2 (Oct. 1, 2002), available at http://assets.aarp.org/rgcenter/health/rx_generic.pdf ("[N]early one in four Americans 45 and older (24%) reported *not* being able to afford a prescription drug because no generic version was available.") (emphasis in original).

## CONCLUSION

The petition for a writ of certiorari should be granted or, at a minimum, the Court should invite the Solicitor General to file a brief expressing the views of the United States.

21

Respectfully submitted,

Thomas C. Goldstein
(Counsel of Record)
Amy Howe
Kevin K. Russell
GOLDSTEIN & HOWE, P.C.
4607 Asbury Pl., NW
Washington, DC 20016
(202) 237-7543

September 7, 2005