*Teva Pharmaceuticals USA, Inc. v. FDA*, Case No. 05-1469 (D.D.C.) (JDB)

# EXHIBIT D

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For
Injunctive Relief Pending Appeal*



William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmlegal.com

Christine J. Siwik
312.222.6304 telephone
312.222.6324 facsimile
csiwik@rmmlegal.com

September 7, 2004

## CONFIDENTIAL ANDA DOCUMENT—
## NOT TO BE DISCLOSED OUTSIDE FDA

**VIA FedEx® and E-Mail**
Mr. Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

Re:    Apotex Inc.'s ANDA No. 76-341 for Pravastatin Sodium Tablets
       10 mg, 20 mg, 40 mg and 80 mg

Dear Mr. Buehler:

On behalf of Apotex Inc. (formerly known as TorPharm, Inc.), we respectfully request the Agency to confirm that:

- Subject to all other substantive requirements for approval, Apotex will be eligible for, and receive, immediate final approval of its ANDA No. 76-341 for Pravastatin Sodium Tablets 10 mg, 20 mg, 40 mg, and 80 mg on April 20, 2006, when the pediatric exclusivity associated with U.S. Patent No. 4,346,227 ("the '227 patent") expires;

- Apotex's final approval will not be delayed by any unexpired 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv) for these drug products; and

312-527-2157 main phone
312-527-4205 main fax

www.rmmlegal.com    6 WEST HUBBARD STREET, SUITE 500, CHICAGO, IL 60610

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 2

- The July 23, 2004 Order (Tab A) dismissing Apotex's declaratory judgment action on U.S. Patent Nos. 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent") constitutes a "decision of a court" under 21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered any exclusivity arising out of these patents as of August 22, 2004.

Apotex requests the courtesy of a response by the end of business on September 21, 2004. If we do not hear from the Agency by then, Apotex will assume that its request has been denied and take appropriate action to protect its rights.

## I.     INTRODUCTION

Apotex and at least seven other applicants have filed ANDAs for generic pravastatin sodium tablets with paragraph III certifications to the '227 patent, which blocks generic entry until April 20, 2006 with pediatric exclusivity, and paragraph IV certifications to the remaining three Orange-Book listed patents. Based on information made available by the NDA-holder, other applicants may have filed paragraph IV ANDAs before Apotex. Based on public statements, these applicants claim to have 180-day exclusivity, pursuant to § 355(j)(5)(B)(iv), on the '447, '589, and '985 patents. If such exclusivity exists, the recent dismissal of Apotex's declaratory judgment action against Bristol-Myers Squibb Company ("BMS") triggered that exclusivity.

As detailed below, Apotex filed suit against BMS seeking a declaratory judgment of noninfringement and/or invalidity of the '447, '589, and '985 patents. The district court dismissed that action for lack of subject matter jurisdiction on July 23, 2004, based on BMS's repeated representations that it has no intention now, or in the future, of suing Apotex for infringement of those patents. In light of BMS's representations, this Order, which became final and unappealable on August 22, 2004, has estoppel effect and precludes BMS from suing Apotex on those patents. Under the D.C. Circuit's decisions in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharmaceuticals, USA, Inc. v. FDA*, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), this dismissal constitutes a "court decision" under § 355(j)(5)(B)(iv)(II), triggering any exclusivity that might have existed for these three patents as of August 23, 2004. Any exclusivity will thus expire no later than February 18, 2005, and cannot delay Apotex's approval beyond April 20, 2006. Apotex now seeks confirmation of this fact from the Agency.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 3

## II.    BACKGROUND

### A.    Reference-listed drug and Orange Book patents

The reference-listed drug on which Apotex based its ANDA is BMS's prescription cholesterol drug Pravachol® (pravastatin sodium) Tablets 10 mg, 20 mg, 40 mg, and 80 mg, first approved by FDA under New Drug Application (NDA) No. 19-898 on October 31, 1991.

BMS has submitted patent information on—and FDA has listed—four patents in the Orange Book in connection with Pravachol® (pravastatin sodium) tablets and NDA No. 19-898. Those patents are:

- The '227 patent, expiring October 20, 2005, with pediatric exclusivity expiring April 20, 2006;

- The '447 patent, expiring July 9, 2008, with pediatric exclusivity expiring January 9, 2009;

- The '589 patent, expiring, July 9, 2008, with pediatric exclusivity January 9, 2009; and

- The '985 patent, expiring April 22, 2014, with pediatric exclusivity expiring October 22, 2014.

### B.    Apotex's ANDA No. 76-341 for Pravastatin Sodium Tablets 10 mg, 20 mg, 40 mg, and 80 mg

On December 21, 2001, Apotex submitted ANDA No. 76-341 for generic pravastatin sodium tablets 10 mg, 20 mg, and 40 mg. Apotex subsequently amended its ANDA to include the 80 mg strength tablet as well. For all tablet strengths, Apotex's ANDA contains a paragraph III certification under 21 U.S.C. § 355(j)(2)(A)(vii)(III) to the '227 patent, thus signifying that Apotex does not intend to market its pravastatin products until after the expiration of the '227 patent, and its corresponding pediatric exclusivity, on April 20, 2006. Apotex submitted paragraph IV certifications, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to the '447, '589, and '985 patents.[1]

---

[1] The recent Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), made significant changes to the 180-day exclusivity provision of the 1984 Hatch-Waxman Amendments (formally known as the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271)). With respect to

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 4

As required by 21 U.S.C. §§ 355(j)(2)(B)(i)-(ii), Apotex provided the requisite notice of its ANDA and paragraph IV certifications, together with the factual and legal bases for those certifications, to BMS, the patent owner and NDA-holder. To date, BMS has not sued Apotex (or any other pravastatin applicant). But, as explained in greater detail below, Apotex filed suit against BMS seeking declaratory judgments of patent noninfringement and/or invalidity of the '447, '589, and '985 patents.

On September 30, 2003, FDA issued tentative approval of Apotex's ANDA, finding that Apotex has satisfied all substantive requirements for approval and that its pravastatin sodium product "is safe and effective for use as recommended in the submitted labeling." (Tab B, 9/30/03 Tentative Approval Letter at 1.) FDA further stated that final approval of Apotex's ANDA will not be made effective until the '227 patent (and its pediatric extension) expire on April 20, 2006. (*Id.* at 2.) Although Apotex's tentative approval letter does not mention anything about 180-day exclusivity, it is our understanding that FDA may award such exclusivity to other pravastatin applicants, as discussed below.

**B.    Other pravastatin ANDAs**

Based on publicly available information from FDA and from patent litigation with BMS, at least seven other applicants apparently have submitted ANDAs for pravastatin sodium tablets with paragraph IV certifications to the listed '447, '589, and '985 patents. (*See* Tab C, Blischak Decl. ¶¶ 5, 7.) All such ANDA applicants have submitted paragraph III certifications to the '227 patent, thus delaying their final approval until April 20, 2006. (*Id.*) Further, one or more of the other paragraph IV ANDAs may have been submitted before Apotex's ANDA. (*See id.* ¶ 7; Tab D, Pravastatin Tentative Approval List.) For example, we understand that FDA considers Teva to be the first applicant to submit a paragraph IV ANDA (No. 76-056) for the 10 mg, 20 mg, and 40 mg strength pravastatin sodium tablets, and Geneva to be the first applicant to submit a paragraph IV ANDA (No. 76-056) for the 80 mg strength tablets.[2] Teva and Geneva have made public statements to the same effect.

By virtue of these purported previous ANDAs, FDA may consider Teva and Geneva (or

---

paragraph IV ANDAs, like Apotex's pravastatin ANDA, filed prior to December 8, 2003, the MMA requires a triggering decision to be a court decision from which no appeal has been or can be taken. *See* MMA § 1102(b)(3). Because the triggering court decision in this case was not appealed, this change has no relevance here. Unless noted otherwise, all citations refer to the pre-MMA provisions of the Hatch-Waxman Amendments.

[2]  The agency considers each strength and dosage form of a particular generic drug to be a separate drug product for which an ANDA applicant may potentially qualify for exclusivity. *See Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454, 456 (D.D.C. 1999), *aff'd*, No. 99-5231, 1999 U.S. App. LEXIS 29571 (D.C. Cir. Oct. 8, 1999).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 5

perhaps others) to be eligible for 180-day exclusivity for those drug products pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Such exclusivity could delay approval of all subsequent ANDAs until 180-days after either first commercial marketing of each drug product by the first-filer or a final court decision on the listed '447, '589, and '985 patents, whichever is earlier.

    C.    **Apotex's offer of confidential access to ANDA No. 76-341**

    On February 3, 2004, in accordance with 21 U.S.C. § 355(j)(5)(C)(i)(III), as amended by the MMA, Apotex extended BMS an offer of confidential access to Apotex's ANDA No. 76-341 for the sole and exclusive purpose of determining whether an infringement action could be brought for infringement of the '447, '589, and '985 patents. By letter dated February 13, 2004, BMS rejected Apotex's offer.

    D.    **Apotex obtains a "decision of a court" that triggers any 180-day exclusivity for pravastatin tablets**

    On April 15, 2004, having satisfied the statutory pre-filing requirements under the MMA, Apotex filed a declaratory judgment action against BMS in the U.S. District Court for the Southern District of New York, pursuant to 21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C. § 271(e)(5), as amended by the MMA. In that suit, Apotex sought a declaratory judgment that its pravastatin products will not infringe the '447, '589, and '985 patents and/or that such patents are invalid.

    On May 25, 2004, BMS moved to dismiss the action for lack of subject matter jurisdiction on the ground that BMS has no intention now, or in the future, of suing Apotex for infringement of the '447, '589, and '985 patents. (*See* Tab E, BMS Mot. to Dismiss; Tab F, BMS Mem.) Indeed, BMS has repeatedly and unambiguously represented that it will not sue Apotex on these three patents:

- "BMS nonetheless has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents . . . ." (Tab C, Blischak Decl. at Ex. G, 2/20/04 Letter from M. Blischak to W. Rakoczy.)

- "[BMS] has repeatedly stated that based on the representations Apotex made regarding its generic pravastatin sodium product, [BMS] has no intention, now or in the future, of suing Apotex for infringement of any of the '447, '589, and '985 patents." (Tab C, Blischak Decl. ¶ 10.)

- "[BMS] has repeatedly stated that it will *not* sue Apotex for infringement of the '447, '589, and '985 patents . . . ." (Tab F, BMS Mem. at 12.)

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 6

- "[BMS] has repeatedly affirmed in writing, in absolute terms, that it has *no* intention of suing Apotex." (*Id.* at 2.)

- "[BMS] had explicitly stated in two separate letters that it would not sue Apotex for infringement of the '447, '589, and '985 patents . . . ." (*Id.* at 9.)

- "All Apotex needs to know is the *fact* that [BMS] does not intend to sue, and [BMS] has made that manifestly plain." (*Id.* at 13.)

The district court struck BMS's motion to dismiss because BMS failed to comply with the court's pre-motion procedures. Before BMS could re-file its motion, however, Apotex's declaratory judgment action was dismissed by stipulation of the parties pursuant to BMS's covenant not to sue Apotex. More specifically, on July 23, 2004, the district court entered an Order dismissing Apotex's action for lack of subject matter jurisdiction based on BMS's representation that it has no intention of suing Apotex for infringement of the '447, '589, and '985 patents. (Tab A, 7/23/04 Order.) The Stipulation and Order provide in pertinent part:

> WHEREAS, prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

> NOW THEREFORE, based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341, Apotex hereby stipulates that Apotex's Complaint seeking a declaratory judgment of noninfringement of the '447, '985, and '589 patents be, and hereby is, dismissed, for lack of subject matter jurisdiction, with each party to bear its own costs.

(*Id.* at 3.) This Order became a final decision from which no appeal has been, or can be, taken on August 22, 2004. On September 3, 2004, in accordance with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to OGD.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 7

The court's July 23, 2004 decision triggered any exclusivity for pravastatin tablets arising out of the '447, '589, and '985 patents. Consequently, such exclusivity will expire no later than February 18, 2005, thus leaving no barrier to final approval for Apotex on April 20, 2006.

III.    ANALYSIS

A.    **Under controlling D.C. Circuit case law, the dismissal of a declaratory judgment action for lack of subject matter jurisdiction, which has estoppel effect, constitutes a triggering "court decision" under § 355(j)(5)(B)(iv)(II)**

The relevant statutory provision governing 180-day exclusivity provides as follows:

(iv) If the application contains a [paragraph IV certification] . . . and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after—

(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv). This provision works by delaying approval of subsequent paragraph IV ANDAs until first commercial marketing by the first-filer or a decision of a court holding that the patent is not infringed or invalid, whichever is earlier. The triggering decision of a court in subclause (II) must be a final decision from which no appeal has been or can be taken. *See* MMA § 1102(b)(3).

The dismissal of Apotex's declaratory judgment action here constitutes a "decision of a court" under § 355(j)(5)(B)(iv)(II). The D.C. Circuit's decisions and interpretation of the statute in *Teva I* and *Teva II* control here. In those cases, the D.C. Circuit explicitly held that a dismissal of a declaratory judgment action for lack of subject matter jurisdiction, which has estoppel effect under the patent laws, is a "court decision" sufficient to trigger the 180-day exclusivity. *See Teva I*, 182 F.3d at 1008; *Teva II*, 2000 WL 1838303. These decisions are

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 8

binding on the Agency here, and require that FDA treat the dismissal of Apotex's declaratory
judgment action as a triggering "court decision" under § 355(j)(5)(B)(iv)(II).

The facts and reasoning of the *Teva* decisions control here. In the *Teva* cases, Apotex
(then known as TorPharm) submitted the first paragraph IV ANDA for a generic version of
Hoffman-La Roche's prescription drug ticlopidine (brand-name Ticlid®). The patentee, Syntex,
did not sue Apotex or any subsequent ANDA applicants for infringement. By virtue of
submitting the first paragraph IV ANDA, FDA awarded Apotex sole 180-day exclusivity for
generic ticlopidine, which delayed the approval of all subsequent applicants until 180 days after
first commercial marketing or a court decision of noninfringement, whichever is earlier.

Apotex's competitor, Teva, while awaiting ANDA approval, filed a declaratory judgment
action against Syntex seeking a declaratory judgment of noninfringement of Syntex's listed
patent. *See Teva I*, 182 F.3d at 1006. Teva did so in order to obtain a "court decision" that
would trigger Apotex's 180-day exclusivity period, thereby allowing Teva to market its generic
drug. *Id.* at 1004. The same day Teva sued, Syntex sent Teva a letter stating: "We will make no
claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the
formulation you have disclosed to us." *Id.* at 1006. Syntex then moved to dismiss the complaint
for lack of subject matter jurisdiction, explaining:

> Given Syntex's express assurance that it would not bring suit against Teva on the
> '592 patent, Teva can have no reasonable apprehension that it will face a lawsuit
> for infringement of the '592 patent. Without such reasonable apprehension, no
> actual case or controversy exists of sufficient immediacy or reality to base
> jurisdiction over Teva's declaratory judgment claim.

*Id.* The district court granted Syntex's motion, holding that Teva "lacks a reasonable
apprehension of suit by Syntex for infringement of [the patent]" and, therefore, there was "no
justiciable case or controversy between the parties concerning any infringement by Teva of the
'592 [p]atent." *Id.*

FDA subsequently refused, without explanation, to recognize the dismissal of Teva's
declaratory judgment action as a triggering court decision. Among other things, FDA refused to
explain why the Agency had previously recognized as a triggering decision the grant of partial
summary judgment based on the patentee's admission of noninfringement, but declined to give
similar effect to Teva's California dismissal based on a finding of no reasonable apprehension of
suit arising from the patentee's stated intention not to sue.

Teva challenged the Agency's refusal to recognize the California dismissal as a triggering
court decision. The district court sided with FDA, holding that the dismissal order did not fall

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 9

within the plain language of the statute, which requires "nothing less than a decision on the merits." *See Teva I*, 182 F.3d at 1007. On appeal, however, the D.C. Circuit reversed, holding that: (1) FDA's interpretation refusing to recognize the California dismissal as a "court decision" is not entitled to *Chevron* deference; (2) FDA "cannot avoid the merits of Teva's contention that the California dismissal satisfies the "court decision" requirement under § 355(j)(5)(B)(iv)(II)"; and (3) FDA's response was arbitrary and capricious. *Id.* In reaching these conclusions, the court made three separate findings that are applicable here.

*First*, the court determined that, as FDA conceded, the Agency's refusal to recognize the dismissal as a triggering "court decision" is not compelled by the statutory language, which merely requires a "decision of a court holding the patent . . . invalid or not infringed." *See Teva I*, 182 F.3d at 1007. Such a "decision," the court explained, can take many forms and "the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement." *Id.* at 1007, 1009. Where estoppel exists, the dismissal constitutes a court decision.

The court noted that "Syntex's declaration and conduct eliminated the need for a declaratory judgment because Syntex would be estopped from challenging Teva's marketing of its generic drug on the ground of patent infringement." *Teva I*, 182 F.3d at 1008. The court further explained:

> The conclusion that the California dismissal has estoppel effect is supported by the decisions of the United States Court of Appeals for the Federal Circuit. That court has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect.

> \*     \*     \*

> Put otherwise, the California dismissal appears to meet the requirements of a triggering 'court decision' because that court had to make a predicate finding with respect to whether Syntex would ever sue Teva for infringement in order to conclude that there was no case or controversy between the parties.

> \*     \*     \*

> Although the dismissal was not a judgment on the merits after consideration of evidence presented by the parties, there was no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement. This is the result that appears to be the purpose of the triggering 'court decision' provision. A contrary view, as Teva contends, means that the

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 10

> patent holder could manipulate the system in order to block or delay generic
> competition by stating that the patent holder will not enforce its patent against the
> Paragraph IV challenger. For these reasons, the California dismissal would
> appear to meet the requirements of a 'court decision' under § 355(j)(5)(B)(iv)(II).

*Id.* at 1008-09 (citations omitted).

*Second*, the court held that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Teva I*, 182 F.3d at 1009. In reaching this conclusion, the court aptly noted that both FDA and the Federal Circuit recognize that a decision that a patent is "unenforceable" also suffices as a court decision, even though the statute says only if the patent is "invalid" or "will not be infringed." *Id.* FDA included "unenforceability" because, in its own words, it would lead to absurd results otherwise. *Id.* As such, the court rejected as "unpersuasive" any attempt by FDA to treat unenforceability, which is included in the regulation, any differently than estoppel for purposes of § 355(j)(5)(B)(iv)(II). *Id.* The court explained:

> As the FDA and [Apotex] concede, Syntex cannot sue Teva for patent
> infringement as a result of the California dismissal. In its regulations, FDA added
> 'unenforceability' to the list of what qualifies as a 'court decision' because it
> concluded that implementing the statute in any other way would be contrary to
> Congress' intent and produce absurd results . . . However, the situation presented
> here appears no less absurd because Teva can never be sued by Syntex for patent
> infringement, but the FDA has nevertheless concluded that the California
> dismissal cannot satisfy the 'court decision' requirement of the statute. Thus, the
> FDA's application of the statute to this case runs counter to its explanation for
> permitting unenforceability to qualify as a 'court decision.'

*Id.* at 1010 (citations omitted.)

*Third*, the court held that FDA acted contrary to its own guidance in which it committed to proceed on a case-by-case basis. FDA conceded in its brief that a dismissal could constitute a "court decision," yet at the same time refused to recognize Teva's dismissal order as such without explanation. *See Teva I*, 182 F.3d at 1010. FDA compounded this error, the court explained, by failing to justify how the Agency could refuse to treat the dismissal of a declaratory judgment action based upon the patentee's representation that it would not sue for patent infringement as a "court decision," in view of FDA's previous determination that a partial summary judgment, based on the patentee's admission of noninfringement, constituted a triggering "court decision." *Id.* at 1010-11. That one case involved a judgment on the merits while Teva's complaint was dismissed for lack of subject matter jurisdiction "does not detract

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 11

from the fact that both proceedings prevent the patent holder from suing the ANDA applicant for patent infringement." *Id.* at 1011. The court further criticized FDA for admittedly adopting, without explanation, an interpretation of the court decision trigger that is narrower than the statute may be able to support. *Id.* Such an interpretation, the court held, "cannot stand." *Id.*

For all these reasons, the D.C. Circuit reversed and remanded to afford FDA the opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement." *Teva II*, 2000 WL 1838303, at *1. On remand, however, FDA merely repeated "its claim that the California dismissal did not state on its face that the underlying patent was not infringed and that refusing to look beyond the face of the order served goals of administrative convenience." *Id.* The district court flatly rejected this explanation and entered the permanent injunction requested by Teva. On appeal, the D.C. Circuit agreed, holding that the "judgment of the agency fails for want of reasoned decision making," and stating that the Agency had failed to provide any meaningful basis for departing from its past interpretation and precedent. *Id.* at *2.

The *Teva I* and *II* rulings remain the controlling rule of law on the issue of whether the dismissal of a declaratory judgment decision for lack of subject matter jurisdiction constitutes a "court decision" trigger under § 355(j)(5)(B)(iv)(II).[3] It clearly provided that it has estoppel effect. To date, FDA has done nothing in the way of a formal rulemaking or otherwise to alter the controlling rule of law from *Teva*.

> B.    **The dismissal of Apotex's declaratory judgment action triggers any 180-day exclusivity on the '447, '589, and '985 patents and entitles Apotex to final ANDA approval immediately upon expiration of the '227 patent (and its corresponding pediatric exclusivity) on April 20, 2006**

The controlling test for a triggering "court decision" under § 355(j)(5)(B)(iv)(II), as articulated by the D.C. Circuit, is whether the decision estops or precludes the patentee "from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*, 182 F.3d at 1009. If so, it is a triggering court decision under the statute. As applied here, the dismissal of Apotex's declaratory judgment action precludes a future suit by BMS, just as the order in *Teva* precluded such a suit by Syntex.

The July 23, 2004 dismissal Order here explicitly is based on BMS's repeated representations that it will not sue Apotex. FDA need not look beyond the face of the Order to

---

[3] FDA considered a proposed rule under which such a dismissal would not constitute a court decision trigger. *See* 64 Fed. Reg. 42873, 42881 (Aug. 6, 1999). However, after reconsidering the *Teva* decisions and comments, FDA rejected and formally withdrew its proposed rule in November 2002, and continues to regulate directly from the statute, just as it had done before *Teva*. *See* 67 Fed. Reg. 66593, 66594 (Nov. 1, 2002).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 12

confirm this fact. The Order dismisses Apotex's case based on BMS's repeated "representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341." (Tab A, 7/23/04 Order at 3.) The record and pleadings confirm the preclusive effect of the Order, as they contain numerous unambiguous representations that "[BMS] has no intention, now or in the future, of suing Apotex for infringement of any of the '447, '589, and '985 patents" (Tab C, Blischak Decl. ¶ 10) and that "[BMS] . . . will *not* sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product" (Tab F, BMS Mem. at 12). .

These statements could not be any more unequivocal. They clearly evidence BMS's complete disavowal of any intent to sue Apotex. As the D.C. Circuit acknowledged, the Federal Circuit "has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *See Teva I*, 182 F.3d at 1008 (citing *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991) (holding that by filing with the district court a covenant not to sue the declaratory judgment plaintiff for infringement of the patent-in-suit, the patentee was "forever estopped from asserting the . . . patent claims against the [declaratory judgment plaintiff]"); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (holding that patentee "is forever estopped by its counsel's statement of nonliability, on its face and as explained during oral argument before this court, from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994. This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case."); *see also Fina Research, S.A. v. Baroid Ltd.,* 141 F.3d 1479, 1483-84 (Fed. Cir. 1998) (discussing *Super Sack* and *Spectronics*).

Thus, the dismissal precludes BMS from asserting the '447, '589, and '985 patents against Apotex in the future, which is exactly the relief Apotex sought in its declaratory judgment action. As in *Teva*, the dismissal meets all the requirements of a "court decision" under § 355(j)(5)(B)(iv)(II). Accordingly, there can be no barriers to final approval of Apotex's ANDA on April 20, 2006. Any 180-day exclusivity for pravastatin tablets arising out of the '447, '589, and '985 patents was triggered, at the latest, on August 22, 2004, and will have expired, at the latest by February 18, 2005. Subject to all other substantive requirements for approval, Apotex is entitled to immediate final approval on April 20, 2006.

## IV.    CONCLUSION

For all these reasons, Apotex requests, and is entitled to, confirmation that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 13

pravastatin ANDA on April 20, 2006; (2) its final approval will not be delayed by any unexpired 180-day exclusivity on the '447, '589, and '985 patents; and (3) any 180-day exclusivity on the '447, '589, and '985 patents was triggered by the dismissal of Apotex's declaratory judgment action. We look forward to receiving the Agency's response by September 21, 2004.

Should you have any questions, please do not hesitate to contact us.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI LLP

William A. Rakoczy

Christine J. Siwik

Enclosures

cc (*via e-mail*):    Daniel Troy, *Office of Chief Counsel*
Elizabeth Dickinson, *Office of Chief Counsel*
Marcy MacDonald, *Apotex Corp.*
Barinder Sandhu, *Apotex Inc.*

# TAB A

## July 23, 2004 Stipulation and Order

SULLIVAN & WORCESTER LLP
Marc A. Lebowitz (ML 7381)
Matthew Giger (MG 3731)
1290 Avenue of the Americas, 29th Floor
New York, New York 10104
Tel: (212) 660-3000
Fax: (212) 660-3001

RAKOCZY MOLINO MAZZOCHI LLP
William A. Rakoczy
Deanne M. Mazzochi
Matthew O. Brady
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6301
Fax: (312) 222-6321

*Attorneys for Plaintiffs*
*Apotex Inc. And Apotex Corp.*

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/23/04
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x
APOTEX INC. and APOTEX CORP.,          :

          Plaintiffs,                   :          Civil Action No. 04 CV 2922 (WHP)

     - against -                        :          **STIPULATION AND ORDER**

BRISTOL-MYERS SQUIBB COMPANY.,         :

          Defendants.                   :
-------------------------------------x

    WHEREAS defendant Bristol-Myers Squibb Company ("BMS") holds approved

New Drug Application ("NDA") No. 19-898 for pravastatin sodium tablets, which BMS sells

under the brand-name Pravachol®.

    WHEREAS U.S. Patent Nos. 4,346,227 (the "'227 patent"), 5,030,447 (the "'447

patent"), 5,180,589 (the "'589 patent"), and 5,622,985 (the "'985 patent") (all of which are

-1-

owned by BMS except for the '227 patent) are listed in the Food and Drug Administration's ("FDA") publication, *Approved Drug Products and Therapeutic Equivalence Evaluations*, in connection with BMS's NDA No. 19-898 and Pravachol® oral tablets.

WHEREAS BMS received notice from TorPharm, Inc., now Apotex Inc. ("Apotex"), notifying BMS that Apotex had filed Abbreviated New Drug Application ("ANDA") No. 76-341, pursuant to 21 U.S.C. § 355(j), seeking approval from FDA to engage in the manufacture, sale, and/or use of a generic version of Pravachol® (pravastatin sodium) tablets in 10 mg, 20 mg, 40 mg, and 80 mg strengths.

WHEREAS Apotex's ANDA No. 76-341 contained (1) a "Paragraph (III)" certification with respect to the '227 patent in which Apotex represented to FDA that it did not seek approval to market a generic pravastatin sodium product prior to the expiration date of that patent (which along with an additional 6 months for "pediatric exclusivity" as granted by the FDA means Apotex cannot receive final FDA approval before April 20, 2006), and (2) "Paragraph (IV)" certifications, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), with respect to the '447, '985, and '589 patents, stating that Apotex seeks FDA approval to market a generic pravastatin sodium product before the expiration of the '447, '985 , and '589 patents, and that such patents are invalid and/or would not be infringed by the marketing, sale, and/or use of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

WHEREAS BMS did not sue Apotex for infringement of the '447, '985, and '589 patents.

WHEREAS on April 15, 2004, Apotex filed suit against BMS, pursuant to 28 U.S.C. §§ 2201 and 2202, 21 U.S.C. § 355(j)(5)(C)(i), and 35 U.S.C. § 271(e)(5), seeking a declaratory judgment of noninfringement and/or invalidity of the '447, '985, and '589 patents.

-2-

WHEREAS, prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

NOW THEREFORE, based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341, Apotex hereby stipulates that Apotex's Complaint seeking a declaratory judgment of noninfringement of the '447, '985, and '589 patents be, and hereby is, dismissed, for lack of subject matter jurisdiction, with each party to bear it own costs.

Dated July 23, 2004

_____
FITZPATRICK, CELLA, HARPER
& SCINTO
Robert L. Baechtold, (RB 6866)
Thomas H. Beck (TB 4400)

30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 218-2100
Fax: (212) 218-2200

*Attorneys for Defendant*
*Bristol-Myers Squibb Company*

Dated July ___, 2004

_____
SULLIVAN & WORCESTER LLP
Marc A. Lebowitz (ML 7381)
Matthew Giger (MG 3731)

1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 660-3000
Fax: (212) 660-3001

SO ORDERED:

_____
WILLIAM H. PAULEY  III  U.S.D.J.

-3-

*Of Counsel:*

RAKOCZY MOLINO MAZZOCHI LLP
William A. Rakoczy
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6301
Fax: (312) 222-6321

*Attorneys for Plaintiffs*
*Apotex Inc. and Apotex Corp.*

SO ORDERED this _____ day of _____, 2004

_____
Honorable William H. Pauley III
United States District Judge

NY_MAIN 441191v1

4

# TAB F

# Defendant BMS's Memorandum of Law in Support of its Motion to Dismiss

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| APOTEX INC. and APOTEX CORP., | : ) ) ) : ) : ) ) : ) ) : | |
| Plaintiffs, | | |
| v. | | Civil Action No. 1:04-CV-2922 (WHP, ECF) |
| BRISTOL-MYERS SQUIBB COMPANY, | | |
| Defendant. | | |

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

THE RELEVANT STATUTORY SCHEME.................................................................3

STATEMENT OF FACTS ......................................................................................6

    A.    Bristol's NDA .......................................................................... 6

    B.    "Paragraph (IV)" Certification Notices Received By Bristol .................. 7

    C.    Apotex's Efforts To Manufacture A Controversy ................................. 8

ARGUMENT ....................................................................................................10

I.    APOTEX'S DECLARATORY JUDGMENT ACTION SHOULD BE
DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION .......................... 10

    A.    Apotex Has Not And Cannot Demonstrate That An Actual Case Or
Controversy Exists ....................................................................... 10

        i)    The test for an "actual controversy." ..................................... 10

        ii)    Apotex was unable to plead sufficient facts to establish an actual
controversy because they do not exist. .................................. 11

    B.    Apotex Is Not Entitled To The Declaratory Relief It Has Requested................. 15

        i)    The existence of a patent, even one listed in the Orange Book,
does not create a case or controversy...................................... 15

        ii)    Apotex should not succeed in its attempt to manipulate the
statutory balance. .......................................................... 17

    C.    The Medicare Act Does Not Create An Artificial Case Or Controversy
For The Purpose Of Bringing A Declaratory Judgment Action .......................... 19

II.    EVEN IF THE COURT FINDS AN ACTUAL CONTROVERSY, DISMISSAL
IS WARRANTED ....................................................................................... 23

CONCLUSION..................................................................................................25

i

# TABLE OF AUTHORITIES

## Cases

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)..........................................................................1

*Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002).........................................3

*BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) ................ 10, 11, 15, 22, 23

*BP Chems. Ltd. v. Union Carbide Corp.*, 757 F. Supp. 303 (S.D.N.Y. 1991) ...................... 11, 18

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942) ...........................................................23

*Charles Mach. Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980
    (W.D. Okla. 2003) .................................................................................................................. 15

*Demby v. Schweiker*, 671 F.2d 507 (D.C. Cir. 1981) .................................................................21

*Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110 (2d Cir. 2000).............................21

*Dr. Reddy's Labs., Ltd. v. Pfizer Inc.*, No. CIV.A.03-CV-726, 2003 WL 21638254
    (D.N.J. July 8, 2003)..........................................................................................14, 16-19

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*,
    148 F. Supp. 2d 412 (D. Del. 2001).......................................................................... 15

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)...............................................23, 24

*Gillette Co. v. Optiva Corp.*, No. 99 CIV. 402, 2000 WL 307389
    (S.D.N.Y. Mar. 23, 2000) ................................................................................................ 10

*Mutual Pharm. Co. v. Pfizer, Inc.*, 307 F. Supp. 2d 88 (D.D.C. 2004) ........................... 10, 14, 22

*Mylan Pharms., Inc. v. Thompson*, 268 F.3d 1323 (Fed. Cir. 2001) ............................................3

*National Presto Indus., Inc. v. Dazey Crop.*, 107 F.3d 1576 (Fed. Cir. 1997) ............................ 10

*Premo Pharm. Labs., Inc. v. Pfizer Pharms., Inc.*, 465 F. Supp. 1281
    (S.D.N.Y. 1979)................................................................................................................ 10, 14

*Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037 (Fed. Cir. 1995) .................................................. 24

*SGM Elettronica v. Vari-Lite, Inc.*, No. 99CIV.11684, 2000 WL 977701
    (S.D.N.Y. July 14, 2000) ................................................................................................ 6, 11

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992)............................................ 10, 11, 15

Defendant Bristol-Myers Squibb Company ("Bristol") moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. This Court lacks jurisdiction because no actual case or controversy exists between Bristol and the plaintiffs (Apotex Inc. and Apotex Corp. – together "Apotex"). Further, even if there were jurisdiction, this Court should decline to accept it to avoid conflict with the policies and interests embodied in the Hatch-Waxman and Medicare Acts.[1]

## INTRODUCTION

Apotex, a generic drug manufacturer, brought this action seeking a declaration that a drug product that it does not yet sell, and does not yet have FDA approval to sell, does not infringe any valid claim of certain Bristol patents. As the facts will show there is no basis for declaratory judgment jurisdiction here because there is no controversy.

The essential Constitutional predicate for subject matter jurisdiction in a declaratory judgment action is that there be a real "case or controversy." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). In the context of an action seeking a declaration of invalidity or non-infringement of a patent:

1.    The patent owner must have engaged in conduct that creates a reasonable apprehension by the plaintiff that it will be sued, i.e., the patent owner must have "threatened" the plaintiff; and

2.    The plaintiff's allegedly infringing activity must be imminent or ongoing.

---

[1]    The Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman Act," is the legislation that governs the approval of generic drugs and is codified in pertinent part at 21 U.S.C. § 355 and 35 U.S.C. § 271. Additional amendments were recently made by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "Medicare Act"). Except as otherwise noted the Medicare Act revisions do not apply to the issues presently before the Court.

The lack of a real controversy between Apotex and Bristol could not be more plain. Apotex cannot reasonably fear being sued by Bristol, because Bristol has repeatedly affirmed in writing, in absolute terms, that it has *no* intention of suing Apotex.

On November 10, 2003, counsel for Bristol wrote to counsel for Apotex (then TorPharm[2]):

> Based on the information and representations in [Apotex's] paragraph IV notice, and so long as such information and representations remain accurate, *BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents by the product described in ANDA No. 76-341.*

In a letter on February 13, 2004, Bristol's in-house counsel reassured Apotex that based on Apotex's prior representations,

> *[Apotex] has no reason, now or in the future, to be apprehensive that BMS will sue it for infringement based on any of those three patents.*

In a third letter dated February 20, 2004, Bristol's in-house counsel stated yet again that it

> *has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents* so long as [Apotex's] previous representations about its proposed generic products remain accurate.[3]

Therefore, in the face of Bristol's unequivocal written representations, the fears of suit that Apotex pleads are sham. Its real objective is not to resolve any concerns it has about being sued, but rather to use this suit as an end run to erode another generic pharmaceutical company's marketing exclusivity as granted by the Hatch-Waxman Act.

---

2    TorPharm, Inc. is now Apotex Inc. (Complaint ¶ 66). "Apotex" is used in place of "TorPharm" throughout this Memorandum of Law.

3    Apotex has never disavowed its representations regarding its product.

Recognizing that its purported standing to sue finds no support in judicial precedent, Apotex asserts that the recent Medicare Act created a new cause of action with relaxed jurisdictional standards. However, as the legislators expressly acknowledged, that is not so, indeed could not be so, because the existence of a legitimate "case or controversy" is a Constitutional requirement for an Article III court. The statutory changes enacted in December 2003 simply did not change or eliminate that fundamental constitutional requirement, nor could they.

## THE RELEVANT STATUTORY SCHEME

The Hatch-Waxman Act is the product of a carefully constructed balance between the policy interest in "inducing pioneering research and development of new drugs" with that of "enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). Further balancing was done in the Medicare Act, enacted on December 8, 2003.

A company, such as Bristol, that develops a new drug must submit a comprehensive New Drug Application ("NDA") to the FDA to obtain approval to manufacture and market that drug. *See* 21 U.S.C. § 355(a)-(b)(1). An NDA consists of thousands of pages of safety, pharmacokinetic, efficacy and manufacturing studies and data. "Preparing an NDA is frequently a time-intensive and costly process, because among other things, it must contain detailed clinical studies of the drug's safety and efficacy." *Mylan Pharms., Inc. v. Thompson*, 268 F.3d 1323, 1325 (Fed. Cir. 2001). The NDA holder is also required to inform the FDA of any patents that cover the new drug, which the FDA then "lists" in what is known as the "Orange Book." 21 U.S.C. § 355(b)(1).

After an NDA has been approved by the FDA, a company that wants to manufacture and market a generic version of the drug may submit an Abbreviated New Drug

-3-

Application ("ANDA") to the FDA for approval. 21 U.S.C. § 355(j)(1). The generic drug company is only required to submit information showing that its generic drug is bioequivalent (*i.e.* provides the same amount of drug in the blood) to the brand-name drug; it is allowed to rely on all of the safety and efficacy studies previously submitted in the brand-name drug company's NDA and is spared the investment of time and effort to create that body of data. 21 U.S.C. § 355(j)(2)(A).

       The Hatch-Waxman Act states: "It shall not be an act of infringement to make, use, offer to sell, or sell . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . . ." 35 U.S.C. § 271(e)(1). Therefore, a company that wants to bring a generic drug to the market may do the bioequivalency studies required for an ANDA application without fear that it will be sued for patent infringement. As part of its ANDA application, however, the generic drug manufacturer must include a certification regarding any patents that have been listed in the Orange Book for the relevant brand-name drug. 21 U.S.C. § 355(j)(2)(A)(vii). If the generic drug company elects to wait to market its generic drug product until a listed patent has expired, it files what is known as a "paragraph (III)" certification. 21 U.S.C. § 355(j)(2)(A)(vii)(III). If the generic company seeks to sell its generic drug product before a listed patent has expired, it must file what is known as a "paragraph (IV)" certification, in which it certifies that the listed patent "is invalid or will not be infringed by the manufacture, use, or sale of the new [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The ANDA applicant must also provide the patentee with notice and a detailed statement of the basis for the applicant's belief that the patent is invalid or not infringed. 21 U.S.C. § 355(j)(2)(B).

After receiving the ANDA applicant's "paragraph (IV)" certification statement, the patent owner evaluates the information provided by the ANDA applicant to determine whether to sue for patent infringement. If the patent owner sues the ANDA applicant within 45 days of receiving the "paragraph (IV)" certification statement, the ANDA cannot be finally approved by the FDA (and therefore the generic company cannot enter the market) until the earlier of (i) 30 months from the date that the detailed statement is received, or (ii) the date of a court decision holding the patent invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iii). If the patent owner does not sue within the 45-day window, any patent-based impediment to FDA approval of the generic company's ANDA application is removed, including the statutory 30-month stay.

To encourage ANDA filers to design around or challenge a patent listed in the Orange Book, the Hatch-Waxman Act provides an incentive for early ANDA applicants. It grants a 180-day exclusivity period, during which time the first applicant who makes a "paragraph (IV)" certification (whether based on avoiding infringement or contesting validity) may market its generic drug without competition from all subsequent generic filers. 21 U.S.C. § 355(j)(5)(B)(iv). That exclusivity period expires 180 days after the earlier of (i) actual marketing of the drug by that first ANDA filer, or (ii) a court decision holding the involved patent invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv) (old).[4]  Of course, if the first ANDA filer is not sued, there can be no adjudication of the patent in a litigation involving that applicant as a party and, absent any other triggering event, its exclusivity period begins when it commences actual marketing. However, actions involving a subsequent ANDA filer (*e.g.* an adverse adjudication) can prematurely trigger

---

[4]    For ANDA's filed prior to the Medicare Act, a court decision will still start the 180-clock for the first filer. *See* Medicare Act § 1102(b)(1). However, the Medicare Act's definition of a "court decision" as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken" does apply to these earlier-filed ANDA's. *See* Medicare Act § 1102(b)(3).

the first filer's exclusivity period.[5] If that happens before the first ANDA filer has its FDA

approval, its marketing exclusivity is eroded or totally lost. *See generally Teva Pharms. USA, Inc.*

*v. USFDA*, 182 F.3d 1003 (D.C. Cir. 1999).

## STATEMENT OF FACTS

A.    Bristol's NDA

Bristol developed a formulation of pravastatin sodium, a drug used to treat high

cholesterol conditions and cardiovascular disease. (Blischak Decl. ¶ 3).[6] Bristol did the required

extensive studies for an NDA and obtained approval from the FDA to market and sell its

pravastatin sodium formulation, which is currently sold under the brand name Pravachol®.

(Blischak Decl. ¶¶ 3-4). In addition, the United States Patent and Trademark Office issued a

number of patents to Bristol, which cover Bristol's pravastatin sodium formulation.

United States Patent No. 4,346,227 ("the '227 patent") issued on August 24, 1982

and covers the pravastatin compound. That patent expires on October 20, 2005 and is not the

subject of a "paragraph (IV)" certification from any ANDA filer. (Blischak Decl. ¶ 5). With an

additional 6 months for "pediatric exclusivity" as granted by the FDA, no generic pravastatin

product can thus receive final FDA approval before April 20, 2006. *See* Blischak Decl. ¶ 5;

21 U.S.C. § 355(j)(5)(B)(ii).

---

[5]    *See* footnote 4 *supra*.

[6]    "Blischak Decl." refers to the Declaration Of Matthew P. Blischak Under 28 U.S.C. § 1746
In Support Of Defendant's Motion To Dismiss Plaintiffs' Complaint. "In deciding a
motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary
matters outside the pleadings."· *SGM Elettronica v. Vari-Lite, Inc.*, No. 99CIV.11684, 2000
WL 977701, at * 3 (S.D.N.Y. July 14, 2000) (Exhibit 1 to the accompanying Declaration of
Lori A. Klucsarits, Esq. (hereafter "Klucsarits Decl.")).

United States Patent Nos. 5,030,447 ("the '447 patent"), and 5,180,589 ("the '589 patent"), issued July 9, 1991, and January 19, 1993, respectively. These two patents cover a "reduced mass formulation" of pravastatin sodium. Finally, United States Patent No. 5,622,985 ("the '985 patent") issued on April 22, 1997 and covers a method of using pravastatin sodium for one specific class of patients — to reduce the risk of or prevent a second heart attack. (Blischak Decl. ¶ 5). As it was required to do, Bristol informed the FDA of the '227, '447, '589, and '985 patents, and the FDA listed them in the Orange Book for Pravachol®. (Blischak Decl. ¶ 6).

B.    "Paragraph (IV)" Certification Notices Received By Bristol

At least eight generic drug manufacturers submitted ANDA's seeking to market generic pravastatin products. The '447, '589, and '985 patents were the subject of multiple "paragraph (IV)" certification notices and statements from different generic manufacturers explaining why each company believes that its intended generic product will not infringe these patents and/or why one or more of the patents were believed to be invalid. (Blischak Decl. ¶ 7).

Apotex was not the first generic company from which Bristol received a "paragraph (IV)" certification notice. (Blischak Decl. ¶ 7). As Apotex was not the first to file an ANDA with a "paragraph (IV)" certification, it is not entitled to the 180-days of exclusivity provided by the Hatch-Waxman Act. *See* Complaint ¶ 73; *see also* 21 U.S.C. § 355(j)(5)(B)(iv). To the contrary, pursuant to the time periods provided under the Hatch-Waxman Act, Apotex cannot obtain FDA approval to market until 180 days after the first ANDA filer commences marketing its generic product, unless, prior to that time, there is a court decision finding Bristol's patents invalid or not infringed. *See* Complaint ¶ 77; *see also* 21 U.S.C. § 355(j)(5)(B)(iv) (old).[7]

---

[7]    *See* footnote 4 *supra*.

Bristol has not sued, threatened to sue, or charged infringement of the '447, '589 and '985 patents by *any* of the generic drug companies that have provided Bristol with detailed "paragraph (IV)" certification statements pertaining to the '447, '589 and '985 patents. (Blischak Decl. ¶ 9). Bristol has not taken any action to preclude or delay any generic companies from entering the market with or obtaining FDA approval for their generic pravastatin sodium formulations. (Blischak Decl. ¶ 20).

C.    Apotex's Efforts To Manufacture A Controversy

In correspondence with Apotex regarding the '447, '589, and '985 patents, Bristol has repeatedly affirmed that it does not intend to sue Apotex.

A letter from Apotex's counsel, dated October 27, 2003, (Blischak Decl., Exh. A), asserted that the '447, '589, and '985 patents were improperly listed in the Orange Book and demanded that Bristol withdraw those patents immediately. That letter also demanded that Bristol agree in writing that Apotex's proposed generic pravastatin sodium product "does not and will not infringe the '447, '589, and '985 patents." Counsel for Bristol responded on November 10, 2003 (Blischak Decl., Exh. B), calling Apotex's assertions regarding the listing of the patents, "baseless," but assuring Apotex that

> [b]ased on the information and representations in [Apotex's] paragraph IV notice, and so long as such information and representations remain accurate, *BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents by the product described in ANDA No. 76-341.*

On December 4, 2003, Bristol sent Apotex's counsel a follow-up letter (Blischak Decl., Exh. C) responding in more detail to Apotex's contentions regarding the Orange Book listing of Bristol's patents. Bristol said it would not withdraw the '447, '589, and '985 patents from the Orange Book and explained why the patents are properly listed. But it did not retract its

-8-

previously expressed intention not to sue Apotex or in anyway suggest that its position had

changed. Apotex made no further challenge to the listing of the patents.

In a letter dated February 3, 2004 (Blischak Decl., Exh. D), counsel for Apotex

extended to Bristol an Offer of Confidential Access to Application. On February 13, 2004, Bristol

declined Apotex's offer, and reminded Apotex that Bristol had already indicated that it had no

intention of suing Apotex for infringement of Bristol's patents relating to pravastatin. (Blischak

Decl., Exh. E). In the February 13 letter, Bristol again reassured Apotex that it had no intention of

bringing a suit for the infringement of the '447, '589 and '985 patents, stating that unless Apotex

disavowed its prior representations regarding its generic pravastatin sodium product,

> *[Apotex] has no reason, now or in the future, to be apprehensive*
> *that BMS will sue it for infringement based on any of those three*
> *patents.*

In a letter dated February 15, 2004 (Blischak Decl., Exh. F), Apotex took issue with

what it asserted were "glaring inconsistencies in BMS' prior letters" regarding Bristol's position

on what was covered by the listed Orange Book patents and Apotex's ANDA. Even though

Bristol had explicitly stated in two separate letters that it would not sue Apotex for infringement of

the '447, '589, and '985 patents, Apotex accused Bristol of "impliedly" accusing Apotex's product

of infringing those patents.

Bristol responded with a letter dated February 20, 2004 (Blischak Decl., Exh. G):

> While [Apotex] may continue to disagree with BMS' interpretation
> of the claims of the three BMS patents, *BMS nonetheless has no*
> *intention, now or in the future, of suing [Apotex] for infringement*
> *of any of the three BMS patents* so long as [Apotex's] previous
> representations about its proposed generic products remain accurate.

Despite Bristol's three clear and timely statements that it has no intention of suing

Apotex for infringement of the '447, '589, and '985 patents, Apotex filed this suit for declaratory

judgment against Bristol on April 15, 2004.

-9-

### ARGUMENT

I.     **APOTEX'S DECLARATORY JUDGMENT ACTION SHOULD
BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

    A.     Apotex Has Not And Cannot Demonstrate
          That An Actual Case Or Controversy Exists

        i)     *The test for an "actual controversy."*

When subject matter jurisdiction is challenged, the burden rests on the plaintiff to

establish its presence. *National Presto Indus., Inc. v. Dazey Crop.*, 107 F.3d 1576, 1580 (Fed. Cir.

1997) ("[T]he party seeking jurisdiction, bears the burden of showing jurisdiction.").

Under Article III of the United States Constitution, federal jurisdiction does not

exist in the absence of an actual case or controversy. U.S. CONST. art. III, § 2, cl. 1; *see Mutual*

*Pharm. Co. v. Pfizer, Inc.*, 307 F. Supp. 2d 88, 91 (D.D.C. 2004); *Spectronics Corp. v. H.B. Fuller*

*Co.*, 940 F.2d 631, 635 (Fed. Cir. 1991). Although the Declaratory Judgment Act created a new

remedy, it could not eliminate the requirement of "a case of actual controversy" between the

parties. 28 U.S.C. § 2201(a); *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir.

1993) ("[T]he controversy must be actual, not hypothetical or of uncertain prospective

occurrence.").[8]  If there is no actual controversy between the parties regarding the subject matter

on which a declaratory judgment is sought, the court must dismiss the action for lack of subject

matter jurisdiction. *Spectronics*, 940 F.2d at 634 ("When there is no actual controversy, the court

has no discretion to decide the case."); *see also Gillette Co. v. Optiva Corp.*, No. 99 CIV. 402,

2000 WL 307389, at *3 (S.D.N.Y. Mar. 23, 2000) (Klucsarits Decl., Exh. 2); *Premo Pharm. Labs.,*

*Inc. v. Pfizer Pharms., Inc.*, 465 F. Supp. 1281, 1284 (S.D.N.Y. 1979). A complaint that seeks

declaratory relief "must plead facts *initially* sufficient to establish the existence of an actual

---

[8]    Any appeal in this case would be heard by the Court of Appeals for the Federal Circuit.
*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 n.4 (Fed. Cir. 1992).

controversy." *Spectronics*, 940 F.2d at 634 & n.1; *BP Chems. Ltd. v. Union Carbide Corp.*, 757 F. Supp. 303, 304 (S.D.N.Y. 1991) ("The legal standard is an objective one, and its elements must exist at the time the suit is filed."), *aff'd, BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993).

For declaratory judgment actions involving patents, a two-pronged test is used to determine whether an "actual controversy" exists. *Spectronics*, 940 F.2d at 634. When subject matter jurisdiction is challenged, the burden is on the plaintiff to show that 1) the patentee's conduct has created a reasonable apprehension on the part of the plaintiff that the patentee will initiate a suit for patent infringement, and 2) the plaintiff has either produced the potentially infringing device or prepared to produce it. *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297 (Fed. Cir. 1992). The court considers the conduct of the patentee-defendant under the first prong and that of the plaintiff under the second prong. *BP Chems.*, 4 F.3d at 978. The declaratory judgment plaintiff must establish by a preponderance of the evidence that a reasonable apprehension of suit exists in order to satisfy the first prong of the test. *BP Chems.*, 757 F. Supp. at 305.

    ii)    *Apotex was unable to plead sufficient facts to establish an actual controversy because they do not exist.*

Under the first prong of the "actual controversy" test, the plaintiff must establish that it has a reasonable apprehension that it will be sued for patent infringement. To do so it must show by a preponderance of the evidence that the patentee's conduct indicates an intent to enforce the specific patent against the plaintiff. *Shell Oil*, 970 F.2d at 887-88. When there are no express charges of infringement, the court will look at the "totality of the circumstances." *Id.* at 888; *SGM*, 2000 WL 977701, at *3.

-11-

Apotex cannot have an objectively reasonable apprehension of suit. Its attempts to establish the necessary factual support for a declaratory judgment are based on a distorted interpretation of the correspondence between it and Bristol to fabricate a contrived apprehension of suit where one could not possibly exist. (Complaint ¶¶ 78-89).

Bristol has repeatedly stated that it will *not* sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product. (Blischak Decl. ¶ 10). Bristol's November 10, 2003 letter stated that

> *BMS does not intend to file suit against [Apotex] alleging*
> *infringement of any of these three patents by the product described*
> *in ANDA No. 76-341.*

(Emphasis added) (Blischak Decl., Exh. B). Bristol's February 13, 2004 letter, repeated that

> *[Apotex] has no reason, now or in the future, to be apprehensive*
> *that BMS will sue it for infringement based on any of those three*
> *patents.*

(Emphasis added) (Blischak Decl., Exh. E).

When Apotex's counsel sought to fabricate a controversy from the fact that Bristol had declined to accede to Apotex's demand that Bristol remove the '447, '589, and '985 patents from the Orange Book, Bristol responded:

> While [Apotex] may continue to disagree with BMS' interpretation
> of the claims of the three BMS patents, *BMS nonetheless has no*
> *intention, now or in the future, of suing [Apotex] for infringement*
> *of any of the three BMS patents* so long as [Apotex's] previous
> representations about its proposed generic products remain accurate.

(Emphasis added) (Blischak Decl., Exh. G).

Thus, while Bristol declined to engage in an unnecessary debate over claim interpretation, it stated, in three separate letters, that based on Apotex's representations regarding its generic product, Bristol has no intention of suing Apotex for infringement of the '447, '598, and '985 patents. Apotex made representations about what its proposed product does and does not

-12-

contain. Bristol said, unequivocally, that if those representations are indeed true, it will not sue Apotex on the '447, '598 or '985 patents. Apotex knows best whether the representations it made *are* true, and its complaint nowhere suggests they are not. Nor has Apotex otherwise disavowed those statements. Whether Apotex and Bristol agree on the reasons *why* Bristol will not sue is a purely academic question. All Apotex needs to know is the *fact* that Bristol does not intend to sue, and Bristol has made that manifestly plain.

Apotex says in paragraph 82 of its Complaint that Apotex's ANDA and pravastatin sodium product "are subject to change or modification during the FDA approval process." That is at most a theoretical possibility. Whether changes will be made and, if so, what they will be, is pure conjecture at this point. Something that is *completely speculative* is not enough to create the "case or controversy" necessary for maintaining a declaratory judgment action. *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059-60 (Fed. Cir. 1995) ("The residual possibility of a future infringement suit based on [Apotex's] future acts is simply too speculative a basis for jurisdiction . . . ."). That theoretical possibility cannot overcome the fact that Bristol has informed Apotex on multiple occasions that it has no present or future intention of suing Apotex for infringement of the '447, '589, and '985 patents based on Apotex's current representations regarding its generic product.

Not only has Bristol affirmatively expressed that it has no intention of suing Apotex, there are no other actions on the part of Bristol which could have given Apotex an objectively reasonable apprehension of suit. Unlike the '227 patent on the basic active ingredient pravastatin, itself, which *none* of the generic filers challenged, the '447 and '589 patents are directed to specific formulations, with specific, required, additional components. A generic that does not include those other components would not infringe. The '985 patent covers using

-13-

pravastatin for one specific use – in patients who have already suffered a heart attack. A generic that does not seek approval to sell for that use has not infringed. After receiving several "paragraph (IV)" certifications, Bristol has not sued any of the ANDA applicants for infringement of any of those patents (Blischak Decl. ¶ 9), and the 45-day period during which a suit by Bristol would have invoked the 30-month stay of FDA approval under 21 U.S.C. § 355(j)(5)(B)(iii) has expired for all of the ANDA filers. (Blischak Decl. ¶ 8). Bristol's decision not to bring suit against Apotex (or any of the generics that filed "paragraph (IV)" certifications regarding the '447, '589, and '985 patents) is evidence that Bristol has no intention of suing Apotex on these three patents. *Dr. Reddy's Labs., Ltd. v. Pfizer Inc.*, No. CIV.A.03-CV-726, 2003 WL 21638254, at *7 (D.N.J. July 8, 2003) ("Furthermore, Pfizer failed to sue DRL within the statutory 45 day period after the paragraph IV certification for the '699 patent, thus providing some evidence that Pfizer does not intend to sue DRL.") (Klucsarits Decl., Exh. 3).

      The Apotex Complaint refers to previous litigation between it and Bristol and other suits by Bristol against third parties, all involving *other* products and *other* patents. (*See* Complaint ¶¶ 92-94). However, a history of patent enforcement against companies that seek to market generic versions of a patentee's different brand-name drug, does not create a reasonable apprehension in and of itself. *Mutual Pharm.*, 307 F. Supp. 2d at 93-94; *Dr. Reddy's Labs*, 2003 WL 21638254, at *7 ("Pfizer's history of enforcing its patent rights does not provide any indication of Pfizer's intentions with regards to the '699 patent and DRL's generic setraline product."); *see also Premo Pharm.*, 465 F. Supp. at 1283-84.

      This Court and others have recognized that a history of patent litigation by itself, even if between the same two parties, does not provide grounds for a reasonable apprehension of suit. *See Mutual Pharm.*, 307 F. Supp. 2d at 93-94 (previous litigation between the same two

-14-

parties does not create a reasonable apprehension in and of itself); *DuPont Dow Elastomers, L.L.C.*

*v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412, 415 & n.1 (D. Del. 2001) (infringement suits

between the same parties but involving different patents do not create a reasonable apprehension).

Nor do suits against unrelated third parties necessarily create an objective,

reasonable apprehension in a declaratory judgment plaintiff. *West Interactive*, 972 F.2d at 1298;

*Charles Mach. Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980, 983, 986 (W.D. Okla.

2003) (even where patentee had asserted multiple patents against multiple defendants, there was

not sufficient evidence that the patentee had formed an intent to sue the declaratory judgment

plaintiff).

Accordingly, Apotex has failed to establish the jurisdictional predicate of conduct

by Bristol that would give rise to an objectively reasonable apprehension that Bristol will bring an

infringement suit on these patents against Apotex. Absent a credible indication that Bristol intends

to bring suit against Apotex, any apprehension of suit on Apotex's part is unreasonable, and the

Court should dismiss Apotex's Complaint. *See West Interactive*, 972 F.2d at 1296-98.

B.    **Apotex Is Not Entitled To The Declaratory Relief It Has Requested**

i)    *The existence of a patent, even one listed in*
*the Orange Book, does not create a case or controversy.*

"The Declaratory Judgment Act was intended to protect threatened parties, not to

drag a non-threatening patentee into court." *Shell Oil*, 970 F.2d at 889. For an actual controversy

in patent cases, "more is required than the existence of an adversely held patent." *BP Chems.*, 4

F.3d at 978. The mere existence of Bristol's '447, '589, and '985 patents is an "insufficient basis

for a declaratory action to invalidate the patent[s]." *Id.* at 981. Merely having patents does not

equate to brandishing them like a modern-day "Sword of Damocles." (*See* Complaint ¶ 40). More

-15-

is required on the part of the patentee than owning patents, even ones listed in the Orange Book, for an ANDA filer to have an objectively reasonable apprehension of suit.

The statute *requires* that the NDA applicant list all patents that might be asserted. In particular, pursuant to 21 U.S.C. § 355(b)(1), an NDA applicant "*shall*" submit information regarding patents for which "a claim of patent infringement *could reasonably be asserted*." Contrary to Apotex's contention, this does *not* mean that "a suit for infringement *can and will be asserted* against any ANDA applicant that attempts to seek approval for and market a generic version of the NDA drug." (Complaint ¶ 25). By listing the subject formulation patents in the Orange Book, Bristol represented that those patents cover the formulation that *Bristol* sells. Bristol did *not* represent that they cover every conceivable formulation that others might seek to sell. The *statutorily required* listing of patents in the Orange Book simply is, therefore, not enough to give rise to a reasonable apprehension of suit by an ANDA applicant. *Dr. Reddy's Labs.*, 2003 WL 21638254, at *5 ("In the absence of strong objective evidence 'sufficient to indicate intent to initiate an enforcement action,' the mere listing of multiple patents does not create declaratory judgment jurisdiction . . . ." (citation omitted)). A blanket inference that listing a patent in the Orange Book means the patentee has expressly declared its intention to sue any potential infringer, would cover every patent holder that has a listed patent, thereby completely eliminating one of the prongs used to determine whether an "actual controversy" actually exists. *Teva Pharms. USA Inc. v. Pfizer, Inc.*, 69 U.S.P.Q.2d 1791, 1794 (D. Mass. 2003). Thus, contrary to Apotex's assertion, the required listing of patents in the Orange Book does not "*alone* objectively create[] the necessary case or controversy and subject matter jurisdiction for an ANDA-filer to file and maintain a declaratory judgment action" if not sued within the statutory 45-day period. (Complaint ¶ 65, emphasis added).

-16-

ii)    *Apotex should not succeed in its attempt to manipulate the statutory balance.*

Apotex cannot substantiate its declaratory judgment action with its claim that it and the American public "will be irreparably harmed by the indefinite delay" of its market entry. (Complaint ¶ 9). The timing of Apotex's market entry is governed by the Hatch-Waxman and Medicare Acts. Apotex's suit is purely an attempt to subvert the statutory balance created by Congress to allow Apotex to put its product on the market sooner than it is entitled to under these Acts. *See Dr. Reddy's Labs.*, 2003 WL 21638254, at *7 (recognizing that the plaintiff "wishes to trigger the 180 day exclusivity period before [the first ANDA applicant] begins to actually market its product, thus negating the benefits conferred upon the first generic entrant as an incentive to encourage generic producers of drugs"). If any party is attempting to "manipulate the statutory scheme" in this action (Complaint ¶ 101), it is Apotex.

Bristol has not sued any ANDA applicants, including what it believes to be the first ANDA applicant, for infringement of the '447, '589, and '985 patents. (Blischak Decl. ¶ 9). So the only "delay" to the late-filer Apotex's entry into the market is that which was purposefully created by the Hatch-Waxman and Medicare Acts to reward the first ANDA applicant with an exclusivity period of 180 days. Apotex cannot blame that "delay" on Bristol. Bristol was not obliged to sue any generic ANDA filer even if it infringed, and especially not any that represented that it had designed around, and did not infringe, the listed patents. That Apotex's market entry is subject to the 180-day marketing exclusivity of another generic who acted more quickly is the result of the statutory provisions, not anything Bristol did. The suggestion that Bristol had some obligation to bring patent infringement suits solely because it would benefit Apotex if Bristol *lost* them, is absurd. (*See* Complaint ¶ 90).

-17-

Apotex's real goal here is not to remove any actual fear that it will be sued. Rather, what Apotex hopes is that by filing suit it will obtain either a decision from the court or a consent order from Bristol that its proposed generic product does not infringe, and thereby prematurely start the clock running on the first ANDA filer's 180 days of marketing exclusivity. 21 U.S.C. § 355(j)(5)(B)(iv) (old);[9] *see also SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 210 F.R.D. 547, 551 (E.D. Pa. 2002) (first ANDA filer Apotex sought to intervene due to concern that dismissal of declaratory judgment counterclaim based on patentee's covenant not to sue would constitute a "court decision" that could jeopardize its 180-day exclusivity period). Because no one has challenged the basic pravastatin compound patent whose exclusivity runs, in combination with the "periodic exclusivity" granted by the FDA, until April, 2006, Apotex's ploy could cause the first filer's exclusivity to run out before it ever gets to the market. This is not a controversy between Apotex and Bristol. It is a marketing strategy aimed at depriving the ANDA filer that beat Apotex into the FDA from receiving the marketing exclusivity that the Hatch-Waxman Act provided as an incentive for prompt filing.

Courts have recognized that declaratory actions brought for such purposes are improper. *See BP Chems.*, 757 F. Supp. at 310 (dismissing complaint where suit found to be brought as part of a marketing strategy). Apotex's claim, that a patent owner's declining to sue created a bottleneck to prevent full generic competition was specifically rejected in *Dr. Reddy's Laboratories, Ltd.*, where the District Court of New Jersey, aptly called it "unpersuasive" and an attempt "to nullify the statutory benefit given as an incentive for generic companies who take the greatest risk of being the first generic entrant on the market." *Dr. Reddy's Labs.*, 2003 WL 21638254, at *7. "[G]iven the intent of the Hatch-Waxman Amendments to encourage challenges

---

[9]    *See* footnote 4 *supra.*

to market-dominating pharmaceutical patents by" rewarding first filers with 180 days of market exclusivity, any alleged "foot-dragging ... intended to forestall a court decision that might prematurely start the running of [the first ANDA filer's] market exclusivity period" is not actionable. *Teva Pharms.*, 69 U.S.P.Q.2d at 1794-95. Just as the complaints in *Dr. Reddy's Laboratories, Ltd.* and *Teva Pharmaceuticals USA Inc.* were dismissed, so should Apotex's.

The convoluted and unrealistic reasoning Apotex urges on this Court is epitomized by paragraph 90 of its Complaint in which Apotex alleges that Bristol has somehow impeded generic competition by *not* suing Apotex. That bizarre allegation stands logic on its head. By not suing Apotex, Bristol gave up the ability to use the patents in issue to block Apotex's FDA approval. That did not "bottleneck and delay" generic competition, it facilitated it. Indeed, if Bristol *had* sued Apotex, and thereby invoked the statutory 30-month stay on FDA approval, no doubt Apotex would argue that suing was anti-competitive and sham.[10]

C.    The Medicare Act Does Not Create An Artificial Case Or Controversy For The Purpose Of Bringing A Declaratory Judgment Action

Recognizing that its standing to seek declaratory relief will not pass muster under prior precedent, Apotex pleads that the Medicare Act created a new "statutory right" under which Apotex is "entitled by law" to invoke this Court's limited subject matter jurisdiction. (Complaint ¶¶ 1, 8, 17, 46, 86, 108, 120).

Apotex is wrong because the Medicare Act's modifications of the Hatch-Waxman provisions have not, and in fact cannot, change the constitutional requirement for a "case or

---

[10]    If Bristol sued Apotex and won the case, Apotex would be precluded from final FDA approval until 2009, when the formulation patents and corresponding pediatric exclusivity terms expire, or even 2014, when the method of use patent and corresponding pediatric exclusivity term expire. (Blischak Decl. ¶ 5). Therefore, Apotex's "bottleneck" theory presupposes that Bristol had a legal obligation to bring a suit that it was pre-ordained to lose.

controversy." Rather, both the language of the Medicare Act and its legislative history reaffirm

that an actual case or controversy is still required for subject matter jurisdiction. The Medicare Act

provides that

> the courts of the United States shall, *to the extent consistent with the*
> *Constitution*, have subject matter jurisdiction in any action brought
> by such person under section 2201 of title 28 for a declaratory
> judgment that such patent is invalid or not infringed.

Medicare Act § 1101(d) (codified at 35 U.S.C. § 271(e)(5)) (emphasis added). The ANDA

applicant must thus still establish that the constitutionally required case or controversy exists.[11]

The limiting phrase "to the extent consistent with the Constitution" was added after

it was recognized that there were "serious flaws" in the language originally passed by the Senate.[12]

*See* 149 CONG. REC. S15562-69 at S15567 (daily ed. Nov. 22, 2003) (statement of Sen. Hatch)

(Klucsarits Decl., Exh. 5). Jon W. Dudas, Deputy Under Secretary of Commerce for Intellectual

Property and Deputy Director of the United States Patent and Trademark Office, provided

testimony to the United States Committee on the Judiciary on August 1, 2003, warning that "the

proposed amendment to establish an 'actual controversy' for declaratory judgment subject matter

---

[11]   Nor does the Act purport to overturn the prior caselaw precedent defining what is required
for a "case or controversy" in the context of a suit for a declaration of non-infringement or
invalidity of a patent. *See* section I.A.i, *supra*.

[12]   (5) The filing of an application described in paragraph (2) that includes a
certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of
the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and the failure of the
owner of the patent to bring an action for infringement of a patent that is the subject
of the certification before the expiration of the 45 days after the date on which the
notice given under subsection (b)(3) or (j)(2)(B) of that section is received, *shall*
*establish an actual controversy between the applicant and the patent owner*
*sufficient to confer subject matter jurisdiction in the courts of the United States in*
*any action brought by the applicant under section 2201 of title 28 for a*
*declaratory judgment that any patent that is the subject of the certification is*
*invalid or not infringed.*

Prescription Drug and Medicare Improvement Act of 2003, S. 1, 108th Cong. § 702.
(Klucsarits Decl., Exh. 4).

-20-

purposes could undermine the patent system." (Klucsarits Decl., Exh. 6). Sheldon Bradshaw,

Deputy Assistant Attorney General, U.S. Department of Justice, testified to the Administration's

view that the provision was "inconsistent with Article III of the Constitution" as it "attempts to

vest the lower federal courts with jurisdiction over disputes that, because of Article III's case or

controversy requirement, the Constitution does not empower these courts to hear." Accordingly,

the Administration suggested that the provision be deleted or rewritten. (Klucsarits Decl., Exh. 7).

Congress thus considered and rejected the original language of the provision that would have made

the failure to file a lawsuit by the patentee a sufficient basis for Federal jurisdiction.

> The subsequent Conference Committee Report[13] then explained:
>
>> Through the modifications in this Act, the conferees do not intend for the courts to modify their application of the requirements under Article III that a declaratory judgment plaintiff must, to the extent required by the Constitution, demonstrate a "reasonable apprehension" of suit to establish jurisdiction. The conferees expect the courts to examine as part of their analysis the particular policies served by the Hatch-Waxman Act.
>> In determining whether a reasonable apprehension of suit exists where an ANDA has been filed with a paragraph IV certification and the patentee has not brought an infringement suit within the 45 days, the conferees expect courts to examine these specific factors as part of the totality of the circumstances. In any given case, the conferees expect a court may or may not find a reasonable apprehension of suit where these two specific factors are present.

H.R. CONF. REP. NO. 108-391, at 836 (2003) (citations omitted) (Klucsarits Decl.,

Exh. 8).

> Thus Congress did not, and could not, create a new basis for federal jurisdiction

over any and all declaratory judgment actions brought by ANDA applicants. It most certainly did

---

[13]    See *Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent."); *see also Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124-25 (2d Cir. 2000).

not "explicitly mandate[] that an ANDA applicant is entitled to maintain a declaratory judgment action even when it is not sued," as Apotex alleges. (Complaint ¶ 46, see also ¶ 48).

Rather, one of the applicable Medicare Act provisions actually limits the right to seek declaratory relief by requiring the ANDA applicant to meet some specific criteria. These criteria are a required condition for a declaratory judgment action by an ANDA filer, but there is no merit to Apotex's allegation that it is "statutorily entitled to institute and maintain an action for declaratory judgment" if that list of statutory pre-requisites are fulfilled. (Complaint ¶ 48). The Act specifically affirms the Constitutional jurisdiction requirement of an "actual controversy," and the legislative history disclaims any intent to relax that requirement. An ANDA applicant must still prove it has an objectively reasonable apprehension of suit by the patentee before subject matter jurisdiction can attach in any declaratory judgment action, and that burden is not met simply by the fact that the ANDA applicant was *not* sued by the patentee. *See Mutual Pharm.*, 307 F. Supp. 2d at 93 (The Federal Circuit has yet to find "that the jurisdictional prerequisites for a declaratory judgment suit are met anytime an ANDA filer that files a paragraph IV certification is not sued by the pioneer patent holder within the 45-day window.").

As Bristol has done nothing to indicate that it is even contemplating a suit against Apotex under the patents laws, and on the contrary, has repeatedly said it will not sue Apotex for infringement of the '447, '589, and '985 patents, there is presently no live case or controversy, and the Medicare Act did not create an artificial case or controversy for ANDA filers. "The obverse of a definite and concrete dispute may be described as an advisory opinion on a situation not ripe for litigation." *BP Chems.* 4 F.3d at 977. In the absence of any affirmative indication from Bristol that it will bring suit, the need for judicial attention here is "prospective and uncertain of

-22-

occurrence" rather than "real and immediate." *Id.* at 978. Thus, to avoid rendering an advisory opinion, the Court should dismiss Apotex's request for declaratory relief.

## II. EVEN IF THE COURT FINDS AN ACTUAL CONTROVERSY, DISMISSAL IS WARRANTED

While the court has no discretion to decide a declaratory judgment action where there is no actual controversy, it is well-settled law that, even when there is an actual controversy, it is still within the court's sound discretion to decline to exercise jurisdiction over it. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942); *Spectronics*, 940 F.2d at 634. "[A]s long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad jurisdiction to refuse to entertain a declaratory judgment action." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996). In *EMC*, the Federal Circuit affirmed the district court's dismissal of a declaratory judgment action even though it found that the undisputed facts sufficiently established a controversy between the parties. *Id.* at 809, 811. The district court had found that the action was an abuse of the declaratory device and "not one that furthered the objectives of the Declaratory Judgment Act." *Id.* at 814, 815.

What has happened in the present case is precisely what the Hatch-Waxman Act prescribes. Because Bristol has patents that cover its specific formulation, it was required to inform the FDA, and the FDA properly listed those patents in the Orange Book. Because the patents were so listed, generic ANDA applicants studied them, certified their generic product would not infringe and/or that the patents were believed to be invalid, and explained their reasoning to Bristol. Bristol received those notices, carefully studied them, and chose not to bring suit within 45 days, and thereby the approval of those applicants cannot be delayed by any action of Bristol's. Because the first of those ANDA applicants to provide a "paragraph (IV)"

-23-

certification fulfilled all of the requirements of the Act before Apotex did, it earned a right of 180 days of marketing exclusivity against all later applicants, specifically against Apotex.

Apotex's alleged fear of being sued by Bristol is contrived, and Apotex's real purpose is not to resolve any dispute between it and Bristol, but rather to impair the statutory exclusivity right of another, first-filing generic, to Apotex's marketing advantage. Apotex's suit here is simply an attempt to subvert the provisions of the Hatch-Waxman and Medicare Acts and to achieve a "court decision" in an effort to prematurely start the 180 days of marketing semi-exclusivity at a time when the first-filing party who is entitled to it is unable to benefit from it, thereby accelerating Apotex's market entry. There is no actual case or controversy here between Bristol and Apotex.

However, if the Court concludes that, notwithstanding Bristol's clear and repeated disclaimers of any intention to sue, there was any basis at all for a reasonable apprehension in Apotex's mind, the Court should exercise its discretion and still decline jurisdiction. This Court should not allow Apotex to impose on the Court or on Bristol the significant expense and effort of unnecessary patent litigation to effectuate its attempt to strip a non-party generic applicant of its right to priority of marketing. *See Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995) (finding that when the investment of the court's time and resources would not be worthwhile, a party has no right to a declaratory judgment). "Simply because there is an actual controversy between the parties does not mean that the district court is required to exercise that jurisdiction." *EMC*, 89 F.3d at 813. Rather, the Declaratory Judgment Act "specifically entrusts courts with discretion to hear declaratory suits or not depending on the circumstances." *Serco*, 51 F.3d at 1039.

-24-

## CONCLUSION

Apotex's suit for a declaratory judgment that Bristol's '447, '589, and '985 patents are invalid and/or not infringed should be dismissed for lack of subject matter as no "actual controversy" exists. Even if this court finds an actual controversy, as required by both the Declaratory Judgment Act and the Medicare Act, this Court should exercise its discretion to deny Apotex's request for declaratory relief where that request is nothing but an attempt to circumvent the Hatch-Waxman and Medicare Acts.

Respectfully submitted,

s\ Thomas H. Beck
Robert L. Baechtold (RB 6866)
Thomas H. Beck (TB 4400)
FITZPATRICK, CELLA, HARPER
    & SCINTO
30 Rockefeller Plaza
New York, New York 10112-3801
Telephone: (212) 218-2100
Facsimile: (212) 218-2200

*Attorneys for Defendant*
*Bristol-Myers Squibb Company*

Dated: May 25, 2004

-25-