PUBLIC VERSION

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 04-5211

---

APOTEX, INC.,

Plaintiff-Appellant,

v.

FOOD AND DRUG ADMINISTRATION,
TOMMY G. THOMPSON, Secretary of
Health and Human Services, and
LESTER M. CRAWFORD, Acting
Commissioner of Food and Drugs,

Defendants-Appellees,

and

PUREPAC PHARMACEUTICAL CO.,

Intervenor-Defendant-Appellee.

---

## EMERGENCY MOTION OF APPELLEE PUREPAC
## PHARMACEUTICAL CO. TO VACATE STAY OF FINAL
## REGULATORY APPROVAL FOR GABAPENTIN

Appellee Purepac Pharmaceutical Co. ("Purepac") hereby respectfully moves on

an emergency basis, for an order vacating this Court's *pendente lite* stay of the FDA's

final regulatory approval of Purepac's Abbreviated New Drug Application (ANDA) for

gabapentin capsules imposed by the Court's order entered on July 26, 2004, in response

to the following four changed circumstances which are inequitably costing Purepac

**PUBLIC VERSION**

millions of dollars under the burden of the stay:

(1)     On September 1, 2004, appellant Apotex, the party whose motion resulted in the stay, acknowledged in writing that Apotex has no inventory of gabapentin capsules and has not even begun production of gabapentin capsules, contrary to Apotex's earlier statement to this Court that it stood to lose $169 million in gabapentin sales if the Court did not enter the stay.

(2)     On September 3, 2004, the board of Purepac's parent company authorized a commercial launch of Purepac's generic gabapentin capsule drug product upon a lifting of the stay, despite an unresolved patent infringement action involving gabapentin.

(3)     On August 18, 2004, the generic gabapentin market was opened up by the launch of a generic gabapentin tablet product by another company, Ivax Corp., a commercial development that will render the market for generic gabapentin capsules irretrievably lost, even according to Apotex, unless Purepac is able to market its gabapentin capsules.

(4)     According to recent press reports, Pfizer Inc., manufacturer of Neurontin®, (the brand name version of gabapentin capsules), expects to imminently launch the drug pregabalin, a drug chemically related to gabapentin. Pregabalin will reduce the gabapentin market and therefore Purepac's potential share of that market due to anticipated aggressive efforts by Pfizer to persuade physicians to prescribe pregabalin (which has no generic competition) instead of gabapentin (which does).

**PUBLIC VERSION**

These significant changed circumstances, coupled with the fact the district court below ruled in favor of Purepac, not Apotex, and the likelihood that Purepac will prevail on the merits of this appeal as explained below, fully warrant vacation of the stay. In the alternative, Apotex should be required to post a bond in the amount of $        as security for the lost profits Purepac will incur if the stay remains in place and Purepac prevails.

**REDACTED**

## ARGUMENT

This is an appeal of a district court order dismissing appellant Apotex's complaint challenging a determination by the U.S. Food and Drug Administration (FDA) that appellee Purepac is eligible for 180 days of generic market exclusivity for the anti-epilepsy prescription drug gabapentin in capsule dosage form. Briefing dates have been set, and oral argument is scheduled for December 6, 2004.

On July 26, 2004, the Court granted Apotex's motion for a stay of the FDA's final regulatory approval of Purepac's Abbreviated New Drug Application (ANDA) for gabapentin capsules, pending a decision in this appeal.

Now, substantial changes in circumstances since the Court entered the stay warrant an immediate lifting of the stay.

### A.     The Court is Empowered to Vacate the Stay

It is well established that an appellate court has equitable discretion to respond to changed circumstances, and to take corrective action, when its prior *pendente lite*

PUBLIC VERSION

injunctive order threatens to foster rather than forestall irreparable harm.  Consolidated Edison Company of New York v. Federal Power Commission, 511 F.2d 372, 378 (D.C. Cir. 1974).  See also:  Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383-84, 112 S.Ct. 748, 760, 116 L.Ed.2d 867 (1992); Marsh v. Johnson, 263 F.Supp.2d 49, 52 (D.D.C. 2003); Purolite Int'l Ltd. v. Rohm & Haas Co., 24 U.S.P.Q.2d 1857, 1859-60 (E.D. Pa. 1992); Atchison, Topeka and Santa Fe Railway Co. v. Callaway, et al., 431 F. Supp. 722 (D.D.C. 1977).

**B.      Significant, Marked Changes in Circumstances Mandate
           Lifting the Stay of Purepac's Approval for Gabapentin Capsules**

   **1.      Apotex Cannot Go to Market**

        When it moved this Court for a stay, appellant Apotex represented to the Court that it would be irreparably harmed absent a stay because "[i]f allowed to launch, Apotex would earn at least $193 million in sales…[b]ut those sales would drop to $24 million if Purepac is permitted to launch during this appeal." (Emergency Motion of Plaintiff-Appellant Apotex Inc. for Injunctive Relief Pending Appeal, filed June 21, 2004, p. 18; Supporting McIntire Declaration, Ex. 1, pp. 107, 111, copies annexed as Exhibit A).

        Yet this allegation of $169 million in lost sales by Apotex is squarely contradicted by recent admissions Apotex has made to Purepac.  Just last week, Apotex's chairman and CEO informed Purepac's parent company Alpharma. Inc., in a written communication:

        " 2.     Apotex has no capsule inventory whatsoever, and has not begun
                 production.

4

    3.    Apotex will not have a tablet product, and has not even yet submitted an ANDA for same."

(Letter from Apotex, Inc. to Alpharma, Inc., dated September 1, 2004, p. 1 (see Exhibit B, accompanying Declaration of Matthew T. Farrell, Executive Vice President and Chief Financial Officer of Alpharma, ¶ 10, Appendix ("App.") 1).

And in another written communication three weeks earlier, Apotex's chairman and CEO had similarly conceded to Alpharma: "Apotex does not even have [gabapentin] launch quantities available, and therefore poses little overall threat to Alpharma and its partner Teva." (Letter from Apotex, Inc. to Alpharma, dated August 21, 2004, Ex. B, Farrell Decl., ¶ 11, App. 2, p. 5). [1]

Thus, Apotex either misrepresented to this Court its capability to launch gabapentin capsules to obtain a stay of a market launch by Purepac, or Apotex has somehow encountered a change in circumstance that obviates its ability to make any sales of gabapentin whatsoever during the pendency of this appeal. [2]

Either way, Apotex is not entitled to a continuation of the stay of Purepac's gabapentin capsule ANDA approval, and was plainly not entitled to the stay in the first

---

[1]    Apotex has no viable claim to exclude these letters from the Court's consideration. Fed. R. Evid. 408, marked on the letters, only applies to statements made in compromise negotiations offered as evidence of liability or claim validity during a trial. The rule does not require exclusion of statements merely because they occur during the course of compromise negotiations, or when the proffer is made for some other purpose. Here, Purepac presents the letters to show Apotex's lack of good faith, and change in its capability to market gabapentin capsules.

[2]    The notion that Apotex recently discovered a capability problem is highly suspect. Apotex must have known what its launch capability would be in September when it moved to stay Purepac's approval just two and a half months ago.

place.  Apotex will not suffer any harm, no less "irreparable" harm, if Purepac launches its gabapentin capsule product.  Apotex does not even have product available to earn the $169 million contended would be lost absent the stay.  Simply put, Apotex is not in any position to lose gabapentin capsule sales—because it has no gabapentin capsules to sell.

Apotex's shift from an assertion of $169 million in lost sales, to an acknowledgment that it has no present ability to market its product, is obviously a drastic change of circumstance presented to the Court that dramatically alters the landscape.  In and of itself, this newly disclosed situation cries out for a lifting of the stay.

## 2.    <u>Purepac Is Ready to Launch Gabapentin</u>

In contrast, Purepac does have launch quantities available, and is ready and able to commercialize its gabapentin capsule product.  (Ex. B, Farrell Decl, ¶ 9).  On September 3, the board of directors of Alpharma authorized a launch of Purepac's generic gabapentin capsules as soon as the stay is lifted.  (Ex. B, Farrell Decl., ¶ 8).  There were no other qualifications. *Id.* [3]

Gabapentin is a critical product for Purepac and Alpharma, highly leveraged companies who are counting on the product's success.  (Ex. B, Farrell Decl., ¶¶ 5-7). Such success should result, in part, from substantial sales during the first six months, due to the award of 180-day generic market exclusivity from the FDA when Purepac will have the only generic gabapentin capsule on the market.  (Ex. B, Farrell Decl., ¶ 2).

---

[3]    Purepac has decided to launch despite an unresolved patent infringement action involving gabapentin brought by Pfizer in New Jersey.

PUBLIC VERSION

Purepac is ready and able to go to market upon the grant of the instant emergency motion, a further changed circumstance supporting this motion.

Unlike Apotex, Purepac will suffer            harm if it cannot launch its capsule product before the Court decides this appeal (conservatively in February 2005, two months after oral argument). This harm arises from two additional recent events that will diminish the value of Purepac's gabapentin opportunity.

### 3. Ivax Has Introduced Gabapentin Tablets, Which Will Take Away Purepac's Sales

The generic gabapentin market has very recently been entered by another company, Ivax Corp., who started to sell a generic gabapentin drug product in tablet form on August 18, 2004 (see Ivax press release annexed as Exhibit C).

Ivax's gabapentin tablets are not blocked from the market by Purepac's 180-day exclusivity because they are tablets rather than capsules, and the FDA regulates different dosage forms as separate drug products. However, Ivax's gabapentin tablets can be generically substituted for the Neurontin® brand-name version of gabapentin capsules under the laws of a number of states and third-party prescription drug plans (see article in *The Pink Sheet*, a pharmaceutical industry trade publication, dated August 23, 2004, copy annexed as Exhibit D).

If Purepac's gabapentin capsule, which is generically substitutable for Neurontin® capsules in all states, cannot be launched until the stay expires upon a decision in this appeal (conservatively, in February 2005), generic gabapentin sales that would go to Purepac will instead go to Ivax. Every day Ivax is selling and Purepac is not represents a loss of market share at Purepac's expense. (Ex. B, Farrell Decl., ¶ 4). Purepac has

REDACTED

PUBLIC VERSION

calculated that Ivax's gabapentin tablet product will garner $      million of sales during the next six months if Purepac's product is not on the market.  (Ex. B, Farrell Decl., ¶ 14, App. 3, Scenario 2). [4]   Indeed, even Apotex concedes that Ivax's launch makes the generic gabapentin market "irretrievably lost" unless Purepac gets to market now.  (Apotex Letter of August 21, 2004 to Alpharma, Ex. B, Farrell Decl., App.2, p. 4).

Thus, the launch of Ivax's generic gabapentin tablet is a significant new development potentially harming Purepac's gabapentin sales, and constitutes a third changed circumstance justifying removal of the stay that impedes Purepac's ability to sell.

### 4.    Pfizer's Pregabalin Will Reduce the Size of the Gabapentin Market

The generic market for gabapentin is further jeopardized by the imminent market launch of pregabalin, another Pfizer drug chemically related to gabapentin for which Pfizer has received an "approvable" letter from the FDA (see *Pink Sheet* article in Exhibit E and stock research report in Exhibit F).  Final FDA approval is imminent.  (See Exs. E, F).

The trade press and industry are predicting that Pfizer will launch pregabalin as early as November in a counterattack to generic gabapentin competition (see *Wall Street Journal* and USA Today articles annexed in Exhibit G).  Pfizer's counterattack involves a "switch strategy" whereby Pfizer convinces prescribing physicians to switch patients

[4]   Purepac also has a gabapentin tablet product awaiting final FDA approval.  The figure of $      million in lost sales to Ivax would not be altered if Purepac were to receive approval and begin to sell its tablet during the next six months, because Purepac's tablet will be available in different dosage strengths than Ivax's tablet, and generic substitution can only be made for the identical strength.

PUBLIC VERSION

from gabapentin to its new pregabalin product (see Exhibits E, F, G). Pfizer's strategy, even if only moderately successful, will decrease physician and consumer demand for generic gabapentin products, thereby reducing the size of the gabapentin market and the volume of generic gabapentin sales.

Accordingly, the advent of pregabalin is a fourth changed circumstance calling for an end to the stay.

## C.     Purepac Will Be Irreparably Harmed Unless the Stay is Vacated

Unless the stay of FDA approval for its gabapentin capsule is dissolved immediately, the harm that Purepac will suffer, due to significant erosion of the generic gabapentin market before it has a chance to launch, will be irreparable.[5]

Purepac does have significant gabapentin capsule quantities available for a commercial launch. Purepac is under contract to purchase $75 million in gabapentin raw material. So far, it has converted approximately $    million worth of that material into capsule dosage forms to prepare for its commercial launch. (Ex. B, Farrell Decl., ¶ 9). The only way for Purepac to fully capitalize on this launch investment, as well as the millions of dollars that it has spent so far litigating Pfizer's patent infringement suit in New Jersey and Apotex's multiple challenges to Purepac's exclusivity at the FDA, is for this Court to lift this stay and permit Purepac to begin commercially marketing its capsule

REDACTED

---

[5]   The Court's order of July 26 evidently sought to preserve the *status quo* pending the outcome of this appeal. However, the Court's order has not preserved the *status quo* for Purepac, but has put Purepac in a worse position than it was before, by depriving Purepac of the opportunity to begin marketing its generic gabapentin capsule product, an opportunity that had been granted to Purepac by the FDA's final approval of its ANDA.

**PUBLIC VERSION**

product <u>now</u>.  (See Ex. B, Farrell Decl., ¶¶ 19).

Purepac will make $     million in net gabapentin capsule sales through February 2005 if it launches by October 1, 2004.  (Ex. B, Farrell Decl., ¶ 16, App. 3, Scenario 1). If Purepac cannot launch until this appeal is decided (conservatively, in February 2005), it will only have net sales of $     million during the first six months of marketing.  (Ex. B, Farrell Decl., ¶ 17, App. 3, Scenario 2).  This is a loss of

dollars (          ) in net sales and                    dollars ($          ) in profits. (Ex. B, Farrell Decl. ¶ 18, App. 3, Scenarios 1, 2). [6]

Each day this Court's stay remains in effect, the value of Purepac's gabapentin opportunity decreases.  Even Apotex acknowledges that the generic gabapentin market will be "decimated" unless Purepac is able to get its product to market promptly. (See Apotex Letter of August 21, 2004 to Alpharma, Ex. B, Farrell Decl., App. 2, p. 4).  This decrease in value translates into $     million in lost gabapentin profits for Purepac (not even counting sales during the subsequent months if this appeal is not decided by then). If Purepac cannot launch its gabapentin product until this Court decides the appeal, it stands to lose these                    of dollars in sales, a significant blow to a company striving to remain competitive in the U.S. generic pharmaceutical industry.

---

[6]    These figures assume that Ivax will be in the market with its tablet product during the next six months, that Pfizer will launch pregabalin by November 1, that Ivax's and Purepac's products are priced at 65-70% of the Neurontin® capsule price in Scenario 1 and 50-70% in Scenario 2, that Purepac's 180-day exclusivity for gabapentin capsules is in place, and that Apotex is not in a position to enter the market as evidenced by its recent disclosures. (See Ex. B, Farrell Decl., App. 3, Scenarios 1, 2).  Purepac in this context means Purepac and its partner and active ingredient supplier Teva Pharmaceutical Industries Ltd., which will have the right to market its own gabapentin capsule during Purepac's exclusivity period upon meeting certain conditions of an agreement between the parties. (Ex. B, Farrell Decl. ¶16; n.2).  Purepac alone, however, has the capacity to achieve $402 million of sales during the relevant period. *Id.*

PUBLIC VERSION

(Ex. B, Farrell Decl. ¶ 18). There is no way for Purepac to recoup these losses. (Ex. B, Farrell Decl. ¶ 7, 18). This irretrievable loss is surely irreparable harm, for it goes not merely to lost sales but to the viability of the company. Thus, continuation of the stay inappropriately fosters rather than forestalls irreparable harm. Consolidated Edison, 511 F.2d at 378.

But if this Court lifts the stay, a successful commercial launch of Purepac's gabapentin capsules will ensue, representing a defining moment for the company and its parent Alpharma. (Ex. B, Farrell Decl. ¶¶ 4-5). The income from the gabapentin sales that Purepac anticipates if the stay is lifted represent a significant and irreplaceable opportunity for Purepac's corporate parent, Alpharma, to reduce its outstanding debt so that it can invest the substantial funds necessary to keep its business competitive with other leading manufacturers of generic drugs. (Ex. B, Farrell Decl. ¶ 5).

Vacating the stay will also serve the public interest in these cost-conscious times for health care, by making Purepac's lower-priced generic gabapentin capsules, which are substitutable for Neurontin® capsules in all states and third party prescription drug plans, available to consumers immediately.

## D.    Purepac Will Likely Prevail on the Merits

In addition to its above showing of irreparable harm, Purepac's 180-day generic market exclusivity award for gabapentin capsules will likely be affirmed. This is so irrespective of the Court's ultimate holding on the FDA's patent-by-patent interpretation of the Hatch-Waxman 180-day exclusivity provision. As the district held, Apotex's

11

PUBLIC VERSION

claim against Purepac's exclusivity is barred by *res judicata*, an entirely separate ground warranting dismissal of Apotex's claim (see Purepac's Opposition to Motion by Apotex, Inc. for Injunctive Relief Pending Appeal, pp. 9-13)).

**E.    In the Alternative, Apotex Should be Required to Post a Bond**

When a stay or injunction pending the outcome of an appeal is imposed by a Court of Appeals, the Court may require the party who moved for the stay to post a bond in a proper amount for the payment of costs and damages that are incurred by the enjoined party who is ultimately found to have been wrongfully enjoined.  Fed. R. App. P. 8(a)(2)(E).  See also Fed. R. Civ.P. 65(c). [7]

Here, if the stay is not lifted, the Court should require Apotex to post as security a bond in the amount of $            the amount of lost profits Purepac will suffer if it is not permitted to market its generic gabapentin capsules between October 1, 2004 and February 28, 2005. (Ex. B, Farrell Decl., ¶18).

**CONCLUSION**

This Court's July 26th order staying Purepac's final gabapentin capsule ANDA approval effectively prohibits Purepac from commercially marketing its gabapentin capsules until this appeal is decided or the stay is vacated.  Because Apotex's "showing" of harm has now been exposed as a sham, and market challenges from Ivax and Pfizer

---

[7]    That the stay technically enjoined the FDA's final approval of Purepac's ANDA does not alter this result, since the true enjoined party in interest suffering harm from the stay is Purepac. See Timken Co. v. United States, 6 C.I.T. 76, 569 F. Supp. 65, 71-72 (1983).

PUBLIC VERSION

have upset the *status quo* and will visit irreparable harm on Purepac, this Court should

vacate the stay forthwith and allow Purepac to launch its gabapentin capsules.

Due to the immediacy of the market situation set forth herein, Purepac

respectfully requests a decision on this motion by September 17, 2004.

Dated: September **10**, 2004            Respectfully submitted,

Charles J. Raubicheck
Edgar H. Haug
Terri-Lee Young Nataline
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
TEL.:   (212) 588-0800
FAX:   (212) 588-0500


William B. Schultz
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1201 Connecticut Avenue, N.W.
Washington, D.C. 20036
TEL.:   (202) 778-1800
FAX:   (202) 822-8106


*Attorneys for Intervenor-Defendant-Appellee*
PUREPAC PHARMACEUTICAL CO.

13

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Emergency Motion of Appellee Purepac Pharmaceutical Co. to Vacate Stay of Final Regulatory Approval for Gabapentin (Public Version) via first class mail, this 10th day of September, 2004 to the following addresses:

Arthur Y. Tsien
Olsson, Frank and Weeda
1400 16th Street, N.W.
Washington, D.C. 20036-2220

William A. Rakoczy
Deanne M. Mazzochi
Rakoczy Molino Mazzochi
6 West Hubbard Street
Suite 500
Chicago, IL 60610

Douglas N. Letter
Howard S. Scher
Civil Division
Department of Justice
950 Pennsylvania Ave., N.W., Room 7239
Washington, D.C. 20530-0001

Daniel E. Troy
Eric M. Blumberg
Karen E. Schifter
Marc C. Caden
U.S. Department of Health and Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857


Alexandra W. Miller

EXHIBIT A

**B.    Apotex will suffer substantial irreparable harm.**

Absent injunctive relief, Purepac is free to launch its product during this appeal and gain a strangle-hold over the gabapentin market.  In light of the recent Teva agreement (A114; A118), it is no longer a matter of "if," but "when" Purepac will launch.  This head-start will enable Purepac to tie up distribution channels and access to important customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-term. (A86-A87; A104-A105.)  More importantly, it will effectively shut Apotex out of the gabapentin market altogether.  (A105.)  Even if this Court ultimately concludes that Apotex was entitled to approval, the harm will have been done and this bell cannot be "unrung"—Apotex will never recover its substantial gabapentin investment (over $50 million in research and development, legal fees, and raw materials) or effectively compete in the gabapentin market.

Gabapentin is also a once-in-a-lifetime opportunity for Apotex.  If allowed to launch, Apotex would earn at least $193 million in sales, even assuming simultaneous market entry by Purepac and Teva.  (A103; A111.)  But those sales drop to $24 million if Purepac is permitted to launch during this appeal—that's $169 million in lost sales for Apotex.  (A103; A110; A112.)[3]  These losses are not

---

[3]  Moreover, if both Purepac and Teva were to share in Purepac's "exclusivity" and both marketed their generic gabapentin products during the first 180 days of generic gabapentin competition, Apotex's losses would increase to approximately

-18-

only substantial, but irreparable in every sense of the term, *see Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003, 1012 n.8 (D.C. Cir. 1999), and can only be prevented by staying approval of Purepac's gabapentin ANDA until this Court can decide whether Apotex and other applicants are entitled to launch.

### C.     The balance of harms favors injunctive relief.

The balance of harms tips decidedly in favor of injunctive relief. *See Mova*, 140 F.3d at 1066; *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 843. Without it, Apotex will lose its entire investment and be effectively shut out of the market. Purepac, on the other hand, will suffer no appreciable harm whatsoever. It has already received one exclusivity period that has expired; and has waited over a *year* to launch. (A94; A98.) It will not be harmed by waiting a little while longer for this Court to decide this appeal. If Purepac prevails, it will have lost nothing and can still enjoy its purported exclusivity.

### D.     The public interest favors injunctive relief.

The public benefits "in having legal questions decided on the merits, as correctly and expeditiously as possible." *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 843. But the inconsistent district court rulings have generated only uncertainty that has delayed the marketing of generic gabapentin. Purepac now seeks to take advantage of the situation by launching its product prior to a decision

---

$178 million in lost sales during the first year—leaving Apotex with only $15 million in sales during that time. (A103-A104; A106; A109; A112.)

# McIntire Declaration

## Exhibit 1:

*2001-2003 Neurontin® Sales,*
*Projected 2004 Neurontin® Sales*
*and*
*Projected Gabapentin Sales During*
*First 12 Months of Generic Competition*

## Total U.S. Neurontin® Capsule Sales (2001-2003) and Projected U.S. Neurontin® Capsule Sales (2004)

| | Total Neurontin® Sales 2001 (in millions)[1] | Total Neurontin® Sales 2002 (in millions) | Total Neurontin® Sales 2003 (in millions) | Projected Neurontin® Sales 2004 (in millions) |
|---|---|---|---|---|
| **Pfizer Neurontin® 100 mg capsules** | $134 | $158 | $171 | $183 |
| **Pfizer Neurontin® 300 mg capsules** | $873 | $1,011 | $1,173 | $1,328 |
| **Pfizer Neurontin® 400 mg capsules** | $279 | $294 | $302 | $309 |
| **TOTAL** | $1,286 | $1,463 | $1,646 | $1,820 |

Source (for 2001-2003 Sales Data): *IMS America*

[1] All figures are in U.S. dollars.

A108

## Scenario I[2]

### FIRST 6 MONTHS OF GENERIC COMPETITION

|  | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Purepac | $1,820 | $910 | 75% | 65% | 50% | $222[3] |
| Teva |  |  |  |  | 50% | $222 |

### SECOND 6 MONTHS OF GENERIC COMPETITION

|  | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Apotex | $1,820 | $910 | 80% | 20% | 10% | $15 |
| Purepac |  |  |  |  | 40% | $58 |
| Teva |  |  |  |  | 40% | $58 |
| Generic X |  |  |  |  | 10% | $15 |

Scenario I Sales (Apotex): $0 *(first 6 months)* + $15 million *(second 6 months)* = TOTAL: $15 million

---

[2] For Scenario I, we assume that Purepac and Teva equally share 180 days of generic gabapentin marketing without other generic competition. Apotex and one other generic competitor (denoted as "Generic X") start marketing generic gabapentin after Purepac and Teva's 180-day marketing period concludes.

[3] For each scenario depicted within this Exhibit, Total Sales for any six-month period can be calculated as follows: *Projected 12-month sales / 2 = Projected 6 month sales * Generic Share of Total Gabapentin Market = Generic Sales (if sold at Neurontin® price) * Generic Price (as % of Neurontin® price) = Total Generic Sales * Share of Generic Market = Total Sales (per company).*

-2-

A109

## Scenario II[footnote]

### FIRST 6 MONTHS OF GENERIC COMPETITION

| | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Purepac | $1,820 | $910 | 65% | 70% | 100% | $414 |

### SECOND 6 MONTHS OF GENERIC COMPETITION

| | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Apotex | | | | | ~ 13% | $24 |
| Purepac | $1,820 | $910 | 80% | 25% | ~ 60% | $109 |
| Teva | | | | | ~ 13% | $24 |
| Generic X | | | | | ~ 13% | $24 |

Scenario II Sales (Apotex): $0 (*first 6 months*) + $24 million (*second 6 months*) = TOTAL: $24 million

[footnote] For Scenario II, we assume that Purepac alone launches and markets during its purported 180-day exclusivity period. Apotex, Teva and one other generic competitor ("Generic X") begin marketing generic gabapentin after Purepac's 180-day exclusivity period concludes. The figures set forth within this scenario would be identical if Purepac were to selectively waive its 180-day exclusivity in favor of Teva, such that Purepac would enter the market with Apotex after Teva's 180 days of exclusivity.

-3-

## Scenario III[5]

### FIRST 6 MONTHS OF GENERIC COMPETITION

| | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Apotex | $1,820 | $910 | 75% | 65% | ~33% | $148 |
| Purepac | | | | | ~33% | $148 |
| Teva | | | | | ~33% | $148 |

### SECOND 6 MONTHS OF GENERIC COMPETITION

| | Projected 12-month Neurontin® Capsule Sales (in millions) | Projected 6-month Neurontin® Capsule Sales (in millions) | Generic Share of Gabapentin Capsules Market | Generic Price (as % of Neurontin® price) | Share of Generic Market (per company) | Total Sales (per company) (in millions) |
|---|---|---|---|---|---|---|
| Apotex | $1,820 | $910 | 80% | 20% | 31% | $45 |
| Purepac | | | | | 31% | $45 |
| Teva | | | | | 31% | $45 |
| Generic X | | | | | 7% | $10 |

Scenario III Sales (Apotex): $148 million *(first 6 months)* + $45 million *(second 6 months)*. TOTAL: $193 million.

[5] For Scenario III, we assume that Apotex, Purepac and Teva begin marketing generic gabapentin immediately and are the only three generic gabapentin suppliers for the first six months; one other generic competitor ("Generic X") starts marketing generic gabapentin during the second six months that generic gabapentin is available.

-4-

A111

EXHIBIT B

PUBLIC VERSION

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————————————

No. 04-5211

—————————————

APOTEX, INC.,

Plaintiff-Appellant,

v.

FOOD AND DRUG ADMINISTRATION,
TOMMY G. THOMPSON, Secretary of
Health and Human Services, and
LESTER M. CRAWFORD, Acting
Commissioner of Food and Drugs,

Defendants-Appellees,

and

PUREPAC PHARMACEUTICAL CO.,

Intervenor-Defendant-Appellee.

—————————————

## DECLARATION OF MATTHEW T. FARRELL IN SUPPORT OF THE EMERGENCY MOTION OF APPELLEE PUREPAC PHARMACEUTICAL CO. TO LIFT STAY OF FINAL REGULATORY APPROVAL FOR GABAPENTIN

I, MATTHEW T. FARRELL, declare on September 10, 2004 as follows:

I am the Executive Vice President and Chief Financial Officer of Alpharma Inc., the

parent company of Defendant-Appellee Purepac Pharmaceutical Co. ("Purepac").  I submit this

Declaration in support of Purepac's Motion to Lift the Stay of Final Regulatory Approval for

Gabapentin.

I have personal knowledge of the truth of the facts set forth in this Declaration, or I

believe such facts to be true based upon information provided to me by other knowledgeable

PUBLIC VERSION

persons who work with me at Purepac and Alpharma, or my experience.

## Background

1.       Purepac is in the business of formulating and marketing generic versions of prescription drug products.  A generic drug has the same active ingredient as its branded counterpart when used to treat the same disease conditions.  Typically, generic drugs are sold at a discount to the prices charged for brand-name drugs, thus affording substantial savings to the consuming public and third party payers in plans that offer prescription drug coverage.

2.       I am familiar with Purepac's plans to market generic gabapentin capsules.  The U.S. Food and Drug Administration has determined that Purepac is eligible for a 180-day period of marketing exclusivity as to that product based on its first-to-file paragraph IV certification against the '482 patent.

## The 180-Day Exclusivity Reward & Generic Market Share

3.       It is well known in the pharmaceutical industry that the first drug company to offer a generic version of a brand-name drug product (in this case, Purepac's generic version of Pfizer's Neurontin® brand gabapentin capsules) obtains the largest market share of all generic versions of that drug product.  Furthermore, a company that is able to obtain the 180-day generic market exclusivity for its generic product has the first and only generic product on the market for a period of six months.

## The Financial Significance of Gabapentin to Purepac and Its Parent Company Alpharma

4.       The gabapentin opportunity, together with the substantial increase in expected incremental sales over the following years, represent a unique and irreplaceable opportunity for Purepac and its corporate parent Alpharma Inc. to transform itself from a highly leveraged entity to a company that has the financial resources necessary to be more competitive in the

PUBLIC VERSION

marketplace.  The opportunity to form the market for gabapentin will be a            event for

Purepac and its corporate parent, Alpharma Inc.                          **REDACTED**

5.    Alpharma's deteriorating operating performance in 2004 led to an amendment to

its bank credit agreement in July 2004 which relaxed certain financial covenants through

December 31, 2004.  On August 9, 2004, Standard & Poor's Rating Services reduced the

corporate credit rating on Alpharma to "B" from "B+" citing the continued poor operating

performance in Alpharma's key U.S. generics business.  The income that Purepac will earn from

its gabapentin sales will enable it to reduce its bank debt and invest the substantial funds

necessary to keep the business competitive with other leading manufacturers of generic drugs.

6.    Furthermore, the increased market share that Purepac would reasonably expect to

retain after the exclusivity period expires will also provide incremental sales and profits in future

years.

7.    Gabapentin is therefore a critical product for Purepac and Alpharma.  There is no

way for Alpharma to recoup the significant loss in profits due to a delayed gabapentin capsule

launch.

8.    On September 3, 2004, Alpharma's Board of Directors authorized Purepac to

launch its gabapentin capsule product as soon as the Court's stay is lifted.  There were no other

qualifications.

9.    Purepac is under contract to purchase $75 million in gabapentin raw material.  So

far, it has converted approximately $    million worth of that material into capsule dosage forms

in preparation for the commercial launch.

- 3 -

PUBLIC VERSION

### Apotex Is Not Prepared to Launch its Gabapentin Capsules

10.    Just last week, Purepac received a letter from Apotex's Chairman and CEO.  In

that letter, Apotex concedes that it "has no capsule inventory whatsoever, and has not begun

production." (*See* App. 1, 9/1/04 Apotex Ltr. at p. 1)

11.    In another communication to Alpharma's Board of Directors, Apotex's Chairman

and CEO conceded that: "Apotex does not even have [gabapentin] launch quantities available,

and therefore poses little overall threat to Alpharma and its partner Teva." (*See* App. 2, 8/21/04

Apotex Ltr, p. 5).

12.    Purepac does have sufficient quantities of gabapentin available to commercially

launch its product.  The only way for Purepac to fully capitalize on this inventory investment, as

well as the millions of dollars it has spent over the past six years litigating Pfizer's patent

infringement actions and Apotex's multiple exclusivity challenges, is for Purepac to launch its

gabapentin capsule product as soon as the Court lifts this stay.

### The Impact of Ivax's Launch on the Generic Gabapentin Market

13.    Recently, Ivax launched its generic gabapentin ("low dose") tablet product.  That

product is sold in the same dosage strengths (100 mg, 300 mg, and 400 mg) as Neurontin®

capsules.[1]  With aggressive marketing, pricing, and the potential for generic substitution, Ivax

will likely obtain a significant share of gabapentin capsule sales during the next six (6) month

period (September 2004-February 2005) even though Ivax's product is sold in a tablet dosage

form.  Thus, with each day that Ivax is the only generic on the market, Purepac loses potential

market share for its gabapentin capsules.

14.    Purepac estimates that Ivax will sell approximately $     million in gabapentin

during that period, sales that Purepac would be competing for if its ANDA approval were not

- 4 -

PUBLIC VERSION

stayed. (*See* App. 3, Scenario 2).

15.    Purepac's gabapentin opportunity will be further jeopardized by the launch of Pfizer's "next generation" Neurontin® product, called pregabalin. The trade press and industry are predicting that Pfizer's launch is imminent. Purepac expects that Pfizer's pregabalin launch will likely reduce the size of the gabapentin market and the volume of generic sales.

16.    If this Court grants Purepac's emergency motion to lift the stay, Purepac alone, or Purepac with its partner, Teva, expect gabapentin net sales of approximately      million between October 1, 2004 and March 31, 2005.[2] (*See* App. 3, Scenario 1) Purepac alone, however, has the capacity to achieve $    million of sales during the relevant period.

17.    If the Court does not lift the stay until the appeal is decided (which Purepac estimates will occur in early February 2005) then Purepac alone, or with its partner Teva, expect gabapentin net sales of approximately $    million during the following six-month period. (*See* App. 3, Scenario *2*)

18.    Thus, continuing the stay will cause a $    million loss of gabapentin net sales to Purepac. These sales are irreplaceable and their loss will be a      blow to a company striving to remain competitive in the U.S. generic pharmaceutical industry. (Compare App. 3, Scenarios 1 &2). The $    million loss of gabapentin net sales will translate into approximately $    million in lost profits to Purepac, after required payments to its partner.

19.    Therefore, to fully capitalize on this valuable asset, the stay must be lifted so that Purepac can compete with Ivax and obtain its share of gabapentin sales before Pfizer switches the gabapentin market over to its new pregabalin product.

REDACTED

---

[1] Neurontin® is also sold in 600 mg and 800 mg tablet dosage forms. Purepac is currently seeking final FDA approval to market gabapentin tablets in those dosage strengths.
[2] Upon meeting certain conditions of an existing agreement between the parties, Teva Pharmaceutical Industries Ltd. will have the right to market its gabapentin capsule product during Purepac's exclusivity period.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1346, that the foregoing is true and correct.

Executed on _____          _Matthew T. Farrell_
                                                        Matthew T. Farrell

APPENDIX 1

09/02/04  08:14 FAX 2015921481      LEGAL                                    ☐002

Sep-01-04  19:01  From-

# APOTEX INC.
CANADA'S PHARMACEUTICAL COMPANY
SOCIÉTÉ PHARMACEUTIQUE ENTIÈREMENT CANADIENNE

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed. R. Evid. 408*

September 1, 2004

**VIA FACSIMILE (201.947.4576)**

Frederick J. Lynch
President, Generic Pharmaceuticals
& Human Pharmaceuticals Supply Chain
Alpharma Inc.
One Executive Drive
Fort Lee, NJ USA 07024

Re:  Gabapentin - URGENT

Dear Mr. Lynch:

This is further to our letter of August 21, 2004, addressed to the Chairman and
Board of Directors of Alpharma Inc.

We are now writing to put forward additional settlement options for your
consideration.

Our letter of August 21, 2004 proposed, in essence, that Apotex would abandon
its appeal and lift the injunction, in exchange for a selective waiver of exclusivity,
which would enable both Purepac/Teva and Apotex to launch.

Given that each blocks the other, and given the probability that the Court of
Appeal will hold that there is no exclusivity, we believe that it would have been
reasonable for us propose an arrangement whereby profits are divided equally
between Purepac/Teva and Apotex.  However, we believe it clear that what we
proposed would give far greater benefit to Purepac/Teva than Apotex, for the
following reasons:

1.   Purepac and Teva, individually and collectively, have far greater
     customer following than Apotex;

2.   Apotex has no capsule inventory whatsoever, and has not begun
     production; and

3.   Apotex will not have a tablet product, and has not even yet
     submitted an ANDA for same.

150 Signet Drive, Toronto, Ontario, Canada M9L 1T9
Tel: (416) 749-9300 • Fax: (416) 401-3849 • www.apotex.com



Frederick J. Lynch
Alpharma Inc.
September 1, 2004
Page 2

It thus appear clear that, even if Apotex were to receive a selective waiver, the market share captured by Apotex would be far less than that captured by Purepac/Teva.

We thus estimate that the benefit would go at least two-thirds to Purepac/Teva and less than one-third to Apotex. We are prepared to accept such an outcome, notwithstanding our view, as aforesaid, that our position is no less valuable than that of Purepac/Teva.

We would be prepared to agree to further provisions, at the option of Alpharma, to give greater assurances to Purepac/Teva.

More specifically, if you wish to have an assurance that the benefit to Apotex will not exceed half the benefit to Purepac/Teva, we would be agreeable to an arrangement whereby, for any period of time which you may elect, Purepac/Teva would pay to Apotex one-third of its profits on sales of gabapentin capsules, and Apotex would pay to Purepac/Teva two-thirds of its profits. This would guarantee Purepac/Teva two-thirds of the profits on our combined sales.

Assuming that you prefer to have such an arrangement to share the profits from all sales, we would suggest that, for simplicity, the profits of each party would be defined as net sales less cost of goods, and that, for such purpose, cost of goods would be an agreed cost per 1000 capsules, such as for example:

    100mg - $60.00/M        300mg - $180.00/M        400mg - $240.00/M.

Assuming that you prefer such an arrangement to divide profits, as opposed to both parties simply entering the market with no such arrangement, we are flexible as to both the term of such an arrangement and the deemed cost per 1000 capsules of all 3 strengths, provided, of course, that the cost per 1000 capsules is deemed to be the same for both parties.

We urge you to accept one of these options so that we may together proceed to derive value for both parties.

Obviously, Alpharma has a duty to its shareholders to act so as to maximize expected value. We believe that, by any reasonable calculation, expected value to Alpharma from the arrangement proposed herein greatly exceeds the expected value from continuing to await the outcome of the litigation. In particular:

Confidential For Settlement Purposes Only--
Not Admissible For Any Other Purpose Under Fed. R. Evid. 408

09/02/04  08:14 FAX 2015921481          LEGAL                                    ☒004

Sep-01-04   10:52   From-                                    T-924   P.003/004   F-921

Frederick J. Lynch
Alpharma Inc.
September 1, 2004
Page 3

1.  If one assumes, for example, that the profits to be made by
    Purepac/Teva from an immediate launch (without launch by
    Apotex) would be $100 million, then the value to Alpharma from
    what we propose is about $67 million.

2.  On the other hand, if Alpharma refuses to so agree and thus cannot
    now launch, there are 2 possible outcomes:

    (a)  If Purepac wins, with the result that the Court affirms the
         exclusivity and lifts the injunction in about March 2005, much
         of the market will already have been lost to Ivax, probably an
         authorized generic, and also pregabalin. Given the much
         smaller expected market open to Purepac/Teva in 2005, the
         value of such a win is unlikely to exceed the $67 million
         value that Purepac/Teva would enjoy if Purepac settles with
         Apotex to enable launch now.

    (b)  More significantly, there is, in our view, at least a 50%
         probability that Purepac will lose. This view is supported by
         the holding of the District Court in the case of paroxetine, a
         plain reading of the statute, the fact that the same Panel of
         the Court of Appeal has already taken the extraordinary step
         of enjoining FDA from approving Purepac's product on the
         very basis that Apotex has a strong case, and the fact that
         the Court will hear that, as a result of the purported multiple
         exclusivities, generic entry has been delayed for years, with
         no guarantee of an end in sight, which is a clear perversion
         of Congressional intent. If Purepac loses, not only will there
         be no value at all, but Purepac will be left with a large loss of
         inventory, legal costs, etc.

The expected value of Purepac electing not to enter into an arrangement with
Apotex must be calculated as the sum of the value of each possible outcome
times its probability. If one assumes that the probability of Purepac's winning on
appeal is 50% (and, as aforesaid, we believe it to be less), then the expected
value of electing not to enter an arrangement with Apotex is, at the most:

$$\$67 \text{ million} \times 50\% \; + \; \$0 \times 50\% = \$33 \text{ million.}$$

It thus seems clear to us that Alpharma will more than double its expected value
by settling with Apotex immediately, to enable market entry. Moreover, if
Alpharma gambles on winning on appeal but loses, the adverse consequences to
Alpharma and its shareholders would be severe.

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed. R. Evid. 408*

09/02/04  08:15 FAX 2015921481          LEGAL                                              ☑005
Sep-01-04  18:02   From-                                           T-694  P.004/004  F-971

Frederick J. Lynch
Alpharma Inc.
September 1, 2004
Page 4

We thus urge once again that you agree to a reasonable arrangement for our
mutual benefit, so as to end the continuing dissipation of a valuable and
irreplaceable asset.

Once again, we are agreeable to allowing Alpharma to elect from among several
options as follows:

1.  We would be agreeable to dismissing our appeal and lifting the
    injunction in exchange for a selective waiver, with or without an
    arrangement to share profits.

2.  If you elect that we share profits (in the ratio of two-thirds to
    Purepac/Teva and one-third to Apotex), you may elect the length of
    the term of such an arrangement.

3.  If you elect that we share profits, we will also agree to whatever
    deemed cost of product you elect for the purposes of the profit
    calculations.

As time is of the essence, may we please have a timely response.

Very truly yours,

Dr. Bernard C. Sherman
Chairman and CEO
Apotex Inc.

Confidential For Settlement Purposes Only—
Not Admissible For Any Other Purpose Under Fed. R. Evid. 408

APPENDIX 2

Aug-21-04  16:53  From-                                    T-628  P.001/005  F-759



# APOTEX INC.

CANADA'S PHARMACEUTICAL COMPANY
SOCIÉTÉ PHARMACEUTIQUE ENTIÈREMENT CANADIENNE

August 21, 2004

**VIA FedEx® and Fax**

Einar W. Sissener
Chairman of the Board
Alpharma Inc. (c/o A.L.
Industrier AS)
Harbitzalleen 3
P.O. Box 158
Skoyen N-0212
Oslo, Norway
Fax: (+47) 22 52 93 40
2252396l

Ingrid Wiik
President and Chief Executive
Officer
Alpharma Inc.
One Executive Drive
Fort Lee, NJ 07204
Fax: (201) 947-4879

Glen E. Hess, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611
Fax: (212) 446-4900

Einar Kloster
c/o Alpharma Inc.
One Executive Drive
Fort Lee, NJ 07204
Fax: (201) 947-4879

William I. Jacobs
c/o Alpharma Inc.
One Executive Drive
Fort Lee, NJ 07204
Fax: (201) 947-4879

Jill Kanin-Lovers
Senior Vice President, Human
Resources
Avon Products, Inc.
1345 Avenue of the Americas
New York, NY 10105-0196
Fax: (212) 282-6049

Robert Thong
c/o Alpharma Inc.
One Executive Drive
Fort Lee, NJ 07204
Fax: (201) 947-4879

Peter G. Tombros
Chief Executive Officer
VivoQuest Inc.
771 Executive Blvd.
Valley Cottage, NY 10989
Fax: (845) 267-0926

Farah M. Walters
c/o Alpharma Inc.
One Executive Drive
Fort Lee, NJ 07204
Fax: (201) 947-4879

Re:   Gabapentin - URGENT

Dear Mr. Chairman and Board of Directors of Alpharma Inc.:

I am writing to seek your co-operation in resolving the long-running dispute between our respective companies regarding gabapentin. Apotex stands ready to enter into a reasonable contractual arrangement with Alpharma that will allow both companies to launch their respective generic gabapentin products in the United States in order to capitalize on any remaining exclusivity. Apotex has, on numerous occasions in the past, attempted to resolve this dispute with certain officers of Alpharma or its wholly-owned subsidiary, Purepac Pharmaceutical Co. (collectively "Alpharma"). Unfortunately, Apotex believes that these particular officers have not acted in the best interests of Alpharma and its shareholders. To derive any benefit from the

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed.R.Evid. 408*

150 Signet Drive, Toronto, Ontario, Canada M9L 1T9
Tel: (416) 749-9300 • Fax: (416) 401-3849 • www.apotex.com



Aug-21-04   16:53   From-                                    T-628   P.002/005   F-753

Chairman and Board of Directors
Alpharma Inc.
August 21, 2004
Page 2

purported exclusivity for gabapentin, it is critical that Alpharma act now before events beyond
its control result in the irretrievable complete loss of that benefit.

    A word on the history of this dispute is in order. Despite the expiration of the pioneer
patent for gabapentin, Pfizer Inc. has—until yesterday—continued to monopolize the gabapentin
market in the United States, earning over $6 million (USD) per day.

    In 1998, Alpharma and Apotex were the first companies to submit ANDAs for generic
gabapentin capsules. Alpharma subsequently submitted an ANDA for tablets as well. With
those ANDAs, our respective companies each filed certifications challenging the infringement
and validity of Pfizer's patents. Pfizer sued for infringement of three patents, resulting in
consecutive 30-month stays of FDA approval that did not expire until December 2002.
Alpharma was initially eligible for 180-day exclusivity for gabapentin capsules and tablets on the
'476 patent. Apotex was eligible for its own exclusivity on the '479 patent. Early on, Apotex
prevailed in its litigation on the '476 patent. Any exclusivity Alpharma had on the '476 patent
was triggered and expired years ago. However, under the FDA's so-called patent-based "shared
exclusivity" regime, the FDA later awarded Alpharma a second exclusivity on the later-listed
'482 patent—even though Apotex was the first company to simultaneously certify to the '482
patent and send its notice letter to the patentee as required by the statute.

    In late December 2002, FDA was prepared to approve both companies' ANDAs upon
expiration of the last 30-month stay, and to award our respective companies "shared exclusivity"
for gabapentin. Although Alpharma refused to launch its gabapentin products at risk during the
ongoing litigation with Pfizer on the '482 patent, Apotex was prepared to do so. In fact, Apotex
had begun preparing launch quantities of capsules in reliance on the FDA's stated intention to
award shared exclusivity. But before Apotex could launch, Alpharma initiated litigation that
would eventually bring us to where we are today -specifically, the likelihood that there will be no
gabapentin exclusivity for either Alpharma or Apotex, resulting in the complete dissipation of
this very valuable asset for Alpharma and its shareholders.

    In its lawsuit, Alpharma argued that it was not required to certify to the '479 patent—on
which Apotex had already prevailed— on the ground that such patent claimed an off-label use of
the drug. Alpharma won this lawsuit. The end result was that the FDA removed the '479 patent
from the Orange Book and revoked Apotex's exclusivity on that patent. Apotex was thus denied
exclusivity on a patent for which it was the first to certify and to carry years of resource-draining
litigation on which it ultimately prevailed (and allowed Alpharma to prevail on that patent as
well). The FDA also declared that, despite Alpharma's admitted violation of the statute,
Alpharma would receive yet another exclusivity on the '482 patent. Apotex challenged these
decisions in court.

*Confidential For Settlement Purposes Only—
Not Admissible For Any Other Purpose Under Fed.R.Evid. 408*

Chairman and Board of Directors
Alpharma Inc.
August 21, 2004
Page 3

During that litigation, Apotex contacted certain Alpharma officers on several occasions to attempt to reach an arrangement that would settle the companies' differences and permit launch of our respective generic products—launches that had already been delayed for far too long. These efforts were rebuffed and met with utter disdain. The litigation then proceeded to a conclusion. While Apotex still believes that it had the better and indeed correct view of the law, the federal appeals court upheld the FDA's decisions in January 2004. Still, however, despite the expiration of the last 30-month stay in December 2002, Alpharma continued to delay launch. Apotex's approval, of course, was now delayed indefinitely behind Alpharma's purported second exclusivity period. Unable to engage Alpharma in any type of meaningful dialogue, Apotex suffered the loss of millions of gabapentin capsules (worth millions of dollars) that Apotex had prepared for launch.

Earlier this year, a significant intervening change in the relevant law took place. In a case involving paroxetine, another court rejected the FDA's "shared exclusivity" approach—under which Alpharma had qualified for a second gabapentin exclusivity. The court held that the statute only provides for one exclusivity period per product. Under the *Paroxetine* decision, any exclusivity for gabapentin products arose solely out of the earlier '476 patent and expired years ago, thus opening the market to all otherwise approvable applicants, including Apotex. Given this change in law, Apotex again requested final approval of its capsule product, which the FDA refused to grant. As a consequence, Apotex sued the FDA, challenging this refusal based on the recent *Paroxetine* decision. The lower court disagreed with the *Paroxetine* decision and ruled for the FDA. Apotex appealed and filed an emergency motion for an injunction staying final approval of Alpharma's gabapentin capsule ANDA pending resolution of the appeal.

On July 27, 2004, a three-judge panel of the U.S. Court of Appeals for the D.C. Circuit granted that motion. In doing so, the panel concluded that Apotex had established a strong likelihood of succeeding on the merits of its claim that Alpharma is not entitled to exclusivity. The same three-judge panel that granted Apotex's motion will hear oral argument on December 6, 2004. It is likely that no decision will be issued until February 2005 at the earliest.

It is my understanding that other gabapentin applicants may shortly move in both the appellate court and the lower court to also extend the current stay to Alpharma's gabapentin tablet ANDA. It is likely that such relief will be granted in view of the existing stay on the capsule product. This means that there is a very real possibility that Alpharma will be unable to enjoy any of its purported gabapentin exclusivity until at least early 2005. There is also, we believe, a probability that Alpharma will lose the pending appeal, resulting in the irretrievable loss of any gabapentin exclusivity. In that case, the market will be open to product launches from all otherwise approvable applicants, including Apotex, Teva, Ivax, Sandoz, Eon, and Ranbaxy. If that happens, Alpharma will have completely lost, through delay and the

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed.R.Evid. 408*

Aug-21-04  16:54  From-                                    T-628  P.004/005  F-763

Chairman and Board of Directors
Alpharma Inc.
August 21, 2004
Page 4

intransigence of its officers' in refusing to deal with Apotex in good faith, what was an extremely valuable asset of the company and its shareholders.

Moreover, even if Alpharma ultimately prevails in the ongoing appeal and preserves its eligibility for exclusivity, recent and anticipated events would render it a Pyrrhic victory:

- Yesterday Ivax launched its low-dose tablets (100 mg, 300 mg, and 400 mg). While Ivax's product is not AB-rated, it will still capture a substantial share of the market. You may recall that Par was able to capture at least 20% of the generic fluoxetine market with a similar non-AB-rated tablet product. Given that Ivax has now launched its tablets ahead of generic capsules, it is certain that Ivax will convert much more than 20% of the market to its tablets. This market will be irretrievably lost for both Alpharma and Apotex. There is also a risk that Ivax will enter into an authorized generic arrangement with Pfizer, as it did for Zoloft®, in exchange for a royalty. This would allow Ivax to circumvent Alpharma's purported exclusivity on all products.

- Pfizer's Greenstone Division has been aggressively pre-selling an authorized generic version of Neurontin®. While this product has not yet been launched, it is my understanding that it will be very soon. An authorized generic product from Pfizer would further devastate Alpharma's future market. Par was able to do exactly that with its authorized generic Paxil® launch.

- Pfizer also expects approval of its gabapentin substitute, pregabalin, within the next month and will begin an aggressive marketing campaign. Analysts are predicting the highest switch rate in history for this product. Again, you may recall that GSK was able to switch almost 25% of the market to its new Paxil® CR before generic market entry. Pregabalin is expected to far exceed that amount.

In the end, unless you now respond immediately and constructively, it is certain that Alpharma and its shareholders will never derive any significant value from this important asset, because either the litigation is lost or the generic market is decimated before Alpharma can launch, or both. In view of the *Paroxetine* decision and the recent stay order, Apotex conservatively has at least the same—if not a greater—chance of prevailing in the litigation as Alpharma. More importantly, however, if Alpharma waits to find out (because, according to one of its offers, it "knows" it will win), and even if it does win, it will find that there is no longer any significant gabapentin market to be had. This certainly appears to be a risk that Alpharma's directors cannot afford to, and should not, take. The only way for Alpharma to avoid this risk and derive value from this asset for its shareholders is to act now and resolve this matter with

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed.R.Evid. 408*

Chairman and Board of Directors
Alpharma Inc.
August 21, 2004
Page 5

Apotex so that both companies can enter the market. In that way, both companies can benefit from their investment and years of litigation, instead of both companies ending up with nothing.

Unfortunately, Apotex's most recent efforts to resolve this matter have again been rebuffed without justification by Alpharma's officers. After entry of the recent injunction, Apotex again attempted to resolve its differences with Alpharma. In particular, in exchange for a selective waiver of Alpharma's purported exclusivity, Apotex offered to lift the injunction and dismiss its appeal—both of which are considerable concessions on Apotex's part. Moreover, unlike before, Apotex does not presently have launch quantities available, and therefore poses little overall threat to Alpharma and its partner Teva.

Initially, Apotex received no substantive response to its offer. When one of Apotex's officers attempted to approach Alpharma again, she was, among other things, rudely accused of "extortion" by one of Alpharma's officers; told that Alpharma cannot lose the appeal (though the officer was "not at liberty to say why"); and instructed that Apotex could launch "three months early" in exchange for "50% of its profits." This is hardly a good faith response under the circumstances, and not likely to result in any value for Alpharma's shareholders.

Apotex does not wish to see—and nor should you wish to see—the continuing dissipation of this valuable asset of both Alpharma and Apotex because of the intransigence of Alpharma officers who have refused to deal with Apotex in good faith. But Apotex fears that is exactly what will happen without your immediate intervention. Apotex remains ready and willing to make a commercially reasonable deal with Alpharma to the benefit of both parties. To that end, I am at your disposal to meet and discuss this issue.

Very truly yours
Apotex Inc.

Bernard C. Sherman, Ph.D., P.Eng.
Chairman and CEO

*Confidential For Settlement Purposes Only—*
*Not Admissible For Any Other Purpose Under Fed.R.Evid. 408*

APPENDIX 3

## SCENARIO 1[1]

### ASSUMES AUG-04 IVAX LAUNCH; OCT-04 PUREPAC LAUNCH[2], NOV-04 PREGABALIN LAUNCH

|  | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | PUREPAC 6 MONTH TOTAL SALES (in mill) |
|---|---|---|---|---|---|---|---|---|---|
| Projected Neurontin Capsules Sales (in millions) | | | | | | | | | |
| Projected Ivax Sales (in millions) | | | REDACTED | | | | | | |
| Projected Purepac Sales (in millions) | | | | | | | | | million |

1. For both Scenarios, we assume that Purepac is allowed 180 days of exclusive generic gabapentin marketing; however, Ivax remains in the market with its non-AB-rated tablets which were launched in August-04. We assume that Pregabalin launches in early November 2004 based on recent press announcements. We also assume no authorized generic in both scenarios.

2. Scenario I assumes that the stay is lifted and Purepac launches by October 1, 2004. If an authorized generic were to launch ahead of Purepac's launch that product could capture half of Purepac's sales as shown above.
Assumes that 80% of the market switches to generic by March 2005, generic price as a percentage of brand price ranges from 70% to 65% over the reported period.

## SCENARIO 2[1]

### ASSUMES AUG-04 IVAX LAUNCH; NOV-04 PREGABALIN LAUNCH; FEB-05 PUREPAC LAUNCH[2]

| | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Jan-04 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | PUREPAC 6 MONTH TOTAL SALES (in mill) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Neurontin Capsules Sales (in millions) | | | | | | | | | | | | | |
| Projected Ivax Sales (in millions) | | | | | REDACTED | | | | | | | | |
| Projected Purepac Sales (in millions) | | | | | | | | | | | | | $$ million |

1. For both Scenarios, we assume that Purepac is allowed 180 days of exclusive generic gabapentin marketing; however, Ivax remains in the market with its non-AB-rated tablets which were launched in August-04. We assume that Pregabalin launches in early November 2004 based on recent press announcements. We also assume no authorized generic in both scenarios.

2. For Scenario 2, we assume that Purepac is delayed in marketing its gabapentin until after the appeal is heard and a decision is rendered, realistically, early Feb-05. If an authorized generic were to launch ahead of Purepac's launch that product would likely capture much more than half of Purepac's sales above. Assumes that 85% of the market switches to generic by July 2005, generic price as a percentage of brand price ranges from 70% to 50% over the reported period.

EXHIBIT C





FOCUSING, GROWING

▶ Corporate Information   ▶ Research & Development   ▶ Marketed Products   ▶



⤳ **About IVAX**

⤳ **Officers and Directors**

⤳ **Investor Relations**

⤳ **Press Center**

⤳ **Careers**

⤳ **Contact Us**

## Sign Up Now
The IVAX News Releases

Please enter email 

◉ Subscribe

◯ Unsubscribe

August 18, 2004

IVAX Launches Gabapentin Tablets

MIAMI – August 18, 2004 – IVAX Corporation (AMEX: IVX, LSE: IVX.L) announced today that it has commenced the initial commercialization of its gabapentin tablets in 100 mg, 300 mg and 400 mg strengths to selected customers. IVAX received final approval of its Abbreviated New Drug Application for these tablets from the FDA in April 2004. As the first company to file an ANDA with a Paragraph IV patent certification, IVAX has been awarded 180-days marketing exclusivity for the tablet form of the product in the above sizes. Gabapentin is the generic name of Neurontin®, approved to treat seizures and postherpetic neuralgia (PHN), and is marketed by Warner-Lambert, a unit of Pfizer Inc. Neurontin had U.S. sales of approximately $2.4 billion in 2003.

Neurontin is sold by Warner-Lambert in 5 dosage strengths: 100 mg, 300 mg and 400 mg capsules and 600 mg and 800 mg tablets. It is the 100 mg, 300 mg and 400 mg tablets, not currently marketed, that IVAX intends to market through its U.S. generics subsidiary, IVAX Pharmaceuticals, Inc.

IVAX received a tentative approval from the FDA for its ANDA for the 100 mg, 300 mg, and 400 mg capsules, and on the 600 mg and 800 mg tablets marketed by Warner-Lambert. Litigation with Pfizer concerning the Neurontin patent is pending and a trial has not yet been scheduled.

IVAX Corporation, headquartered in Miami, Florida, discovers, develops, manufactures, and markets branded and brand equivalent (generic) pharmaceuticals and veterinary products in the U.S. and internationally.

Copies of this and other news releases may be obtained free of charge from IVAX' website at www.ivax.com.

**August 25, 2004**
IVAX COMPLETES FI
SPLIT
Read More

**August 20, 2004**
IVAX to Continue Selli
Pfizer's TRO Motion a
Denied
Read More

**August 19, 2004**
IVAX Responds to Arti
Pharmaceutical Comp
Challenge
Read More

**August 18, 2004**
IVAX Launches Gabar
Read More

**July 29, 2004**
IVAX Receives Final A
Tablets
Read More

**July 28, 2004**
IVAX Reports Record
Quarter of 2004
Read More

**July 26, 2004**
IVAX Provides Second
Results Release Date
Information
Read More

**July 20, 2004**
IVAX Receives Docum
Florida
Read More

**July 15, 2004**
IVAX Announces Five-
Read More

**July 15, 2004**
IVAX Announces Resu
Shareholders' Meeting
Read More

↳ Archived Stories

The "FDA" refers to the United States Food and Drug Administration.

Except for the historical matters contained herein, statements in this press release are forward-looking and are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Investors are cautioned that forward-looking statements involve risks and uncertainties which may affect the company's business and prospects, including the risks that launch of gabapentin tablets in 100 mg, 300 mg and 400 mg dosage strengths may be delayed or may be stopped at any time; that, the products will not be successfully commercialized; that market acceptance for the tablet dosage form of gabapentin may not as anticipated; changing market conditions; the availability and cost of raw materials and other third party products; the impact of competitive products and pricing; the difficulty in predicting the timing and outcome of legal proceedings, including the outcome of Pfizer's patent infringement claim against IVAX and others with respect to gabapentin; that the patent litigation with respect to these products could prevent us from selling these products, could result in substantial damages which could exceed the expected profit or selling price for these products; the difficulty of predicting the timing of U.S. Food and Drug Administration, or FDA, approvals; the impact of FDA's or other administrative or judicial agency's decisions on exclusivity periods; competitors' ability to extend exclusivity periods past initial patent terms; that final approval of IVAX' ANDA for the 100 mg, 300 mg and 400 mg capsules and the 600 mg and 800 mg tablets may be delayed or not received at all, and that if finally approved, the products will not be successfully commercialized; that IVAX may not increase the number of products in its generic portfolio; and other risks and uncertainties based on economic, competitive, governmental, technological and other factors discussed in the Company's Annual Report on Form 10-K and its other filings with the Securities and Exchange Commission.. Neurontin® is a registered trademark of Warner-Lambert Company, a unit of Pfizer Inc.

CONTACT:
David Malina
Director/Investor Relations & Corporate Communications
305.575.6043

Site Map  |  Legal Notice  |  Privacy Policy

© 2002 IURH Corporation

EXHIBIT D

F-D-C REPORTS —

FOUNDED 1939
$1,455 A YEAR

# *"The Pink Sheet"*®

## PRESCRIPTION PHARMACEUTICALS AND BIOTECHNOLOGY

### THE NEWS THIS WEEK                    Vol. 66, No. 34    August 23, 2004

**Medicare Rx Formulary: Will USP's Number Of Classes Make The Grade?**

- **USP FLUNKS COX-2s, STATINS; BLOCKBUSTERS HELD BACK FROM "CLASS" IN DRAFT MEDICARE FORMULARY.** COX-2s are grouped together with other NSAIDs and statins with other cholesterol-lowering drugs. CMS says it will evaluate formularies on "more granular level" than described in USP's model .................................................................................................3

- **USP's DRAFT MODEL FORMULARY FOR MEDICARE DRUG COVERAGE SETS 146 CATEGORIES AND CLASSES,** in which plan sponsors would have to cover at least two drugs. The draft guidelines appear to leave everyone unsatisfied: PCMA asserts fewer classes are needed to assure cost control; PhRMA counters that a higher threshold is necessary to maintain access to critical drugs ..................................................................................................................................................5

- ***Prexige* TARGET study not quite a bull's-eye for Novartis; COX-2 inhibitor shows GI benefit** compared to NSAIDs in overall population, but benefit disappears among patients taking low-dose aspirin. Study shows no significant cardiovascular signal but suggests trend toward increased myocardial infarction ...........................................20

- **Entire COX-2 class is "TARGET" of critical *Lancet* editorial; authors cite *Prexige*** study as further evidence that the benefits of COX-2s over NSAIDs are not worth the added risks. Authors point to lack of GI benefit in patients taking low-dose aspirin ..........................................................................................................................................21

- **Dual eligibles' transfer from Medicaid to Medicare could generate windfall for Rx manufacturers,** Blue Cross Blue Shield of New Jersey rep suggests. The health plan will participate as a sponsor in both Part D and Medicare Advantage but does not expect to be able to negotiate discounts below current Medicaid "best price" floor. Plan also concerned about whether states will try to obtain portion of plan-negotiated discounts ............................................10

- **Lilly *Alimta* "reasonably likely" to improve survival for non-small cell lung cancer patients,** labeling says. FDA clears pemetrexed for second-line treatment of NSCLC. While "no controlled trials" demonstrate clinical benefit, FDA says the surrogate endpoint of response rate suggests a survival benefit ...........................................................................25

- **Aventis *Taxotere* adds early stage breast cancer indication** Aug. 18. Taxotere arm of pivotal trial shows 25.7% reduction in risk of relapse.................................................................................................................................................26

- **Ivax launches *Neurontin* generic "at risk" less than two weeks before user fee date** for Pfizer's follow-on agent *Lyrica*. Generic gabapentin tablets are not AB-rated but could grab market share before Pfizer actively converts patients to pregabalin. Ivax' move increases pressure on Purepac/Teva and Apotex to settle litigation challenging Purepac's exclusivity for gabapentin capsules ..................................................................................................................16

- **Mylan's *Duragesic* generic cannot escape J&J's pediatric exclusivity; D.C. court upholds** FDA's decision to rescind full approval of Mylan's fentanyl patch ANDA until Jan. 23. Mylan is appealing ..........................................................15

- **"Authorized" generics fight moves to Capitol Hill, FTC and the courts;** Mylan making case that authorized generics are anticompetitive, lead to fewer Paragraph IV certifications. Other generic firms expected to join in.................................13

**Drug & Device Dialogue**

# What's the future for authorized generics?

**Join Sen. Hatch and Rep. Waxman for Drug & Device Dialogue's Oct. 6-7 web-based audio conference as they discuss their landmark 1984 law and the outlook for generic competition.**
See our ad on p. 19.

Contents copyrighted © F-D-C Reports, Inc. 2004; protected by U.S. Copyright Law. Reproduction, photocopying, storage or transmission by magnetic or electronic means strictly prohibited by law. Authorization to photocopy items for internal or personal use is granted by F-D-C Reports, Inc., when the fee of $25.00 per copy of each page is paid directly to Copyright Clearance Center, 222 Rosewood Dr., Danvers, MA 01923, (978) 750-8400. The Transaction Reporting Service fee code is: 1530-6240/04 $0.00 + $25.00. Violation of copyright will result in legal action, including civil and/or criminal penalties, and suspension of service. For more information contact: Michael Magoulias, F-D-C Reports, Inc., at 301-657-9830.

# Ivax Launches *Neurontin* Generic "At Risk" As Pregabalin User Fee Date Nears

Ivax' "at risk" launch of generic gabapentin comes less than two weeks before the anticipated FDA user fee date for Pfizer's *Neurontin* follow-on drug *Lyrica*.

Ivax announced Aug. 18 that "it has commenced the initial commercialization of its gabapentin tablets in 100 mg, 300 mg, and 400 mg strengths to selected customers."

Pfizer filed for a temporary restraining order against Ivax, but its request was denied by Newark, N.J. federal Judge John Lifland on Aug. 20.

Pfizer does not market Neurontin in 100 mg, 300 mg and 400 mg tablets; the branded agent is sold in capsule form in those strengths.

Ivax' ANDA for the three tablet strengths was approved April 28 with 180-day marketing exclusivity ("The Pink Sheet" May 3, 2004, p. 17).

In launching gabapentin tablets at risk, Ivax could be liable for treble damages if it is found to infringe a Pfizer patent. Patent litigation with Pfizer is ongoing; a trial date has not yet been set.

Ivax' gabapentin tablets are not AB-rated to Neurontin capsules and, consequently, are not directly substitutable for the brand at pharmacy. However, in most states, a script for "gabapentin" could be filled with the generic tablets, according to the National Association of Boards of Pharmacy.

Ivax' gabapentin is indicated only for adjunctive therapy for epilepsy in individuals ages 12 and older. The generic "carves out" the Neurontin indication for pediatric epilepsy, FDA said. Neurontin is also indicated for post-herpetic neuralgia.

The launch gives Ivax a chance to grab gabapentin market share before Pfizer actively begins converting patients to Lyrica (pregabalin).

Pfizer had originally planned to launch pregabalin prior to generic competition for gabapentin. The NDA filing was delayed at least three years by a number of issues, including carcinogenicity and toxicological data, and the addition of a generalized anxiety disorder indication.

Pfizer submitted its Lyrica NDA Oct. 30, 2003, setting an estimated user fee date of Aug. 30 ("The Pink Sheet" Dec. 29, 2003, p. 17).

Neurontin U.S. sales were $2.2 bil. in 2003. Pfizer's 2004 revenue forecast assumed no generic competition for the drug ("The Pink Sheet" July 26, 2004, p. 5).

In a court filing on the TRO request, former Neurontin Team Leader John Marino said Pfizer would lose "goodwill" among consumers and physicians if Ivax' generic stays on the market.

If Ivax "enters the market now and is later enjoined, consumers would be faced with the prospect of changing medications yet again. The loss of goodwill caused by this extreme inconvenience to consumers would irreparably harm [Pfizer] by adversely affecting sales of Neurontin," the filing states.

In addition, "once consumers are able to purchase gabapentin at lower generic prices, they would abhor a return to paying the higher brand price," the filing states. This would force Pfizer to lower Neurontin's price to generic levels or risk losing patients to competing drugs, such as Johnson & Johnson's *Topamax* (topiramate), Marino said.

The launch gives Ivax a jump on Purepac, which holds generic exclusivity on 100 mg, 300 mg and 400 mg gabapentin capsules.

The Alpharma division received ANDA approval in September 2003 but did not launch due to pending litigation with Pfizer.

Apotex filed suit challenging Purepac's exclusivity, and a federal appeals court stayed Purepac's ANDA approval pending resolution of the Apotex lawsuit. A hearing is scheduled for December ("The Pink Sheet" Aug. 2, 2004, In Brief)

Purepac previously agreed to selectively waive its 180-day exclusivity on gabapentin capsules to Teva. Ivax' launch now increases the pressure on Purepac/Teva and Apotex to reach an agreement that would allow the additional generics to enter the market before year-end. Pfizer is expected to launch its own generic through its Greenstone division. ♦ ♦

EXHIBIT E

F-D-C REPORTS —

FOUNDED 1939
$1,455 A YEAR

# *"The Pink Sheet"*®

## PRESCRIPTION PHARMACEUTICALS AND BIOTECHNOLOGY

**THE NEWS THIS WEEK**                     **Vol. 66, No. 36    September 6, 2004**

### Drug & Device Dialogue

## Hatch-Waxman Revisited: The web event you can't afford to miss...

### See our ad on p. 34

### Follow-On Biologics, "Authorized" Generic Decisions Delayed

- **SANDOZ *OMNITROPE* NDA WILL AWAIT FOLLOW-ON BIOLOGICS GUIDANCE,** FDA indicates. Agency tells Sandoz it is unable to reach a decision on follow-on version of growth hormone because of unresolved scientific and legal issues............35

- **MYLAN MAY ADD ANTITRUST CLAIMS IN RENEWED LEGAL CHALLENGE TO "AUTHORIZED" GENERICS:** company drops lawsuit against FDA related to Watson's *Macrobid* generic, but could refile the case based upon antitrust claims ..................36

- **Sanofi-Aventis global management is all-European: Aventis COO Markham** is among execs dismissed as first step in integration process. U.S. business will be lead by Tim Rothwell, with Aventis exec Soriot heading operations. Markham leaves Aventis as one of most experienced top pharma execs in industry ...........................................................3

- **Pfizer *Lyrica* "approvable" for three indications; "not approvable"** for anxiety claim .........................................8

- ***Macugen* shows 15% treatment effect in "wet" age-related macular degeneration, FDA** tells advisory committee during review of Pfizer/Eyetech ophthalmic drug.........................................................................................39

- ***Zocor* dosing recommendations unchanged by "A to Z" study, FDA and Merck agree;** SEARCH trial may be key to determining future of high dose of simvastatin.........................................................................................14

- **Merck praised for publishing "A to Z" trial, but *JAMA*** editorial wonders what happened to data on *Zocor* 160 mg ............13

- **GSK trial registry begins with *Avandia*; 64 study summaries posted,** including 25 unpublished trials .................12

- ***Paxil* settlement requires disclosure of early-stage research, going beyond PhRMA position** that only *Phase III* and *IV* studies must be published. GSK settlement may make it difficult for industry to hold the line on "exploratory" trials......11

- **PhRMA, Sen. Grassley debate "corporate death penalty" under False Claims Act** in an exchange of letters. Grassley urges association to concentrate on educating members about compliance instead of seeking relief from penalties...........9

- **Rx prices in U.S. are fueling importation debate, CMS head McClellan** observes. President Bush indicates he would support reimportation if safety issues are resolved ....................................................................................33

### Medicare Formularies: In-Depth Coverage Of USP Drug Classification System

- **Medicare formularies would need to cover at least 348 different products,** assuming health plans offer two drugs per class and one in each "recommended subdivision" proposed by USP ...............................................................17

- **USP's proposed drug classification system: categories, classes and subdivisions** reproduced by "The Pink Sheet" ..........18

- **FDA enters formulary fray: agency plans analysis** for electronic-prescribing standards development ...................16

Contents copyrighted © F-D-C Reports, Inc. 2004; protected by U.S. Copyright Law. Reproduction, photocopying, storage or transmission by magnetic or electronic means strictly prohibited by law. Authorization to photocopy items for internal or personal use is granted by F-D-C Reports, Inc., when the fee of $25.00 per copy of each page is paid directly to Copyright Clearance Center, 222 Rosewood Dr., Danvers, MA 01923, (978) 750-8400. The Transaction Reporting Service fee code is: 1530-6240/04 $0.00 + $25.00. Violation of copyright will result in legal action, including civil and/or criminal penalties, and suspension of service. For more information contact: Michael Magoulias, F-D-C Reports, Inc., at 301-657-9830.

8                          "The Pink Sheet"                September 6, 2004

# Pfizer's *Lyrica:* "Approvable" For Three Indications, Not Generalized Anxiety

Pfizer's *Lyrica* (pregabalin) is "approvable" for three of four requested indications.

The three approvable indications are neuropathic pain associated with diabetic peripheral neuropathy, postherpetic neuralgia and adjunctive therapy for partial seizures in adults with epilepsy.

Lyrica received approvable letters from FDA Aug. 31 and in late June.

Pfizer received a "non-approvable" letter for Lyrica for the treatment of generalized anxiety disorder.

The Lyrica NDA, which was submitted Oct. 30, 2003, was delayed in part due to the addition of the GAD indication.

Pfizer had planned to launch the *Neurontin* follow-on drug ahead of gabapentin generics. However, Ivax launched its non-AB-rated generic "at risk" in mid-August ("The Pink Sheet" Aug. 23, 2004, p. 16).

Pfizer has said it plans to market generic gabapentin through its Greenstone division, but the product has not yet launched.

Neurontin is approved for two of the four proposed Lyrica indications: postherpetic neuralgia and epileptic seizures.

Pfizer confirmed that it had received approvable and non-approvable letters for Lyrica in a Sept. 2 press release. *[Editor's note: News of Lyrica's status was first reported in the "The Pink Sheet" DAILY Sept. 1. To get breaking pharmaceutical news, sign up for a free trial at www.ThePinkSheetDAILY.com.]*

Under FDA's current regulations, approvable decisions are considered publicly disclosable, while a non-approvable decision is not. FDA is proposing to replace "approvable" and "not approvable" actions with "complete response" letters, which would not be disclosed ("The Pink Sheet" July 26, 2004, p. 10).

The company "is continuing to work closely with the FDA during the ongoing regulatory review to resolve open issues on all indications and labeling," Pfizer said.

In July, Lyrica was approved in Europe for the treatment of peripheral neuropathic pain and adjunctive therapy for epilepsy. ♦ ♦

# TAP President Will Be Former Sales VP Alan MacKenzie

Former TAP VP-sales Alan MacKenzie will become president of the company effective Sept. 1.

MacKenzie is rejoining TAP approximately two months after being acquitted in Boston federal court of charges related to a U.S. government investigation into marketing practices for the prostate cancer therapy *Lupron*.

In July, MacKenzie and seven other current and former TAP employees were found not guilty on charges of conspiracy to pay kickbacks to prescribers, conspiracy to defraud Medicaid and conspiracy to violate the Prescription Drug Marketing Act ("The Pink Sheet" July 19, 2004, p. 14).

The Takeda/Abbott joint venture settled charges against the company stemming from the investigation in 2001, paying $875 mil. ("The Pink Sheet" Oct. 22, 2001, p. 19).

MacKenzie worked for TAP from 1985 to 1998 in a variety of sales roles.

His association with the joint venture was on the Takeda side. Before taking a leave of absence in 2001, MacKenzie was president of Takeda Pharmaceuticals North America.

He was replaced by current Takeda President Mark Booth in August 2002 ("The Pink Sheet" Sept. 2, 2002, In Brief).

Current TAP President Thomas Watkins is leaving the company after a six-year term. Under the joint venture agreement, Takeda and Abbott alternate heading up TAP every five to seven years.

Watkins, who most recently served as senior VP-Abbott HealthSystems, will remain involved at TAP for a transition period as MacKenzie moves in. After that, he will rejoin Abbott in a "senior management role," TAP said.

*[Editor's note: A version of this story first appeared in "The Pink Sheet" DAILY Aug. 31. Visit our website, www.ThePinkSheetDAILY.com, to sign up for a free trial.]* ♦ ♦

Unauthorized photocopying is prohibited by law. See page one.

EXHIBIT F



**HARRIS NESBITT**

Research Comment

September 1, 2004

# Pfizer
(PFE-NYSE)

**Pharmaceuticals**

**John T. Boris, R.Ph.**
212-885-4138
john.boris@harrisnesbitt.com

**Stock Rating:** Outperform
**Industry Rating:** Negative

## Securities Info

| Price (31-Aug) | $32.67 | Target Price | $42 |
|---|---|---|---|
| 52-Wk High/Low | $39/$30 | Dividend | $0.68 |
| Mkt Cap (mm) | $249,239 | Yield | 2.1% |
| Shs O/S (mm) | 7,629 | Float O/S (mm) | 7,600 |
| Options O/S (mm) | na | Avg Daily Vol (000s) | 16,618 |

## Price Performance



## Valuation/Financial Data

| (FY-Dec.) | 2003A | 2004E | 2005E | 2006E |
|---|---|---|---|---|
| EPS Pro Forma | $1.75 | $2.13 | $2.37 | $2.51 |
| P/E | | 15.3x | 13.8x | 13.0x |
| *First Call Cons.* | | $2.12 | $2.37 | $2.54 |
| EPS GAAP | $0.54 | $1.68 | $2.31 | $2.46 |
| FCF | $1.25 | $2.01 | $2.65 | $2.84 |
| P/FCF | | 16.3x | 12.3x | 11.5x |
| EBITDA ($mm) | $20,169 | $28,409 | $28,974 | $30,358 |
| EV/EBITDA | | 9.5x | 8.7x | 8.3x |
| Rev. ($mm) | $45,189 | $52,500 | $56,213 | $57,774 |
| EV/Rev. | | 4.8x | 4.5x | 4.3x |

| Quarterly EPS | 1Q | 2Q | 3Q | 4Q |
|---|---|---|---|---|
| 2003A | $0.45 | $0.30 | $0.47 | $0.53 |
| 2004E | $0.52A | $0.48A | $0.52 | $0.61 |

**Balance Sheet Data** (1-Jun)

| | | | |
|---|---|---|---|
| Net Debt ($mm) | $1,486 | Tot. Debt/EBITDA | 0.7x |
| Total Debt ($mm) | $18,969 | EBITDA/Int Exp. | nm |
| Net Debt/Cap. | 1.8% | Price/Book | 3.7x |

## FDA Action on Lyrica (pregabalin) Expected on or Before October 29

### Event
The 10-month PDUFA date for Lyrica passed on August 30. We believe that the unprecedented size of the NDA for Lyrica will result in an FDA action on or before the 12-month PDUFA date of October 29.

### Impact
Neutral. Two divisions of the FDA are reviewing the NDA for Lyrica. The neuropsychopharm branch is reviewing the generalized anxiety disorder and add-on in epilepsy indications and the division of anesthetic, critical care, and addiction is reviewing the neuropathic pain data. Each of these branches approved similarly designed Neurontin studies for add-on epilepsy and post herpetic neuralgia, which minimizes the risk of approval, in our opinion.

### Forecasts
We maintained our 2004 Lyrica sales estimate of $90M, as it rolls out in the EU in 2H04 (approved in EU in 7/04 for epilepsy and neuropathic pain). Our model assumes a 4Q04 US launch. We believe the Street is under appreciating the earning leverage associated with the Lyrica asset. We maintained our $2.13 EPS estimate, which is $0.01 above consensus.

### Valuation
Our $42 price target is derived by using a 12-month forward-looking multiple of 18x our 2005 EPS estimate $2.37 (+12%). We expect PFE's multiple to expand as investors become more confident with its long-term growth rate, supported by its ability to grow earnings from organically derived sources over the next several years.

### Recommendation
PFE is inexpensive relative to its historical multiple, trading at 13.8x our 2005 EPS estimate of $2.37, representing a 12% discount to both the group and to the S&P 500. Near term, we project top-tier earnings growth with a three-year CAGR of low- to mid-teens growth. We maintain our **OUTPERFORM** rating.

**Please refer to pages 6 to 8 for Disclosure Statements, including the Analyst's Certification.**

## Details & Analysis

The clinical development program for Lyrica was modeled after the drug use by indication profile for Neurontin, which is reasonable given that Lyrica is in the same class of compounds as Neorontin. In addition, the clinical trial program for Lyrica contains an unprecedented number of clinical trials that contain favorable data in the treatment of neuropathic pain, generalized anxiety disorder, and add-on therapy in epilepsy. We believe that these factors should minimize the risk of approval, as both divisions of the FDA previously reviewed similarly designed clinical trials for Neurontin (i.e., the FDA neuropharm branch reviewed data for Neurontin as add-on therapy in the treatment of epilepsy and the anesthesia branch approved Neurontin for the treatment of post herpetic neuralgia). The wild card indication, in our view, is generalized anxiety disorder. However, the quality of the data recently presented at the American Psychiatric Association meeting would lead us to believe that this indication should be approved.

In 1997/1998, Warner-Lambert rolled out one of the largest clinical trial programs in the history of central nervous system products. It contained more than 75 studies that were conducted in the treatment of multiple types of neuropathic pain, psychiatric disorders including generalized anxiety disorder, migraine prophylaxis and add-on and monotherapy in the treatment of epilepsy. We believe that Pfizer has enriched the NDA with additional studies to ensure that it has secured the appropriate claim structure for promotion including efficacy data supporting a flexible dosage schedule of once-daily or twice-daily dosing. We estimate that the clinical trial program involved well over 100 studies in a vast array of indications. We believe that the size of the NDA for Lyrica is the primary trigger behind a longer review. We expect this vast body of data to be presented over the next few years in support of the brand.

**Exhibit 1. Lyrica Clinical Development Program (>100 studies)**



Source: Warner-Lambert Analyst Meeting and Harris Nesbitt Research estimates.

**What do the Lyrica clinical trials tell us?** Pfizer has presented data in post herpetic neuralgia and diabetic neuropathy that demonstrate a robust response rate that is comparable to Neurontin studies. Lyrica will enjoy multiple advantages over Neurontin (see Exhibit 2 below). In addition to those listed in Exhibit 2, Neurontin is only indicated for the treatment of post herpetic neuralgia, while Lyrica is anticipated to carry a broader neuropathic pain label. Lyrica was associated with a response rate of more than 65%, with a 30% reduction in neuropathic pain at doses ranging from 300mg-600mg/day. In May 2004, Pfizer presented GAD data at the American Psychiatric Association meeting that was held in New York. In five, double-blind, placebo-controlled GAD studies, pregabalin was shown to exhibit a statistically significant effect in each study, as the product provided relief from psychological as well as somatic symptoms associated with anxiety. We do not expect a rapid onset like benzodiazepines (i.e., Valium, Xanax or Ativan) in the treatment of GAD, as the onset of effect from clinical trials usually occurred within the first week of therapy. In our opinion, the least important indication is add-on therapy in the treatment of epilepsy, where the market is crowded with several agents that are more potent (i.e., Topimax by Johnson & Johnson and Lamictal by GlaxoSmithKline), but are also associated with a higher degree of side effects. Lyrica data as an add-on therapy in epilepsy has demonstrated a response rate of more than 50%, cutting the number of seizures that patients experienced by one-half. The main advantage as an add-on therapy in epilepsy is that Lyrica can easily be added to Dilantin (sold by Pfizer) and Tegretol (sold by Novartis), without the risk of any drug-drug interactions. This feature makes it an ideal add-on therapy in multiple psychiatric and neurologic disorders were polypharmacy is used. If Pfizer successfully garners approval in all three major indications for Lyrica and secures a clean label form the FDA, we believe that there is upside to our $2 billion peak 2009 estimate. The upside for Lyrica largely comes from the generalized anxiety indication, which alone represents a multibillion-dollar opportunity.

**What are the potential advantages over Neurontin?** Mechanistically, Neurontin and Lyrica work by a similar mechanism of action. Lyrica is a GABA analogue that has a chemical structure related to Neurontin. We expect Lyrica's major points of differentiation in the market will be numerous compared with competitive therapies that are approved to treat pain, psychiatric disorders such as generalized anxiety disorders, and epilepsy. These features include 1) lack of a need to class the product as a controlled substance; 2) its potency relative to Neurontin; 3) its broader range of indications, especially against a vast array of neuropathic types of pain; 4) its more convenient and flexible once-daily or twice-daily dosing schedule; and 5) its safety profile and lack of drug-drug interactions as the product is not metabolized. This makes it an ideal add-on therapy in psychiatric, neurologic, and pain patients that are frequently on multiple medications. In Exhibit 2, we summarize the major points of differentiation between Lyrica and Neurontin. On the pricing front, a 2,400mg-3,600mg dose of Neurontin carries an attractive average selling price (ASP is price paid by retail and chain drugstores) of $8.52-$12.78 per day. We believe that the potential advantages of Lyrica over Neurontin would justify premium pricing for a comparable Lyrica dose. However, if Pfizer secures the GAD indication, we would expect Pfizer to price the product at a modest discount to a comparable dose of Neurontin to gain broad formulary acceptance.

**Harris Nesbitt**                                                                        **Pfizer**

### Exhibit 2. Neurontin versus Lyrica - Points of Differentiation

| Product Feature | Neurontin | Lyrica |
|---|---|---|
| **Mechanism of Action** | | |
| -GABA Analogue | Yes | Yes |
| -Potency in Humans | | >7-10x |
| **Pharmacokinetic Profile** | | |
| -Half-Life | 5-7 hours | 10-12 hours |
| -Volume of Distribution | Similar | Similar |
| -Metabolism | None | None |
| **Drug Internations** | | |
| Drug-Drug Internations | None | None |
| **Efficacy Indications** | | |
| -Neuropathic Pain | | |
| diabetic neuropathy | | X |
| post herpetic neuralgia | X | X |
| other forms of neuroathic pain | | X |
| migraine prophylaxis | | X |
| -Psychiatry | | |
| generalized anxiety disorder | | X |
| bipolar disorder | | X |
| Epilepsy | | |
| add-on therapy | X | X |
| monotherapy | | X |
| **Side Effect Profile** | | |
| -mild to moderate | X | X |
| -dizziness | X | X |
| -somnolence | X | X |
| **Dosing** | | |
| -Dose | 2,400-3,600mg | 150-600mg |
| -Frequency | 3-4x/day | 1-2x/day |
| *Cost per day of therapy* | *$8.52 to 12.78/day* | *?* |

Source: Harris Nesbitt Research Estimates. Average Selling Price (ASP) data is sourced from Amerisource Bergen database.

## Investment Thesis

We project 2004 earnings growth of 22% for Pfizer, with three-year earnings CAGR in the low-to mid-double-digit range, which is at the upper end of the industry average and ahead of consensus estimated deceleration of the S&P 500. In the near term, Pfizer is projected to deliver top-tier earnings growth driven by 1) in-line products; 2) the launch of four significant new product opportunities (Caduet, Spiriva, Lyrica in 2004, and Macugen possibly in 2005); 3) manageable exclusivity losses (Diflucan mid-2003, Zithromax late 2005, and Zoloft mid-2006 and Norvasc in September 2007); and 4) impressive financial resources ($90 billion in cash and short-term investments by 2009). This provides Pfizer with a significant competitive advantage to leverage its financial resources and stellar reputation as a premier commercial partner (i.e., Aricept, Lipitor, Celebrex/Bextra, Rebif, Spiriva, Daxas, Macugen, Indiplon, and asenapine) to buy additional growth if necessary.

Our model assumes that Pfizer's in-line growth drivers, new products, and recent in-licensing efforts (Spiriva, Daxas, Macugen, Indiplon, and asenapine) are adequate opportunities to offset exclusivity losses of $3.0 billion in 2006, $4.0 billion in 2007, and $4.8 billion in 2008. Although the company may take advantage of small tuck-in acquisitions that complements its R&D or commercial efforts (i.e., Esperion), we do not expect Pfizer to enter into another major merger. This would allow the Street to assess the company's organic earnings growth prospects as we move forward. We argue that Pfizer has the resources to generate organically driven growth, which will be rewarded over time with multiple expansion.

**Other companies mentioned (priced as of the close on August 31, 2004):**

GlaxoSmithKline ADR (GSK, $41.14, Not Rated)
Johnson & Johnson (JNJ, $58.10, Not Rated)
Novartis ADR (NVS, $46.45, Not Rated)

**Harris Nesbitt**                                                                                      **Pfizer**

# PFIZER INC (PFE)



September 1, 2004

**Harris Nesbitt**                                                                                                      **Pfizer**

## Important Disclosures

**Analyst's Certification**

I, John T. Boris, R.Ph., hereby certify that the views expressed in this report accurately reflect my personal views about the subject securities or issuers. I also certify that I have not, am not, and will not receive, directly or indirectly, compensation in exchange for expressing the specific recommendations or views in this report.


Analysts who prepared this report are compensated based upon (among other factors) the overall profitability of HNC, BMO Nesbitt Burns, and their affiliates, which includes the overall profitability of investment banking services. Compensation for research is based on effectiveness in generating new ideas and convincing clients to act on them, performance of recommendations, accuracy of earnings estimates, and service to clients.

**General Disclosure**

The information and opinions in this report were prepared by HNC. HNC is an affiliate of BMO Nesbitt Burns Inc., and BMO Nesbitt Burns Ltee/Ltd. ("BMO Nesbitt Burns"). This information is not intended to be used as the primary basis of investment decisions, and because of individual client objectives it should not be construed as advice designed to meet the particular investment needs of any investor. This material is for information purposes only and is not an offer or solicitation with respect to the purchase or sale of any security. The reader should assume that HNC, BMO Nesbitt Burns, or their affiliates may have a conflict of interest and should not rely solely on this report in evaluating whether or not to buy or sell securities of issuers discussed herein. The opinions, estimates, and projections contained in this report are those of HNC as of the date of this report and are subject to change without notice. HNC endeavors to ensure that the contents have been compiled or derived from sources that we believe are reliable and contain information and opinions that are accurate and complete. However, HNC makes no representation or warranty, express or implied, in respect thereof, takes no responsibility for any errors and omissions contained herein, and accepts no liability whatsoever for any loss arising from any use of, or reliance on, this report or its contents. Information may be available to HNC or its affiliates that is not reflected in this report. This report is not to be construed as an offer or solicitation to buy or sell any security. HNC, BMO Nesbitt Burns, or their affiliates will buy from or sell to customers the securities of issuers mentioned in this report on a principal basis. HNC and BMO Nesbitt Burns are subsidiaries of Bank of Montreal.

**Company Specific Disclosure**

Harris Nesbitt has provided advice for a fee with respect to this company within the past 12 months: No

Harris Nesbitt has undertaken an underwriting liability with respect to this company within the past 12 months: No

Harris Nesbitt has provided investment banking services with respect to the company within the past 12 months: No

Harris Nesbitt or its affiliates owns 1% or more of any class of common equity securities of the company: No

Harris Nesbitt or its affiliates makes a market in the security: No

Harris Nesbitt or its affiliates managed or co-managed a public offering of securities of the company in the past twelve months: No

Harris Nesbitt or its affiliates received compensation for investment banking services from the company in the past twelve months: No

Harris Nesbitt or its affiliates or its officers own warrants or options: No

Company is a client (or was a client) of Harris Nesbitt or an affiliate within the past 12 months: No

Employee, officer, or director of Harris Nesbitt is a member of the Board of Directors or an advisor or officer of this company: No

A member of the Board of Directors of Bank of Montreal is also a member of the Board of Directors or is an officer of this company: No

Analyst and/or associate who prepared this report is a member of the Board of Directors of this company or an advisor or officer of this company: No

A household member of the research analyst and/or associate who prepared this report is a member of the Board of Directors of this company or an advisor or officer of this company: No

Analyst or associate who prepared this report or member of household of analyst or associate owns shares: Yes

Analyst or associate who prepared this report or member of household of analyst or associate owns warrants/options: No

Harris Nesbitt or its affiliates expects to receive or intends to seek compensation for investment banking services from the company in the next three months: No

Analyst received compensation from the company in the past year: No

Harris Nesbitt or its affiliates received compensation for products or services other than Investment Banking Services from the company in the past 12 months: No

**Harris Nesbitt**                                                                                                              **Pfizer**

**Breakdown of Rating Distribution and Banking Clients**

| (As of June 30, 2004) | Buy | Hold | Sell | Unrated |
|---|---|---|---|---|
| % of total Harris Nesbitt coverage within rating category | 43.2% | 49.8% | 7.0% | 0.0% |
| % of stocks within rating category for which the Firm provided banking services over the past 12 months | 9.8% | 2.8% | 0.0% | 0.0% |

**Harris Nesbitt Rating System**
Our investment ratings compare a stock's expected performance to that of an index of comparable companies over a 9-15 month horizon. Our sector ratings are based on the expected performance of sector with that of a broader market index over the same time period.

**STOCK RATINGS**
**OUTPERFORM** - We believe the stock's total return, including dividends, will exceed the group average by over 15%.
**NEUTRAL** - We believe the stock's total return will generally match the group average.
**UNDERPERFORM** - We believe the stock's total return will fall short of the group average by more than 15%.

**SECTOR RATINGS**
**POSITIVE** - We believe the sector will outperform the S&P 500 Index.
**NEGATIVE** - We believe the sector will underperform the S&P 500 Index.

**Prior Harris Nesbitt Rating System (7/12/00-3/28/03)**
Harris Nesbitt does not make a judgment on the prospects for the broad market indices. Our investment ratings have a time horizon of 12-18 months relative to the market over that time. We compare a stock's expected performance to that of a broader, relevant index, which is typically either the S&P 500 or the Russell 2000.
**Buy** - We believe the stock will outperform the market by at least 20% over the next 12 months and that there are compelling reasons to own it sooner than later.
**Outperform** - We believe the company's business model and prospects are solid, and we expect the stock will outperform the market. However, we see upside of less than 20% relative to the market or are somewhat concerned about near-term performance.
**Neutral** - We don't have a strong opinion about which way the stock price will move, but expect it to rise or fall less than 10% relative to the market. Our analysis suggests a value reasonably close to the current price.
**Underperform** - We believe the stock may be well ahead of itself or we are sufficiently concerned about results that we cannot justify the current valuation. We believe the stock may underperform the market by as much as 20%.
**Sell** - We expect the stock to underperform the market by at least 20% and see no reason to own the stock.

**Other Important Disclosures**
Our analysts use various valuation methodologies including discounted cash flow, price/earnings (P/E), enterprise value/EBITDA, and P/E to growth rate, among others. Risks to our price targets include failure to achieve financial results, product risk, regulatory risk, general market conditions, and the risk of a change in economic conditions. For more specific information, please refer to this report and prior research on this company, which can be found on www.harrisnesbitt.com.

**Dissemination of Research**
Harris Nesbitt Corp. Equity Research is available via our web site http://www.harrisnesbitt.com. Please contact your investment advisor or institutional salesperson for more information. Institutional clients may also receive our research via FIRST CALL Research Direct and Multex.

All of our research is made widely available at the same time to all HNC client groups entitled to our research.

**Additional Matters**
To Canadian Residents:  BMO Nesbitt Burns Inc. and BMO Nesbitt Burns Ltee/Ltd., affiliates of Harris Nesbitt Corp., furnish this report to Canadian residents and accept responsibility for the contents herein subject to the terms set out above. Any Canadian person wishing to effect transactions in any of the securities included in this report should do so through BMO Nesbitt Burns Inc. and/or BMO Nesbitt Burns Ltee/Ltd.

To UK residents: The contents hereof are intended solely for the use of, and may only be issued or passed onto, persons described in part VI of the financial Services and Markets Act 2000 (Financial Promotion) Order 2001.

---

**ADDITIONAL INFORMATION IS AVAILABLE UPON REQUEST**

BMO Financial Group (NYSE, TSX: BMO) is an integrated financial services provider offering a range of retail banking, wealth management, and investment banking products. BMO serves Canadian clients through its Canadian retail arm BMO Bank of Montreal and BMO Nesbitt Burns. In the United States, clients are served through Chicago-based Harris Bank, and Harris Nesbitt, an investment bank.  HNC is a member of SIPC.  BMO Nesbitt Burns is a Member of CIPF.  "Nesbitt Burns" is a registered trademark of BMO Nesbitt Burns Corporation Limited, used under license.  "BMO (M-Bar roundel symbol)" is a registered trademark of Bank of Montreal, used under license.

©COPYRIGHT 2004 HARRIS NESBITT CORP.

A member of BMO  Financial Group

# Morgan Stanley

Quick Comment    Page 1

## Equity Research
North America

United States of America

# Pfizer Inc

Reuters: PFE.N  Bloomberg: PFE  NYSE: PFE

Pharmaceuticals, Major

Jami Rubin
?+1 (1)212 761 4651
Jami.Rubin@morganstanley.com
Nancy Yu
+1 (1)212 761 3865
Nancy.Yu@morganstanley.com
Carlos Garcia-Tunon, CFA
+1 (1)212 761 0532
Carlos.Garcia-Tunon@morganstanley.com

Company Update                      September 1, 2004

## *Lyrica's "Approvable" Letter Not Surprising in Light of History*

| STOCK RATING | OVERWEIGHT |
|---|---|
| Price (September 1, 2004) | $32.35 |
| 52-Week Range | $38.87-29.91 |

*Stock ratings are relative to the analyst's industry for industry team's) coverage universe.*

| INDUSTRY VIEW | ATTRACTIVE |
|---|---|
| EPS 2003 | $1.74 |
| EPS 2004e | $2.07 |

e = Morgan Stanley Research estimates

**Quick Comment:** As reported by the Pink Sheets Daily, FDA has deemed PFE's Lyrica (pregabalin) "approvable" on its 10 month PDUFA deadline. Lyrica was filed with the FDA on 10/30/03 for three separate indications, including neuropathic pain, generalized anxiety disorder, and treatment of epilepsy. Lyrica was approved for marketing in Europe on July 6th for neuropathic pain and epilepsy. An NDA for GAD is pending in Europe for approval. PFE management would not comment on the FDA's action so we are left to speculate on the reasons for the delay.

While this is not the "best case scenario" in which the product would have received a full approval on the ten-month clock, we view it as a more favorable development than if FDA action had been delayed until the 12-month deadline (prolonging the uncertainty) and certainly better than the worst case outcome of a "non-approval letter". Moreover, we do not view the agency's action as particularly surprising in light of the complexity of the filing (i.e. multiple indications and two divisions of FDA reviewing the application) and the development history of the product. Based on these factors, our published models have been assuming a more conservative timetable based on a full 12 month approval at FDA, with just $60 million in U.S. sales this year. Over time, we forecast the product will achieve peak sales of $2.3 billion globally.

In our opinion, Lyrica represents the most important near term new drug launch for PFE given its significant commercial potential coupled with the uncertainties surrounding the timing of generic Neurontin. The filing of Lyrica was delayed by several years because of rodent cardinogenicity findings related to the GAD indication (in addition to the reduced urgency due to the extended patent exclusivity for Neurontin). While Ivax recently announced their plans to launch gabapentin (Neurontin) tablets, they are not generically substitutable, and hence do not represent a serious threat to the franchise, in our opinion. However, we believe an AB rated version could be launched by Alpharma and Teva before the legal issues are resolved later this year or early next, so timing of Lyrica's launch remains critically important to PFE's long term outlook.

While we admittedly have limited detail on the pending issues behind the approvable letter, we have no reason to believe the delay is serious and are assuming that the issues

Morgan Stanley does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of Morgan Stanley in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.morganstanley.com/equityresearch or can call 800-624-2063 to request a copy of this research.

**Please see analyst certification and other important disclosures starting on page 3.**

# Morgan Stanley

can be resolved within the next couple of months. In our view, the most likely explanation involves coordination on labeling issues between the two divisions of the agency and negotiation and how (or if) the hemangiosarcoma issues in animals should be reflected in the label. We continue to assume that the drug will receive approval for all three indications within the next two-to-three months. While risk remains that the reasons are more serious and could lead to a lengthier review, we think the shares offer compelling value at current levels.

**Please see analyst certification and other important disclosures starting on page 3.**

# Morgan Stanley

## Analyst Certification

The following analysts hereby certify that their views about the companies and their securities discussed in this report are accurately expressed and that they have not received and will not receive direct or indirect compensation in exchange for expressing specific recommendations or views in this report: Jami Rubin.

## Important US Regulatory Disclosures on Subject Companies

The information and opinions in this report were prepared by Morgan Stanley & Co. Incorporated and its affiliates (collectively, "Morgan Stanley").

The following analyst, strategist, or research associate (or a household member) owns securities in a company that he or she covers or recommends in this report: Jami Rubin - Pfizer Inc (common stock), Wyeth (common stock); Nancy Yu - Merck & Co. (common stock), Pfizer Inc (common stock), Wyeth (common stock). Morgan Stanley policy prohibits research analysts, strategists and research associates from investing in securities in their sub industry as defined by the Global Industry Classification Standard ("GICS," which was developed by and is the exclusive property of MSCI and S&P). Analysts may nevertheless own such securities to the extent acquired under a prior policy or in a merger, fund distribution or other involuntary acquisition.

As of July 30, 2004, Morgan Stanley beneficially owned 1% or more of a class of common equity securities of the following companies covered in this report: Pfizer Inc, Bristol-Myers Squibb, Schering-Plough and Wyeth.

Within the last 12 months, Morgan Stanley managed or co-managed a public offering of securities of Pfizer Inc, Merck & Co. and Schering-Plough.

Within the last 12 months, Morgan Stanley has received compensation for investment banking services from Pfizer Inc, Bristol-Myers Squibb, Eli Lilly, Merck & Co., Schering-Plough and Wyeth.

In the next 3 months, Morgan Stanley expects to receive or intends to seek compensation for investment banking services from Pfizer Inc, Bristol-Myers Squibb, Eli Lilly, Merck & Co., Schering-Plough and Wyeth.

Within the last 12 months, Morgan Stanley has received compensation for products and services other than investment banking services from Pfizer Inc, Bristol-Myers Squibb, Eli Lilly, Merck & Co. and Wyeth.

Within the last 12 months, Morgan Stanley has either provided or currently is providing investment banking services to the following companies covered in this report Pfizer Inc, Bristol-Myers Squibb, Eli Lilly, Merck & Co., Schering-Plough and Wyeth.

Within the last 12 months, Morgan Stanley has either provided or currently is providing non-investment banking, securities related services to and/or in the past has entered into an agreement to provide services or currently has a client related relationship with the following companies covered in this report Pfizer Inc, Bristol-Myers Squibb, Eli Lilly, Merck & Co. and Wyeth.

The research analysts, strategists, or research associates principally responsible for the preparation of this research report have received compensation based upon various factors, including quality of research, investor client feedback, stock picking, competitive factors, firm revenues and overall investment banking revenues.

Morgan Stanley & Co. Incorporated makes a market in the securities of Schering-Plough.

Morgan Stanley

## Stock Ratings

Different securities firms use a variety of rating terms as well as different rating systems to describe their recommendations. For example, Morgan Stanley uses a relative rating system including terms such as Overweight, Equal-weight or Underweight (see definitions below). A rating system using terms such as buy, hold and sell is not equivalent to our rating system. Investors should carefully read the definitions of all ratings used in each research report. In addition, since the research report contains more complete information concerning the analyst's views, investors should carefully read the entire research report and not infer its contents from the rating alone. In any case, ratings (or research) should not be used or relied upon as investment advice. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations.

### Global Stock Ratings Distribution

*(as of August 31, 2004)*

| Stock Rating Category | Coverage Universe | | Investment Banking Clients (IBC) | | |
|---|---|---|---|---|---|
| | Count | % of Total | Count | % of Total IBC | % of Rating Category |
| Overweight/Buy | 641 | 36% | 268 | 41% | 42% |
| Equal-weight/Hold | 817 | 45% | 297 | 45% | 36% |
| Underweight/Sell | 339 | 19% | 94 | 14% | 28% |
| Total | 1,797 | | 659 | | |

*Data include common stock and ADRs currently assigned ratings. For disclosure purposes (in accordance with NASD and NYSE requirements), we note that Overweight, our most positive stock rating, most closely corresponds to a buy recommendation; Equal-weight and Underweight most closely correspond to neutral and sell recommendations, respectively. However, Overweight, Equal-weight, and Underweight are not the equivalent of buy, neutral, and sell but represent recommended relative weightings (see definitions below). An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations. Investment Banking Clients are companies from whom Morgan Stanley or an affiliate received investment banking compensation in the last 12 months.*

## Analyst Stock Ratings

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

More volatile (V). We estimate that this stock has more than a 25% chance of a price move (up or down) of more than 25% in a month, based on a quantitative assessment of historical data, or in the analyst's view, it is likely to become materially more volatile over the next 1-12 months compared with the past three years. Stocks with less than one year of trading history are automatically rated as more volatile (unless otherwise noted). We note that securities that we do not currently consider "more volatile" can still perform in that manner.

Unless otherwise specified, the time frame for price targets included in this report is 12 to 18 months. Ratings prior to March 18, 2002: SB=Strong Buy; OP=Outperform; N=Neutral; UP=Underperform. For definitions, please go to www.morganstanley.com/companycharts.

## Analyst Industry Views

Attractive (A). The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be attractive vs. the relevant broad market benchmark named on the cover of this report.

In-Line (I). The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be in line with the relevant broad market benchmark named on the cover of this report.

Cautious (C). The analyst views the performance of his or her industry coverage universe over the next 12-18 months with caution vs. the relevant broad market benchmark named on the cover of this report.

*Stock price charts and rating histories for companies discussed in this report are also available at www.morganstanley.com/companycharts. You may also request this information by writing to Morgan Stanley at 1585 Broadway, 14th Floor (Attention: Research Disclosures), New York, NY, 10036 USA.*

# Morgan Stanley

---

**Stock Price, Price Target and Rating History (See Rating Definitions)**

Pfizer Inc (PFE.N) - As of 9/1/04 in USD
Industry : Pharmaceuticals, Major



Volatility (Introduced 3/4/01. Shading indicates "more volatile" (V) rating.)

Stock Rating History: 2/7/00 : OP; 3/18/02 : E/A; 1/5/04 : O/A

Price Target History: 11/30/00 : 52; 3/18/02 : 48; 7/12/02 : 42; 11/12/02 : 38; 3/19/03 : 37; 6/18/03 : 41;
7/31/03 : 40; 10/23/03 : 37; 1/6/04 : 42; 1/23/04 : 44; 7/22/04 : 42

Source: Morgan Stanley Research     Date Format : MM/DD/YY     Price Target —     No Price Target Assigned (NR)
Stock Price (Not Covered by Current Analyst)     Stock Price (Covered by Current Analyst) ▬▬
Stock Ratings abbreviated as below (Effective 3/18/02, ratings appear as Stock Ratings/Industry View) ♦
Stock Ratings as of 3/18/02: Overweight (O) Equal-weight (E) Underweight (U) More Volatile (V) No Rating Available (NAV)
Stock Ratings prior to 3/18/02: Strong Buy (SB) Outperform (OP) Neutral (N) Underperform (UP) No Rating Available (NAV)
Industry View: Attractive (A)   In-line (I)   Cautious (C)   No Rating (NR)

# Morgan Stanley

## Other Important Disclosures

This research report has been published in accordance with our conflict management policy, which is available at www.morganstanley.com/institutional/research/conflictpolicies.

For a discussion, if applicable, of the valuation methods used to determine the price targets included in this summary and the risks related to achieving these targets, please refer to the latest relevant published research on these stocks. Research is available through your sales representative or on Client Link at www.morganstanley.com and other electronic systems.

This report does not provide individually tailored investment advice. It has been prepared without regard to the individual financial circumstances and objectives of persons who receive it. The securities discussed in this report may not be suitable for all investors. Morgan Stanley recommends that investors independently evaluate particular investments and strategies, and encourages investors to seek the advice of a financial adviser. The appropriateness of a particular investment or strategy will depend on an investor's individual circumstances and objectives.

This report is not an offer to buy or sell any security or to participate in any trading strategy. In addition to any holdings disclosed in the section entitled "Important US Regulatory Disclosures on Subject Companies", Morgan Stanley and/or its employees not involved in the preparation of this report may have investments in securities or derivatives of securities of companies mentioned in this report, and may trade them in ways different from those discussed in this report. Derivatives may be issued by Morgan Stanley or associated persons.

Morgan Stanley & Co. Incorporated and its affiliate companies do business that relates to companies covered in its research reports, including market making and specialized trading, risk arbitrage and other proprietary trading, fund management, investment services and investment banking. Morgan Stanley sells to and buys from customers the equity securities of companies covered in its research reports on a principal basis.

Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We have no obligation to tell you when opinions or information in this report change apart from when we intend to discontinue research coverage of a subject company.

With the exception of information regarding Morgan Stanley, reports prepared by Morgan Stanley research personnel are based on public information. Facts and views presented in this report have not been reviewed by, and may not reflect information known to, professionals in other Morgan Stanley business areas, including investment banking personnel.

Morgan Stanley research personnel conduct site visits from time to time but are prohibited from accepting payment or reimbursement by the company of travel expenses for such visits.

The value of and income from your investments may vary because of changes in interest rates or foreign exchange rates, securities prices or market indexes, operational or financial conditions of companies or other factors. There may be time limitations on the exercise of options or other rights in your securities transactions. Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized.

This publication is disseminated in Japan by Morgan Stanley Japan Limited; in Hong Kong by Morgan Stanley Dean Witter Asia Limited; in Singapore by Morgan Stanley Dean Witter Asia (Singapore) Pte., regulated by the Monetary Authority of Singapore, which accepts responsibility for its contents; in Australia by Morgan Stanley Dean Witter Australia Limited A.B.N. 67 003 734 576, holder of Australian financial services licence No. 233742, which accepts responsibility for its contents; in Canada by Morgan Stanley Canada Limited, which has approved of, and has agreed to take responsibility for, the contents of this publication in Canada; in Spain by Morgan Stanley, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that this document has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations; in the United States by Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc., which accept responsibility for its contents; and in the United Kingdom, this publication is approved by Morgan Stanley & Co. International Limited, solely for the purposes of section 21 of the Financial Services and Markets Act 2000 and is distributed in the European Union by Morgan Stanley & Co. International Limited, except as provided above. Private U.K. investors should obtain the advice of their Morgan Stanley & Co. International Limited representative about the investments concerned. In Australia, this report, and any access to it, is intended only for "wholesale clients" within the meaning of the Australian Corporations Act.

The trademarks and service marks contained herein are the property of their respective owners. Third-party data providers make no warranties or representations of any kind relating to the accuracy, completeness, or timeliness of the data they provide and shall not have liability for any damages of any kind relating to such data. The Global Industry Classification Standard ("GICS") was developed by and is the exclusive property of MSCI and S&P.

This report or any portion hereof may not be reprinted, sold or redistributed without the written consent of Morgan Stanley.

*Pfizer Inc – September 1, 2004*

# Morgan Stanley

Morgan Stanley research is disseminated and available primarily electronically, and, in some cases, in printed form.

**Additional information on recommended securities is available on request.**

# Morgan Stanley

| The Americas | Europe | Japan | Asia/Pacific |
|---|---|---|---|
| 1585 Broadway<br>New York, NY 10036-8293<br>United States<br>Tel: +1 (1)212 761 4000 | 25 Cabot Square, Canary Wharf<br>London E14 4QA<br>United Kingdom<br>Tel: +44 (0)20 7425 8000 | 20-3, Ebisu 4-chome<br>Shibuya-ku,<br>Tokyo 150-6008, Japan<br>Tel: +81 (0)3 5424 5000 | Three Exchange Square<br>Central<br>Hong Kong<br>Tel: +852 2848 5200 |

## INDUSTRY COVERAGE: PHARMACEUTICALS, MAJOR

| Company | Ticker | Rating as of | Price at 09/01/04 |
|---|---|---|---|
| Bristol-Myers Squibb | BMY.N | U | 05/23/02 | $23.64 |
| Eli Lilly | LLY.N | E | 05/01/02 | $64.11 |
| Merck & Co. | MRK.N | E | 11/21/03 | $44.54 |
| Pfizer Inc | PFE.N | O | 01/05/04 | $32.35 |
| Schering-Plough | SGP.N | O | 06/24/04 | $18.36 |

| Company | Ticker | Rating as of | Price at 09/01/04 |
|---|---|---|---|
| Wyeth | WYE.N | O | 03/18/02 | $37.37 |

*Stock ratings are subject to change. Please see latest research for each company.*

© 2004 Morgan Stanley

EXHIBIT G

WSJ.com - Ivax Takes Risk With the Launch Of Pfizer Copycat                    Page 1 of 2

 

THE WALL STREET JOURNAL.
O N L I N E

FORMAT FOR
PRINTING
sponsored by

**August 19, 2004**

**HEALTH**

# Ivax Takes Risk
# With the Launch
# Of Pfizer Copycat

By LEILA ABBOUD
Staff Reporter of THE WALL STREET JOURNAL
*August 19, 2004; Page D5*

**DOW JONES REPRINTS**

(R) This copy is for your personal,
non-commercial use only. To order
presentation-ready copies for
distribution to your colleagues,
clients or customers, use the Order
Reprints tool at the bottom of any
article or visit:
www.djreprints.com.

• See a sample reprint in PDF
format.
• Order a reprint of this article now.

Generic drug maker Ivax Corp. launched its copycat version of **Pfizer**
Inc.'s blockbuster drug Neurontin before the courts have settled a lengthy
patent fight over it.

Neurontin is an anticonvulsant that is widely prescribed for unapproved uses, including a range of
psychiatric and pain conditions. It had $2.2 billion in U.S. sales last year.

Miami-based Ivax is taking a risk by launching the drug, generically known as gabapentin, earlier than
expected. If the courts side with Pfizer in the patent case, Ivax could have to pay damages. However, Ivax
said that it was carrying out only a "limited" launch to a small number of buyers. The company declined
to provide specifics, but likely buyers would be pharmacy-benefit managers and managed-care
organizations, which save money by switching patients to generics.

One key thing will limit Ivax's sales: pharmacists won't be able to directly substitute Ivax's gabapentin for
Neurontin because it is in a different dosage form than the original. Ivax plans to market tablets, while
Pfizer's drug is made in capsules.

That difference may have been one of the reasons that Ivax decided to launch early. Its generic wouldn't
fare well against the direct-substitute copies that are on the way. But if Ivax's drug is the first one the
scene, it could capture a good chunk of the market. Par Pharmaceuticals had a similar strategy on Prozac,
and took 20% of the market, said Elliot Wilbur, analyst with CIBC World Markets.

The impact on Pfizer, while significant, won't be debilitating. The dosage strengths that Ivax is producing
account for about 60% of total Neurontin sales, and analysts expect that the biggest share Ivax could hope
to grab is 20%.

A spokesman for Pfizer said the New York-based company plans to challenge Ivax's launch in the courts.
A hearing is set for today in a U.S. District Court in New Jersey to consider Pfizer's request for a
temporary restraining order against Ivax to prevent the launch, the spokesman said.

Another factor that may have pushed Ivax to market early is that Pfizer's successor to Neurontin, called
Lyrica, is expected to launch in the coming months. Pfizer would then begin a marketing push to switch
patients to the newer drug. Ivax would want to grab customers before they have a chance to opt for
Lyrica.

Ivax declined to provide any information on how its version of gabapentin would be priced. Typically the first generic to market discounts 20% to 30% off the branded price, and then the price falls sharply as more generics enter. This case is different, though, because the generic differs in form from the original, so Ivax may have to discount further to attract big buyers.

Consumers without prescription-drug coverage who are willing to try the tablet form would see some costs savings. Managed-care organizations and pharmacy-benefit managers are also likely to urge consumers and their doctors to switch, but that lowers costs only for employers and health insurers.

The patent litigation over Neurontin involves eight generic companies, including Ivax, and has been bogged down in court for years. Both sides filed motions to the judge to rule in their favor without a trial nearly two years ago, but the New Jersey judge has yet to rule. The slow pace of the patent litigation has meant that Pfizer hasn't yet had to face the onslaught of generics.

Shares of Ivax advanced 27 cents to $23.89 in 4 p.m. American Stock Exchange trading; Pfizer rose 47 cents to $31.85 in 4 p.m. New York Stock Exchange composite trading.

**Write to** Leila Abboud at leila.abboud@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/0,,SB109284617399794809,00.html

**Hyperlinks in this Article:**
(1) mailto:leila.abboud@wsj.com

Copyright 2004 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.





PRINT THIS

Powered by Clickability

# Pfizer poised to fight off generics with new drug

By Julie Schmit, USA TODAY

Neurontin may soon face competition for the first time in the USA from lower-cost generics, which would likely hurt the drug's sales. But Pfizer is readying a counterattack.

Last year, Pfizer asked the Food and Drug Administration to approve the drug Lyrica, also known as pregabalin, to treat the same conditions the FDA has already approved Neurontin for — epilepsy and nerve pain related to shingles — plus nerve pain related to diabetes and for anxiety. **(Related story: Drugmaker admitted fraud, but sales flourish)**

Lyrica, more potent than Neurontin, requires smaller doses, so patients experience less fatigue.

Wall Street anticipates a "switch strategy," in which patients move off Neurontin to Lyrica, said Lehman Bros. in a May report. Market researcher Datamonitor dubs Lyrica another "blockbuster" for Pfizer.

New drugs are generally protected from generic competition for 20 years so drugmakers recoup investments and encourage new drug development.

In the government's Neurontin case, it alleged that one reason Warner-Lambert didn't try to get the FDA to approve use of Neurontin for more conditions sooner was to protect Lyrica. Warner-Lambert was bought by Pfizer in 2000.

Once Neurontin's patent expires, the date of which is being hashed out in court, generics will be allowed for Neurontin's FDA-approved uses. If Neurontin had received FDA approval for more ailments, generics could battle those, too.

If Lyrica wins FDA approval, it will likewise enjoy protection from generic competition. Lyrica recently received approval from the European Union for treatment of epilepsy and nerve pain.

Prosecutors say the company has every right to time Lyrica's launch to counter generic versions of Neurontin. Where Warner-Lambert went wrong was in promoting Neurontin for conditions that the FDA had not approved it to treat, they say.

**Find this article at:**
http://www.usatoday.com/money/industries/health/drugs/2004-08-17-neurontin-side_x.htm

☐ Check the box to include the list of links referenced in the article.